UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

JERAMIAH BROWN,

                              Plaintiff,

                                                      5:22-cv-762
v.                                                    (BKS/TWD)

UNITED PARCEL SERVICE, INC., et al.,

                              Defendants.
——————————————————————————

APPEARANCES:

JERAMIAH BROWN
Plaintiff, *pro se*
22106 Lane Road
Watertown, New York
13601

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Jeramiah Brown ("Plaintiff") initiated this action *pro se* on July 20, 2022, asserting

claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against

United Parcel Service, Inc. ("UPS"). (Dkt. No. 1.) Conducting an initial review pursuant to 28

U.S.C. § 1915(e)(2)(B), the undersigned recommended that the Court dismiss the Complaint in

its entirety for failure to state a claim. (*See* Dkt. No. 6; *Brown v. United Parcel Serv., Inc.*, No.

5:22-CV-762 (BKS) (TWD), 2022 WL 3017366 (N.D.N.Y. July 29, 2022), *report and*

*recommendation adopted*, 2022 WL 4077775 (N.D.N.Y. Sept. 6, 2022) (hereinafter, Dkt. No.

6).) The Court adopted the undersigned's recommendation and dismissed Plaintiff's Complaint

with leave to amend. (*See* Dkt. No. 8; *Brown v. United Parcel Serv. Incorp.*, No. 5:22-CV-762

(BKS) (TWD), 2022 WL 4077775, at *1 (N.D.N.Y. Sept. 6, 2022) (hereinafter, Dkt. No. 8).)

On or about September 20, 2022, Plaintiff filed his First Amended Complaint ("FAC"), naming UPS, D. Scott Davis, Ashley Janisch, and Robert Milne as defendants (collectively, "Defendants"). (Dkt. No. 9.) Through the FAC, Plaintiff repeats many of the factual allegations contained within his initial Complaint. *Compare id.* at 6-14, *with* Dkt. No. 1; *see generally* Dkt. No. 6. Based on those allegations, Plaintiff appears to advance three causes of action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*: (1) hostile work environment, (2) discriminatory discharge, and (3) retaliation. (*See* Dkt. No. 9 at 12-14.) Plaintiff's FAC also contains a motion to seal portions of the record, an objection to the undersigned's Order and Report-Recommendation, and a motion to convene a panel of three judges. *See id.* at 15-17.

For the reasons discussed below, Plaintiff's motion to seal is denied, and the undersigned recommends that the Court overrule Plaintiff's objection as untimely and moot, deny Plaintiff's request for a panel of three judges, dismiss Plaintiff's FAC in its entirety with one final opportunity to amend, and consider imposing a bar Order under 28 U.S.C. § 1651(a). (Dkt. No. 9.)

## I.    PLAINTIFF'S MOTION TO SEAL

Plaintiff's FAC includes a section titled "Request to Seal Case" wherein he "requests the Case to be sealed due to Local Rule 5.2 Personal Privacy protection." *Id.* at 16. In particular, Plaintiff expresses concern over disclosure of his home address, his UPS Employee ID, and his financial history. *See id.* According to Plaintiff, several individuals—including UPS employees—have harassed him and damaged property at his home address. *See id.* at 16-17. Plaintiff accordingly requests the Court to seal the record in this case. *See id.*

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).[1] This right arises from "the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (hereinafter, *Amodeo II*); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139-40 (2d Cir. 2016). "In light of the presumption in favor of public access, the Second Circuit has established a three-part test for determining whether documents may be placed under seal." *City of Providence v. BATS Glob. Markets, Inc.*, No. 14-CV-2811 (JMF), 2022 WL 539438, at *1 (S.D.N.Y. Feb. 23, 2022).

"First, a court must . . . conclude that the documents at issue are indeed judicial documents . . . and that therefore a common law presumption of access attaches." *Id.* (quoting *Lugosch*, 435 F.3d at 119). "Second, the court must determine the weight of that presumption, which is governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (quoting *Lugosch*, 435 F.3d at 119). "Finally, . . . the court must balance competing considerations against the presumption of access, including the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* (quoting *Lugosch*, 435 F.3d at 120). The party seeking to maintain information filed under seal bears "the burden . . . to demonstrate that the interests favoring non-access outweigh those favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995) ("*Amodeo I*"); *see also* N.D.N.Y. L.R. 5.3(a)

---

[1] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

("A party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard.").

Under Local Rule 5.2(a), parties' filings should not include—or should redact—personal identifiers like home addresses.  *See* N.D.N.Y. L.R. 5.2(a); *see, e.g.*, *Richards v. Cordis Corp.*, No. 5:17-CV-178 (BKS) (ATB), 2022 WL 602563, at *4 (N.D.N.Y. Mar. 1, 2022) (directing the plaintiff to "redact personal identifiers from . . . filings in accordance with Local Rule 5.2(a)."). The rule further warns parties to exercise caution when filing documents that contain personal information, like "individual financial information."  *See* N.D.N.Y. L.R. 5.2(a).  If a party wishes to file a document that contains personal information, he may either: (1) "file an unredacted version of the document under seal in compliance with Local Rule 5.3," or (2) "file a reference list under seal."  *See* N.D.N.Y. L.R. 5.2(b).

Here, Plaintiff failed to comply with this Court's Local Rules for requesting the sealing of this case (or the redaction of certain documents), and he failed to demonstrate compelling reasons that require sealing the case.  First, Plaintiff's FAC includes the very information he wishes shielded from public view.  (*See generally* Dkt. No. 9.)  He did not file an unredacted version of the FAC or a reference list under seal.  *See generally* N.D.N.Y. L.R. 5.2(a)-(b). Plaintiff accordingly failed to follow this Court's rules for requesting the redaction of certain documents or for sealing the case.  *See id.*; *see generally Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (explaining "*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law").

Second, Plaintiff has not carried his burden of demonstrating that his interest in protecting certain personal information outweighs the interests favoring public access to judicial

documents. *See Amodeo I*, 44 F.3d 141, 148; *see also* N.D.N.Y. L.R. 5.3(a). Plaintiff's FAC is a judicial document subject to the presumption of public access. *See Bernstein*, 814 F.3d at 139-40 (concluding a complaint is a judicial document subject to the presumption of public access); *Brown v. Hortons*, No. 5:19-CV-1160 (LEK) (ATB), 2019 WL 4621936, at *2 (N.D.N.Y. Sept. 24, 2019) (same). The submission at issue here, Plaintiff's FAC, gives this presumption additional weight because, as explained by the Second Circuit, "[a] complaint initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision." *Bernstein*, 814 F.3d at 140; *see also id.* (explaining "the fact of filing a complaint, whatever its veracity, is a significant matter of record," and "the inspection of pleadings allows the public to discern the prevalence of certain types of cases, the nature of the parties to particular kinds of actions, . . . and the types of materials that are likely to be sealed."). This weighty presumption is the not overcome by Plaintiff's concern for the disclosure of information that he already placed in the public sphere through filings in four separate civil actions he initiated in this Court. *See generally infra* Section V; *accord Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again."); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-L01570 (GBD) (SN), 2020 WL 8611148, at *2 (S.D.N.Y. Oct. 2, 2020) (same).

Plaintiff appears to seek a sealing order because UPS employees have allegedly harassed him and damaged property at his home residence. (*See* Dkt. No. 9 at 16-17.) Although the undersigned is sympathetic to Plaintiff's allegations of harassment and property damage, the undersigned is unpersuaded that sealing this case or redacting certain documents would shield Plaintiff from further harassment or property damage. According to Plaintiff, Defendants have

known his identity and home address since October of 2021, well before the Complaint and the FAC were filed in this case.  (*See* Dkt. Nos 1, 9.)  "The genie is out of the bottle," and the undersigned does "not [have] the means to put the genie back."  *Gambale*, 377 F.3d at 144.

In sum, Plaintiff failed to comply with the Local Rules for requesting the sealing of the case or the redaction of certain documents.  *See generally* N.D.N.Y. L.R. 5.2, 5.3.  Because of this, and because Plaintiff has submitted various filings in the four other civil actions he initiated in this Court, Plaintiff has already placed into public view the information he seeks to shield.  *See generally infra* V; *Gambale*, 377 F.3d at 144.  Plaintiff has failed to carry his burden of demonstrating his interest in protecting certain personal information outweighs the interests favoring public access to judicial documents.  *See Amodeo I*, 44 F.3d 141, 148; *see also* N.D.N.Y. L.R. 5.3(a).  Plaintiff's motion to seal is accordingly DENIED.  (Dkt. No. 9 at 16-17.)

## II.    PLAINTIFF'S OBJECTION

Plaintiff's FAC includes a section titled "Objection of Case Being Dismissed."  *See id.* at 15-16.  Construing this objection liberally, the undersigned interprets it as a second objection to the Order and Report-Recommendation ("Order-RR") filed on July 29, 2022, wherein the undersigned recommended that the Court dismiss Plaintiff's Complaint in its entirety with leave to amend.  *See generally* Dkt. No. 6 at 4-10.  That Order-RR was served on Plaintiff via regular mail on July 29, 2022, and Plaintiff filed his first objection on August 10, 2022.  (*See* Dkt. Nos. 6-7.)  On September 6, 2022, the Court overruled Plaintiff's Objection and adopted the Order-RR in its entirety.  *See* Dkt. No. 8 at 4-6.  Plaintiff subsequently filed the FAC, which replaced the Complaint.  (*See* Dkt. No. 9.)  The undersigned accordingly recommends that the Court overrule Plaintiff's second objection to the Order-RR as untimely and moot.  *See* 28 U.S.C. § 636(b)(1)(C); *see also* Dkt. No. 9.

### III.    THREE JUDGE PANEL

Plaintiff moves to convene a panel of three judges to decide the issues in this case.  (Dkt. No. 9 at 16.)  Under 28 U.S.C. § 2284(a), "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."  28 U.S.C. § 2284(a).  None of these conditions are present here. *See generally* Wright & Miller, 17A Fed. Prac. & Proc. § 4235 (3d ed. 2022) (explaining "[t]he continued provision of a three-judge court 'when otherwise required by Act of Congress' has reference principally to certain provisions of the Civil Rights Act of 1964 and the Voting Rights Act of 1965, as amended, that require or permit a three-judge court, although there are a few other rare instances in which an Act of Congress requires a three-judge court.").  The undersigned accordingly recommends that the Court deny Plaintiff's motion to convene a panel of three judges.  *See, e.g.*, *Zheng v. Gen. Elec. Co.*, No. 1:17-CV-671 (TJM) (CFH), 2018 WL 11417797, at *4 (N.D.N.Y. Mar. 22, 2018).

### IV.    SUFFICIENCY OF THE FIRST AMENDED COMPLAINT

#### A.    Summary of the First Amended Complaint[2]

Through his FAC, Plaintiff repeats many of the factual allegations contained in his initial Complaint.  (*Compare* Dkt. No. 9 at 6-14, *with* Dkt. No. 6 at 2.)  Based on the same series of events set forth in Plaintiff's original Complaint, Plaintiff appears to advance three claims

---

[2] The following recitation of facts is drawn from the FAC, which the Court accepts as true for purposes of initial review.  *See, e.g.*, *LaTouche v. Rockland County*, No. 22-CV-1437 (LTS), 2022 WL 953111, at *1 (S.D.N.Y. Mar. 29, 2022); *Walker v. City of New York*, No. 20-CV-5240 (PKC) (LB), 2021 WL 1838277, at *1 n.1 (E.D.N.Y. May 7, 2021).

against Defendants under Title VII of the Civil Rights Act: (1) hostile work environment, (2) discriminatory discharge, and (3) retaliation. (*See* Dkt. No. 9 at 12-14.)

Through his first cause of action, Plaintiff claims UPS employees Ashley Janisch, McKenzie, and Robert Milne treated him unfairly on November 3, 2021. *See id.* These individuals "publicly humiliated, degraded, and discriminated [against Plaintiff]," by: (i) degrading his "[a]ppearance, [h]eight, [w]eight, and position of employment;" (ii) comparing his "appearance to McKenzie's appearance;" (iii) harassing him based on his "[s]ex and [s]exual [o]rientation;" (iv) sharing "private information about another (UPS) delivery [d]river living on the same dead-end road as [Plaintiff]," (v) "telling [Plaintiff] that the (UPS) [d]river who lives on the same dead-end road as [Plaintiff] has been trying to get his son a job at (UPS) but has been unsuccessful;" (vi) telling him he "should not have been hired;" and (vii) subjecting him to a road test that "[n]o other personal seasonal delivery driver was . . . subjected to." *See id.* Plaintiff claims this created a hostile workplace environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2. *See id.*

Through his second cause of action, Plaintiff claims UPS employee Robert Milne discriminated against him by subjecting him to a driving test that no other applicant was required to take. *See id.* at 13. UPS employee Cole Worden administered the driving test at the direction of Robert Milne. *See id.* Following the road test, Cole Worden told Plaintiff that UPS would not be hiring him. *See id.* Cole Worden subsequently "promised [Plaintiff] . . . a position of employment inside the (UPS) facility," but that never came to fruition. *See id.* Plaintiff "reported the [d]iscrimination and adverse act of employment to UPS Corporate Human Resources hotline at 1-800-220-4126," but they "failed to resolve [the] [a]dverse action and employment and hardship done by McKenzie, Robert Milne and Ashley Janisch." *Id.* Plaintiff

claims this constituted discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.  *See id.*

Through his third cause of action, Plaintiff claims UPS employees Robert Milne and McKenzie retaliated against him.  *See id.*  Plaintiff "reported the [d]iscrimination and adverse effect of employment from Robert Milne to the New York State Division of Human Rights on 01/12/2022."  *Id.*  "During the NYSDHR [i]nvestigation McKenzie lied to NYSDHR [i]nvestigators retaliating against [Plaintiff]."  Plaintiff claims this constituted retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3.  *See id.*

### B.   Standard of Review

This Court must conduct an initial review of complaints filed *in forma pauperis*.  28 U.S.C. § 1915(e)(2)(B).  When conducting this review, "the court shall dismiss the case at any time if the court determines . . . the action . . . fails to state a claim on which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at *1 (2d Cir. Sept. 30, 2021).  The Court must accordingly construe *pro se* pleadings with the utmost leniency.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  This short and plain statement of the claim must be "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The statement of the

claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

## C.    Sufficiency of the First Amended Complaint

Plaintiff's FAC should be dismissed because it fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff has failed to adequately plead his claims for hostile work environment, discriminatory discharge, and retaliation. The undersigned accordingly recommends that the Court dismiss Plaintiff's FAC in its entirety with leave to amend. *See id.*

### i.    Hostile Work Environment

First, Plaintiff has failed to adequately state a claim for hostile work environment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a). *See* 28 U.S.C. § 1915(e)(2)(B)(ii). Title VII of the Civil Rights Act makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (concluding

"discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.").

To state a *prima facie* case of discrimination under Title VII, a plaintiff must allege "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse,* 673 F.3d 141, 150 (2d Cir. 2012). "Specifically, Plaintiff must show either that he suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or . . . demonstrate that harassment on one or more of these bases amounted to a hostile work environment." *Morren v. New York Univ.*, No. 20-CV-10802 (JPO) (OTW), 2022 WL 1666918, at *14 (S.D.N.Y. Apr. 29, 2022), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022) (quoting *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004)).

"While a *prima facie* case of employment discrimination requires application of the well-known burden-shifting approach set forth in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792 (1973), surviving a motion to dismiss requires only that the plaintiff give fair notice of the basis of his claims and the claims themselves must be facially plausible." *Oliver v. City of New York*, No. 19-CV-11219 (PGG) (JLC), 2022 WL 455851, at *19 (S.D.N.Y. Feb. 15, 2022); *see generally Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511-12 (2002). So, "[t]o state a hostile work environment claim, a plaintiff must plead facts tending to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's

sex, or another protected characteristic." *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012); *see also Feingold,* 366 F.3d at 149-50.

Here, Plaintiff failed to plausibly allege Defendants' conduct was motivated by a protected characteristic. (*See generally* Dkt. No. 9.) In support of his first cause of action, Plaintiff recites the elements of a hostile work environment claim, but those conclusory statements do not plausibly state a cause of action. *See Iqbal*, 556 U.S. at 678. For example, Plaintiff claims UPS employees Ashley Janisch, McKenzie, and Robert Milne treated him unfairly on November 3, 2021, because of his "[s]ex and [s]exual [o]rientation." *See id.* at 12; *see generally Bostock*, 140 S. Ct. at 1747. Yet, Plaintiff advanced no specific factual allegations indicating what Defendants did or said to suggest the alleged harassment on November 3, 2021, was motivated by his sex or sexual orientation. (*See generally* Dkt. No. 9 at 6-14.) Absent some non-conclusory factual allegations linking Defendants' actions to Plaintiff's sex or sexual orientation, the FAC fails to state a claim for hostile work environment discrimination. *See, e.g.*, *Merisier v. Kings Cnty. Hosp.*, No. 16-CV-7088 (RRM) (RML), 2017 WL 4857565, at *2 (E.D.N.Y. Oct. 25, 2017) ("As Merisier has not adequately alleged that she was discriminated against on the basis of her membership in a protected class, the complaint, as filed, fails to state a claim for relief and must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)."); *Fox v. Albany Med. Ctr.*, No. 1:17-CV-0798 (TJM) (DEP), 2017 WL 4417751, at *3 (N.D.N.Y. Sept. 11, 2017), *report and recommendation adopted*, 2017 WL 4417679 (N.D.N.Y. Oct. 3, 2017) (recommending the dismissal of plaintiff's hostile work environment claim because "there [wa]s

nothing in her complaint to link the harassment she experienced with any protected classification").[3]

### ii.    *Discriminatory Discharge*

Second, Plaintiff has failed to adequately state a claim for discriminatory discharge under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a).  *See* 28 U.S.C. § 1915(e)(2)(B)(ii). Title VII of the Civil Rights act prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To make out a prima facie case of discrimination under Title VII, Plaintiff must allege "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown,* 673 F.3d at 150. While Plaintiff is not required to make out a prima facie case of discrimination at the pleading stage, he must allege facts that "give plausible support to a minimal inference of discriminatory motivation."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see generally Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (concluding plaintiff failed to state a claim where she "failed to plead any facts that would create an inference that any adverse action taken by any defendant was based upon her gender.").

---

[3] "In addition, it is long established that individuals are not subject to liability under Title VII." *Chisholm v. Stryker*, No. 22-CV-2705(JMA) (SIL), 2022 WL 3647288, at *4 n.2 (E.D.N.Y. Aug. 24, 2022); *see generally* 42 U.S.C. § 2000e-2(a) (prohibiting employers from discriminating). Plaintiff's claims against D. Scott Davis, Ashley Janisch, and Robert Milne should accordingly be dismissed on the grounds that they are implausible and frivolous.  *See* 28 U.S.C. §§ 1915(e)(2)(B)(i)-(ii).

As explained above, Plaintiff has failed to allege facts that give rise to a reasonable inference Defendants' conduct was motivated by animus towards a protected characteristic. (*See generally* Dkt. No. 9 at 6-14.) Rather, Plaintiff's entire FAC contains the following conclusory allegations about protected characteristics: (i) "United Parcel Service (UPS) discriminated [against Plaintiff] based upon [s]ex and [n]ational [o]rigin;" (ii) Defendants harassed him based "on his [s]ex and [s]exual [o]rientation;" and (iii) "Robert Milne discriminated [against him] based on [s]ex, [s]exual orientation, . . . [and] [n]ational [o]rigin." *See id.* at 6, 12-13. These conclusory statements do not plausibly state a cause of action for discriminatory discharge. *See Iqbal*, 556 U.S. at 678. Absent some non-conclusory factual allegations linking Defendants' actions to one of Plaintiff's protected characteristics, the FAC fails to state a claim for discriminatory discharge. *See, e.g.*, *Weekes v. JetBlue Airways Corp.*, No. 21-CV-1965 (MKB), 2022 WL 4291371, at *9 (E.D.N.Y. Sept. 16, 2022) (dismissing plaintiff's Title VII discrimination claim as inadequately pled because he did not "allege any facts that would permit the Court to infer causation between Plaintiff's membership in any protected class and the adverse employment actions he faced."); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 554 (W.D.N.Y. 2016) (same); *see generally Chisholm v. Stryker*, No. 22-CV-2705(JMA) (SIL), 2022 WL 3647288, at *3–4 (E.D.N.Y. Aug. 24, 2022) ("Courts in this Circuit have routinely dismissed discrimination claims where the plaintiff's allegations, like here, fail to suggest discriminatory intent.") (collecting cases).

### iii.    Retaliation

Finally, Plaintiff has failed to adequately state a claim for retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a). *See* 28 U.S.C. § 1915(e)(2)(B)(ii). "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job

applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). "To establish a prima facie case of retaliation, the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x 88, 93 (2d Cir. 2014); *see also Gonzalez v. NYU Langone Hosps.*, No. 21-2569, 2022 WL 4372199, at *1 (2d Cir. Sept. 22, 2022). However, "[a]t the pleading stage, the allegations in the complaint need only give plausible support to the[se] . . . prima facie requirements." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018); *see also Belyea v. City of Glen Cove*, No. 20-CV-5675 (MKB), 2022 WL 3586559, at *12 (E.D.N.Y. Aug. 22, 2022). So, to adequately state a claim for Title VII retaliation at the pleading stage, a plaintiff must plausibly allege: "(1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Duplan*, 888 F.3d at 625; *see also Belyea*, 2022 WL 3586559, at *13.

Here, Plaintiff failed to adequately allege Defendants took an adverse employment action against him *because* he opposed an employment practice made unlawful by Title VII. (*See* Dkt. No. 9 at 13-14.) In relevant part, Plaintiff claims that after he suffered an "adverse effect of employment from Robert Milne," he complained about it to the New York State Division on Human Rights ("NYSDHR"). *See id.* at 13. To make out a plausible retaliation claim, Plaintiff must allege "that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001). Yet by Plaintiff's

account, and as asserted in the section titled "Third Cause of Action," the adverse employment

action (e.g., firing or failing to hire him) *preceded* the protected activity (e.g., complaining to

NYSDHR). (*See* Dkt. No. 9 at 13-14.) This sequence of events—where the adverse

employment action precedes the protected activity—does not establish causation for a Title VII

retaliation claim. *See Raniola v. Bratton*, 243 F.3d at 624. Plaintiff has accordingly failed to

adequately allege Defendants took an adverse employment action against him *because* he

opposed an employment practice made unlawful by Title VII. *See, e.g.*, *Holmes v. Astor Servs.*

*for Child. & Fams.*, No. 16-CV-2260 (CS), 2017 WL 3535296, at *7 (S.D.N.Y. Aug. 16, 2017)

("Because these allegedly retaliatory events all occurred before Plaintiff engaged in any

protected activity, no causal connection can be established between them and her complaint of

discrimination."); *Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, 207-208 (S.D.N.Y.

2011) ("Because Ballard has not provided sufficient evidence to demonstrate that the alleged

protected activity preceded the adverse employment action, Ballard fails to establish the causal

connection required to support her retaliation claim."); *Hartley v. Rubio*, 785 F. Supp. 2d 165,

183 (S.D.N.Y. 2011) (concluding "no causal connection exists between . . . the November 2004

complaint . . . and the adverse employment action" because it "pre-dated Hartley's

reassignment"); *St. Louis v. New York City Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 236

(E.D.N.Y. 2010) ("Plaintiff's January 7, 2003 NYSDHR complaint cannot be a basis for her

claim of retaliation because it did not precede her adverse employment action.").

In sum, Plaintiff failed to adequately plead each of his Title VII claims. *See* 28 U.S.C.

§ 1915(e)(2)(B)(ii). His FAC fails to state a Title VII hostile work environment claim because it

lacks factual allegations linking Defendants' actions to Plaintiff's sex or sexual orientation. *See,*

*e.g.*, *Merisier*, 2017 WL 4857565, at *2; *Fox*, 2017 WL 4417751, at *3. His FAC fails to state a

Title VII discriminatory discharge claim for the same reason. *See, e.g.*, *Weekes*, 2022 WL 4291371, at *9; *Boza-Meade*, 170 F. Supp. 3d at 554. Finally, his FAC fails to state a Title VII retaliation claim because it lacks a plausible theory of causation. *See, e.g.*, *Holmes*, 2017 WL 3535296, at *7; *Ballard*, 781 F. Supp. 2d at 207-208. The undersigned accordingly recommends that the Court dismiss Plaintiff's FAC in its entirety for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## V.     PLAINTIFF'S FILING HISTORY

This is the fifth action Plaintiff has filed with this Court in recent years. *See Brown v. Fat Dough Incorp.*, Case No. 5:22-cv-761-BKS-ML, Dkt. No. 1 (asserting claims under the ADA) (N.D.N.Y. 2022); *Brown v. 7-Elven Incorp.*, No. 5:20-CV-1339 (TJM) (ML), 2021 WL 964207, at *2 (N.D.N.Y. Mar. 15, 2021) (overruling Plaintiff's objections to the report-recommendation, adopting the report-recommendation, and dismissing claims Plaintiff asserted under the ADA and New York state law); *Brown v. 7-Eleven Incorp*, No. 5:20-CV-553 (TJM) (ML), 2020 WL 4039450, at *1 (N.D.N.Y. July 17, 2020) (adopting the report and recommendation and dismissing claims Plaintiff asserted under the ADA); *Brown v. Hortons*, No. 5:19-CV-1160 (LEK) (ATB), 2019 WL 4621936, at *2 (N.D.N.Y. Sept. 24, 2019) (granting Plaintiff's motion to proceed in forma pauperis, denying his motion to seal, denying his motion for the appointment of counsel, and ordering that defendant file a formal response to claims Plaintiff asserted under the ADA); *see also Brown v Hortons*, Case No. 5:19-cv-1160-LEK-ATB, Dkt. No. 13 (dismissing Plaintiff's claims with prejudice) (N.D.N.Y. Nov. 5, 2019). To date, none of Plaintiff's actions have proved to be meritorious.

Because this is likely to be the fifth meritless action Plaintiff has initiated in this Court, the undersigned recommends that the Court consider imposing a bar Order under 28 U.S.C.

§ 1651(a).  *See Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.").

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion to seal is denied, and the undersigned recommends that the Court overrule Plaintiff's objection as untimely and moot, deny Plaintiff's request for a panel of three judges, dismiss Plaintiff's FAC in its entirety with one final opportunity to amend, and consider imposing a bar Order under 28 U.S.C. § 1651(a).  (Dkt. No. 9.)

**ACCORDINGLY**, it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that Plaintiff's motion to seal (Dkt. No. 9 at 16-17) is **DENIED**; and it is further

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's objection (Dkt. No. 9 at 15-16); and it is further

**RECOMMENDED** that the Court **DENY** Plaintiff's request for a panel of three judges (Dkt. No. 9 at 16); and it is further

**RECOMMENDED** that Plaintiff's First Amended Complaint (Dkt. No. 9) be **DISMISSED WITH LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**RECOMMENDED** that the Court consider imposing a bar Order under 28 U.S.C. § 1651(a).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  October 12, 2022
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[4] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2022 WL 3017366

2022 WL 3017366
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramiah BROWN, Plaintiff,

v.

UNITED PARCEL SERVICE, INC., Defendant.

5:22-cv-762 (BKS/TWD)
|
Signed July 29, 2022

**Attorneys and Law Firms**

JERAMIAH BROWN, Plaintiff, pro se, 22106 Lane Road,
Watertown, New York, 13601.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** Jeramiah Brown ("Plaintiff") initiated this action *pro se*
on July 20, 2022, asserting claims under the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against
United Parcel Service, Inc. ("UPS" or "Defendant"). (Dkt.
No. 1.) Plaintiff simultaneously moved to proceed in forma
pauperis ("IFP") and for the appointment of *pro bono* counsel.
(Dkt. Nos. 2-3.) The Clerk sent Plaintiff's Complaint, IFP
Application, and request for the appointment of counsel to
the undersigned for initial review. *See* 28 U.S.C. § 1915(e)(2)
(B). Plaintiff's IFP Application is granted for purposes of this
review. (Dkt. No. 2.) Plaintiff's request for the appointment
of counsel is denied without prejudice. (Dkt. No. 3.) For the
reasons discussed below, the undersigned recommends that
the Court dismiss Plaintiff's Complaint in its entirety with
leave to amend. (Dkt. No. 1.)

**I. SUMMARY OF THE COMPLAINT** [1]

[1]
The following recitation of facts is drawn from
the Complaint, which the Court accepts as true for
purposes of initial review. *See, e.g.*, *LaTouche v.
Rockland County*, No. 22-CV-1437 (LTS), 2022
WL 953111, at *1 (S.D.N.Y. Mar. 29, 2022);
*Walker v. City of New York*, No. 20-CV-5240 (PKC)

(LB), 2021 WL 1838277, at *1 n.1 (E.D.N.Y. May
7, 2021).

Plaintiff is disabled due to thrombocytopenia-absent radius
syndrome, irritable bowel syndrome, traumatic brain injury,
and chronic illness. (Dkt. No. 1 at 2.) In the fall of 2021,
Plaintiff applied for a job as a Personal Seasonal Delivery
Driver with UPS. *Id.* at 3; Dkt. No. 1-1 at 13. When he
arrived at training, one UPS employee ignored him, and
another "made remarks" about his appearance. (Dkt. No. 1-1
at 13-14.) During a driving test, another UPS employee asked
Plaintiff questions about his disability—including whether his
disability prevented him from reaching the steering wheel of
his car, handling packages, and quickly opening and closing
the car door during deliveries. *Id.* at 16. Although Plaintiff
passed the driving test, he was told he would not be hired
as a Personal Seasonal Delivery Driver with UPS because
he was a "[s]afety hazard." *Id.* A UPS employee nonetheless
told Plaintiff that Defendant would consider him for other
employment opportunities. *Id.* UPS never hired Plaintiff. *See
generally id.*

Based on this series of events, Plaintiff appears to advance
three claims against UPS: discriminatory discharge, failure
to accommodate, and retaliation. (Dkt. No. 1 at 3.) Plaintiff
claims UPS wrongfully terminated him based on a "driving
test that no other drivers had to take" that "was administered
unsafely." *Id.* He claims the UPS employees laughed at him
"due to his appearance," "made remarks to [him] about his
size, weight, height, and capability of fulfilling job tasks,"
harassed him, and required him to take this test because of his
"appearance, [d]isability, and skull abnormalities." *Id.*

**II. STANDARD OF REVIEW**
This Court must conduct an initial review of complaints
filed *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B). When
conducting this review, "the court shall dismiss the case at
any time if the court determines ... the action ... fails to
state a claim on which relief may be granted." 28 U.S.C.
§ 1915(e)(2)(B)(ii); *see also Allen v. Stringer*, No. 20-3953,
2021 WL 4472667, at *1 (2d Cir. Sept. 30, 2021).[2] The
Court must accordingly construe *pro se* pleadings with the
utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520-21
(1972) (holding that a *pro se* litigant's complaint is to be held
"to less stringent standards than formal pleadings drafted by
lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537
F.3d 185, 191 (2d Cir. 2008).

2022 WL 3017366

2        Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

**\*2** To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### III. SUFFICIENCY OF THE COMPLAINT

Plaintiff's Complaint should be dismissed because it fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff has failed to adequately plead his claims for discriminatory discharge, failure to accommodate, and retaliation. The undersigned accordingly recommends that the Court dismiss Plaintiff's Complaint in its entirety with leave to amend.

#### A. Discriminatory Discharge

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability in regard to," among other things, "the hiring ... or discharge of employees." 42 U.S.C. § 12112(a); *see generally* 42 U.S.C. §§ 12111(2), (5) (defining "Covered entity" and "Employer"). To establish a *prima facie* case of discriminatory discharge under the ADA, a claimant must show: "(1) his employer is

subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998).

Construing Plaintiff's discriminatory discharge claim liberally, *see Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes he failed to adequately plead the third element of his claim, *see* 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff did not adequately allege he was qualified to perform the essential functions of the Personal Seasonal Delivery Driver position with UPS. (*See generally* Dkt. No. 1.) Plaintiff alleged he passed the driving test, but this allegation does not give rise to a reasonable inference that he was qualified to perform all essential functions of the job he sought. *See id.* Plaintiff advanced no allegations about what the job requirements were and whether he met them. *See id.* Nor did he advance any allegations concerning reasonable accommodations that could have been made to allow him to adequately perform the job. *See id.* Because Plaintiff failed to adequately plead his discriminatory discharge claim, the undersigned recommends that the Court dismiss the claim with leave to amend. 28 U.S.C. § 1915(e)(2)(B)(ii).

#### B. Failure to Accommodate

**\*3** The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This extends to an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A); *see also McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). To make out a *prima facie* case of failure to accommodate under the ADA, a claimant must show: "(1) the plaintiff is a person with a disability for purposes of the ADA; (2) an employer covered by the statute had notice of the plaintiff's disability; (3) with reasonable accommodation, the plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such an accommodation." *Laguerre v. Nat'l Grid USA*, No. 20-3901-CV, 2022 WL 728819, at \*1 (2d Cir. Mar. 11, 2022); *Frantti v. New York*, 850 F. App'x 17, 19 (2d Cir. 2021).

2022 WL 3017366

Construing Plaintiff's failure to accommodate claim liberally, *see Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes he failed to adequately plead the third and fourth elements of his claim, *see* 28 U.S.C. § 1915(e)(2) (B)(ii). Plaintiff made no allegation about the reasonable accommodation (or accommodations) Defendant could have made to permit him to perform the duties of a Personal Seasonal Delivery Driver, nor did he advance allegations concerning the existence of an alternative vacant job he was qualified to perform. (*See generally* Dkt. No. 1; *see also McBride*, 583 F.3d at 97 ("The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified.").) Moreover, Plaintiff did not allege he specifically requested an accommodation, nor did he allege Defendant refused such a request. (*See generally* Dkt. No. 1; *see, e.g., Frantti*, 850 F. App'x at 20 (dismissing plaintiff's claim where there was "no evidence in the record that [he] requested these accommodations from his employer.").) Because Plaintiff failed to adequately plead his failure to accommodate claim, the undersigned recommends that the Court dismiss the claim with leave to amend. 28 U.S.C. § 1915(e)(2)(B)(ii).

### C. Retaliation

The ADA prohibits covered employers from discriminating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To make out a *prima facie* case of retaliation under the ADA, a claimant must show: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia*, 313 F.3d at 719; *see also Frantti*, 850 F. App'x at 21. "A plaintiff's burden at this prima facie stage is *de minimis.*" *Treglia*, 313 F.3d at 719.

Construing Plaintiff's retaliation claim liberally, *see Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes he failed to adequately plead the first and fourth elements of his claim, *see* 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff failed to allege he engaged in a protected activity under the ADA. (*See generally* Dkt. No. 1.) As explained above, Plaintiff's Complaint lacks any allegation that he requested an

accommodation from Defendant. *See id.* Plaintiff's Complaint also lacks any allegation that he complained to Defendant of disability discrimination before Defendant's hiring decision. *See id.*; *see, e.g., Frantti*, 850 F. App'x at 21 (concluding an email plaintiff sent to the defendant did not constitute a protected activity "because [Franti] ... neither complains of discrimination nor seeks an accommodation."). Absent some allegation that Plaintiff engaged in a protected activity before Defendant's hiring decision, there is no reasonable inference of causation—there can be no causal connection if the protected activity, the fundamental precipitating event, never occurred. *See generally Treglia*, 313 F.3d at 720 ("In order to establish the last element of a prima facie case of retaliation, Treglia must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent."). Plaintiff accordingly failed to adequately plead the causation element of his retaliation claim. Because Plaintiff failed to adequately plead his retaliation claim, the undersigned recommends that the Court dismiss the claim with leave to amend. 28 U.S.C. § 1915(e)(2)(B)(ii).

### IV. REQUEST FOR THE APPOINTMENT OF COUNSEL

**\*4** Although civil litigants do not have a constitutional right to the appointment of counsel, "[t]he court may request an attorney to represent any person unable to afford counsel." *See* 28 U.S.C. § 1915(e)(1); *see also Leftridge v. Conn. State Trooper Officer No. 1283*, 640 F.3d 62, 68 (2d Cir. 2011) ("A party has no constitutionally guaranteed right to the assistance of counsel in a civil case."). A court's power to request such assistance "must be understood to guarantee indigents meaningful access to the courts as required by the Constitution." *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). In addition, the voluntary assistance of counsel aids the Court, the *pro se* litigant, and the opposing parties by relieving the Court of duty in "the uncomfortable role of a quasi-advocate." *See Hendricks v. Coughlin*, 114 F.3d 390, 393 (2d Cir. 1997).

"In deciding whether to appoint counsel ... the district judge should first determine whether the indigent's position seems likely to be of substance." *Hodge*, 802 F.2d at 61; *see also Dolan v. Connolly*, 794 F.3d 290, 296-97 (2d Cir. 2015). "If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that

case why appointment of counsel would be more likely to lead to a just determination." *Hodge*, 802 F.2d at 61-62; *see also Dolan*, 794 F.3d at 296-97.

The undersigned concludes it is "too early in this action to determine whether [Plaintiff's] claim is likely to be of substance." *See Genao v. City of New York*, No. 20-CIV-6507 (PGG) (SLC), 2022 WL 1115563, at *4 (S.D.N.Y. Apr. 14, 2022); *see also Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 204-05 (2d Cir. 2003) (concluding appointment of counsel "would have been inappropriate" because plaintiff's claim "was not likely to be of substance"). The undersigned cannot evaluate the substance of Plaintiff's claims because he has failed to adequately plead them. Moreover, Plaintiff's request for the appointment of counsel indicates he contacted two law firms. (*See* Dkt. No. 3.) This does not assure the undersigned that Plaintiff was "unable to obtain counsel." *Hodge*, 802 F.2d at 61 ("In our view, the language of the statute itself requires that the indigent be unable to obtain counsel before appointment will even be considered."). Accordingly, the undersigned denies Plaintiff's request for the appointment of *pro bono* counsel without prejudice. (Dkt. No. 3.) Plaintiff may renew his request for the appointment of *pro bono* counsel when the Court is better able to determine whether he is likely to have some chance of success on his claims, and if he can demonstrate that he is unable to obtain counsel. *See, e.g., Genao*, 2022 WL 1115563, at *4.

Plaintiff is advised that he may seek assistance from one of the Lawyer Referral Services or Legal Aid Services listed on the website for the United States District Court for the Northern District of New York at https://www.nynd.uscourts.gov/legal-aid-referral-services. In addition, the Court has a Pro Se Assistance Program which can be reached at 877-422-1011 or prose@ndnyfcba.org.

**V. CONCLUSION**
For the foregoing reasons, the undersigned recommends that the Court dismiss Plaintiff's Complaint in its entirety with leave to amend. (Dkt. No. 1.) Plaintiff's IFP Application is granted for purposes of this review. (Dkt. No. 2.) Plaintiff's request for the assistance of counsel is denied without prejudice. (Dkt. No. 3.)

***5 ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED** solely for purposes of initial review; and it is further

**ORDERED** that Plaintiff's request for the appointment of counsel (Dkt. No. 3) is **DENIED** without prejudice; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[3] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[3]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Slip Copy, 2022 WL 3017366

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4077775
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramiah BROWN, Plaintiff,

v.

UPS UNITED PARCEL
SERVICE INCORP., Defendant.

5:22-cv-762 (BKS/TWD)
|
Signed September 6, 2022

**Attorneys and Law Firms**

Plaintiff pro se: Jeramiah Brown, Watertown, NY 13601.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

 *1 Plaintiff pro se Jeramiah Brown brings this action against United Parcel Service, Inc. ("UPS"), alleging claims for discriminatory discharge, failure to make reasonable accommodation, and retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"). (Dkt. No. 1). Plaintiff simultaneously moved for leave to proceed in forma pauperis ("IFP") and for the appointment of counsel. (Dkt. Nos. 2, 3). This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks for initial review. On July 29, 2022, Magistrate Judge Dancks issued an Order and Report-Recommendation (1) granting Plaintiff's IFP application for purposes of initial review, (2) denying Plaintiff's motion for the appointment of counsel without prejudice, and (3) recommending that Plaintiff's complaint be dismissed with leave to amend. (Dkt. No. 6, at 9–10). Plaintiff has filed a timely objection to the Report-Recommendation. (Dkt. No. 7). For the following reasons, the Report-Recommendation is adopted in its entirety.

**II. STANDARD OF REVIEW**

The Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the

specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Molefe*, 602 F. Supp. 2d at 487.

**III. DISCUSSION**

**A. The Report-Recommendation** [1]

[1] The Court presumes familiarity with the factual allegations of Plaintiff's complaint as set forth in the Report-Recommendation.

Magistrate Judge Dancks recommended that each of Plaintiff's three claims under the ADA be dismissed, with leave to amend, for failure to plead at least one required element of each claim. First, with respect to Plaintiff's discriminatory discharge claim, Magistrate Judge Dancks concluded that Plaintiff had failed to adequately allege that he was "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation." (Dkt. No. 6, at 4–5 (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020))). Specifically, Plaintiff alleged that he passed a driving test, but this allegation "does not give rise to a reasonable inference that he was qualified to perform all essential functions" of the Personal Seasonal Delivery Driver position at UPS. (*Id.*). Magistrate Judge Dancks determined that Plaintiff did not allege what the job requirements of that position were and whether he met them. (*Id.* at 5).

 *2 Second, the Report-Recommendation concluded that Plaintiff did not state a claim for failure to accommodate because the complaint does not adequately allege that Plaintiff could "perform the essential functions of the job at issue" with "reasonable accommodation" or that UPS had "refused to make such an accommodation." (*Id.* at 5–6 (quoting *Laguerre v. Nat'l Grid USA*, No. 20-cv-3901, 2022 WL 728819, at *1, 2022 U.S. App. LEXIS 6328 (2d Cir. Mar. 11, 2022))). Magistrate Judge Dancks concluded that Plaintiff did not

allege any reasonable accommodation that would permit him to perform the duties of a Personal Seasonal Delivery Driver, that he requested any accommodation, or that UPS refused any such request. (*Id.* at 6).

Finally, the Report-Recommendation concluded that Plaintiff failed to state a claim for retaliation under the ADA because he did not adequately allege that he engaged in any protected activity and therefore necessarily did not allege a causal connection between protected activity and an adverse action. (*Id.* at 6–7). Magistrate Judge Dancks concluded that Plaintiff's complaint contained no allegation that he requested an accommodation from Defendant or complained of any disability discrimination before Defendant's hiring decision. (*Id.* at 7).

### B. Plaintiff's Objection

In his objection, Plaintiff argues that he has "stated such violations and allegations in the complaint" and "provided substantial evidence backing [his] claims and allegations of Discrimination." (Dkt. No. 7, at 1). Plaintiff "find[s] it extremely prejudicial" that the Report-Recommendation "impl[ied] that [he] was incapable of doing the job duties," pointing to the Certificate of Course Completion from the American Safety Council attached to his complaint. (*Id.*; *see* Dkt. No. 1-1, at 25 (certificate of completion for internet version of the New York Six (6) Hour Motor Vehicle Accident Prevention Course)). [2] Plaintiff's objection then proceeds to recite essentially the same factual allegations that are contained in the complaint and attached exhibits, and he concludes by quoting portions of the ADA. (*See* Dkt. No. 7, at 1–9).

[2]    The Court does not credit Plaintiff's assertion that it is a "conflict of interest" for Magistrate Judge Dancks to be assigned to two different civil cases Plaintiff has filed in this District. (Dkt. No. 7, at 1).

### C. Analysis

#### 1. Discriminatory Discharge Claim

The Court concludes that Plaintiff has properly preserved a specific objection to the portion of the Report-Recommendation concluding that Plaintiff had failed to plausibly allege that he was qualified to perform the essential functions of the Personal Seasonal Delivery Driver

position. The Court's review of this portion of the Report-Recommendation is therefore de novo.

A prima facie case of discrimination under the ADA requires a plaintiff to show that (1) his "employer is subject to the ADA," (2) he was disabled within the meaning of the ADA, (3) he was "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation," and (4) he "suffered adverse employment action because of his disability." *Woolf*, 949 F.3d at 93. A "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "essential functions" is equivalent to "the fundamental job duties of the employment position"; evidence relevant to this inquiry includes "the employer's judgment as to what functions of a job are essential and any written description prepared by the employer before advertising or interviewing applicants." *Williams v. MTA Bus Co.*, 44 F.4th 115 (2d Cir. 2022) (internal quotation markets, brackets, and citations omitted). To be "otherwise qualified," a plaintiff must also satisfy the "requisite skill, experience, education, and other job-related requirements of the employment position." *Id.*

*3 Here, on de novo review, the Court concludes that Plaintiff has failed to plausibly allege that he was "otherwise qualified" for the Personal Seasonal Delivery Driver position with or without reasonable accommodation. Plaintiff alleges that he passed a road test administered by a UPS employee, and he submitted a certificate of completion for an online accident prevention course. (Dkt. No. 1, at 3; Dkt. No. 1-1, at 16, 25). However, Plaintiff's complaint does not allege the "essential functions" or "fundamental job duties" of the Personal Seasonal Delivery Driver position or that he was able to perform those functions. *See Williams*, 44 F.4th 115 (2022). Without such allegations, Plaintiff has not plausibly alleged he was otherwise qualified for the position. Accordingly, the Court finds that Plaintiff has failed to state a discriminatory discharge claim under the ADA.

#### 2. Remainder of the Report-Recommendation

Plaintiff has failed to identify any other portion of the Report-Recommendation that Plaintiff asserts to be error. While the Court has considered the factual allegations in Plaintiff's objection in deference to his pro se status, Plaintiff's submission does not articulate any objection to Magistrate

2022 WL 4077775

Judge Dancks's determination that Plaintiff had failed to plead all of the required elements of his failure to accommodate or retaliation claims. The Court's review of the remainder of the Report-Recommendation is therefore for clear error. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts it for the reasons stated therein.

**IV. CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 6) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED with leave to amend**; and it is further

**ORDERED** that any amended complaint must be filed **within thirty (30) days** of the date of this Order. Any amended complaint must be a complete pleading which will replace the current complaint in total; and it is further

**ORDERED** that if Plaintiff files a timely amended complaint, it shall be referred to Magistrate Judge Dancks for review; and if Plaintiff fails to file a timely amended complaint, the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 4077775

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 539438
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CITY OF PROVIDENCE, Rhode Island, et al., Plaintiffs,

v.

BATS GLOBAL MARKETS, INC., et al., Defendants.

14-CV-2811 (JMF)
|
Signed 02/23/2022

**Attorneys and Law Firms**

Thomas Gregory Hoffman, Jr., Labaton Sucharow LLP, New York, NY, David W. Mitchell, Steven M. Jodlowski, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Joshua C. Littlejohn, Motley Rice LLC, Mount Pleasant, SC, for Plaintiff Boston Retirement System.

Douglas W. Henkin, Justine Margolis, Kiran Patel, Dentons US LLP, New York, NY, J. Mark Little, Baker Botts LLP, Houston, TX, Jacqueline A. Giannini, Stephen J. Senderowitz, Dentons US LLP, William Walsh, McGonigle, P.C., Chicago, IL, Nicholas W. Petts, Dentons US LLP, Washington, DC, for Defendants Chicago Stock Exchange, Inc., New York Stock Exchange, L.L.C., NYSE Arca, Inc.

Douglas W. Henkin, Dentons US LLP, New York, NY, for Defendant Direct Edge ECN, L.L.C.

Douglas Randall Cox, Amir C. Tayrani, Jacob T. Spencer, Gibson, Dunn & Crutcher, LLP, Washington, DC, Robert F. Serio, David Philip Salant, Justine Marie Goeke, Gibson, Dunn & Crutcher, LLP, Arun Srinivas Subramanian, Elisha Brandis Barron, Steven M. Shepard, Susman Godfrey LLP, Douglas W. Henkin, Dentons US LLP, New York, NY, Patrick Ammann, Susman Godfrey LLP, Houston, TX, for Defendant The Nasdaq Stock Market L.L.C.

Douglas Randall Cox, Amir C. Tayrani, Jacob T. Spencer, Gibson, Dunn & Crutcher, LLP, Washington, DC, Robert F. Serio, Justine Marie Goeke, Gibson, Dunn & Crutcher, LLP, Arun Srinivas Subramanian, Elisha Brandis Barron, Steven M. Shepard, Susman Godfrey LLP, Douglas W. Henkin, Dentons US LLP, New York, NY, Patrick Ammann, Susman Godfrey LLP, Houston, TX, for Defendant Nasdaq OMX BX, Inc.

Douglas W. Henkin, Dentons US LLP, Kayvan Betteridge Sadeghi, Jenner & Block LLP, New York, NY, Michael K. Molzberger, Paul E. Greenwalt, Schiff Hardin LLP, Chicago, IL, for Defendant Bats Global Markets, Inc.

MEMORANDUM OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

**\*1** On January 18, 2022, the Court granted in part Plaintiffs' motion to unseal 372 documents filed by the parties in connection with their briefing of the pending motions for summary judgment (ECF Nos. 599, 607), and class certification (ECF No. 610). *See* ECF No. 799. The Court reserved judgment on Defendants' request that a small subset of the documents remain under seal and that another subset of the documents be redacted in part. *See* ECF No. 799, at 2; ECF No. 788 ("Defs.' Opp'n"), at 1; ECF No. 802-1 ("Defs.' List"). For the reasons stated below, Defendants' requests are granted in part and denied in part.

**APPLICABLE LEGAL STANDARDS**

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Brown v. Maxwell*, 929 F.3d 41, 47-52 (2d Cir. 2019). This right arises from "the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*"). In light of the presumption in favor of public access, the Second Circuit has established a three-part test for determining whether documents may be placed under seal. First, "a court must ... conclude that the documents at issue are indeed 'judicial documents' ... and that therefore a common law presumption of access attaches." *Lugosch*, 435 F.3d at 119. Second, the court "must determine the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (internal quotation marks omitted). "Finally, ... the court must balance competing considerations against" the presumption of access, including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* at 120

(internal quotation marks omitted). The party seeking to maintain information filed under seal bears "the burden ... to demonstrate that the interests favoring non-access outweigh those favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995) ("*Amodeo I*").

"Notwithstanding the presumption of public access to judicial records, courts may deny access to records that are 'sources of business information that might harm a litigant's competitive standing.' " *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MC-2542 (VSB), 2014 WL 12772236, at *2 (S.D.N.Y. Nov. 5, 2014) (noting that "[t]he need to protect sensitive commercial information from disclosure to competitors seeking an advantage may constitute" an interest outweighing the presumption of public access); *Coscarelli v. ESquared Hosp. LLC*, No. 18-CV-5943 (JMF), 2021 WL 5507034, at *21 (S.D.N.Y. Nov. 24, 2021) (same). To deny public access on that ground, the party seeking nondisclosure "must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Ashmore v. CGI Grp. Inc.*, 138 F. Supp. 3d 329, 351 (S.D.N.Y. 2015), *aff'd*, 923 F.3d 260 (2d Cir. 2019); *accord In re Parmalat Sec. Litig.*, 258 F.R.D. at 244. [1]

[1]     The First Amendment to the United States Constitution also "protect[s] the public's right to have access to judicial documents." *United States v. Erie Cnty., N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014). To determine whether this right attaches, courts in the Second Circuit look to whether "experience and logic" support public access to the documents. *Id.* (quoting *Lugosch*, 435 F.3d at 120). In doing so, courts must "consider (a) whether the documents 'have historically been open to the press and general public' (experience) and (b) whether 'public access plays a significant positive role in the functioning of the particular process in question' (logic)." *Id.* (quoting *Lugosch*, 435 F.3d at 120). If a court finds that a First Amendment right of access attaches, the documents "may be sealed [only] if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to

serve that interest." *Id.* (quoting *Lugosch*, 435 F.3d at 120) (alteration in original).

## DISCUSSION

**\*2**  Defendants request that the Court (1) maintain a set of fourteen filings (the "First Set") under seal in their entirety [2] and (2) partially redact a set of approximately seventy-five other filings (the "Second Set"). [3]  *See* Defs.' Opp'n, at 1; Defs.' List. There is no dispute that all of these filings — which were submitted in connection with Defendants' motions for summary judgment — are "judicial documents." *See Lugosch*, 435 F.3d at 121 ("[D]ocuments submitted to a court for its consideration in a summary judgment motion are — as a matter of law — judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."). Accordingly, the Court will proceed to the second and third steps of the common-law inquiry for each set of filings.

[2]     In their opposition, Defendants originally requested that the Court maintain fourteen documents under seal. *See* Defs.' Opp'n 7. But one of these documents (ECF No. 660-74) was not named on Plaintiffs' original list of filings that they sought to unseal. *See* ECF No. 798-1. Thereafter, Defendants omitted the document from their chart of "filings in dispute." ECF No. 802, at 1 n.1. Nevertheless, because Defendants discuss this filing in their opposition, *see* Defs.' Opp'n 6-7, and Plaintiffs do the same in their reply, *see* ECF No. 792, ("Pls.' Reply"), at 7, the Court will address it here.

[3]     Defendants originally requested that the Court partially redact another seventy-four documents, *see* Defs.' Opp'n 1; however, there appear to be seventy-five documents in Defendants' chart of "filings in dispute" for which Defendants request partial redactions, *see* Defs.' List.

### A. The First Set of Documents
Beginning with the First Set, the Court concludes that ten of the fourteen documents at issue should remain under seal in their entirety unless and until the Court orders otherwise:

- **NYSE Revenue Spreadsheets:** Three of the filings in the First Set, ECF Nos. 660-128, 660-219, 671-17, are

identical copies of a spreadsheet that shows revenues earned by Defendants New York Stock Exchange, LLC, NYSE Arca, Inc., and NYSE Chicago, Inc., (the "NYSE Defendants") from proprietary data feeds and co-location services between 2010 and 2019, *see* ECF No. 788-2 ("Blaugrund Decl."). The spreadsheet identifies the NYSE Defendants' customers and shows annual revenue by product for each customer. *See* ECF Nos. 660-128, 660-219, 671-17. Two additional filings in the First Set, ECF Nos. 660-220, 671-18, are identical copies of a similar spreadsheet with revenues earned by the NYSE Defendants from these products between 2009 and 2019 separated out by customer. The Court finds that the "privacy interests of innocent third parties," *Amodeo II*, 71 F.3d at 1050, namely the NYSE Defendants' customers, and the potential harm to the NYSE Defendants' "competitive standing," *In re Parmalat Sec. Litig.*, 258 F.R.D. at 244, outweigh the presumption of access afforded to these filings. The filings contain confidential customer information of a type that is "commonly sealed." *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 600 (S.D.N.Y. 2018). Additionally, disclosure of these filings could cause "investor[ ] ... confusion," and thereby harm the NYSE Defendants, as the revenue details contained in the spreadsheet are not disclosed in public financial reporting and are "incomplete." Blaugrund Decl. 2. Defendants have therefore met their burden to justify maintaining these filings under seal in their entirety. *See Lugosch*, 435 F.3d at 120; *Amodeo II*, 71 F.3d at 1050 ("[T]he privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation.") (alterations in original); *see also, e.g., Tyson Foods, Inc. v. Keystone Foods Holdings, Ltd.*, No. 19-CV-010125 (ALC), 2020 WL 5819864, at *2 (S.D.N.Y. Sept. 30, 2020) (granting a motion to maintain under seal exhibits that contained, among other things, "revenue information" and "customer information, including their identities and purchases").

**\*3** • **2015 BATS Market Data Strategy Presentation:** This filing, ECF No. 671-232, is a BATS Global Markets, Inc., ("BATS") internal presentation on market data strategy from July 2015. The presentation contains assessments of industry trends and dynamics, *id.* at 4-5, as well as analyses of BATS's revenue streams and products, *id.* at 6-7. It also contains peer comparison analyses and information on BATS's market data strategy, initiatives, and revenue potential going forward. *Id.* at 9-15. This filing is subject to a comparatively weak presumption of access given that it post-dates the proposed class period (2009 to 2014) and, while it may ultimately play some role in the Court's consideration of the motions for summary judgment, that role is unlikely to be significant. *See, e.g., Coscarelli v. ESquared Hosp. LLC*, No. 18-CV-5943 (JMF), 2021 WL 5507034, at *21 (S.D.N.Y. Nov. 24, 2021) (concluding document was "subject only to a weak presumption of public access" for similar reasons). At the same time, the potential harm to BATS's competitive standing from disclosure of this filing is significant. *See* ECF No. 788-1 ("Carrai Decl."), at 3-4; *see also, e.g., GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 649-50 (S.D.N.Y. 2011) (concluding that the defendants' "privacy interests ... outweigh[ed] the presumption of public access" where the documents "contain[ed] highly proprietary material concerning the defendants' marketing strategies, product development, costs and budgeting" and granting request to maintain the documents under seal); *Tyson Foods, Inc.*, 2020 WL 5819864, at *2 (same on similar grounds). Sealing is therefore warranted.

• **2014 Nasdaq Account Management Presentation:** This filing, ECF No. 660-86, dated October 21, 2014, is a Nasdaq Stock Market LLC ("Nasdaq") internal "Strategic Account Management Plan" presentation, regarding a specific, nonparty Nasdaq customer and its usage of Nasdaq's products and services, *see, e.g., id.* at 12, 20, 23-25, 27-29, as well as its responses to Nasdaq's proposals, *see, e.g., id.* at 10-11, 18. It also contains a summary of Nasdaq's view of the customer's business strategy based on confidential information. *See id.* at 6. Although the document is several years old, the third-party privacy interest of Nasdaq's customer in preventing disclosure of this sensitive information regarding its trading and business strategies is significant, *see* ECF No. 788-3 ("Yetter Decl."), at 7-8. And while portions of this filing may play a role in the Court's "exercise of Article III judicial power" in resolving the pending motions for summary, *Lugosch*, 435 F.3d at 119, that role is likely to be limited and the third-party privacy interests at stake are sufficient to rebut the presumption of public access, *see Amodeo II*, 71 F.3d at 1050 ("[T]he privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation."); *see also, e.g., Tyson Foods, Inc.*, 2020 WL 5819864, at *2 (Documents "containing trade secrets, confidential research and development information, marketing plans,

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 30 of 235
City of Providence v. BATS Global Markets, Inc., Slip Copy (2022)

2022 WL 539438

revenue information, pricing information, and the like ... [are] commonly sealed.”).

• **2015 Nasdaq Business Development Presentation:** This filing, ECF No. 660-74, dated May 5, 2015, is an internal business development presentation. Like the 2014 Nasdaq Account Management Presentation, it contains confidential information about a specific, nonparty Nasdaq customer, including its usage of Nasdaq products and services, its responses to Nasdaq proposals, and Nasdaq's view of its business strategy. *See id.*; Yetter Decl. 6-7. Accordingly, the Court finds that Defendants have met their burden to justify sealing for substantially the same reasons.

• **2009 Presentation on Nasdaq Data Center:** Two filings, ECF Nos. 660-158, 671-264, dated June 1, 2009, contain identical copies of an internal Nasdaq presentation regarding the economics and technical operations of one of Nasdaq's data centers and Nasdaq's arrangement with a nonparty company to provide co-location services. The presentation contains, among other things, strategic analyses of ways to expand Nasdaq's data center capacity and financial projections (with forecasts out to 2016) for various proposals regarding a new data center. *See, e.g.*, ECF No. 660-158, at 9-14. Although the document itself is over a decade old, Defendants’ declarant avers that “th[e] document reflects nonpublic technical and financial strategies of Nasdaq still in use today,” disclosure of which “would cause competitive injury to Nasdaq.” Yetter Decl. 6. The weight of the presumption of access for this filing is also relatively weak given that the technical specifications and financial projections for the data center contained in it appear unlikely to play a meaningful role in the Court's resolution of the pending motions for summary judgment. *See Coscarelli,* 2021 WL 5507034, at *21. The Court therefore concludes Defendants have met their burden to justify sealing; *see, e.g., Encyclopedia Brown Prods., Ltd. v. Home Box Off., Inc.,* 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998) (“Confidential business information dating back even a decade or more may provide valuable insights into a company's current business practices that a competitor would seek to exploit.”).

**\*4** The Court concludes that the other four documents in the First Set can and should be partially redacted, again unless and until the Court orders otherwise:

• **2013 Nasdaq Revenue Chart and Price Change Analysis:** This filing, ECF No. 660-75, from May 30, 2013, *see* Defs.’ List 1, contains a chart with revenues from Nasdaq's co-location services on a service-by-service basis. It also includes an internal analysis of a potential pricing change for Nasdaq's co-location services and the revenue impact of such a change. *See* ECF No. 660-75. While the internal sales and revenue figures and price change analysis in this filing “fall into categories commonly sealed,” *Tyson Foods, Inc.,* 2020 WL 5819864, at *2, Defendants offer no justification for sealing information about the range of products offered and their “current price” as of May 2013, *see* ECF No. 660-75, at 1 (cells A9-B35 and D9-35), which presumably would have been publicly available and is now “stale” in any event, *Koch v. Greenberg,* No. 07-CV-9600 (BSJ) (DF), 2012 WL 1449186, at *4 (S.D.N.Y. Apr. 13, 2012). As such, Defendants’ request to maintain this filing under seal in its entirety is denied. *See Lugosch,* 435 F.3d at 120 (requiring narrow tailoring). Redacting the figures in the document, except for those in cells A9-B35 and D9-35, would appear sufficient to safeguard Nasdaq's interests. *See, e.g., In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,* 2014 WL 12772236, at *2 (permitting redaction of “only the specific percentages” of the company's internal market share projections).

• **2011-2013 Email Chain with Nasdaq Customer:** This filing, ECF No. 660-155, contains an email chain from October 2011 through June 2013 among members of Nasdaq's Service Bureau and Connectivity and Transaction Services department and employees at a nonparty Nasdaq customer. The emails discuss technical aspects of products and services purchased by the customer, including the customer's IP addresses and data circuit identifications and specifications. *See id.*; Yetter Decl. 5. Another exhibit contains the same email chain, divided into three filings. ECF Nos. 671-62, 671-63, 671-64. The strong third-party privacy interests in keeping these communications under seal outweigh the presumption of access for nearly all of the emails contained in this filing, particularly since the customer-specific technical specifications contained in the emails are unlikely to play any role in the Court's adjudication of the pending motions for summary judgment. *See Amodeo II,* 71 F.3d at 1050; *Coscarelli,* 2021 WL 5507034, at *21. That said, Defendants offer no justification for sealing the final page of the

exhibit — a promotional email from over a decade ago without any customer-specific information. ECF No. 660-155, at 35; ECF No. 671-64, at 13; *see* Yetter Decl. 5 (discussing potential harm from disclosure of "customer information," not Nasdaq's marketing materials); *see also Koch*, 2012 WL 1449186, at *4 ("[W]here commercially sensitive information is stale, this can undermine [a] party's ... claim that disclosure will create a competitive disadvantage."). Redacting the rest of the email chain and the personal contact information from that page is sufficient to protect the privacy and competitive standing interests implicated by this exhibit.

**\*5**  **• 2010 Nasdaq Draft White Paper:** This document, divided into two filings, ECF Nos. 671-68, 671-69, dated December 17, 2010, is a draft of an internal Nasdaq white paper. It contains an analysis of Nasdaq's systems, including nonpublic diagrams of those systems, ECF No. 671-68, at 206; an analysis of "material risks to [Nasdaq's] operations from customers and other third parties," ranked from medium to high risk, *id.* at 7-21; and an analysis of "legal risk," ECF No. 671-69, at 55-61. This type of sensitive commercial information undoubtedly "fall[s] into categories commonly sealed." *Tyson Foods, Inc.*, 2020 WL 5819864, at *2. Additionally, Defendants also note, correctly, that the document "contains a detailed discussion of the PHLX Options Market, the Nasdaq Options Market, and the PSX Equities market, none of which are Defendants or at issue in this action." Yetter Decl. 6. That said, the document is over a decade old, and Defendants state only that "*much* of the paper reflects nonpublic business or financial strategies and confidential competitive information that are still applicable today." *Id.* (emphasis added). As such, Defendants have not met their burden to justify sealing the document in its entirety. *Koch*, 2012 WL 1449186, at *4 ("Generally, ... a court will not protect several-year-old information without a specific explanation of the harm that would be caused by disclosure."). Instead, the Court finds that redacting information that in fact remains "applicable today" and information relating to "the PHLX Options Market, the Nasdaq Options Market, and the PSX Equities market," Yetter Decl. 6, will adequately protect Defendants' interests.

Once the Court has ruled on the underlying motions associated with these filings — and is in a better position to evaluate whether, and to what extent, the filings are relevant to the Court's "exercise of Article III judicial power," *Lugosch*, 435 F.3d at 119 — the Court may revisit whether these documents should remain under seal or in redacted form.

**B. The Second Set of Documents**

Defendants request four types of redactions with respect to the documents in the Second Set. First, they request that the Court permit them to redact identifying information of nonparty market participants in certain documents in order to protect those entities' business investment or trading strategies from public disclosure. Defs.' Opp'n 11-12; *see* Defs.' List. Plaintiffs do not oppose this request. *See* Pls.' Reply 1. The Court concludes that the significant interest in protecting "sensitive financial ... information related to third parties" is sufficient to rebut the weak presumption of access for that information given the limited role that nonparty identifying information will play in the Court's adjudication of the pending motions. *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2021 WL 1177737, at *1 (S.D.N.Y. Mar. 29, 2021). The Court therefore grants Defendants' request to redact identifying information of nonparty market participants in these filings. *See* Defs.' List.

Second, Defendants request that, for deposition transcripts of witnesses previously employed or retained by Defendants, the Court only require "the pages actually cited in Plaintiffs' papers [to] be filed publicly." Defs.' Opp'n 12. Once again, Plaintiffs do not oppose this request. *See* Pls.' Reply 1. While large portions of the deposition transcripts may ultimately prove irrelevant, it remains to be seen whether portions of the transcripts beyond the pages cited by Plaintiffs will play a role in the Court's adjudication of the pending motions. Thus, the Court will temporarily grant Defendants' request until it rules on the underlying motions and can more fully evaluate the balance between any applicable right of public access and "competing considerations." *Lugosch*, 435 F.3d at 120.

Third, Defendants request that two Nasdaq documents be filed with redactions to protect privileged information. Defs.' Opp'n 13-14; Yetter Decl. 16-17. According to Defendants, the scope of these redactions has been "discussed and agreed between Plaintiffs and Nasdaq." Yetter Decl. 17. Importantly, however, "the parties' agreement to seal or limit disclosure of documents on file is not a sufficient basis for granting such an order." *Landmark Am. Ins. Co. v. Magoo's II, Inc.*, No. 07-CV-327 (MRK), 2007 WL 3023265, at *1 (D. Conn. Oct. 12, 2007) (citing *Amodeo II*, 71 F.3d at 1050-51). Defendants shall therefore file these documents with proposed redactions

for the Court's review, per Paragraph 7 of the Court's Individual Rules and Practices in Civil Cases.

**\*6** Finally, Defendants request that the Court permit them to redact "what is believed to be the personal email address of a relative of a former BATS employee" in ECF No. 660-210. Defs.' Opp'n 12 n.5; Carrai Decl. 3. This information will almost certainly play no role in the Court's resolution of the pending motions and there is a strong third-party privacy interest in redacting it. *See Amedeo II*, 71 F.3d at 1050. The Court therefore grants Defendants' request to redact the email address.

\* \* \* \*

Two housekeeping matters remain. First, Plaintiffs moved to file under seal their briefing related to their motion to unseal. *See* ECF Nos. 775, 791. The Court granted these motions temporarily pending resolution of Plaintiffs' motion to unseal. *See* ECF Nos. 782, 795. The Court denies these motions without prejudice to renewal consistent with this Opinion and Order. The Court is skeptical that the general descriptions of the documents at issue in Plaintiffs' filings should remain under seal; however, the Court will give the parties an opportunity to propose limited redactions, if appropriate, no later than **March 7, 2022**. Second, in light of the foregoing, the Court denies as moot the "petition[ ]" to "remove the temporary *Confidential Treatment*" for certain documents filed by Francine McKenna, an independent journalist. *See* ECF No. 796.

## CONCLUSION

The Clerk of Court is directed to terminate ECF No. 791. No later than **March 7, 2022**, Defendants shall, in accordance with Paragraph 7 the Court's Individual Rules and Practices in Civil Cases, publicly file copies of the following filings with proposed redactions consistent with this Opinion and Order:

- ECF No. 660-75 (2013 Nasdaq Revenue Chart and Price Change Analysis)

- ECF Nos. 660-155, 671-62, 671-63, 671-64 (2011-2013 Email Chain with Nasdaq Customer);

- ECF Nos. 671-68, 671-69 (2010 Nasdaq Draft White Paper);

- The filings for which Defendants request permission to redact identifying information of nonparty market participants, as identified in Defendants' chart of disputed filings, *see* Defs.' List;

- The deposition transcript filings for which Defendants request permission to redact all pages not cited in Plaintiffs' papers, as identified in Defendants' chart of disputed filings, *see* Defs.' List;

- The two filings for which Defendants request permission to redact information the parties have agreed are subject to legal privilege, *see* Defs.' Opp'n 13; Yetter Decl. 16-17;

- ECF No. 660-210 (filing with personal email address of a relative of a former BATS employee).

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 539438

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Hortons, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 33 of 235

2019 WL 4621936

2019 WL 4621936
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramiah BROWN, Plaintiff,

v.

Tim HORTONS; 7-Eleven, Defendants.

5:19-CV-1160 (LEK/ATB)
|
Signed 09/24/2019

**Attorneys and Law Firms**

JERAMIAH BROWN, Plaintiff, pro se.

**DECISION and ORDER**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** The Clerk has sent to the court for review a complaint, together with an application to proceed in forma pauperis ("IFP"), filed by pro se plaintiff Jeramiah Brown. (Dkt. Nos. 1, 2). Plaintiff has also filed a motion to seal [1] this action and a motion for appointment of counsel. (Dkt. Nos. 3, 4).

[1]    The Clerk filed the case under seal, pending this court's order on plaintiff's motion.

**I. IFP Application**
Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. No. 2). This court agrees, and finds that plaintiff is financially eligible for IFP status.

**II. Complaint**
Plaintiff brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., alleging that his employer Tim Horton's /7-Eleven [2] discriminated against him based on his disability, refusing to grant him reasonable accommodations, retaliating against him, and constructively terminating him in violation of the ADA. (Complaint ("Compl.") at ¶ 5). The complaint contains a detailed explanation of plaintiff's allegations, and the court refers to the complaint for additional facts regarding his allegations. (Compl. at ¶ 6, CM/ECF pp.3-9). Plaintiff has attached his right-to-sue letter which he received from the

Equal Employment Opportunity Commission ("EEOC"), together with the relevant documents that were submitted in support of his EEOC charges. (Dkt. No. 1-1). Plaintiff's submissions are sufficient for this court to order service of the complaint on defendant(s).

[2]    One of the documents submitted in support of plaintiff's complaint indicates that 7-Eleven operates several upstate New York Tim Horton's restaurants. (Dkt. No. 1-1 at 5).

**III. Motion to Seal**

**A. Legal Standards**
There is a general presumption in favor of public access to judicial documents. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "Judicial documents" are documents that a court "relies on to perform its Article III duties and substantively adjudicate a matter." *Winfield v. City of New York*, No. 15-CV-5236, 2017 WL 2880556, at \*3 (S.D.N.Y. July 5, 2017) (citing *U.S. v. Amodeo*, 71 F.3d 1044, 1048-50 (2d Cir. 1995); *Lugosch*, 435 F.3d at 119 (2d Cir. 2006)). The "presumption of access" is secured by the First Amendment and the common law. *Lugosch*, 435 F.3d at 121. The party seeking to seal judicial documents bears the burden of overcoming the presumption of public access. *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997); *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, Nos. 6:12-CV-196, 6:12-CV-743 (BKS/ATB), 2017 WL 1653608, at \*2 (N.D.N.Y. Apr. 26, 2017).

Under the common law presumption of access, "[o]nce the court has determined that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption." *Lugosch*, 435 F.3d at 119. The court must balance the document's "role in the performance of Article III duties" against "the competing considerations such as the privacy interests of those resisting disclosure." *Bernstein v. Bernstein Litowitz Berger & Grossman* LLP, 814 F.3d 132, 142 (2d Cir. 2016). Under this First Amendment framework, "sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. "Notwithstanding the presumption of access under both the common law and the First Amendment, the documents may be kept under seal if 'countervailing factors' in the common

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 34 of 235

Brown v. Hortons, Not Reported in Fed. Supp. (2019)

2019 WL 4621936

law framework or 'higher values' in the First Amendment framework so demand." *Id.*

### B. Application

**\*2** In this case, plaintiff has moved to seal his case because he was the victim of identity theft in the past. (Dkt. No. 3). A complaint is a judicial document, subject to the presumption of access. *Bernstein*, 814 F.3d at 139. Documents related to filed motions are also judicial documents. *Wells Fargo Bank, N.A. v. Wales LLC*, 993 F. Supp. 2d 409, 412 (S.D.N.Y. 2014).

Plaintiff's speculative concern for identity theft is insufficient to justify sealing this entire action. Plaintiff provides no specifics, and he does not indicate how sealing this action for such a reason would preserve the "higher values" of the First Amendment. Thus, the court must deny plaintiff's motion to seal. While plaintiff's reason is clearly insufficient to justify sealing the action, the court is more concerned with medical information that might be contained in the papers filed in this action. While this will not suffice to order sealing of the entire case, the court may restrict access to parties and public terminal users as is done is cases which could contain sensitive information. Thus, although the court will deny the motion to seal, the court will order restricted access to the file.

### IV. Appointment of Counsel

#### A. Legal Standards

There is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the Court in ruling upon such a motion. As a threshold matter, the Court should ascertain whether the indigent's claims seem likely to be of substance. If so, the Court should then consider:

> The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

#### B. Application

Plaintiff has filed a motion for appointment of counsel, indicating that he has contacted an attorney, who has apparently refused to take plaintiff's case. (Dkt. No. 4). This action has only recently been commenced. The only facts upon which this court may base its decision as to whether this lawsuit is of substance are the facts stated in the complaint. Where there are merely unsupported allegations, the court cannot adequately determine whether the complaint has "substance," and therefore, the moving party does not meet the first requirement imposed by the Second Circuit for appointment of pro bono counsel. *See Harmon v. Runyon*, No. 96-Civ.-6080, 1997 WL 118379 (S.D.N.Y. Mar. 17, 1997). Thus, appointment of counsel is premature, and the court will deny plaintiff's motion without prejudice to renewal at an appropriate time.

**\*3 WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's IFP application (Dkt. No. 2) is **GRANTED**. [3] The Clerk shall issue a summons and forward it, along with a copy of the complaint and a packet containing General Order 25, which sets forth the Civil Case Management Plan used by the Northern District of New York, together with the Initial Discovery Protocols for Employment Discrimination Cases Alleging Adverse Action, to the United

2019 WL 4621936

States Marshal for service upon the named defendants, and it is further

3      The Court notes that although plaintiff's IFP application has been granted, plaintiff will still be required to pay fees that she may incur in the future regarding this action, including but not limited to copying and/or witness fees.

**ORDERED**, that a formal response to plaintiff's complaint be filed by the defendants or defendants' counsel as provided in the Federal Rules of Civil Procedure, subsequent to service of process on the defendants, and it is further

**ORDERED**, that the Clerk is directed to schedule a Rule 16 conference before me, and it is further

**ORDERED**, that plaintiff's motion to seal (Dkt. No. 3) is **DENIED**, and the Clerk is directed to **unseal** this action, however, the Clerk is further directed to restrict access to this case to parties and public terminal users, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE** as described above, and it is

**ORDERED**, that any paper sent by a party to the Court or the Clerk shall be accompanied by a certificate setting forth the date a true and correct copy of it was mailed to all opposing parties or their counsel. **Any letter or other document received by the Clerk or the Court which does not include a certificate of service which clearly states that an identical copy was served upon all opposing parties or their attorneys may be stricken by the Court.** Plaintiff shall also comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All motions shall comply with the Local Rules of Practice of the Northern District, and it is further

**ORDERED**, that the Clerk serve a copy of this Order upon plaintiff in accordance with the Local Rules.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4621936

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 8611148
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: TERRORIST ATTACKS
ON SEPTEMBER 11, 2001

03-MDL-01570 (GBD)(SN)
|
Signed 10/02/2020

### OPINION & ORDER

SARAH NETBURN, United States Magistrate Judge:

**\*1** On July 20, 2020, the Court issued an Opinion and Order filed under seal ("July 20 Order") addressing the Plaintiffs' Executive Committees' ("Plaintiffs" or "the PECs") motion for an oral deposition of Akram Alzamari. ECF No. 6322. By e-mail dated August 26, 2020, the Court instructed the parties, pursuant to Paragraph 11 of the FBI Protective Order, to jointly submit a letter motion concerning disputes regarding the sealing of information in the July 20 Order. See ECF No. 4255. On September 9, 2020, the Plaintiffs' Executive Committees and counsel for the Federal Bureau of Investigation ("FBI") and Akram Alzamari submitted a joint letter ("Sept. 9 Ltr.") to the Court. ECF No. 6443. This Opinion and Order resolves the disputed redactions raised in the parties' September 9, 2020 letter.

### LEGAL STANDARD

A presumption of public access attaches to judicial documents. See Bernstein v. Bernstein Litowitz Berger & Grossman LLP, 814 F.3d 132, 141 (2d Cir. 2016) (citing Newsday LLC v. Cry. of Nassau, 730 F.3d 156, 167 n.15 (2d Cir. 2013)). This presumption is secured by two independent sources: the First Amendment and the common law. Id. (citing Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006)). The First Amendment right of access is "stronger and can only be overcome under more stringent circumstances than the common law presumption." United States v. Eerie Cty., 763 F.3d 235, 241 (2d Cir. 2014). Accordingly, where, as here, the First Amendment is applicable, the Court "need not ... engage in ... a common law analysis." Accent Delight Int'l Ltd. v. Sotheby's, No. 18-

cv-9011 (JMF), 2019 WL 2602862, at *7 (S.D.N.Y. June 25, 2019) (citing Erie County, 763 F.3d at 241).

The Court of Appeals has articulated two different approaches to determine whether judicial documents receive First Amendment protection. See Bernstein, 814 F.3d at 141. The first approach considers "experience and logic": that is, "whether the documents have historically been open to the press and general public," and "whether public access plays a significant positive role in the functioning of the particular process in question." Id. The second approach asks whether the documents "are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." Newsday LLC, 730 F.3d at 164 (citing Lugosch, 435 F.3d at 120). This approach applies only when the judicial proceedings themselves are covered by the First Amendment. The Court of Appeals has held that the First Amendment "secure[s] to the public and to the press a right of access to civil proceedings." Lugosch, 435 F.3d at 124 (citing Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir. 1984)).

To overcome a First Amendment right of access to judicial documents, the moving party must demonstrate that sealing is "essential to preserve higher values and is narrowly tailored to serve that interest." Bernstein, 814 F.3d at 144 (citing In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987)). The Court must "review the documents individually and produce specific, on-the-record findings that sealing is necessary." Brown v. Maxwell, No. 18-2868-CV, 2019 WL 2814839, at *4 (2d Cir. July 3, 2019) (internal citations and quotation marks omitted). "Broad ... findings" and "conclusory assertion[s]" are insufficient to overcome the public's right to access the record. Bernstein, 814 F.3d at 144-45. Because the Court finds that the First Amendment attaches, the Court needs to consider whether sealing is necessary to preserve higher values.

### DISCUSSION

### I. Redactions on Page One

**\*2** Alzamari asks the Court to redact information about his interview with Plaintiffs' investigator Catherine M. Hunt on the grounds that Plaintiffs have previously made an application to the Court setting forth their concerns about the safety of third-party witnesses in this case. Sept. 9 Ltr., at 1. Plaintiffs' application had sought to withhold from Saudi Arabia their potential third-party witness list because of concerns based in part on the murder of Saudi Arabian

author and Washington Post journalist Jamal Khashoggi, who was interviewed by an investigator for the PECs roughly one year before his death. See ECF No. 6003-2 at ¶¶ 3, 9. Alzamari contends that Plaintiffs' prior concerns regarding third-party witnesses is inconsistent with their current effort to add information to the public docket regarding Alzamari. Sept. 9 Ltr., at 2. Alzamari also believes he is likely to face increased risk of harm if this information is unredacted. Id.

Plaintiffs minimize Alzamari's concerns and claim that he makes only "broad and conclusory assertions" about the disruption to his life and damage that may be caused if this information is released, failing to comply with the high standards for sealing set forth by the Court of Appeals. Id. Additionally, Plaintiffs argue that the fact that the information is already well known to any interested observer is further reason to deny the request. Id., at 3. Seeking to defend their apparent change of heart, Plaintiffs claim that their concerns regarding witness safety applied to third-party witnesses who had not yet testified or even been identified as witnesses. See ECF No. 6003, at 3. Now that Alzamari has already provided answers to written questions, has not described any specific threats, and his identity as a witness is known to the Kingdom, Plaintiffs are no longer concerned for his safety. Sept. 9 Ltr., at 3.

The Court agrees with Alzamari that if the views set forth in Plaintiffs' February 21 application were held in good faith, it is difficult to reconcile them with Plaintiffs' current arguments regarding these redactions. The Court strongly condemns the use of threats to personal safety as a litigation tool by Plaintiffs or any other party and is troubled by Plaintiffs' reversal on this issue.

Plaintiffs' inconsistent positions on Alzamari's safety, however, do not determine whether the language at issue should be redacted. Documents on the public docket already reveal that Alzamari (i) "had personal knowledge concerning the two 9/11 hijackers and Fahad al Thumairy," see ECF No. 4528, at 5; and (ii) had been interviewed by the FBI in connection with the 9/11 investigation, see ECF No. 4496, Ex. 1, at ¶ 13. The Court of Appeals has observed that "[w]e simply do not have the power, even were we of the mind to use it if we had, to make what has ... become public private again." Gambale v. Deutsche Bank AG, 377 F.3d 133, 144 (2d Cir. 2004). The Court cannot put the public fact of Alzamari's knowledge of the hijackers back in the box, even if it wanted to. The Court also takes into account the fact that the FBI has not proposed redacting this language. While the Court takes

threats to witness safety extremely seriously, the Court finds that there is no basis, on this record, on which to keep this language redacted.

## II. Sentences on the Last Two Lines of Page Five

The language in the first redaction at issue consists of Alzamari reading a portion of an FBI 302 so that he can later provide testimony clarifying the statement in the 302.[1] See ECF No. 6224-9, at FBI141. The language in the second redaction is a clarification of a statement attributed to Alzamari in the 302. The FBI notes that public disclosure of the contents of 302 interview reports for particular witnesses has the potential to compromise the integrity of an FBI investigation by revealing to other witnesses and potential witnesses the questions that were asked by the FBI and the specific information reported to the FBI as part of its investigation. Sept. 9 Ltr., at 4. Plaintiffs contend that the content of these sentences have already been publicly discussed. See ECF No. 6154-3, at ¶¶ 34-35.

[1]    In the July 20 Order, the Court mistakenly characterized this language as representing Alzamari's deposition testimony. The FBI correctly notes that this language represents Alzamari reading a portion of his 302.

**\*3**  The FBI has asserted a "higher value" in maintaining the confidentiality of its 302s. Disclosure of the content of the 302 may reveal, for example, what information the FBI has focused on or not focused on, and what information it has obtained or not obtained. Disclosure of this information has the potential both to compromise the integrity of an investigation and to discourage candor and cooperation of future witnesses with FBI investigations. This higher value, moreover, persists, even if the "information" has been disclosed through other means. The FBI's interest in protecting the information is not to keep certain facts from the public. Rather, it is to keep from the public the fact that the FBI may (or may not) know those facts too.

The first portion of the proposed redactions on the bottom of page 5, Alzamari's recitation of a portion of his 302, contains citations to a document that has been produced subject to the FBI Protective Order. The second portion, Alzamari's testimony clarifying the significance of [Redacted], has not previously been discussed in the public record before the Court and would tend to reveal what was contained in the 302 itself. Accordingly, both these portions should be kept redacted.

### III. First Full Sentence on Page Six

The language in this proposed redaction is a direct quote from an FBI 302 report memorializing an interview with Alzamari. See ECF No. 6224-10, at FBI183. Plaintiffs contend that the information here appears in Ms. Hunt's publicly docketed declaration. But information contained in an FBI 302 is properly protected to advance the FBI's higher interests. Additionally, contrary to the Plaintiffs' representation, the language in the publicly docketed declaration does not communicate the same information as the redacted sentence. See ECF No. 6154-3, at ¶ 34. And even if Alzamari had separately made the identified statements to Ms. Hunt, the redacted information reveals additional information, namely, what Alzamari told the FBI. Sept. 9 Ltr., at 6. Accordingly, the Court finds that this sentence should remain redacted.

### IV. Sentence on Page Six Beginning With "Alzamari Corrected Minor"

Each of these redactions reveals the content of portions of an FBI 302 report memorializing an interview of Alzamari. See ECF No. 6224-9, at FBI141-142. While information has been made public regarding [Redacted]. See Sept. 9 Ltr., at 7 (citing sources). Plaintiffs Exhibits B and C similarly do not mention [Redacted] as reported in the 302. Accordingly, the Court finds that this sentence should remain redacted. However, the Court finds that the phrase "the meeting at," which Alzamari seeks to redact but the FBI does not, should be unredacted.

### V. Last Full Sentence on Page Six

The FBI contends that the language in this proposed redaction should remain sealed because it reveals information that is contained in an FBI 302 report. Sept. 9 Ltr., at 8. However, the statement that Al Thumairy interacted with the 9/11 hijackers is not contained within the language of the 302 and is a widely reported fact and a matter of public record. See, e.g., ECF No. 6154-3, at ¶ 17. Alzamari's confirmation of this fact

does not rely on the content of the FBI 302s, and thus falls outside the scope of the FBI protective Order and should be disclosed. The FBI counters that because the Opinion reveals that Alzamari's testimony was [Redacted] To promote the disclosure of the key language at issue that "Thumairy and the hijackers ... knew each other," the Court will instead redact the language [Redacted]

### VI. Proposed Redaction on Page Eight

The FBI contends that the language in this proposed redaction should remain sealed [Redacted] Sept. 9 Ltr., at 8. The Court's Order, however, cites to a communication from Alzamari's counsel, which is wholly consistent with a statement that Alzamari gave to Ms. Hunt in August 2018 and does not refer directly or indirectly to an FBI 302 or its contents. See ECF No. 6154, at ¶ 25. It is not readily apparent from the language in this proposed redaction that the information is in any way sourced to an FBI 302 or was provided to the FBI. Accordingly, the Court finds that this portion of the sentence should be unredacted.

### CONCLUSION

**\*4** The publication of the July 20 Order on the public docket with the above redactions is stayed for 7 days to give the parties an opportunity to file any appeals. The parties are directed to redact the briefing papers filed in connection with the July 20 Order consistent with this Order and upload the filing papers with redactions onto the public docket within 30 days.

### SO ORDERED.

### All Citations

Slip Copy, 2020 WL 8611148

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 11417797
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wenchun ZHENG, Plaintiff,

v.

GENERAL ELECTRIC COMPANY, Kimberly
Craver, Richard Bourgeois, Douglas Austin,
Katie Trant, and Minesh Shah, Defendants.

1:17-cv-671 (TJM/CFH)
|
Signed 03/22/2018

**Attorneys and Law Firms**

Wenchun Zheng, Ph.D., Morgan Hill, CA, Pro Se.

Michael D. Billok, Bond, Schoeneck & King, PLLC, Saratoga
Springs, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 *1  Plaintiff Wenchun Zheng commenced an action in
the New York State Supreme County, Schenectady County,
alleging that the Defendants violated "the New York State
Human Rights Law ("NYSHRL"), New York State Civil
Rights Law § 79-N ("NYSCRL"), the NYS Workers'
Compensation Law and New York State Constitution,
common law and contract law for the employment
harassment, discrimination and retaliation, bodily injury and
wrongful termination based on race, national origin and age."
Compl., ¶ 1, Dkt. # 2. The claims all arise during and in
relation to Plaintiff's employment with Defendant General
Electric Company ("GE"). *Id.* ¶¶ 3-41.

The action was removed to this court by Defendants GE,
Kimberly Craver, Richard Bourgeois, Douglas Austin, Katie
Trant, and Minesh Shah, asserting, *inter alia*, that the majority
of the claims in this action were already adjudicated in *Zheng
v. General Electric Company, et al.*, 1:15-cv-1232 (TJM/
CFH)("*Zheng I*"). *See* Notice of Removal, Dkt. # 1.

Plaintiff moves to remand the action to state court, Dkt. # 19,
and seeks a three-judge review of the issues in this matter.

Dkt. # 23. Defendants oppose Plaintiff's motion to remand,
Dkt. # 21, and move to dismiss Plaintiff's Complaint. Dkt. #
20. Plaintiff opposes dismissal and cross-moves for sanctions
against Defendants' counsel. Dkt. # 24.

For the reasons that follow, Plaintiff's motions are denied and
Defendants' motion to dismiss the action is granted.

**II. BACKGROUND**

 **a. Zheng I**

In *Zheng I,* the Court and the Hon. Christian F. Hummel,
United States Magistrate Judge, reviewed Plaintiff's prolix
pleadings, and concluded that Plaintiff brought claims of
discrimination, harassment, and retaliation under federal and
New York state law, all arising during and in relation to his
employment with Defendant GE, and from the conduct of the
individually named Defendants. *See Zheng I,* Dkt #s 5, 10,
17, 18, 29, 35. Defendants moved to compel arbitration of
all claims in the Second Amended as amended [1] ("Second
Amended Complaint") pursuant to the Federal Arbitration
Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), and requested that after
referring Plaintiff's claims to arbitration, the Court dismiss
the action pursuant to Federal Rule of Civil Procedure 12(b)
(1). *Zheng I,* Dkt. # 30. Plaintiff opposed the motion by
arguing that his claims could not be subjected to arbitration,
*Zheng I*, Dkt. # 37, [2] and Defendants filed a reply. *Zheng
I*, Dkt. # 40. After considering the parties' positions, the
Court granted Defendants' motion. *See Zheng I,* 06/09/16
Dec. & Ord., Dkt. # 42. In doing so the Court ordered: "All
claims asserted in this matter are referred to arbitration in
accordance with the terms of the GE Solutions Procedure, and
the Second Amended Complaint, as amended, is dismissed in
its entirety." *Id.*, 8.

[1]    The Second Amended Complaint was deemed
amended by a proposed Third Amended Complaint
submitted by Plaintiff. The proposed Third
Amended Complaint was not a complete pleading,
but only sought to asserted certain claims that did
not appear in the Second Amended Complaint.

[2]    In his opposition, Plaintiff did not make an
application to "stay the trial of the action until
such arbitration has been had in accordance with
the terms of the agreement" as required by 9
U.S.C. § 3. *See Zheng I*, Dkt. # 37. Thus,
Plaintiff did not satisfy a prerequisite to invoking

Section 3's mandatory stay provision. *See Katz v. Cellco P'ship,* 794 F.3d 341, 345 (2d Cir.)("The plain language specifies that the court 'shall' stay proceedings pending arbitration, provided an application is made and certain conditions are met."), *cert. denied,* 577 U.S. 1031, 136 S. Ct. 596, 193 L. Ed. 2d 471 (2015). Plaintiff's first request to stay the action pending the outcome of arbitration came on February 28, 2017, *see Zheng I,* Dkt. # 68, which was well after judgment had been entered and the matter closed. *See* June 9, 2016 Judgment in *Zheng I,* Dkt. # 43.

**\*2** On June 24, 2016, Plaintiff moved for reconsideration of the June 9, 2016 Decision and Order, *see Zheng I,* Dkt. # 49, and moved for leave to file a Fourth Amended Complaint. *Zheng I,* Dkt. # 50. Defendants opposed these motions. *Zheng I,* Dkt. # 53. The Court denied Plaintiff's motions for reconsideration of the June 9, 2016 Decision and Order and for leave to file a Fourth Amended Complaint. *See Zheng I,* 08/05/16 Dec. & Ord., Dkt. # 56.

Plaintiff then filed a Notice of Appeal and an Amended Notice of Appeal, appealing this Court's decisions in *Zheng I* to the United States Court of Appeals for the Second Circuit. *See Zheng I,* Dkt. # 57, Dkt. # 60. On March 21, 2017, the Second Circuit issued a Mandate indicating:

> Appellant, *pro se,* moves for appointment of counsel and a stay of arbitration proceedings. Upon due consideration, it is hereby ORDERED that the motion for appointment of counsel is DENIED and the appeal is DISMISSED because it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *see also* 28 U.S.C. § 1915(e). It is further ORDERED that the motion for a stay of arbitration proceedings is DENIED as moot.

Mandate, Dkt. # 70 in *Zheng I.* The Second Circuit also subsequently denied Plaintiff's motion for panel reconsideration or, in the alternative, *en banc* rehearing. *See* 2d Cir. case # 16-3036, Dkt. # 86 in *Zheng I.*

Plaintiff continued to file motions in *Zheng I,* and notified the Court on June 19, 2017 that the arbitrator's decision on the underlying claims was issued on April 17, 2017. *See Zheng I,* Dkt. #s 86 & 99. Plaintiff's motions were denied, and he was advised that because *Zheng I* was closed, he would have to expeditiously file a new action if he wanted to challenge the arbitrator's award. *Zheng I,* Dkt. # 86, pp.

7-8. Undeterred, or perhaps unwilling to accept the Court's determinations, Plaintiff filed additional motions in *Zheng I,* including motions challenging the arbitrator's award. *Zheng I,* Dkt. #s 88 & 99. These motions were all denied, including the motions to vacate the arbitration award which the Court addressed on the merits. *Zheng I,* Dkt. # 99.

**b.** *Zheng II*

On May 22, 2017, Plaintiff filed a Complaint in state court. The parties in this action and in *Zheng I* are the same. As discussed below, the claims in both actions all arise from Plaintiff's employment with GE. There is significant overlap in the claims made in both actions.

Defendants removed this action to this court, asserting:

> This is a civil action over which this Court has original subject matter jurisdiction under 28 U.S.C. § 1331 in that the action presents federal questions and arises under the laws of the United States, including but not limited to the Federal Arbitration Act and Title VII of the Civil Rights Act. Jurisdiction in this court is also proper because diversity of citizenship exists under 28 U.S.C. § 1332(a) and the amount in controversy exceeds $75,000.00. It is also an action which Defendant is entitled to remove to this Court pursuant to 28 U.S.C. § 1441.

Notice of Removal, Dkt. # 1, ¶ 4.

Defendants' Notice of Removal requested that "the United States District Court for the Northern District of New York accept this Notice of Removal and that it assume jurisdiction of this action. This action also contains claims already adjudicated and dismissed by Judge McAvoy in [*Zheng I*], and Defendant respectfully requests that this case be considered a filing under [*Zheng I*] and assigned to Judge McAvoy, and that the Court issue such further orders as may be necessary to effectuate removal of this action." *Id.* ¶ 7.

**\*3** Upon removal, Defendants filed a Notice of Related Case, indicating that this case is related to *Zheng I,* and

requested that the case be reassigned to the undersigned because I presided over *Zheng I*. Dkt. # 6. After an initial review, the Hon. Frederick J. Scullin, Jr., the United States District Judge originally assigned to the case, determined that this case was related to *Zheng I*, and indicated that the matter should be reassigned to the undersigned. *See* Text Order, Dkt. # 10.

After Judge Scullin's Text Order, Dkt. # 10, Plaintiff opposed reassignment, Dkt. # 11, and filed a Letter Motion with the Hon. Glenn T. Suddaby, Chief Judge, requesting that the Text Order reassigning the case be set aside. Dkt. # 14. Chief Judge Suddaby denied Plaintiff's motion. *See* Text Order, Dkt. # 15.

As indicated above, the parties in the instant action ("*Zheng II*") and in *Zheng I* are identical. The claims in both actions all arise from Plaintiff's employment at GE. The the claims in

the Complaint are based, essentially, on the same facts as in the Second Amended Complaint in *Zheng I*. *See* Def. Mem. L. in Supp. Dismiss., p. 3 (setting forth a chart that matches up the paragraphs in the Complaint with the paragraphs from the Second Amended Complaint in *Zheng I).* In many paragraphs identified by Defendants as matching the factual allegations in the Second Amended Complaint, the language in the Complaint is taken verbatim from the Second Amended Complaint.

Likewise, the causes of action alleged in the Complaint are mostly taken from the Second Amended Complaint. As Defendants correctly identify in their memorandum of law, *see* Def. Mem. L. in Supp. Dismiss., p. 4, and as indicated in the chart that follows, the majority of the claims in the instant case correspond with claims made in *Zheng I*.

| Instant Complaint | Second Amended Complaint |
|---|---|
| I. Age, race, color, and national origin discrimination based on New York Human Rights Law | IX. "Unlawful Discriminatory Practice in Violation of New York State Human Rights Law ... GE Company **discriminated Plaintiff based on age, race, color and national origin** through the Individual Defendants' unlawful harassment, bullying, retaliation and wrongful termination." |
| II. Wrongful termination based on New York Human Rights Law | IX. "Unlawful Discriminatory Practice in Violation of New York State Human Rights Law ... GE Company discriminated Plaintiff based on age, race, color and national origin through the Individual Defendants' unlawful harassment, bullying, retaliation **and wrongful termination**." |
| III. Age discrimination based on New York Human Rights Law | IX. "Unlawful Discriminatory Practice in Violation of New York State Human Rights Law ... GE Company **discriminated Plaintiff based on age**, race, color and national origin through the Individual Defendants' unlawful harassment, bullying, retaliation and wrongful termination." |
| VI. Harassment based on New York State Civil Rights Law 79-N (against Bourgeois) | X. "Intentional Unlawful Harassment in Violation of New York State Civil Rights Law§ 79 ... Richard Bourgeois acts violated **NYSCRL 79-n 2** ..." |
| VII. "Unequal Opportunity Employer in Violation of New York State Constitution, contract law and common law...." | XI. "Unequal Opportunity Employer in Violation of Title VII of the Civil Rights Act of 1964, The Civil Rights Act of 1991, The Fourteenth Amendment and 42 U.S.C. § 1983." |

In addition, the Court's May 9, 2016 Order in *Zheng I* held: "Plaintiff's Eleventh Cause of Action against GE Company for 'Unequal Opportunity Employer' shall be read as an unconscionability claim against GE Company pursuant to **state contracts law**, and such claim may proceed."

Plaintiff also asserts claims in the Complaint alleging violations under the New York Workers' Compensation Law (Claims III and IV). These claims were not contained in the Second Amended Complaint. However, Defendants provide evidence indicating that Plaintiff's Workers' Compensation Law discrimination claim was presented to a New York State Workers' Compensation Board Administrative Law Judge ("ALJ"), who rejected the claim, and that Plaintiff appealed this ruling of the New York State Workers' Compensation Board. *See* Billok Declaration and Exhibits A-C.[3] Plaintiff then withdrew his Workers' Compensation discrimination claim under the mistaken belief that, because the Workers' Compensation Board did not promptly respond to his appeal, he could withdraw this claim and litigate it and a Workers' Compensation benefits claim in state court. *See* Pl. Opp. to Mot. to Dismiss, Dkt. # 24, p. 5;[4] *id.* at Exs. 1 & 2.

[3]   The exhibits to the Billok Declaration are administrative in nature, reflecting the proceedings that have taken place before the Workers Compensation Board, and are not offered for the truths of the matter asserted, but for the purpose of judicial notice. Thus, the Court may consider such exhibits on this motion to dismiss without converting this motion into one for summary judgment. *See Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F. Supp. 2d 115, 125 (W.D.N.Y. 2010) ("the Court takes judicial notice of the District's response to the May 12, 2008 EEOC charges") (citing *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 253-54 (E.D.N.Y. 2002)); *see also Frederick v. Wells Fargo Home Mortg.*, 2015 WL 1506394, at *15, 2015 U.S. Dist. LEXIS 41328, at *39 (E.D.N.Y. Mar. 30, 2015) ("It is well settled that in disposing of a Rule 12(b)(6) motion to dismiss, a court's review of DHR or judicial proceedings (and to the papers filed or issued therein) does not trigger Rule 12(d)'s provision for conversion of the motion into one for summary judgment.") (citing *Ferrari v. County*

*of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011)).

[4]   Plaintiff asserts: "Plaintiff didn't make the compensation claim at the Board, but the Albany office treated the complaint as the benefit claim. It is more than two months after Plaintiff submitted the Reply to the Rebuttal that Plaintiff had not received and [*sic*] feedback from the Board Review committee on the appeal. It is shown that the Board is not a proper platform to pursue the discrimination claim, I withdrew this discrimination claim from the Board (Ex. 2), same as the compensation claim."

## III. DISCUSSION

### a. Plaintiff's motion for a three-judge panel

**\*4** Plaintiff moves to convene a three-judge panel to decide issues in this case. Dkt. # 23. "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284. None of these conditions are present. The motion, which is frivolous because it is made without proper factual or legal basis, is denied.

### b. Plaintiff's Motion to Remand

#### 1. Plaintiff's Arguments

Plaintiff moves to remand the action to state court. Dkt. # 19. In support of this motion, Plaintiff recounts the determinations by this Court, the Second Circuit, and the arbitrator in *Zheng I*, and argues that none were legally proper. Dkt. # 19, pp. 2-3. He contends that "[u]nder this situation, Plaintiff had to fight for his right to trial warranted under New York State law, so that he filed the lawsuit at the State Supreme Court, Schenectady County." *Id.*, p. 3. He argues that the claims filed in the New York State Supreme Court case are not removable because under the "well-pleaded

complaint rule," none of his claims raise federal issues. He further argues that the Federal Arbitration Act does not apply because the GE Solution Procedure denominates the New York Consolidated Laws as the exclusive governing law "without regard to choice of law principles," and, although the GE Solution procedure provides that "[f]or all Covered Employees, this procedure is an agreement to arbitrate pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. Sections 1-14," it also provides that "if that Act is held to be inapplicable for any reason, the arbitration law in the state in which the arbitration hearing is held" shall control. Plaintiff argues, apparently based on his contention that the FAA does not apply, "the New York State arbitration law applies to the case filed in the State Court by the Solution [sic]." Id. p. 5.

Plaintiff also argues that the inclusion of the Workers' Compensation claims in the Complaint prevents removal of the action. Id. (citing 28 U.S.C. § 1445 (c)("A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."). Plaintiff contends that under New York Law, "it is the injured employee's option to claim in court or the [Workers' Compensation] Board. The defendants (Employer GE) has [sic] no right or authority of any kind on how and where the injured employee to [sic] pursue the claims." Id.

Finally, Plaintiff argues that because "Defendant GE and the State Supreme Court of Schenectady County are located in the same city," the action "is not removable 'solely on the basis of the jurisdiction under section 1332(a)'." Id., p. 6. In support of this argument, Plaintiff points to 28 U.S.C. § 1441(b)(2), which provides that "[a] civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." Id.

## 2. Defendants' Arguments

In opposition, Defendants argue that Plaintiff, dissatisfied by the determination in Zheng I that sent all of his claims to arbitration, now improperly attempts to obtain the proverbial second bite at the apple by engaging in "artful pleading," trying to avoid federal subject matter jurisdiction by alleging only state law claims. But, Defendants contend, this attempt is futile because the majority of the claims in the instant action

present the same claims addressed in Zheng I, including his federal question claims.

## 3. Removal & Remand Standards

 *5  A party may remove a case to federal court from state court if the case originally could have been brought in federal court. 28 U.S.C. § 1441(a). Either complete diversity of citizenship between the parties where the amount in controversy is $75,000 or greater, or a question arising under federal law, is required to establish federal jurisdiction. Id. §§ 1331, 1332(a). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." Id. § 1447(c).

"On a motion to remand, 'the defendant has the burden of establishing that removal is proper.' " Quadrille Wallpapers & Fabric, Inc. v. Pucci, No. 1:10-CV-1394 LEK/DRH, 2011 WL 3794238, at *3 (N.D.N.Y. Aug. 24, 2011)(quoting United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)). "The Court 'construes all factual allegations in favor of the party seeking remand.' " Id. (quoting O'Brien & Gere Ltd. v. Bus. Software Alliance, No. 5:07-CV-1174, 2008 WL 268430, at *3 (N.D.N.Y. Jan. 30, 2008). Additionally, "[a]ny doubts regarding the propriety of removal are resolved in favor of remand, and 'federal courts construe the removal statute narrowly.' " Anwar v. Fairfield Greenwich Ltd., 676 F. Supp.2d 285, 292 (S.D.N.Y. 2009) (quoting Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994)).

## 4. Analysis - Motion to Remand

### a. All Claims Except Workers' Compensation Claims

#### i. FAA, 9 U.S.C. § 1, et seq.

Here, even when construing all factual allegations in the Complaint in Plaintiff's favor, there can be no doubt that Plaintiff's claims in this action, save for the Workers' Compensation claims, are subject to arbitration in accordance with the terms of the GE Solutions Procedure as explained in Zheng I. See Zheng I, Dkt. # 42, pp. 5-7;[5]  see also Second Circuit Mandate, Zheng v. General Electric, Case No. 16-3036, (2d Cir. Jan. 25, 2017)(Dkt. # 78 in Zheng I)

(Dismissing Plaintiff's appeal *sua sponte*, stating the appeal had no "arguable basis either in law or in fact."). Furthermore, it has already been determined that arbitration of Plaintiff's workplace claims is proper under the FAA. *See Zheng I*, Dkt. # 42; *see also* Second Circuit Mandate, Dkt. # 78 in *Zheng I*. Plaintiff's refusal to accept this determination provides no basis to reject it, and provides no legitimate reason to vacate the already-completed arbitration and start anew under state arbitration law. Plaintiff's grounds to vacate the arbitration award have already been addressed on the merits and rejected. *See Zheng I*, Dkt. # 99.

5    The Court held in *Zheng I*:

> There can be no dispute that the Offer Letter and the incorporated Solutions Procedure constitute a valid and binding agreement between Plaintiff and GE to arbitrate all claims regarding harassment, discrimination, or retaliation, as well as all claims related to involuntary termination. Dixon, 947 F. Supp. 2d at 397. By signing the Offer Letter, Plaintiff impliedly acknowledged that he read, considered, and understood the terms of the Offer Letter, and by accepting employment he impliedly acknowledged his agreement that the GE Solutions Procedure as the sole procedure for resolving the claims he brings here.

> * * *

> The GE Solutions Procedure is broad and encompasses "[c]laims relating to involuntary terminations," "[e]mployment discrimination and harassment claims," "[r]etaliation claims for legally protected activity," and "[c]laims of violation of public policy." Docket No. 22-2, at 5-6. It clearly defines "Covered Claims" in Section II.K, including in its definition "[e]mployment discrimination and harassment claims, based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, handicap/disability, or other characteristic protected by law," and "[r]etaliation claims for legally protected activity and/or for whistleblowing." Id. Furthermore, Covered Claims "include all claims that arise out of or are related to an employee's employment or cessation of employment (whether asserted by or against the Company)." Docket No. 22-2, at 5. "The Company" is defined in Section II.H as "GE, any subsidiaries, affiliates, joint

ventures, and parents thereof that have adopted the procedure, and, as to each of these, their officers, directors, agents, supervisors/managers acting within the scope of employment, and any of its or their successors or assigns." Id. at 4.

There can be no meritorious dispute that all of Plaintiff's claims are against "the Company" as defined by the GE Solutions Procedure. Accordingly, all of Plaintiff's claims fall within the scope of the GE Solutions Procedure, which makes plain that "Covered Employees and the Company are not allowed to litigate a Covered Claim in any court."

There also can be no meritorious dispute that all of Plaintiff's federal claims are arbitrable. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 27-28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (ADEA claims are arbitrable); Arciniaga v. General Motors Corp., 460 F.3d 231, 238 (2d Cir. 2006) (§ 1981 claims are arbitrable); Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 148 (2d Cir. 2004) (Title VII claims are arbitrable). Likewise, there can be no meritorious dispute that Plaintiff's claims based on the New York State Human Rights Law and New York State Civil Rights Law are also arbitrable. See Lapina v. Men Women N.Y. Model Mgmt., 86 F. Supp. 3d 277, 288 (S.D.N.Y. 2015) ("Given that Plaintiffs' statutory claims are arbitrable, Plaintiffs' pendent state law claims are also arbitrable.") (citation omitted); Schuetz v. CS First Boston Corp., 1997 WL 452392, at *4, 1997 U.S. Dist. LEXIS 11612, at *4 (S.D.N.Y. Aug. 8, 1997) (Human Rights Law claims are arbitrable); Kamakazi Music Corp. v. Robbins Music Corp., 1980 WL 1159, at *——– ——, 1980 U.S. Dist. LEXIS 11836, at *1-3 (S.D.N.Y. June 5, 1980) (granting motion to compel New York Civil Rights Law claim to arbitration).

Thus, the Court finds that (1) the parties agreed to arbitrate, and, (2) the scope of the agreement encompasses all of the claims at issue in this action. Accordingly, and in recognition of the national policy favoring arbitration when the parties contract for that mode of dispute resolution, see E.S. Originals Inc., 734 F. Supp. 2d at 529, Defendants' motion to compel arbitration is granted.

2018 WL 11417797

*Zheng I*, Dkt. # 42, pp. 5-7.

**\*6** A federal question arises under the FAA because of the question of arbitrability of the majority of the claims pleaded in the Complaint, and by the fact that many of the claims in the state action have already been adjudicated in a *Zheng I*, a federal action started by Plaintiff.

### ii. Well-Pleaded Complaint Rule & Artful Pleading Doctrine

Moreover, as Defendants argue, the claims pleaded in the instant action can properly be construed as federal claims under the artful pleading doctrine. "Where the removal is based upon federal question jurisdiction, the 'well-pleaded complaint rule' governs." *Panizza v. Mattel, Inc.*, No. 02 CV 7722, 2003 WL 22251317, at \*2 (S.D.N.Y. Sept. 30, 2003) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L.Ed.2d 318 (1987)). "The well-pleaded complaint rule requires that a federal question appear on the face of a properly pled complaint." *Quadrille Wallpapers & Fabric, Inc. v. Pucci*, No. 1:10-CV-1394 LEK/DRH, 2011 WL 3794238, at \*3 (N.D.N.Y. Aug. 24, 2011) (citing *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986), *cert. denied*, 479 U.S. 885, 107 S. Ct. 277, 93 L. Ed. 2d 253 (1986), in turn citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed.2d 420 (1983)). Under the well-pleaded complaint rule, a plaintiff is "normally the master of [his] complaint, and a federal question will not be found if it is not in the complaint." *Ryan v. Dow Chem. Co.*, 781 F. Supp. 902, 916 (E.D.N.Y. 1991), *aff'd sub nom. In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425 (2d Cir. 1993)(citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L. Ed. 126 (1908)). This rule "permits [a] plaintiff to avoid federal jurisdiction by exclusively relying on state law." *Panizza*, 2003 WL 22251317, at \*2.

However, "in certain limited circumstances a plaintiff may not defeat removal by clothing a federal claim in state garb, or, as it is said, by use of artful pleading." *Travelers*, 794 F.2d at 758 (internal quotation omitted).

The Supreme Court established the general test for removal of a claim based on an "artfully pleaded" complaint in *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2, 101 S. Ct. 2424, 2427 n.2, 69 L. Ed. 2d 103 (1981). In holding that removal of plaintiff's state law claims was

proper because they had "sufficient federal character," the Court wrote:

Courts 'will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum ... [and] occasionally the removal court will seek to determine whether the real nature of the claim is federal, regardless of the plaintiff's characterization.' *Id.* (quoting 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3722, pp. 564-66 (1976)) (citations and footnotes omitted).

Following *Federated*, the Second Circuit identified two criteria for determining whether a state law claim is actually an "artfully pleaded" federal claim: (1) whether "the elements of the claim [are] virtually identical to those of a claim expressly grounded on federal law" and (2) whether the plaintiff "previously elected to proceed in federal court." [*Travelers*, 794 F.2d at 758].

*Feuerman v. Sears, Roebuck & Co.*, 1996 U.S. Dist. LEXIS 16510 \*7-8, 1996 WL 648966 (S.D.N.Y. Nov. 4, 1996).

**\*7** The majority of the claims in the Complaint satisfy both of the *Travelers* criteria.

### A. Virtually Identical Elements

The facts underlying the majority of the claims in the Complaint are virtually identical to those underlying the claims expressly grounded on federal law alleged in the Second Amended Complaint. Moreover, to prove his current claims under the New York State Human Rights Law, Plaintiff would need to prove the same elements as under the Title VII and ADEA claims alleged in the Second Amended Complaint. *See Pucino v. Verizon Communs., Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."); *Cohen v. S.U.P.A., Inc.*, 814 F. Supp. 251, 257 (N.D.N.Y. 1993) ("The elements to prove a claim under the NYSHRL are 'virtually identical' to those pursuant to the ADEA and Title VII") (citations omitted). This satisfies the first *Travelers* criteria.

### B. Previous Election to Proceed in Federal Court

As is clear from *Zheng I*, Plaintiff previously elected to proceed in federal court. Plaintiff was the master of his

Second Amended Complaint that he elected to bring in federal court. He could have brought that complaint in 2015 in state court, alleging claims only under state law, but he did not do so. Rather, in *Zheng I* Plaintiff alleged claims under federal law, and elected to file his complaint in federal court. This satisfies the second *Travelers* criteria.

Plaintiff may not now argue that his nearly identical claims in the Complaint are not subject to federal jurisdiction simply to avoid dismissal of his already decided claims. *See Ryan, 781 F. Supp. at 918* ("Because plaintiff's actions are in reality artful pleadings to avoid a prior federal court decision, this court has jurisdiction over plaintiff's removed actions."); *see also DeCarlo v. Archie Comic Publ'ns, Inc.*, 11 Fed. Appx. 26, 28-29 (2d Cir. 2001) (upholding district court's decision that denied remand where claim brought under state law was at its core essentially a claim under federal copyright law).

### b. Workers' Compensation Claims

Plaintiff's inclusion of New York State Workers' Compensation claims in the Complaint does not defeat removal or require the above-referenced claims to be remanded. Contrary to Plaintiff's belief, he cannot bring his Workers' Compensation claims in the first instance in state court. *See* N.Y. Workers' Comp. Law §§ 11;[6] 20,[7] 23,[8] 120;[9] N.Y. Gen. Oblig. Law § 18-201(2);[10] *O'Rourke v. Long*, 41 N.Y.2d 219, 222, 391 N.Y.S.2d 553, 359 N.E.2d 1347 (N.Y. 1976).[11] Moreover, Plaintiff proceeded before the Workers' Compensation Board, at least on his Workers' Compensation discrimination claim, which he pursued to appeal before withdrawing the claim. *See* Pl. Opp. to Mot. to Dismiss, Dkt. # 24, p. 5. His inclusion in the Complaint of a Workers' Compensation discrimination claim that was withdrawn following an adverse determination by the ALJ, and a Workers' Compensation benefits that should have been brought before the Workers' Compensation Board, cannot serve to defeat removal of the other claims. *Feuerman*, 1996 U.S. Dist. LEXIS 16510, *11-12.[12]

[6]    ("The liability of an employer prescribed by the last preceding section *shall be exclusive and in place of any other liability whatsoever, to such employee ..., at common law or otherwise, on account of such injury or death or liability arising therefrom, except that if an employer fails to secure the payment of compensation for his or her injured employees*

*and their dependents* as provided in section fifty of this chapter, *an injured employee*, or his or her legal representative in case of death results from the injury, *may, at his or her option, elect to claim compensation under this chapter, or to maintain an action in the courts for damages on account of such injury....*")(emphasis added).

[7]    ("[A] a claim for compensation may be presented to the employer or to the chair. *The board shall have full power and authority to determine all questions in relation to the payment of claims presented to it for compensation under the provisions of this chapter....* Upon a hearing pursuant to this section either party may present evidence and be represented by counsel. *The decision of the board shall be final as to all questions of fact*, and, except as provided in section twenty-three of this article, as to all questions of law.")(emphasis added).

[8]    ("*An award or decision of the board shall be final and conclusive upon all questions within its jurisdiction*, as against the state fund or between the parties, unless reversed or modified on appeal therefrom as hereinafter provided. *Any party may ... file with the board* an application in writing for a modification or rescission or review of such award or decision, as provided in this chapter.... *[An] appeal may be taken therefrom to the appellate division of the supreme court, third department*, by any party in interest, ... *provided, however, that any party in interest ... make application in writing for review thereof by the full board....* Failure to apply for review by the full board shall not bar any party in interest from taking an appeal directly to the court as above provided.... *The board shall be deemed a party to every such appeal from its decision upon such application, and the chair shall be deemed a party to every such appeal from an administrative redetermination review decision pursuant to subdivision five of section fifty-two of this chapter.... An appeal may also be taken to the court of appeals* in the same manner and subject to the same limitations not inconsistent herewith as is now provided in the civil practice law and rules.") (emphasis added).

[9]    (It shall be unlawful for any employer or his or her duly authorized agent to discharge or fail to reinstate pursuant to section two hundred

three-b of this chapter, or in any other manner discriminate against an employee as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, or claimed or attempted to claim any benefits provided under this chapter or because he or she has testified or is about to testify in a proceeding under this chapter and no other valid reason is shown to exist for such action by the employer. Any complaint alleging such an unlawful discriminatory practice must be filed within two years of the commission of such practice. Upon finding that an employer has violated this section, *the board shall make an order* that any employee so discriminated against shall be restored to employment or otherwise restored to the position or privileges he or she would have had but for the discrimination and shall be compensated by his or her employer for any loss of compensation arising out of such discrimination together with such fees or allowances for services rendered by an attorney or licensed representative as *fixed by the board*. Any employer who violates this section shall be liable to a penalty of not less than one hundred dollars or more than five hundred dollars, *as may be determined by the board*. All such penalties shall be paid into the state treasury. All penalties, compensation and fees or allowances shall be paid solely by the employer. The employer alone and not his or her carrier shall be liable for such penalties and payments. Any provision in an insurance policy undertaking to relieve the employer from liability for such penalties and payments shall be void. An employer found to be in violation of this section and the aggrieved employee *must report to the board* as to the manner of the employer's compliance within thirty days of receipt of a final determination. In case of failure to report on compliance, or *failure to comply with an order or penalty of the board* within thirty days after the order or notice of penalty is served, except where timely application to the board for a modification, rescission or review of such order or penalty has been filed under section twenty-three of this chapter, *the chair* in any such case *or, on the chair's consent*, any party may enforce the order or penalty in a like manner as an award of compensation.")(emphasis added).

10 ("The liability of an employer and his or her employees set forth in sections ten, eleven and twenty-nine of the workers' compensation law *shall be exclusive and in place of any other liability whatsoever*, to employees, their personal representatives, spouses, parents, dependents, distributees or any person otherwise entitled to recover damages, contribution or indemnity, at common law or otherwise, on account of injury or death or liability arising therefrom, *except that if an employer fails to secure the payment of compensation for its injured employees and their dependents* as provided in section fifty of the workers' compensation law, *an injured employee*, or his or her legal representative in case death results from the injury, *may, at his or her option, elect to claim compensation under the workers' compensation law, or to maintain an action in the courts for damages against the employer on account of such injury....*")(emphasis added).

11 ("The Workmen's Compensation Law evinces a legislative design to require employers to pay workmen's compensation benefits where employees sustain injuries or meet their death in the course of specified hazardous employments. (Workmen's Compensation Law, § 3.) Every employer who is subject to the law must "secure compensation to his employees and pay or provide compensation for their disability or death from injury arising out of and in the course of the employment without regard to fault as a cause of the injury, except that there shall be no liability for compensation under this chapter when the injury has been solely occasioned by intoxication of the injured employee while on duty or by wilful intention of the injured employee to bring about the injury or death of himself or another." (Workmen's Compensation Law, § 10.) *The liability of the employer to provide compensation is the exclusive liability of the employer unless the employer fails to secure the payment of compensation.* (Workmen's Compensation Law, § 11.) Securing the payment of compensation involves the procurement of one of several forms of insurance, or, alternatively, obtaining authorization to rely upon self-insurance. (Workmen's Compensation Law, § 50.) *In the event that payment of compensation is not secured, the employee*, or in the case of death

his representatives, *may nevertheless elect to claim compensation or, at their option, maintain a plenary action in the courts for damages.* (Workmen's Compensation Law, § 11; *see, generally*, 2A Larsen, Workmen's Compensation Law, § 67.22.")(emphasis added).

12    ("All that is required to remove a case to federal court is a single claim that is an 'artfully pled' federal claim.")(citing *Travelers*, 794 F.2d at 760 n.7 (upholding removal of all four claims, including three state claims, even though only one claim out of four was identified as "federal") and *Cresswell v. Sullivan & Cromwell*, 771 F. Supp. 580, 585 (S.D.N.Y. 1991) ("Although the [statutory] claim in each action is clearly a state law claim, the Plaintiffs' decision to join those claims with their fraud claims justifies removal of both the New Actions in their entirety under 28 U.S.C. § 1441(c)."), *aff'd*, 962 F.2d 2 (2d Cir. 1992)).

### 5. Diversity of Citizenship

**\*8**  Because the Court finds that the Complaint presents a federal question under 28 U.S.C. § 1331, there is no reason to address Plaintiff's argument attacking diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

### 6. Conclusion - Motion to Remand

For the reasons discussed above, Plaintiff's motion to remand this action to state court, Dkt. # 19, is denied.

### c. Defendants' Motion to Dismiss

Defendants move to dismiss Plaintiff's claims under the doctrine of *res judicata*. Dkt. # 20.

" 'Under the doctrine of *res judicata*, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that action.' " *EDP Med. Computer Sys. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d cir. 2000)). The doctrine "bars later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.' " *Id.*

(quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)). The doctrine applies to " 'any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided.' " *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir. 1992)).

*Fowlkes v. Adamec*, 2014 U.S. Dist. LEXIS 185790 \*6-7, 2014 WL 11350294 (N.D.N.Y. Oct. 8, 2014). Each of the elements required for dismissal under *res judicata* is met here for all claims in the Complaint.

The Court will first address the non-Workers' Compensation Law claims

### 1. Final judgment on the merits

This Court issued its Decision and Order in *Zheng I* in June 2016, finding that all of the claims in the Second Amended Complaint were subject to GE's Solutions alternate dispute resolution procedure, and because "a valid and compulsory arbitration provision covering all claims eliminates subject matter jurisdiction and bars a plaintiff from pursuing suit in a nonarbitral forum," the "the action in this Court [was] dismissed." *Zheng I*, Dkt. # 42, at 7-8. When Plaintiff appealed the decision, the Second Circuit dismissed the appeal *sua sponte*, stating the appeal had no "arguable basis either in law or in fact." *Zheng v. General Electric*, Case No. 16-3036 (2d Cir. Jan. 25, 2017), Dkt. # 78 in *Zheng I*.

There can be no meritorious dispute that the Court's judgment in *Zheng I* was final. There also can be no meritorious dispute that the judgment was based on the merits of whether Plaintiff's claims could be litigated in court or whether they were subject to mandatory arbitration, with the Court unequivocally holding that all claims were subject to arbitration.

### 2. Court of competent jurisdiction

There also can be no meritorious dispute that this court is a court of competent jurisdiction to decide the issues related to the claims in *Zheng I*. Indeed, Plaintiff elected to bring his claims in *Zheng I* in this court.

### 3. Same Parties

The instant action involves exactly the same parties as did *Zheng I.*

### 4. Same causes of action

With the exception of Plaintiff's Workers' Compensation claims, the Complaint alleges the same facts as the dismissed Second Amended Complaint, with pages of paragraphs taken verbatim from the Second Amended Complaint. Moreover, the Complaint alleges the same causes of action against Defendants under the New York State Human Rights Law and state contract law as addressed in *Zheng I.*

### 5. State Constitution, Contract law, & Common Law Claims

**\*9** To the extent the Complaint alleges claims under the New York State Constitution, contract law, or common law that were not raised and adjudicated in *Zheng I*, these claims could have been raised and adjudicated in *Zheng I.* Therefore, the doctrine of *res judicata* also applies to these claims as well.

### 6. Conclusion - All Claims Except Workers' Compensation Claims

For these reasons, all claims asserted in the Complaint, save the Workers' Compensation Claims, are dismissed under the doctrine of *res judicata* for having been litigated in *Zheng I*, or because the opportunity existed to litigated the other non-Workers' Compensation claims in that previous action. *See Fowlkes*, 2014 U.S. Dist. LEXIS 185790, at *7; *Flynn v. James*, 2013 WL 665069, *——, 2013 U.S. Dist. LEXIS 24287, *3 (N.D.N.Y. Feb. 22, 2013)*; *Lasko v. United States DOJ*, 2011 U.S. Dist. LEXIS 154916, *12 (N.D.N.Y. Jan. 19, 2011).

### 7. Defendants' Arguments on Workers' Compensation Claims

Defendants argue that although the Workers' Compensation claims were not included in the Second Amended Complaint,

these claims should be dismissed under the doctrine of *res judicata* because Plaintiff could have raised these issues in *Zheng I.* Alternatively, Defendants argue that the claims should be dismissed because Plaintiff litigated the Workers' Compensation Law Section 120 discrimination claim before a Workers' Compensation Board ALJ, and appealed the adverse decision. Moreover, Plaintiff had the opportunity to litigate his Workers' Compensation benefits claim before the Workers' Compensation Board. Thus, Defendants contend, Plaintiff had a full and fair opportunity to litigate his Workers' Compensation claims.

### 8. Conclusion - Workers' Compensation Claims

Because Plaintiff could not have brought his Workers' Compensation claims in this court, these claims are not barred by the doctrine of *res judicata* under the theory that they could have been raised and adjudicated in *Zheng I.* However, the record supports Defendants' argument that Plaintiff had a full and fair opportunity to litigated his Workers' Compensation claims before the Workers' Compensation Board and, if dissatisfied with the result, pursue an appeal to the New York State Supreme Court, Appellate Division, Third Department and, possibly, to the New York State Court of Appeals. *See* N.Y. Workers' Comp. Law § 23. The fact that Plaintiff mistakenly interpreted the law and withdrew his Workers' Compensation claims under the misunderstanding that he could, mid-way through the litigation, change the forum that would decide these claims, *see* Pl. Opp. to Mot. to Dismiss, Dkt. # 24, p. 5, does not defeat the application of the doctrine of *res judicata* to these claims. Accordingly, Plaintiff's Workers' Compensation Law claims are barred by the doctrine of *res judicata* and are dismissed.

### d. Plaintiff's Motion for Sanctions

In opposition to Defendants' motion to dismiss this action, Plaintiff cross-moves for sanctions against defense counsel. Dkt. # 24. The basis for Plaintiff's motion is, essentially, that he disagrees with Defendants' arguments in support of dismissal. *See* Dkt. # 24. As indicated above, Defendants' positions are adequately supported by the facts underlying this case and by the law applicable to this matter. Therefore, Plaintiff's cross-motion for sanctions, Dkt. # 24, is denied.

### e. Defendants' Renewed Motion for Sanctions

**\*10** In their Reply Memorandum in Support of the Motion to Dismiss, Dkt. # 25, Defendants renew their motion for

2018 WL 11417797

sanctions made in *Zheng I*. In *Zheng I*, Defendants filed a motion for sanctions against Plaintiff, seeking an injunction barring him from filing another motion or complaint against Defendants without leave of court. *Zheng I*, Dkt. # 84. The Court denied the motion without prejudice, allowing Defendants to renew "if Plaintiff continues to engage in litigation and motion practice in this matter." *Zheng I*, Dkt. # 86, at 9-10. The Court also warned Plaintiff that "even as a *pro se* litigant, sanctions may be imposed upon him under Rule 11 of the Federal Rules of Civil Procedure if he files frivolous or baseless pleadings, motions, or other papers." *Id.* Defendants point out that Plaintiff continued to file motions in *Zheng I*, and made several motions in the instant case and indicates that he seeks to continue his litigation in state court. Defendants argue:

> The "twin goals of arbitration" are "settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71-72 (2d Cir. 2012) (citations omitted). There is no dispute that Plaintiff's repeated attempts to ignore the Court's June 9, 2016 ruling, holding that claims arising out of his employment do not have a court forum and are subject solely to the Solutions Procedure, "lacks an arguable basis either in law or in fact." *Zheng v. GE*, Case No. 16-3036 (2d Cir. Jan. 25, 2017). ... Plaintiff's efforts to overturn or evade that final ruling remain undaunted, resulting in the very thing arbitration is supposed to avoid, long and expensive litigation. And while Plaintiff has been warned not to file frivolous or baseless pleadings, motions, or other papers, Plaintiff continues to defy that warning, continuing to make frivolous motions and arguments, hurling insults and slurs at [defense counsel] and the Court, and promising that he will continue to file additional motions, appeals, and complaints.

Def. Reply Mem. L., pp. 3-4.

Defendants' position is well taken. Plaintiff continued to file motions in *Zheng I* long after the case was closed, and filed

baseless motions for a three-judge review and for sanctions against defense counsel in the instance matter. Nonetheless, Defendants' application was made in a Reply which, under the Local Rules, does not ordinarily afford the other party an avenue to respond. It is generally frowned upon to grant relief requested in a reply without affording the opposing party an opportunity to respond. Because *Zheng I,* and this case, appear to be at the ends of their journeys in this court, and because the application was made in a Reply, the Court will deny Defendants' application for sanctions but will do so with leave to renew upon the filing of further motions or pleadings by Plaintiff in this court.

## IV. CONCLUSION

For the reasons discussed above,

-Plaintiff's motion to convene a three-judge panel to decide issues in this case, Dkt. # 23, is **DENIED**;

-Plaintiff's motion to remand the action to state court, Dkt. # 19, is **DENIED;**

-Defendants' motion to dismiss Plaintiff's claims under the doctrine of *res judicata*, Dkt. # 20, is **GRANTED**, and all claims in this matter are **DISMISSED** with prejudice;

-Plaintiff's cross-motion for sanctions, Dkt. # 24, is **DENIED**; and

-Defendants' renewed application for sanctions against Plaintiff, Dkt. # 25, is **DENIED** with leave to renew upon the filing of further motions or pleadings by Plaintiff in this court.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 11417797

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 953111
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Valery LATOUCHE, Plaintiff,

v.

ROCKLAND COUNTY; Rockland County Jail;
John Morley, Chief Medical Officer; Department
of Correctional Services; Dr. Jacobson, DDS,
Sing Sing Correctional Facility; Tushar Udeshi,
DDS, Sing Sing Correctional Facility, Defendants.

22-CV-1437 (LTS)
|
Signed 03/29/2022

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

**\*1** Plaintiff, who is currently incarcerated at Sing Sing
Correctional Facility (Sing Sing), brings this *pro se* action
under 42 U.S.C. § 1983, asserting numerous claims that
are wholly unrelated to one another. Plaintiff brings claims
arising from his 2004 arrest, and he challenges his 2005
conviction. Plaintiff also brings claims about his medical
care, which he asserts against: (1) two dentists who allegedly
provided "negligent" dental care in 2016, at Sing Sing; and (2)
the Rockland County Jail, the New York State Department of
Corrections and Community Supervisions (DOCCS),[1] and
DOCCS Chief Medical Officer John Morley in connection
with medical treatment of Plaintiff's hair loss, eczema, and
gynecomastia.

[1]  Plaintiff names as a defendant "Department
of Correctional Services," which the Court
understands to refer to the DOCCS, rather than the
New York City Department of Correction.

By order dated March 14, 2022, the Court granted Plaintiff's
request to proceed *in forma pauperis* (IFP), that is, without
prepayment of fees.[2]

[2]  Prisoners are not exempt from paying the full filing
fee even when they have been granted permission
to proceed *in forma pauperis*. *See* 28 U.S.C. §
1915(b)(1).

**STANDARD OF REVIEW**

The Prison Litigation Reform Act requires that federal courts
screen complaints brought by prisoners who seek relief
against a governmental entity or an officer or employee of a
governmental entity. *See* 28 U.S.C. § 1915A(a). The Court
must dismiss a prisoner's *in forma pauperis* complaint, or any
portion of the complaint, that is frivolous or malicious, fails
to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such
relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v.
Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must
also dismiss a complaint if the court lacks subject matter
jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the
court is obliged to construe *pro se* pleadings liberally, *Harris
v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them
to raise the "strongest [claims] that they *suggest*," *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)
(internal quotation marks and citations omitted) (emphasis in
original). But the "special solicitude" in *pro se* cases, *id. at
475* (citation omitted), has its limits – to state a claim, *pro se*
pleadings still must comply with Rule 8 of the Federal Rules
of Civil Procedure, which requires a complaint to make a short
and plain statement showing that the pleader is entitled to
relief.

**BACKGROUND**

Plaintiff Valery LaTouche alleges the following facts, which
the Courts accepts as true for purposes of screening the
complaint.

**1. False Arrest**
In 2004, Plaintiff was at a friend's house in New City,
Rockland County, New York. (ECF 1 at 2.) There was a
"police raid," and Plaintiff was "unreasonably seized by a
Ramapo police officer." (*Id.*) He was arrested and charged
with unlawful possession of weapons. Later, at a preliminary

hearing, the charges against Plaintiff were dismissed based on information that he did not reside in the home.

**\*2** In 2005, Plaintiff was arrested on an "active warrant" arising from the 2004 police raid, which "was used as cause" to detain him in connection with the charges for which he is currently serving a sentence.[3] Plaintiff obtained, in 2021, a certificate of dismissal from the Ramapo Town Court in connection with the weapons possession charges. Plaintiff sues the County of Rockland for false imprisonment and violations of his rights under the Fourth Amendment in connection with this 2004 arrest, for which the charges were dismissed.

[3]    In the report and recommendation addressing Plaintiff's petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, the court noted that Plaintiff was arrested because a plainclothes officer believed that there was an outstanding warrant from Clarkstown for his arrest, but he was released when it was determined that the warrant was no longer valid. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013).

### 2. Challenge to 2005 Conviction

Plaintiff asserts claims against Defendant "Rockland County Supreme Court," in connection with Justice Kevin Russo's handling of Plaintiff's post-conviction motions, under New York Criminal Procedure Law § 440.10.

Plaintiff contends that the Rockland County District Attorney, in opposing Plaintiff's December 18, 2018 motion to vacate his conviction, ignored the arguments that Plaintiff was actually innocent and disputed that defense counsel was ineffective in failing to present evidence of Plaintiff's "low intellectual disability." (*Id.* at 4, ¶ 19.) Justice Russo denied Plaintiff's motion under New York Criminal Procedure Law § 440.10(3)(c) based on Plaintiff's failure to have raised these arguments in his earlier § 440.10 motions. (*Id.* at 4, ¶ 20.) Justice Russo also denied the motion for rehearing, and the Appellate Division, Second Department, denied leave to appeal.

Plaintiff also filed applications in state court arguing (1) that his § 440.10 motion should not have been heard by Justice Russo, whose law clerk was a former prosecutor who had previously worked for a judge who is biased against Plaintiff (Justice Kelly); and (2) that the Grand Jury proceedings were flawed. Plaintiff seeks only damages in this complaint and has not requested any other relief in connection with these claims against the Rockland County Supreme Court.

### 3. Medical Treatment

During Plaintiff's confinement as a pretrial detainee at Rockland County Jail in 2005, he was diagnosed with depression and placed on suicide watch. Plaintiff was prescribed two antidepressant medications: Rameron and Atrax. (*Id.* at 6, ¶ 25.) In May 2005, a doctor at the jail diagnosed Plaintiff with gynecomastia "as a result of his [in]gestion of Rameron." (*Id.* at ¶ 26.) Plaintiff was referred "to a surgeon for a biopsy." (*Id.* at ¶ 27.) Before the biopsy took place, Plaintiff was convicted and taken into DOCCS custody. (*Id.*)

DOCCS initially housed Plaintiff at Downstate Correctional Facility, where he "repeatedly sought medical attention for his gynecomastia." (*Id.*) On an unspecified date, after Plaintiff was transferred to Sing Sing, he asked Doctors Kwan, Bigaud, and Ezeke for medical treatment because he had pain when lying on his chest. Plaintiff had a mammogram, which had a "negative result." (*Id.* at 6.) Plaintiff continued to complain about the gynecomastia, and gave Sing Sing physician Dr. Muthra, who is not named as a defendant in this action, documents from Rockland County Jail that showed his earlier referral for a biopsy. Dr. Muthra explained that the "Albany official" denied Plaintiff's request for a biopsy based on the results of the mammogram and because treatment for the breast enlargement itself is considered a "cosmetic procedure." (*Id.* at 6, ¶ 29.) Plaintiff brings claims against Rockland County Jail, DOCCS, and its Chief Medical Officer John Morley for failing to treat his gynecomastia.

**\*3** On August 30, 2021, Dr. Muthra told Plaintiff that there was "a spike in his hormonal glands," which can indicate a "possible benign tumor." (*Id.*) Plaintiff was sent to an outside hospital for an MRI. (*Id.* at 7.) At Plaintiff's next medical visit, when he inquired about the MRI results, Dr. Muthra told Plaintiff that his earlier abnormal "blood test w[as] likely a lab error," but that he would continue to monitor Plaintiff's status. (*Id.*)

On an unspecified date, Plaintiff told "his medical provider" at Sing Sing that he had a recurring skin rash, and it was diagnosed as eczema. (*Id.* at 7, ¶ 32.) Plaintiff continued to complain about itching, apparent "ringworm," and hair thinning and bald spots on his scalp and beard. Dr. Muthra prescribed a topical cream (fluocinolone acetonide) for

Plaintiff, and he was given "tar shampoo" and lotion with vitamin E. Plaintiff asked for a biopsy and dermatologist visit, but these requests were denied, and Plaintiff was told that "the Albany official considers his condition to be cosmetic." (*Id.* at ¶ 33.) Plaintiff asserts claims against DOCCS and its Chief Medical Officer, John Morley, for denying him "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp." (*Id.* at 31.)

### 4. Dental Care at Sing Sing in 2016

On April 4, 2016, at Sing Sing, Dr. Allen Jacobson examined Plaintiff's teeth and found cavities and decay. (*Id.* at 2-3.) Two weeks later, on April 19, 2016, dental hygienist cleaned Plaintiff's teeth. Dr. Jacobson then filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and the tooth might need to be extracted. (*Id.* at 3.) Shortly after the filing, "the tooth became infected," and Plaintiff suffered "extreme sensitivity" and shooting pain. On July 18, 2016, Dr. Jacobson attempted to "file down" the injured tooth. X-rays were taken and these showed that "cavities surrounding the tooth" caused scraping near the nerve. Dr. Jacobson advised Plaintiff that the tooth needed to be extracted, but Plaintiff refused and asked him to "cur[e] the infection." (*Id.*) Dr. Jacobson prescribed penicillin and ibuprofen.

On July 22, 2016, another dentist at Sing Sing, Dr. Udeshi, told Plaintiff that tooth #12 needed to be extracted. Plaintiff told Dr. Udeshi that the medication that Plaintiff had taken was provided to "save the tooth," and he refused the extraction. (*Id.* at 3.)

In 2021, the filling in tooth #12 fell out. Dr. K. Rakib examined Plaintiff and found deep cavities in the "tooth opposite ... tooth #12." (*Id.* at 3-4.) Plaintiff told Dr. Rakib that he had been unable to chew on his left side, where tooth #12 was located, due to the "destructive dental filling." (*Id.* at 4.) As a result, he chewed on the other side of his mouth, which "cause[d] the decay in the tooth opposite #12." (*Id.*) On January 21, 2022, Plaintiff's tooth #12 was extracted. Plaintiff asserts claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.)

Plaintiff brings this complaint against Defendants Rockland County, Rockland County Jail, Dentists Jacobson and Udeshi, DOCCS and DOCCS Chief Medical Officer John Morley. Plaintiff seeks $35 million in damages.

### DISCUSSION

#### A. Timeliness

Many of Plaintiff's claims under section 1983 appear to be time-barred. The statute of limitations for section 1983 claims is found in the "general or residual [state] statute [of limitations] for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, that period is three years. *See* N.Y. C.P.L.R. § 214(5). Section 1983 claims generally accrue when a plaintiff knows or has reason to know of the injury that is the basis of the claim. *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013). Plaintiff knew of his injuries when they occurred, and his claims therefore accrued at that time. Plaintiff's claims arising more than three years before he filed this complaint on February 22, 2022 therefore are time-barred, including his claims arising from his 2004 arrest, his 2005 conviction, his medication with Rameron at Rockland County Jail in 2005, and his dental treatment in 2016.

**\*4** Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the case is timely filed. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Dismissal is appropriate, however, where the existence of an affirmative defense, such as the statute of limitations, is plain from the face of the pleading. *See Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.") (internal quotation marks and citation omitted); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds); *see also Abbas*, 480 F.3d at 640 (concluding that district court should grant notice and opportunity to be heard before dismissing complaint *sua sponte* on statute of limitations grounds).

If Plaintiff amends his complaint, and the amended complaint includes any claim arising more than three years before he filed the original complaint on February 22, 2022, he must include any facts showing why the claim should not be deemed time-barred. The doctrine of equitable tolling permits a court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order 'to prevent inequity.' " *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir.

2003) (citation omitted). The statute of limitations may be equitably tolled, for example, when a defendant fraudulently conceals from a plaintiff the fact that the plaintiff has a cause of action, or when the plaintiff is induced by the defendant to forego a lawsuit until the statute of limitations has expired. *See Pearl*, 296 F.3d at 82-83. [4]

[4]    In addition, New York provides by statute for other circumstances in which a limitations period may be tolled. *See, e.g.*, N.Y. C.P.L.R. § 204(a) (where commencement of an action has been stayed by court order), *id. at § 204* (where a dispute has been submitted to arbitration but is determined to be non-arbitrable), id. at § 207(3) (defendant is outside New York at the time the claim accrues), *id.* at § 208 (plaintiff is disabled by infancy or insanity).

As set forth below, even if Plaintiff's claims were not time-barred, the allegations of the complaint generally fail to state a federal claim on which relief can be granted or are otherwise not cognizable in an action under section 1983.

## B. False Arrest in 2004
The Court first looks to state law to establish the elements of a false arrest claim under section 1983. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 925 (2017) ("[T]o flesh out the elements of this constitutional tort, we must look for 'tort analogies.' "); *see also Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (holding that common law principles are meant simply to guide rather than to control the definition of Section 1983 claims and courts should not "mechanically apply" the law of New York State).

Under New York law, to state a claim for false arrest, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).

Officers have probable cause to arrest when they "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and citation omitted). "Probable cause can exist even where

it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (1994); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (holding that a police officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

**\*5** Here, Plaintiff alleges that he was arrested after a "raid" on a home where unlawful weapons were found, and that the charges against him were dismissed when he demonstrated that he did not reside in the home. The fact that the charges against Plaintiff were dismissed, without more, is insufficient to plead plausibly that the Ramapo police officer who arrested Plaintiff lacked probable cause to do so.

Moreover, Plaintiff has not sued an individual officer who allegedly made a wrongful arrest. Instead, he brings this claim against the County of Rockland. To state a claim against a municipality, such as the County of Rockland, a plaintiff must allege that the municipality itself violated Plaintiff's rights. *See Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011). It is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. To state a § 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Even if Plaintiff had adequately alleged that a police officer violated his rights, which he has not done, that allegation would be insufficient to provide a basis for liability on the part of the County of Rockland. Plaintiff does not include any allegations that any policy, custom, or practice on the part of Rockland County violated his rights in connection with this 2004 arrest. Plaintiff thus fails to state a claim against the County of Rockland based on his 2004 arrest on charges that were later dismissed.

Plaintiff also suggests that this wrongful arrest in 2004 was used in 2005 as a pretense to arrest him for the charges for which he is currently serving a prison sentence. A prisoner cannot pursue civil rights claims that would necessarily be inconsistent with a conviction. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Moreover, even where a civil rights

claim would lie, a plaintiff cannot seek relief for "the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." *Id.* at 477, n. 7. Plaintiff's 2005 conviction has not been overturned, and any claim for damages for the injury of serving this sentence would be inconsistent with this conviction.

As set forth above, these claims had been time-barred for nearly 15 years when Plaintiff filed this complaint. It therefore would be futile for Plaintiff to replead these claims, unless he has some adequate basis for equitable tolling.

## C. Challenge to 2005 Conviction

Plaintiff brings civil rights claims regarding the denial of his post-conviction motions against Defendant "Rockland County Supreme Court." As an initial matter, "state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.*

The Supreme Court of the State of New York, Rockland County, is a part of the New York State Unified Court System, and, as such, is an arm of the State of New York. *Id.* at 368 (explaining that a court that is part of the New York State Unified Court System "is unquestionably an 'arm of the State,' entitled to Eleventh Amendment sovereign immunity."). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). The Eleventh Amendment therefore bars Plaintiff's section 1983 claims against the Rockland County Supreme Court.

**\*6** Moreover, Plaintiff's allegations that Justice Russo wrongfully denied his § 440.10 motions are not cognizable in a civil rights action under section 1983. A prisoner can challenge the validity of his state conviction in federal court, or obtain release from custody, only by bringing a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. *See Wilkinson v. Dotson*, 544 U.S. 74, 78-82 (2005) (citing *Preiser v. Rodriguez*, 411 U.S. 475 (1973)) (noting that writ of *habeas corpus* is sole federal remedy for prisoner seeking to challenge the fact or duration of his confinement). Plaintiff's

section 1983 claims challenging his conviction must therefore be dismissed for failure to state a claim on which relief can be granted and because defendant is immune from suit. 28 U.S.C. § 1915(e)(2)(b)(ii)-(iii).

The Court also declines to recharacterize these claims as arising under section 2254, because Plaintiff has already challenged his 2005 conviction in a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, which was denied on the merits. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013), *certificate of appealability denied*, No. 13-3720 (2d Cir. Mar. 13, 2014), *lv to file successive petition denied*, No. 15-3662 (2d Cir. Dec. 7, 2015), *certificate of appealability denied*, No. 16-2885 (2d Cir. Feb. 13, 2017) (appeal of denial of Rule 60(b) motion), *lv to file successive petition denied*, No. 19-4006 (2d Cir. Jan 21, 2020). Plaintiff would require permission from the Court of Appeals to bring a new petition for a writ of *habeas corpus* under section 2254.

## D. Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that several defendants were deliberately indifferent to his serious medical needs. Such claims arise under the Due Process Clause of the Fourteenth Amendment, if Plaintiff was a pretrial detainee at the time of the events giving rise to his claims, and under the Eighth Amendment, if he was a convicted prisoner. *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Whether Plaintiff was a pretrial detainee or convicted prisoner, he must satisfy two elements to state such a claim: (1) an "objective" element, which requires a showing that the challenged conditions are sufficiently serious, and (2) a "subjective" or "mental" element, which requires a showing that the officer acted with at least deliberate indifference to the challenged conditions. *Darnell*, 849 F.3d at 29.

The objective element of a deliberate indifference claim is the same for pretrial detainees and convicted prisoners. The plaintiff's medical need must be a "sufficiently serious" condition that "could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (noting that standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain").

The "subjective" or "mental" element varies depending on whether a plaintiff is a pretrial detainee or convicted prisoner. A convicted prisoner must allege that a correction official actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32 (quoting *Farmer*, 511 U.S. at 837). That is, a convicted prisoner must allege that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." *Id.* By contrast, a pretrial detainee need allege only that the official intentionally or recklessly failed to act with reasonable care "even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Id.* at 35 (emphasis added).

**\*7** The mere negligence of a correction official is not a viable basis for a claim of a federal constitutional violation under section 1983, under either the Eighth or the Fourteenth Amendment. *See Daniels v. Williams*, 474 U.S. 327, 335 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

### 1. Dental Care

Plaintiff was a convicted prisoner as of 2016, when his claims for constitutional violations in connection with his dental care first arose. Plaintiff adequately alleges at this stage that his dental problems were a serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (holding that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become painful or otherwise dangerous). Plaintiff therefore has pleaded facts showing that the objective prong of a deliberate indifference claim is satisfied.

Plaintiff fails, however, to plead any facts giving rise to an inference that either dentist acted with the subjective intent required for deliberate indifference. He states that Dr. Jacobson filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and that the tooth might need to be extracted, which later proved true; Plaintiff nevertheless refused to have it extracted, and Dr. Jacobson prescribed penicillin and ibuprofen for the infection. These allegations do not show that Dr. Jacobson "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. On the contrary, it appears that Plaintiff acted against Dr. Jacobson's advice, and Dr. Jacobson then took steps to mitigate the danger to Plaintiff.

Plaintiff further alleges that, on July 22, 2016, Dr. Udeshi told Plaintiff that tooth #12 needed to be extracted, but Plaintiff refused the extraction. (ECF 2 at 3.) Plaintiff brings claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.) These allegations are insufficient to support a claim of a constitutional violation, both because Plaintiff alleges that he was the one who refused the tooth extraction and because allegations of negligence are insufficient to state a claim that a defendant actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. Plaintiff's section 1983 claims against Doctors Jacobson and Udeshi must therefore be dismissed for failure to state a claim on which relief can be granted.

### 2. Cosmetic Conditions

Plaintiff alleges that Defendants have denied him adequate treatment for his hair loss and eczema because these are cosmetic conditions. "Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury to state a cognizable claim." *Washington v. Fludd*, No. 18-CV-1273(JS) (SIL), 2019 WL 1643542, at \*3 (E.D.N.Y. Apr. 16, 2019) (quoting *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (internal quotation marks and additional citation omitted; alteration in original)). A "cosmetic" condition can rise to the level of seriousness needed to establish a duty of care if: (1) a reasonable doctor would perceive the condition as important and worthy of treatment; (2) the condition significantly affects the prisoner's daily activities; and (3) the condition results in chronic and substantial pain. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

**\*8** Plaintiff alleges that he suffers from hair thinning and bald spots on his scalp and beard. Hair loss is generally not deemed a serious medical condition. *See, e.g., Guthrie v. US Fed. Bureau of Prisons*, No. 09-CV-990 (LAP), 2010 WL 2836155, at \*5 (S.D.N.Y. July 7, 2010) (holding that "[t]he BOP's duty of care to provide for the safekeeping of its prisoners does not require them to provide medication that is cosmetic in nature, including administering hair loss medication), *aff'd*, 421 F. App'x 120 (2d Cir. 2011). Plaintiff does indicate that he has "itching" on his scalp or beard, and apparent "ringworm," but these allegations do not show that he was in chronic or substantial pain at any relevant time or that the condition significantly affected his daily activities. He thus fails to plead facts showing that this was

a sufficiently serious medical condition that satisfies the objective component of a deliberate indifference claim.

Plaintiff also alleges that he was diagnosed with eczema. Skin conditions can be sufficiently serious to satisfy the objective component of a deliberate indifference claim. *Brock*, 315 F.3d at 163 (holding that prisoner's thick keloid scar that was a source of chronic pain was a serious medical condition). Plaintiff alleges, however, that Dr. Muthra prescribed treatment with a topical cream (fluocinolone acetonide), "tar shampoo," and lotion with vitamin E. Although Plaintiff contends that he was denied a biopsy, a dermatologist visit, and "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp" (*id.* at 31), it is well established that "[d]isagreements over medications ... forms of treatment, or the need for specialists ... are not adequate grounds for a Section 1983 claim." *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Plaintiff's allegations are therefore insufficient to state a claim for deliberate indifference in connection with his hair loss or eczema.

### 3. Gynecomastia

Plaintiff alleges that while he was a pretrial detainee at Rockland County Jail, in 2005, he was prescribed a psychiatric drug (Rameron) that caused breast enlargement, known as gynecomastia. He was referred for a biopsy but was transferred to the custody of DOCCS in May 2005, before it took place. Plaintiff sues Rockland County for administering a drug that caused him harm.

Plaintiff's allegations might be construed as a claim for violation of the Fourteenth Amendment right to information about potential side effects of the medication. *See Pabon v. Wright*, 459 F.3d 241, 250-51 (2d Cir. 2006) ("In order to permit prisoners to exercise their right to refuse unwanted treatment, there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment."). [5] Because Plaintiff alleges that he knew of this harm in 2005, it appears that his claim accrued at that time. The three-year limitations period for a section 1983 claim therefore barred this claim when he filed the complaint in 2022. Plaintiff should not replead this claim in his amended complaint, unless he can plead facts showing equitable tolling of the limitations period.

[5] To establish a claim for violation of the Fourteenth Amendment right to medical information, "a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment." *Pabon*, 459 F.3d at 250-51.

Plaintiff alleges that the DOCCS and its Chief Medical Officer have denied treatment for gynecomastia on the ground that it is a cosmetic condition. In cases where a prisoner alleges that gynecomastia "significantly affects daily activities" or cause him "chronic and substantial pain," gynecomastia may qualify as a serious medical condition. *See, e.g., Blaine v. Burnes*, No. 3:20-CV-1039 (KAD), 2020 WL 5659101, at *6 (D. Conn. Sept. 23, 2020) ("While Gynecomastia can cause pain or discomfort, and can result in discharge from the nipple, [plaintiff] alleges none of these infrequent side effects."); *Washington v. Fludd*, 2019 WL 1643542, at *3 (dismissing plaintiff's Eighth Amendment claim based on gynecomastia as a Risperdal side effect for failure to allege facts sufficient to meet the objective component). Plaintiff's allegations are insufficient to show that his breast enlargement "significantly affects daily activities" or causes him "chronic and substantial pain." *Moore*, 2008 WL 4186340 at *6 (citing Brock, 315 F.3d at 162-63).

**\*9** Because Plaintiff may be able to allege facts showing that this is a sufficiently serious condition that is not merely cosmetic, and that defendants are actually aware that this condition is more than cosmetic, the Court grants Plaintiff leave to amend to replead this claim against Chief Medical Officer John Morley or other individuals who were personally aware of a serious medical condition related to Plaintiff's gynecomastia and were deliberately indifferent to the risk to him of serious harm.

### E. Leave to Amend
Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss

[a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid claim about his medical conditions, the Court grants Plaintiff 60 days' leave to amend his complaint to detail his claims.

Plaintiff is granted leave to amend his complaint to provide more facts about his claims. In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

    a) the names and titles of all relevant people;

    b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

    c) a description of the injuries Plaintiff suffered; and

    d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.

## CONCLUSION

Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order,

caption the document as an "Amended Complaint," and label the document with docket number 22-CV-1437 (LTS). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**\*10**  SO ORDERED.

Attachment

## I.  LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other:

## II.  PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City          State          Zip Code

## III.  PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other: _____

Page 2

## IV.  DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 2:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 3:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 4:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Page 3

## V.  STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Page 4

### INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.  RELIEF

State briefly what money damages or other relief you want the court to order.

Page 5

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    9

2022 WL 953111

## VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature | |
|---|---|---|---|
| First Name | Middle Initial | Last Name | |
| Prison Address | | | |
| County, City | | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

**All Citations**

Slip Copy, 2022 WL 953111

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1838277
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Michael WALKER, Plaintiff,

v.

CITY OF NEW YORK; Brooklyn Public Defenders
Office; Danielle Regis; New York City Police
Department; Detective Courtney Winston; Detective
Raymond Higgins; Detective Jason Guzman; Detective
Patrick Jean Pierre; Ranking Detective Daniel Pierrino;
Civil Complaint Review Board; Chairman Frank
Davie; Field Investigator A. Wassim; Panel Member
S. Carceterra; Panel Member M. Rivadene; Records
Access Officer George Alexander; Internal Affairs
Bureau; Captain Brian White; Lt. Dwayne Watson;
Sgt. Moode; Detective Carmelo Rivera; Detective
Rashad Vandross; Corporation Counsel Law Dept.;
Supervisor Nelson Genevieve; Daniel Oliner; Allyson
Nicole Brown; Christopher D. Deluca, Defendants.

20-CV-5240 (PKC) (LB)
|
Signed 05/07/2021

**Attorneys and Law Firms**

Michael Walker, Napanoch, NY, pro se.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*1** Plaintiff Michael Walker, incarcerated at the Eastern New
York Correctional Facility, brings this *pro se* action under
42 U.S.C. §§ 1983, 1985, and 1986, the Americans with
Disabilities Act ("ADA") and Rehabilitation Act, and various
state-law provisions. Plaintiff's request to proceed *in forma
pauperis* ("IFP") is granted pursuant to 28 U.S.C. § 1915. For
the reasons discussed below, Plaintiff's Amended Complaint
(Dkt. 24-1) is dismissed in its entirety. Plaintiff is granted
sixty (60) days' leave to file a Second Amended Complaint
as set forth below.

**BACKGROUND**

**I. Underlying Facts** [1]

[1]   This recitation of the facts is based on the
non-conclusory allegations in the Complaint and
Amended Complaint, which the Court accepts
as true at this stage in the case, *see Milan v.
Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (per
curiam) (citation omitted), as well as the Court's
factual findings at the summary judgment stage in
*Walker v. Raja, see* 2020 WL 606788.

This case is related to Plaintiff's pending action in *Walker
v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Aug. 22,
2017). [2] On January 8, 2017, Plaintiff was arrested following
an attempted armed robbery of a jewelry store. *Walker v.
Raja*, No. 17-CV-5202 (PKC) (LB), 2020 WL 606788, at \*1
(E.D.N.Y. Feb. 7, 2020). After an altercation during which
Plaintiff threatened the store owner and an employee with
a gun, Plaintiff fled the store with the jewelry and firearm.
*Id.* The store owner followed Plaintiff and wrestled him to
the ground, where the pair exchanged blows until civilian
bystanders intervened, grabbing Plaintiff and restraining him
on the pavement. *Id.*

[2]   In that lawsuit, Plaintiff has asserted § 1983 and
state-law claims against NYPD officers based on
the same attempted robbery incident that forms the
basis of this action.

Soon thereafter, several police officers from the New York
City Police Department ("NYPD") arrived at the scene. *Id.* In
their attempts to subdue and arrest Plaintiff, an officer struck
Plaintiff several times, and a female officer "began repeatedly
punching him in the face." *Id.* Plaintiff was charged with, *inter
alia*, robbery, assault, grand larceny, criminal possession of
a weapon, and criminal possession of stolen property. *Id.* at
\*2. He pled guilty to attempted robbery in the second degree
pursuant to New York Penal Law § 160.10(2)(a), and was
sentenced to 12 years to life as a "persistent violent felony
offender." *Id.*

Plaintiff had advanced glaucoma and distorted vision prior
to the January 8, 2017 arrest, but his vision became
completely impaired following the arrest. *Id.* Plaintiff is now
legally blind, and "cannot see, write, type, nor navigate
himself without the assistance of" auxiliary aids. (Amended
Complaint ("Am. Compl."), Dkt. 24-1, at 10.) Plaintiff also
suffers from post-traumatic stress disorder following the
arrest and, upon admission to the New York Department of
Corrections and Community Supervision ("DOCCS") local

county jail, was hospitalized in the medical unit due to medical complications. (*Id.* at 14–15.)

**\*2** Attorney Danielle Regis from the Brooklyn Defender Services [3] ("BDS") was assigned to represent Plaintiff in his criminal proceeding. (*Id.* at 15.) Around April 2017, Regis visited Plaintiff in DOCCS confinement, accompanied by a social worker. (*Id.*) During the visit, Regis played back the surveillance tape from Plaintiff's arrest, verbally describing the video to Plaintiff due to his visual impairment. (*Id.* at 16.) In the video, the arresting officers were subduing Plaintiff and striking him "until incoherent," including NYPD Officer Elisa Battista, who was "seen repeatedly striking [P]laintiff's head[.]" (*Id.* at 16.) Regis "immediately shut[ ] off [the] video" in the middle of playback, which Plaintiff characterizes as "a conscious disregard in preventing [P]laintiff any further information due to overwhelming exculpatory impeaching evidence, enough for criminal charges being brought on [the] seven arresting officers." (*Id.*) Plaintiff thereafter requested access to the surveillance tape several times to "[n]o avail," which he claims is due to Regis's "derelict tactics to insulate [the] seven arresting officers." (*Id.*)

[3] Though Plaintiff refers to the "Brooklyn Public Defender Office" in his Complaint (*see, e.g.*, Complaint ("Compl."), Dkt. 1, at 10), the Court assumes Plaintiff meant to name Brooklyn Defender Services, a non-profit public defender organization, *see* http://bds.org/ (last visited Mar. 3, 2021), and refers to the organization by its correct name.

On or about May 12, 2017, Plaintiff filed a Notice of Claim with the New York State Office of the Comptroller concerning state-law claims arising from his January 2017 arrest. [4] (*see id.* at 17); *see also Walker*, 2020 WL 606788, at *2. Plaintiff also filed a "[p]etition with the (DOJ) Dept[.] of Justice (Southern District)" on May 6, 2017, a citizen's complaint with the Civilian Complaint Review Board ("CCRB") [5] on May 18, 2017, and a citizen's complaint with the NYPD's Internal Affairs Bureau ("IAB") [6] on June 6, 2017. (*See* Am. Compl., Dkt. 24-1, at 17.) On August 22, 2017, Plaintiff filed a *pro se* action against NYPD Officers Taimur Raja, David Vazquez, Estharlin Lopez, and Kyle Brown, advancing claims under 42 U.S.C. § 1983 and state law in connection with his January 2017 apprehension and arrest. *See* Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 22, 2017), ECF No. 2; *see also Walker*, 2020 WL 606788, at *2.

[4] The Comptroller's Office informed Plaintiff on or about May 24, 2017 that his claim was denied as untimely because it had not been filed within 90 days from the date of his January 8, 2017 arrest. *Walker*, 2020 WL 606788, at *2.

[5] The CCRB is an independent City agency "empowered to receive, investigate, mediate, hear, make findings, and recommend action on complaints against New York City police officers." *Joseph v. Doe*, No. 16-CV-2004 (PKC) (LB), 2017 WL 4233024, at *2 n.3 (E.D.N.Y. Sept. 22, 2017).

[6] The IAB is a division of the NYPD that "investigates claims of serious misconduct and corruption of members of the NYPD." *Floyd v. City of New York*, 739 F. Supp. 2d 376, 379 (S.D.N.Y. 2010); *see id.* at 384 ("IAB investigations are confidential, including within the NYPD.").

## II. *Walker v. Raja*

The New York City Office of Corporation Counsel ("Corporation Counsel") represents the arresting officers in *Walker v. Raja*, which is still pending before this Court. Previously, Allyson Brown, an attorney with Corporation Counsel, requested a stay of the proceedings in light of the pending CCRB investigation. (Am. Compl., Dkt. 24-1, at 18); *see also* Motion to Stay, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 2, 2017), ECF No. 19; 11/6/2017 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2017), ECF No. 21. On June 12, 2018, following an 18-month investigation and hearing in front of a three-member panel, [7] the CCRB "exonerated [the] five arresting officers[,]" Raja, Brown, Vazquez, Lopez, and Sgt. Rahman. (Am. Compl., Dkt. 24-1, at 18.) The stay in *Walker v. Raja* was lifted, and the case proceeded to discovery. (*Id.* at 18); *see also* 8/7/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 7, 2018), ECF No. 51.

[7] The panel consisted of CCRB chairman Frank Davie and CCRB members S. Carceterra and M. Rivadene. (Am. Compl., Dkt. 24-1, at 18.)

**\*3** During discovery, Plaintiff received the CCRB investigative records and learned that there were seven NYPD officers involved in his arrest, not five, as he had previously thought. (Am. Compl., Dkt. 24-1, at 19.) According to Plaintiff, when questioned by the Court as

to whether there were other arresting officers that should have been added to the complaint, Corporation Counsel attorney Brown "strategically respon[ded][ ] by mentioning only[ ] (Sgt. Rahman) with a conscious disregard [in] excluding arresting officers ... [William Chow and Elisa Battista] ... when having constructive knowledge of direct participation [by] all seven arresting officers." (*Id.* at 19.) Plaintiff claimed that Brown failed to mention Officers Chow and Battista in order to cover up the CCRB's "mishandling [of] investigations in disavowing information while deleting arresting officers police misconduct ... which result[ed] in [the] same two arresting officers [being] intentionally excluded from the" CCRB decision. (*Id.* at 19–20.) Plaintiff also alleged that BDS attorney Regis had seen Officers Chow and Battista on the surveillance tape during her visit with Plaintiff in April 2017, but hid their involvement from Plaintiff. (*Id.* at 20.) Plaintiff further claimed that he later learned through discovery that "the video surveillance tape, audio and investigative records sent by [the City], [BDS], Brooklyn District Attorney['s] Office and Corporation Counsel law dept [had been] doctor[ed], deleting [the] arresting officers['] police misconduct[.]" (*Id.*) Plaintiff believed that the "records, videos, and audio[ ]" provided to Plaintiff and the Court were "doctored when sent during discovery." (*Id.* at 21–22 (asserting that Defendants were "banking on [P]laintiff's disability" and "hinder[ing] him from exercising his Civil Rights").) According to Plaintiff, the original video surveillance tape showed Officer Battista "kneeling over [P]laintiff in a malicious assault," and an audio file depicted Officer Vazquez stating that "he [had] used physical force on [P]laintiff," but both files had been deleted, "along with missing investigative records concerning direct participation[.]" (*Id.* at 20.)

On November 6, 2018, the Court granted Plaintiff leave to file an amended complaint. (Dkt. 62.) The Amended Complaint additionally named as defendants NYPD Officers William Chow and Elisa Battista, Sergeant Sazedur Rahman, and the City of New York (the "City").[8] Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61; 11/6/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2018), ECF No. 62. On February 7, 2019, Plaintiff filed a motion to compel, in which he raised the issue of the allegedly altered videos, asserting that the "CCRB and Corporation Counsel have in their po[ss]ession video record evidence of ... facts of police criminal misconduct." Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 7, 2019), ECF No. 86, at 1. In response, Corporation Counsel explained that:

> Defendants produced copies of these videos to Plaintiff in their original form as received by [Corporation Counsel], and were not altered in any way by this Office. Additionally, Defendants attach hereto as Exhibit B a video of the underlying incident received from the Kings County District Attorney's Office, which is an incomplete version of the video from Brooklyn Defender Services that was previously provided to Plaintiff during discovery and to the Court on December 22, 2017.

Response to Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 22, 2019), ECF No. 91, at 1–2.[9] In its partial grant of summary judgment, the Court briefly addressed this argument and found it "not cognizable," given that "Plaintiff offer[ed] no record evidence to suggest that the video evidence [had been] doctored." *Walker*, 2020 WL 606788, at \*3 n.6.

8        In his Amended Complaint in *Walker v. Raja*, Plaintiff set forth his theories about the video alterations and omission of Officers Chow's and Battista's identities from the defendants' initial disclosures. *See, e.g.*, Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61, at 3 ("Plaintiff states that police officer Battista [ ] somehow was not mentioned within [the initial disclosures] but was present during [P]laintiff['s] assault and arrest.... In addition[,] in and around April of 2017[,] [P]laintiff, defense attorney, and [a] social worker viewed a record of a female officer [ ] assaulting [P]laintiff[.] [T]his video record is missing as evidence and has yet to surface[ ].... Battista[ ] somehow disappear[ed] from [the] CCRB investigation completely[.]"), 12 ("Police officer Battista was not included but is an Arresting officer present at the scene.").

9        Plaintiff alleges that, in response to his raising of the issue of doctored videos in *Walker v. Raja*, Corporation Counsel stated that it was the Kings County District Attorney's Office that had deleted portions of the video surveillance

tape, not Corporation Counsel. (Compl., Dkt. 1, at 15 (referring to the "Brooklyn" District Attorney's Office, which is the Kings County District Attorney's Office).) Although Corporation Counsel's above statement from its response to the motion to compel, *Walker v. Raja*, No. 17-CV-5202, Dkt. 91, at 1–2, does indicate that the copy of the video sent by the District Attorney's Office to Corporation Counsel was "incomplete" when compared to the BDS version provided to Plaintiff and the Court, that does not mean that the District Attorney's Office "doctored" the video; rather, it means only that the Office did not provide the entire video to Corporation Counsel. "Incomplete" is not the same as "doctored" or equivalent to altering images. Indeed, contrary to Plaintiff's contention, he received the entire video from BDS in discovery, and there is no basis for Plaintiff's claim that any party "doctored" video evidence in *Walker v. Raja*.

**\*4** Plaintiff also moved for sanctions against the CCRB and Corporation Counsel, [10] *see* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Mar. 4, 2019), ECF No. 93, which the Honorable Lois Bloom denied on the grounds that there was "no record evidence that [D]efendants [had] disobeyed a discovery order or engaged in sanctionable conduct. Defendants have provided the videos to plaintiff as they were received by their office," 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 2, 2019), ECF No. 95.

[10]     In a submission filed April 1, 2019, Plaintiff asserted that, though Defendants "produced 3 doctored video segments" during discovery, "the building where the incident occurred had an adjoining store," which "had at least one other camera that would have recorded a more concise detailed description concerning relevant footage of [Officer] Vazquez strategically taking a firearm from a civilian then carefully planting [the] firearm near plaintiff['s] feet as he is beaten by other defendants." Plaintiff's Supportig Evidence, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 1, 2019), ECF No. 94, at 5. Plaintiff claimed that he "attempted to obtain this footage on multiple occasions[,] but was unsuccessful due to preventive tactics by counsel for the defendants." (*Id.*)

The parties cross-moved for summary judgment, and by Memorandum and Order on February 7, 2020, the Court

denied Plaintiff's motion and partially granted and denied Defendants' motion, dismissing some of Plaintiff's claims. *Walker*, 2020 WL 606788, at \*13. That case is pending trial as to the few remaining claims, *i.e.*, claims for excessive force and failure to intervene as to Defendants Raja, Vazquez, Brown, Chow, and Battista, and failure to supervise as to Defendant Rahman. [11] *See id.* In anticipation of trial, the Court, *inter alia*, granted the defendants' motion in limine to preclude Plaintiff "from proffering any evidence to suggest that any material was doctored in this matter." Court's Motions *in Limine* Chart, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020) ECF No. 144, at 2, #9.

[11]     On April 12, 2021, the Court referred the case to the Trial Ready Rapid Mediation Program, and requested the ADR Department to secure pro bono counsel for Plaintiff. *See* 4/12/2021 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 12, 2021).

Plaintiff filed the instant action thereafter.

### III. The Instant Action

On October 29, 2020, Plaintiff commenced the instant action against the City, BDS, the CCRB, the IAB, and Corporation Counsel based on the alleged misconduct relating to investigations into his January 2017 arrest and the discovery process in *Walker v. Raja*. (Compl., Dkt. 1.) On January 21, 2021, Plaintiff filed a submission entitled "Amended Complaint," consisting of three pages summarizing the exhibits he seeks to incorporate in his Complaint. (Dkt. 21.) On February 9, 2021, Plaintiff filed the Amended Complaint, adding as defendants the NYPD and individual employees of the NYPD, CCRB, and Corporation Counsel in their individual and official capacities. [12] (*See generally* Am. Compl., Dkt. 24-1.)

[12]     Specifically, Plaintiff seeks to bring claims against Detective Courtney Winston, Detective Raymond Higgins, Detective Jason Guzman, Detective Patrick Jean Pierre, and Ranking Detective Daniel Perrino of the NYPD's 70th Precinct; Chairman Frank Davie and employees A. Wassim, S. Carceterra, M. Rivardene, and Records Access Officer Alexander George of the CCRB; Captain Brian White, Lieutenant Dwayne Watson, Sergeant Moode, Detective Carmelo Rivera, and Detective Rashad Vandross of the NYPD's IAB and 67th precinct; and Corporation Counsel attorneys

Nelson Genevieve, Daniel H. Oliner, Allyson Nicole Brown, and Christopher D. Deluca.

**\*5** For the reasons discussed below, the Court dismisses the Amended Complaint in its entirety, and grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days.

## LEGAL STANDARD

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A document filed *pro se* is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). "If [a] liberal reading of the complaint gives any indication that a valid claim might be stated, the Court must give the plaintiff an opportunity to amend the complaint." *Nelson-Charles v. U.S. Dep't of Educ.*, No. 19-CV-1616 (PKC) (PK), 2019 WL 1675999, at *2 (E.D.N.Y. Apr. 16, 2019) (internal quotation marks omitted) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Title 28 of the United States Code § 1915A requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). Similarly, pursuant to the IFP statute, a district court must dismiss a case if the court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

## DISCUSSION

Although Plaintiff's Amended Complaint is slightly confusing in that he frequently references legal phrases without substantively elaborating on his allegations, he appears to center his claims on five main theories: (1) the CCRB and IAB failed to properly investigate his claims against his arresting officers, and the City, CCRB, IAB, Corporation Counsel, and BDS subsequently conspired to cover up the mishandled investigation by doctoring video evidence and failing to disclose the identities of Officers Chow and Battista in *Walker v. Raja*; (2) NYPD officers pressured witnesses and covered up evidence in the lead-up to Plaintiff's grand jury indictment; (3) the City's failure to train led to the foregoing violations; (4) the City and BDS failed to accommodate Plaintiff's visual impairment during his underlying criminal proceedings; and (5) the City failed to establish an independent commission to investigate Plaintiff's claims against his arresting officers. Based on these factual allegations, Plaintiff asserts claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against the City, the NYPD, individual NYPD officers, BDS, BDS attorney Regis, the CCRB, CCRB employees, the IAB, IAB employees, Corporation Counsel, and Corporation Counsel attorneys; claims pursuant to Title II of the ADA and the Rehabilitation Act against the City, BDS, and BDS attorney Regis; and state-law claims against the City. (Am. Compl., Dkt. 24-1, at 23–43.) [13]

[13]    Though not distinguishing between claims under Section 1983 and state law, Plaintiff explains that he "asserts the following thirteen Counts of which all are amongst defendants": (1) deliberate indifference, (2) negligence, (3) conspiracy, (4) failure to intervene, (5) fraudulent misrepresentation or deception, (6) abuse of process, (7) intentional infliction of emotional distress, (8) equitable estoppel, (9) due process, (10) equal protection, (11) procedural due process, (12) fabrication of evidence and failure to investigate, and (13) substantive due process. (Dkt. 26, at 4.)

## I. Section 1983

**\*6** 42 U.S.C. § 1983 ("Section 1983") "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012) (quoting *Baker v. McCollan*, 443 U.S 137, 144 n.3 (1979)); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). In order to maintain a civil rights action under Section 1983, a plaintiff must allege two essential elements. First, the conduct challenged must have been "committed by a person

acting under color of state law[.]" *Cornejo*, 592 F.3d at 127 (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (internal quotation marks and citation omitted)). Second, the conduct complained of "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo*, 592 F.3d at 127; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### A. Claims Against the NYPD, IAB, CCRB, and Corporation Counsel

As an initial matter, claims against agencies of the City of New York, including the NYPD, IAB, the CCRB, and Corporation Counsel, are not allowed, and instead, must be brought against the City of New York. *See* N.Y.C. Charter, ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Ojeda v. Mendez*, No. 20-CV-3910 (EK) (LB), 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (dismissing claims against, *inter alia*, the NYPD and IAB as non-suable entities (citing N.Y.C. Charter, ch. 17, § 396)); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City." (citation omitted)); *Wingate v. City of New York*, No. 14-CV-4063 (ARR) (LB), 2018 WL 3863439, at *10 (E.D.N.Y. Aug. 14, 2018) ("Plaintiff's claims against Corporation Counsel ... are dismissed because [it is] not [a] suable entit[y]." (citing, *inter alia*, N.Y.C. Charter ch. 17, § 396)).

Therefore, Plaintiff's claims against the NYPD, the IAB, the CCRB, and Corporation Counsel are dismissed for failure to state a claim.

### B. Claims against BDS and BDS Attorney Regis

Plaintiff's Section 1983 claims against BDS and BDS attorney Regis also must be dismissed. Though BDS and Regis were appointed by the state court as Plaintiff's counsel in his underlying criminal case, as a general matter, Plaintiff cannot sue his public defender under Section 1983. *see Polk County. v. Dodson*, 454 U.S. 312, 324–25 (1981) (holding that public defenders do not act under color of law when they represent defendants and are not subject to suit under Section 1983); *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir.

1997) ("[C]ourt-appointed attorneys performing a lawyer's traditional functions as counsel to defendant[s] do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." (internal citation omitted)).

> Absent special circumstances suggesting concerted action between an attorney and a state representative, the representation of a defendant by private counsel in state criminal proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under § 1983, regardless of whether that attorney is privately retained, court-appointed, or employed as a public defender.

*Liverpool v. City of New York*, No. 19-CV-5527 (CM), 2019 WL 3745734, at *2 (S.D.N.Y. Aug. 7, 2019) (citing, *inter alia, Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005)); *see also id.* at *3 (noting that the plaintiff "has not stated a § 1983 claim against" a BDS attorney, who is a "private part[y] who do[es] not work for any state or other government body"). Although Plaintiff claims that BDS attorney Regis prevented Plaintiff from seeing and accessing certain surveillance tape evidence in an effort to "insulate [the] seven arresting officers" (Am. Compl., Dkt. 24-1, at 16), these claims neither sufficiently allege "concerted action" between Regis and "state representatives," nor are they supported by any factual allegation in the Complaint or Amended Complaint. Given the wholly conclusory nature of Plaintiff's assertion that Defendant Regis sought to protect the arresting officers, the Court cannot find any "special circumstance" that justifies deviating from the fundamental principle that Plaintiff's court-appointed defense counsel cannot be sued as state actors under Section 1983.

**\*7** Therefore, Plaintiff's Section 1983 claims against BDS and Regis are dismissed for failure to state a claim.

### C. Claims Against NYPD Officers

When asserting claims under Section 1983 against government officials, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v.*

*Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). In connection with his claims against NYPD 70th Precinct Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, Plaintiff alleges that the detectives,

> acting under the color of state law, also as arms to the (NYPD), in concert with the [BDS], in a Sin Qua Non to insulate seven arresting officers police misconduct by suppressing exculpatory impeaching evidence, falsifying arrest reports, and allowing inadmissible tainted / manufactured evidence during plaintiff's grand jury proceedings. [The detectives] amplified their conduct by excluding two crucial arresting officers, (William Chow) [ ], (Elisa Battista) police misconduct, obstructed the due course of justice. [The detectives] dissuaded arresting officers from telling the truth during secretive meeting of the minds, while forwarding false reports to the grand jury resulting in perjury of witnesses to deprive, oppress, annoy, wantonly motivated to do plaintiff harm in order to insulate seven arresting officers['] police misconduct in order to obtain a collateral objective that's outside legitimate ends of process.

(Am. Compl., Dkt. 24-1, at 27–28.) [14] As to supervisory officers Captain White, Lieutenant Watson, and Sergeant Moode, Plaintiff alleges simply that they "failed t[o] intervene to prevent such violations [by the IAB] from occurring[,] resulting in injuries of fraudulent concealment [and] [subjecting] [P]laintiff [to] discovery harm that was suffered in deception to delay in bring[ing] [ ] suit by keeping investigation reports from [P]laintiff." (*Id.* at 39.)

[14]   In an affirmation attached to his Amended Complaint, Plaintiff asserts further allegations against Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, but these allegations are

similarly vague and fail to allege the detectives' personal involvement. (*See* Dkt. 24-2, at 3–7.)

To the extent Plaintiff argues that his arrest and criminal charges were premised on the presentation of "manufactured evidence" during grand jury proceedings, the Court already dismissed such a claim in *Walker v. Raja*, finding that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," and thus Plaintiff cannot establish that "fabricated evidence le[d] to a false charge against him." *See* 2020 WL 606788, at *10. Furthermore, to the extent this claim calls into question the validity of Plaintiff's conviction, it is barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), which holds that a state prisoner's Section 1983 action is barred if success in that action would necessarily demonstrate the invalidity of a criminal conviction or sentence. *see Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis removed)). Lastly, Plaintiff's general, conclusory statements fail to allege the individual officers' personal conduct that led to the deprivation of Plaintiff's constitutional rights. In fact, Plaintiff fails to state *any* factual allegations as to Detectives Rivera and Vandross of the 67th precinct, despite naming them as Defendants in the Amended Complaint.

**\*8**  Plaintiff's claims against the individual NYPD officers of the 70th Precinct are thus dismissed, with leave to replead facts relating to their individual conduct, provided that any repleaded allegations do not relate to the due-process claim the Court has already dismissed in *Walker v. Raja. See* 2020 WL 606788, at *10.

### D. Claims against CCRB Employees

To the extent Plaintiff brings claims against CCRB employees —Chairman Frank Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carceterra—for their involvement in the allegedly defective investigation into Plaintiff's arresting officers, the claims are dismissed for lack of personal involvement and for failure to state a claim. First, with respect to Defendants Davie, Alexander, Rivardene, and Carceterra, Plaintiff alleges only that they participated in the CCRB's decision absolving the

2021 WL 1838277

arresting officers of responsibility, which, in itself, does not constitute a violation of Plaintiff's rights. As to CCRB investigator A. Wassim, Plaintiff alleges:

> (CCRB) field investigator, (A. Wassim) interrogated plaintiff's Brooklyn Public Defender, (Danielle Regis) and with a conscious disregard withheld records of interrogations, an overt act in concealing meetings of the minds that exhibited deliberate indifference by turning their heads to the obvious by disavowing, exculpatory, probative, impeaching evidence in interference with state and federal Court proceedings, unlawful actions motivated by an intent to deprive plaintiff Equal protection of the laws. Defendants refrained and dissuaded arresting officers from giving the truth, concerning accurate statements involving the plaintiff incident on, (Jan 8. 2017) resulting in false oral and written statements preventing an honest investigation when false and defamatory statements of facts in their final determination caused a deprivation of plaintiff's civil rights, pursuant to, 42 USC § 1985, while inconsistent with the, IAB investigation holding a different set of arresting officers in their investigation, violation of plaintiff's Due process. Private actors acted in concert with the IAB and Corporation Counsel to inflict an unconstitutional Injury, causing damages[.]

(Am. Compl., Dkt. 24-1, at 33.) Beyond the conclusory statements couched in legal terminology, Plaintiff has failed to explain exactly what "truth" Defendant Wassim dissuaded the officers from telling, and what "false and defamatory statements" were induced. Without more, the claim against Defendant Wassim cannot proceed.

Furthermore, Plaintiff fails to allege the violation of any constitutional right in connection with the CCRB

investigation and final decision. "It is well[-]established that there is no constitutional right to an investigation by government officials." *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *6 (S.D.N.Y. Sept. 25, 2014) (internal quotations, alterations, and citations omitted); *see also Koulkina v. City of New York*, 559 F. Supp. 2d 300, 316 (S.D.N.Y. 2008) ("[T]here is no federal constitutional right to a[ ] [CCRB] investigation." (citing *Blount v. Swiderski*, No. 03-CV-0023 (ENV), 2006 WL 3314635 at *12 (E.D.N.Y. Nov. 14, 2006)); *McCaffrey v. City of New York*, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim[.]"). Plaintiff thus lacks an actionable claim against the CCRB, the IAB, and their employees for allegedly failing to investigate his claims against the arresting officers.

**\*9** Therefore, Plaintiff's claims against CCRB Chairman Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carceterra are dismissed.

### E. *Monell* Claims Against the City
Plaintiff alleges that the City failed to protect his constitutional rights by, *inter alia*, "fail[ing] to train and supervise" its employees, "creating and contin[uing] in policies or customs upon having a conscious disregard in private and government municipalities in protecting plaintiff's (Const Rights)," and failing to

> set[ ] in place a Commission (Watchdog agency) in preventing private and government entity's in mishandling, and disavowing information involving seven arresting officers police misconduct, revealed upon their investigative work (Collectively) by subpoenaing records resulting in overt acts by withholding, Aided cards, doctor[ing] investigative records, video surveillance tapes, TRI audio radio runs, and disciplinary records[.]

(Am. Compl., Dkt. 24-1, at 23–25.)

Plaintiff's claims against the City of the New York cannot proceed. A municipality can be liable under Section 1983 if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Four types of practices may give rise to a Section 1983 claim against a municipality:

> (1) a formally adopted municipal policy; (2) the actions or decisions of a municipal official with final policymaking authority; (3) a practice so persistent and widespread that it constitutes a custom or usage; and (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference.

*Doe v. City of New York*, No. 18-CV-670 (ARR) (JO), 2018 WL 3824133, at *8 (E.D.N.Y. Aug. 9, 2018) (internal quotation marks and citation omitted); *Safran v. Singas*, No. 20-CV-4537 (PKC) (SMG), 2020 WL 7125232, at *4 (E.D.N.Y. Dec. 4, 2020) (citation omitted). Critically, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

### 1. Underlying Constitutional Violation

Plaintiff purports to bring claims under the Sixth, Fifth, and Fourteenth Amendments, but fails to allege constitutional violations by any state actor.

Plaintiff fails to state a Six Amendment claim.

To prevail on a claim for denial of the constitutional right to a fair trial, a plaintiff must demonstrate that "(1) an investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."

**\*10** *Case v. City of New York*, 408 F. Supp. 3d 313, 322–23 (S.D.N.Y. 2019) (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 24 (2d Cir. 2018) (summary order)). The fabricated information must be "both false and likely to influence a jury's decision." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016). Plaintiff has failed to sufficiently allege any element of a Sixth Amendment violation. As discussed, he offers only conclusory assertions that evidence was "manufactured" by NYPD officers and others without providing any factual allegations to support these claims, such as what evidence was allegedly fabricated and forwarded to prosecutors, by whom, and when, and how that evidence might have affected a jury's verdict. Furthermore, to the extent Plaintiff alleges that NYPD officers mishandled investigations leading up to his criminal charges, "in the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution." *Campbell v. Giuliani*, No. 99-CV-2603 (JG), 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000) (citing *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998)); *see also Luck v. Westchester Med. Ctr.*, No. 17-CV-9110 (NSR), 2020 WL 564635, at *7 (S.D.N.Y. Feb. 4, 2020) (collecting cases). For the same reasons set forth in *Walker v. Raja*, Plaintiff fails here too to state a claim for false imprisonment, false arrest, or malicious prosecution. Thus, Plaintiff's Sixth Amendment claims are dismissed.

As to any Fifth Amendment claims Plaintiff seeks to bring, the "Fifth Amendment only applies to claims against the federal government," and not the Defendants in this case. *see Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 412 n.1 (S.D.N.Y. 2013). Any Fifth Amendment claims are thus dismissed.

Plaintiff's claims of Fourteenth Amendment violations pursuant to Section 1983 are also dismissed for failure to state a claim. First, to the extent Plaintiff alleges an equal-protection violation, he has failed to make the requisite factual allegations. "To prove a violation of the Equal Protection Clause ... [,] a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination ... [and] that the

2021 WL 1838277

disparity in treatment cannot survive the appropriate level of scrutiny[.]" *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citations omitted). Plaintiff has not alleged facts from which to infer that Defendants acted with any racial or otherwise impermissible animus, or that Plaintiff was treated differently from any similarly situated persons.

Furthermore, as discussed above, to the extent Plaintiff argues that his procedural due process rights were violated by the mishandling of investigations into his claims against the officers by the CCRB, the IAB, and their employees, these allegations do not give rise to a constitutional violation. *See supra* Section I.D.

Nor does the alleged withholding of evidence and alteration of video surveillance footage in *Walker v. Raja* amount to a constitutional violation. Though Plaintiff alleges that Defendants withheld evidence regarding Officers Chow's and Battista's involvement in the January 2017 altercation, Plaintiff faced no barriers in adding Officers Chow and Battista as Defendants in his amended complaint in *Walker v. Raja*. In fact, the excessive force claims in that case against the NYPD Officers, including Officers Chow and Battista, are currently pending trial. Though Plaintiff was not able to name Officers Chow and Battista as defendants as early as he otherwise may have liked, this delay does not violate Plaintiff's constitutional rights. *Cf. Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) ("Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." (internal quotations and citation omitted)); *see also Smith v. Annucci*, No. 18-CV-1107 (DNH) (DJS), 2019 WL 11727264, at *4–5 (N.D.N.Y. Jan. 16, 2019) ("A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts. Instead, a plaintiff must demonstrate actual injury by establishing that the denial hindered his efforts to pursue a non-frivolous legal claim." (internal quotations and citations omitted)).

**\*11** Finally, to the extent Plaintiff wishes to hold the Defendant NYPD Officers and/or Corporation Counsel accountable for "derelict tactics" during discovery, the correct mechanism through which to do so is moving for sanctions in that case, which Plaintiff has already, albeit unsuccessfully, done. *See* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Mar. 4, 2019), ECF No. 93; 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Apr. 2, 2019), ECF No. 95. And as discussed above, the issue of the allegedly doctored video evidence

was addressed and rejected by the Court in *Walker v. Raja*. *See, e.g.*, *Walker*, 2020 WL 606788, at *3 n.6; Transcript of 8/11/2020 Pretrial Conference, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020), at 25:15–24 (the Court stating: "The bottom line is I have not seen any evidence, Mr. Walker, about the tapes to show that this tape has been doctored. I have viewed the video surveillance a number of times and it certainly depicts the event that you are complaining about in which you say that the officers use excessive force. And obviously, I relied in part o[n] my viewing of that video surveillance to allow your excessive force claim to go through. So at this point, again I will just reiterate, that I do not see any basis for your claim that the video surveillance footage was doctored.").

In sum, Plaintiff has failed to sufficiently allege a constitutional violation by any state actor, which, in itself, requires dismissal of his *Monell* claims against the City.

### 2. Custom or Policy

Even if this were not the case, the allegations in Plaintiff's Amended Complaint do not give rise to a *Monell* claim against the City. Plaintiff proffers two theories of liability against the City under *Monell*: that the City (1) failed to train and supervise its employees, exhibited deliberate indifference to Plaintiff's rights, and created a policy or custom that resulted in the deprivation of Plaintiff's rights (Am. Compl., Dkt. 24-1, at 23–24); and (2) consciously disregarded Plaintiff's equal-protection and due-process rights, and rights under the ADA, by failing to establish an independent Commission to investigate Plaintiff's claims against the officers (*id.* at 24–25). (*see also id.* at 14 ("Plaintiff advance[s] two theories of municipal liability. First asserts that the City has a custom of zealously promoting debating science in mishandling investigations failed to train employees[.]")

However, Plaintiff offers only conclusory statements in support of his claims that the City failed to train and supervise its employees or created a policy or custom that resulted in the deprivation of Plaintiff's rights. (*See, e.g.*, Am. Compl., Dkt. 24-1, at 23–24.) Plaintiff argues, for example, that the City "knew of the moral certain[t]y that private and government superiors and their subordinates would acquire legally blind individuals (clients)," and that the failure to train subordinates pursuant to the ADA "will virtually always lead to a substantial violation[ ], in Due process [and] Equal protection[.]" (*Id.* at 12.) Plaintiff also

argues that the City failed to properly train its agencies, presumably the CCRB and the IAB, "in handling police misconduct allegations and records," thereby insulating the seven arresting officers and violating Plaintiff's Fourth and Fourteenth Amendment rights. (*Id.* at 13.) Such "boilerplate assertion[s]" are insufficient to state a *Monell* claim. *see Dumel v. Westchester County*, No. 19-CV-2161 (KMK), 2021 WL 738365, at *6 (S.D.N.Y. Feb. 25, 2021) (collecting cases); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012) (same). Nor does the decision against establishing an independent Commission (*e.g.*, Am. Compl., Dkt. 24-1, at 24–25)—a discretionary choice by the City—arise to a conscious disregard of Plaintiff's rights. *see Doe*, 2018 WL 3824133, at *8.

Therefore, Plaintiff's *Monell* claims against the City are dismissed for failure to state a claim. *see Johnson v. City of New York*, No. 18-CV-4030 (MKB), 2020 WL 249100, at *2 (E.D.N.Y. Jan. 16, 2020) (dismissing a *Monell* claim because the plaintiff failed to allege facts "to support an inference that the City had an official policy or custom that caused a violation of any federally protected right").

## II. Sections 1985 and 1986

**\*12** To the extent Plaintiff alleges a conspiracy to deprive him of constitutional rights under Sections 1985 and 1986, those claims are dismissed as to all Defendants.

> To state a civil rights conspiracy under § 1985(3), a plaintiff must allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A section 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotations and citations omitted); *see also Brito v. Arthur*, 403 F. App'x 620, 621 (2d Cir. 2010) (summary order) ("To state a conspiracy claim under 42 U.S.C. § 1985, App ellant must have alleged: (1) some racial or other class-based discriminatory animus underlying the Appellees' actions; and (2) that the conspiracy was aimed at interfering with Appellant's protected rights." (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993))).

With respect to his claims under Sections 1985 and 1986, Plaintiff alleges that Defendants

> held secret meetings of the minds, leading to issuing subpoenas, conducting interrogations, communication through e-mails, coming into contact, and further overt acts in the suppression of exculpatory evidence, unreasonably prolonging investigations, while doctoring records, video, audio recordings, falsifying reports and dissuading arresting officers from telling the truth, fraudulent concealment caused plaintiff to suffer possible discovery deception wrongly deceived.

(Am. Compl., Dkt. 24-1, at 11–12.)

These allegations plainly fail to state a claim under Section 1985(3). First, they are "nothing more than conclusory allegations of a conspiracy between and among Defendants." *see DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 67 (E.D.N.Y. 2019). Second, they do not suggest any agreement to violate constitutional rights based on class-based discriminatory animus. *see Brito*, 403 F. App'x at 621. Accordingly, Plaintiff's Section 1985 claim must be dismissed. *see Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the

minds"); *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (per curiam).

Since Plaintiff's Section 1985 conspiracy claim fails, his Section 1986 claim also fails. *see Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir. 1996) ("[A] § 1986 claim is contingent on a valid § 1985 claim[.]"); *see also Wang v. Off. of Pro. Med. Conduct*, 228 F. App'x 17, 19 (2d Cir. 2007) (summary order). [15]

[15]     42 U.S.C. § 1986 creates civil liability for failing to prevent actions taken pursuant to a § 1985 conspiracy: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...." 42 U.S.C. § 1986.

 **\*13** Therefore, Plaintiff's Section 1985 and 1986 claims are dismissed for failure to state a claim.

## III. ADA and Rehabilitation Act

Plaintiff alleges that the City failed "to implement adequate training courses to [BDS] in safeguarding [P]laintiff's [rights] pursuant to [the] ADA [and] Rehabilitation Act[.]" (Am. Compl., Dkt. 24-1, at 30.) He asserts that the City should have "implemented polic[ies, or customs fit in training Court appointed attorneys when faced with representing qualified individuals" (*id*), and that BDS attorney Regis's meeting with Plaintiff without "a qualified interpreter (advocate)" and "any auxiliary aids and devices for [P]laintiff's disability" violated Plaintiff's rights (*id.* at 31).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing, *inter alia*, 29 U.S.C. § 794(a)). "In most cases, the standards are the same for actions under both statutes." *Harris*, 572 F.3d at 73 (internal quotations, alteration, and citation omitted). The Court thus analyzes Plaintiff's claims with reference only to Title II of the ADA, but the same analysis applies for any claim under the Rehabilitation Act.

To assert a claim under Title II, Plaintiff "must demonstrate that '(1) he is a qualified individual with a disability; (2) [Defendants] [are] subject to [the statute]; and (3) he was denied the opportunity to participate in or benefit from [ ] [D]efendant[s'] services, programs, or activities, or was otherwise discriminated against by [D]efendant[s] because of his disability." *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 196–97 (2d Cir. 2014) (footnote omitted) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d. Cir. 2012)). An ADA "plaintiff may base [his] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016); *see also Disabled in Action*, 752 F.3d 189, 197 (2d Cir. 2014) (ellipsis omitted) ("To assure meaningful access, 'reasonable accommodations in the [public entity]'s program may have to be made.' " (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003))).

Under the applicable standards, there are several limitations to Plaintiff's ADA claims. First, Title II claims may proceed against individuals only if they are government officers acting in their official capacity. *see Harris*, 572 F.3d at 72. Plaintiff thus cannot bring an ADA claim against BDS attorney Regis, a private individual (who does not qualify as a state actor, as previously discussed). Plaintiff's ADA claim against BDS attorney Regis is therefore dismissed. *see Green v. City of New York*, 465 F.3d 65, 76 (2d Cir. 2006) (affirming dismissal of ADA claim against a private individual).

 **\*14** Second, "Title II applies only to state and local governments, their instrumentalities, and commuter authorities." *Pierce v. Fordham Univ., Inc.*, 692 F. App'x 644, 646 (2d Cir. 2017) (summary order) (citing 42 U.S.C. §§ 12131, 12132; *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162–63 (2d Cir. 2013)). The Second Circuit interprets " 'instrumentality' ... as referring to a creature of a state or municipality." *Green*, 465 F.3d at 79. A private entity "performing services pursuant to a contract with a municipality[,] even if it does so according

to the municipality's rules and under its direction, is not a creature of any governmental entity." *Id.* As discussed above in the dismissal of § 1983 claims against BDS, public defender organizations are private entities. Thus, Plaintiff's ADA claims against BDS are similarly dismissed. *see Browdy v. Karpe*, 131 F. App'x 751, 753–54 (2d Cir. 2005) (summary order) ("[Plaintiff's] ADA claims also were properly dismissed because he has sued his [public defenders], not [a] public entity[.]").

Third, "it is well[-]settled that monetary damages are [ ] available under Title II of the ADA [only] where the Plaintiff is able to demonstrate intentional discrimination." *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)), *aff'd*, 633 F. App'x 14 (2d Cir. 2016) (summary order). To prevail on a claim for intentional discrimination under Title II, "a plaintiff must prove a policymaker's 'deliberate indifference to the rights secured the disabled by those statutes,' in addition to the other elements of a Title II claim." *Gershanow v. City of Rockland*, No. 11-CV-8174 (CS), 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014) (quoting *KM ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005)).

Unless Plaintiff properly pleads the City's intentional discrimination to his rights secured by the ADA and Rehabilitation Act, Plaintiff may claim only injunctive relief. Plaintiff's ADA and Rehabilitation Act claims against the City are thus dismissed, with leave to replead. If Plaintiff seeks to replead his claims under the ADA and Rehabilitation Act, he should make sure to identify the program, benefit, or activity that he was denied the ability to participate in due to his disability.

## IV. State-Law Claims

To the extent Plaintiff purports to bring state-law claims for intentional infliction of emotional distress ("IIED"), respondeat superior, or negligence (*see* Dkt. 26, at 4) these claims are dismissed with leave to replead.

### A. Intentional Infliction of Emotional Distress

"Under New York Law, [IIED] has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Saleh v. United States*, No. 12-CV-4598 (KBF), 2013 WL 5439140, at *11 (S.D.N.Y.

Sept. 27, 2013) (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). "Whether the alleged conduct is sufficiently extreme and outrageous is a matter of law for the courts to decide." *Frigerio v. United States*, No. 10-CV-9086 (SAS), 2011 WL 3163330, at *9 (S.D.N.Y. July 22, 2011). The extreme and outrageous requirement is met "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotations and citations omitted). "[T]he requirements of the rule are rigorous, and difficult to satisfy. Given the 'rigorous' requirements, courts often dismiss claims under the 'extreme and outrageous conduct' prong as a matter of law." *Reid v. Sack*, No. 20-CV-1817 (VM), 2021 WL 100490, at *5 (S.D.N.Y. Jan. 12, 2021) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).

**\*15** Plaintiff fails to allege that Defendants engaged in extreme and outrageous conduct with the intent to cause him emotional distress, or that he suffered emotional distress as a result of their conduct. To the extent Plaintiff's claim is that some Defendants engaged in extreme and outrageous conduct by "manufacturing" or "doctoring" evidence, that conclusory assertion, as previously discussed, is insufficient. Plaintiff's IIED claim therefore is dismissed.

### B. Respondeat Superior

Because Plaintiff has not demonstrated an "entitlement to recover against [any City] employee," his claim against the City under the doctrine of respondeat superior fails. *see Ferreira v. City of Binghamton*, 975 F.3d 255, 278 (2d Cir. 2020).

### C. Negligence

Plaintiff asserts that the City "was grossly negligent upon setting in place a contractual agreement between, (the City) and [BDS]." (Am. Compl., Dkt. 24-1, at 29.) Under New York law, an essential element of a negligence claim against a municipality is a "a special duty to the injured person, in contrast to a general duty owed to the public." *Ferreira*, 975 F.3d at 283 (quoting *McLean v. City of New York*, 12 N.Y.3d 194, 199 (2009)), *certified question accepted*, 35 N.Y.3d 1105 (2020).

New York courts have recognized the existence of such a duty where either "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the

2021 WL 1838277

government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition."

*Id.* at 281 (quoting *Applewhite v. Accuhealth, Inc.*, 972 N.Y.S.2d 169, 173 (2013)). Plaintiff has alleged no such duty. His negligence claim against the City is therefore dismissed with leave to replead.

## V. Leave to Amend

In light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days of this Memorandum and Order. "Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction." *Liverpool*, 2019 WL 3745734, at *3 n.2 (internal quotations omitted). Because the Court grants Plaintiff leave to replead his federal claims, Plaintiff is also granted leave to replead his state-law claims.

Plaintiff's leave to amend his pleadings is subject to the following limits: (1) Plaintiff should not assert § 1983 claims against the CCRB, IAB, Corporation Counsel, and BDS because, as discussed above, they are non-suable entities under § 1983; (2) Plaintiff should not assert claims relating to the CCRB or IAB investigations against the arresting officers because, as discussed above, there is no constitutional right to a government investigation; (3) Plaintiff should not assert claims relating to the delayed disclosure of Officers Chow's and Battista's involvement in his arrest because, as discussed above, Plaintiff suffered no prejudice and was able to timely add them as defendants in *Walker v. Raja*; (4) Plaintiff should not re-assert any claim that surveillance videotape was "doctored," or that "manufactured" or "fabricated" evidence was produced or introduced during grand jury proceedings; and (5) Plaintiff should not assert-due process claims relating to his underlying arrest and indictment, as the Court has already determined in *Walker v. Raja* that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," *Walker*, 2020 WL 606788, at *10. *see Hunt v. All. N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile.").

**\*16** Plaintiff is advised that the Second Amended Complaint will completely replace the Amended Complaint, must be

captioned "Second Amended Complaint," and shall bear the same docket number as this Memorandum and Order. Plaintiff is also advised that he should submit only one filing constituting his Second Amended Complaint, and that such filing need not include reproductions of court opinions to which Plaintiff cites. Plaintiff need not, and should not, file additional affirmations (*e.g.*, Dkts. 24-2, 26, 27) in connection with the Second Amended Complaint, and should submit only one copy of all further filings in this case. Furthermore, Plaintiff's Second Amended Complaint should reference only exhibits and documents filed in this action and bearing the same docket number as this Memorandum and Order.

Although the Court is obliged to allow Plaintiff to amend his complaint at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted), Plaintiff should proceed in good faith and he must refrain from setting forth conclusory statements (*i.e.*, statements not based on specific factual allegations) in support of his claims and repeating any claims that have been dismissed by this Order.

## CONCLUSION

For the reasons stated above, the Amended Complaint is dismissed in its entirety for failure to state a claim pursuant to 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B). However, the Court grants Plaintiff's motion to proceed IFP and leave to file a Second Amended Complaint within sixty (60) days, as set forth above. All further proceedings shall be stayed for sixty (60) days or until Plaintiff files a Second Amended Complaint, whichever is earlier. If Plaintiff fails to file a Second Amended Complaint within the time allowed or fails to show good cause why he cannot, the Court shall direct the Clerk of Court to enter judgment and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore IFP status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## All Citations

Slip Copy, 2021 WL 1838277

**Walker v. City of New York, Slip Copy (2021)**

2021 WL 1838277

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Allen v. Stringer, Not Reported in Fed. Rptr. (2021)

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 76 of 235

2021 WL 4472667

2021 WL 4472667
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Doran ALLEN, Plaintiff-Appellant,

v.

Scott M. STRINGER, New York City Comptroller,
Warden AMKC-C-95, Defendants-Appellees.

20-3953
|
September 30, 2021

Appeal from a judgment of the United States District Court
for the Southern District of New York (Stanton, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Doran Allen, pro se,
Ossining NY.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: RICHARD C. WESLEY, RICHARD J.
SULLIVAN, Circuit Judges, JOHN G. KOELTL, District
Judge. [*]

[*]    Judge John G. Koeltl of the United States District
Court for the Southern District of New York, sitting
by designation.

**SUMMARY ORDER**

Appellant Doran Allen, proceeding pro se, sued Scott M.
Stringer, in his capacity as New York City Comptroller, and
the unnamed warden of the Rikers Island Anna M. Kross
Center ("AMKC") under 42 U.S.C. § 1983 for violations of
the Due Process Clause of the Fourteenth Amendment. Allen
alleges that, while he was detained at AMKC, a corrections
officer refused to help him carry breakfast trays, causing him
to slip and fall on broken stairs, injuring himself. The district
court dismissed the complaint sua sponte for failure to state a
claim. We assume the parties' familiarity with the underlying
facts, the procedural history of the case, and the issues on
appeal.

We review de novo a district court's sua sponte dismissal of
a complaint under 28 U.S.C. § 1915(e)(2). *Zaleski v. Burns*,
606 F.3d 51, 52 (2d Cir. 2010). Under that statute, the district
court must dismiss a complaint filed in forma pauperis if
it determines that the action "(i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To
avoid dismissal, a complaint must plead "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft
v. Iqbal*, 556 U.S. 662, 678 (2009) (recognizing that "legal
conclusions" and "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do
not suffice" to plead a viable claim). Pro se submissions are
reviewed with "special solicitude," and "must be construed
liberally and interpreted to raise the strongest arguments that
they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d
471, 474–75 (2d Cir. 2006) (internal quotation marks and
emphasis omitted).

Conditions-of-confinement claims brought by pretrial
detainees are analyzed under the Fourteenth Amendment's
Due Process clause. *Darnell v. Pineiro*, 849 F.3d 17, 29
(2d Cir. 2017). To state such a claim, a plaintiff must
satisfy both an objective prong and a subjective prong.
*See id.* The objective prong requires "showing that the
challenged conditions were sufficiently serious to constitute
objective deprivations of the right to due process," while
the subjective prong requires "showing that [an] officer
acted with at least deliberate indifference to the challenged
conditions." *Id.* (internal quotation marks omitted). If a
conditions-of-confinement claim is predicated on an unsafe
condition, a court will analyze "whether society considers
the risk that the prisoner complains of to be so grave that it
violates contemporary standards of decency to expose *anyone*
unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25,
36 (1993).

Allen alleges that he slipped or tripped on broken stairs,
causing him to fall. But while the existence of broken stairs
could be deemed to constitute negligence on the part of
the prison, broken stairs alone cannot satisfy the objective
prong of a conditions-of-confinement claim. *See McCray v.
Lee*, 963 F.3d 110, 120 (2d Cir. 2020) (explaining that the
defendant's complaint alleging unconstitutional conditions of

2021 WL 4472667

confinement after a slip and fall in an icy prison yard did not show "exceptional circumstances" that would "elevate" the conditions "beyond the typical level of danger presented by a slippery sidewalk or a wet floor"). Because broken stairs cannot be considered a risk that is "so grave that it violates contemporary standards of decency," Allen's conditions-of-confinement claim was properly dismissed. *Helling*, 509 U.S. at 36.

**\*2** But even if it could be argued that Allen alleged an objectively serious condition, the district court properly dismissed Allen's claims against Stringer and the AMKC warden due to the obvious deficiencies in Allen's complaint. As the district court concluded, the suit against the warden in his official capacity was more properly a suit against the City of New York because Allen did not allege that the warden personally had done or failed to do anything that violated his rights. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity... should be treated as suits against the State."). Similarly, Stringer, as the New York City Comptroller, is sued in his official capacity. Allen was therefore obligated to allege sufficient facts showing that the Fourteenth Amendment violation occurred "pursuant to a municipal policy or custom," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing, inter alia, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978)), or was caused by a "failure to train," *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694). Allen did not allege any facts showing that the corrections officer acted pursuant to an unconstitutional policy or custom, or that the City of New York failed to train its corrections officers, as required for such a claim.

The district court also did not abuse its discretion by declining to exercise supplemental jurisdiction over any state-law claims because the district court properly dismissed Allen's § 1983 claim, the only claim over which it had original jurisdiction. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." (internal quotation marks omitted)).

Finally, the district court did not err by denying Allen leave to amend his complaint. A district court should not dismiss a pro se plaintiff's complaint without granting leave to amend "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted). As discussed above, the incident involving the corrections officer and the broken steps did not amount to a due process violation, and that deficiency in the complaint cannot not be cured. Accordingly, amendment would have been futile.

We have considered all of Allen's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

## All Citations

Not Reported in Fed. Rptr., 2021 WL 4472667

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1666918
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,
v.
NEW YORK UNIVERSITY,
UCATS Local 3882, Defendants.

No. 20-CV-10802 (JPO) (OTW)
|
Signed 04/29/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree
Deakins, New York, NY, for Defendant New York University.

Gregory Ainsley, Robert T. Reilly, Serge Ambroise,
Ambroise Law, Rachel Sonia Paster, Cohen, Weiss and Simon
LLP, New York, NY, for Defendant Ucats Local 3882.

## REPORT AND RECOMMENDATION

ONA T. WANG, United States Magistrate Judge:

**\*1  To the Honorable J. PAUL OETKEN, United States
District Judge:**

### I. INTRODUCTION

Plaintiff Darwyn M. Morren brings this action against the
defendants, New York University ("NYU"), and UCATS
Local 3882 ("UCATS"). (ECF 2). Plaintiff alleges that: (1)
Defendants discriminated against Plaintiff on the basis of
race and national origin under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 1981, the New York City Human
Rights Law ("NYCHRL"), and the New York State Human
Rights Law ("NYSHRL"); (2) Defendants discriminated
against Plaintiff under the Americans with Disabilities Act
("ADA"), the NYCHRL, and the NYSHRL; (3) Defendants
violated the Family and Medical Leave Act of 1993; (4)
NYU breached a contract by terminating him; (5) UCATS
breached the Collective Bargaining Agreement ("CBA")
with NYU by failing to submit grievances on his behalf;
(6) UCATS breached their duty of fair representation to
Plaintiff (ECF 2, ECF 25); (7) Defendants conspired to
deprive Plaintiff of equal protection under 42 U.S.C. § 1985

(ECF 25); (8) Defendants violated Plaintiff's Civil Rights
under Civil Rights Law § 79-n (ECF 25); and (9) negligent
infliction of emotional distress against both Defendants. (ECF
25). Plaintiff seeks "compensatory damages in the sum of
$100,000,000 [f]or emotional and psychological distress.
[P]lus any punitive damages which is exclusive of the
$100,000,000 demand." (Am. Compl. 6).

### II. PROCEDURAL HISTORY

Plaintiff filed a Charge with the U.S. Equal Employment
Opportunity Commission ("EEOC") on August 25, 2020.
(ECF 2). Plaintiff alleges that he received his Rights of
Notice to Sue from the EEOC, dated September 21, 2020, on
September 28, 2020. (ECF 2).

On December 18, 2020, Plaintiff filed his *pro se* Complaint
against Defendants NYU and UCATS. (ECF 2). The
Honorable John P. Cronan referred this case to me for General
Pretrial Management and Dispositive Motion on April 14,
2021.[1] (ECF 15). Plaintiff filed his First Amended Complaint
on June 4, 2021, which adds additional details, but no
additional claims. (ECF 25 (hereinafter "Am. Compl.")). On
June 9, 2021, the parties agreed to a briefing schedule for
Defendants' motions to dismiss the Amended Complaint.
(ECF 29, 33). Plaintiff requested a 31-day extension of
the briefing schedule because of health concerns, which I
granted on July 7, 2021. (ECF 37, 38). The day Defendants'
submissions were due (August 9, 2021), Plaintiff attempted
to amend his First Amended Complaint, without the Court's
leave and without Defendants' consent. (ECF 40, 43). I denied
this request as untimely.[2] (ECF 43).

[1]     The case was reassigned earlier this year to Judge
        Oetken.

[2]     I reviewed ECF 40, Plaintiff's Proposed Second
        Amended Complaint, and do not find that Plaintiff's
        Proposed Second Amended Complaint alleges
        additional facts that would have been material to
        this Report & Recommendation.

Defendants filed their respective Motions to Dismiss on
August 9, 2021, in accordance with the amended briefing
schedule. (ECF 46, 48). Ten days later, Plaintiff sought
another extension to file his opposition, which I granted.[3]
(ECF 55, 60). Plaintiff filed his opposition on October 7,
2021, and Defendants filed their replies on October 28, 2021.
(ECF 65, 68, 70).

[3] Plaintiff alleged on October 7, 2021 that NYU was continuing to retaliate against him by sending the "answer to [his] complaint to his old address." (ECF 65 at 1). NYU filed an Affirmation and a "true and correct copy of the confirmation that Defendant's Motion to Dismiss papers were delivered" to Plaintiff's address listed on the docket. (ECF 71).

## III. FACTUAL BACKGROUND [4]

[4] For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, *see Krassner v. 2nd Ave Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and draws all inferences in the Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

**\*2** Plaintiff identifies as an "Afro-Caribbean male (black/[A]frican descent), of Trinidadian [n]ational [o]rigin" with ADHD. (Am. Compl. 22). [5] He began working at NYU's Bobst Library in November 2016 as an "ADRSS" (Access Delivery Resource Sharing Services) assistant. (Am. Compl. at 22). His job responsibilities included "various administrative tasks in the library, including checking out, shelving, unshelving, and stacking books; creating and managing patrons' accounts; working in the course reserves section amongst other responsibilities." (Am. Compl. 23 at ¶ 1). Upon starting work, Plaintiff joined UCATS, where Linda Wambaugh was his union representative. (Am. Compl. 23 at ¶ 2). NYU terminated Plaintiff's employment effective on December 13, 2019. (Am. Compl. 33 at ¶ 49).

[5] To reduce the likelihood of confusion, all citations to the Amended Complaint reference PDF page numbers, ranging from one (1) to thirty-nine (39) (the entirety of ECF 25 in one PDF). Plaintiff did not include paragraph numbers until page 22. Accordingly, citations to the Amended Complaint on or after page 22 will also include paragraph citations.

### *1. Plaintiff is Assigned a Less Convenient Work Schedule.*

Plaintiff reported to several individuals when he worked at NYU. (Am. Compl. at 23 ¶ 1). His immediate supervisor was Patricia Warrington. (Am. Compl. 23 at ¶ 1). Plaintiff and Warrington both reported to the circulation manager, Deborah

Caesar, who was later replaced by Frances Rodriguez. (Am. Compl. 23 at ¶ 1).

In December 2016, Plaintiff met with "management" [6] and was told that he "exceeded expectations" in performance and attendance. (Am. Compl. 23 at ¶ 3). At this meeting, Plaintiff complained that two coworkers were "affecting teamwork/morale," and were "ma[king] [the workplace] a hostile work environment." [7] (Am. Compl. 23 at ¶ 3). "Management" responded by telling Plaintiff, "don't worry about it, and just worry about yourself." [8] (Am. Compl. 23 at ¶ 3).

[6] Plaintiff does not identify or define "management," nor does he identify subsequent work reviews at which he was informed he was performing adequately.

[7] Plaintiff does not identify these individuals nor does he detail any incidents in connection with this complaint.

[8] Management also asked that Plaintiff not wear his coat/jacket while working, even though he was cold, because the security guard had complained about the way "it looked" on Plaintiff. (Am. Compl. 23 at ¶ 3).

Around December 2016 or January 2017, Gary Speizale, Plaintiff's coworker, complained about the shift schedule. (Am. Compl. 23 at ¶ 4). Plaintiff alleges that, as a result, Plaintiff's schedule was changed so that he no longer had consecutive days off, while his coworkers, including Speizale, did. (Am. Compl. 23 at ¶ 4). Plaintiff complained to Warrington, Caesar, and Rodriguez that the new schedule was unfair, but "they" told Plaintiff that the schedule was based on seniority, and Plaintiff had the "least amount of seniority" among his coworkers because he was "the most recent hire." (Am. Compl. 23 at ¶ 4). Plaintiff complained to Wambaugh about the schedule, explaining that he was not the most recent hire, but she also said that Speizale was senior to Plaintiff. [9] (Am. Compl. 23–24 at ¶ 4). The Union did not file a grievance on Plaintiff's behalf. [10] (Am. Compl. 24 at ¶ 4).

[9] Plaintiff does not allege whether Speizale was in fact senior to him, nor does he allege why his supervisors and union representative thought Speizale was senior to Plaintiff. Plaintiff also

does not allege facts about other similarly situated coworkers and their work schedules.

10    Article 34 of the CBA governs the Grievance and Arbitration Procedure with UCATS. (ECF 49-1, CBA at 27).

### 2. Plaintiff is Reprimanded for Taking a Previously-Scheduled Trip to a "Religious Festival."

**\*3** Plaintiff told his employer "[b]efore [he] [s]tarted employment" in November 2016 that he had plans to attend an annual "Cultural and Religious Festival/carnival [sic]" in Trinidad. (Am. Compl. 24 at ¶ 6). Before he began working, Plaintiff alleges that he was told that he could attend this event, and that he would be paid during his absence.[11] (Am. Compl. 24 at ¶ 6). Then, in February 2017, days before attending the "Cultural and Religious Festival/carnival in Trinidad," "they" told Plaintiff that he would not be paid for the time off he was taking.[12] (Am. Compl. 24 at ¶ 6). Plaintiff went to the festival, but "was accused of misusing sick time" and upon his return, was told that he would be terminated. (Am. Compl. 24 at ¶ 8). "[Plaintiff] explained that [he] was only doing what Rodriguez told [him] to do, and that in any event, [he] had a doctor's note." (Am. Compl. 24 at ¶ 8). Ultimately, Plaintiff was not "disciplined." (Am. Compl. 24 at ¶ 8).

11    Plaintiff alleges extremely similar facts occurred in 2018. (Am. Compl. 10). It is unclear whether these facts are for the same event in 2017 and Plaintiff misstates the date, or whether this is a different event entirely.
Plaintiff alleges that in 2018, he asked Rodriguez for unpaid time off to attend a "religious holiday," and his request was denied. (Am. Compl. 10). Plaintiff "brought up the fact that Gary Speizale gets his religious requests approved" but Plaintiff was told "to worry about [himself]." (Am. Compl. 10). Plaintiff alleges that Rodriguez told Plaintiff to "call out sick for those days," and told Plaintiff that he would not need a doctor's note. (Am. Compl. 10). Plaintiff followed Rodriguez's suggestion and upon returning, Caesar told Plaintiff that he had abused sick days and NYU "will have to let [him] go if [he doesn't] have a doctor's note." (Am. Compl. 10). Plaintiff alleges that he reported he was

sick, produced a doctor's note, and therefore was not terminated. (Am. Compl. 10).
Plaintiff does not allege any additional facts about what Rodriguez advised him to do regarding his sick time and the festival, what doctor he saw, or what sickness, if any, he experienced.

12    Plaintiff does not identify "they," or whether "they" were supervisors.

Plaintiff also alleges that in July 2019, he requested time off for his vacation to Trinidad in February 2020, which Rodriguez denied. (Am. Compl. 15). Plaintiff alleges that Caesar had approved Plaintiff's request the past three years (which is inconsistent with his earlier allegations). (Am. Compl. 15). Plaintiff halved the vacation days he initially requested and later cancelled his flight because with fewer days, the cost was higher. (Am. Compl. 15).

### 3. Plaintiff's Probation is Extended.

In February 2017, Plaintiff complained to NYU and UCATS "that [his] probation period had been extended." (Am. Compl. 24 at ¶ 7). Caeser and Rodriguez told Plaintiff that the extension was because of his "performance issues." (Am. Compl. 24 at ¶ 7). Plaintiff was unaware of any performance issues because he had allegedly been told "numerous of times [sic] that [he] performed [his] job duties beyond expectations and [his] attendance was perfect, unlike others on probation and ... their probation wasn't extended." (Am. Compl. 24 at ¶ 7). Plaintiff also complained about his "coworkers not getting along with one another" at this time. (Am. Compl. 24 at ¶ 7). In response, Rodriguez told Plaintiff, "You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around." (Am. Compl. 24 at ¶ 7). Plaintiff alleges that at the time, Warrington added, "Why don't you just go back to Trinidad to live since you['re] always complaining about what we do here?" (Am. Compl. 15). When Plaintiff told Wambaugh about this interaction, she told him that "the Employer would have fired [him]," and only had not because Plaintiff "had ADHD, [and] they did not want any complaints."[13] (Am. Compl. 24 at ¶ 7). Plaintiff ultimately completed his probationary period in April 2017. (Am. Compl. 24 at ¶ 7).

13    Plaintiff does not provide any facts about when or to whom he disclosed his ADHD disability.

He also does not plead the original length of his probationary period.

### 4. Plaintiff Grows Increasingly Suspicious of His Coworkers and Others.

**\*4** Plaintiff alleges that one to two months into his employment (in December 2016 or January 2017), Plaintiff "complained numerous times about coworkers making false statements and claims in order to get [him] fired and sabotage [his probation]." (Am. Compl. 24 at ¶ 5). Between 2017 and 2018, Plaintiff "repeatedly complained to Caesar that Rodriguez" was trying to get him "disciplined or fired." (Am. Compl. 24 at ¶ 8). Caesar's response was that Plaintiff should "not worry about it." (Am. Compl. 24 at ¶ 8). Plaintiff does not state who else, if anyone, tried to get him fired or what statements Rodriguez or others made.

On three occasions between late 2018 and April 1, 2019, Plaintiff complained to Rodriguez and Caesar that "some full-time coworkers seemed to be manipulating students and student-workers to do illegal things, who worked in the library, to look at [him] and treat [him] in a different or suspicious way." (Am. Compl. 25 at ¶¶ 10–12). Plaintiff also complained about Chris Crowe, a Union Representative (who also allegedly lived with Speizale), engaging in this behavior. (Am. Compl. 25 at ¶ 11). Plaintiff further complained that on multiple occasions he was being "stalked" by coworkers and students, and mistreated by students, staff, and professors. (Am. Compl. 25 at ¶ 13). This included allegations that: (1) "students came into the library and pointed and laughed at [Plaintiff]"; (2) students "were recording [Plaintiff]"; and (3) a student bumped into him and another student recorded the incident, "almost as if to catch [Plaintiff] doing something to the student who bumped [him]." (Am. Compl. 25 at ¶ 13). Plaintiff verbally reiterated these complaints to Rodriguez and Caesar for the next two months. (Am. Compl. 25 at ¶ 14). Rodriguez and Caesar did not escalate the complaints; rather, Caesar called Plaintiff "paranoid." (Am. Compl. 25 at ¶ 14). Plaintiff also complained to Wambaugh, who told Plaintiff that there was "no grievance[s] that could be filed about [his] coworkers, students, and professors doing this to [him]." (Am. Compl. 25 at ¶ 14).

At some unspecified time, Plaintiff alleges that he complained to Wambaugh about his coworkers stalking him, sabotaging his work, and making derogatory comments to him. In response, Wambaugh allegedly said, "they just don't like you" and "they don't have to be nice to you." (Am. Compl.

9). Wambaugh did not file a grievance about Plaintiff's complaint. (Am. Compl. 9).

Plaintiff filed formal written complaints about the above actions in June and July 2019 to Rodriguez and Caesar, which complaints were then forwarded to Human Resources ("HR"). (Am. Compl. 25–26 at ¶ 15). Plaintiff did not feel comfortable discussing the matter with HR, however, because he "believed[d] that management was involved in the mistreatment." (Am. Compl. 26 at ¶ 15). Around this time, Plaintiff also complained to Wambaugh that: (1) a new student coworker was stalking Plaintiff; and (2) Caesar was dating a coworker who was harassing Plaintiff.[14] (Am. Compl. 26 at ¶¶ 16, 17). Wambaugh said that the Union could not file a grievance about the stalking, and that the Union and NYU knew about Caesar's relationship, but "there was nothing that could be done." (Am. Compl. 26 at ¶¶ 16, 17). A few weeks later, Rodriguez took over Caesar's role as circulation manager and Caesar began working in HR. (Am. Compl. 26 at ¶ 18).

[14]    Plaintiff does not identify any of these individuals.

"At around the same time," Plaintiff alleges "that [his] electronic devices and personal, NYU email accounts and other accounts had been hacked by the Employer."[15] (Am. Compl. 26 at ¶ 19). Plaintiff believes he was hacked because on one occasion Plaintiff could not log into his NYU email, and on another occasion, he "learned that an NYU VPN had been created with [his] work ID and password" when he was not at work. (Am. Compl. 26 at ¶ 19).

[15]    Plaintiff alleges that he "heard people in the library discussing videos [he] had watched, or things on [his] social media [ac]counts and email accounts and electronic devices, that no one but [Plaintiff] should have knowledge of." (Am. Compl. 26 at ¶ 19). He also alleges that "Amazon web IP addresses [were] popping up on [his] phone and laptop that weren't there before." (Am. Compl. 26 at ¶ 19).

**\*5** After moving apartments in July 2019, Plaintiff alleges that NYU was sending people to stalk his whereabouts.[16] (Am. Compl. 26–27 at ¶ 20). In response to Plaintiff's complaints about this behavior, Warrington told Plaintiff "that [he] was paranoid," and Wambaugh "asked [Plaintiff] what this had to do with the Union." (Am. Compl. 27 at ¶ 20). Wambaugh did not file a grievance. (Am. Compl. 27 at ¶ 20). Plaintiff alleges, however, that after he complained about the

stalking, "the Employer changed [his] address in its system back to [his] old address in the Bronx" even though he "never gave them [his] Queens address, but [he] ha[s] mailings from the Union [a]nd NYU with [his] Queens [a]ddress." (Am. Compl. 27 at ¶ 21).

[16]    Plaintiff said that "[he] noticed people on the train looking at [him], standing next to [him], raising their phones at [him] as if they were recording [him], stomping in front of [him], and engaging in other activity that [he] viewed as an effort to agitate [him]. [He] suspected that the Employer was involved in this because it was the same behavior [he] was experiencing at the library [a]nd only started after [his] initial complaints." (Am. Compl. 27 at ¶ 20).

At some unspecified time, Plaintiff told Rodriguez that he was having sleeping issues. (Am. Compl. 28 at ¶ 26). Plaintiff then alleges that in July or August 2019, Rodriguez recommended that Plaintiff receive treatment from his psychiatrist regarding his sleeping issues.[17] (Am. Compl. 38 at ¶ 72).

[17]    Plaintiff alleges "[t]he meds the psychiatrist prescribed [Plaintiff], shouldn't have been prescribed, as [he] wasn't diagnosed with any of the ailments [that mandated] the medication." (Am. Compl. 38 at ¶ 72). Plaintiff further alleges that the psychiatrist had omitted all of his "confessions of the stalking from NYU" and other misconduct by Defendants but Plaintiff does not say why the psychiatrist did this. (Am. Compl. 38 at ¶ 72).

### 5. Plaintiff Arrives at Work Late and Takes Time Off.

On September 30, 2019, Rodriguez told Plaintiff that he noticed Plaintiff had been "late a couple times" and warned Plaintiff that if it continued he would be "disciplined." (Am. Compl. 27 at ¶ 23). Plaintiff responded that he "always got to the desk on time, as per [his] schedule, to deal with library patrons," but Rodriguez said that "didn't matter." (Am. Compl. 27 at ¶ 23). Plaintiff told Rodriguez "that other employees had more late arrivals than [he] did, [and] were not disciplined," but Rodriguez "told [Plaintiff] not to worry about other workers." (Am. Compl. 27 at ¶ 23). Plaintiff expressed to Rodriguez that he was "going through a lot," including that he was being stalked to and from work, his devices were being hacked, and he was "traumatized by the

harassment at work."[18] (Am. Compl. 27 at ¶ 23). Rodriguez suggested that Plaintiff apply for FMLA leave.[19] (Am. Compl. 27 at ¶ 23). Plaintiff alleges that he applied for FMLA leave in early October 2019. (Am. Compl. 28 at ¶ 25).

[18]    Plaintiff does not identify or describe specific acts that he believes constitute harassment other than the stalking and hacking events, and specific arguments and altercations, described in this section and Section III.11.

[19]    At this meeting, Rodriguez asked Plaintiff to sign "the verbal warning," but Plaintiff said he wanted to speak with a Union representative first. (Am. Compl. 27 at ¶ 23). Rodriguez then "shredded the verbal warning she asked [Plaintiff] to sign." (Am. Compl. 27 at ¶ 23).

At another unspecified time, Plaintiff received "troubling texts" from a number he believes was "pretending to be someone else in [his] contacts." (Am. Compl. 28 at ¶ 26). The texts made "derogatory statement[s],[20] "question[ed]" whether Plaintiff was actually sick, and "stat[ed] that [his] meds are the reason [he] can't get any sleep." (Am. Compl. 28 at ¶ 26). Plaintiff intimates that Rodriguez is the unidentified sender because he told Rodriguez he was not getting any sleep "because of the ongoing harassment from NYU." (Am. Compl. 28 at ¶ 26).

[20]    The text messages stated "[N _ _ _ S] are not even human no more" and accused Plaintiff of being "involved in 'a whole lot of gang shit.' " (Am. Compl. 28 at ¶ 26).

*6  In early October 2019, Plaintiff took some sick days. (Am. Compl. 28 at ¶ 27). On October 12, 2019, Plaintiff's coworker, Freddie Olivia, approached Plaintiff, "put [him] in a chokehold from behind," and asked him where he had been the past few days.[21] (Am. Compl. 28 at ¶ 27). Plaintiff told Olivia that he was "concerned" that he was being harassed at work, and also complained that his "work in the Course Reserve Department ... was not being used effectively" because no one would "ever take the books outor [sic] barely." (Am. Compl. 28 at ¶ 27). Plaintiff does not describe what his "work in the Course Reserve Department" entails.

21    Plaintiff thinks NYU "was using Olivia to spy on [him] to see why [he] wasn't at work." (Am. Compl. 28 at ¶ 27).

In the days following this interaction, Plaintiff alleges that "faculty members came up to [him] on several occasions and nervously told [him] why they weren't using their Course Reserve items." (Am. Compl. 28 at ¶ 28). Plaintiff also alleges that items were showing up "on [his] account when [he] wasn't doing Course Reserve work." 22 (Am. Compl. 28 at ¶ 28).

22    Plaintiff further "suspect[ed] that this was all part of the Employer's campaign to retaliate against [him]." (Am. Compl. 28 at ¶ 28). Plaintiff does not explain the nature of his "Course Reserve" work, the relevance or significance of his conversations with these faculty members, or how these alleged facts constitute retaliation.

### 6. Plaintiff is Suspended for Fighting at Work.

On November 1, 2019, Plaintiff alleges that Olivia was "staring over [his] shoulder and following [his] movements." (Am. Compl. 28–29 at ¶ 29). Plaintiff confronted Olivia about this behavior and Olivia responded by "aggressively trying to [i]ncite a fight [with Plaintiff] and [saying], 'So [w]hat's up?!' " (Am. Compl. 29 at ¶ 29). Plaintiff began to walk away when another coworker, Robert Jameson, ran toward Plaintiff and "grabbed and/or pushed [Plaintiff]." (Am. Compl. at 29 ¶ 29). Plaintiff claims to have self-recorded audio of this interaction. (Am. Compl. 29 at ¶ 31).

That same day, Plaintiff was working alongside Adjoa Walker, a student-worker. (Am. Compl. 29 at ¶ 30). Plaintiff repeatedly asked Walker to help him check out customers until Walker began crying. (Am. Compl. 29 at ¶ 30). Plaintiff asked whether Walker was okay, and "suspect[ed] that she was crying because she was torn between harassing and agitating [him], at the request of the Employer, and doing her job." (Am. Compl. 29 at ¶ 30). Later that day, Plaintiff was called to HR where he met with Katie O'Brien, the Assistant Director of HR, and Enrique Yanez, the Director of HR. 23 (Am. Compl. 29 at ¶ 31). The exact order of the following events is unclear:

- O'Brien and Yanez left the room during the meeting because a security guard asked to speak with Plaintiff alone. (Am. Compl. 29 at ¶ 31).

- Plaintiff told the security guard that "[he] had a legal right to union representation if they were going to discipline [him], and that [he] didn't want to start the meeting" without representation. (Am. Compl. 29 at ¶ 31).

- When Plaintiff requested his Union Representative join the meeting, the meeting "was called to an end." (Am. Compl. 29 at ¶ 31).

- The security guard escorted Plaintiff out of the room. (Am. Compl. 29 at ¶ 31).

No grievance was filed by Wambaugh following this incident. 24 (Am. Compl. 29 at ¶ 32).

23    Plaintiff does not "recall if they told [him] that it was because of the incident with Freddy [O]livia, but in the event they didn't, [he] understood that was what the meeting was about, because it was the only incident that happened that day." (Am. Compl. 29 at ¶ 31).

24    Plaintiff alleges that Wambaugh "should have known to file a grievance" for "racial discrimination," for him, since she "had the audio evidence" of the fight with Jameson. (Am. Compl. at 29 ¶ 32).

**\*7** Plaintiff then alleges a series of HR meetings involving Yanez, O'Brien, Rodriguez and possibly others, but does not coherently state the topic of each meeting or the events at each meeting. (Am. Compl. 30). On November 6, 2019, a meeting was scheduled between Plaintiff, Yanez, O'Brien, and a shop steward to discuss the November 1, 2019 incident with Jameson. (Am. Compl. 29–30 at ¶ 33). Plaintiff sent an audio file of the incident to those present. (Am. Compl. 30 at ¶ 33).

From November 6 to November 19, Plaintiff does not state whether he was working, suspended, or on unpaid leave. On November 14, 2019, Yanez and O'Brien asked to meet with Plaintiff because they "had new information on the case." (Am. Compl. 30 at ¶ 34). Plaintiff responded that he was not comfortable coming to the building because of the "[r]egular harassment [he] had been suffering from NYU", and that he "was under the weather[ ]." (Am. Compl. 30 at ¶ 34). On November 18, 2019, Plaintiff was called into

a scheduled meeting via conference call with Wambaugh and O'Brien to discuss a complaint Rodriguez made about Plaintiff "ma[king]" Walker cry. (Am. Compl. 30 at ¶ 35). At the meeting, Plaintiff explained to O'Brien "that [he] just asked the student to help with the long line which is her job." (Am. Compl. 30 at ¶ 35). O'Brien reminded Plaintiff of the policy regarding how many patrons must be present for him to ask for help (which Plaintiff argued was incorrect). (Am. Comp. 30 at ¶ 35). Plaintiff additionally notes that "O'Brien stated that [Rodriguez] said she thinks [Plaintiff] felt guilty about what [he] did to the student, and labeled [his] concerns about the student as 'small talk.'" (Am. Compl. 30 at ¶ 35). At some point, O'Brien sent Plaintiff an email allowing him to return to work the next day. (Am. Compl. 30 at ¶ 36). In this email, Plaintiff was given a "final" warning. [25] (Am. Compl. 30 at ¶ 36). Plaintiff claims that aside from the warning about his attendance, "this is the only warning [he] had ever received." (Am. Compl. 30 at ¶ 36).

[25]    Plaintiff does not explain what the "final warning" threatened. Plaintiff states that he told O'Brian that "[he] didn't understand how [he] was getting a final warning and suspension, when [he] had audio of the incident which proves that [he] didn't threaten or touch anyone." (Am. Compl. 30 at ¶¶ 36–38).

On November 19, 2019, Plaintiff returned to work. (Am. Compl. 30 at ¶ 37). Plaintiff "immediately" attended a meeting with O'Brien, Yanez, and Wambaugh at which O'Brien told Plaintiff that he was suspended for three days because [Plaintiff] exhibited threatening and violent behavior." [26] (Am. Compl. 30 at ¶ 36). Plaintiff does not clearly allege whether his suspension was because of the fight with Jameson or his interaction with Walker. (Am. Compl. 30 at ¶ 36). Wambaugh also informed O'Brien "that the Union was filing a grievance over [his] suspension." (Am. Compl. 30 at ¶ 38). The grievance concerned the November 19, 2019 suspension and the final written warning. HR notified Plaintiff on December 9, 2019 that "the November 19 grievance had been closed, and that the Employer was denying the grievance." (Am. Compl. 31 at ¶ 41). (ECF 49-2, Exhibit 2 (November 21, 2019 Step 2 Grievance at 59).

[26]    It is unclear whether this was a new suspension, or a continuation of another suspension.

### 7. Plaintiff Suspects Additional Foul Play from Coworkers.

On November 30, 2019, Plaintiff recognized an application ("app") on his phone that was also on his NYU work computer, although he claims that *he* never installed the app. (Am. Compl. 31 at ¶ 39). [27]

[27]    Plaintiff additionally notes that on December 9, 2019, his "phone(s) had been installed as a modems [sic]," (Am. Compl. 31 at ¶ 41), but Plaintiff does not explain what this means.

**\*8** On December 10, 2019, Plaintiff asked Warrington if he could leave early that day "because [he] wasn't feeling good as [he was] being harassed by [his] coworkers, who were stalking [him]." (Am. Compl. 31 at ¶ 43). Warrington said no. (Am. Compl. 31 at ¶ 43). Rodriguez then asked Plaintiff to attend a meeting with HR. (Am. Compl. 31 at ¶ 43). Plaintiff said he needed Wambaugh to represent him, and the meeting was rescheduled for the next day. (Am. Compl. 31 at ¶ 44). Plaintiff asked to reschedule to either a different time the next day, or to December 16. (Am. Compl. 31–32 at ¶ 44). Neither O'Brien, Yanez, nor Rodriguez responded to this request. (Am. Compl. 32 at ¶ 44).

### 8. Plaintiff's Employment is Suspended at Least a Second Time, and then Terminated.

Plaintiff does not clearly allege the order of the following events:

- On December 11, 2019, Plaintiff "saw some of the same suspicious Amazon IP addresses." [28] (Am. Compl. 32 at ¶ 47). Plaintiff alleges, however, that one of the "IP addresses" was "traceable to the Massachusetts Institute of Technology, which is an NYU partner [and that] (this IP hacked [Plaintiff's] personal email again on 5/21/20)." (Am. Compl. 32 at ¶ 47).

- At some point between December 10 and 12, 2019, Plaintiff was emailing "multiple parties" about "the harassment and retaliation that was ongoing" when Rodriguez approached Plaintiff and told him he could leave and would be paid for the rest of the time that he was scheduled to work. (Am. Compl. 32 at ¶ 45). Plaintiff again asked Rodriguez the time of the

December 11 meeting. [29] (Am. Compl. 32 at ¶ 45). Rodriguez walked away and "about two minutes later [Plaintiff] heard her speaking by the entrance of the circulation Dept and use the words 'black man being aggressive.' " (Am. Compl. 32 at ¶ 45). Fifteen minutes later, two security guards and two NYPD officers arrived at the scene and stated that there was a complaint about Plaintiff "being aggressive, and trespassing." (Am. Compl. 32 at ¶ 45). Plaintiff responded that he worked there and that he was being harassed. (Am. Compl. 32 at ¶ 45). O'Brien cancelled the tentatively set December 11, 2019 HR meeting. (Am. Compl. 32 at ¶ 47).

• Plaintiff states that he was suspended because "the Employer knew, through its control of [his] devices, [he] discovered the Amazon web IP addresses logged into [his] personal and NYU email accounts." (Am. Compl. 32 at ¶ 47).

• Plaintiff asked Wambaugh "how [he] could be suspended without a meeting." (Am. Compl. 32 at ¶ 47).

[28]    Plaintiff does not explain, and the Court cannot discern, the significance of the "suspicious Amazon IP addresses."

[29]    Plaintiff does not allege the purpose of the December 11 meeting with the Union and Human Resources. This meeting was previously scheduled for December 10, 2021, where Plaintiff requested Human Resources be present, and Human Resources rescheduled it. (Am. Compl. 31 at ¶ 43).

On December 14, 2019, Plaintiff saw an email regarding his termination effective on December 13, 2019. (Am. Compl. 33 at ¶ 49). The email stated that "[Plaintiff] denied [a] meeting with management and HR ... and that [he] was aggressive and insubordinate ... which required the Employer to call the police to escort [him] out of the building." (Am. Compl. 33 at ¶ 49). Plaintiff alleges that "[his] suspension was converted to a termination because the Employer, having hacked [his] phone, knew that [he] had gone to the doctor to start FMLA leave, which would have given [him] job protection, and also went [to] a lawyer on December 12." (Am. Compl. 33 at ¶ 49).

**9. Plaintiff Engaged in a Post-Termination Grievance Process.**

On December 19, 2019, Plaintiff asked Wambaugh "how [he] could be terminated without even having the suspension meeting." (Am. Compl. 33 at ¶ 51). Wambaugh told Plaintiff that she would file a grievance about Plaintiff's suspension and termination. [30] (Am. Compl. 33 at ¶ 52). Plaintiff also asked Wambaugh to "file a grievance alleging ADHD discrimination," which Wambaugh said she would do. (Am. Compl. at 33 ¶ 51); (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance)). Plaintiff alleges that he "turned down" severance and unemployment benefits. (Am. Compl. 33 at ¶ 51).

[30]    Plaintiff also asked Wambaugh about "the final warning grievance, and the Employer's failure to respond to the information request in time." (Am. Compl. 33 at ¶ 51). Plaintiff does not clarify what information he sought and whether any information was conveyed by Wambaugh.

*9    On December 20, 2019, Plaintiff reached out to Wambaugh about the status of his suspension and termination grievances. (Am. Compl. 33 at ¶ 52). Plaintiff requested a grievance be filed about the grievance process along with an ADHD discrimination grievance. [31] (Am. Compl. 34 at ¶¶ 51, 53, 57) On the same day, Peter Lanzo, a New York State United Teachers representative, was assigned to Plaintiff's case. (Am. Compl. 34 at ¶ 54). Plaintiff asked Lanzo to give him access to his NYU email records, [32] which Plaintiff was initially denied because he was "rightfully terminated." (Am. Compl. 34 at ¶ 53); (Am. Compl. 36 at ¶ 62). Lanzo responded that he would speak with NYU regarding the email account access. (Am. Compl. 36 at ¶ 62).

[31]    Plaintiff alleges that Wambaugh told Plaintiff that she was not going to file the ADHD discrimination grievance and that she had not known that Plaintiff had ADHD. (Am. Compl. 33–34 at ¶ 52).

[32]    Plaintiff wanted his NYU emails because he sought proof that Defendants were being dishonest about the grievances they filed. (Am. Compl. 13). Plaintiff suggests that Defendants withheld his emails so that he "wouldn't have proof during arbitration." (Am. Compl. 13).

On January 6, 2020, Plaintiff informed Lanzo that the grievances UCATS filed were missing important information; on January 22, 2020, Plaintiff asked that they be corrected. [33] (Am. Compl. 34 at ¶ 56); (Am. Compl. 35 at ¶ 58).

The grievances were amended to reflect this missing information [34] on January 23, 2020. (Am. Compl. 35 at ¶ 58).

[33]  Plaintiff also had intended to file a grievance about the grievance process, which Lanzo allowed, but Wambaugh said was not done. (Am. Compl. 33 at ¶ 51); (Am. Compl. 34 at ¶ 57).

[34]  The amended document shows the provision violated changed from "Article 5 – No Discrimination and all other Articles that apply" to "Article 37 – Health and Safety." The nature of grievance was further amended from "Mr. Morren was discriminated against based on having a disability" to "The university failed in its obligation and policy's [sic] to maintain a healthy and safe working conditions [sic]." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance) (Amended 1/22/2020 Step 1 Grievance)).

In May 2020, Plaintiff spoke with Lanzo and Marc Laffer, Lanzo's supervisor, who assured Plaintiff that the grievances were filed on time. (Am. Compl. 36 at ¶ 64). Lanzo and Laffer suggested that Plaintiff start the grievance process without the emails. (Am. Compl. 36 at ¶ 64). Plaintiff does not plead any facts about the grievance process, its timing, or any other details. Plaintiff alleges that he had wanted to set up a meeting with "management," which Lanzo suggested was not a good idea. (Am. Compl. 36 at ¶ 64).

A few days later, Plaintiff received an email from O'Brien asking Plaintiff to confirm a grievance meeting that Lanzo had attempted to schedule. (Am. Compl. 36–37 at ¶ 65). Plaintiff declined the meeting because he did not want to move forward with the meeting without his emails. (Am. Compl. 37 at ¶ 65).

Around the end of May or beginning of June 2020, Plaintiff alleges that he emailed Lanzo alerting him that the grievances were filed late. (Am. Compl. 37 at ¶ 66). Plaintiff alleges that Lanzo said, "let's see if the employer notices." (Am. Compl. 37 at ¶ 66). Lanzo "took responsibility for the grievances being filed late." (Am. Compl. 37 at ¶ 66).

Plaintiff alleges that his suspension and termination grievances are still open and that the grievances he asked Wambaugh to file were never filed. (Am. Compl. 37 at ¶ 67).

### *10. Plaintiff's Other Factual Allegations*

On or about September 30, 2019, Rodriguez suggested that Plaintiff take FMLA leave. (Am. Compl. 27 at ¶ 23). Plaintiff asked Rodriguez for instructions, and Rodriguez told Plaintiff that he needed "to get certification" from his medical provider. (Am. Compl. 27 at ¶ 23). Wambaugh told Plaintiff the same thing. (Am. Compl. 27 at ¶ 24). Plaintiff also alleges that both Rodriguez and Wambaugh incorrectly gave him FMLA instructions that applied to non-union employees. (Am. Compl. 28 at 17). Plaintiff alleges that he applied for FMLA leave through "Lincoln Financial" in early October, but did not hear anything back for several months. (Am. Compl. 29 at ¶ 25).

**\*10** On December 12, 2019, Plaintiff was "in the process" of pursuing FMLA leave and visited a health care provider. (Am. Compl. 32–33 at ¶ 48). Plaintiff mentions that he has a diagnosis of ADHD, but that the doctor also "wanted to include a diagnosis of insomnia and major depression," which Plaintiff avers he had "never been tested for or diagnosed with." (Am. Compl. 32–33 at ¶ 48). Plaintiff's medical provider said that he would send Plaintiff's diagnosis to the insurance company so that Plaintiff could pursue FMLA leave. (Am. Compl. 32–33 at ¶ 48). On or about December 24, 2019, Plaintiff called Lincoln Financial to see if they received his FMLA leave request, which they said they did not. (Am. Compl. 34 at ¶ 54).

On December 26, 2019, however, Lincoln Financial notified Plaintiff that his claim had been denied "because [he] was no longer employed." [35] (Am. Compl. 34 at ¶ 54). Then in February 2020, Plaintiff "learned that Lincoln Financial ... without [his] permission, opened up another claim for [him], and approved a leave claim, which [he] wasn't qualified for or asked for ([i]nsurance fraud)." (Am. Compl. 35 at ¶ 61). Through his own research, Plaintiff "learned the FMLA instructions given to [him] by [NYU] and [UCATS] was [sic] in fact incorrect information, which was later confirmed by Lanzo." (Am. Compl. 36 at ¶ 61). Plaintiff confronted Lincoln Financial and NYU. Plaintiff alleges Lincoln Financial apologized; NYU never responded. [36] (Am. Compl. 36 at ¶ 61).

[35]  Plaintiff further alleges:

"[T]hey said I requested FMLA while I was employed, they said that was false. Lincoln

Financial also informed me that their point of contact at the Employer was Enrique Yanez. NYU, between the 24th and the 26th, how did they get in contact with Enrique Yanez, At home on his personal time? [A]nd, I note that Yanez is not the person who handles leave claims at NYU. As such, I believe that my claim was denied because the Employer is retaliating against me." (Am. Compl. 34 at ¶ 54).

36      Plaintiff then alleges:

"I believe that the approval of the short-term claim was part of the Employer's retaliation against me. I also believe that the Employer was engaged in a conspiracy with my doctor to retaliate against me, which led to medical malpractice, doctoring of my medical records, and prescribing me with medication for ailments I was not diagnosed with, which causes suicide and other life threatening diseases. Maliciously [i]nciting a suicide attempt is attempted murder." (Am. Compl. 36 at ¶ 61).

### 11. Plaintiff's Other Allegations of Stalking, Harassment, and Spying.

Plaintiff alleges that from April 2019 to February 4, 2020, several unidentified individuals had acted on Defendants' behalf to stalk and harass Plaintiff, but does not tie these allegations to any Defendants:

- On February 4, 2020, Plaintiff went to T-Mobile, where the representative helping him engaged in "unusual conversation" and had spent an hour setting up Plaintiff's phone when it should have only taken 10 minutes. (Am. Compl. 35 at ¶ 59).

  - During this interaction, a man with sunglasses standing across the street kept looking at Plaintiff, and got into his car when Plaintiff walked past him. (Am. Compl. 35 at ¶ 59).

- On February 5, 2020, Plaintiff's phone had "the same amazon.com [IP] addresses that were being used by [NYU] in [his] phone[.]" (Am. Compl. 35 at ¶ 59).

- On February 9, 2020, Plaintiff was at a store across from a different T-Mobile store where someone "follow[ed] ... and harass[ed]" him in the store, which other patrons allegedly noticed. (Am. Compl. 35 at ¶ 60).

- Plaintiff's landlord, Tevia Clarke, who is an NYU alumna, has "harass[ed] ... and agitat[ed]" Plaintiff from July 2019 to April 2020, by "hacking [Plaintiff's] electronic devices and taking and/or tampering with ... packages sent to [his] house ... calling [him] 'weird' or stating [he is] crazy ... [and] constantly trying to start arguments in the apartment to get a violent reaction out of [him]." (Am. Compl. 37 at ¶ 68).

  **\*11**   • Plaintiff alleges that one time he had not been receiving messages from Clarke and when he made her aware of this, "she pressed something on her phone and all of the text messages from her and other people, voicemails came thr[ough] at the exact same time." (Am. Compl. 37 at ¶ 68).

- On April 27, 2020, Plaintiff alleges "[he] saw Tevia Clarke Verizon IP address in [his] personal VPN account ... which is linked to [his] personal email address and is password protected." (Am. Compl. 37 at ¶ 68).

- Plaintiff alleges that Clarke is being bribed by Defendants to retaliate against him. (Am. Compl. 37 at ¶ 68). To support this allegation, Plaintiff notes that "[he] received mailings from the Union in May 2019 or June 2019, which had the Queens address on it, even though [he] did not move or change [his] address until mid July 2019." (Am. Compl. 37 at ¶ 68). Further, Plaintiff alleges Clarke gave Plaintiff's address to NYU UCATS. (Am. Compl. 37 at ¶ 68).

- Plaintiff alleges that "NYU has been contacting lawyers to either not take or diminish [his] case at[ ]least since December 2019 ... since filing [his] case on 12/18/20." (Am. Compl. 38 at ¶ 74).

- On January 31, 2021, Plaintiff discovered text messages from Cindy Morren (his sister and an NYU student) and his mother, in which Cindy was texting from Plaintiff's phone number through iMessage and "pretending to be [Plaintiff] and pretending to have a good relationship with [his] mother." (Am. Compl. at 38). Plaintiff alleges that his sister got his Apple ID through his ex-girlfriend, who also worked at NYU. (Am. Compl. 38 at ¶ 74).

- Plaintiff alleges that on June 3, 2021, his mother "called mental help officials." (Am. Compl. 39 at ¶ 74). Plaintiff alleges that "[he] was not mentally ill and that she was

just trying to harass [him] and deter [him] from making further complaints ...." (Am. Compl. 39 at ¶ 74).

• Plaintiff alleges in 2019-2020, Defendant NYU contacted his psychiatrist Dr. Rudoy "to diminish [his] complaints, and prescribe [him] wrong medication for illness he or his other doctors never diagnosed [Plaintiff] with." (Am. Compl. 39 at ¶ 74). Plaintiff was prescribed the medication in August 2019 following his complaints to Defendant NYU. (Am. Compl. 39 at ¶ 74). According to Plaintiff, Dr. Rudoy did not document any of Plaintiff's complaints and did not tell Plaintiff why. (Am. Compl. 39 at ¶ 74).

## IV. DISCUSSION

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.,* *Holmes v. Grubman,* 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly,* 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* " '[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

**\*12** As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d Cir. 2010). Therefore, this Court must interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal citations omitted). "However, the liberal treatment afforded to *pro se* litigants does not excuse a *pro se* party 'from compliance with relevant rules of procedural and substantive law.' " *Wang v. Palmisano,* 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (quoting *Maisonet v. Metro Hosp. & Health Hosp. Corp.,* 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009)). Accordingly, the Court may not "invent factual allegations that a plaintiff has

not pled." *Daly v. Westchester Cty. Bd. of Legislators,* No. 19-CV-4642 (PMH), 2021 WL 229672, at *4 (S.D.N.Y. Jan. 22, 2021) (alterations and quotations omitted) (quoting *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir. 2010)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). As mentioned, however, the Court may consider facts raised in opposition papers, depending on the circumstances. *Davila v. Lang,* 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018).

In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.,* 930 F.Supp. 2d 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss....").

### *1. Breach of Duty of Fair Representation*

Plaintiff brings a "hybrid" claim against UCATS and NYU under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and based on a union's duty of fair representation, arising from the National Labor Relations Act ("NLRA"). Liberally construed, Plaintiff alleges that NYU violated the CBA when it discriminated against him, and that UCATS breached its duty of fair representation when it: (1) failed to file grievances on Plaintiff's behalf, and (2) misled Plaintiff about the deadline for filing grievances. (Am. Compl. 12–14).

#### i. Applicable Law

The duty of fair representation arises out of a union's status as the exclusive bargaining agent with the employer. *See Greco v. Commc'ns Workers of Am., Loc.,* 1104, 824 F.Supp. 2d 351, 356 (E.D.N.Y. 2011). Accordingly, the duty requires a labor organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998) (quotation marks omitted).

It is well established that an employee can sue their employer for breach of a CBA. *Smith v. Evening News Ass'n.*, 371 U.S. 195 (1962). Usually, an employee must exhaust any grievance or arbitration process set forth in the CBA before bringing suit. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). In *DelCostello v. International Brotherhood of Teamsters*, however, the Supreme Court recognized that such an exhaustion requirement may result in an "unacceptable injustice" when the union representing the employee in these processes acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello*, 462 U.S. at 164. In such a case, an employee can sue both the employer and the union, regardless of the grievance or arbitration proceeding. *Id.* In doing so, the plaintiff must allege that the union has breached its duty of fair representation and that the employer has breached its CBA. *Id.* A plaintiff has six months from the time he "knew or should have known of the breach of the duty of fair representation" to bring suit. *See White v. White Rose Food a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997).

 **\*13** Breach of duty of fair representation is difficult to plead because "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," subject to good faith and honesty in exercising its discretion. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). A breach of this duty only occurs if a union's conduct toward a member of the collective bargaining unit are "shown to have arbitrarily, discriminatorily, or in bad faith foreclosed the employee's opportunities to vindicate such wrong through the grievance process." *Castro v. New York City Bd. of Educ.*, 777 F. Supp. 1113, 1118 (S.D.N.Y.), No. 89-CV-4114 (KTD), *aff'd*, 923 F.2d 844 (2d Cir. 1990). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372–73 (1990).

To support allegations of discrimination in a breach of duty of fair representation claim, a plaintiff must plead facts that show a defendant's conduct was motivated by discriminatory animus. *Rivera v. Communications Workers of America*, No. 16-CV-1673, 2017 WL 4338754, at \*5 (E.D.N.Y. Sept. 29, 2017). A plaintiff must then allege "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 (quoting *Spellacy*, 156 F.3d at 126).

ii. Plaintiff's Fair Representation Claims are Time-Barred.

As an initial matter, all of Plaintiff's claims for breach of duty of fair representation are time-barred. This Circuit has established that a plaintiff's duty of fair representation claim accrues "at the latest" by the date of his National Labor Relations Board ("NLRB") charge. *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003) ("His bringing of the NLRB charge establishes that he had actual knowledge of the breach by [the date of his NLRB filing]. It is beyond dispute that his claim had accrued by that date.").

Plaintiff filed an unfair labor practice ("ULP") charge with the NLRB on **June 15, 2020**, alleging that UCATS failed to fairly represent him. (See ECF 65, Ex. 5 (Plaintiff's filed EEOC Charge)). As a matter of law, Plaintiff knew or should have known of UCATS's alleged breach of the duty of fair representation when he filed his ULP. Plaintiff filed his Complaint on **December 18, 2020**. Thus, any alleged breaches that Plaintiff knew or should have known about before **June 18, 2020** (6 months prior to the date of this action), are time-barred. Plaintiff does not argue that this statute of limitations should be tolled. Accordingly, his claim of a breach of duty of fair representation stemming from his June 15, 2020 NLRB charge should be dismissed. *See Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003).[37] Accordingly, I recommend that Plaintiff's claims against UCATS for breach of their duty of fair representation be dismissed. Additionally, because Plaintiff's claims against UCATS are "inextricably interdependent" with his claim against NYU, I recommend that Plaintiff's claim for breach of the CBA against NYU also be dismissed. *See DelCostello*, 462 U.S. at 164; *Tomney v. Int'l Ctr. For Disabled*, 357 F.Supp. 2d 721, 738 ("The Union did not violate its DFR, and so Tomney's claims against [the employer] for violating the CBA are dismissed.").

[37] Allegations about Wambaugh allegedly giving Plaintiff the "incorrect FMLA leave Request Instructions (Am. Compl. at 6), and UCATS' failure to file a grievance—all of which occurred before June 18, 2020 (Am. Compl. at ¶¶ 7, 9, 14–16, 17, 20, 37–38, 40, 41) (Am. Compl. at 6)—are time barred.

Even if these claims were not time-barred, however, Plaintiff has not alleged any facts that

support his claim that UCATS declined to file grievances on Plaintiff's request *with an improper intent, purpose, or motive.* Without any supporting facts, this assertion is conclusory, and insufficient to state a claim for breach of the duty of fair representation. *See Stoner v. Walsh,* 772 F. Supp. 790, 806–07 (S.D.N.Y. 1991) (Mukasey, J.). Where Plaintiff alleges slightly more, the allegations are still conclusory and circular, and should be dismissed.

### 2. Breach of Contract

**\*14** Reading the Complaint most liberally, Plaintiff may be seeking to bring additional breach of contract claim(s) against NYU and UCATS. Plaintiff makes references to the "Union" or "Ucats" contract, but does not include any other facts about, or even references to, any other contracts. (Am. Compl. 20) ("WRONGFUL TERMINATION PURUSANT TO ... BREACH OF CONTRACT"); (Am. Compl. 24 at ¶ 5) ("I complained about potential contract violations to the Employer and to the Union ...."); (Am. Compl. 23 at ¶ 4) ("which it states in the Ucats Contract"); (Am. Compl. at 14) ("The Union Contract does not contain a clear and unmistakable waiver of my right to sue.").

NYU is correct that any state-law breach of contract claim Plaintiff brings against NYU is preempted by Section 301 of the LMRA. (ECF 46 at 20). Although the LMRA does not preempt claims for a violation of the CBA, if Plaintiff is claiming that Defendants violated the CBA, those claims are time barred. *See* Section V. *Cunningham v. Local 30, Int'l Union of Operating Eng'rs,* 234 F.Supp.2d 383, 395 (S.D.N.Y. 2002). Similarly, to the extent Plaintiff complains about UCATS's failure to pursue grievances on his behalf, these would be claims for breach of fair duty of representation, addressed in Section 1, *supra.*

### 3. Employment Discrimination

To state a claim for employment discrimination, a plaintiff must allege that: (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action ("AEA"), and (iv) there are facts suggesting an inference of discriminatory motivation. [38] *Littlejohn v. City of N.Y.,* 795 F.3d 297, 311 (2d Cir. 2015). Specifically, Plaintiff must show either that he "suffered

an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ... demonstrat[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir. 2001)). Similarly, to state a claim for disability discrimination, Plaintiff would need to plausibly allege that (1) Defendants are subject to the relevant statutes; (2) he suffers from a disability within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. [39]

[38] Employment discrimination claims under Section 1981 and the NYSHRL are analyzed under the same framework as Title VII. *McGill v. University of Rochester,* 600 F. App'x 789, 790 (2d Cir. 2015). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination [to] plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks omitted). "[T]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Carter v. Verizon,* No. 13-CV-7579 (KPF), 2015 WL 247344, at \*5 (S.D.N.Y. Jan. 20, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.,* 552 F. App'x 100, 102 (2d Cir. 2014)).

[39] Aside from the NYSHRL and NYCHRL having a broader definition of "disability," "[t]he standard for pleading a claim for disability discrimination under the NYSHRL and the NYCHRL is virtually identical to the ADA." *Marquez v. Starrett City Assocs.,* 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017).

**\*15** To survive a motion to dismiss, a plaintiff must allege facts that plausibly suggest that the employer discriminated against him *because of* his race, national origin, or disability. *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 85 (2d Cir. 2015). "An inference of discrimination can arise from circumstances including, but not limited to,

the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The evidence necessary to satisfy this initial burden is "minimal and *de minimis*." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotations omitted). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If defendant does so, the burden shifts back to the plaintiff to demonstrate that defendant's reason is merely a pretext for discrimination or retaliation. *Id.* In other words, the Court only evaluates "pretext" if Plaintiff adequately alleges a *prima facie* case.

Evaluating his claims under those laws, Plaintiff fails to allege that he experienced any adverse employment action under circumstances that give rise to an inference of discrimination. (Am. Compl. 13). Plaintiff complains that: (1) he was unable to take vacations or sick leave for "religious/cultural event[s]" in Trinidad; (2) his seniority was miscalculated resulting in a less convenient schedule; (3) he experienced a "hostile work environment" because he had been subjected to derogatory comments, was "mocked daily," "ostracized," harassed, cyberstalked, and stalked; (4) NYU "retaliated" against Plaintiff for complaining about these events by "wrongfully suspend[ing] [him] twice] and eventually terminating his employment; and (5) NYU failed to provide him reasonable accommodations for his ADHD (Am. Compl. 14). I evaluate all of Plaintiff's claims for discrimination on the basis of race or national origin first, and then turn to Plaintiff's disability discrimination claim.

### i. Plaintiff Does not Allege Discrimination on the Basis of Race or National Origin

I evaluate Plaintiff's first two discrimination claims under a disparate treatment analysis, and in the alternative, a disparate impact analysis. *See Gonzalez v. Police Com'r Bratton*, 2000 WL 1191558, at *20 (S.D.N.Y. Aug. 22, 2000) (acknowledging hostile work environment and disparate treatment claims are "distinct" from one another and

"require[ ] different pleading and proof"); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 n.10 (S.D.N.Y. 2009) ("[I]t bears emphasis that the analysis of adverse employment actions involving disparate treatment claims is different [from] that involving retaliation claims."). Notwithstanding the differences between disparate treatment and retaliation, "[t]he burden of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp. ...*" *Shah v. New York State Dep't of Civ. Serv.*, 341 F. App'x 670, 673 (2d Cir. 2009).

### a. Plaintiff does not Allege Defendants Had a Full Prohibition on Vacation or Restricted his Sick Leave.

Plaintiff alleges that in 2017 or 2018, Plaintiff went to a "Religious/Cultural" festival in Trinidad. Rodriguez instructed Plaintiff to use sick leave during his absence and said Plaintiff would not need a doctor's note. (Am. Compl. 10 & 24 at ¶ 8). Plaintiff alleges that he complained that his coworker, Speziale was treated differently because he "gets religious requests approved" while he did not. Upon return, Caesar told Plaintiff NYU "will have to let [him] go if [he doesn't] have a doctor's note" for the time he was out. (Am. Compl. 10). Ultimately, Plaintiff reported that he was sick, produced a doctor's note, and therefore was not terminated for taking his trip[s] to Trinidad. (Am. Compl. 10).

**\*16** Although it is unclear whether Plaintiff actually lost or was denied vacation time, a loss or denial of vacation time "does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F.Supp. 2d 256, 261 (S.D.N.Y. 2011); *see Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019). Courts in this District have declined to recognize an employer's denial of a vacation request as an adverse employment action where this denial did not constitute a "complete bar" on a plaintiff's taking vacation. *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *see also Roff v. Low Surgical & Med. Supply, Inc.*, No. CV-033655 (SJF) (JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004). Plaintiff here did not allege that NYU completely forbade him from taking vacation; indeed, Plaintiff states at one point that NYU approved Plaintiff's request to go to Trinidad for this event three years in a row. (Am. Compl. 15).

### b. Plaintiff's Seniority Miscalculation Does Not Result in an AEA.

Plaintiff alleges that he was given a worse work schedule than his coworkers, who were less senior to him. (Am. Compl. 23 at ¶ 4). Plaintiff states that both NYU supervisors and UCATS's representative Wambaugh believed Speizale to be senior to Plaintiff, which Plaintiff disputed. Loss of "seniority" in this context is not an adverse employment action because unfavorable work schedules are not an adverse employment action, and Plaintiff alleges no other ramifications or less favorable treatment because of the seniority miscalculation. *See Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CV-7735, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) (finding denial of transfer to position with better hours was not an adverse employment action) *aff'd*, 514 F. App'x 33 (2d Cir. 2013); *Daniels v. Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at *8 (D. Conn. Aug. 17, 2015) ("[Plaintiff] also suggests that the ... position is a 'preferred working schedule for officers,' but an unfavorable schedule is not an adverse employment action.") (citing *Albuja v. Nat'l Broad. Co. Universal*, 851 F.Supp. 2d 599, 608 (S.D.N.Y. 2012)).

### c. None of the Alleged Adverse Employment Actions Give Rise to an Inference of Discrimination.

Even if changes to Plaintiff's vacation time and work schedule were considered adverse employment actions, Plaintiff still does not state a claim for employment discrimination because none of Plaintiff's alleged AEAs —including suspension, termination, and hostile work environment—occurred under circumstances that give rise to an inference in discrimination.[40] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.' " *Id.* "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.' " *Sollazzo v. Just Salad Rest.*, No. 15-CV-252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03-CV-1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004)). A

plaintiff also "must show that [his] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d. Cir. 2000). While "all material respects" varies, a plaintiff must typically "plead comparators' relevant experience and length of employment in order to raise an inference of discrimination." *LeeHim v. New York City Dep't of Educ.*, No. 17-CV-3838 (PAE), 2017 WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017).

[40]    Indeed, "[b]eing forced to endure a hostile work environment is one type of adverse employment action." *Dietrich v. City of New York*, No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020).

**\*17** The Amended Complaint lacks factual allegations to support an inference that similarly situated non-Black or non-disabled employees were treated differently from Plaintiff. The only comparator Plaintiff alleges is Gary Speizale, who he alleges is white, less senior to him, and gets his holiday vacation time approved. (Am. Compl. 10). Plaintiff conclusorily alleges that Speizale is "similarly situated" to him in "all material respects," and does not identify any other comparator. *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815 (KPF), 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (finding plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenure, or experiences). Accordingly, the Complaint's conclusory allegations of differential treatment are insufficient to plausibly suggest an inference of discrimination with regard to work schedule or denial of travel to Trinidad. *See id.*; *see also Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68–69 (2d Cir. 2015); *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 408 (S.D.N.Y. 2014).

Similarly, Plaintiff does not allege discrimination under a disparate impact theory. To do so, Plaintiff must allege that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This requires: (i) identifying a specific employment practice or policy; (ii) demonstrate that a disparity exists; and (iii) alleging a causal relationship between the two. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). To demonstrate a disparity sufficient to withstand a motion to dismiss, plaintiffs must allege statistical evidence or allege that a "neutral employment practice denied equal employment opportunities to a small number of members of a protected

class compared to similarly-situated colleagues." *Gordon v. City of N.Y.*, No. 14-CV-6115 (JPO) (JCF), 2016 WL 4618969, at *23 (S.D.N.Y. Sept. 2, 2016).

Plaintiff has not identified any employment practice or policy related to vacation time or his work schedule. [41] *See African Am. Legal Defense Fund v. N.Y. State Dep't of Educ.*, 8 F.Supp. 2d 330 (S.D.N.Y. 1998) (dismissing Title VII disparate impact claim where plaintiff failed to allege any statistics to support allegations that facially neutral hold-harmless provisions had a disparate impact on minorities). Accordingly, I recommend Plaintiff's race and national origin discrimination claims be dismissed.

[41]    While Plaintiff alleges that he sought to file a grievance about the grievance process, he does not allege any facts about the process and procedure for filing grievances, or how the process was allegedly different for him due to his membership in a protected class. (Am. Compl. 34–35 at ¶ 53, 57).

### ii. Plaintiff Fails to Allege a Hostile Work Environment.

To state a claim for a hostile work environment under § 1983, § 1981, Title VII, or the NYSHRL, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Bermudez v. City of New York*, 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

*18  The standards for a union's liability for hostile work environment are different from those governing the liability of an employer. Under Title VII, a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e–2(c)(3). To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union. [42] *See Agosto v. Correctional Officers Benevolent Ass'n*, 107 F.Supp. 2d 294, 307 (S.D.N.Y. 2000); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *21–22 (S.D.N.Y. Sept. 26, 2018).

[42]    The case law governing a union's liability for hostile work environment under the NYSHRL and NYCHRL is less clear. Most cases, however, hold that NYSHRL and NYCHRL claims against a union "are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and non-discriminatory manner." *Grandy v. AEG Mgmt. Brooklyn, LLC*, No. 16-CV-4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (collecting cases).

### a. Plaintiff Does Not Adequately Allege that NYU or UCATS Stalked or Harassed Plaintiff, or Hacked Plaintiff's Electronic Devices.

Plaintiff's allegations that he was stalked, harassed, and hacked are conclusory. *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 3757120, at *10 (S.D.N.Y. June 17, 2015), *R&R adopted*, No. 14-CV-3592 RA, 2015 WL 4579147 (S.D.N.Y. July 29, 2015) (finding plaintiff's allegations that certain conduct "allow[ed] 'criminal host(s) to steal the site content' ... 'manipulate users' web activity," "lose control of her email account, and [ ] be subject to email spam" conclusory). Plaintiff's allegations here—that numerous people, including T-Mobile employees; Plaintiff's roommate/landlord, psychiatrist, sister, or mother; and/or strangers on the subway were hired by Defendants to stalk and harass him—are wholly unsupported by facts and do not state a claim for a hostile work environment. [43] The Court understands that Plaintiff describes these instances in support of his *belief* that there is an ongoing conspiracy

against Plaintiff to create a hostile work environment for him. Plaintiff's beliefs—however strongly he may hold them—are not facts. *Gallop v. Cheney,* 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic' or 'delusional.' ") (quoting *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992)); *Tessema v. Env't Prot. Agency,* No. 1:20-CV-9700 (MKV), 2021 WL 2666855, at *4 (S.D.N.Y. June 29, 2021), *appeal dismissed sub nom. Tessema v. United States Env't Prot. Agency,* No. 21-1729, 2021 WL 6427942 (2d Cir. Dec. 16, 2021) (finding that Plaintiff's claims that the EPA has tortured him and subjected him to human experiments involving exposure to hazardous pollutants were "fanciful" in nature and "clearly warrants dismissal"); *Mercier v. Mercier,* No. 07-CV-0523, 2007 WL 1582267, at *1–2 (N.D.N.Y. May 25, 2007) (Kahn, J.); *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."); *see also Banks v. Mental Health Clinicians,* No. 11–CV–7848, 2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, *inter alia,* that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with "punitive intentions") (internal quotation marks omitted).

[43]     Generally, an employer is not liable as a matter of law for harassment resulting "from nonwork-related, off-duty interactions between co-employees, because those actions are not part of the work environment." *See Devlin v. Teachers' Ins. & Annuity Ass'n of Am.,* No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion for summary judgment on the plaintiff's sexual harassment claim because, *inter alia,* the plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).

**\*19** Additionally, Plaintiff has failed to allege sufficient facts from which one could reasonably conclude that the alleged hostile conduct was *because of* Plaintiff's membership in protected classes. *See Wilson v. JPMorgan Chase Bank, N.A.,* No. 20-CV-4558 (JMF), 2021 WL 918770, at *5 (S.D.N.Y. Mar. 10, 2021).

*b. Plaintiff Does Not Adequately Allege Discriminatory Comments That Rise to a Hostile Work Environment.*

Plaintiff also does not plead sufficient facts to support a hostile work environment claim against NYU (and therefore UCATS) arising from allegedly discriminatory comments because the conduct about which Plaintiff complains is not severe or pervasive.[44] *See Benzinger v. Lukoil Pan Americas, LLC,* 447 F. Supp. 3d at 99. Plaintiff alleges he was subject to several derogatory statements and was "ostracized," stalked, harassed, and hacked at work. (Am. Compl. 20). *See also* Am. Compl. 22 ("was labeled a criminal, threatening, violent, aggressive, unprofessional all which are racial sterotypes[sic]/profiles for person(s) of [A]frican descent"; Am. Compl. 20 ("Management and my coworkers would say things like 'why don't you go back to your country since you keep complaining', or 'you don't fit the culture here.' "); Am. Compl. 24 at ¶ 7 (" 'You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around' "); Am. Compl. 15 ("Why don't you just go back to Trinidad to live since [you're] always complaining about what we do here."); Am. Compl. 32 at ¶ 45 (Rodriguez used the words 'black man being aggressive' "); Am. Compl. 11 ("subjected to numerous disparaging comments from 4/2/19 to 12/10/19").

[44]     To the extent any part of Plaintiff's claims under the NYSHRL fall under the less demanding NYCHRL standard, his claims also fail for the reasons discussed herein. The burden to state a claim under the NYCHRL is somewhat less demanding, requiring the plaintiff to allege: (i) that the plaintiff was "treated less well than other employees;" and (ii) that such treatment was because of the plaintiff's protected class. *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558, 2021 U.S. Dist. LEXIS 45132, at *13 (S.D.N.Y. Mar. 10, 2021).

Because Plaintiff's Complaint is at times vague and repetitive, I cannot discern for many of the claims the speaker, context, or frequency of these comments. Accordingly, Plaintiff fails to state a claim for hostile work environment based on the comments identified here.

iii. <u>Plaintiff Does not Adequately Allege Retaliation.</u>

To establish a claim of retaliation under § 1981, Title VII and the NYSHRL, Plaintiff must allege facts that plausibly suggest that: (i) he participated in protected activity, (ii) he suffered an adverse employment action, and (iii) there was a causal connection between his engaging in the protected activity and the adverse employment action. [45] *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see also Wilson*, 2021 U.S. Dist. LEXIS 45132, at *13.

[45]    Plaintiff must also establish these elements under the NYCHRL, except that instead of an adverse employment action, he need only prove that "something happened that would be reasonably likely to deter a person from engaging in protected activity." Wilson, 2021 U.S. Dist. LEXIS 45132, at *20.

**\*20** Liberally construing the Complaint, Plaintiff claims that he was suspended and fired for seeking to file grievances (or otherwise complaining) about mistreatment in the workplace. *See* Am. Compl. 12 ("[Plaintiff has] complained about a hostile workplace, Harassment, Retaliation, Discrimination and my complaints were either wrongfully labeled as meritless or I was deceitfully told they were filed when they were not."). [46] It is well settled that filing "[a] union grievance can constitute protected activity if it concerns discrimination, but union grievances that complain of matters other than discrimination do not constitute protected activity for purposes of Title VII." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790 (PMH), 2020 WL 2131771, at *4 (S.D.N.Y. May 4, 2020) (quoting *Mack v. Paris Maint. Co. Inc.*, No. 14-CV-6955, 2016 WL 8650461, at *9 (S.D.N.Y. Feb. 22, 2016), *R&R adopted*, No. 14-CV-6955, 2016 WL 1071030 (S.D.N.Y. Mar. 17, 2016)).

[46]    Even though Plaintiff has not pleaded a *prima facie* case for discrimination that would, under *McDonnell Douglas*, shift the burden to Defendants to provide a legitimate non-discriminatory reason for Plaintiff's suspension and termination, Plaintiff nonetheless acknowledges that NYU's proffered reasons for his suspensions and termination were because of Plaintiff's interpersonal conflicts with coworkers. (Am. Compl. 30 at ¶ 37, 38).

Plaintiff does not adequately allege that he engaged in protected activity. Although Plaintiff alleges that coworkers made racially charged comments to him, Plaintiff does not

provide facts about when he sought to file a grievance for this conduct, or for any other **discriminatory conduct** that he endured based on his race or national origin. Although Plaintiff sought to file many grievances with UCATS, in the majority of the alleged instances, Plaintiff only states that UCATS did not or could not file a grievance—not that he sought to file a grievance because of discrimination on the basis of race or national origin. (Am. Compl. 24 at ¶ 4); (Am. Compl. 25 at ¶ 14); (Am. Compl. 9); (Am. Compl. 26 at ¶ 17); (Am. Compl. 27 at ¶ 20); (Am. Compl. at 30 ¶ 32). Only on three occasions does Plaintiff plead slightly more. Specifically, Plaintiff alleges that: (1) Defendants "maliciously misled [him] into thinking the grievances were filed when they weren't" so that both parties could avoid a breach of a duty of fair representation claim (Am. Compl. 9); (2) Wambaugh "did not file a grievance for racial discrimination, which *she should have known* to [do because] she had the audio evidence" of the fight between Plaintiff, Olivia, and Jameson (Am. Compl. 29 at ¶ 32) (emphasis added); and (3) UCATS violated their duty of fair representation in May 2020 because some grievances UCATS allegedly filed were "not actual grievances and lack sig[ ]natures by all parties." (ECF 68). Plaintiff does not allege any facts that suggest UCATS's decision not to file a grievance for Plaintiff was motivated by discriminatory animus. [47] Accordingly, I recommend that Plaintiff's Retaliation claim be dismissed.

[47]    In fact, only Plaintiff's January 16, 2020 Grievance Form states that Plaintiff "was discriminated against based on having a disability." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance). The Grievance does not reference Plaintiff's race or national origin, at all.

iv. Plaintiff's Disability Discrimination Claim Fails.

Plaintiff does not adequately plead disability discrimination under the ADA, the NYCHRL or the NYSHRL. Plaintiff does not allege that the Defendants are subject to the ADA, that he was in fact disabled under the ADA, or that he suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination. [48]

[48]    Among other things, Plaintiff neither pleads when he made his employer aware of his ADHD nor

how his ADHD is related to any alleged adverse employment action.

**\*21** A person has a "disability" within the meaning of the ADA if he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;" or if he is (C) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Plaintiff has not alleged that his ADHD has impacted him in any way. [49]

[49]   Even if Plaintiff has a disability under the broader NYSHRL definition in light of his ADHD diagnosis (ECF 65-7 at 1), it is unnecessary for me to evaluate this since Plaintiff fails to allege any adverse employment action giving rise to an inference of disability discrimination. *See Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109 (JCF), 2007 WL 1149979, at \*19 (S.D.N.Y. Apr. 18, 2007), *aff'd sub nom. Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008).

Moreover, Plaintiff does not plead any facts that support his allegation that Defendants denied him any reasonable accommodation. To state a claim for failure to accommodate, "a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." *Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), *aff'd sub nom. Howard v. United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016). Here, Plaintiff merely restates the legal standard that employer generally have a duty to accommodate employees with disabilities and checks a box that the Defendants denied him accommodations. (Am. Compl. 5, 14). This is conclusory and insufficient.

Although Plaintiff's November 21, 2019 Step 2 Grievance states that he "was discriminated against based on having a disability," his supporting reasons include that he was "stalked, bullied, harassed[ ], character defamed, privacy breached," among other things. (ECF 49-3 at 3). As addressed above, these allegations are fanciful and should be dismissed. *Gallop*, 642 F.3d at 368 (2d Cir. 2011). Accordingly,

I recommend that the Court dismiss Plaintiff's disability discrimination claims.

### 4. FMLA Interference

Plaintiff believes that UCATS and NYU violated the FMLA because they denied his initial claim, but then approved an FMLA application for Plaintiff that Plaintiff claims he never made. These allegations do not support a claim for FMLA violations against either defendant. To state an FMLA interference claim, Plaintiff must establish: (i) that he is an eligible employee under the FMLA; (ii) that the defendant is an employer as defined by the FMLA; (iii) that he was entitled to take leave under the FMLA; (iv) that he gave adequate notice to the defendant of his intention to take leave; **and** (v) that he was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff's claim against UCATS fails because Plaintiff has not (and cannot) allege that UCATS is an "employer" within the meaning of the FMLA. *Eckert v. United Auto. Workers Loc. Union 897*, No. 04-CV-538S, 2005 WL 2126295, at \*9 (W.D.N.Y. Sept. 1, 2005) (concluding that a union that represented plaintiff's interests and acted on his behalf "relative to [Plaintiff's] employment" is "precisely the opposite" of an employer under the FMLA); *see also Latella v. Nat'l Passenger R.R. Corp. (Amtrak)*, 94 F. Supp. 2d 186, 190 (D. Conn. 1999) (rejecting an argument for breach of duty of fair representation against a union for "not advising him of his rights under the FMLA" because "no private right of action exists for a violation of the FMLA's notice requirements against an employer or a union."). Accordingly, Plaintiff's FMLA claim is not applicable against UCATS, and I recommend that it be dismissed.

**\*22** Plaintiff's claim against NYU also fails. Plaintiff does not allege any facts that identify how NYU interfered with his FMLA rights or resulted in a denial of Plaintiff's benefits. Plaintiff alleges that he applied for FMLA leave in early October 2019, after a September 30, 2019 conversation between Plaintiff and Rodriguez. (Am. Compl. 28 at ¶¶ 23, 25). Plaintiff also alleges that on December 12, 2019 he visited a doctor in "pursu[it] [of] FMLA leave." (Am. Compl. 32–33 at ¶ 48). Plaintiff does not allege whether the FMLA leave he was pursuing in December 2019 was a part of the same request or not. Plaintiff's operative complaint is devoid of any allegations regarding his FMLA process for the two

months immediately preceding Plaintiff's termination. NYU terminated Plaintiff's employment on December 13, 2019. (Am. Compl. 33 at ¶ 49). At most, Plaintiff alleges that Rodriguez "deliberately" gave him "the wrong Fmla [sic] request instructions ... which interfered with [his] FMLA rights entitlement." (Am. Compl. 17).

NYU is correct, however, that failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). Plaintiff makes the conclusory statement that Rodriguez's and Wambaugh's errors "interfered with [his] FMLA rights entitlement," but does not allege how being provided non-union employee instructions affected Plaintiff's pursuit of FMLA leave when he knew that he was a union employee. (Am. Compl. 17). Because of conflicting and incoherent allegations, I cannot discern from Plaintiff's pleadings: (1) what Rodriguez's FMLA instructions were; (2) when he requested FMLA leave; or (3) any October 2019 request was approved or denied. Accordingly, I recommend that Plaintiff's FMLA interference claim be dismissed.

### 5. Conspiracy under *Section 1985(3)*.

Plaintiff fails to assert a *§ 1985* claim against both defendants for the same reason: he fails to allege any facts that suggest either defendant acted in agreement with anyone, or acted with an intent to deprive Plaintiff of any of his rights under the law. As stated in Section VII, Plaintiff also does not allege that any party acted with discriminatory animus.

To state a claim under *§ 1985(3)*, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privileges of a citizen of the United States. *Trautz v. Weisman*, 819 F. Supp. 282, 290 (S.D.N.Y. 1993). The conspiracy must further be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Cuoco v. U.S. Bureau of Prisons*, No. 98-CV-9009 (WHP), 2001 WL 167694, at *3 (S.D.N.Y. Feb. 16, 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The claim must be pleaded with "at least some

degree of particularity ... [to] establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014). This requires "establish[ing] the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Id.* (quoting *Roach*, at 147 (2d Cir. 1999). An explicit agreement is not necessary but may be shown through a "general conspiratorial objective" among the participants in the conspiracy. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1999) (quoting *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990)). A plaintiff must further allege that the defendant's "overt acts ... were reasonably related to the promotion of the claimed conspiracy." *Id.* (quoting *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999). In making this claim, a plaintiff must adequately allege "the most fundamental aspect of a conspiracy: an agreement." *Gropper,* 12 F. Supp. 3d at 671. The Court will not simply infer an agreement from violations of the laws because that would essentially "permit every civil rights case to become a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts." *Id.* at 671.

**\*23** Plaintiff alleges that he complained to UCATS about the hostile work environment he experienced, but UCATS told him his concerns were meritless, or told Plaintiff they filed grievances when they had not. (Am. Compl. 9, 12). Defendants' "dishonesty," Plaintiff alleges, is a "clear sign of a conspiracy to deprive [him] of [his] rights." (Am. Compl. 12). While Plaintiff was upset by UCATS's responses that they either would not or could not file a grievance for some of the events about which Plaintiff complained, Plaintiff does not allege sufficient facts to withstand a motion to dismiss. Plaintiff fails to state any facts with particularity that suggest UCATS and NYU employees worked *in concert* (either totally within UCATS, totally within NYU, or some combination of UCATS and NYU) to *deprive* Plaintiff of his constitutional rights.

Plaintiff's allegations are limited to conclusory statements. Complaints that state "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2017 WL 4011395, at *8, (S.D.N.Y. Sept. 11, 2017); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic.' or 'delusional.' ") (quoting

*Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Evidence to support a conspiracy may be "when, where or with whom an unlawful agreement was made" or "any specific acts performed in furtherance of the alleged unlawful agreement. *Almonte v. Florio*, No. 02-CV-6722 (SAS), 2004 WL 60306, at *5 (S.D.N.Y. Jan. 13, 2004). None of that is present. Plaintiff does not adequately allege that UCATS or NYU acted in furtherance of a conspiracy to deprive him of his constitutional rights because his allegations are conclusory. As discussed, the Complaint does not adequately allege that NYU or UCATS's actions were motivated by a racial animus. *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at *16 (S.D.N.Y. Mar. 1, 2018). Accordingly, I recommend that Plaintiff's § 1985 claim against UCATS be dismissed.

### 6. *Civil Rights Violation Under Civil Rights Law Section 79-n.*

Civil Rights Law § 79-n creates a cause of action against anyone who "summons a police officer ... without reason to suspect a violation of the penal law, any other criminal conduct, or an imminent threat to a person or property," "because of a belief or perception regarding," *inter alia*, race or disability. Civil Rights Law § 79-n. To state a claim under CRL § 79-n, a plaintiff must allege that a defendant (1) intentionally committed, (2) damage to a person or property, (3) 'because of a belief or perception regarding [that person's] ... [protected characteristic].' " *Le v. Triza Elec. Corp.*, No. 19-CV-5134 (ARR) (PK), 2020 WL 1274977, at *3 (E.D.N.Y. Mar. 16, 2020). Section 79-n does not provide a remedy "where existing discrimination laws already provide protection, such as in employment ... decisions. Unless a plaintiff could show bias-related violence or intimidation in the hiring ... decision ... [they] could not bring an action under this new section." *Governor's Approval Memorandum*, No. 7, ch. 227, filed with Assembly Bill Number 529.

Plaintiff's Section 79-n claim fails because of the availability of other statutory remedies in the employment context. Even if it did not, Plaintiff would still fail to state a claim. Plaintiff alleges that Rodriguez "falsely summoned" an NYPD officer "to arrest [him] and or escort [him] out for criminal trespassing" as he was writing an email about the hostile work environment he was experiencing. (Am. Compl. 12 at ¶ 6). Rodriguez is not a defendant in this action.[50] Even if this behavior extended to NYU, Plaintiff does not assert that NYU intentionally threatened Plaintiff

*because of* his protected characteristics.[51] As best as I can discern, Plaintiff alleges that he was suspended on or before December 11, 2019 because NYU knew, "through its control of [Plaintiff's] devices," that Plaintiff knew NYU hacked his devices. (Am. Compl. 32 at ¶ 47). By Plaintiff's own account, his employment was suspended, and his supervisor suggested he leave. When he did not leave, he overheard Rodriguez say, "black man being aggressive" and NYPD officers appeared to "arrest [him] for criminally trespassing."[52]

50   Plaintiff does not allege any facts involving UCATS and the Court cannot discern any Civil Rights § 79-n claim against them.

51   As Defendants point out, at least one court has dismissed a Section 79-n claim because it was brought against an organization and not an individual. *Morrison v. Shalach*, 67 Misc. 3d 451, 457, 124 N.Y.S.3d 512 (N.Y. Sup. Ct. Westchester Cty. 2020).

52   Plaintiff compares his experience to that of his coworkers Speizale and Wambold, who he alleges could come into the building "on their days off," use the workstations, and were "never asked to leave" or have NYPD "called to arrest them for criminally trespassing. (Am. Compl. 32 at ¶ 46). But Plaintiff's comparison falls short in this instance because Plaintiff was not given a day off when he was told to leave—he had already been suspended from working at NYU.

### 7. *Negligent Infliction of Emotional Distress.*

**\*24** Plaintiff brings claims against both NYU and UCATS for negligent infliction of emotional distress ("NIED"). Plaintiff alleges that he experienced emotional distress because of the "employment discrimination" he experienced at NYU. (Am. Compl. 13).

As an initial matter, Plaintiff's NIED claim against NYU is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"). *See* N.Y. Work. Comp. Law § 11. The WCL provides the exclusive remedy for an employee who is injured "by the negligence or wrong of another in the same employ." *Rivera v. Baccarat, Inc.*, No. 95-CIV-9478 (MBM), 1996 WL 251850, at *4, (S.D.N.Y. May 10, 1996). WCL precludes Plaintiff from

recovering from claims of NIED that arise out of workplace conduct. *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014); *Stevens v. New York*, 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009); *see Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (finding negligence claim for hostile work environment barred by exclusivity of workers compensation). While the Court is sympathetic to Plaintiff's distress, Plaintiff's allegations arise out of alleged workplace conduct. Accordingly, the claim is barred by the WCL and must be dismissed.

Plaintiff's NIED claim against UCATS also fails. First, while Plaintiff makes this claim against "NYU **and UCATS**" (Am. Compl. 25 at 13), he does not provide facts that support any allegation that UCATS as an entity or a UCATS employee did anything that would support a claim for negligent infliction of emotional distress. (Am. Compl. 25 at 13–14). While Plaintiff alleges that he was being stalked and is experienced a hostile work environment (allegations that appear to be targeted at NYU, not UCATS), these allegations are conclusory. *See Goodrich v. Long Island R.R. Co.*, No. 10 Civ. 2195 (SAS), 2010 WL 2473593, at *1, (S.D.N.Y. June 17, 2010) (following Plaintiff's coworker posting on a public bulletin board his positive HIV status, Plaintiff withdrew his NIED claim, conceding he " 'was never placed in fear of imminent bodily harm, nor did he ever suffer any physical impact' "). To the extent Plaintiff is alleging UCATS acted negligently by failing to file grievances for Plaintiff, as discussed, UCATS has wide discretion in those decisions, and Plaintiff does not adequately allege that they abused their discretion. *See supra* Section 1.

### V. Conclusion and Recommendation

For the reasons stated above, I recommend that the Motion be **GRANTED**. Although *pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated," *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002), amendment may be denied upon a finding of futility. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271–72 (2d Cir. 1996). I do not recommend that Plaintiff be given leave to amend his conspiracy claim because his allegations, even liberally construed, are still fanciful and factually frivolous. *See Kraemer v. City of New York*, No. 19-CV-6671 (VEC), 2020 WL 1974204, at *4 (S.D.N.Y. Apr. 24, 2020) ("While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources.") (finding Plaintiff's allegations

of coordinated efforts by police, AMC movie theaters, T-Mobile, Starbucks, NYU and others to "surveil, mock, and harass Plaintiff" frivolous). Similarly, because Plaintiff's fair representation claims are time-barred, leave to amend would also be futile.

**\*25** Because Plaintiff is proceeding *pro se*, however, I recommend that he be given **one final opportunity** to replead only his **Discrimination Claims for Hostile Work Environment and Retaliation, and his FMLA Claims,** and that he be directed to file a proposed second amended complaint within 30 days of Your Honor's final disposition of this motion. To the greatest extent possible, Plaintiff's amended complaint must allege *facts* to support that his claims, including:

(1) Identifying the NYU or UCATS employees, if any, who engaged in the specific discriminatory conduct; and

(2) Identifying and describing the specific acts by the NYU or UCATS employees that constitute discriminatory acts.

### VI. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable J. Paul Oetken, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Oetken.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Defendants. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by mail and file proof of

service on the docket within seven days. Alternatively, if circumstances related to the ongoing COVID-19 pandemic prevents their service, they must file a letter on the docket instead.

**All Citations**

Slip Copy, 2022 WL 1666918

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1665013
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY, et al., Defendant.

20-CV-10802 (JPO)
|
Signed 05/25/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New York, NY, for Defendant.

ORDER ADOPTING REPORT
AND RECOMMENDATION

J. PAUL OETKEN, District Judge:

**\*1** *Pro se* Plaintiff Darwyn M. Morren sues New York University and UCATS Local 3382 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*; the Labor Management Relations Act, 29 U.S.C. § 185; 42 U.S.C. § 1985; the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 *et seq*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq*; and New York Civil Rights Law § 79-n. Plaintiff also brings claims for breach of contract and negligent infliction of emotional distress. (*See* Dkt. No. 25 ("Am. Compl") Dkt. No. 25-1 ("Pl.'s Memo") 4-14.) Defendants have each moved to dismiss the amended complaint for failure to state a claim. (*See* Dkt. No. 47 ("UCATS Mot."); Dkt. No. 53 ("NYU Mot.").) In a report and recommendation, Magistrate Judge Ona T. Wang has recommended that Defendants' motions to dismiss be granted. (*See* Dkt. No. 76 ("R. & R.") at 49.)

Plaintiff objects to the report and recommendation only on the grounds that (i) he did not file a motion to amend his complaint; (ii) he did not receive Defendants' motions to dismiss; and (iii) UCATS Local 3882 did not process his grievances. (*See* Dkt. No. 79 ("Pl.'s Objections") at 1-2.) In reviewing a report and recommendation, a district judge "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b). In reviewing a *pro se* party's submissions, the court is "obligated to afford a special solicitude," *Tracy v. Freshwater,* 623 F.3d 90, 101 (2d Cir. 2010), so such submissions are read "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (per curiam).

Plaintiff's objections here are without merit. Magistrate Judge Wang's report and recommendation concerns Defendants' motions to dismiss the amended complaint, not any motion to further amend the complaint. (*See* R. & R. at 49.) Defendants filed these motions on ECF, and Plaintiff had consented to the electronic service of court documents through ECF. (*See* Dkt. No. 3.) Finally, Plaintiff does not meaningfully contest that his claims against UCATS Local 3882 relating to the failure to process his grievances are time-barred. Plaintiff brings a claim that UCATS breached its duty of representation, but a plaintiff has only six months to bring suit from the time he "knew or should have known of the breach of the duty of fair representation." *White v. White Rose Food a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir. 1997). Such a claim accrues "at the latest" by the date of a National Labor Relations Board ("NLRB") charge. *Kovowras v. N.Y. Times Co.,* 328 F.3d 50, 55 (2d Cir. 2003). Plaintiff filed an unfair labor practice charge with the NLRB on June 15, 2020. (*See* Dkt. No. 49-5 ("NLRB Charge").) In that charge, he alleged that UCATS failed to fairly represent him. (*See id.* at 2.) Plaintiff had until December 15, 2020, to bring suit, but he did not do so. (*See* Dkt. No. 1 ("Compl").) Accordingly, even if Plaintiff's allegations are true, his claim must be dismissed.

**\*2** The remainder of the report and recommendation is adopted in full. Where there is no objection, a district court reviews for clear error. *See* Fed. R. Civ. P. 72(b), Advisory Committee's Notes (1983) ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."); *see also Borcsok v. Early,* 299 F. App'x 76, 77 (2d Cir. 2008). Magistrate Judge Wang's thorough and well-reasoned report presents no errors, clear or otherwise.

For the foregoing reasons, Plaintiff's objections are overruled and Judge Wang's Report and Recommendation (Dkt. No.

76) is ADOPTED in full. Defendants' motions to dismiss are GRANTED. Further, for the reasons explained by Judge Wang, Plaintiff is granted leave to amend his discrimination claims for hostile work environment and retaliation and his FMLA claims, provided that he must file a proposed second amended complaint repleading those claims within thirty days after the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 47 and 53.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1665013

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 455851
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Akeem OLIVER, Plaintiff,

v.

CITY OF NEW YORK, Dermot F. Shea in his official
capacity as Commissioner of the New York City Police
Department, John L. O'Connell in his official capacity
as Commanding Officer of the Ninth Precinct of the
New York City Police Department, Josep Gonzalez
in his personal and official capacity as a Sergeant
of the New York City Police Department, Kenneth
J. Taylor in his personal and official capacity as an
Officer of the New York City Police Department,
Five Unknown Officers of the New York City
Police Department in their personal and official
capacities, Board of Education of the City School
District of the City of New York, Tompkins Square
Middle School, Carry Chan in her official capacity as
Superintendent of School District 1, Kristine Mustillo in
her personal and official capacity as Deputy Community
Superintendent of School District 1 and Sonhando
Estwick in his personal and official capacity as principal
of Tompkins Square Middle School, Defendants.

19-CV-11219 (PGG) (JLC)
|
Signed February 15, 2022

**Attorneys and Law Firms**

Catherine Foti, Katherine Janna Drooyan, Robert James
Anello, Morvillo, Abramowitz, Grand, Iason, & Anello P.C.,
New York, NY, for Plaintiff.

Alison Sue Mitchell, Carolyn Kay Depoian, Omar Javed
Siddiqi, Peter William Brocker, New York City Law
Department, Leo Ernst, Jackson Lewis P.C., New York, NY,
for Defendant City of New York.

Alison Sue Mitchell, Peter William Brocker, Omar Javed
Siddiqi, New York City Law Department, Leo Ernst, Jackson
Lewis P.C., New York, NY, for Defendants Dermot F. Shea,
John L. O'Connell, Kenneth J. Taylor.

Alison Sue Mitchell, Peter William Brocker, New York City
Law Department, Leo Ernst, Jackson Lewis P.C., New York,
NY, for Defendant Josep Gonzalez.

Alison Sue Mitchell, Maria Fernanda Decastro, Omar Javed
Siddiqi, New York City Law Department, Leo Ernst, Jackson
Lewis P.C., New York, NY, for Defendants Board of
Education of the City School District of the City of New York,
Kristine Mustillo.

Alison Sue Mitchell, New York City Law Department, Leo
Ernst, Jackson Lewis P.C., New York, NY, for Defendant
Tompkins Square Middle School.

Alison Sue Mitchell, Maria Fernanda Decastro, New York
City Law Department, Leo Ernst, Jackson Lewis P.C., New
York, NY, for Defendants Carry Chan, Sonhando Estwick.

## REPORT AND RECOMMENDATION

JAMES L. COTT, United States Magistrate Judge.

### Table of Contents

*1 I. BACKGROUND...——

A. Factual Background...——

1. Parties to the Case...——

2. Oliver's Experiences at TSMS prior to March
2019...——

3. NYPD's Arrest of Oliver at TSMS on March 22,
2019...——

4. Oliver's Experiences Following the Arrest...——

B. Procedural History...——

II. DISCUSSION...——

A. Applicable Legal Standards...——

1. Motion to Dismiss Pursuant to Rule 12(b)(6)...——

2. Qualified Immunity...——

3. Municipal Liability...——

B. Timeliness of Plaintiff's Claims...——

**C. Analysis of Claims Against the NYPD Defendants...——**

   1. Probable Cause...——

      a. Legal Standard...——

      b. Application...——

   2. Qualified Immunity...——

      a. Legal Standard...——

      b. Application...——

   3. State Law Claims...——

   4. Derivative Claims...——

      a. Supervisory Liability of Shea, O'Connell, Gonzalez...——

      b. *Respondeat Superior* Liability of the City...——

      c. Municipal Liability...——

   5. Summary of Claims Against the NYPD Defendants...——

**D. Analysis of Claims Against the DOE Defendants...——**

   1. Discrimination...——

      a. Legal Standards...——

      b. Race Discrimination...——

         i. Adverse Employment Action...——

         ii. Inference of Discrimination...——

      c. Hostile Work Environment...——

         i. Legal Standards...——

         ii. Application...——

      d. Discrimination Under the NYCHRL...——

   2. Retaliation...——

      a. Legal Standard...——

      b. Application...——

         i. Protected Activity...——

         ii. Adverse Employment Action...——

         iii. Causal Connection...——

      c. Retaliation Under the NYCHRL...——

   3. Personal Involvement of Individual Defendants...——

   4. Derivative Claims...——

      a. Supervisory Liability and *Respondeat Superior*...——

      b. Municipal Liability...——

   5. Summary of Claims Against the DOE Defendants...——

**III. CONCLUSION**...——

**To the Honorable Paul G. Gardephe, United States District Judge:**

Akeem Oliver, a teacher at Tompkins Square Middle School in Manhattan, brings this action against the City of New York, four named and five unknown officers of the New York City Police Department, the Board of Education of the City School District of the City of New York, Tompkins Square Middle School and its principal, and two individual employees of the Board of Education. As against the NYPD Defendants and the City of New York, Oliver brings claims of false arrest and discrimination under the United States Constitution, 42 U.S.C. § 1983, and the New York State Constitution. As against the Department of Education Defendants and the City of New York, Oliver brings claims of race discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, the New York State Human Rights Law, and the New York City Human Rights Law. Oliver brings a total of 22 claims against the Defendants, all arising from events surrounding his arrest and subsequent investigation in March 2019.

Defendants have moved to dismiss Oliver's complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend the motion be granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

The following facts are taken from Oliver's Second Amended Complaint ("SAC"), Dkt. No. 41, and are accepted as true for purposes of the pending motion. *See, e.g.,* *Smolen v. Wesley,* No. 16-CV-2417 (KMK), 2019 WL 4727311, at *4 (S.D.N.Y. Sept. 25, 2019)* (citing *Erickson v. Pardus,* 551 U.S. 89, 94 (2007))*.

### 1. Parties to the Case

**\*2** Oliver is a Black male special needs teacher at Tompkins Square Middle School ("TSMS") in New York City. SAC ¶¶ 1, 44–45. He has been an educator employed by Defendant Board of Education of the City School District of New York for 12 years, holds a master's degree in special education, and has participated in "numerous trainings, courses, or certifications" relevant to his job. SAC ¶ 44.

Oliver has brought suit against the following:

- The City of New York ("City");

- The "NYPD Defendants," including:

  ○ Dermot F. Shea, Commissioner of the New York City Police Department (in his official capacity) ("Shea");

  ○ John L. O'Connell, Commanding Officer of the Ninth Precinct of the New York City Police Department (in his official capacity) ("O'Connell");

  ○ Josep Gonzalez, a sergeant of the New York City Police Department (in his personal and official capacities) ("Gonzalez");

  ○ Kenneth J. Taylor, an officer of the New York City Police Department (in his personal and official capacities) ("Taylor");

  ○ Five Unknown Officers of the New York City Police Department (in their personal and official capacities) ("Unknown Officers"); and

- The "DOE Defendants," including:

  ○ Board of Education of the City School District of the City of New York ("Department of Education" or "DOE");

  ○ Tompkins Square Middle School ("TSMS");

  ○ Carry Chan, Superintendent of School District 1 (in her official capacity) ("Chan");

  ○ Kristine Mustillo, Deputy Community Superintendent of School District 1 (in her personal and official capacities) ("Mustillo"); and

  ○ Sonhando Estwick, TSMS' Principal (in his personal and official capacities) ("Estwick").

### 2. Oliver's Experiences at TSMS prior to March 2019

Oliver alleges that for seven years, he "endured" a "series of attacks and vicious false rumors on his character, professional reputation, and standing as a teacher" at TSMS. SAC ¶ 2. Oliver alleges that Estwick and other DOE employees "spread rumors and false accusations about [him]," which "spread throughout the TSMS community, including to TSMS students and parents." SAC ¶ 6.

As described in the Second Amended Complaint, the alleged series of attacks and false rumors prior to the incident giving rise to this action include the following:

- In early 2012, Oliver asked Estwick during a staff meeting whether Black History month was celebrated at TSMS. SAC ¶ 50. Estwick responded that TSMS "had no plans to do anything" in recognition, and later that day he "complained" about Oliver's question by "making disparaging remarks" to him, including calling him an "affirmative action hire," informing that his "radical views were not welcome at the school," and stating that he wanted Oliver to leave TSMS. SAC ¶¶ 50–51.

- Estwick and DOE disseminated, facilitated, and/or condoned "fabricated rumors" that Oliver "harbored 'predatory' intentions toward TSMS students consistent with the racial stereotyping of Black men as predators." SAC ¶ 57. Specifically, Estwick issued disciplinary letters to him "riddled with false statements." SAC ¶ 56. On November 14, 2012, Estwick addressed a "Counseling Letter" to Oliver's file in which he expressed "purported 'concerns about the personal nature of [Oliver's] interactions with some of [his] students'" and "expressed Defendant Estwick's 'belief' that 'some of' Mr. Oliver's interactions with students 'dealt with personal matters such as peer and family relationships.'" SAC ¶ 58. The letter "did not

cite any specific interactions" that Estwick believed were inappropriate, and stated that "nothing ha[d] led [Defendant Estwick] to believe that there have been any improper physical relations with students." SAC ¶ 58.

**\*3** • Estwick prevented Oliver from serving in after-school coaching capacities without reason. SAC ¶ 52.

• Estwick gave Oliver a negative teaching evaluation for the 2013–2014 school year. SAC ¶ 52.

• In or around January 2017, a TSMS teacher told a student exhibiting signs of depression and abuse, T.S., that he was "concerned" about Oliver's relationship with T.S. and to stop reaching out to him. SAC ¶¶ 59–60.

• On or around January 18, 2017, TSMS's then-guidance counselor "falsely told a foster care agency worker that ... Oliver harbored 'predatory' intentions" toward T.S. and suggested that Oliver had made "improper advances" toward T.S. SAC ¶ 61.

• Oliver "repeatedly" asked for Estwick's help to dispel rumors, but Estwick refused and defended the other employees responsible for spreading them. SAC ¶ 63.

• On April 7, 2017, Oliver and a union representative met with Estwick, during which time Estwick "stated that he did not believe ... Oliver had an inappropriate relationship" with T.S. but "abdicated" responsibility, adding that he could not control what others said. SAC ¶ 63.

• Estwick reassigned Oliver to "the Rubber Room" between April 19 and September 25, 2017 during an investigation into his conduct related to an inappropriate relationship with T.S. SAC ¶¶ 56, 65, 67. [1]

• Prior to his reassignment, Oliver earned additional income from participating in per session activities as part of TSMS's after-school program, including coaching the girls' basketball team and the co-ed volleyball team and performing homework help. SAC ¶ 66. While reassigned to the Rubber Room, Oliver was unable to participate in per session activities and teach Summer School, resulting in a loss of additional income that he would have received and on which he relied. SAC ¶ 65.

• While reassigned to the Rubber Room, Oliver was "treated poorly" by DOE staff and "forced" to complete

secretarial tasks, including working on one occasion in the mail room. SAC ¶ 68.

[1]    As described in the Second Amended Complaint, "[t]he Rubber Room is a room where teachers under investigation due to allegations of wrongdoing—regardless of whether these allegations are substantiated—must report and simply sit and idle away the hours while they anxiously await a conclusion to the investigation as to whether they have done anything wrong. No timetable is provided for how long teachers assigned to the Rubber Room will need to nervously and mindlessly idle there. Reassignment to the Rubber Room is viewed as a punishment; thus, teachers reassigned to the Rubber Room face the stigma of wrongdoing, even if they ultimately are exonerated." SAC ¶ 3.

As described in the Second Amended Complaint, Oliver is alleged to have previously taken the following legal actions challenging his treatment at TSMS:

• In 2014, Oliver brought an arbitration proceeding against Estwick seeking to overturn a negative teaching evaluation, allegedly resulting from Estwick's "negative attitude towards ... Oliver because [he] was a Black man" ("Arbitration Proceeding"). SAC ¶ 5. Oliver prevailed at the proceeding, but Estwick "apparently faced no disciplinary action" from the DOE. SAC ¶¶ 53–54.

**\*4** • In 2014, Oliver filed a complaint against Estwick with the DOE Office of Equal Opportunity for racial discrimination in the workplace ("OEO Complaint"). SAC ¶ 5. After some initial interaction between Oliver and the OEO in 2015, the OEO took no action of which Oliver is aware from December 2015 until April 2018, at which point the OEO closed its investigation. SAC ¶ 55.

• In 2017, Oliver filed an action for "employment and related complaints" ("Previous Action"). SAC ¶ 5. This action settled on December 27, 2018. SAC ¶ 69. During the action's pendency, Oliver continued to teach at TSMS but described the situation as "very uncomfortable." SAC ¶ 70.

• In 2018, Oliver filed a complaint with the U.S. Equal Employment Opportunity Commission against Estwick and others ("2018 EEOC Complaint"). SAC ¶ 69.

### 3. NYPD's Arrest of Oliver at TSMS on March 22, 2019

On March 21, 2019, a TSMS student, G.C., reported to Estwick and TSMS Guidance Counselor Paola Melendez that "at some point" Oliver "caressed G.C.'s arm" and "said something to G.C. along the lines of 'I know you love me, or you know you love me,' which purportedly made her uncomfortable." ("Alleged Incident"). SAC ¶ 73. Oliver claims that "upon information and belief, rather than speaking to [him] directly about G.C.'s account or speaking to other students who would have been present in the classroom during the Alleged Incident," Estwick and other DOE employees "immediately [reported] the Alleged Incident to G.C.'s parents and/or the NYPD, encouraging G.C. and her parents to report the Alleged Incident to the NYPD, and/or by encouraging the NYPD to arrest [him] without first undertaking any investigation of the Alleged Incident." SAC ¶ 76.

The next morning, March 22, 2019, "Estwick interrupted Oliver's classroom lesson and removed him from the classroom under the false pretense that [Chan] wanted to see [him]." SAC ¶ 79. Estwick then led Oliver to the TSMS entrance where six NYPD Arresting Officers were waiting for him. SAC ¶ 79. These included Taylor and the Five Unknown NYPD Officers. SAC ¶ 8.[2] Upon arriving at the entrance, Estwick said to the Arresting Officers, "Here he is." SAC ¶ 79. The Arresting Officers "told Mr. Oliver that he was under arrest" and "immediately thrust Mr. Oliver's body into the wall of the building." SAC ¶ 80. They "forced Mr. Oliver's hands behind his back, handcuffed him, and conducted a pat down search of him, all in public." SAC ¶ 80.

[2]     Oliver is "uncertain" whether the Five Unknown NYPD Officers included Gonzalez. *Id.* To date, despite ongoing discovery, Oliver has not amended his complaint further to identify these officers.

None of the Arresting Officers informed Oliver why he was under arrest. SAC ¶ 81. The Arresting Officers led Oliver on a "perp walk" through a "large group of TSMS parents, staff, and students." SAC ¶ 83. Once he was seated in the back of a police car, one of the officers informed Oliver that he was being charged with "endangering a child." SAC ¶ 84. Oliver alleges that up to this point, the NYPD had not investigated the incident and did not have any evidence that he posed an immediate threat. SAC ¶¶ 78, 85.

After his arrest, the officers took Oliver to the Ninth Precinct for processing, where they detained him in a cell for approximately three and a half hours. SAC ¶¶ 86, 89. The NYPD arrest report, which Officer Taylor allegedly authored, "states that the only information purportedly supporting [his] arrest was a child's allegation 'that her teacher rubbed on her arm and stated "I know that you love me" w/o permission or authority to do so.' " SAC ¶ 92. Sergeant Gonzalez is alleged to have "approv[ed]" Oliver's arrest for violating New York Penal Law Section 260.10 (Endangering the Welfare of a Child). SAC ¶ 93.

**\*5** The NYPD released Oliver that same afternoon. SAC ¶ 97. According to Oliver, one of the unknown Arresting Officers told him that the NYPD had been holding him "while it completed its investigation of the Alleged Incident," and that they had spoken to two students "identified as witnesses" and that neither corroborated G.C.'s account. SAC ¶ 97. Another Officer allegedly said to Oliver that, "given the allegations at issue, the NYPD's arrest of [Oliver] was 'unusual,' and that similar cases were not 'typically' handled in the same way." SAC ¶ 98.

At the Ninth Precinct, the Officers allegedly did not provide Oliver with the opportunity to call anyone, nor had anyone from TSMS called Oliver's emergency contacts to inform them of his arrest. SAC ¶ 89. While being processed, Oliver alleges that he observed one of the Arresting Officers pull out a "drop gun," which he understood to be a gun of a different make and caliber than the ones that officers carried in their holsters, purportedly used to falsely allege that suspects were armed as a self-defense argument when police officers killed suspects. SAC ¶¶ 86–87. Oliver claims that upon seeing the gun, he feared he might be similarly harmed. SAC ¶ 87. Officers allegedly handcuffed Oliver until the time he was placed in a cell, and as a result of the handcuffs being too tight, he contends that he suffered an indentation and redness on his wrists. SAC ¶ 88.

### 4. Oliver's Experiences Following the Arrest

Oliver returned to TSMS that same day after being released from police custody. SAC ¶ 108. Oliver alleges that he was "refused entrance into a faculty meeting about his arrest and immediately escorted out of his classroom by school safety officers." SAC ¶ 108. Estwick then met with Oliver, at which time Estwick allegedly told him that the arrest had been the result of his "very negative reputation." SAC ¶

108. Estwick handed him a Reassignment Letter from the DOE informing Oliver he was reassigned to the Rubber Room because the New York City Special Commissioner of Investigations had opened an investigation into him. SAC ¶¶ 108–09. Oliver also alleges that the letter stated that, due to his reassignment, he would be "unable to participate in per session activities and teach in Summer School," resulting in a loss of additional income he "would have received and on which he relied." SAC ¶ 109. Due to this reassignment, he allegedly was "unable to apply for additional teaching and coaching responsibilities" that would have provided additional income. SAC ¶ 115. Oliver also alleges he was "ineligible to a seek a transfer to another school once he left the Rubber Room" because he did not receive a performance rating for the 2018–2019 year due to this reassignment. SAC ¶ 116.

Estwick allegedly sent an email to TSMS parents informing them that Oliver "ha[d] been reassigned away from the school pending the results of an investigation." SAC ¶ 112. Oliver contends that "[e]mails broadcasting a teacher's reassignment to the Rubber Room are not common and unnecessary." SAC ¶ 113. On approximately June 6, 2019, Oliver received a letter from the DOE which authorized him to return to his position at TSMS; he resumed teaching there on June 10, 2019. SAC ¶¶ 118–19. Upon his return, Estwick purportedly "apologized" to Oliver for having "turned [him] over" to the police on March 22, saying he "felt like [he] was walking [Oliver] to [his] death sentence." SAC ¶ 119.

On June 7, 2019, Oliver received a letter from Deputy Community Superintendent Mustillo, requesting a meeting "to discuss an allegation of professional misconduct." SAC ¶ 121. When they met on June 11, 2019, Mustillo gave Oliver a copy of an investigation report dated June 10, 2019, reflecting that the investigation into Oliver was referred by the OEO to the District 1 Office (the District in which TSMS is located in New York City public schools). SAC ¶ 122. Oliver alleges that the report was "littered with false statements" supposedly made by anonymous TSMS students against him, which Oliver denied to Mustillo. SAC ¶¶ 125–26. A DOE letter Oliver received on June 17, 2019, adopted the allegations in the investigation report and warned Oliver that the allegations "may lead to further disciplinary action, including charges that can lead to your termination." SAC ¶ 131. Oliver claims the determination that these allegations against him were credible was due to a "racist view of Black men as predators" and "in retaliation" for the Previous Action. SAC ¶ 132. After attempting to apply for a hardship transfer

to a different school, DOE staff allegedly told Oliver that he was not eligible because of this June 17 letter. SAC ¶ 133.

**\*6** Oliver alleges that the DOE's treatment of him after the March 21, 2019 allegations by G.C. is in "stark contrast" to treatment of white TSMS teachers facing similar accusations. SAC ¶ 134. Specifically, Oliver identifies the following teachers and incidents in his second amended complaint:

- White Teacher No. 1 is a white male who "allegedly forcefully grabbed children by the arms" and "commented on at least one female student's skin and another student's weight." SAC ¶ 136. This teacher once asked, in the presence of Oliver and other TSMS students, why he "always got the suicidal and depressed kids." SAC ¶ 135. Oliver alleges a parent reported to Estwick around October 2016 that this teacher made "inappropriate and racially-charged remarks in the classroom, such as by referring to the 'Muslim Ban' as the '[Muslim student's name] ban' in front of several other students." SAC ¶¶ 135. Upon information and belief, "complaints were filed" about him with the DOE's Office of Special Investigations, and while the investigation was pending, "he was not removed to the Rubber Room or subjected to disciplinary action but instead continued teaching at TSMS." SAC ¶ 137. As alleged, "White Teacher No. 1 and Mr. Oliver were co-teachers at Defendant TSMS (i.e., they taught classes together)" and "[l]ike Mr. Oliver, White Teacher No. 1 was a tenured teacher who was supervised by Defendant Estwick and TSMS's Assistant Principal". SAC ¶ 138.

- White Teacher No. 2 is a white male teacher at TSMS, whom Oliver claims G.C. alleged "inappropriately rubbed against her." SAC ¶ 140. Oliver alleges G.C. subsequently complained to the school, requesting this teacher no longer serve as her advisor, but that TSMS "never conducted an investigation" or ever subjected him to disciplinary action. SAC ¶¶ 140–41. As alleged, White Teacher No. 2 was a teacher supervised by Estwick and TSMS's Assistant Principal. SAC ¶ 142.

- White Teacher No. 3 is a white male teacher at TSMS who allegedly "inappropriately touched" another student, making that student feel "uncomfortable." SAC ¶ 144. Upon information and belief, he never faced any disciplinary action. SAC ¶ 144. As alleged, White Teacher No. 3 was a tenured teacher (and he and Oliver were previously co-teachers) supervised by Estwick and TSMS's Assistant Principal. SAC ¶ 145.

Oliver further contends that his treatment is similar to treatment of other Black teachers. SAC ¶ 149. To support that theory, he alleges that the DOE recently entered into settlements with the U.S. Attorney's Office for the Southern District of New York agreeing to pay more than one million dollars to resolve allegations of engaging in a pattern and practice of racial discrimination and retaliation in violation of Title VII. SAC ¶ 149.

As a result of his March 2019 arrest, assignment to the Rubber Room, and "continued humiliation," Oliver claims to have "suffered severe emotional distress that has manifested itself in difficulty sleeping and other medical problems for which Mr. Oliver has sought treatment from medical professionals." SAC ¶ 159.

**B. Procedural History**

Oliver commenced this action on December 6, 2019. Dkt. No. 1. On June 4, 2020, Oliver filed the First Amended Complaint, Dkt. No. 33, and on August 13, 2020, Oliver filed the Second Amended Complaint ("SAC"), Dkt. No. 41. In the Second Amended Complaint, Oliver brings the following 22 claims:

**\*7** 1. Arrest without Probable Cause under 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") and the United States Constitution against Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers (First Claim);

2. False Arrest against Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers (Second Claim);

3. Equal Protection Violation under the New York State Constitution against Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers (Fifth Claim);

4. Unreasonable Search, Seizure, and Interception Violation under the New York State Constitution against Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers (Sixth Claim);

5. Race Discrimination under Title VII against the DOE (Eighth Claim);

6. Hostile Work Environment under Title VII against the DOE (Ninth Claim);

7. Retaliation under Title VII against the DOE (Tenth Claim);

8. Race Discrimination under § 1983 against TSMS, Chan, Mustillo, and Estwick (Eleventh Claim);

9. Hostile Work Environment under § 1983 against TSMS, Chan, Mustillo, and Estwick (Twelfth Claim);

10. Retaliation under § 1983 against TSMS, Chan, Mustillo, and Estwick (Thirteenth Claim);

11. Race Discrimination under the New York State Human Rights Law ("NYSHRL") against the DOE, TSMS, Chan, Mustillo, and Estwick (Sixteenth Claim);

12. Race Discrimination under the New York City Human Rights Law ("NYCHRL") against the DOE, TSMS, Chan, Mustillo, and Estwick (Nineteenth Claim);

13. Hostile Work Environment under the NYSHRL against the DOE, TSMS, Chan, Mustillo, and Estwick (Seventeenth Claim);

14. Hostile Work Environment under the NYCHRL against the DOE, TSMS, Chan, Mustillo, and Estwick (Twentieth Claim);

15. Retaliation under the NYSHRL against the DOE, TSMS, Chan, Mustillo, and Estwick (Eighteenth Claim); and

16. Retaliation under the NYCHRL against the DOE, TSMS, Chan, Mustillo, and Estwick (Twenty-First Claim).

Oliver additionally asserts the following derivative claims:

17. *Monell* liability against the City of New York (for the actions of the NYPD) (Third Claim);

18. *Monell* liability against the DOE (for failure to supervise and discipline Estwick) (Fourteenth Claim);

19. Supervisory Liability against Shea, O'Connell, and Gonzalez (Fourth Claim);

20. Supervisory Liability against Chan and Mustillo (Fifteenth Claim);

21. Respondeat Superior liability against the City of New York (Seventh Claim); and

22. Respondeat Superior liability against the DOE (Twenty-Second Claim).

On November 11, 2020, Defendants moved to dismiss the Second Amended Complaint on the following grounds: (1) that it is time-barred; (2) it is barred by plaintiff's failure to comply with all conditions precedent to bringing suit; (3) it is barred by waiver and general release; (4) the individual Defendants are immune from suit based upon qualified immunity; and (5) the second amended complaint fails to state a claim for relief. Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint ("Def. Mem."), Dkt. No. 63 at 5 (Date stamped February 4, 2021 on ECF). Oliver submitted his opposition to Defendants' motion on December 23, 2020, and Defendants submitted reply papers on February 4, 2021. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Opp. Mem."), Dkt. No. 64; Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss ("Def. Rep. Mem."), Dkt. No. 65 (Both date stamped February 4, 2021 on ECF). On April 23, 2021, this case was referred to me for general pre-trial supervision and for a report and recommendation on the motion to dismiss. Dkt. No. 71.

**\*8** Fact discovery is currently scheduled to be completed by April 15, 2022, and expert discovery by June 20, 2022. Dkt. No. 92. [3]

[3]    The Court held an unsuccessful settlement conference in July 2021.

## II. DISCUSSION

### A. Applicable Legal Standards

#### 1. Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must plead facts in his complaint that "state a claim to relief that is plausible on its face" and that satisfy Rule 8(a)(2). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). A claim is facially plausible when the plaintiff alleges facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully" and includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663, 678 (citing

*Twombly*, 550 U.S. at 556). This standard requires a plaintiff's pleadings to sufficiently "nudge[ ] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

When considering a motion to dismiss, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306–07 (2d Cir. 2015) (citing *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 300 (2d Cir. 2006)). "A complaint need not include 'detailed factual allegations,' but it must contain more than mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *JCG v. Ercole*, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815, at *5 (S.D.N.Y. Apr. 24, 2014) (quoting *Iqbal*, 556 U.S. at 678) (internal quotations omitted), *adopted by* 2014 WL 2769120 (June 18, 2014). A complaint containing only "conclusory allegations or legal conclusions masquerading as factual conclusions" will not survive a motion to dismiss. *Womack v. Cap. Stack, LLC*, No. 18-CV-4192 (ALC), 2019 WL 4142740, at *3 (S.D.N.Y. Aug. 30, 2019) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)). The Court must construe a complaint "liberally" to determine if it states a claim. *Lawton v. Town of Orchard Park*, No. 14-CV-867S (WMS), 2017 WL 3582473, at *4 (W.D.N.Y Aug. 18, 2017).

#### 2. Qualified Immunity

In order to state a claim for relief under Section 1983, a plaintiff must plausibly allege that the conduct in question (1) was "committed by a person acting under color of state law," and (2) "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." 42 U.S.C. § 1983; *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citations omitted). Section 1983 is intended to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

**\*9** A government official may be entitled to immunity from civil suit if (1) his conduct "did not violate clearly established law" or (2) it was "objectively reasonable" for

that official to believe that the action did not violate the law. *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (collecting cases). Thus, government officials are shielded from liability "whenever their actions are based on reasonable mistakes of law or fact." *Id.*

On a motion to dismiss, a defendant presenting an immunity defense "must accept the more stringent standard applicable to this procedural route ... [n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations omitted). The defense of qualified immunity "usually" cannot support the grant of a Rule 12(b)(6) motion. *Id.* at 435 (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). It is "generally premature" to address qualified immunity at this stage, *Walker v. Mendoza*, No. 00-CV-93 (JG), 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000), because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial. *McCray v. City of New York*, No. 03-CV-10080 (DAB), 2007 WL 4352748, at *18 (S.D.N.Y. Dec. 11, 2007).

### 3. Municipal Liability

A municipality can only be held liable under Section 1983 if it is the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" which causes a constitutional deprivation." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). In order to hold a city liable under this theory, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York* 490 F.3d 189, 195 (2d Cir. 2007). A "causal connection" between the policy and deprivation of the plaintiff's rights must exist. *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 394 (S.D.N.Y. 2020) (citing *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). A municipality is not held liable solely on a *respondeat superior* theory, nor "solely because it employs a tortfeasor," but rather only where the municipality itself was the "moving force" behind the deprivation of the plaintiff's rights. *Lawton*, 2017 WL 3582473, at *6 (cleaned up).

A plaintiff can demonstrate this "policy or custom" by proving at least one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

**\*10** *Davis v. City of New York*, No. 12-CV-3297 (PGG), 2018 WL 10070540, at *4 (S.D.N.Y. Mar. 30, 2018) (cleaned up).

### B. Timeliness of Plaintiff's Claims

Defendants move to dismiss any claims barred by waiver or a statute of limitations. Def. Mem. at 9. Oliver executed a waiver and general release to settle a prior lawsuit against the City and the DOE on December 27, 2018, agreeing to release the City and its employees from claims based on any act prior to its execution. Def. Mem. at 3, 9. As Defendants observe, discrimination and retaliation claims brought under § 1983 have a three-year statute of limitations. Def. Mem. at 9; *see, e.g.*, *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018). Title VII claims require the filing of an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discrimination. *Id.* at 621. NYSHRL and NYCHRL claims against the DOE have a one-year statute of limitations. N.Y. Educ. Law § 3813(2-b).

Oliver's claims all stem from allegations made against him on March 21, 2019, his March 22, 2019 arrest, and his treatment thereafter. Oliver served a Notice of Claim on June 14, 2019, 84 days after the arrest. SAC ¶ 29. On August 2, 2019, he

appeared for a hearing pursuant to Section 50-h of the New York City General Municipal Law; 258 days after his arrest, on December 5, 2019, he filed a charge of discrimination with the EEOC alleging violations of Title VII. SAC ¶¶ 30–31; Pl. Opp. Mem. at 10–12. On December 6, 2019, 259 days after his arrest, Oliver commenced this suit against the Defendants. Dkt. No. 1. Oliver received his Notice of Right to Sue from the EEOC on May 11, 2020, SAC ¶ 31, and on June 4, 2020, Oliver filed the First Amended Complaint. Dkt. No. 33.

Given this chronology and history prior to commencement of this action, the statute of limitations did not run on any of the claims, nor did Oliver's waiver preclude him from filing a lawsuit on a claim arising out of an act occurring after December 27, 2018. Defendants' motion to dismiss on timeliness or waiver grounds should therefore be denied.

### C. Analysis of Claims Against the NYPD Defendants

Defendants move to dismiss Oliver's § 1983 claims for false arrest. Def. Mem. at 26–32. An arrest undertaken without a warrant "must be supported by probable cause or else it violates the Fourth Amendment." *United States v. Valentine,* 539 F.3d 88, 93 (2d Cir. 2008). To properly analyze a claim for false arrest under § 1983, "courts look to the law of the state in which the arrest occurred." *Smith v. City of New York,* No. 18-CV-5079 (MKV), 2021 WL 4267525, at *7 (S.D.N.Y. Sept. 20, 2021) (citing *Jaegly v. Couch,* 439 F.3d 149, 151–52 (2d Cir. 2006)). "A [S]ection 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York,* 478 F.3d 76, 84 (2d Cir. 2007). "To prevail on a claim for false arrest under New York law, the plaintiff must show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Smith,* 2021 WL 4267525, at *7 (quoting *Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir. 2012)) (cleaned up). An arresting officer may avoid liability for a claim of false arrest by demonstrating "either 1) he had probable cause for the arrest, or 2) he is protected from liability because he has qualified immunity." *Simpson v. City of New York,* 793 F.3d 259, 265 (2d Cir. 2015) (citing *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)).

**\*11**  Defendants argue that probable cause for Oliver's arrest existed, and even if it did not, the Arresting Officers are entitled to qualified immunity. Def. Mem. at 26–32. The Court will review each of these arguments in turn.

### 1. Probable Cause

#### a. Legal Standard

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson,* 702 F.3d at 19 (quoting *Weyant,* 101 F.3d at 852). Probable cause to arrest exists when officers have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution" that "the person to be arrested has committed or is committing a crime." *Id.* (cleaned up).

In considering the existence of probable cause, courts in the Second Circuit look to which facts were available to the officer at the time of, and immediately before, the arrest. *See, e.g., Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir. 2006) ("courts must consider those facts *available to the officer* at the time of the arrest and immediately before it") (cleaned up); *Gonzalez,* 728 F.3d at 155 ("The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.") (internal quotation marks and citation omitted). This evaluation is based on the "totality of the circumstances" and a "full sense of the evidence that led the officer to believe there was probable cause to make an arrest." *Stansbury v. Wertman,* 721 F.3d 84, 92–93 (2d Cir. 2013).

#### b. Application

As an initial matter, Oliver brings false arrest claims against all of the NYPD Defendants, and Defendants do not differentiate among them in their Motion to Dismiss. SAC ¶¶ 166–71; Def. Mem. at 26–32. However, only Taylor and the Five Unknown NYPD Officers are specifically alleged to have been Arresting Officers. SAC ¶ 8. Therefore, because no specific allegations of direct involvement in the arrest are made as to Shea, O'Connell, or Gonzalez, the claims for false arrest against them should be dismissed.

As to the Arresting Officers, Defendants argue that they had probable cause, or at least arguable probable cause, to arrest Oliver for endangering the welfare of a child. Def. Mem. at 28. Endangerment of the welfare of a child under New York Penal Law Section 260.10 requires that a person "knowingly [act] in a manner likely to be injurious to the physical, mental

or moral welfare of a child less than seventeen years old." "The conduct need not actually harm a child, as long as 'harm was likely to occur, and not merely possible,' and the defendant was '*aware* that the conduct may likely result in harm to a child.' " *Pehush v. Ashworth*, 757 F. App'x 47, 50 (2d Cir. 2018) (quoting *People v. Hitchcock*, 98 N.Y.2d 586, 589–91 (2002)) (emphasis in original).

Oliver alleges that upon hearing about G.C.'s allegations, Estwick and other DOE employees "immediately [reported] the Alleged Incident to G.C.'s parents and/or the NYPD, encouraging G.C. and her parents to report the Alleged Incident to the NYPD, and/or by encouraging the NYPD to arrest ... Oliver without first undertaking any investigation of the Alleged Incident." SAC ¶ 76. He claims that Estwick "interrupted Oliver's classroom lesson" and "led" him to the entrance of the school where NYPD Officers told Oliver he was under arrest. SAC ¶¶ 79–80.

**\*12** Putative victim or eyewitness accounts may, on their own, give rise to probable cause to arrest. *Ingersoll ex rel. Est. of Intersoll v. LaPlante*, 76 F. App'x 350, 354 (2d Cir. 2003) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). In their motion, Defendants emphasize that there is no reason to doubt the veracity of an account given by an individual based on her being under the age of 18. Def. Mem. at 31–32. However, this is not the only relevant issue. The Second Amended Complaint does not allege only that the putative victim, G.C., directly reported information to the police, but rather that it is possible the police were made aware of the incident through some method not yet known to Oliver. *See* SAC ¶ 92.

Accepting all factual allegations as true and drawing all reasonable inferences in favor of Oliver requires the Court to consider that at the time of the arrest, the only information known to the officers was provided by either Estwick or G.C.'s parents—third party informants who did not witness the incident firsthand. SAC ¶ 96. Probable cause cannot be found as a matter of law on the basis of information known by the police at the time of the arrest when it is unclear what was said to the police, and by whom. *Lurch v. City of New York*, No. 19-CV-11254 (VEC) (OTW), 2021 WL 842616, \*4 (S.D.N.Y. Feb. 10, 2021) (citing *United States v. Freeman*, 735 F.3d 92, 98 (2d Cir. 2013) (anonymous 911 call insufficient to establish probable cause); *Mizrahi v. City of New York*, No. 15-CV-6084 (ARR) (LB), 2018 WL 3848917, \*13 (E.D.N.Y. Aug. 13, 2018) (finding 911 call insufficient probable cause to arrest)), *adopted by* 2021 WL 1172506

(Mar. 29, 2021). Here, discovery is required before a factual determination can be made regarding what was known to the police at the time of the arrest. Thus, although "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers"—that is not the case here. *Weyant*, 101 F.3d at 852.

Further, there are no allegations in the Second Amended Complaint that an eyewitness, or even the alleged victim, spoke directly with the police. On the contrary, Oliver alleges that up to the point of arrest, the NYPD had not investigated the incident and did not have any evidence that he posed an immediate threat; indeed, he alleges that "none of the Arresting Officers attempted to speak to [him] or any of the other TSMS students or staff known to be potential witnesses to the Alleged Incident" prior to his arrest. SAC ¶¶ 78, 85. Officers are not required to look for evidence that could eliminate probable cause. *Panetta*, 460 F.3d at 398. However, the purported failure of Defendants to take "easy investigative steps" could indicate that they made up their minds based solely on "secondhand reports." *Pehush*, 757 F. App'x at 51.

In *Pehush*, a teacher (Pehush) was arrested for child abuse under New York Penal Law § 260.10(1) after school officials reported her to authorities. *Id.* at 48–49. In contrast to the events in Oliver's case, police officers in *Pehush* interviewed and received a sworn statement from the teaching assistant who witnessed the offending incident, and also interviewed and received written, sworn statements from other teachers relaying secondhand accounts of what they heard from the witnessing teaching assistant. *Id.* at 48. Two days after responding to the call, a detective interviewed Pehush about the incident at the police station for approximately an hour before speaking with the District Attorney's office, and only *then* placed her under arrest. *Id.* at 49. In that case, the Second Circuit found genuine issues of material fact precluded summary judgment on qualified immunity as a matter of law. *Id.* at 52. In so ruling, the Circuit observed that law enforcement "inexplicably" failed to speak with the only other eyewitness, never asked the teaching assistant witness to "recreate the physical circumstances" of the alleged incident which she described briefly in her statement, and may have ignored later, exculpatory statements from an eyewitness. *Id.* at 51. The Second Circuit remanded for trial, explaining that the failure to take these steps "supports an inference that [the Defendant] had made up her mind based only on ... secondhand reports." *Id.* at 51.

**\*13**  Here, Oliver alleges the NYPD conducted even less of an investigation than in *Pehush*. According to Oliver, one of the unknown Arresting Officers told him that the NYPD had been holding him "while it completed its investigation of the Alleged Incident," and that they spoke to two students "identified as witnesses" and that neither corroborated G.C.'s account. SAC ¶ 97. Another NYPD Officer allegedly said to Oliver that, "given the allegations at issue, the NYPD's arrest of [Oliver] was 'unusual,' and that similar cases were not 'typically' handled in the same way." SAC ¶ 98.

Thus, because the facts as alleged in the Second Amended Complaint support "an inference that [Defendants] had made up [their] mind[s] based only on ... [a] secondhand report[ ]," *Pehush*, 757 F. App'x at 51, Defendants have not established that probable cause existed to arrest Oliver as a matter of law, and their motion to dismiss on this ground should be denied as to the Arresting Officers.

### 2. Qualified Immunity

Defendants separately argue that the false arrest claim should be dismissed because the Arresting Officers are entitled to qualified immunity. Def. Mem. at 30–32. For the reasons which follow, the Court recommends finding that the Arresting Officers have not demonstrated on the current record that they are entitled to qualified immunity, and the motion to dismiss on this ground should be denied as well.

#### a. Legal Standard

"An arresting officer is entitled to qualified immunity even when ... probable cause to arrest does not exist, 'if he can establish that there was 'arguable probable cause' to arrest.' " *Ackerson*, 702 F.3d at 21 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)); *see also Soto v. City of New York*, No. 13-CV-8474 (LTS) (JLC), 2017 WL 892338, at \*4 (S.D.N.Y. Mar. 6, 2017). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Ackerson*, 702 F.3d at 21 (cleaned up). "In this respect, the qualified immunity test is more favorable to the officers than the one for probable cause." *Id.* (internal quotation marks omitted). "The test is not toothless, however: '[i]f officers of reasonable competence would have to agree that the information possessed by the officer at the time of

arrest did not add up to probable cause, the fact that it came close does not immunize the officer.' " *Id.* (quoting *Jenkins*, 478 F.3d at 87).

To find qualified immunity after the violation of a constitutional right (such as via an arrest without probable cause), a court must "determine whether the application of that right to the circumstances at issue was 'clearly established' at the time of the conduct, and whether an 'objectively reasonable' officer would have known that his conduct amounted to such a violation." *Naumovski*, 934 F.3d at 211. The Supreme Court has "repeatedly" reminded courts that "clearly established law" must be specific to the facts of the case. *Vasquez v. Maloney*, 990 F.3d 232, 238 (2d Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Naumovski*, 934 F.3d at 211. While "existing precedent must have placed the statutory or constitutional question beyond debate," the Supreme Court does "not require a case directly on point." *al-Kidd*, 563 U.S. at 741. Officers are thus entitled to qualified immunity unless the "existing law" was " 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal citations omitted). Qualified immunity rests on a "demanding standard" that protects " 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (internal citations omitted). Relevant case law is "usually," but not always, needed to clearly establish whether or not probable cause existed. *Id.* at 590.

**\*14**  Qualified immunity is an "affirmative defense"; therefore, "defendants bear the burden of showing that there was arguable probable cause." *Nunez v. City of New York*, No. 14-CV-4182 (RJS), 2016 WL 1322448, at \*5 (S.D.N.Y. Mar. 31, 2016) (quoting *Gaston v. City of New York*, 851 F. Supp. 2d 780, 795 (S.D.N.Y. 2012) (collecting cases)). "On a motion to dismiss, ... a qualified immunity defense based on arguable probable cause 'faces a formidable hurdle ... and is usually not successful.' " *Id.* (internal citations omitted); *see also Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002) ("[A] ruling on the availability of a qualified immunity defense would be premature" because "[t]he qualified immunity issue ... turn[ed] on factual questions that [could] not be resolved" on a Rule 12(b)(6) motion.").

#### b. Application

2022 WL 455851

Here, qualified immunity turns on a disputed factual question that cannot be resolved on a Rule 12(b)(6) motion: the knowledge of the officers at the time of the arrest. In a false arrest case, "only where the facts are undisputed or clearly established does probable cause become a question of law for the court." *Amobi v. D.C. Dept. of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014). For a claim of false arrest in New York, "the issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn from such facts." *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 529 (1991).

As described above, the Second Circuit has previously held that the existence of probable cause could not be determined as a matter of law when issues of material fact existed as to what a detective knew at the time that she arrested a teacher for endangering the welfare of a child under New York law based on third-party allegations. *Pehush*, 757 F. App'x at 52.

Moreover, whether the law was clearly established is a determination "made not from the perspective of courts or lawyers, but from that of a reasonable officer in the defendant's position." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (citations omitted). Here, Oliver claims that an NYPD Officer described the arrest as "unusual," which by reasonable inference gives rise to the plausibility that a reasonable officer may have understood "that what he [was] doing was unlawful," and may have in fact "knowingly" violated the law. *Wesby*, 138 S. Ct. at 589. At the motion to dismiss stage, this alleged fact, particularly when coupled with the established case law concerning non-witness informants described above, creates a factual question as to whether the arrest violated clearly established law.

When viewed in the light most favorable to Oliver, the facts alleged in the Second Amended Complaint indicate the plausibility of an arrest made on the sole basis of an accusation provided by a non-witness, without reasonable efforts at any available investigation, and described by a fellow officer as "unusual." The totality of the circumstances therefore precludes any recommendation, at this stage of the proceedings, that the claim be dismissed.

In sum, drawing all reasonable inferences in Oliver's favor, Defendants have not met their burden of establishing that probable cause, or even arguable probable cause, existed at the time of the arrest. The Court therefore recommends that the motion to dismiss the false arrest claim as to the Arresting Officers including Taylor be denied. However, due to their

lack of involvement, the Court recommends that the motion to dismiss the false arrest claim as to Shea, O'Connell, and Gonzalez, be granted.

### 3. State Law Claims

**\*15** Oliver also brings claims against the NYPD Defendants for violations of equal protection and security against unreasonable searches, seizures, and interceptions guaranteed by the New York State Constitution. SAC ¶ 183–88. It is well-settled that "no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Buari v. City of New York*, 530 F. Supp. 3d 356, 408 (S.D.N.Y. 2021) (cleaned up); *see also Mesa v. City of New York*, No. 09-CV-10464 (JPO), 2013 WL 31002, at \*33 (S.D.N.Y. Jan. 3, 2013). Unreasonable search and seizure claims are largely cognizable under the Fourth Amendment of the United States Constitution, and equal protection claims can be brought under the Fourteenth Amendment. *See* U.S. CONST. amends. IV, XIV; N.Y. CONST. art. I, §§ 11, 12. Equal protection claims under the New York State Constitution in particular are "virtually coextensive with those of the U.S. Constitution." *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999).

As in *Buari*, where the plaintiff could not sustain his state constitutional due process claim against the NYPD Defendants because § 1983 provided an adequate remedy, so too Oliver cannot maintain his claims under Article I, Sections 11 and 12 of the New York Constitution because § 1983 provides an adequate remedy here. *Buari*, 530 F. Supp. 3d at 409. Thus, the motion to dismiss claims against the individual NYPD Defendants under Article I, Sections 11 and 12 of the New York Constitution should be granted.

### 4. Derivative Claims

Defendants move to dismiss Oliver's derivative claims against the NYPD Defendants, including the claims for supervisory responsibility, *respondeat superior*, and municipal liability. Def. Mem. at 3, 26. In the following subsections, the Court will examine each of these issues.

### a. Supervisory Liability of
### Shea, O'Connell, and Gonzalez

Defendants move to dismiss Oliver's supervisory liability claims against Shea, O'Connell, and Gonzalez. Def. Mem. at 33–35. As a threshold matter, because Oliver has adequately pleaded claims for false arrest, these claims should not be dismissed on the grounds of failing to plead an underlying violation, as Defendants argue. Def. Mem. at 3.

It is well-settled, however, that "supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Vasquez v. Reilly*, No. 15-CV-9528 (KMK), 2017 WL 946306, at \*11 (S.D.N.Y. Mar. 9, 2017) (quoting *Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014)) (internal quotation marks omitted). " 'Because vicarious liability is inapplicable to ... § 1983 suits,' [plaintiff] must raise a genuine dispute as to whether 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (emphasis omitted) (quoting *Iqbal*, 556 U.S. at 676). "There is no special rule for supervisory liability," rather, the plaintiff must "plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). In *Tangreti,* the Second Circuit overturned the "special standards for supervisory liability set forth" in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), and instead required that "[t]he violation must be established against the supervisory official directly." *Id.* at 617–18.

Oliver claims Gonzalez acted in a supervisory capacity as a sergeant and "approv[ed]" his arrest. SAC ¶ 93. Oliver is "uncertain" whether the unknown Arresting Officers included Gonzalez. SAC ¶ 8. Oliver alleges no additional facts demonstrating liability against Shea and O'Connell other than their status as commissioner and commanding officer, respectively.

**\*16** Supervisory Officers may rely on information provided by the Arresting Officers in making charging decisions. *Martinez v. Simonetti*, 202 F.3d 625, 634–35 (2d Cir. 2000). Gonzalez therefore did not have a duty to conduct an independent investigation before deciding to charge an individual because it is reasonable for police officers to rely on the accounts provided by other officers at the scene. *Id.* at 635. In *Martinez,* the court denied summary judgment

as to a charging officer despite the police officers at the station house receiving conflicting accounts from officers at the scene of the incident leading to the arrest. *Id.* at 634–35. However, at the motion to dismiss stage, supervisory liability claims can survive when a plaintiff alleges that the officers "approved Plaintiff's arrest." *Bobbit v. Marzan*, No. 16-CV-2042 (AT), 2020 WL 5633000, at \*7 n.5 (S.D.N.Y. Sept. 21, 2020). Because Gonzalez is alleged to have been involved in the arrest by approving it, the record needs to be further developed to determine his knowledge of the facts giving rise to Oliver's arrest.

As to O'Connell and Shea, however, Oliver has not pleaded any non-conclusory facts demonstrating their personal involvement in the underlying violation whatsoever. Thus, the motion to dismiss supervisory liability claims as against Gonzalez should be denied, but granted as against O'Connell and Shea.

### b. *Respondeat Superior* Liability of the City

Defendants move to dismiss the claims against the NYPD Defendants in their entirety, but they do not specifically analyze Oliver's seventh claim for relief against the City under the theory of *respondeat superior*. *See* SAC ¶ 189–91. Nonetheless, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell*, 436 U.S. at 691, nor "solely because it employs a tortfeasor." *Lawton*, 2017 WL 3582473, at \*6 (cleaned up). Oliver's *respondeat superior* claim as to the City of New York for the conduct of the Officers pursuant to § 1983 thus fails as a matter of law. [4] Therefore, to the extent the Defendants move to dismiss this claim as well, the Court recommends its dismissal.

4 To the extent that Oliver brings his *respondeat superior* claim against the City for the conduct of Officer Taylor pursuant to the New York State Constitution, SAC ¶¶ 183–88, the Court likewise recommends the claim be dismissed because the Court recommends dismissing the underlying state law claims (described above). Should those claims be permitted to proceed, however, so too may the derivative *respondeat superior* claim against the City pursuant to the state law claims. "[U]nlike cases brought under § 1983, municipalities may be liable for the common law torts ... committed by their employees under the doctrine of *respondeat*

*superior.*" *Mesa*, 2013 WL 31002, at *34. "[S]tate law claims ... may proceed due to the potential for vicarious liability for the actions of the officers as its employees." *Reyes v. City of New York*, 992 F. Supp. 2d 290, 299 (S.D.N.Y. 2014).

### c. Municipal Liability

A municipality or municipal corporation may be liable under § 1983 if "the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted). It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. As described *supra*, this policy or custom can be proven by demonstrating "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware ..." *Davis*, 2018 WL 10070540, at *4 (quoting *Vasquez v. Rockland Cty.*, 15-CV-8912 (KMK), 2017 WL 456473, at *4 (S.D.N.Y. Feb. 1, 2017)). A plaintiff must allege "that the relevant practice is so widespread as to have the force of law," essentially demonstrating that the custom is the "standard operating procedure of the local government entity." *Kucharczyk v. Westchester Cty*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) (cleaned up).

*17 Here, Oliver claims that the City "knew or should have known of the NYPD's widespread practice of racial profiling and bias-based policing but did not take any steps to correct this unlawful practice, and instead sanctioned a culture in which acts of racial profiling and bias-based policing were common and tolerated." SAC ¶ 174. He asserts that this custom of bias-based policing led to his "unusual" arrest, when purportedly similarly situated white teachers were not arrested for similar accusations. SAC ¶ 163.

"[T]he operative inquiry at this stage is not whether the [sources cited in the allegations] will ultimately support a finding of *Monell* liability, but rather whether Plaintiff has sufficiently alleged a policy or practice that is widespread and of which policymakers must have been aware." *Kucharczyk*, 95 F. Supp. 3d at 545. In his effort to establish *Monell* liability, Oliver relies on media reports, a city investigation, and the decision in *Floyd v. City of New York*, 959 F. Supp. 2d 540

(S.D.N.Y. 2013) to establish that the NYPD "has a widespread practice of racial profiling and bias-based policing." SAC ¶ 174; Pl. Opp. Mem. at 34–36.

Oliver's assertion that the court in *Floyd* found the NYPD to have a general policy of indirect racial profiling, Pl. Opp. Mem. at 34–36, is without merit. *Floyd*'s holding is specific to racial profiling in the context of stop-and-frisk, or *Terry* stops, which is a subject not relevant to Oliver's case. *Floyd*, 959 F. Supp. 2d at 658–67. In the Second Amended Complaint, Oliver acknowledges this holding, stating that "the Court concluded that the NYPD had a '*policy* of indirect racial profiling' in its application of 'stop-and-frisk.' " SAC ¶ 101 (underlining added).

Oliver's reliance on media reports is similarly unpersuasive. Media reports published after the arrest do not demonstrate that policymakers "must have been aware" of the facts contained therein. *Kucharczyk*, 95 F. Supp. 3d at 545. Only one of the media reports to which Oliver cites was published prior to his arrest. SAC ¶ 103 n.7 (citing Benjamin Mueller et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, N.Y. TIMES (May 13, 2018), https://www.nytimes.com/2018/05/13/nyregion/marijuana-arrests-nyc-race.html). The report demonstrates racial disparities in NYPD arrests; however, the analysis is specific to marijuana-related arrests, and is thus not sufficient on its own to put the City on notice. *Id.*

Oliver also cites to a New York City Department of Investigation report published in June 2019 to claim that "[i]n the years since the 'stop-and-frisk' practice purportedly ended, the NYPD regularly received complaints of bias-based policing." SAC ¶ 104. However, this source cannot serve as a predicate for a claim of *Monell* liability, since it was released months after Oliver's arrest in March 2019. *See Fernandez*, 457 F. Supp. 3d at 395 ("[C]ourts have consistently rejected the notion that a report issued long after the events in question could have put the City on notice of a policy that was causing constitutional deprivations.").

Thus, the facts alleged in the complaint regarding the NYPD's widespread practice of racial profiling and bias-based policing that may have led to Oliver's arrest are not sufficient to rise to the level of plausibility required to survive a motion to dismiss. The NYPD Defendants' motion to dismiss the *Monell* claim for municipal liability against the City should thus be granted.

**5. Summary of Claims Against the NYPD Defendants**

*18  In sum, the Court recommends Defendants' motion be granted as to:

1. The New York State Constitution claims against the City of New York, Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers (Fifth and Sixth Claims);

2. The False Arrest/Arrest without Probable Cause claims against Gonzalez, O'Connell, and Shea (First and Second Claims);

3. The Supervisory Liability claims against O'Connell and Shea (Fourth Claim);

4. The *Respondeat Superior* claim against the City of New York (Seventh Claim); and

5. The *Monell* Liability claim against the City of New York (Third Claim); and denied as to:

1. The False Arrest/Arrest without Probable Cause claims against Taylor and the Five Unknown NYPD Officers (First and Second Claims); and

2. The Supervisory Liability claim against Gonzalez (Fourth Claim). [5]

[5]  Defendants argue any claims of excessive force or assault and battery should be dismissed for failure to state a claim upon which relief can be granted. Def. Mem. at 39–41. According to Oliver, he does not assert any claims of "unlawful search, excessive force, assault, and battery." Pl. Opp. Mem. at 29 n.5. Thus, any such claims do not need to be addressed.

**D. Analysis of Claims Against the DOE Defendants**

The DOE Defendants have moved to dismiss all of Oliver's discrimination, hostile work environment, and retaliation claims. Those claims consist of the following:

• Race Discrimination under Title VII against the DOE;

• Hostile Work Environment under Title VII against the DOE;

• Retaliation under Title VII against the DOE;

• Race Discrimination under § 1983 against TSMS, Chan, Mustillo, and Estwick;

• Hostile Work Environment under § 1983 against TSMS, Chan, Mustillo, and Estwick;

• Retaliation under § 1983 against TSMS, Chan, Mustillo, and Estwick;

• Race Discrimination under the NYSHRL and NYCHRL against the DOE, TSMS, Chan, Mustillo, and Estwick;

• Hostile Work Environment under the NYSHRL and NYCHRL against the DOE, TSMS, Chan, Mustillo, and Estwick; and

• Retaliation under the NYSHRL and NYCHRL against the DOE, TSMS, Chan, Mustillo, and Estwick.

In addition, Oliver asserts the following derivative claims:

• *Monell* liability against the DOE;

• Supervisory Liability against Chan and Mustillo; and

• *Respondeat Superior* liability against the DOE.

The Court will first review the claims pertaining to the underlying legal issues (discrimination, including race discrimination and hostile work environment, and retaliation). For the reasons that follow, the Court recommends finding that Oliver pleaded sufficient facts to state a claim for relief under each of those theories. The Court will then discuss which of the Defendants may be liable for each of those underlying issues, followed by analysis of the derivative claims.

**1. Discrimination**

**a. Legal Standards**

Under Title VII, it is "unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1983, "through its application of the Equal Protection

Clause of the Fourteenth Amendment, [likewise] 'protect[s] public employees from various forms of discrimination, including hostile work environment and disparate treatment' on the basis of race." *Littlejohn*, 795 F.3d at 320 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). The analysis for a § 1983 employment discrimination claim is the same as for employment discrimination claims brought under Title VII, except that § 1983 claims can be brought against individuals acting under color of state law whereas Title VII claims cannot. *See, e.g., Demoret*, 451 F.3d at 149.

**\*19** While a *prima facie* case of employment discrimination requires application of the well-known burden-shifting approach set forth in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792 (1973), surviving a motion to dismiss requires only that the plaintiff "give fair notice of the basis of [his] claims and the claims themselves must be facially plausible." *Shamilov*, 2011 WL 6085550, at \*4. *See also Colon v. City of New York et al.*, No. 19-CV-10435 (PGG) (SLC), 2021 WL 4427169, at \*7 (S.D.N.Y. Sept. 26, 2021) (cleaned up) ("[A] plaintiff alleging employment discrimination or retaliation is not required to plead facts sufficient to establish a prima facie case ... [i]nstead, the ordinary rules for assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 8(a)'s notice pleading standard applies").

A plaintiff can establish a claim of disparate treatment under Title VII in one of two ways: by demonstrating that (1) he "suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin," or (2) "harassment on one or more of those bases amounted to a hostile work environment." *See Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)).

Because the standards for discrimination under Title VII, § 1983, and the NYSHRL are the same, the Court may consider them together. *See, e.g., Marquez v. Hoffman*, No. 18-CV-7315 (ALC), 2021 WL 1226981, at \*13 (S.D.N.Y. Mar. 31, 2021); *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n. 2 (2d Cir. 2010). NYCHRL claims, however, must be analyzed "separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Marquez*, 2021 WL 1226981, at \*15 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

Oliver asserts various claims based on 1) race discrimination and 2) hostile work environment. The Court will review each of those claims in the following subsections.

### b. Race Discrimination

Oliver asserts claims of race discrimination under § 1983, the NYSHRL, and the NYCHRL against TSMS, Chan, Mustillo, and Estwick, and a claim of race discrimination under NYSHRL and NYCHRL against the DOE. Race discrimination requires a plaintiff to show that "(1) [ ]he was within the protected group, (2) [ ]he was qualified for the position, (3) [ ]he experienced adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discrimination." *Barrer-Cohen v. Greenburgh Cent. Sch. Dist.*, No. 18-CV-1847 (NSR), 2019 WL 3456679, at \*3 (S.D.N.Y. July 30, 2019) (citing *Johnson v. Andy Frain Servs., Inc.*, 683 F. App'x 68, 70 (2d Cir. 2016)). "[E]mployment discrimination claims under Title VII require a showing that the conduct complained of occurred *because of* a plaintiff's membership in a protected class." *Concey v. N.Y. State Unified Court Sys.*, No. 08-CV-8858 (PGG), 2011 WL 4549386, at \*14 (S.D.N.Y. Sept. 30, 2011).

Here, Oliver has adequately pled that he is a Black man who is qualified for his job as a teacher based on his education and years in the position, satisfying the first two elements. SAC ¶¶ 1, 44–45. Thus, the remaining elements in question are: (i) whether Oliver pled facts adequately alleging he suffered an adverse employment action, and (ii) whether Oliver has pled sufficient facts to raise an inference of discrimination.

### i. Adverse Employment Action

**\*20** "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (citations omitted). Such an action must be more than a "mere inconvenience" or "an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted)).

"Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions." *Concey*, 2011 WL 4549386, at \*15 (quoting *Walder v.*

*White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 498 n.18 (S.D.N.Y. 2010)) (internal citations omitted). Materially adverse employment actions may include but are not limited to termination, decrease in salary, less distinguished title, material loss of benefits, or significantly diminished material responsibilities. *See Vega*, 801 F.3d at 85; *Terry*, 336 F.3d at 138; *Concey*, 2011 WL 4549386, at *15.

Whether an action constitutes an adverse employment action must be determined on a "case-by-case basis." *Pimentel v. City of New York,* No. 00-CV-326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002). Oliver alleges that he suffered adverse employment actions when the DOE Defendants assigned him to the Rubber Room. *See* SAC ¶¶ 109–16. Specifically, he alleges that his teaching responsibilities were taken away, he was precluded from partaking in other activities that would have provided additional revenue including teaching summer school, and he was unable to receive a performance rating for the academic year, rendering him ineligible to seek a transfer to another school. SAC ¶¶ 109, 115–16. Even after returning to TSMS following his assignment to the Rubber Room, Oliver was "unable" to participate in per session activities that provide additional income despite seeking to do so. SAC ¶ 120.

Notably, other courts have found that assignment to the Rubber Room is "plainly an adverse employment action." *Batyreva v. N.Y.C. Dep't of Educ.*, No. 07-CV-4544 (PAC) (DF), 2010 WL 3860401, at *12 (S.D.N.Y. Oct. 1, 2010), *aff'd*, 464 Fed. Appx. 31 (2d Cir. 2012); *see also Thomas v. NYCDOE*, No. 10-CV-464 (EK) (CLP), 2021 WL 2646350, at *5 (E.D.N.Y. June 28, 2021). Oliver was assigned to the Rubber Room from March 22, 2019 to June 6, 2019. SAC ¶¶ 108, 109, 118. Further, when a change in responsibilities is "so significant as to constitute a setback to the plaintiff's career," the change may be an adverse employment action. *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-6670 (AT), 2019 WL 4039958, at *7 (S.D.N.Y. Aug. 27, 2019) (cleaned up). Significant changes in responsibilities that suggested a demotion in *Rosen* included denying the plaintiff access to information needed to carry out her job, stripping her of her duties in a "purposeful public forum," singling her out in public for verbal attacks, and asking her to return to classroom teaching from a different position. *Id.* Oliver alleges similar public humiliation, including that he "was refused entrance into a faculty meeting about his arrest" and was "immediately escorted out of his classroom by school safety officers." SAC ¶ 108. Estwick sent an email to the parents of TSMS students informing them of Oliver's reassignment pending

the results of an investigation, allegedly a "code word" for being removed to the Rubber Room. SAC ¶¶ 112–13. Oliver's reassignment being "permanently" listed on employment records within DOE, SAC ¶ 117, and the fact that he is "not eligible for a hardship transfer" due to the disciplinary letter from Mustillo, SAC ¶¶ 131–33, each may fairly be characterized as an alleged "setback to the plaintiff's career" that could rise to the level of an adverse employment action. *Rosen*, WL 4039958, at *7.

**\*21** Finally, in the Second Circuit, disciplinary procedures such as suspension with pay "may rise to the level of an adverse employment action," *Barrer-Cohen*, 2019 WL 3456679, at *3 (citing *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)), particularly when an employer "takes actions beyond the employee's normal exposure to disciplinary procedures." *Joseph v. Leavitt*, 465 F.3d 87, 92 n.1 (2d Cir. 2006) (paid suspension during an investigation could potentially be an adverse action). The relevant question is "whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those ...." *Id.* Here, the email that Estwick sent to TSMS parents regarding Oliver's reassignment may have "exceeded" reasonable disciplinary procedures because, as alleged, "[e]mails broadcasting a teacher's reassignment to the Rubber Room are not common" when an individual is reassigned. SAC ¶ 113.

For these reasons, Oliver has pled sufficient facts to allege that he suffered an adverse employment action.

### ii. Inference of Discrimination

On a motion to dismiss in an employment discrimination action, "a plaintiff must plausibly allege that ... his race, color, religion, sex, or national origin was a motivating factor in the [adverse] employment decision." *Jeanty v. Rhino,* No. 21-CV-8326 (LTS), 2021 WL 4865202, at *2 (S.D.N.Y. Oct. 18, 2021) (quoting *Vega*, 801 F.3d at 86). A plaintiff "may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* (quoting *Vega*, 801 F.3d at 87). At the pleadings stage, a plaintiff need only allege that he "can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 988 (S.D.N.Y. 2017) (quoting *Littlejohn*, 795 F.3d. at 311).

"A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'— is a recognized method of raising an inference of discrimination ...." *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000)). "A plaintiff relying on disparate treatment evidence 'must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself].' " *Id.* (quoting *Graham,* 230 F.3d at 39).

Oliver alleges that he was disciplined more harshly than three white teachers to whom he claims he is similarly situated for similar accusations. Specifically, he identifies three comparators, White Teacher Nos. 1, 2, and 3, who, like him, are male teachers at TSMS supervised by Estwick and TSMS's Assistant Principal. SAC ¶¶ 138, 142, 145. Two of these comparators were at one time co-teachers with Oliver. SAC ¶¶ 138, 145. As alleged in the Second Amended Complaint, White Teacher No. 1 "forcefully grabbed children by the arms," "commented on at least one female student's skin and another student's weight," and made "racially-charged remarks in the classroom." SAC ¶¶ 135-36.

G.C., the same student who accused Oliver of "caress[ing]" her arm and saying something "along the lines of 'I know you love me, or you know you love me,' " also accused White Teacher No. 2 of "inappropriately rubb[ing] against her." SAC ¶¶ 73, 140. Oliver alleges that G.C. complained to TSMS about the conduct of White Teacher No. 2, much as G.C. complained to Estwick about the conduct of Oliver. SAC ¶¶ 73, 140. According to Oliver, upon information and belief, White Teacher No. 2 was never subjected to disciplinary action nor did TSMS conduct an investigation into the incident, SAC ¶ 141, whereas Oliver was arrested and reassigned to the Rubber Room pending an investigation. SAC ¶ 112. These details identify, with adequate specificity, the individuals to whom Oliver compares himself, how their workplace conduct compared to his, and how they were disparately treated following similar accusations. *See, e.g., Henry v. N.Y.C. Health & Hosp. Corp.,* 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (inference of race discrimination may be supported by demonstrating that similarly situated employees of different race were treated more favorably). While the specific details of the incident are certainly not identical, given the facts as described, they are also not "incomparable" as Defendants argue. Def. Mem. at 18.

**\*22** Defendants contend that making allegations "upon information and belief" as the basis of a comparator claim is "insufficient to plausibly allege an inference of discrimination." Def. Mem. at 16–17. However, that is the case when allegations are not supported with a statement of facts that creates a plausible inference of their truth, which is not the situation here. "The Second Circuit has ruled that pleading on information and belief in employment discrimination suits can suffice to meet the relevant plausibility standard when the relevant facts are particularly within the possession, knowledge, and control of the defendant." *Moore v. City of New York,* No. 15-CV-6600 (GBD) (JLC), 2017 WL 35450, at \*23 (S.D.N.Y. Jan. 3, 2017) (citing *Arista Records, LLC v. Doe,* 604 F.3d 110, 120 (2d Cir. 2010); *see also Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir. 2008)). Pleading "upon information and belief" is not fatal to a plaintiff's claims when, for example, he states the amount of his base salary, identifies at least one comparator, and alleges that the comparator received a higher base salary. *See Barrett v. Forest Labs., Inc.,* 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014).

Similarly, here, the allegations at issue are factual in nature rather than legal conclusions. For example, Oliver (1) stated that G.C. accused White Teacher No. 2 of inappropriate physical conduct, (2) specified the disciplinary response White Teacher No. 2 received, and (3) described the different disciplinary response White Teacher No. 2 received following G.C.'s allegations of inappropriate physical conduct. SAC ¶¶ 140–43. At the motion to dismiss stage the key question is whether the defendants have "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Barrett,* 39 F. Supp. 3d at 432 (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002)). Oliver has provided sufficient "fair notice." *Id.*

While development of the record may establish that the comparators described by Oliver are ultimately not similarly situated to him, at this stage of the proceedings, a plaintiff only needs to provide "minimal support" to show that the employer was motivated by discriminatory intent in order to survive a motion to dismiss. *Littlejohn,* 795 F.3d at 311. With respect to Estwick, Oliver has done so. However, he has pled no facts specific to actions taken by Chan, Mustillo, or TSMS, and the claims of race discrimination against them should be dismissed. [6]

[6]     The personal involvement of each of the named defendants is further discussed below.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 122 of 235

### c. Hostile Work Environment

Oliver asserts claims of hostile work environment under § 1983, the NYSHRL, and the NYCHRL against TSMS, Chan, Mustillo, and Estwick, and claims of hostile work environment under Title VII, NYSHRL, and NYCHRL against the DOE. For the reasons which follow, I recommend the motion to dismiss as to TSMS, Chan, and Mustillo be granted, but denied as to Estwick.

### i. Legal Standards

The standard for hostile work environment claims under Title VII, § 1983, and the NYSHRL is the same. *Lewis, 246 F. Supp. 3d at 989 n.5*. In order to state a claim for a hostile work environment, a plaintiff must allege facts sufficient to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn, 795 F.3d at 320–21* (citing *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)* (internal quotations omitted)). A plaintiff must plead facts "tending to show" the following:

> that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's ... protected characteristic.

**\*23** *Robinson v. Harvard Prot. Servs., 495 F. App'x 140, 141 (2d Cir. 2012)* (quoting *Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)*). Additionally, a plaintiff "must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold, 366 F.3d at 150*; *see also Terry, 336 F.3d at 148 n.20*.

In evaluating claims of hostile work environment, courts consider the totality of the circumstances, weighing factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23*. "Isolated acts, unless very serious," do not sustain a hostile work environment claim. *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)*.

"While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high ...." *Terry, 336 F.3d at 148*. At the pleadings stage, "a plaintiff need only plead facts sufficient to support the conclusion that [ ]he was faced with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse.' " *Lewis, 246 F. Supp. 3d at 989* (citing *Patane, 508 F.3d at 113* (quoting *Terry, 336 F.3d at 148*)).

### ii. Application

To support his claim for hostile work environment, Oliver alleges that Estwick and the DOE "disseminat[ed], facilitat[ed], and/or condon[e]d fabricated rumors that Oliver harbored "predatory" intentions toward TSMS students. SAC ¶ 57. Three alleged incidents prior to the arrest and subsequent disciplinary procedures on March 22, 2019 undergird this allegation. First, on November 14, 2012, Estwick addressed a "Counseling Letter" to Oliver's file in which he expressed "purported 'concerns about the personal nature of [Oliver's] interactions with some of [his] students,' " although the letter did not cite any specific incidents. SAC ¶ 58. Second, in January 2017, a TSMS teacher told a student exhibiting signs of depression and abuse, T.S., that he was "concerned" about Oliver's relationship with T.S. and that the student should stop reaching out to Oliver. SAC ¶¶ 59–60. Third, on or around January 18, 2017, TSMS's then-guidance counselor "falsely told a foster care agency worker that Mr. Oliver harbored 'predatory' intentions" toward T.S. and suggested that Oliver had made "improper advances" toward the student. SAC ¶ 61. These claims rely on Oliver's understanding of the word "predatory" being "consistent with the racial stereotyping of Black men as predators." SAC ¶ 57. To support this claim, Oliver cites a scholarly publication in the Journal of Contemporary Criminal Justice, noting in its Abstract that "[t]he stereotyping of Blacks as criminals is so pervasive throughout society that 'criminal predator' is used as a euphemism for 'young Black male.' This common stereotype has erroneously served as a subtle rationale for the unofficial

policy and practice of racial profiling by criminal justice practitioners." SAC ¶ 57 n.2 (quoting Kelly Welch, *Black Criminal Stereotypes and Racial Profiling*, 23 J. CONTEMP. CRIM. JUSTICE 276 (2016), https://journals.sagepub.com/doi/abs/10.1177/1043986207306870).

**\*24** Racist comments can constitute a hostile work environment, but there generally must be "more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Snell v. Suffolk Cnty.*, 782 F. 2d 1094, 1103 (2d Cir. 1986)). "The Second Circuit has found a hostile work environment where there was evidence of a 'stream of racially offensive comments,' including a 'veritable barrage of racial epithets.' " *Concey*, 2011 WL 4549386, at \*17 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Estwick's comments from 2012 regarding Oliver being an "affirmative action hire," SAC ¶¶ 50–51, are therefore insufficient, even under a continuing violation claim, to state a claim for relief on their own.

Unlike discrete acts relevant to a discrimination claim, hostile environment claims by their very nature involve repeated conduct. *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). Because such claims are based on the cumulative effect of individual acts rather than an incident that occurs on any particular day, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*." *Davis-Garett*, 921 F.3d at 42 (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 122). Expiration of the limitations period is not a bar to using prior acts, such as statements by a decision-maker or earlier decisions typifying retaliation involved, as background evidence in support of a timely claim. *See, e.g.*, *Davis-Garett*, 921 F.3d at 42 (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113; *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005)). Thus, while actions that occurred prior to Oliver's arrest on March 22, 2019 are largely barred from being raised as distinct claims on which to file suit, the context of Oliver's work environment can serve as "background evidence" in support of a hostile work environment claim. *Id.*

The allegations described above form exactly such "background evidence" that the Court can consider. As another court recently observed: "A reasonable person would likely find it 'hostile or abusive' if his co-workers repeatedly implied that he was engaging in inappropriate sexual relations with his students." *Dash v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 238 F. Supp. 3d 375, 391 (E.D.N.Y. 2017) (cleaned up) (denying summary judgment on hostile work environment claim). "[A] single accusation can reasonably be viewed as having intolerably altered plaintiff's work environment, because it is deleterious to a school's environment when students are led to believe that a staff member is abusing his students." *Id.*

Applying these principles and mindful that this assessment is being made solely on the pleadings, the Court concludes that Oliver has adequately pled a hostile work environment claim sufficient to survive a motion to dismiss.

### d. Discrimination Under the NYCHRL

Discrimination claims under the NYCHRL must be interpreted independently and be more liberally construed to favor the plaintiff than in claims under Title VII, Section 1983, or the NYSHRL. N.Y.C. Local L. No. 85 of 2005 §§ 1, 7; *see, e.g.*, *Harris v. NYU Langone Med. Ctr.*, No. 12-CV-454 (RA) (JLC), 2013 WL 3487032, at \*25 (S.D.N.Y. July 9, 2013) ("The NYCHRL should be broadly construed 'in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' ") (quoting *Mihalik*, 715 F.3d at 109), *adopted as modified by* 2013 WL 5425336 (Sept. 27, 2013); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009). While federal and state law "may be used to aid in interpretation," they should be considered "a floor below which the City's Human Rights law cannot fall." N.Y.C. Local L. No. 85 of 2005 § 1.

**\*25** Oliver has pled sufficient facts to state a claim for race discrimination and hostile work environment under Title VII, Section 1983, and the NYSHRL against Estwick. Similarly, and because the standard is even easier to meet, the motion to dismiss race discrimination and hostile work environment claims under the NYCHRL against Estwick should be denied as well. However, even under the broader pleading standard, the Second Circuit has cautioned that "district courts must be mindful that the NYCHRL is not a 'general civility code'... [and] [t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40). Because Oliver pled no facts demonstrating a discriminatory motive for the actions of Chan and Mustillo beyond bare conclusions, the discrimination and hostile work environment claims under

the NYCHRL against those two individual defendants should be dismissed.

### 2. Retaliation

Defendants move to dismiss Oliver's retaliation claims against the DOE under Title VII, the NYSHRL, and the NYCHRL, and the retaliation claims against TSMS, Chan, Mustillo, and Estwick under § 1983, the NYSHRL, and the NYCHRL. Def. Mem. at 21–23. Because the standards for retaliation under § 1983 and the NYSHRL are the same, the Court may consider them together. *See Marquez, 2021 WL 1226981, at \*18.* As to his retaliation claims, Oliver argues that the DOE Defendants subjected him to retaliation "because of his race and his previous attempts to rectify the discriminatory treatment that he has faced while working at TSMS." Pl. Opp. Mem. at 2. He contends that the adverse employment actions he suffered—being reported to the NYPD, reassignment to the Rubber Room pending investigation, and the negative impacts that stem from that action including an uncommon email sent to TSMS parents about him—began to occur less than three months after he settled his previous lawsuit pertaining to race discrimination. *See* SAC ¶¶ 6–7. The Previous Action was settled on December 27, 2018. *Id.* ¶ 69. 85 days later, on March 22, 2019, Oliver was arrested and reassigned to the Rubber Room. *Id.* ¶ 109.

### a. Legal Standard

The Title VII anti-retaliation provision prohibits an employer from discriminating against an employee or applicant "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing...." *42 U.S.C. § 2000e-3(a).* The Second Circuit has " 'acknowledge[d] that there has been considerable confusion surrounding the viability of retaliation claims under *§ 1983* ... [but has clarified that] under *Vega,* retaliation claims stemming from complaints of racial discrimination are actionable under the Equal Protection Clause pursuant to *Section 1983.*" *Colon, 2021 WL 4427169, at \*14* (quoting *Vega, 801 F.3d at 80*).

To establish a *prima facie* case of retaliation in violation of Title VII, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the

protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)* (cleaned up). Allegations in a complaint need only give "plausible support to the reduced *prima facie* requirements that arise under *McDonnell Douglas* at the initial phase of a Title VII litigation." *Littlejohn, 795 F.3d at 316.* Thus, to survive a motion to dismiss on a claim of retaliation, a plaintiff must allege in the complaint that "(1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Vega, 801 F.3d at 90–91* (cleaned up).

### b. Application

#### i. Protected Activity

Oliver claims that litigating, including settling, his previous legal action is protected activity for the purposes of a retaliation claim. SAC ¶ 69; Pl. Opp. Mem. at 23. Under Title VII, a plaintiff participates in a protected activity when he "oppose[s] any practice made an unlawful employment practice by [Title VII], or because [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Colon v. City of New York, et al., No. 19-CV-10435 (PGG) (SLC), 2021 WL 4943552, at \*18 (S.D.N.Y. Jan. 15, 2021)* (cleaned up), *adopted by 2021 WL 4427169 (Sept. 26, 2021).* These are known as the "opposition" and "participation" clauses, either of which can constitute protected activity. *See Littlejohn, 795 F.3d at 316* (quoting *Townsend v. Benjamin Enters. Inc., 679 F.3d 41, 48 (2d Cir. 2012)*). The participation clause "only encompasses participation in formal EEOC proceedings," *Littlejohn, 795 F.3d. at 316,* not internal investigations, because its plain language requires that the investigation be "under" Title VII, "not merely integral to effectuating its purposes." *Townsend, 679 F.3d at 50–51.* The Previous Action in this case is more akin to an EEOC proceeding than an internal investigation if the claims are specifically brought "under" Title VII. Oliver does not describe in the Second Amended Complaint the specific claims made in that lawsuit, or against whom they were brought, alleging only that it was "an action for employment and related complaints." SAC ¶ 5. However, the Court can reasonably infer—as it is required to do on a motion to dismiss—that the action complained of was brought under Title VII as the nature of the claims concerned a "campaign

of discrimination" related to employment and were followed thereafter by an EEOC complaint. SAC ¶ 5. Additionally, because this settlement took place between Oliver and the DOE Defendants, arising out of Oliver's alleged treatment at TSMS, the DOE necessarily was aware of the protected activity.

**\*26** Further, as it is part of the litigation process, settlement of an action can reasonably be construed as a form of "participat[ing] in any manner" in a "proceeding." *Colon, 2021 WL 4943552, at \*18*. While Defendants cite *Kim v. Columbia Univ., 460 F. App'x 23, 25 (2d Cir. 2012)* for the proposition that settlement of a lawsuit is "plainly not protected activity," that case is distinguishable. Def. Rep. Mem. at 9. Affirming summary judgment in *Kim*, the Second Circuit confirmed that the period for temporal proximity between protected activity and adverse action is measured from the date of the employer's knowledge of the protected activity. There, a settlement of a claim in April 2007 followed by an adverse action in May 2007 was not sufficient for temporal proximity because the initial complaint leading up to the claim was filed 15 years prior, in 1992, *and* it was "coupled with the undisputed evidence" that the adverse action was similarly taken against 2,000 others. *Kim, 460 F. App'x at 25*. No such compounding factor exists here. While courts in other districts cite *Kim* for the proposition that temporal proximity is measured from the date a previous lawsuit was filed rather than when it was settled, other courts have more recently used "pending" or "ongoing litigation" as a basis for finding adequate temporal proximity to find causation, undermining Defendants' assertion that the protected action ends the moment the Defendants become aware of a filed case. *Compare Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545 (SJF) (GRB), 2014 WL 1154056, at \*4 (E.D.N.Y. Mar. 20, 2014) (measuring from date previous lawsuit was filed) *with Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416 (KMK), 2020 WL 5720753, at \*11 (S.D.N.Y. Sept. 24, 2020) (citing cases) (ongoing litigation sufficient to establish temporal proximity to find causation).

Other courts have not reached a consensus on this issue. *See, e.g., Pediford-Aziz v. City of New York, 170 F. Supp. 3d 480, 489 (E.D.N.Y Mar. 17, 2016)* (finding that span of eight months between time plaintiff settled lawsuit and time she was prevented from coming to work was sufficient to establish temporal proximity). Oliver cites to *McFarlane v. Harry's Nurses Registry*, No. 17-CV-6350 (PKC) (PK), 2020 WL 1643781, at \*14 (E.D.N.Y. Apr. 2, 2020) as persuasive authority giving rise to the possibility that a settlement can

constitute protected activity. Pl. Opp. Mem. at 25. There, where the court denied summary judgment on plaintiffs' retaliation claims, plaintiffs had engaged in protected activity by "filing the Complaint in this matter ... [and] previously threatening to file a lawsuit regarding wages, which led to a settlement with Defendants in or around December 2016." *McFarlane, 2020 WL 1643781, at \*14*. Defendants are correct that the *McFarlane* Court's holding is not, as Oliver alleges, that "settlement of a previously threatened lawsuit constitute[s] protected activity." Def. Rep. Mem. at 10; Pl. Opp. Mem. at 25. However, the *McFarlane* court goes on to discuss the relevance of whether settlement took place in December 2015 or December 2016 to determine if discriminatory pay beginning in February 2016 was prior to or after the settlement for purposes of a temporal link between protected activity and the employment action. *McFarlane, 2020 WL 1643781, at \*14*. This discussion demonstrates that the court in *McFarlane* implicitly recognized the settlement itself as the trigger of protected activity. *Id.* Similarly, here, settlement of a previous claim can constitute a protected activity for the purposes of a retaliation claim.

Oliver therefore participated in protected activity when he settled the Previous Action on December 27, 2018.

### ii. Adverse Employment Action

The standard for finding an action "adverse" for the purposes of a retaliation claim is broader than that for a discrimination claim. *See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 53–54, 57, 67 (2006)*; *Patane, 508 F.3d at 116*. A plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006)* (quoting *Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68*); *see also Carpenter v. City of Mount Vernon, 198 F.Supp.3d 272, 283–84 (S.D.N.Y. 2016)* (cleaned up). In the Second Circuit, "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to [a] classroom on [the] fifth floor which aggravated teacher's physical disabilities" may qualify as adverse employment actions for purposes of a retaliation

claim. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (cleaned up).

**\*27** Here, because an adverse employment action took place for the purposes of a discrimination claim, *see supra* Section II(D)(1)(b)(i), it follows that Oliver suffered an adverse employment action under the even broader standard applied to retaliation claims. *See Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 440 (E.D.N.Y. 2015) (actions were adverse employment actions under "more lenient standard" for retaliation claims when court previously concluded they qualified under "more demanding standard" for traditional discrimination claims).[7]

[7]    While the *Vale* case made a determination as to adverse employment actions under the ADA, that court previously explained that it was applying the Title VII standard to ADA retaliation claims. *Id. See also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (analyzing retaliation claim under ADA using same framework employed in Title VII cases).

### iii. Causal Connection

In order to state a claim for relief on a retaliation theory, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90 (citation omitted). A plaintiff can demonstrate a causal connection either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Oliver has not alleged any facts giving rise to the possibility of direct causal connection, but he has sufficiently pled facts alleging indirect causation through both temporal proximity and disparate treatment.

The period between Oliver's protected activity on December 27, 2018, and the adverse employment actions on March 22, 2019 (85 days) is less than three months, which Defendants contend falls within the time period that precludes an inference of retaliation. Def. Mem. at 23. However, in the Second Circuit, no "bright line [defines] the outer limits

beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Kim*, 460 F. App'x at 25 ("This court has not identified an outer limit beyond which a temporal relationship is too attenuated to support a finding of causality ... [i]nstead, we exercise [our] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.") (cleaned up).

In addition to any alleged temporal proximity, circumstantial evidence demonstrates the plausibility of disparate treatment of fellow employees engaged in similar conduct. Oliver settled his previous action in December 2018, and less than three months later was accused by a student of inappropriate conduct. Accepting the alleged facts as true, the reaction to that accusation against Oliver, a Black teacher—alerting the NYPD, reassigning him to the Rubber Room, emailing TSMS parents, sending disciplinary letters, and more—was notably different than the reaction to similar accusations against white teachers as discussed in detail above. *See, e.g.* SAC ¶¶ 134–45. In addition, while the Court makes no conclusions on the subject on a motion to dismiss, it is plausible that the DOE Defendants disciplined Oliver so strongly after this accusation as it was the "earliest opportunity" to retaliate without raising suspicion. *Ahmad*, 2020 WL 5720753, at \*11 (termination eight months after knowledge of plaintiff's lawsuit might have been "earliest opportunity" to retaliate when superintendent made proclamations over several months that he was seeking plaintiff's termination); *see also Cronin v. St. Lawrence*, No. 08-CV-6346 (KMK), 2009 WL 2391861 (S.D.N.Y. Aug. 5, 2009) (passage of eleven months "at least in the range of acceptable time periods" for retaliation, "particularly if Defendant had no earlier opportunity") (collecting cases).

**\*28** Drawing all reasonable inferences in Oliver's favor, the combination of temporal proximity between the settlement of the Previous Action as well as allegations of differential treatment of Oliver as compared to similarly situated white teachers sufficiently indicates a causal connection at this "early stage" in the proceedings to survive a motion to dismiss. *Ahmad*, 2020 WL 5720753, at \* 11.

### c. Retaliation Under the NYCHRL

Oliver v. City of New York, Slip Copy (2022)
Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 127 of 235
2022 WL 455851

Under the NYCHRL, the retaliation inquiry is even broader. *See, e.g., Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010). Retaliation in any manner is prohibited under the NYCHRL, and "[t]he retaliation ... need not result in an ultimate action with respect to employment ... or in a materially adverse change in the terms and conditions of employment.' " *Id.* (citing N.Y. City Admin. Code § 8-107(7)). The elements required to assert a *prima facie* claim of retaliation under the NYCHRL are identical to the elements under analogous federal law, "except that the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened 'that would be reasonably likely to deter a person from engaging in protected activity.' " *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009) (citing N.Y. City Admin. Code § 8-107(7)).

Because the motion to dismiss the various retaliation claims under federal law should be denied, the same result is warranted with respect to the various retaliation claims under the NYCHRL.

### 3. Personal Involvement of Individual Defendants

The claims against TSMS should be dismissed, as it is not a proper party to the case. "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Estate of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 422 (S.D.N.Y. 2017) (quoting *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 43, 477 (E.D.N.Y. 2002)). Pursuant to this doctrine, schools like TSMS do not have a "legal identity separate from their school district." *Z.F.X. by Vankesteren v. Riverhead Central School District*, No. 20-CV-962 (GRB) (ST), 2021 WL 1238842, at *2 (E.D.N.Y. Apr. 2, 2021). TSMS as an entity is therefore neither an individual defendant nor a school district operating a public school with the possibility of *Monell* liability, and as such is not a proper defendant under Section 1983 or NYSHRL claims.

The individual Defendants—Chan, Mustillo, and Estwick—each acted under color of state law in their interactions with Oliver because they were public employees in their official capacities as DOE employees exercising their responsibilities pursuant to state law. *See Feingold*, 366 F.3d at 159. However, "[a]n individual may be held liable under ... § 1983 only if that individual is 'personally involved in the alleged deprivation.' " *Marquez*, 2021 WL 1226981, at *8 (quoting *Littlejohn*,

795 F.3d at 314). The NYSHRL and NYCHRL "also require personal involvement" in order to hold an individual defendant personally liable for an act of discrimination. *Lewis*, 2017 WL 1169647, at *8. This standard requires a plaintiff to establish that the supervisor's actions were the "proximate cause" of the deprivation, and that the supervisor's behavior amounted to "intentional discrimination on the basis of a protected characteristic ...." *Littlejohn*, 795 F.3d at 314 (cleaned up).

**\*29** On a § 1983 claim, a supervisor's personal involvement may be demonstrated by a plaintiff in four different ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)).

Chan, Mustillo, and Estwick can all be characterized as Oliver's supervisors. In her role as Superintendent, Chan "oversees hiring, supervising, and development of principals, as well as teacher promotion decisions," and in her role as Deputy Community Superintendent, Mustillo "is responsible for assisting [Chan]," specifically "in implementing policies ... related to teacher conduct and ... overseeing [the] response to any reports of suspected abuse of District 1 students." SAC ¶¶ 42–43. As principal of TSMS, Estwick "is responsible for all aspects of running [TSMS], including ... evaluation and professional development of teaching staff." SAC ¶ 43.

However, Oliver's claims against Chan, even though alleged against her in her official capacity, are not sufficient to demonstrate personal involvement. Oliver pleads no facts in the Second Amended Complaint referring to Chan's involvement in any of the actions giving rise to his discrimination and retaliation claims. He alleges only in a conclusory manner that Chan was "aware of the discrimination" Oliver suffered, but "did nothing to prevent" Estwick or the school from engaging in further discrimination. SAC ¶ 72. Oliver then states that Chan was one of the individuals who met with G.C.'s parents at TSMS the morning of March 22, 2019 following the incident and claims that the NYPD decided to arrest him with Chan's "encouragement," although he fails to allege any factual basis for this assertion. SAC ¶ 78. Even drawing all reasonable inferences in Oliver's favor as required at this stage of the case, the only constitutional deprivation with which Chan is remotely involved as pled in the Second Amended Complaint is Oliver's purported false arrest, which was allegedly committed by the NYPD and not by Chan, her subordinates, or anyone beholden to an alleged policy she created or allowed to continue. See SAC ¶¶ 77–80.

Mustillo is alleged to have been involved in the investigation and disciplinary actions that followed Oliver's return to TSMS after he was sent to the Rubber Room in 2019. SAC ¶ 121. Oliver met with her on June 11, 2019, at which time she gave him a copy of an investigative report regarding G.C.'s accusations against him. SAC ¶ 122. Oliver claims Mustillo found credible what he deems to be "false accusations" with no evidence in the report. SAC ¶ 126. According to Oliver, the accusations are false because he denied them and because those who conducted the investigation interviewed other students all at one time rather than individually. SAC ¶¶ 126–29. On these facts, Oliver asserts that Mustillo adopted as true the accusations in her June 17, 2019 disciplinary letter to him "based on a racist view of Black men as predators." SAC ¶¶ 131–32. However, Oliver has alleged no facts leading to this conclusion.

*30  On the other hand, Estwick was personally involved in Oliver's arrest (engaging with G.C. after the accusations and leading Oliver to the NYPD, SAC ¶¶ 73–79) and the disciplinary action taken against Oliver (his reassignment to the Rubber Room and the notification to TSMS parents, SAC ¶¶ 109, 112). As pleaded in the SAC, Estwick also supervised White Teachers Nos. 1–3, Oliver's alleged comparators. SAC ¶¶ 138, 142, 145. Neither Mustillo nor Chan are specifically alleged to have been involved in the disciplinary decisions against those teachers, and as such Oliver has not pled that they had any intent to discriminate.

Even accepting all reasonable inferences as true at the pleadings stage, while Oliver has alleged sufficient facts to support a claim against Estwick for violating his constitutional right to be free from race discrimination, a hostile work environment, and retaliation, he has not done so against Chan and Mustillo. Accordingly, the motion to dismiss the discrimination, hostile work environment, and retaliation claims under Section 1983 and NYSHRL against TSMS, Chan, and Mustillo should be granted, but should be denied with respect to the claims against Estwick. The claims against the DOE are discussed further *infra* at Section II(D) (4)(b).

## 4. Derivative Claims

The DOE Defendants move to dismiss Oliver's derivative claims, including the claims for supervisory responsibility, *respondeat superior*, and municipal *Monell* liability. Def. Mem. at 24, 33–38. In the following subsections, the Court will examine each of these issues.

### a. Supervisory Liability and *Respondeat Superior*

Defendants move to dismiss Oliver's supervisory liability claims against Chan and Mustillo, and *respondeat superior* liability claims against the DOE. Def. Mem. at 33–35. Because Oliver has adequately pled claims for discrimination, hostile work environment, and retaliation against Estwick, the claims are not without merit solely on the grounds of failing to plead an underlying violation.

As to federal law violations, " 'supervisors cannot be held liable based solely on the alleged misconduct of their subordinates.' " *See supra* Section II(C)(4); *Vasquez, 2017 WL 946306, at \*11* (quoting *Lindsey, 43 F. Supp. 3d at 329*). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell, 436 U.S. at 691,* nor "solely because it employs a tortfeasor." *Lawton, 2017 WL 3582473, at \*6* (quoting *Bisignano, 43 F. Supp. 2d at 601*). Oliver's claims on these bases fail as a matter of law, and therefore the motion to dismiss supervisory liability claims against Chan and Mustillo and *respondeat superior* against the DOE on federal law grounds should be granted.

However, Oliver pleads state law claims under the NYSHRL and NYCHRL as well. "[U]nlike cases brought under § 1983, municipalities may be liable for the common law torts ... committed by their employees under the doctrine of *respondeat superior*." *Mesa*, 2013 WL 31002, at *34 (cleaned up). Specifically with regard to the NYCHRL, an "employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of [the relevant provisions] of this section [ ] where ... the employee or agent exercised managerial or supervisory responsibility." *Pollock v. Shea*, No. 20-CV-6273 (JGK), 2021 WL 4962736, at *7 (S.D.N.Y Oct. 26, 2021) (citing N.Y.C. Admin. Code § 8–107(13)(b)). Oliver adequately pled that the DOE employed Estwick and that Chan and Mustillo were his supervisors during the time of the alleged violations. SAC ¶¶ 40–43.

Thus, the motion to dismiss claims for supervisory liability against Chan and Mustillo and for *respondeat superior* against the DOE on state law grounds should be denied.

### b. Municipal Liability

**\*31** As described above, a municipality may be liable under Section 1983 if "the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick*, 563 U.S. at 60 (internal quotation marks omitted). It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

Here, Oliver alleges a failure by policymakers to provide adequate training or supervision to such an extent that it amounts to deliberate indifference to the rights of those who come in contact with municipal employees. *See Davis*, 2018 WL 10070540, at *4; *supra* Section II(A)(3). In his effort to establish *Monell* liability, Oliver claims that the DOE "knew to a moral certainty that [Estwick] had a history of mishandling situations" involving Oliver and therefore its "failure to supervise and discipline Estwick constituted a *de facto* policy or custom that exhibited deliberate indifference to [Oliver]'s constitutional rights," causing his rights to be violated. SAC ¶¶ 223, 225. Oliver alleges that this failure

to adequately supervise rises to the level of "deliberate indifference." SAC ¶ 223, Pl. Opp. Mem. at 25–26.

"A school district may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Martinetti v. Mangan*, No. 17-CV-5484 (KMK), 2019 WL 1255955, at *9 (S.D.N.Y. Mar. 19, 2019) (cleaned up). To establish liability premised on a failure to supervise, the plaintiff must plead both (1) "a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity"; and (2) that "the municipality consistently failed to investigate those allegations." *Treadwell v. Cnty. of Putnam*, No. 14-CV-10137 (KMK), 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016).

The number of legal actions Oliver previously took – including the Previous Action, the OEO complaint, the arbitration proceeding, and the EEOC complaint – demonstrates a pattern of complaints of unconstitutional activity. *Treadwell*, 2016 WL 1268279, at *4. Further, unlike in *Martinetti* (where plaintiff did not allege that any prior investigations were "unreasonably performed" or identify any policymakers involved in the investigation or otherwise on notice for insufficient policies or training), Oliver does make allegations of a consistent failure to investigate complaints. *Martinetti*, 2019 WL 1255955, at *10. Oliver claims that Estwick "faced no disciplinary action" following the conclusion of the Arbitration Proceeding in 2014 at which Oliver allegedly prevailed, and further that the OEO took "no action" for three years on Oliver's complaint despite those kinds of complaints being "typically closed within 90 days of the filing." SAC ¶¶ 53–55. Based on these allegations, policymakers plausibly would have been "on notice" that Estwick was alleged to have been mishandling incidents involving Oliver, thus indicating they were "aware of any alleged ... deficiencies." *Martinetti*, 2019 WL 1255955, at *9. For the purposes of surviving a motion to dismiss, Oliver has therefore alleged sufficient facts to "support an inference" that the municipality failed to supervise Estwick in his treatment of Oliver in the course of his working at TSMS. *Treadwell*, 2016 WL 1268279, at *4.

**\*32** Thus, the motion to dismiss the municipal liability claim against the DOE should be denied.

**5. Summary of Claims Against the DOE Defendants**

In sum, the Court recommends the motion be granted as to:

1. The various Race Discrimination, Hostile Work Environment, and Retaliation Claims against DOE, Chan, Mustillo, and TSMS (Eighth through Thirteenth, and Sixteenth through Twenty-First Claims);

2. The Supervisory Liability claims against Chan and Mustillo on federal law grounds (Fifteenth Claim); and

3. The Respondeat Superior claims against the DOE on federal law grounds (Twenty-Second Claim).

The Court recommends the motion be denied as to:

1. The Race Discrimination, Hostile Work Environment, and Retaliation Claims against Estwick (Eighth through Thirteenth, and Sixteenth through Twenty-First Claims);

2. The Supervisory Liability claims against Chan and Mustillo under NYSHRL and NYCHRL (Twenty-Second Claim);

3. The Respondeat Superior claims against the DOE under NYSHRL and NYCHRL (Twenty-Second Claim); and

4. The Municipal Liability claim against the DOE (Fourteenth Claim).

### III. CONCLUSION

For the foregoing reasons, the Court recommends the motion to dismiss the Second Amended Complaint be granted as to these claims:

1. The False Arrest/Arrest without Probable Cause federal law claims against Shea, O'Connell, and Gonzalez;

2. The New York State Constitution claims against Shea, O'Connell Gonzalez, Taylor, and the Five Unknown NYPD Officers;

3. The Supervisory Liability claims against O'Connell and Shea;

4. The *Respondeat Superior* claims against the City of New York;

5. The *Monell* Liability claim against the City of New York;

6. The various Race Discrimination, Hostile Work Environment, and Retaliation Claims against DOE, Chan, Mustillo, and TSMS;

7. The Supervisory Liability claims against Chan and Mustillo on federal law grounds; and

8. The Respondeat Superior claims against the DOE on federal law grounds.

The Court recommends the motion be denied as to these claims:

1. The False Arrest/Arrest without Probable Cause federal law claims against Taylor and the Five Unknown NYPD Officers;

2. The Supervisory Liability claim against Gonzalez;

3. The various Race Discrimination, Hostile Work Environment, and Retaliation Claims against Estwick;

4. The Supervisory Liability claims against Chan and Mustillo under NYSHRL and NYCHRL;

5. The Respondeat Superior claims against the DOE under NYSHRL and NYCHRL; and

6. The *Monell* Liability claim against the DOE.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardephe. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham. Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

2022 WL 455851

**All Citations**

Slip Copy, 2022 WL 455851

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

495 Fed.Appx. 140
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Anthony L. ROBINSON, Plaintiff–Appellant,

v.

HARVARD PROTECTION
SERVICES, Defendant–Appellee.

No. 11–2625–CV
|
Sept. 6, 2012.

**Synopsis**

**Background:** Former employee brought suit against
employer alleging discrimination and retaliation in violation
of Title VII. The United States District Court for the Southern
District of New York, Richard J. Holwell, J., dismissed
complaint, and plaintiff appealed.

**[Holding:]** The Court of Appeals held that plaintiff would not
be allowed to amend his complaint on appeal.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (1)

**[1]**    **Federal Courts**    In general;  necessity

**Federal Courts**    Failure to mention or
inadequacy of treatment of error in appellate
briefs

Plaintiff would not be allowed to amend his
complaint on appeal with filing which presented
arguments that were not raised in district court
or were abandoned when they were not included
in his opening appellate brief to court, and which
sought to introduce facts that were not part of his
complaint.

24 Cases that cite this headnote

**\*140**  Appeal from a judgment of the United States District
Court for the Southern District of New York (Richard J.
Holwell, Judge).

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
judgment entered on May 25, 2011 is AFFIRMED.

**Attorneys and Law Firms**

Anthony L. Robinson, New York, NY, pro se.

Perry S. Heidecker, Milman Labuda Law Group, PLLC, Lake
Success, NY, for Appellee.

PRESENT: REENA RAGGI, DEBRA ANN LIVINGSTON
and RAYMOND J. LOHIER, JR., Circuit Judges.

**SUMMARY ORDER**

Anthony Robinson appeals *pro se* from the dismissal of
his second amended complaint, alleging discrimination and
retaliation by his former employer, Harvard Protective
Services, LLC, in violation of Title VII of the Civil Rights Act
of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* In reviewing
the challenged dismissal *de novo, see Forest Park Pictures
v. Universal Television Network, Inc.,* 683 F.3d 424, 429 (2d
Cir.2012), we assume the parties' familiarity with the facts
and record of prior proceedings, which we reference only as
necessary to explain our decision to affirm.

To survive a motion to dismiss, the complaint must plead
"enough facts to state a claim to relief that is plausible on its
face." **\*141** *Bell. Atl. Corp. v. Twombly,* 550 U.S. 544, 570,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *accord Metz v. U.S.*

*Life Ins. Co.,* 662 F.3d 600, 602 (2d Cir.2011). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *accord Forest Park Pictures v. Universal Television Network, Inc.,* 683 F.3d at 429.

To state a *prima facie* case of discrimination under Title VII, a plaintiff must allege that "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse,* 673 F.3d 141, 150 (2d Cir.2012) (internal quotation marks omitted). To state a hostile work environment claim, a plaintiff must plead facts tending to show "that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex," or another protected characteristic. *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007) (internal quotation marks and punctuation omitted). A plaintiff suing under Title VII for retaliation must allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (internal quotation marks omitted).

Mindful of these principles, we conclude that Robinson has waived any specific challenges to the district court's decision because he does not raise any arguments directed at the merits of the district court's opinion in his opening brief to this court. *See LoSacco v. City of Middletown,* 71 F.3d 88, 92–93 (2d Cir.1995) (holding, in the context of a *pro se* appeal, that issues not raised in an appellate brief are abandoned). Indeed, Robinson failed to present any such arguments to the district

court. *See United States v. Lauersen,* 648 F.3d 115, 115 (2d Cir.2011) (declining to address arguments raised for the first time on appeal).

In any event, an independent review of the record and relevant case law reveals that the district court correctly dismissed Robinson's second amended complaint because it did not plausibly allege a claim of Title VII discrimination based on race—or, indeed, of discrimination based on any other protected characteristic. Nor did his complaint plausibly allege a claim of retaliation under Title VII. The complaint is simply devoid of facts tending to establish the elements of those claims.

In a document filed more than five months after the appellee's brief and styled as a "Motion for Response to Dismissal," Robinson for the first time states that he is "not white[ ]" and that he was terminated because of his race. We ordinarily will not consider an issue raised for the first time on appeal. *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994). Moreover, we generally deem arguments not raised in an opening brief abandoned, even where the appellant is *pro se. See LoSacco v. City of Middletown,* 71 F.3d at 92–93. Robinson's latest filing presents arguments that were neither raised in the district court nor included in his opening brief to this court; moreover, Robinson seeks to introduce facts that were not part **\*142** of his complaint, which he was twice permitted by the district court to amend. Under the circumstances, "we see no reason to allow [him] to effectively amend [his] complaint on appeal." *Kendall v. Emps. Ret. Plan of Avon Prods.,* 561 F.3d 112, 117 (2d Cir.2009).

We have considered all of Robinson's arguments and conclude that they are without merit. Accordingly, we AFFIRM the judgment of the district court.

### All Citations

495 Fed.Appx. 140

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 134 of 235

Merisier v. Kings County Hospital, Not Reported in Fed. Supp. (2017)

2017 WL 4857565

2017 WL 4857565
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Marie MERISIER, Plaintiff,

v.

KINGS COUNTY HOSPITAL, Defendant.

16-CV-7088 (RRM) (RML)

|

Signed 10/25/2017

**Attorneys and Law Firms**

Marie Merisier, Jamaica, NY, pro se.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, United States District Judge

**\*1** Plaintiff Marie Merisier, proceeding *pro se*, brings this employment discrimination action against her employer, Kings County Hospital. (*See* Compl. (Doc. No. 1).) Her request to proceed *in forma pauperis* is granted solely for the purpose of this Order. For the reasons stated below, Merisier's complaint is dismissed with leave to replead within 30 days of the date of entry of this Order.

**BACKGROUND**

Merisier commenced this action by filing a form complaint for employment discrimination actions and checking the box to initiate an action under Title VII of the Civil Rights Act of 1964. (Compl. at 3.) [1] Merisier checked the boxes indicating discriminatory conduct consisting of unequal terms and conditions of employment and retaliation. (Compl. at 4.) In the section to allege discrimination, she neither checks any of the boxes nor specifies any basis for discrimination. (Compl. at 5.) In the space to describe the facts of her case, Merisier states: "Since my employment at this agency I have been treated differently from my peers." (Compl. at 6.) She does not indicate how long she was employed with her current employer. She states that she was assaulted by an employee on September 23, 2015, but that the administration penalized her instead of the other employee. (*Id.*) She states: "Administration has continuously ... tried to defame my character by trying to make me out to be a violent person

with these false allegations where there is video footage of everything that has taken place but refuse to provide it because it will show that I'm continuously being bullied/harassed and now assaulted." (*Id.*) Merisier alleges that she filed a complaint with the Division of Human Rights, but that the investigator told her that a decision had been made "based on lack of evidence in support of my claims." (*Id.*) She does not allege that the harassment or disciplinary action were based on her race, color, sex, religion, or national origin.

[1]    For ease of reference, all pages refer to the Electronic Filing System ("ECF") pagination.

**DISCUSSION**

A complaint filed *in forma pauperis* may be dismissed "at any time" upon determination that the action "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In evaluating whether a pleading states a claim for relief, "a court must accept as true all factual allegations contained in a complaint but need not accept legal conclusions." *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to nudge a plaintiff's claims "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

**\*2** *Pro se* complaints, like other pleadings, must contain sufficient factual allegations to meet the plausibility standard. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). However, "[a] document filed *pro se* is 'to be liberally construed,' ... and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Thus, a court must read a *pro se* complaint with "special solicitude," *Ruotolo v. I.R.S.*, 28 F. 3d 6, 8 (2d Cir. 1994), and must interpret it to raise the strongest claims it suggests. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006). Where a liberal reading of the pleading "gives any indication that a valid claim might be stated," the Court must

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 135 of 235

Merisier v. Kings County Hospital, Not Reported in Fed. Supp. (2017)

2017 WL 4857565

grant leave to amend it at least once. *See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* (quotation marks omitted).

Title VII provides in relevant part:

It shall be an unlawful employment practice for an employer—

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin

42 U.S.C.A. § 2000e-2(a). In order to state a claim under Title VII, Merisier must establish (1) that she is a member of the protected class, (2) that she was qualified for the position, (3) that she was subject to an adverse employment decision, and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination. *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir. 2001). To state a cause of action for hostile work environment under Title VII, abusive conduct in the workplace must also be related to the plaintiff's membership in a protected class. *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999). "Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law." *Rissman v. Chertoff,* No. 08-CV-7352 (DC), 2008 WL 5191394, at *2 (S.D.N.Y. Dec. 12, 2008).

Merisier's complaint fails to state a claim under Title VII. In the instant complaint, Merisier has not identified herself as a member of a protected class, nor has she presented any facts indicating that she was discriminated against on that basis. The only potentially abusive behavior she reports is that an unidentified employee shoved her and that she faced disciplinary action as a result of the incident. She has not alleged that this treatment was based on her membership in a protected class.

Nothing in Merisier's complaint, as submitted, suggests that the different treatment she has experienced in her employment

was related to her membership in a protected class or that she was discriminated against on the basis of such membership. As Merisier has not adequately alleged that she was discriminated against on the basis of her membership in a protected class, the complaint, as filed, fails to state a claim for relief and must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

In light of Merisier's *pro se* status, the Court grants leave to file an amended complaint. In order to state a claim for employment discrimination pursuant to Title VII, she must allege that she is a member of a protected class and present facts that would support her claim that the harassment she faced was because of membership in that group. Because Merisier already has a complaint alleging racial discrimination in employment that remains pending, any claims asserted in a possible amended complaint in the instant action must not overlap with or duplicate the claims she asserted in her prior complaint.

## CONCLUSION

**\*3** For the reasons set forth above, the complaint is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B). Merisier is granted leave to file an amended complaint within 30 days from the date of this Order. The new complaint should be captioned as an "Amended Complaint," and bear the same docket number as this Order. Any amended complaint completely replaces the original complaint. No summons shall issue at this time, and all further proceedings shall be stayed for 30 days. Failure to plead sufficient facts in the amended complaint to give rise to a claim will result in dismissal of this action, and, if Merisier fails to file an amended complaint within 30 days, judgment shall enter. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully directed to send Merisier a copy of this order, together with a form complaint for employment discrimination actions, and note the mailing on the docket.

SO ORDERED.

2017 WL 4857565

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4857565

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

2017 WL 4417751

2017 WL 4417751
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'Drea FOX, Plaintiff,

v.

ALBANY MEDICAL CENTER, et al., Defendants.

Civil Action No. 1:17-CV-0798 (TJM/DEP)
|
Signed 09/11/2017

**Attorneys and Law Firms**

K'DREA FOX, 37 Mohawk Avenue, Waterford, NY 12188,
Pro se.

REPORT, RECOMMENDATION, AND ORDER

David E. Peebles, U.S. Magistrate Judge

**\*1** This is an action brought by *pro se* plaintiff K'Drea
Fox against defendant Albany Medical Center ("AMC") and
five individuals pursuant to Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title
VII"), alleging employment discrimination and retaliation.
Plaintiff's complaint and accompanying application for leave
to proceed *in forma pauperis* ("IFP") have been forwarded to
me for review. For the reasons set forth below, plaintiff's IFP
application is granted, and I recommend that each of plaintiff's
claims be dismissed, with the exception of her Title VII
retaliation cause of action asserted against defendant AMC.

I. BACKGROUND

Plaintiff commenced this action on July 20, 2017. Dkt. No.
1. In her complaint, which is prepared on a pre-printed form
generated for use in Title VII actions, plaintiff alleges that she
was employed by defendant AMC initially in August 2014
as a sterile processing associate, and was later transferred
into the AMC Pharmacy Department in or about March 2016.
Dkt. No. 1 at 3. While in the Pharmacy Department, plaintiff
was harassed and retaliated against and, after requesting a
meeting with the company's new human resources director
to complain of the harassment, was demoted and subjected
to further harassment. *Id.* The complaint also alleges that
plaintiff was sent home in the middle of a shift for not
following department protocol, a disciplinary action to which

other employees had not been subjected for similar conduct,
and was suspended from her job on April 29, 2016. *Id.*
Plaintiff's employment was ultimately terminated on May 9,
2016. *Id.*

Plaintiff's complaint contains two causes of action. In the first,
she alleges discrimination on the basis of race and sex and
the existence of a hostile work environment based on her sex.
Dkt. No. 1 at 3. Plaintiff's second claim asserts a retaliation
claim for seeking to file a formal complaint regarding the
discrimination and harassment. *Id.* at 4. As relief, plaintiff
seeks compensatory and punitive damages. *Id.* at 5.

Plaintiff's complaint was accompanied by an application for
leave to proceed without prepayment of fees and costs. Dkt.
No. 2. The application reflects that plaintiff is not currently
receiving income from any source and is indebted to several
creditors. *Id.*

II. DISCUSSION

A. IFP Application
When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $400, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed IFP if it determines that she
is unable to pay the required filing fee. 28 U.S.C. § 1915(a)
(1). [1] In this instance, because I conclude that plaintiff meets
the requirements for IFP status, her application for leave to
proceed without prepayment of fees is granted. [2]

[1]    The language of that section is ambiguous, in that
       it suggests an intent to limit availability of IFP
       status to prison inmates. *See* 28 U.S.C. § 1915(a)
       (1) (authorizing the commencement of an action
       without prepayment of fees "by a person who
       submits an affidavit that includes a statement of
       all assets such prisoner possesses"). Courts have
       construed that section, however, as making IFP
       status available to any litigant who can meet the
       governing financial criteria. *Hayes v. United States,*
       71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *see also*
       *Fridman v. City of N.Y.,* 195 F. Supp. 2d 534, 536
       n.1 (S.D.N.Y. 2002).

[2]    Plaintiff is reminded that, although her IFP
       application has been granted, she will still be

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 138 of 235

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

2017 WL 4417751

required to pay fees incurred in this action, including copying and/or witness fees.

### B. Sufficiency of Plaintiff's Complaint

#### 1. Standard of Review

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in her complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by applicable requirements of the Federal Rules of Civil Procedure. Specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

#### 2. Analysis

##### a. Title VII Claims Asserted
##### Against the Individual Defendants

**\*3** Plaintiff's claims are asserted pursuant to Title VII. Dkt. No. 1 at 2. As defendants, plaintiff not only names her former employer, the AMC, but also five individual defendants. *Id.* at 1. It is well established, however, that "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) (quotation marks omitted). Accordingly, I recommend that plaintiff's claims against the individual defendants in this action be dismissed.

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 139 of 235

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

2017 WL 4417751

#### b. Discrimination Claims Asserted Against Defendant AMC

To state a *prima facie* case of discrimination under Title VII, a complaint must allege that (1) the plaintiff belongs to a protected class; (2) she is qualified for the position at issue; (3) her employment was terminated, or she suffered some other form of adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004). In this case, plaintiff's complaint is lacking in allegations plausibly linking the adverse actions complained of—including being sent home in the middle of a shift, being stripped of duties or demoted, and ultimately having her employment terminated—to either plaintiff's sex or race. Accordingly, I recommend that plaintiff's Title VII discrimination claim be dismissed.

To assert a cognizable Title VII hostile work environment claim, a complaint must allege facts plausibly suggesting that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [plaintiff]'s employment and create an abusive environment." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010). In addition, "it is axiomatic" that the defendants' conduct "occurred because of [plaintiff's protected status]." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Once again, in this case, while plaintiff alleges harassment, there is nothing in her complaint to link the harassment she experienced with any protected classification. Accordingly, I recommend that plaintiff's hostile work environment claim be dismissed as well.

#### c. Retaliation

Plaintiff's second cause of action alleges retaliation. Dkt. No. 1 at 4. In order to plead a cognizable claim of retaliation, plaintiff must advance non-conclusory allegations that (1) she engaged in protected activity; (2) the defendants were aware of the activity; (3) the defendants took adverse action against the plaintiff; and (4) there is a causal connection with the protected activity and the adverse action. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). In this case, in light of my obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint alleges sufficient facts to survive review under section 1915(e) concerning plaintiff's retaliation claim.[3]

Accordingly, I recommend that defendants be directed to answer plaintiff's complaint with respect to the retaliation claim only.

[3]      In rendering this finding, I express no opinion as to whether plaintiff's retaliation claim can withstand a properly filed motion to dismiss.

#### C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

**\*4** In this case, I find that plaintiff's Title VII claims asserted against the individual defendants are not legally cognizable, and no better pleading can cure this defect. I therefore recommend that plaintiff not be permitted to amend her complaint to assert claims against individual defendants under Title VII. The defects discussed above with respect to plaintiff's discrimination and hostile work environment claims, however, could possibly be cured with better pleading. For that reason, I recommend that leave to amend be granted with regard to those claims.

If plaintiff chooses to file an amended complaint, she should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany

**Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)**

2017 WL 4417751

of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

## III. SUMMARY, ORDER, AND RECOMMENDATION

Because plaintiff has demonstrated entitlement to IFP status, her application for leave to proceed without prepayment of fees is granted. Turning to the allegations in plaintiff's complaint, while I find that plaintiff's retaliation cause of action should survive review under section 1915(e), the complaint otherwise fails to support a cognizable discrimination or hostile work environment claim. Based upon the foregoing it is hereby

ORDERED that plaintiff's application for leave to proceed without prepayment of fees (Dkt. No. 2) is GRANTED; and it is further respectfully

RECOMMENDED as follows:

(1) All of plaintiff's Title VII claims asserted against the individual defendants in this action be DISMISSED without leave to replead;

(2) Plaintiff's Title VII discrimination and hostile work environment claims asserted against defendant Albany Medical Center be DISMISSED with leave to replead; and

(3) In the event plaintiff does not avail herself of the opportunity to file an amended complaint, the case proceed only with respect to plaintiff's Title VII retaliation claim asserted against defendant Albany Medical Center.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [4] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[4]     If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*5** The clerk of the court shall serve a copy of this order on plaintiff in accordance with the court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4417751

---

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 141 of 235

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

2017 WL 4417679

2017 WL 4417679
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'Drea FOX, Plaintiff,

v.

ALBANY MEDICAL CENTER, et al., Defendants.

1:17-CV-0798 (TJM/DEP)
|
Signed 10/03/2017

**Attorneys and Law Firms**

K'Drea Fox, Waterford, NY, pro se.

### DECISION & ORDER

Thomas J. McAvoy, Senior, U.S. District Judge

### I. INTRODUCTION

**\*1** This *pro se* employment action was referred to the Hon.
David E. Peebles, Chief United States Magistrate Judge.
In his September 11, 2017 Report, Recommendation and
Order, Magistrate Judge Peebles granted plaintiff's *in forma
pauperis* application and, after conducting a 28 U.S.C. §
1915(e) initial review, recommended that:

> (1) All of plaintiff's Title VII claims asserted against
> the individual defendants in this action be DISMISSED
> without leave to replead;

> (2) Plaintiff's Title VII discrimination and hostile work
> environment claims asserted against defendant Albany
> Medical Center be DISMISSED with leave to replead; and

> (3) In the event plaintiff does not avail herself of the
> opportunity to file an amended complaint, the case proceed
> only with respect to plaintiff's Title VII retaliation claim
> asserted against defendant Albany Medical Center.

Ord., Rep. & Rec., dkt. # 5, p. 13 (dkt. # 5).

Magistrate Judge Peebles also informed Plaintiff that any
amended complaint will "replace the existing complaint, and

must be a wholly integrated and complete pleading that does
not rely upon or incorporate by reference any pleading or
document previously filed with the court." Id. p. 12 (citing
Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d
Cir. 1994) ("It is well established that an amended complaint
ordinarily supersedes the original, and renders it of no legal
effect.")).

Plaintiff did not file objections to the Report,
Recommendation and Order [dkt. # 5], and the time to do so
has expired. However, Plaintiff filed an amended complaint
which include claims only against Albany Medical Center.
See dkt. # 6.

### II. DISCUSSION

After examining the record, this Court has determined that the
Report, Recommendation and Order is not subject to attack
for plain error or manifest injustice.

### III. CONCLUSION

Accordingly, the Court **ADOPTS** the Report,
Recommendation and Order [dkt. # 5] for the reasons stated
therein. Thus, it is hereby

**ORDERED** that

> (1) All of plaintiff's Title VII claims asserted against
> the individual defendants named in the complaint are
> DISMISSED without leave to replead, and the individual
> defendants are terminated from this action;

> (2) Plaintiff's Title VII discrimination and hostile work
> environment claims asserted in the complaint against
> defendant Albany Medical Center are DISMISSED with
> leave to replead; and

> (3) Plaintiff's amended complaint [dkt. # 6] is referred to
> Magistrate Judge Peebles for a 28 U.S.C. § 1915(e) initial
> review.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4417679

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3647288
Only the Westlaw citation is currently available.
<u>For Online Publication Only</u>
United States District Court, E.D. New York.

Thomas J. CHISHOLM, II, Plaintiff,
v.
Patrick STRYKER, et al., Defendants.

22-CV-2705 (JMA) (SIL)
|
Signed August 24, 2022

**Attorneys and Law Firms**

Thomas J. Chisholm, II, West Babylon, NY, Pro Se.

**MEMORANDUM & ORDER**

AZRACK, United States District Judge:

**\*1** Before the Court is the renewed <u>in forma pauperis</u> application filed by Thomas J. Chisholm, II ("Plaintiff") pursuant to the Court's July 12, 2022 Order. (ECF Nos. 9-10.) Upon review, the Court finds that Plaintiff's reported financial position qualifies him to proceed with this action without prepayment of the filing fee. Accordingly, the Court grants Plaintiff's renewed <u>in forma pauperis</u> application. However, for the reasons that follow, the Court finds that Plaintiff has not set forth a plausible claim for relief. Accordingly, the amended complaint is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

**I. Background**

**A. Relevant Procedural History**
Plaintiff's amended complaint names Patrick Stryker, as CEO of A.B.C. Employment Agency ("Stryker"), the A.B.C. Employment Agency ("the Agency"), and Woodcrest Estates ("Woodcrest" and collectively, "Defendants") as Defendants and is submitted on the Court's complaint form for employment discrimination claims with an additional nine-typed pages and includes a copy of the Determination and Notice of Rights from the U.S. Equal Employment Opportunity Commission ("EEOC"). (ECF No. 7.) Plaintiff checked the box on the form to allege that his claims are brought pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII")

as well as other unspecified federal, state, and city or county laws. (<u>Id.</u> at ¶ II.) Plaintiff also checked the boxes on the form to allege that, during the period from September 27, 2020 to September 29, 2020, his employment was terminated, he suffered unequal terms and conditions of his employment, and that the Defendants retaliated against him on account of his race and color, which Plaintiff alleges is African-American. (<u>Id.</u> ¶¶ III.) According to the amended complaint, Plaintiff filed a charge with the EEOC on or about December 21, 2020 and he received a Notice of Right to Sue on February 14, 2022. (<u>Id.</u> ¶ IV and at 17-18.)

**B. The Amended Complaint** [1]

[1] The following facts are taken from the amended complaint and are presumed to be true for the purposes of this Memorandum and Order.

This action arises from the termination of Plaintiff's temporary job placement as a Maintenance Mechanic at Woodcrest. (<u>Id.</u> at 8 and <u>in toto</u>.) According to the amended complaint, Stryker, as "C.E.O./President" of the Agency, phoned Plaintiff on September 3, 2020 and offered him the position and explained that the temporary position could become permanent if Plaintiff "worked hard, arrived on time and was capable of the assignments." (<u>Id.</u> at 8, 13.) Plaintiff alleges that he "performed a stellar job every day", was "early every single day and approach[ed] each assignment with pride and respect for my co-workers and important residents who lived [at Woodcrest]. (<u>Id.</u> at 9, 14.) Plaintiff alleges that in the short time he was employed, he had "befriended" a few unidentified residents who Plaintiff claims expressed "surprise[ ] that a Black man was even hired at Woodcrest and to be very careful because they believed Woodcrest staff was partial to such or it seems so." (<u>Id.</u>)

**\*2** Approximately three weeks into Plaintiff placement at Woodcrest, on or about September 27, 2020, Plaintiff was assigned to accompany the on-site superintendent "Raul" to change out a refrigerator from an apartment unit. (<u>Id.</u>) When Plaintiff and Raul arrived with the new refrigerator at the door of the apartment, there was a "Red Dot" which Plaintiff alleges was a signal for "no entry" while the occupant was not at home. (<u>Id.</u>) After no one answered the doorbell, Plaintiff claims he suggested to Raul that they not enter and return when the resident was at home. According to the amended complaint, Raul insisted that they enter and complete the task since Raul had the key. (<u>Id.</u>) Once inside, Plaintiff describes that Raul removed the contents from the old refrigerator and placed them in the sink and on the counters causing other

items such as pictures, calendars, and other papers to be "strewn about." (Id.) The old refrigerator was dismantled and removed and the new one was installed at which time Plaintiff and Raul left. (Id.)

Shortly thereafter, the resident of that unit "flagged" Plaintiff and Raul down, yelled and cursed at them, and questioned why they had entered her apartment without permission. (Id. at 10.) She further complained that the doors of the new refrigerator were installed incorrectly and that a "crystal figurine that her deceased husband collected and left to her [was] suddenly missing." (Id.) The resident then contacted the property manager, Mary Schultz, who instructed Plaintiff and Raul to come to the office where she allegedly expressed her belief that they did not take the figurine. (Id.) The next day, while Plaintiff and Raul were together in a truck, Mary called Raul and Plaintiff allegedly overheard her tell Raul to come to the office but to leave Plaintiff "behind in the shop." (Id.) While Raul and Mary were meeting, Plaintiff alleges he took "a 2 hour lunch" break. (Id. at 10-11.)

Later that day, at approximately 6 or 7 p.m., Stryker called Plaintiff and informed him that he would no longer be working at Woodcrest. (Id. at 11.) When Plaintiff questioned Stryker, the amended complaint alleges that Stryker told Plaintiff that "it has something to do with a figurine." (Id.) When Plaintiff protested, Stryker alleged told Plaintiff it is also because "you have no driver's license." (Id.) When Plaintiff objected and reminded Stryker that Plaintiff had emailed a copy of his driver's license and Social Security card prior to commencing his employment, Plaintiff alleges that Stryker "became more upset." (Id.) Plaintiff alleges that he then told Stryker that his rights were being violated and that he believes his termination is "because of [his] African American status." (Id. at 12.)

For relief, Plaintiff seeks the termination of employment of Schultz and Raul "if [they are] still employed" as well as $5 million from each Defendant and additional punitive damages and any other relief "deemed just and proper by this honorable institution." (Id. ¶ V at 6.)

## II. Discussion

### A. *In Forma Pauperis* Application
Upon review of Plaintiff's declaration in support of his renewed application to proceed *in forma pauperis*, the Court finds that Plaintiff is qualified to commence this action without prepayment of the filing fee. 28 U.S.C. § 1915(a)(1).

Therefore, Plaintiff's renewed application to proceed *in forma pauperis* is granted.

### B. Standard of Review
The in forma pauperis statute requires that a court dismiss an action if it determines that it "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). The Court must dismiss the action as soon as it makes such a determination.

Pro se submissions are afforded wide interpretational latitude and should be held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam); see also Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997). In addition, the court is required to read a plaintiff's pro se amended complaint liberally and interpret it as raising the strongest arguments it suggests. United States v. Akinrosotu, 637 F.3d 165, 167 (2d Cir. 2011) (per curiam) (citation omitted).

**\*3** The Supreme Court has held that pro se complaints need not even plead specific facts; rather the complainant "need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotation marks and citations omitted); cf. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). However, a pro se plaintiff must still plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678. While " 'detailed factual allegations' " are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Id. at 678 (quoting Twombly, 550 U.S. at 555).

### C. Title VII
Title VII makes it an unlawful for an employer to refuse to hire, discharge, or otherwise discriminate against any individual with respect to employment because of such individual's race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1). In order to state a claim for

employment discrimination under Title VII, a plaintiff must allege (1) that he is a member of a protected class, (2) that he was qualified for the position at issue, (3) that he suffered an adverse employment action, and (4) that the circumstances give rise to an inference of discriminatory motivation. Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); see Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78 (2d Cir. 2015) ("[I]n a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, or national origin was a motivating factor in the employment decision."). While plaintiff is not required to demonstrate a prima facie case of discrimination at the pleading stage, he must allege facts that "give plausible support to a *minimal* inference of discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original).

The "sine qua non of a ... discriminatory action claim under Title VII is that the discrimination must be *because of*" the employee's protected characteristic. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam) (emphasis in original). Accordingly, a claim for discrimination under Title VII is properly dismissed where the plaintiff fails "to plead any facts that would create an inference that any adverse action taken by any defendant was based upon" the protected characteristic. Id. Here, as is readily apparent, Plaintiff has not alleged any facts from which the Court could reasonably construe circumstances surrounding the termination of Plaintiff's employment that give rise to an inference of discrimination. Indeed, Plaintiff acknowledges that his employment was "temporary" and alleges no facts suggesting that any of the Defendants' actions were motivated at all by Plaintiff's race. (ECF No. 7 at 8, 13 and in toto.)

Courts in this Circuit have routinely dismissed discrimination claims where the plaintiff's allegations, like here, fail to suggest discriminatory intent. See, e.g., Pantane, 508 F.3d at 112 & 112 n. 3 (finding that the district court correctly noted that "[p]laintiff failed to allege even the basic elements of a discriminatory action claim."); Lucas v. Apple Food Serv. of New York, LLC, No. 15-CV-4007(SJF)(AKT), 2015 WL 6507495, at *3 (E.D.N.Y. Oct. 27, 2015) (finding "the complaint fails to plead any facts linking defendant's conduct, i.e., the suspension of plaintiff without pay for two (2) weeks and termination of her employment, to plaintiff's race, color, gender, religion or pregnancy, or supporting a reasonable inference that defendant discriminated against plaintiff because of those protected characteristics.") (citing

Hedges v. Town of Madison, 456 F. App'x 22, 24 (2d Cir. Jan.13, 2012) (summary order) (affirming dismissal, inter alia, of the plaintiff's ADA claim on the basis that he "ha[d] not adequately pleaded discrimination on the basis of disability" because he "alleg[ed] not a single fact in support of his claims of discriminatory treatment which might conceivably give notice of the basis of his claims to the defendants"); Berkery v. Archdiocese of Hartford, 352 F. App'x 487, 490 (2d Cir. 2009) (summary order) (affirming dismissal of the plaintiff's ADA claim because the complaint presented no allegations linking the defendant's employment decision to the plaintiff's disability or supporting an inference of disability discrimination); Samuel v. Bellevue Hosp. Ctr., 366 F. App'x 206, 207 (2d Cir. Feb.17, 2010) (summary order) (affirming dismissal of the plaintiff's employment discrimination claim on the basis that he "failed to allege sufficient facts to render plausible his conclusory assertion that the defendants discriminated against him on the basis of his membership in a protected class.")); see also Maldonado v. George Weston Bakeries, 441 F. App'x 808, 808-09 (2d Cir. 2011) (summary order) (affirming dismissal of pro se complaint where plaintiff alleged that other employees involved in similar altercations were given preferential treatment, but did not allege that this preferential treatment was due to race or age); Kouakou v. Fideliscare N.Y., 920 F. Supp. 2d 391 (S.D.N.Y. 2012) (dismissing pro se complaint where comments alleged in complaint did "not create an inference that the denial of [p]laintiff's requested transfer were motivated by his race or national origin, particularly where [p]laintiff [did not allege that employer granted transfer requests of similarly situated employees outside of plaintiff's racial group]"); Palmer v. Safetec of Am., Inc., No. 11-CV-702, 2012 WL 2994060, at *7 (W.D.N.Y. May 31, 2012) (report and recommendation) (dismissing complaint where plaintiff "fail[ed] to allege any facts that could plausibly be construed as establishing [that] Plaintiff's discharge was based on his membership in any of the protected classes [at issue]," and noting that plaintiff failed "to identify or to otherwise specify" employees outside of plaintiff's protected classes who received preferential treatment or engaged in similar misconduct); adopted by 2012 WL 2994057 (W.D.N.Y. July 20, 2012).

*4 Given that absence of any facts suggesting that the termination of Plaintiff's temporary employment was motivated, even in part, by discriminatory animus, he has not alleged a plausible claim for relief. Nor has Plaintiff alleged that others were treated more favorably, including Raul, whose employment status is apparently unknown to

Plaintiff. (See ECF No. 7 at ¶ V.) Accordingly, the amended complaint is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). [2]

[2] In addition, it is long established that individuals are not subject to liability under Title VII. See Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004); Jones-Khan v. Westbury Bd. of Educ., No. 21-CV-3908(JMA)(JMW), 2022 WL 280646, at *7 (E.D.N.Y. Jan. 31, 2022) (dismissing Title VII claims against individual defendants because there is no individual liability under Title VII); Gioia v. Singh, No. 20-CV-4014(JMA)(SIL), 2021 WL 602701, at *2 (E.D.N.Y. Feb. 16, 2021) (" 'Title VII does not impose liability on individuals.' ") (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)) (add'l citation omitted). Accordingly, Plaintiff's Title VII claim against Stryker is not plausible and is dismissed for this additional reason.

### D. State Law Claims

Although Plaintiff does not include any other laws apart from Title VII in the amended complaint, he did, however, check the boxes on the form to allege that his claims are also brought pursuant to unspecified other federal, state, and local laws. (ECF No. 7 at 4.) The Court presumes that Plaintiff intends to assert discrimination claims under the New York State Human Rights Law, N.Y. Executive Law § 296 ("NYSHRL"). Discrimination claims under the NYSHRL are analyzed under the same framework and pleading standard as Title VII claims. See, e.g., Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n. 1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims brought under Title VII [and] ...New York Executive Law § 296 [NYSHRL] ..."). Accordingly, for the reasons set forth above, Plaintiff has not alleged a plausible claim under the NYSHRL either and any such claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

With regard to any other remaining state law claims, under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, courts "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims

over which it has original jurisdiction." Id. § 1367(c); (c)(3); see Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011). The Supreme Court explained: "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, given the absence of a viably pled federal law claim, the interests of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction at this time over any other state law claims that may be reasonably construed from the amended complaint. Accordingly, the Court declines to exercise supplemental jurisdiction over any other potential state-law claims contained in Plaintiff's amended complaint, apart from the NYSHRL claim which the Court has already dismissed, and thus dismisses any such claims without prejudice.

### E. Leave to Amend

**\*5** A pro se plaintiff should ordinarily be given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). Here, the Court has carefully considered whether Plaintiff should be granted leave to amend his complaint. In an abundance of caution, Plaintiff is granted leave to file a second amended complaint in accordance with this Memorandum and Order. Plaintiff shall: (1) clearly label his submission "Second Amended Complaint"; (2) include the same docket number as this Order, 22-CV-2705(JMA)(SIL); and (3) file it within thirty (30) days from the date of this Order. Plaintiff is cautioned that the second amended complaint will completely replace the present amended complaint and, therefore, he must include all claims against any Defendants he seeks to pursue in the second amended complaint and shall include factual allegations concerning the challenged conduct pertaining to each Defendant. If Plaintiff does not file a second amended complaint within the time allowed, judgment shall enter and this case will be closed.

Plaintiff is encouraged to consult with the Hofstra Law Pro Se Clinic located in the Central Islip Courthouse, which can provide free information, advice, and limited scope legal

2022 WL 3647288

assistance to non-incarcerated pro se litigants. The Court notes that the Pro Se Clinic is not part of, nor affiliated with, the United States District Court. The Clinic offers services such as: providing brief legal counseling; advising you about potential federal claims prior to filing suit; explaining federal court rules and procedures; and reviewing and editing draft pleadings. Consultations with the Pro Se Clinic can be conducted remotely via telephone. If you wish to contact the Pro Se Clinic to make an appointment, email them at PSLAP@Hofstra.edu or leave a message at (631) 297-2575.

**III. Conclusion**

For the forgoing reasons, the Plaintiff's renewed application to proceed in forma pauperis is granted. However, Plaintiff's amended complaint is dismissed sua sponte in its entirety without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii) for failure to state a claim for relief. Plaintiff is granted leave to file a second amended complaint in accordance with this Memorandum and Order. If Plaintiff elects to further amend his complaint, he shall clearly label his submission "Second Amended Complaint," include the same docket number as this Order, 22-CV-2705(JMA)(SIL), shall file

it within thirty (30) days from the date of this Order. Plaintiff is cautioned that the second amended complaint will completely replaces the prior complaints. Therefore, Plaintiff must include all claims against any Defendants he seeks to pursue in the second amended complaint. If Plaintiff does not file an amended complaint within the time allowed, judgment shall enter and this case will be closed.

The Court declines to exercise supplemental jurisdiction over any remaining state law claims alleged in the complaint and therefore the state law claims are dismissed without prejudice. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3647288

---

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4291371

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Roy WEEKES, Plaintiff,

v.

JETBLUE AIRWAYS CORPORATION,

Frank Ayala and Warren Green, in their

official and individual capacities, and John

Doe and Jane Doe, individually, Defendants.

21-CV-1965 (MKB)

|

Signed September 16, 2022

**Attorneys and Law Firms**

Tisha M. Jackson, Law Office of Tisha Jackson, New York, NY, for Plaintiff.

Raymond Joseph Berti, Akerman LLP, New York, NY, for Defendants Jetblue Airways Corporation, Frank Ayala, Warren Green.

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge:

**\*1** Plaintiff Roy Weekes commenced the above-captioned action on November 24, 2020, against JetBlue Airways Corporation ("JetBlue"), Frank Ayala and Warren Green in their official and individual capacities, and John and Jane Doe individually, in New York State Supreme Court, Kings County, alleging claims of discrimination, retaliation, failure to provide reasonable accommodations, and negligent and intentional infliction of emotional distress. (Summons & Compl., annexed to Notice of Removal as Ex. A, Docket Entry No. 1-1.) JetBlue, Ayala, and Green removed the action to the Eastern District of New York on April 12, 2021. (Notice of Removal, Docket Entry No. 1.) On July 9, 2021, Plaintiff filed an amended complaint alleging that Defendants discriminated and retaliated against him based on his age, race, gender, and disability and failed to provide reasonable accommodations in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") [1] ; the New

York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"). (Am. Compl. ¶¶ 1–2, Docket Entry No. 14.) Plaintiff also brings aiding and abetting claims under the NYSHRL and NYCHRL, interference claims under the NYCHRL, and state law claims of negligent and intentional infliction of emotional distress ("NIED" and "IIED," respectively). (Id. ¶¶ 228–31, 246–53, 278–80.)

[1]   Plaintiff subsequently withdrew his cause of action under the ADEA. (Pl.'s Opp'n to Defs.' Mot. 1 n.1, Docket Entry No. 21.) However, he maintains his age discrimination and hostile work environment claims under the NYSHRL and NYCHRL.

Defendants move to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiff opposes the motion. [2] For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

[2]   (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 23; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 23-1; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 21; Defs.' Reply Mem. in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 24.)

**I. Background**

**a. The parties**

Plaintiff is an African-American male who is over sixty years old and has suffered from asthma for over thirty years. [3] (Am. Compl. ¶¶ 40–43.) On or about October 9, 2007, Plaintiff was hired by JetBlue as a Grounds Operations employee. (Id. ¶ 44.) Plaintiff loaded and offloaded bags and luggage onto and off aircraft, worked in the "bag room," and performed "lavatory and water services." (Id. ¶¶ 44–45.) Plaintiff was recognized by JetBlue for his work and was awarded one of JetBlue's "Lift Awards" for his "exceptional" work performance in 2017, 2018, and 2019. (Id. ¶ 49.) Plaintiff "readily assisted other employees and volunteered for duties and responsibilities requested by some of his supervisors and managers." (Id. ¶ 50.) He never received any warnings or suspensions. (Id.)

3      The Court assumes the truth of the factual allegations in the Amended Complaint for the purposes of this Memorandum and Order.

**\*2** JetBlue is "the seventh largest airline in the United States by passengers carried." (*Id.* ¶ 11.) It operates over 1,000 flights daily and serves 100 domestic and international destinations in the United States, Mexico, the Caribbean, Central America, and South America. (*Id.*) JetBlue's principal place of business is in Long Island City, New York. (*Id.* ¶ 10.) Ayala was a manager at JetBlue with managerial and/or supervisory responsibilities over Plaintiff during all relevant times. (*Id.* ¶¶ 18–22, 24–26.) Ayala worked as a Manager for Drug & Alcohol Compliance. (*Id.* ¶ 23.) Green was the Manager of Ground Operations at JetBlue with managerial and/or supervisory responsibilities over Plaintiff during all relevant times. (*Id.* ¶¶ 27–35.)

**b. October 15, 2019 incident and breathalyzer tests**

On October 15, 2019, Plaintiff was working in the bag room handling bags on Belt #4. (*Id.* ¶ 52.) At approximately 10 PM, as Plaintiff was driving out of the bag room to deliver bags to the aircraft, one of the bag doors malfunctioned on Belt #4. (*Id.* ¶ 53.) The door to the bag room had been malfunctioning for weeks and Plaintiff did not cause the accident. (*Id.* ¶ 54.) Plaintiff believes that JetBlue was aware of the malfunctioning door but did not take steps to properly fix it. (*Id.*) Plaintiff immediately reported the incident to Loudes Torres, JetBlue's Supervisor of Ground Operations. (*Id.* ¶ 55.)

At approximately 10:30 PM, Harold Pettiton, JetBlue's Supervisor of Safety, met with Plaintiff and took him to his office. (*Id.* ¶ 56.) Pettiton informed Plaintiff that in compliance with JetBlue's drug testing policies and procedures, Plaintiff had to take a drug test and Pettiton had to call someone to administer the test. (*Id.* ¶¶ 57–58.) Plaintiff contends that he was "not the subject of a random drug test" and that his drug test should have been conducted in accordance with the post-accident regulations, policies, and procedures maintained by JetBlue and mandated by the United States Department of Transportation (the "DOT"). (*Id.* ¶¶ 59–60.) Plaintiff informed Pettiton that he did not drink any alcohol or use any drugs and that the door for the bag room "simply malfunctioned." (*Id.* ¶ 63.)

At approximately 11:15 PM, Joyce Lall, an "employee, contractor, independent contractor, and/or agent of JetBlue" arrived to perform the drug test. (*Id.* ¶¶ 64–65.) Lall requested that Plaintiff take a "breathalyzer" test. (*Id.* ¶ 68.) Plaintiff fully complied but had difficulty blowing into the breathalyzer because he was asthmatic and suffering from severe nasal and sinus polyps. (*Id.* ¶¶ 69–72.) Plaintiff informed Lall that he was having difficulty breathing and was scheduled to have surgery the following day, October 16, 2019. (*Id.* ¶ 71.) Plaintiff then told Lall that his chest was tightening and asked whether there was another way that he could take the test, since JetBlue's and DOT's drug testing policies allow alcohol tests to be performed by either saliva or breath. (*Id.* ¶¶ 74–75.) Lall observed Plaintiff's "physical distress" while taking the breathalyzer test. (*Id.* ¶ 76.) Lall called Ayala, who was the Manager for Drug & Alcohol Compliance, and left the room to speak with Ayala in private for about three to five minutes. (*Id.* ¶¶ 77–78.) Lall then returned to the room and told Plaintiff that Ayala wished to speak with him. (*Id.*)

Plaintiff informed Ayala that he did not use any alcohol or illegal drugs, that he was asthmatic, and that he "was coughing, having difficulty breathing, and his chest was tightening." (*Id.* ¶¶ 79–80.) Plaintiff asked Ayala whether he could take the breathalyzer test another way. (*Id.* ¶ 81.) He also informed Ayala that he was scheduled to have surgery the next day. [4] (*Id.*) Ayala "completely and summarily refused to discuss ... any other methods of testing and dismissively told Plaintiff" that if he could not blow into the breathalyzer, they would "just have to part ways." (*Id.*) Plaintiff alleges that Ayala treated him in a "dismissive and hostile manner" and "refused to engage Plaintiff in any dialogue regarding the existence of an alternative form of testing." (*Id.* ¶¶ 82–83.)

4      Plaintiff alleges that he was scheduled to have surgery "later that day," but the Court presumes that this is an error, as Plaintiff otherwise indicates that he was scheduled to have surgery the following day, and underwent surgery on October 16, 2019. (Am. Compl. ¶¶ 81, 94, 111.)

**\*3** Lall performed the test on Plaintiff twice, but due to Plaintiff's asthma, he had difficulty blowing enough air into the breathalyzer. (*Id.* ¶ 84.) Lall called Ayala again and left the room for five minutes. (*Id.* ¶ 85.) She then returned to the room. (*Id.*) Ayala informed Lall that she had to administer the breathalyzer test three times. (*Id.* ¶ 86.) Plaintiff asked Lall if he could take the test in another way but she stated that she

"only had the equipment for the breathalyzer" and that "he had only one more chance to pass the test." (*Id.* ¶ 87.) Plaintiff had difficulty blowing enough air into the breathalyzer for the third test. (*Id.* ¶ 88.) Defendants did not "document or observe any signs of intoxication such as slurred speech." (*Id.* ¶ 176.)

After Plaintiff took the breathalyzer test three times, Lall requested that Plaintiff take a urine test, which came back negative. (*Id.* ¶¶ 89–90.) Despite this, Ayala immediately suspended Plaintiff and told him that he should not report back to work until further notice. (*Id.* ¶¶ 91–92.) Ayala informed Plaintiff that he would have to take a "shy lung" examination and that he would contact Plaintiff with information on where and when to take the shy lung examination. (*Id.* ¶ 93.)

On October 15, 2019, while turning in his employment credentials, Plaintiff was told by other supervisors that "they never heard of an employee being terminated with a negative 'pee' result." (*Id.* ¶ 189.)

#### c. Plaintiff's subsequent examination by JetBlue doctors

Plaintiff underwent outpatient surgery on October 16, 2019 for severe nasal and sinus polyps. (*Id.* ¶¶ 94, 110.) On or about October 22, 2019, Ayala told Plaintiff to make an appointment at the Concentra Newark New Jersey clinic (the "Clinic") for a shy lung exam. (*Id.* ¶ 95.) "Upon information and belief," the Clinic conducts alcohol and drug testing for JetBlue, has a contract or agreement to administer such testing for JetBlue, conducts other medical examinations of JetBlue employees for JetBlue, and has a contract or agreement to "provide medical care or perform medical examinations or medical reviews of JetBlue employees for JetBlue." (*Id.* ¶¶ 99–102.) Plaintiff explained that he was recovering from surgery and asked whether he could attend a testing facility or doctor's office closer to home. (*Id.* ¶ 96.) Ayala refused and directed Plaintiff to visit the Clinic, "which was in another state over two ... hours away" and which required him to take two trains and a bus. (*Id.* ¶ 97.)

On October 24, 2017, Plaintiff went to the Clinic but was told upon arriving that JetBlue had not scheduled or approved his appointment.[5] (*Id.* ¶¶ 103–04.) The Clinic called JetBlue to confirm that Plaintiff was sent there by the company to take a shy lung exam. (*Id.* ¶ 106.) Plaintiff waited for over an hour to see a doctor and then was examined by Dr. Purvee Patel. (*Id.* ¶¶ 108, 111.) Plaintiff provided her with documentation from his primary care doctor and surgeon advising of his asthma

and recent surgery for severe nasal and sinus polyps. (*Id.* ¶ 110.) Dr. Patel spoke to Plaintiff's surgeon. (*Id.* ¶ 111.) In her medical evaluation report to JetBlue, Dr. Patel noted that JetBlue should consider sending Plaintiff for an independent pulmonology examination. (*Id.* ¶ 120.) Dr. Patel also noted that JetBlue should consider repeating the breathalyzer test, but that there should not be any testing done for up to six to eight weeks due to Plaintiff's surgery on October 16. (*Id.* ¶ 121.) Plaintiff asked Dr. Patel for a complete copy of the medical report and findings, but Dr. Patel told Plaintiff that she would only give her report to JetBlue because they "were the ones paying her." (*Id.* ¶¶ 122–23.)

> 5      Plaintiff alleges that Ayala "deliberately failed to properly schedule" his appointment. (Am. Compl. ¶ 107.)

**\*4** Plaintiff claims that Ayala and JetBlue were required to provide the examining physician with "certain information and instructions." (*Id.* ¶¶ 111–14.) Plaintiff alleges that JetBlue and Ayala: (1) did not instruct Dr. Patel or the Clinic that Plaintiff was required to take a breathalyzer test but was unable to provide enough air to complete the test, (2) did not inform Dr. Patel of the consequences for a refusal to take the required alcohol test, and (3) did not ensure that Plaintiff was examined by a doctor with expertise in the medical issues raised by Plaintiff's inability to pass the breathing test, since Dr. Patel is a family medicine specialist rather than a doctor with an expertise in pulmonology or respiratory ailments. (*Id.* ¶¶ 115–19.) Plaintiff "never refused to participate or take any drug test or medical exam." (*Id.* ¶ 126.)

#### d. Plaintiff's medical documentation

Plaintiff provided JetBlue with additional documentation of his medical condition. (*Id.* ¶ 132.) By letter dated October 22, 2019, Plaintiff's doctor certified that he had been under medical care for asthma for thirty years (the "October 22 Letter"). (*Id.* ¶ 133.) At least twice, Plaintiff "had to be incubated for acute bronchial asthma." (*Id.*) The letter provided contact information for the doctor and noted that she could be reached if Defendants had any questions. (*Id.*) By letter dated October 23, 2019, Plaintiff's medical surgeon noted that he was "under his care for severe nasal/sinus polyps" and that due to Plaintiff's condition, he had been unable to complete the breathalyzer test administered on October 15 (the "October 23 Letter"). (*Id.* ¶ 134.) JetBlue and Ayala did not contact Plaintiff's doctors. (*Id.* ¶ 135.)

### e. Plaintiff's termination

On or about October 25, 2019, Plaintiff told Ayala that he "could not afford to lose [his] job ... so close to retirement." (*Id.* ¶ 136.) He expressed that he felt as though he was being treated unfairly and questioned why he was being singled out and treated differently from other colleagues who passed the urine test and were not terminated. (*Id.*) He told Ayala that he would reach out for help and report him. (*Id.*)

On or about October 27, 2019, Ayala called Plaintiff to inform him that he was going to be terminated and that he should expect a call from one of his supervisors. (*Id.* ¶ 137.) Plaintiff again stated that he did not use any alcohol or illegal drugs and had difficulty breathing due to asthma; he asked for a reasonable accommodation such as taking the test again or taking a different test. (*Id.* ¶¶ 137–39.)

The following day, Plaintiff received a call from Green, the Manager of Ground Operations, who told Plaintiff that he had spoken to Ayala and that Plaintiff would be fired. (*Id.* ¶ 145.) Plaintiff again explained the events of October 15, 2019, including his medical condition. (*Id.* ¶ 146.) Plaintiff asked Green to reconsider his termination, but Green refused. (*Id.* ¶¶ 148–50.) Plaintiff told Green that he was going to reach out to Crew Relations "because he felt that he was being treated unfairly" but Green did not "report or thoroughly investigate Plaintiff's claims of unfair treatment, discrimination, and harassment." (*Id.* ¶¶ 151–52.)

After his conversation with Green, Plaintiff reached out to several JetBlue departments to report that he was the subject of discrimination. (*Id.* ¶¶ 153–54.) Plaintiff also told both Ayala and Green that he was going to report the discriminatory conduct to human resources. (*Id.* ¶ 157.) On October 29, 2019, Plaintiff sent an email to JetBlue's "People Department" and Crew Relations, among others, informing them that he had been unable to complete the breathalyzer test because of his asthma and that his urine test had come back negative. (*Id.* ¶¶ 158, 161.) He also stated that his doctors had provided letters about his medical condition but that these letters had been ignored. (*Id.* ¶ 162.) No one contacted Plaintiff regarding his report and claims of discrimination. (*Id.* ¶ 164.)

**\*5** On November 1, 2019, JetBlue terminated Plaintiff for violation of company policy. (*Id.* ¶ 167.) Plaintiff received a letter from JetBlue dated November 7, 2019, stating:

> Recently you participated in a drug and/or alcohol test in accordance with the JetBlue Airways drug and alcohol compliance program. As you are aware, a physician's review could not establish a valid medical reason for your inability to provide a sufficient breath sample. This is considered a refusal to test.

(*Id.* ¶ 168.) The letter also provided contact information for a substance abuse professional. (*Id.*)

Plaintiff alleges that he was treated less favorably than other younger, white Ground Operations employees, such as Phil Patankoliau. [6] (*Id.* ¶ 179.) Plaintiff also alleges that other Ground Operations employees with Plaintiff's duties and responsibilities have been involved in similar vehicle accidents but were not held to "heightened scrutiny and discriminatory practices." (*Id.* ¶ 180.) Other employees, such as Emmanuel Tuner, were subjected to drug testing after a vehicle accident but were not terminated after passing the urine test. [7] (*Id.*)

[6]    Plaintiff does not allege comparable conduct by Mr. Patankoliau. (*See generally* Am. Compl.)

[7]    Plaintiff does not allege Mr. Tuner's race. (*Id.*)

### f. Post-termination actions

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 24, 2020 (the "EEOC Charge"), (*id.* ¶ 36), and received a Notice of Right to Sue on or about August 27, 2020, (*id.* ¶ 37). Plaintiff timely commenced the action within ninety days of receiving the Notice of Right to Sue. (*Id.* ¶ 38.) Plaintiff also served a copy of his Amended Complaint on the New York City Human Rights Commission and Corporation Counsel of the City of New York pursuant to New York City Administrative Code § 8-502(c). (*Id.* ¶ 39.) Plaintiff alleges that he was discriminated against because of his race,

age, gender, and actual and/or perceived disability. (*Id.* ¶¶ 182–85.) Plaintiff also claims that Defendants refused him a reasonable accommodation, such as conducting a saliva test. (*Id.* ¶¶ 199–200.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff's favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reins. Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). Although all allegations contained in the Amended Complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

### b. Discrimination claims under the ADA, Title VII, NYSHRL, and NYCHRL

**\*6** Defendants argue that Plaintiff's age, race, gender, and disability discrimination claims under the ADA, Title VII, NYSHRL, and NYCHRL should be dismissed because "Plaintiff does not plausibly allege any facts that even remotely suggest that he was terminated because of his membership in those classes." (Defs.' Mem. 8–11.) Further, Defendants argue that Plaintiff fails in his attempts to allege similarly-situated comparators because he fails to provide any further details about the comparators, including their ages, disabilities, employment histories and backgrounds, and supposedly preferential treatment. (*Id.* at 9–10.) Finally, Defendants argue that Plaintiff's discrimination claims should also be dismissed because from the face of the Amended Complaint, it is clear that JetBlue terminated Plaintiff based

on a "legitimate, non-discriminatory reason," namely Dr. Patel's determination that "Plaintiff had intentionally refused to complete the drug and alcohol test provided to him on October 15." (*Id.* at 11.)

Plaintiff contends that his claims for disability discrimination are actionable, as he has a disability as defined under the ADA, NYSHRL, and NYCHRL. (Pl.'s Opp'n 1–3.) He also argues that at all relevant times, "Defendants were aware that [Plaintiff] is a Black man over the age of [sixty]" and that how he was treated, including the difficulty he faced in pursuing his appointment at the Clinic, "reveals that his race, gender, and age were also motivating factors." (*Id.* at 11.) Plaintiff also argues that he was treated less favorably than his co-workers, including a "white[,] younger ground operation crew member" who was not held to heightened scrutiny.[8] (*Id.* at 17.)

[8]    Plaintiff does not provide additional information about the conduct and allegedly preferential treatment.

### i. ADA, NYSHRL, and NYCHRL disability discrimination claims

#### 1. ADA claim

To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010); *see Gorbea v. Verizon N.Y. Inc.*, No. 20-CV-3486, 2021 WL 4851389, at \*2 (2d Cir. Oct. 19, 2021) (listing the four requirements for a prima facie ADA case and quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam)); *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 643 (2d Cir. 2021) (same); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 48–49 (2d Cir. 2014) (outlining requirements for prima facie case under the ADA) (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record

of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include standing, lifting, bending, speaking, and working. *Id.* § 12102(2)(A). Under the EEOC's regulations, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA and 'is not meant to be a demanding standard.' " *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 n.3 (2d Cir. 2014) (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(i)). As a result, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)); *see Woolf*, 949 F.3d at 94 (noting that "the definition of 'disability' is not an exacting one").

**\*7** The parties do not dispute that (1) JetBlue is subject to the ADA; (2) Plaintiff suffers from a disability within the definition of the ADA, namely asthma; and (3) Plaintiff was qualified to perform the essential functions of his job, with or without reasonable accommodations. The Court therefore only considers the fourth prong, whether Plaintiff suffered an adverse employment action because of his disability.

Plaintiff has sufficiently alleged the causality element of a prima facie case. Plaintiff experienced adverse employment actions by being suspended and terminated. (Am. Compl. ¶¶ 91, 167); *see Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (holding that an adverse employment action for purposes of a discrimination claim is a "materially adverse change in the terms and conditions of employment" and includes "termination of employment, a demotion ..., [or] a less distinguished title"). Plaintiff has also plausibly alleged that he suffered these adverse employment actions because of his disability. He was unable to complete his mandatory breathalyzer test due to his asthma, told Lall and Ayala about his disability, and was suspended as a result of not being able to take the test. (Am. Compl. ¶¶ 70–71, 80–87, 91.) After being suspended, he was ordered to take a "shy lung" examination, which Plaintiff was ultimately unable to do because he could not perform spirometry or other breathing tests for several weeks following his surgery for nasal polyps. (*Id.* ¶¶ 91–93, 121.) Dr. Patel, the examining physician, recommended that Plaintiff be sent for an independent pulmonology examination and that JetBlue consider repeating the breathalyzer test after a few weeks. (*Id.* ¶¶ 120–21.) JetBlue refused to consider alternative options to the breathalyzer and terminated Plaintiff's employment. (*Id.*

¶¶ 138, 148–50.) As JetBlue stated in Plaintiff's termination letter, a "physician's review could not establish a valid medical reason for [his] inability to provide a sufficient breath sample" and this was "considered a refusal to test." (*Id.* ¶ 168.)

Plaintiff has met his burden of giving "plausible support to a minimal inference of discriminatory motivation," *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)). By alleging that he was suspended and fired because of his inability to take a breathalyzer test, he has sufficiently alleged that the "adverse action[s] [were] imposed because of [his] disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)). Further, "[t]erminating a disabled employee ... who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA." *Kinneary*, 601 F.3d at 156 (alterations in original) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000)).

### 2. NYSHRL and NYCHRL claims

Because Plaintiff has alleged a disability claim under the ADA, he has also alleged disability claims under the less demanding NYSHRL and NYCHRL.

Historically, discrimination claims under the NYSHRL were "largely subject to the same analysis [courts] apply under Title VII." *Reyes v. Westchester County Health Care Corp.*, No. 21-0410, 2021 WL 4944285, at *2 (2d Cir. Oct. 25, 2021) (citing *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)); *see Williams v. MTA Bus Co.*, No. 17-CV-7687, 2020 WL 1922911, at *5 (S.D.N.Y. Apr. 20, 2020) (same). However, in June of 2019, New York State amended the NYSHRL, "the effect of which is to render the standard for claims [brought under the NYSHRL] closer to the standard under the NYCHRL."[9] *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019); *DeAngelo v. MAXIMUS/NY Medicaid Choice*, No. 19-CV-7957, 2022 WL 3043665, at *12 n.15 (S.D.N.Y. Aug. 2, 2022) (discussing the more liberal post-amendment standard under the NYSHRL); *see also* A8421/S6577 (as amended by S6594/A8424). As to the NYCHRL, "courts must construe the NYCHRL 'liberally for the accomplishment of the uniquely broad and remedial

purposes thereof.' " *Harris v. N.Y.C. Hum. Res. Admin.*, No. 20-CV-2011, 2022 WL 3100663, at *8 (S.D.N.Y. Aug. 4, 2022) (quoting *Leroy v. Delta Airlines, Inc.*, 36 F.4th 469, 474 (2d Cir. 2022)). However, under the NYCHRL, a "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 110 (2d Cir. 2013); *see also Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (acknowledging standard for NYCHRL discrimination claims). To establish a claim under the NYCHRL, the plaintiff must show that the employer treated him or her "less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8; *Harris*, 2022 WL 3100663, at *8 ("To count as being treated 'less well,' a plaintiff must merely plausibly allege 'differential treatment that is more than trivial, insubstantial, or petty.' " (quoting *Torre v. Charter Commc'ns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020))). Even under this more forgiving pleading standard, a plaintiff must still plausibly allege that he was treated less well "at least in part *because* of [his] [belonging to a protected class].' " *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39, 40 n.27 (App. Div. 2009)).

9    The amendments apply to claims accruing after October 11, 2019, *see Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019), and therefore apply to Plaintiff's claims, which accumulated on or after October 15, 2019. (*See generally* Am. Compl.)

 **\*8** Because the standard for pleading a disability discrimination claim under the NYSHRL and NYCHRL is more lenient than the ADA standard, Plaintiff sufficiently pleads NYSHRL and NYCHRL disability discrimination claims. *See Jones*, 838 F. App'x at 644 n.1 (holding that courts considering NYCHRL claims must "constru[e] [NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible" (quoting *Ya-Chen Chen*, 805 F.3d at 75)).

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's ADA, NYSHRL, and NYCHRL discrimination claims. [10]

10    Defendants also argue that Plaintiff's claim should be dismissed because JetBlue terminated Plaintiff "based on a legitimate, non-discriminatory reason." (Defs.' Mem. 11.) While this is a relevant consideration on a motion for summary judgment,

it is not one that the Court considers at the motion to dismiss stage. *Cf. McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (noting that at the summary judgment stage, a "plaintiff must establish a prima facie case; the employer must offer ... a legitimate non-discriminatory reason for the discharge; and the plaintiff must then ... carry the burden of persuasion that the proffered reason is a pretext"). At the motion to dismiss stage, a plaintiff's burden is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("[A] plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.' " (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))).

### ii. Title VII, NYSHRL, and NYCHRL race, age, and gender discrimination claims

#### 1. Title VII race and gender claims

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) "[he] is a member of a protected class; (2) [he] was qualified for the position [he] held; (3) [he] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *see Zheng-Smith v. Nassau Health Care Corp.*, No. 20-CV-3544, 2021 WL 4097316, at *1 (2d Cir. Sept. 9, 2021) (listing the four criteria to establish a prima facie case of discrimination under Title VII); *see also Doe v. City of New York*, 473 F. App'x 24, 27 (2d Cir. 2012) (same). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see Farooq v. City of New York*, No. 20-3185, 2022 WL 793117, at *2 (2d Cir. Mar. 16, 2022) (affirming that the facts required to form a prima facie discrimination case under Title VII "need only give plausible support to a minimal inference of discriminatory motivation"); *Kelleher v. Fred A. Cook, Inc.*,

939 F.3d 465, 468 (2d Cir. 2019) ("A plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.' " (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005)))

**\*9**  While the parties do not dispute that (1) Plaintiff, as a Black male, belongs to protected classes under Title VII, (2) Plaintiff was qualified for his position with JetBlue, and (3) Plaintiff suffered adverse employment actions, the parties dispute whether the adverse employment actions occurred under circumstances giving rise to an inference of discrimination on the basis of either race or gender. However, even under Plaintiff's "minimal" burden at the motion to dismiss stage, Plaintiff does not allege any facts that would permit the Court to infer causation between Plaintiff's membership in any protected class and the adverse employment actions he faced. Plaintiff alleges that he was "treated differently because he is an African American male," (Am. Compl. ¶ 187), that "Plaintiff's ... race ... and gender were factors in Plaintiff's termination," (*id.* ¶ 182), and that he was "discriminated against because of his race ... and gender," (*id.* ¶ 185), but provides no facts to support his conclusory assertions. *See Vega*, 801 F.3d at 84 (stating that "a discrimination complaint ... must at a minimum assert nonconclusory factual matter" (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014))); *Richards v. Dep't of Educ. of N.Y.C.*, No. 21-CV-338, 2022 WL 329226, at \*6 (S.D.N.Y. Feb. 2, 2022) (stating that a complaint "must offer more than 'labels and conclusions' " or " 'naked assertion[s] devoid of 'further factual enhancement' " in order to survive dismissal (quoting *Twombly*, 550 U.S. at 555, 557)); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 554 (W.D.N.Y. 2016) ("Plaintiff has failed to meet her pleading burden of supporting an inference of discriminatory intent, because her claims are not supported by anything other [than] her own conclusory assertions that she was discriminated against on the basis of her race and national origin. Plaintiff has failed to plausibly plead a minimal inference of discriminatory motivation.").

While Plaintiff alleges that he was treated less favorably than "white similarly[-]situated Ground Operations employees" and other members outside of his protected classes, (Am. Compl. ¶ 179), Plaintiff fails to allege that any of the identified employees engaged in comparable conduct or how they allegedly received preferential treatment. *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (finding that the plaintiff failed to assert a Title VII discrimination claim because the plaintiff did not sufficiently

allege that allegedly similarly-situated employees engaged in comparable conduct).

Thus, Plaintiff fails to state a Title VII discrimination claim on the basis of his race or gender.

## 2. NYSHRL and NYCHRL age, gender, and race discrimination claims

Plaintiff fails to allege that he was treated "less well" as a result of his age, gender, or race and provides no facts that would permit the Court to infer differential treatment on these bases. *See Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 242 (S.D.N.Y. 2017) ("Nevertheless, a plaintiff must still 'plead facts sufficient to support an inference that he has been treated less well at least in part *because of* a protected trait." (quoting *Bell v. McRoberts Protective Agency, Inc.*, No. 15-CV-0963, 2016 WL 7192083, at \*5 (S.D.N.Y. Dec. 12, 2016))). Plaintiff therefore fails to plead NYSHRL or NYCHRL age, gender or race discrimination claims. [11]

[11]      Because the NYSHRL was amended with the directive that "its provisions should be construed liberally," *Deveaux v. Skechers USA, Inc.*, No. 19-CV-9734, 2020 WL 1812741, at \*3 n.3 (S.D.N.Y. Apr. 9, 2020), and to bring the standard "closer to that of the [NYCHRL]," *Livingston v. Roosevelt Union Free Sch. Dist.*, No. 17-CV-4189, 2020 WL 1172642, at \*11 n.5 (E.D.N.Y. Jan. 15, 2020), and although the Court recognizes that the NYSHRL and NYCHRL standards are not interchangeable, because the NYSHRL was amended to more closely resemble the NYCHRL, the Court analyzes both claims under the NYCHRL standard.

Accordingly, the Court grants Defendants' motion and dismisses Plaintiff's Title VII gender and race claims and his NYSHRL and NYCHRL age, gender, and race claims.

## c. Failure-to-accommodate claim under the ADA

Defendants argue that Plaintiff's failure-to-accommodate claim should be dismissed because an air carrier should not be lawfully required to waive its post-accident drug and alcohol testing policies where an employee claims to be medically unable to complete this testing and where a third-party medical provider confirms that the employee's

claims are invalid. (Defs.' Mem. 11–16.) They contend that JetBlue had no obligation to accommodate Plaintiff or engage in the interactive accommodations process because such an accommodation would mean deviating from the DOT's drug and alcohol testing procedures. (*Id.* at 14.)

**\*10** Plaintiff contends that Defendants "had a duty to provide a reasonable accommodation" and that he immediately and directly notified his employer that he was in need of a reasonable accommodation due to his medical condition. (Pl.'s Opp'n 6.) He notes that Ayala "refused to engage in an interactive dialogue to assess Plaintiff's needs," (*id.*), and that Green also failed to engage in an interactive dialogue, investigate Plaintiff's claims of unfair treatment, or report Plaintiff's claims to human resources. (*Id.* at 20.) Plaintiff argues that providing him with an accommodation would not have been an undue burden and in fact would have complied with JetBlue's own policy, which notes that the alcohol test can be done by saliva or breath. (*Id.* at 7.)

To establish a prima facie case of failure to accommodate under the ADA, the plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation"; and (4) "his employer refused to make a reasonable accommodation." *Woolf*, 949 F.3d at 93 (first citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); and then citing *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)); *see also Knope v. Garland*, No. 20-CV-3274, 2021 WL 5183536, at \*2 (2d Cir. Nov. 9, 2021) (listing four-pronged test to establish a prima facie case of discrimination based on an employer's failure to accommodate); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (same). In addition, "the plaintiff must show 'the connections between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action.' " *Clark v. Coca-Cola Bevs. Ne., Inc.*, No. 20-CV-4040, 2022 WL 92060, at \*4 (2d Cir. Jan. 10, 2022) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019)); *Knope*, 2021 WL 5183536, at \*2 (same). Reasonable accommodation "may include ... modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." *Molina v. City of Rochester*, 764 F. App'x 49, 51 (2d Cir. 2019) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92,

97 (2d Cir. 2009)). In a failure-to-accommodate claim, "the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment.' " *McMillan*, 711 F.3d at 126 (alterations in original) (quoting *McBride*, 583 F.3d at 97). "This burden is not heavy: 'It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' " *Id.* at 127 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

The parties do not dispute that (1) JetBlue is subject to the ADA, (2) Plaintiff was disabled within the meaning of the ADA, and (3) Plaintiff was otherwise qualified to perform the essential features of his job. In addition, Plaintiff sufficiently alleges that Defendants were aware of his disability and his requests for reasonable accommodations. (*See* Am. Compl. ¶¶ 70–71 ("Plaintiff informed ... the drug test [administrator] that he was asthmatic" and that "he was having difficulty breathing due to his asthma."), ¶¶ 79–81 ("Plaintiff informed Ayala that ... [h]e was asthmatic," "that he was coughing, having difficulty breathing, and his chest was tightening," and "asked Ayala if he could take the breathing test another way since he was coughing and his chest was tightening."), ¶ 146 ("Plaintiff ... explained [to Green] that he had trouble breathing into the 'breathalyzer' due to his asthma and other medical ailments."), ¶ 161 (providing the October 29, 2019 email that Plaintiff wrote to the People Department and Crew Relations regarding his asthma and surgery to remove nasal polyps, which led to the results for the breathalyzer test coming back insufficient on three occasions).)

**\*11** Further, Plaintiff sufficiently alleges a potential accommodation that Defendants failed to provide in the form of a saliva test. After informing a JetBlue employee during his breathalyzer test that he could not breathe and therefore could not complete the test due to his disability, Defendants could have performed a saliva test and then, as Dr. Patel recommended in her report to JetBlue, repeated the breathing test if necessary weeks after Plaintiff's surgery. (Am. Compl. ¶ 121.) JetBlue's own policy states that alcohol tests "are done by saliva or breath," but "Defendants did not conduct a saliva test" even after Plaintiff asked Ayala if "he could take the breathing test another way." (*Id.* ¶¶ 81, 200–01.) Defendants cite to DOT regulations which provide that their testing could have been done by saliva or breath. (*See* Defs.' Mem. 13 ("As an employee, you are considered to have refused to take an alcohol test if you '[f]ail to provide an adequate amount of saliva or breath for any alcohol test required by this part or

DOT agency regulations[.]' " (quoting 49 CFR § 40.261(a)(3))).)

Moreover, this accommodation is reasonable and does not impose an undue hardship, as it is identified as an alternative by both DOT and JetBlue policies. Thus, Plaintiff has established a clear connection between the failure to grant this accommodation, his inability to return to work, and his suspension and termination. Plaintiff has therefore met his burden at the motion to dismiss stage. *See Limauro v. Con. Ed. Co. of N.Y., Inc.*, No. 20-CV-3558, 2021 WL 466952, at *8 (S.D.N.Y. Feb. 9, 2021) ("All that plaintiffs must do at the motion to dismiss stage is plead the existence of a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' " (quoting *Shaywitz v. Am. Bd. of Psychiatry and Neurology*, 675 F. Supp. 2d 376, 390 (S.D.N.Y. 2009))); *Novick v. Village of Wappingers Falls*, 376 F. Supp. 3d 318, 337 (S.D.N.Y. 2019) (stating that at the motion to dismiss stage, a plaintiff "bears only the burden of identifying an accommodation" (quoting *Borkowski*, 63 F.3d at 139)).

Accordingly, the Court denies Defendants' motion as to Plaintiff's ADA failure-to-accommodate claim.

### d. Hostile work environment claims under the ADA, Title VII, NYSHRL, and NYCHRL

Defendants argue that the Amended Complaint does not appear to assert a hostile work environment claim, but even if it did, such a claim would fail and should be dismissed because it is "bereft of any factual allegations regarding any relevant decision-maker's supposed discriminatory animus." (Defs.' Mem. 8 n.3.)

Plaintiff alleges that JetBlue engaged in unlawful employment practices under Title VII, NYCHRL, and NYSHRL by "causing a hostile work environment," (Am. Compl. ¶¶ 212, 225, 238). Plaintiff also alleges that JetBlue "created a hostile environment in violation of Plaintiff's rights under the ADA." (*Id.* ¶ 264.) Plaintiff addresses his hostile work environment claim in two lines of his opposition brief, noting that the Court should not "set[ ] the bar too high." (Pl.'s Opp'n 19 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).)

### i. ADA and Title VII hostile work environment claims

"The analysis of hostile work environment claims under [the ADA] is the same as the analysis under Title VII." *Harris*, 2022 WL 3100663, at *12 n.16. To prevail on a hostile work environment claim under the ADA or Title VII, the plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox*, 918 F.3d at 74 (alteration in original) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)); *see Hawkins-El v. N.Y.C. Transit Auth.*, No. 18-CV-7167, 2021 WL 4222400, at *7 (E.D.N.Y. Sept. 16, 2021) (describing test for finding a hostile work environment under the ADA); *Tsatsani v. Walmart, Inc.*, No. 19-CV-9063, 2020 WL 6688939, at *11 (S.D.N.Y. Oct. 26, 2020) ("A plaintiff asserting a hostile work environment claim under the ADA 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.' " (quoting *Fox*, 918 F.3d at 74)); *see also Tillery v. N.Y.S. Off. of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 27 (2d Cir. 2018) (holding that to establish a hostile work environment claim under Title VII, "a plaintiff must produce enough evidence to show that 'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' " (alterations in original) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010))); *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (holding that conduct must be both objectively severe or pervasive and subjectively perceived to be abusive). Under the totality of the circumstances, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) ("[W]e must consider ... 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))).

### 1. Title VII claim

**\*12** Plaintiff has failed to plausibly allege a hostile work environment claim under Title VII. Plaintiff fails to allege that any allegedly discriminatory conduct was a result of Plaintiff's race or gender and thus his claim fails. *See Tillery*, 739 F. App'x at 27 ("A plaintiff must also demonstrate that [ ]he was subjected to the hostility because of [his] membership in a protected class." (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999))); *Alfano*, 294 F.3d at 377 ("It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."); *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 498 (E.D.N.Y. 2019) (dismissing the plaintiff's Title VII hostile work environment claims because the plaintiff failed to allege "that a hostile work environment was created and existed because of [her] protected status" (alteration in original) (quoting *De La Pena v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 418 (E.D.N.Y. 2013))).

Accordingly, the Court dismisses Plaintiff's Title VII hostile work environment claim.

### 2. ADA claim

Plaintiff plausibly alleges an ADA hostile work environment claim. Plaintiff alleges that (1) he had to take the breathalyzer test despite his complaints of asthma and nasal polyps as well as tightness in the chest, (Am. Compl. ¶¶ 69–74); (2) Ayala "dismissively told [him]" that if he could not blow into the breathalyzer, they would "have to part ways," and suspended him, (*id.* ¶¶ 81, 91); (3) he was ordered to visit the Clinic, which is over two hours away from him, despite his recovery from surgery, (*id.* ¶¶ 96–97); (4) he arrived at the Clinic and there was no appointment scheduled for him, (*id.* ¶¶ 103–04); (5) Dr. Patel recommended both that JetBlue direct Plaintiff to see a pulmonologist and avoid testing him for several weeks following his surgery, (*id.* ¶¶ 120–21); (6) Green refused to consider his medical conditions during the phone call when he terminated Plaintiff, (*id.* ¶¶ 147–51); and (7) his email to Crew Relations and the People Department complaining of disability discrimination was ignored, (*id.* ¶¶ 161–64). Most significantly, Plaintiff alleges that he was ultimately terminated as a result of these actions. (*Id.* ¶ 167.) "Even an isolated act may be so serious that

it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 918 F.3d at 74; *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 606 (2d Cir. 2006) ("[A] single incident was so severe that it could have created a hostile work environment even in isolation, unrepeated and unaccompanied by other conduct."); *Guerrero Toto v. NorthStar Demolition & Remediation*, 366 F. Supp. 3d 449, 465 (W.D.N.Y. 2019) (same). Plaintiff's termination was sufficiently "serious" that it rises to the level of severity or pervasiveness required for a claim. *Alfano*, 294 F.3d at 374 (stating that an isolated act must be "very serious" to constitute a hostile work environment claim). Accordingly, Plaintiff has plausibly pled a hostile work environment claim under the ADA.

Accordingly, the Court dismisses Plaintiff's Title VII hostile work environment claim but denies Defendants' motion as to his ADA hostile work environment claim.

### ii. NYSHRL and NYCHRL hostile work environment claims

Harassment constitutes an "unlawful discriminatory practice" where "it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more ... protected categories." *Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C.*, No. 21-CV-394, 2022 WL 3214924, at \*10 (S.D.N.Y. Aug. 9, 2022). The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a). *See Nguedi v. Fed. Reserve Bank of N.Y.*, 813 F. App'x 616, 617–18 (2d Cir. 2020) (noting when courts review either discriminatory treatment or hostile work environment claims under the NYCHRL, they must "analyze whether a plaintiff is treated 'less well' because of a discriminatory intent" (quoting *Mihalik*, 715 F.3d at 110)); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims."). The federal "severe or pervasive standard of liability" does not apply to NYCHRL claims. [12] *Mihalik*, 715 F.3d at 113.

[12]    As noted above, for claims filed on or after October 11, 2019, the NYSHRL was amended to more closely resemble the NYCHRL. The NYSHRL now provides that harassment is

unlawful "regardless of whether such harassment would be considered severe or pervasive." N.Y. Exec. L. § 296(1)(h).

### 1. Age, gender, and race hostile work environment claims

**\*13**  Plaintiff fails to allege any facts that would permit the Court to infer that he experienced a hostile work environment on the basis of race, gender, or age, and therefore, even under the reduced requirements for NYSHRL and NYCHRL hostile work environment claims, Plaintiff fails to state NYSHRL or NYCHRL race, gender, or age hostile work environment claims.

### 2. Disability hostile work environment claim

However, under this more liberal standard, which requires analyzing whether a plaintiff is treated "less well" and does not require a finding of "severe or pervasive" conduct, Plaintiff sufficiently alleges facts in support of NYSHRL and NYSHRL hostile work environment claims on the basis of disability. In his Amended Complaint and in his opposition, Plaintiff alleges that Defendants "creat[ed] a hostile work environment" because of his requests for accommodation for his disability and that Green and Ayala, among others, treated him less well by ignoring his complaints and requests for accommodation. (Am. Compl. ¶¶ 81, 147–51, 238.) At the motion to dismiss stage, this is sufficient to plead NYSHRL and NYCHRL hostile work environment claims based on his disability. See Kugel v. Queens Nassau Nursing Home Inc., 568 F. Supp. 3d 253, 264 (E.D.N.Y. 2021) (finding that the plaintiff's hostile work environment claim on the basis of disability succeeded "[u]nder NYCHRL's more forgiving standard"); Lebowitz v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 158, 183 (E.D.N.Y. 2017) (permitting NYCHRL claims to proceed where the plaintiffs claimed that they received differential treatment).

Thus, the Court dismisses Plaintiff's NYSHRL and NYCHRL age, gender, and race hostile work environment claims but denies Defendants' motion to dismiss Plaintiff's disability hostile work environment claim.

### e. ADA retaliation claim

Defendants argue that Plaintiff's retaliation claim under the ADA fails for a number of reasons. [13] (Defs.' Mem. 16.) First, Plaintiff does not plausibly allege any retaliatory animus from Defendants. (Id.) Second, Defendants required him to submit to drug and alcohol testing before he allegedly engaged in any protected activity. (Id. at 17.) Third, Defendants terminated him based on their understanding and a "third-party medical provider's evaluation of Plaintiff" that Plaintiff was able to successfully complete the breathalyzer but failed to do so. (Id. at 17–18.) Fourth, the retaliation claim is redundant of Plaintiff's failure-to-accommodate claim. (Id. at 18.)

[13]  Plaintiff also brings retaliation claims under Title VII, the NYSHRL, and NYCHRL, all of which fail. While Plaintiff brings a claim under Title VII, the only potential protected activities he alleges are his requests for accommodation on the basis of his disability, as he admits in his opposition papers. (Pl.'s Opp'n 9.) Because "Title VII does not prohibit discrimination or retaliation on the basis of a disability," Laface v. E. Suffolk Boces, 349 F. Supp. 3d 126, 152 (E.D.N.Y. 2018), the Court dismisses Plaintiff's Title VII retaliation claim. See Risco v. McHugh, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) ("[A] complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII[.]"); Muszak v. Sears, Roebuck & Co., 63 F. Supp. 2d 292, 300 (W.D.N.Y. 1999) ("[A] Title VII retaliation claim must be for actions protected by Title VII, and, quite simply (unlike the ADA that has its own retaliation prohibition), Title VII does not protect a request for an accommodation on the basis of an alleged disability." (footnotes omitted)). Further, "[u]nder both New York State and New York City Human Rights Laws, a request for reasonable accommodation is not a protected activity for purposes of a retaliation claim." Witchard v. Montefiore Med. Ctr., 960 N.Y.S.2d 402, 403–04 (App. Div. 2013); see D'Amico v. City of New York, 73 N.Y.S.3d 540, 558–59 (App. Div. 2018) (same). While the New York City Council amended the NYCHRL to "make[ ] [it] clear that requesting a reasonable accommodation is a protected activity," Piligian v. Icahn Sch. of Med. at Mt. Sinai, 490 F. Supp. 3d 707, 722 (S.D.N.Y. 2020), the amendment became effective on November 11, 2019 and is not retroactive; thus it does not apply to Plaintiff's claims, which accrued in October of 2019 through

his termination on November 1, 2019. *See Limauro v. Con. Ed. Co. of N.Y., Inc.*, No. 20-CV-3558, 2021 WL 466952, at \*10 (S.D.N.Y. Feb. 9, 2021) ("But that amendment had not yet taken effect at the time [the plaintiff] made his [accommodation] requests to [his employer], and there is no indication that the New York City Council intended for the amended NYCHRL to apply retroactively. Thus, [the court] must adhere to the New York courts' prior interpretation of the statutes." (citation omitted)); *Mejia v. City of New York*, No. 17-CV-2926, 2020 WL 2837008, at \*13 (E.D.N.Y. May 30, 2020) ("[A] request for a reasonable accommodation is not a protected activity for purposes of a retaliation claim [under the NYSHRL or NYCHRL]." (quoting *Witchard*, 960 N.Y.S.2d at 403–04)). The Court therefore dismisses Plaintiff's NYSHRL and NYCHRL retaliation claims.

**\*14** Plaintiff argues that requesting a reasonable accommodation constitutes protected activity and that he did so before he was suspended. (Pl.'s Opp'n 9.) Plaintiff also contends that he was suspended without pay within hours of requesting a reasonable accommodation. (*Id.* at 9–10.)

To establish a prima facie case of retaliation under the ADA, a plaintiff "must show that he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action." *Ibela v. Allied Universal*, No. 21-CV-1995, 2022 WL 1418886, at \*2 (2d Cir. May 5, 2022) (quoting *Fox*, 918 F.3d at 72–73); *Clark*, 2022 WL 92060, at \*5 (same); *Norman v. NYU Langone Health Sys.*, No. 20-CV-3624, 2021 WL 5986999, at \*4 (2d Cir. Dec. 17, 2021) (discussing factors of an ADA retaliation claim). "A plaintiff bears only a minimal burden in making this prima facie showing." *Perez v. City of New York*, 843 F. App'x 406, 407 (2d Cir. 2021) (first citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); and then citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

The Court considers each factor below.

### 1. Protected activity

"Activities protected by the ADA include complaints of ADA discrimination, including complaints ... that the employer's actions violated the ADA, and requests for reasonable accommodation." *Flieger v. E. Suffolk BOCES*, 693 F.

App'x 14, 18 (2d Cir. 2017); *see Treglia*, 313 F.3d at 720 ("[A]ttempts to assert ... rights against discrimination are protected activities."); *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (same); *see also Fox*, 918 F.3d at 73 (stating that the plaintiff engaged in a protected activity when he sent an "email and administrative complaint"); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan v. Long Island R.R. Co.*, 622 F. App'x 61, 63–64 (2d Cir. 2015) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). "Requesting a reasonable accommodation of a disability is an ADA-protected activity." *Rodriguez v. Atria Senior Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012) (citing *Weixel v. Bd. of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002)); *see Ibela*, 2022 WL 1418886, at \*2 ("Seeking a reasonable accommodation constitutes protected activity under the ADA."); *Weixel*, 287 F.3d at 149 ("[P]laintiffs ... allege that they were seeking reasonable accommodation [on the basis of] disability — which constitutes protected activity under [the ADA].").

Plaintiff has adequately alleged that he engaged in protected activity. On October 15, 2019, Plaintiff asked Lall and Ayala several times whether there was another way to take the breathalyzer test because his chest was getting tighter and he suffered from asthma. (Am. Compl. ¶¶ 70–74, 80–81, 87.) On October 25, Plaintiff told Ayala that he was "being treated unfairly" and that "he was going to reach out for help and report him." (*Id.* ¶ 136.) On October 27, Plaintiff again asked if anything could be done "such as taking the test again or [a] different test." (*Id.* ¶ 138.) On October 28, Plaintiff explained the situation to Green and asked him to "take his medical condition into consideration." (*Id.* ¶¶ 146–48.) On October 29, he emailed the People Department, Crew Relations, and others, stating that he had been unable to perform his breathalyzer test and stating that his medical documentation had not been "taken into consideration." (*Id.* ¶¶ 161–62.) These requests for reasonable accommodation and complaints of unfair treatment constitute protected activity. *See Treglia*, 313 F.3d at 720 ("[A]ttempts to assert ... rights against discrimination are protected activities."); *see Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (noting that requesting a reasonable accommodation of a disability is an ADA-protected activity); *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015) ("Requests for disability

accommodation and complaints, whether formal or informal, about working conditions related to one's alleged disability are protected activities." (quoting *Gorbea v. Verizon N.Y., Inc.*, No. 11-CV-3758, 2014 WL 917198, at *11 (E.D.N.Y. Mar. 10, 2014))).

### 2. Adverse employment actions

**\*15** "In the context of ... ADA retaliation claims, [the Second Circuit has] described an adverse employment action as 'a materially adverse change in the terms and conditions of employment.' " *Baum v. Rockland County*, 161 F. App'x 62, 64 (2d Cir. 2005). Adverse employment actions include, but are not limited to, suspension and discharge from employment. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001) (holding that for purposes of an ADA retaliation claim, an "adverse employment action" broadly includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))); *Muller v. Costello*, 187 F.3d 298, 315 (2d Cir. 1999) (holding that other adverse actions beyond discharge could be considered for purposes of an ADA retaliation claim); *Weissman v. Dawn Joy Fashions Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (finding that claims of refusal to rehire or denials of employment were adverse actions for purposes of ADA retaliation claims).

Plaintiff alleges that he was suspended on October 15, 2019, (Am. Compl. ¶ 91), and terminated on November 1, 2019, (*id.* ¶ 167). Both constitute adverse employment actions. *See Rodriguez*, 887 F. Supp. 2d at 512 ("Of course, there is no dispute that termination is an adverse employment action."); *Clark*, 96 F. Supp. 3d at 262 ("[The] [p]laintiff's termination constitutes ... an adverse decision taken against [the] [p]laintiff."); *see also Rosenfield v. N.Y.S. Div. of Veterans' Affs.*, No. 18-CV-1299, 2020 WL 8911057, at *6 (N.D.N.Y. May 28, 2020) (stating that "defendants' suspension of plaintiff without pay" was an adverse action); *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 485–86 (E.D.N.Y. 2016) (considering a suspension to be an adverse action for purposes of retaliation under the ADA); *Lovejoy-Wilson*, 263 F.3d at 223–24 (finding that the plaintiff established a prima facie case of retaliation under the ADA where she was suspended).

### 3. Causal connection

To establish a prima facie case of retaliation under the ADA, a plaintiff must show "that a causal connection existed between the protected activity and the adverse action." *Baum*, 161 F. App'x at 64 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)). A causal connection in retaliation claims can be shown: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky*, 921 F.3d at 353 (quoting *Littlejohn*, 795 F.3d at 319). The plaintiff must provide "sufficient evidence of a causal nexus between [his] protected activity and the alleged adverse employment actions he suffered." *Clark*, 2022 WL 92060, at *5 (quoting *Fox*, 918 F.3d at 73). "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy-Wilson*, 263 F.3d at 224 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see Ibela*, 2022 WL 1418886, at *2 ("[A] plaintiff can indirectly establish a causation connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (quoting *Gorman-Bakos v. Cornell Co-Op Ext. of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001))) (finding that a gap of two months between a protected activity and adverse action was sufficient to plausibly allege causation); *Pistello v. Bd. of Educ.*, 808 F. App'x 19, 21–22 (2d Cir. 2020) (considering dates of protected activities in relation to adverse employment actions and permitting the plaintiff's ADA retaliation claim to proceed).

**\*16** Plaintiff requested a reasonable accommodation to the breathalyzer test on October 15, 2019, and that same evening, he was suspended. (Am. Compl. ¶¶ 74, 81, 87, 91.) In addition, Plaintiff made requests for reasonable accommodations on October 25, 27, 28, and 29, complained about unfair treatment, and was terminated effective November 1, 2019. (*Id.* ¶¶ 136, 136–39, 145–49, 161–62, 167.) At the pleadings stage, this temporal proximity is sufficient to infer causation, *see Thomson v. Odyssey House*, No. 14-CV-3857, 2015 WL 5561209, at *22 (E.D.N.Y. Sept. 21, 2015) ("The close temporal proximity between the complaints and [the plaintiff's] termination is sufficient to

meet her minimal burden at this stage of the litigation."), particularly because Plaintiff had not faced adverse job actions or reprimands prior to his requests for reasonable accommodation, *cf. Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). *See Clark*, 96 F. Supp. 3d at 262 (finding that a gap of "several days" between the protected activity and the adverse action was sufficient to satisfy the causal element to establish a prima facie case of ADA retaliation).

Accordingly, the Court finds that Plaintiff has sufficiently alleged a retaliation claim under the ADA and denies Defendants' motion to dismiss this claim.

### f. NYCHRL interference claim, NYSHRL and NYCHRL aiding and abetting claims, and state law tort claims

Defendants argue that because Plaintiff has failed to rebut Defendants' arguments or address his NYCHRL interference claim, NYSHRL and NYCHRL aiding and abetting claims, and state law claims for NIED and IIED, he has waived these claims.[14] (Defs.' Reply 1–2.)

> [14]    Plaintiff alleges that Defendants violated the NYCHRL provision that prohibits individuals from "coerc[ing], intimidat[ing], threaten[ing] or interfer[ing] with[ ] any person in the exercise or enjoyment of ... any right granted or protected." (Am. Compl. ¶¶ 250–53.) In addition, Plaintiff brings NYSHRL and NYCHRL aiding and abetting claims, alleging that Defendants aided and abetted discriminatory and retaliatory conduct. (*Id.* ¶¶ 228–31, 246–49.) Finally, Plaintiff brings NIED and IIED claims on the grounds that the "conduct described ... was extreme and outrageous and severely affected Plaintiff's sense of self and emotional well-being." (*Id.* ¶¶ 278–79.)

Plaintiff has not addressed Defendants' arguments, and accordingly, the Court finds that Plaintiff, who is represented by counsel, has abandoned these claims. *See BYD Co.*

*Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue." (quoting *Kao v. Brit. Airways, PLC*, No. 17-CV-232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018))); *MYL Litig. Recovery I LLC v. Mylan N.V.*, No. 19-CV-1799, 2020 WL 1503673, at *7 (S.D.N.Y. Mar. 30, 2020) ("[The plaintiff] has failed to respond to this argument in its opposition. Accordingly, any argument opposing [the defendant's] position here is waived." (citing *Kao*, 2018 WL 501609, at *5)); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 452 (E.D.N.Y. 2014) ("Plaintiff does not respond to this argument and the [c]ourt therefore construes Plaintiff's failure to respond as an abandonment of this claim."); *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

### III. Conclusion

For the reasons stated above, the Court grants Defendants' motion and dismisses Plaintiff's (1) Title VII discrimination claims based on gender and race and NYSHRL and NYCHRL discrimination claims based on age, gender, and race; (2) Title VII hostile work environment claims based on gender and race, and NYSHRL and NYCHRL hostile work environment claims based on age, gender, and race; (3) Title VII, NYSHRL, and NYCHRL retaliation claims; and (4) NYCHRL interference claim; NYSHRL and NYCHRL aiding and abetting claims; and state law claims for IIED and NIED.

**\*17**  The Court denies Defendants' motion as to Plaintiff's (1) ADA discrimination claim; (2) NYSHRL and NYCHRL disability discrimination claims; (3) ADA failure-to-accommodate claim; (4) ADA hostile work environment claim; (5) NYSHRL and NYCHRL hostile work environment claims based on disability; and (6) ADA retaliation claim.

### All Citations

Slip Copy, 2022 WL 4291371

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

560 Fed.Appx. 88
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

Shelly SANDERSON, Plaintiff–Appellant,

v.

NEW YORK STATE ELECTRIC & GAS
CORPORATION, Defendant–Appellee.

No. 13–1603–cv
|
March 27, 2014.

**Synopsis**
**Background:** Employee filed suit against her employer
alleging hostile work environment and retaliation, in violation
of § 1981, Title VII, and New York law. The United States
District Court for the Western District of New York, 2013 WL
1221930, Michael A. Telesca, J., granted employer summary
judgment. Plaintiff appealed.

**Holdings:** The Court of Appeals held that:

[1] hostile work environment claim was untimely, in that it
was not based on continuing violation;

[2] there was no evidence employer treated female employee
differently than men; and

[3] temporal proximity alone between complaints of sex
discrimination and discharge was insufficient to demonstrate
that employer's reasons for firing employee were pretext for
retaliation.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (4)

**[1]    Civil Rights** 🔑 Continuing violations;  serial,
ongoing, or related acts

Female employee's alleged incidents of hostile
work environment based on sex were not part of
same continuing violation, as would allow timely
incident to prolong hostile work environment
created by earlier actions, pursuant to Title
VII, inasmuch as employee offered no valid
connection or continuation of the unwanted
actions. Civil Rights Act of 1964, § 706(e)(1), 42
U.S.C.A. § 2000e–5(e)(1).

20 Cases that cite this headnote

**[2]    Civil Rights** 🔑 Hostile environment;
severity, pervasiveness, and frequency

Under Title VII, occasional, unspecified sotto
voce comments are too insubstantial to
contribute to a hostile work environment. Civil
Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

21 Cases that cite this headnote

**[3]    Civil Rights** 🔑 Disparate treatment

There was no evidence that employer treated
female gas fitter differently from her male co-
workers in re-assigning her from night shift to
day shift, as required to support her claim against
employer for disparate treatment, in violation of
Title VII and § 1981. Civil Rights Act of 1964, §
701, 42 U.S.C.A. § 2000e; 42 U.S.C.A. § 1981.

2 Cases that cite this headnote

**[4]    Civil Rights** 🔑 Motive or intent;  pretext

Mere temporal proximity alone, between
employee's complaint of sex discrimination and
her discharge a few hours later, was insufficient

to demonstrate that employer's reasons for terminating female gas fitter for insubordination and refusal to return to work after unwanted schedule change were pretext for retaliation, in violation of Title VII and § 1981. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; 42 U.S.C.A. § 1981.

12 Cases that cite this headnote

**\*89** Appeal from the United States District Court for the Western District of New York (Michael A. Telesca, Judge).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

**Attorneys and Law Firms**

Shelly Sanderson, pro se (Christina A. Agola, Christina A. Agola, PLLC, Rochester, New York, filed a brief on behalf of Appellant before being relieved), for Appellant.

Leslie Guy, Hinman, Howard & Kattell, LLP, Binghamton, NY, for Appellee.

PRESENT: PIERRE N. LEVAL, GUIDO CALABRESI, GERARD E. LYNCH, Circuit Judges.

### SUMMARY ORDER

Plaintiff Shelly Sanderson, formerly a gas fitter employed by defendant New York State Electric & Gas Corporation ("NYSEG"), appeals an award of summary judgment for defendant on her federal and state law claims of sex discrimination, in the form of disparate treatment and sexually hostile work environment, and retaliation, see 42 U.S.C. §§ 1981, 2000e et seq.; N.Y. Exec. Law § 290 et seq. We review a district court's award of summary judgment de novo, "construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir.2012) (internal quotation marks omitted). The plaintiff's state law claims are subject to the same standards of proof that govern her Title VII claims, and are thus controlled by our discussion of plaintiff's Title VII claims below unless otherwise indicated. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir.2010); Van Zant v. KLM

Royal Dutch Airlines, 80 F.3d 708, 714–15 (2d Cir.1996). We assume the parties' familiarity with the facts and record of prior proceedings, which we describe only as necessary to explain our decision.

NYSEG provides gas and electric power to customers in upstate New York. Sanderson began working for NYSEG in 2000 as a meter reader. In 2002, she became a day-shift gas fitter in the company's Geneva Office, where she was the only woman among roughly thirty gas fitters. From the beginning of her tenure as a gas fitter, Sanderson experienced difficulties with her co-workers. Sanderson's co-workers "shunned" her "on a daily basis," and declined to provide her with assistance that they provided to each other. One co-worker told her that she was "taking this job from a deserving man who need[ed] to take care of his family." While in the field, her male co-workers would regularly urinate in her presence, and she was often not provided with adequate means of using a restroom herself.

In 2006, Sanderson voluntarily transferred to the night shift. Although Sanderson no longer worked with the day-shift gas fitters, she sometimes saw them when she was arriving for her shift, and they were ending theirs. "[A] couple times a month," the men would engage in "snickering and ... under the breath" comments when they saw her. [1] In September 2009, Sanderson's supervisor Thomas Kelley informed her that she would be required to **\*90** return to the day shift as of October 5. After the defendant denied her requests to remain on the night shift, Sanderson reported to the day shift on October 5 and worked through the end of that week. Sanderson testified that during that week she experienced no problems with her co-workers "[o]ther than the continued ... snickering [and] under-the-breath comments." On October 12, she sought and received permission not to report to work due to stress. Thereafter, Sanderson remained absent from work for several weeks on medical advice. On November 3, Sanderson met with NYSEG representatives to discuss her situation. She informed them that she believed she was being subjected to a hostile work environment and was treated differently based on her sex. Sanderson was ordered to return to work the next day. After she stated that she did not feel capable of doing so, she was fired for insubordination.

---

[1]    In 2008, Sanderson was reassigned to a different work location in Wayne County. Sanderson offered no evidence of any further interaction with the Geneva Office day-shift men after her transfer.

Sanderson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 17, 2010. On February 18, 2011, the EEOC issued a right-to-sue letter, and on February 28, 2011, Sanderson filed the instant complaint in the Western District of New York. On March 25, 2013, the district court granted NYSEG's motion for summary judgment with respect to all of Sanderson's claims. Because we conclude that Sanderson's hostile work environment claim is time-barred, [2] and that she has failed to present evidence from which a reasonable jury could conclude that she was fired because of her sex or in retaliation for her protected activity, we affirm the judgment of the district court.

[2]    On May 3, 2012, NYSEG moved to amend its answer to assert the affirmative defense of statute of limitations. Although Sanderson states that she does not challenge the district court's decision to permit amendment, her brief later suggests that the district court abused its discretion in granting the amendment because the amendment was, in appellant's view, futile. To the extent that Sanderson challenges the district court's decision to permit NYSEG to amend its answer, we conclude that the district court did not abuse its discretion. *See Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 235 (2d Cir.1995) ("In light of [the] preference that amendments be permitted, it is rare for an appellate court to disturb a district court's discretionary decision to allow amendment.").

I. *Timeliness*

"Title VII requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action." *Van Zant,* 80 F.3d at 712. This "statutory requirement is analogous to a statute of limitations." *Id.* Accordingly, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1)." *Patterson v. County of Oneida,* 375 F.3d 206, 220 (2d Cir.2004). In order to recover for a discrete act of discrimination or retaliation, such as a discharge, failure to hire, or failure to promote, the plaintiff must demonstrate that the discrete act took place within the statutory time period. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Patterson,* 375 F.3d at 220. With respect to a claim that the plaintiff suffered a hostile

work environment, on the other hand, the claim is timely "so long as one act contributing to the claim occurred within the statutory period." *Patterson,* 375 F.3d at 220. If that is the case then "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* (internal quotation marks omitted).

**\*91**   Sanderson filed a charge of discrimination with the EEOC on February 17, 2010, and the parties agree that April 23, 2009 marks the beginning of Title VII's statutory limitations period. [3] With respect to Sanderson's New York Human Rights Law claims, which are governed by a three-year statute of limitations, the district court found and the parties do not dispute that the relevant date is February 27, 2007. N.Y. C.P.L.R. § 214(2) (McKinney's 2008); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998). [4]

[3]    The parties do not question the district court's conclusion that Sanderson had 300 days from the alleged discriminatory action within which to file a charge of discrimination with the EEOC. As in *Van Zant,* 80 F.3d at 712 n. 1, "[w]e find no reference in the record to [the plaintiff] having filed her charge with a state or local equal employment agency before filing with the EEOC. However, since the parties agree that the 300–day period applies in this case, we will accept this as a stipulated fact."

[4]    The district court selected this date on the assumption that New York's three-year statute of limitations was tolled during the one year and one day that plaintiff's charge was pending before the EEOC. It is clear that when a complaint has been filed with the New York Division of Human Rights "the Statute of Limitations is tolled until the administrative proceeding is terminated." *Pan Am. Airways v. N.Y. Human Rights Appeal Bd.,* 61 N.Y.2d 542, 549, 475 N.Y.S.2d 256, 463 N.E.2d 597 (1984). This Court "has yet to take a definitive stance on whether the statute of limitations for NYHRL claims is tolled while a plaintiff's charge is pending before the EEOC," although "[n]umerous district courts in the Circuit have ... allowed for such tolling." *Senecal v. B.G. Lenders Serv. LLC,* 2013 WL 5463400, at \*29, 976 F.Supp.2d 199, 229 (N.D.N.Y. Sept. 30, 2013); *see also Hanley v. Chicago Title Ins.* Co., No. 12 Civ. 4418, 2013 WL 3192174, at \*8 (S.D.N.Y. June 24, 2013) (same). We need not do so here, as neither party challenges

the district court's calculation of the limitations period, and the result is the same regardless of whether tolling is applied.

There is no dispute that Sanderson's claims of disparate treatment and retaliation—both based on the 2009 discharge —are timely. NYSEG contends, however, and the district court found, that Sanderson's hostile work environment claim, insofar as it relied on harassing events occurring between 2002 and 2006, is untimely.[5] In particular, the district court concluded that Sanderson could not point to an act contributing to her hostile work environment claim that occurred within the statutory limitation period. On appeal, Sanderson contends that the hostile work environment she experienced between 2002 and 2006 continued in 2009. In particular, she points out that in September 2009, she was the "only scheduled worker who was required to take reassignment to the day shift," and in October 2009, she complained to her supervisor about the fact that the men had urinated in her presence when she previously worked on the day shift.

[5]    We assume without deciding that the conduct Sanderson describes as occurring between 2002 and 2006 was sufficient to constitute a hostile work environment.

In order for a timely incident to prolong a hostile work environment created by earlier actions, the timely incident must be sufficiently related to the prior events so that they can be said to be part of the "same" hostile work environment. *Morgan,* 536 U.S. at 118, 122 S.Ct. 2061 ("[I]f an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee can not recover for the previous acts, at least not by reference to the day 401 act."); *see also* **\*92** *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 77 (2d Cir.2010) ( "Under *Morgan,* a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related."). Moreover, while a harassing incident need not be overtly sex-based, there must be reason to believe that the act was motivated by the plaintiff's sex in order for the incident to contribute to a sexually hostile work environment. *Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir.2002) ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact,

based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

[1]    The events Sanderson points to do not satisfy these standards. First, there is no evidence that Sanderson's reassignment to the day shift was related to the earlier instances of harassment, or that it was based on her sex. Sanderson does not claim that the supervisors who directed her reassignment were among the perpetrators of her earlier harassment. Furthermore, Sanderson concedes that she was the only scheduled worker not already working on the day shift at the time of the 2009 reassignment, so the fact that she was the only worker reassigned does not suggest that she was treated differently than similarly situated male employees. Second, the fact that Sanderson complained in 2009 of the men's pre–2007 conduct cannot render a claim based on the earlier conduct timely. Were the rule otherwise, any claimant could circumvent the statutory limitations period simply by discussing incidents of harassment that occurred outside of the limitations period with her employer during the statutory limitations period.

[2]    Sanderson does not claim to have experienced any difficulties with her male co-workers—the perpetrators of the earlier instances of harassment—within the statutory limitations period, other than the men's snickering and under-the-breath comments. She was unable to identify the nature or content of those comments. Such occasional, unspecified *sotto voce* comments are too insubstantial to contribute to a hostile work environment, and thus to permit consideration of earlier instances of harassment. *See McGullam,* 609 F.3d at 76 (comment that was at most unrefined or uncivil, rather than "obscene or lewd, or even sexually suggestive" was "too trivial to contribute to a Title VII hostile work environment claim"). As a result, her hostile work environment claim is time-barred.

II. *Disparate Treatment*

In order to prevail on a claim of disparate treatment, a plaintiff must first make out a prima facie case, which entails a demonstration by the plaintiff that

> (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action;

and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*United States v. Brennan,* 650 F.3d 65, 93 (2d Cir.2011). "Once the prima facie case has been shown, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (emphasis and internal quotation marks omitted). Upon fulfillment of this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's stated reason for the adverse employment action is pretext **\*93** for discrimination. *Patterson,* 375 F.3d at 221.

[3]  In the instant case, it is conceded that Sanderson is within a protected class, was qualified for the position of gas fitter, and experienced an adverse employment action when she was discharged from that position in November 2009. The district court found, however, that Sanderson failed to offer evidence from which a reasonable jury could conclude that the termination of her employment took place under circumstances giving rise to an inference of discrimination. We agree. Although many types of evidence may support an inference of discrimination, *see Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir.1996), Sanderson offers no such evidence. She does not, for instance, contend that the decisionmakers responsible for her discharge made remarks exhibiting sex-based animus, or that similarly situated male co-workers who declined to return to work following an order to return were treated differently. Instead, she relies on the same allegations of harassment she proffered in support of her hostile work environment claim, as well as the fact that in September 2009 she was the only worker who was required to accept reassignment to the day shift.

Sanderson's reliance on these circumstances is not persuasive. First, Sanderson offers no evidence to suggest that the individuals who harassed her on the day shift played any role in the decision to terminate her employment. *See McLee v. Chrysler Corp.,* 109 F.3d 130, 137 (2d Cir.1997) (finding that allegations of bias against a supervisor who was not consulted about a termination decision "provide no basis for imputing to [the decision maker] an invidious motivation for the discharge"); *cf. Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir.1999) (Title VII may be violated "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role"

in the employment decision). Second, as discussed above, Sanderson has failed to demonstrate that, in reassigning her to the day shift in 2009, NYSEG treated her differently than any similarly situated male employee. In light of the foregoing, the district court properly granted summary judgment to defendant on Sanderson's disparate treatment claim.

### III. *Retaliation*

"Title VII's antiretaliation provision forbids employer actions that discriminate against an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington N. and Sante Fe Ry. Co. v. White,* 548 U.S. 53, 59, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted); 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, "the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir.2001). Once the plaintiff has presented a prima facie case of retaliation, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005). If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's "protected activity was a but-for cause of **\*94** the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* ––– U.S. ––––, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013); *see also Kwan v. Andalex Group LLC,* 737 F.3d 834, 845–46 (2d Cir.2013).

[4]  We assume *arguendo* that Sanderson established a prima face case of retaliation. However, NYSEG has offered a non-retaliatory reason for her discharge—namely, her refusal during the November 3, 2009 meeting to return to work the following day—and Sanderson has failed to present evidence from which a reasonable jury could conclude that NYSEG's proffered reason is a pretext for retaliation. Sanderson insists that the temporal proximity between her complaint about sex-discrimination and her discharge—only a number of hours—is sufficient on its own to demonstrate that NYSEG's asserted reason is pretextual and her complaint was the but-for cause of her firing. She is mistaken. While temporal proximity alone may be sufficient to satisfy a retaliation plaintiff's prima facie burden, we have held that "temporal proximity is insufficient

to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010). Apart from temporal proximity, Sanderson offers no evidence that NYSEG's reliance on her insubordination as the reason for her discharge was a pretext for retaliation. Accordingly, the district court also properly granted summary judgment on plaintiff's claim of retaliation.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**All Citations**

560 Fed.Appx. 88

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Gonzalez v. NYU Langone Hospitals, Not Reported in Fed. Rptr. (2022)

2022 WL 4372199

2022 WL 4372199
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Aida GONZALEZ, Plaintiff-Appellant,

v.

NYU LANGONE HOSPITALS, Defendant-Appellee. *

*    The Clerk of Court is respectfully directed to amend the caption accordingly.

21-2569
|
September 22, 2022

Appeal from a judgment of the United States District Court for the Southern District of New York (Vyskocil, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Kareem El-Din Abdo, Law Office of Kareem Abdo, New York, NY.

FOR DEFENDANT-APPELLEE: William Cusack III, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New York, NY.

PRESENT: ROSEMARY S. POOLER, ROBERT D. SACK, MICHAEL H. PARK, Circuit Judges.

**SUMMARY ORDER**

**\*1** Aida Gonzalez was a long-time employee of NYU Langone Hospitals ("NYULH") who worked as a dietary aide. Between 2010 and 2017, Gonzalez had several performance issues, including failure to follow proper clocking in and out procedures and "no call no shows." Gonzalez's NYULH supervisors repeatedly warned Gonzalez that her failure to correct these performance issues could result in disciplinary action as serious as termination. NYULH finally terminated Gonzalez on February 7, 2017, citing a no call no show three weeks earlier, her alleged dishonesty about her supervisor's approval of a time off request, and a final warning she had received in October

2016 for another no call no show. Gonzalez sued NYULH for retaliation under Title VII of the Civil Rights Act of 1964 alleging that her termination was retaliation for assisting a fellow NYULH employee, Aura Troche, to bring a lawsuit against NYULH by providing translation services for Troche at Troche's attorney's office beginning on October 18, 2016. NYULH moved for summary judgment, which the district court granted because it determined that Gonzalez failed to establish a prima facie case of retaliation by failing to proffer evidence that her termination was causally connected to her protected activity of helping Troche. Gonzalez appealed. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

We review the entry of summary judgment *de novo*, "construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in [the nonmoving party's] favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). Title VII prohibits employers from retaliating against employees for assisting other employees in opposing discriminatory employment practices. *See* 42 U.S.C. § 2000e–3(a).

> In order to show a *prima facie* case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity.

*Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (citation omitted). There are two ways in which a plaintiff can demonstrate a causal connection: "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 169 of 235

Gonzalez v. NYU Langone Hospitals, Not Reported in Fed. Rptr. (2022)

2022 WL 4372199

297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII," *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

**\*2** We agree with the district court that Gonzalez fails to proffer sufficient evidence for a jury to infer a causal connection between her protected activity and termination. Gonzalez therefore does not meet her burden of making out a prima facie case of retaliation. *See Cox*, 760 F.3d at 145. Gonzalez's extensive history of performance issues and ongoing discipline dating back to 2010—long before her protected activity in 2016—prevent her from establishing an indirect causal connection. Although Gonzalez argues that the "temporal proximity" between her protected activity and her termination gives rise to an inference of discrimination, *see* Appellant's Br. at 22, her argument fails because her termination was preceded by "gradual adverse job actions [that] began well before [Gonzalez] had ever engaged in any protected activity." *Slattery*, 248 F.3d at 95. Moreover, Gonzalez no call no showed and was disciplined a week before she began assisting Troche with her lawsuit, and she no call no showed again a week before Troche filed her lawsuit and two weeks before NYULH was served with the complaint. Given Gonzalez's history of performance issues and discipline, temporal proximity, without more, is insufficient to raise an inference of discrimination. *See id.*

Gonzalez also fails to proffer sufficient evidence for a jury to infer that NYULH had knowledge of Gonzalez's protected activity prior to her termination. *See Cox*, 760 F.3d at 145. Gonzalez asserts that her assistance with Troche's lawsuit was protected activity, but there is no evidence that anyone at NYULH knew about Gonzalez's assistance before she was disciplined for her no call no shows. Even in her own deposition testimony, Gonzalez merely speculates that her supervisor, Rebecca Ortiz, was told about Gonzalez's assistance of Troche by another employee, Rosa Perez, without any factual basis or specificity as to timing. *See* App'x 485–88 (Gonzalez asserting that Perez is an "informer" and has Ortiz "on speed dial," but conceding that she had no knowledge that Perez told Ortiz anything). Moreover, although NYULH was served with Troche's complaint on February 3, 2017—four days before Gonzalez's termination—the complaint does not mention Gonzalez or otherwise alert NYULH of her protected activity. There is thus no evidence that NYULH had knowledge of Gonzalez's protected activity, an essential element of a prima facie case of retaliation.

Without evidence of a causal connection between Gonzalez's protected activity and her termination or of NYULH's knowledge of Gonzalez's protected activity, Gonzalez fails to meet her burden of establishing a prima facie case of retaliation. NYULH is therefore entitled to summary judgment. *See Cox*, 760 F.3d at 145. We have considered the remainder of Gonzalez's arguments and find them to be without merit. For the foregoing reasons, we affirm the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 4372199

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3586559
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Darcy BELYEA, Plaintiff,

v.

The CITY OF GLEN COVE and Timothy Tenke in
his individual and official capacities, Defendants.

20-CV-5675 (MKB)
|
Signed August 22, 2022

**Attorneys and Law Firms**

Matthew Brian Weinick, Famighetti & Weinick, PLLC,
Melville, NY, for Plaintiff.

Mark A. Radi, Meltzer Lippe Goldstein & Breitstone, LLP,
Mineola, NY, Steven C. Stern, Sokoloff Stern LLP, Carle
Place, NY, for Defendants.

### <u>MEMORANDUM & ORDER</u>

MARGO K. BRODIE, United States District Judge

**\*1**  I. Background ...

a. The parties 3

b. Plaintiff's early employment with the City 3

c. 2018 actions alleged by Plaintiff 4

d. 2019 actions alleged by Plaintiff 6

e. 2020 actions alleged by Plaintiff 8

II. Discussion 10

a. Standard of review 10

b. Consideration of documents other than the Complaint 10

c. Title VII claims against the City 15

   i. Timeliness 15

   ii. Exhaustion of administrative remedies 18

   iii. Hostile work environment claim 22

   iv. Retaliation 25

      1. Participation in a protected activity 28

      2. Adverse employment action 29

      3. Causal connection between protected activity and
adverse employment actions 31

d. NYSHRL hostile work environment and retaliation claims
against Tenke 35

e. Section 1983 claims against both Defendants 37

   i. Tenke's claims of legislative and qualified immunity 38

      1. Legislative immunity 38

      2. Qualified immunity 42

   ii. Personal involvement of Tenke 44

   iii. First Amendment claims against Tenke and the City 47

      1. First Amendment retaliation claim on the basis of
Plaintiff's gender discrimination complaint 49

      A. Plaintiff sufficiently alleges that she engaged in
protected speech when she issued a press release 49

      (1) Plaintiff's internal complaint 50

      (2) Plaintiff's press release 51

      1. Plaintiff plausibly spoke as a citizen 51

      2. Plaintiff spoke on a matter of public concern 52

      B. Plaintiff alleges that she suffered adverse employment
actions 54

      C. Plaintiff sufficiently alleges causation 56

      2. First Amendment political retaliation 58

   iv. Fourteenth Amendment claims 62

   v. The City's *Monell* liability 63

f. Punitive damages 68

**III. Conclusion 69**

Plaintiff Darcy Belyea commenced the above-captioned action on November 20, 2020, (Compl., Docket Entry No. 1), against Defendants the City of Glen Cove (the "City") and Timothy Tenke, in his individual and official capacities as the mayor of Glen Cove. Plaintiff alleges claims of gender discrimination, retaliation, hostile work environment and free speech violations pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"), and 42 U.S.C. § 1983, based on her workplace environment and her termination as Recreation Director from the City during Tenke's tenure as mayor. (Id. ¶¶ 10, 26, 115–27.)

The City and Tenke separately move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [1] Plaintiff opposes the motions. [2] For the reasons set forth below, the Court grants in part and denies in part Defendants' motions to dismiss.

[1]    (City's Mot. to Dismiss ("City's Mot."), Docket Entry No. 12; City's Mem. in Supp. of City's Mot. ("City's Mem."), Docket Entry No. 12-2; City's Reply in Further Supp. of City's Mot. ("City's Reply"), Docket Entry No. 17; Tenke's Mot. to Dismiss ("Tenke's Mot."), Docket Entry No. 13; Tenke's Mem. in Supp. of Tenke's Mot. ("Tenke's Mem."), Docket Entry No. 13-10; Tenke's Reply in Further Supp. of Tenke's Mot. ("Tenke's Reply"), Docket Entry No. 18.)

[2]    (Pl.'s Mem in Opp. to City's Mot. ("Pl.'s City Opp'n"), Docket Entry No. 15; Pl.'s Mem. in Opp. to Tenke's Mot. ("Pl.'s Tenke Opp'n"), Docket Entry No. 14.)

**I. Background**

**\*2**  The Court assumes the truth of the factual allegations in the Complaint for the purposes of this Memorandum and Order.

**a. The parties**

Plaintiff is a female residing in Glen Cove in Nassau County, New York. (Compl. ¶ 6.) The City employs hundreds of employees and operates approximately nineteen departments to administer the city government. (Id. ¶ 8.) Tenke, a Democrat, is the mayor and chief executive officer and a resident of Nassau County. (Id. ¶¶ 9, 27.)

**b. Plaintiff's early employment with the City**

The City hired Plaintiff as the Recreation Director in November of 1996, and Plaintiff began her first day of work on January 2, 1997. (Id. ¶¶ 10–11.) Recreation Director is a civil service position, subject to the rules and requirements of New York's Civil Service laws and regulations. (Id. ¶ 12.) The Recreation Director position is not appointed annually, unlike some other department head positions, and "exercises general supervision over" and has responsibility for the City's recreational areas, playgrounds, and programs, including City recreational events. (Id. ¶¶ 15–16.) Plaintiff is a member of the collective bargaining unit, identified as "CSEA." (Id. ¶ 17.) After a brief period of probation, Plaintiff became a permanent employee, and the position was then "controlled by N.Y. Civil Service Law § 75 ('Section 75')." (Id. ¶ 13.) Section 75 prohibits the City from terminating an employee without first issuing charges and then providing a hearing on the charges, with some exceptions. (Id. ¶ 14.)

For the first twenty-one years of her employment, Plaintiff performed her job "in an exemplary manner." (Id. ¶ 18.) Plaintiff was "not disciplined or reprimanded, and her personnel record [was] unblemished." (Id. ¶ 19.) From 1997 to 2017, Plaintiff worked "successfully" with four different administrations from both major political parties. (Id. ¶ 20.) Residents have "lauded" her work performance. (Id. ¶¶ 22–23.)

In January of 2016, the CSEA instructed then-mayor Reginald Spinello to remove Plaintiff as a dues-paying member of the CSEA. (Id. ¶ 24.) Spinello declined to take action because he believed the issue "was really between [Plaintiff] and the union." (Id. ¶ 25.)

Plaintiff's work conditions "changed for the worse" "[a]lmost immediately" after Tenke took office as mayor in January of 2018 and City officials worked to undermine and circumvent her. (Id. ¶¶ 28–29.) For example, that month, Tenke and the deputy mayor, Maureen Basdavanos, sought to amend parking regulations at the City stadium parking lot, and although Plaintiff "should have been involved in such discussions," Tenke and Basdavanos excluded her. (Id. ¶¶ 30–31.)

#### c. 2018 actions alleged by Plaintiff

In February of 2018, a "close friend and ally of Tenke," Michael Cervini, began a "campaign of disinformation about [Plaintiff]'s work leading the renovation of the City's batting cages." (*Id.* ¶ 32.) Cervini publicly criticized Plaintiff's work but praised the mayor, including in a full-page advertisement in the local newspaper. (*Id.* ¶ 34.) Plaintiff asked Tenke to confront Cervini, but the conduct did not stop. [3] (*Id.* ¶ 36.)

[3]    Plaintiff does not allege "whether Tenke took action or not." (Compl. ¶ 36.)

 **\*3** At a City Council meeting in July of 2018, Basdavanos' husband accused Plaintiff of not caring about the safety of residents and stated that she should be fired because she did not staff "sufficient lifeguards" for the beaches. (*Id.* ¶ 38.) At that time, there was an ongoing national lifeguard shortage, which was affecting municipalities across Long Island. (*Id.* ¶ 39.)

That summer, a citizen requested documents concerning bathroom renovations being supervised by Plaintiff pursuant to the Freedom of Information Law ("FOIL"). (*Id.* ¶ 40.) Instead of "allowing the FOIL request to proceed in the normal course," Basdavanos sent the documents directly to the resident, who used these documents "to allege that [Plaintiff] should be fired for mismanaging the project." (*Id.* ¶ 41.) Plaintiff contends that the project was "doomed" because of a defunct outside contractor, and that although she had sought assistance from Tenke, the city attorney, and the building department to force the contractor's hand in completing the work, they took no action, leaving Plaintiff to "take the blame for the contractor's failures." (*Id.* ¶¶ 42–43.)

Plaintiff contends that these issues were directed at her based on her gender, because "historically," the mayor supported male employees and would "maintain order at meetings and other events" when residents criticized these employees but did not do the same for Plaintiff. (*Id.* ¶ 45.) In addition, male employees were not reprimanded or criticized for serious misconduct, while Defendants "tacitly condoned and/ or provoked" residents' unwarranted criticisms of Plaintiff. (*Id.*) Examples of male employees receiving better treatment included a male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being

reprimanded, and a male employee not being reprimanded or disciplined for unlawfully switching license plates on City vehicles, one of which was used for non-work-related purposes and involved in an accident. (*Id.* ¶ 46.)

In December of 2018, Tenke attempted to fire the City's controller, Sandra Clarson, but was unable to do so because it would have violated the City Charter. (*Id.* ¶¶ 47–48.) The following summer, *Newsday* reported that Tenke's paychecks did not include certain required deductions for health insurance benefits, but Tenke alleged he was not aware of the error and blamed Clarson's office, saying that this was "what happen[ed] when a duly elected mayor [was] forced to use a holdover political appointee to provide financial checks and balances for the [C]ity." (*Id.* ¶¶ 49–52.) He called this "pure obstructionist politics." (*Id.* ¶ 52.) Tenke attempted to fire Clarson again while she was on vacation, but Clarson temporarily returned to work following an order by a Nassau County Court judge. (*Id.* ¶¶ 54–55.)

#### d. 2019 actions alleged by Plaintiff

In August of 2019, the CSEA asked Tenke to remove Plaintiff's CSEA member status and cease collecting her union dues, as the union was concerned that Plaintiff had brought Section 75 charges against a subordinate CSEA employee for misconduct and believed that such conduct compelled her dismissal from the union. (*Id.* ¶¶ 56–57.) Tenke immediately acquiesced to the demand and revoked Plaintiff's membership. (*Id.* ¶ 58.) Two weeks later, Plaintiff met with CSEA officials to explain her position, and the CSEA retracted its prior demand and told Tenke that he should reinstate Plaintiff. (*Id.* ¶¶ 59–60.)

 **\*4** On October 2, 2019, Clarson, who by then was no longer the City controller, together with Plaintiff, issued a press release concerning "ongoing sex discrimination and harassment of female City employees." (*Id.* ¶ 61.) A friend who had worked with the previous Republican administration assisted in issuing the press release. (*Id.* ¶¶ 62–63.) Tenke refuted the claims and asserted that Plaintiff's press release was a "political attack." (*Id.* ¶ 68.) Councilwoman Marsha Silverman also believed that the press release was "politically motivated and unsubstantiated." (*Id.* ¶ 69.) *Newsday* reported on the story on October 17, 2019. (*Id.* ¶ 70.) On October 15, 2019, Plaintiff sent a letter to a City personnel officer, John Charon, "detailing much of [Plaintiff's] mistreatment from January [of] 2018 to then" and alleging that the treatment

was based on "gender bias." (*Id.* ¶ 64.) The letter outlined the basis for Plaintiff's discrimination allegations, and, in addition, noted that:

> There is a serious and dangerous pattern of proficient and accomplished women working in this administration that are consistently harassed and bullied. Yet, male employees are not reprimanded in any way, even when their offenses are clearly blatant insubordination or border on criminal.

(*Id.* ¶ 65.)

The City did not include Plaintiff in budget talks in the fall of 2019, even though department heads, including Plaintiff, were traditionally involved in budget discussions. (*Id.* ¶¶ 75–77.) In November of 2019, Tenke and other City officials met to discuss one of the City's recreation areas, but Plaintiff was not included in the meeting. (*Id.* ¶¶ 78–79.) At the meeting Tenke announced that Plaintiff would not be working for the City in 2020 and that the Parks Department would be folded into the Department of Public Works (the "DPW"). (*Id.* ¶ 80.) Plaintiff alleges that "Tenke was laying the groundwork to remove [her] in one of the only ways permitted by the Civil Service rules." (*Id.* ¶ 81.)

On December 19, 2019, attorneys for the City contacted Plaintiff, acknowledging receipt of her complaint and setting up twelve hours of interviews to discuss her allegations of sex discrimination. (*Id.* ¶ 82.) Within weeks, Tenke began "stripping" Plaintiff of her duties. (*Id.* ¶ 83.) For example, on December 31, 2019, Plaintiff was told that one of her employees responsible for a major department project was being reassigned to the DPW. (*Id.* ¶ 84.) On January 8, 2020, City officials excluded Plaintiff from a vendor meeting concerning contamination at one of the beaches under her supervision, and the next day, DPW employees told her she had to turn over her files concerning the contamination project. (*Id.* ¶¶ 85–86.) When Plaintiff asked why, the employees "blamed" Basdavanos and Grant Newburger, the Public Relations officer. (*Id.* ¶ 87.)

**e. 2020 actions alleged by Plaintiff**

On January 13, 2020, Plaintiff spoke with Louis Saulino, the DPW director, about the contamination project. (*Id.* ¶ 88.) Saulino told Plaintiff that he needed her in the meetings, was "aggravated" by Tenke's handling of the meetings and exclusion of Plaintiff from the meetings, and wanted nothing to do with assuming any of Plaintiff's responsibilities, as he had enough work "on [his] plate." (*Id.* ¶ 89.) Saulino spoke with Tenke about including Plaintiff in the contamination meetings and Tenke agreed but insisted that Plaintiff should remain excluded from other project meetings, such as a bathroom renovation project at one of her parks. (*Id.* ¶¶ 90–91.)

Several days later, a member of one of the City's sports leagues informed Plaintiff that City residents had heard that the City intended to move her Department's office location to the basement of City Hall or off-site. (*Id.* ¶¶ 92–93.)

On March 9, 2020, shortly after the Covid-19 pandemic began, the City convened a meeting across departments to discuss the City's plan for the pandemic. (*Id.* ¶¶ 94–95.) Even though Plaintiff's department supervised events and sports leagues with hundreds of participants, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan. (*Id.* ¶ 97.)

 **\*5** On May 5, 2020, Tenke ordered the auxiliary police to change the locks on a park facility. (*Id.* ¶ 98.) On July 28, 2020, Tenke proposed a resolution to publicize the results of the City's investigation into Plaintiff's complaints of discrimination, although Plaintiff alleges that "such documents should have remained confidential parts of the employee personnel file." (*Id.* ¶ 99.)

On October 9, 2020, Tenke told Plaintiff he was eliminating her position from the 2021 budget. (*Id.* ¶ 101.) Tenke asserted that the City was facing budget issues and that layoffs were the only solution. (*Id.* ¶ 104.) Plaintiff was the only department head terminated. (*Id.* ¶ 103.) In October of 2020, the City Council met and discussed the proposed budget, which included the layoffs. (*Id.* ¶ 105.) Several Council members pointed out other ways to reduce costs, but Tenke rejected those alternatives as "not viable." (*Id.* ¶ 106.) Tenke did not approach the CSEA, which could have offered cost-saving concessions, and did not approach department heads, who were usually asked to provide input about reducing budget costs. (*Id.* ¶¶ 107–08.) In addition to Plaintiff, five low-level laborers or clerks were set to be laid off. (*Id.* ¶ 109.)

Plaintiff contends that Defendants' actions have caused her to suffer from insomnia, headaches, dizzy spells, and weight gain. (*Id.* ¶ 114.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Vaughn*, 957 F.3d at 145 (same).

### b. Consideration of documents other than the Complaint

In support of his motion to dismiss, Tenke has submitted a number of documents and files that are not attached to the Complaint and asserts that the Court should consider them because they are public records and documents referenced in Plaintiff's Complaint. (Tenke's Mem. 10–11; Tenke's Reply 1–2.)

Plaintiff argues that the documents submitted are unauthenticated, and even if they were authenticated, several documents are not heavily relied upon "to frame the Complaint" and are "all tangential to the central issues." (Pl.'s Tenke Opp'n 6–8.)

In deciding a Rule 12(b)(6) motion, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." (alteration in original) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))). Disputes regarding the authenticity or accuracy of documents preclude a court's consideration on a motion to dismiss. *See DiFolco*, 622 F.3d at 111 (stating that to consider documentary evidence on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006))); *Beer*, 463 F.3d at 134 ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." (first citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); and then citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001))); *Structured Asset Sales, LLC v. Sheeran*, No. 20-CV-4329, 2021 WL 1199495, at *5 (S.D.N.Y. Mar. 30, 2021) (same); *DeLeon v. Teamsters Loc. 802, LLC*, No. 20-CV-24, 2021 WL 1193191, at *8 (E.D.N.Y. Mar. 29, 2021) (same); *F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 381 (E.D.N.Y. 2015) (stating that in order to consider documentary evidence on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible" (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221 (N.D.N.Y. 2014))).

**\*6** In addition to his memorandum of law in support of his motion to dismiss, Tenke has submitted (and the City also

relies on, (*see* City's Mem.)) several documents Defendants contend are referenced in the Complaint: (1) an advertisement placed by Cervini in a local newspaper, which Defendants also claim is a matter of public record; (2) a copy of correspondence between CSEA and the City; (3) a copy of Plaintiff's internal workplace harassment complaint submitted to the City on October 15, 2019; and (4) a copy of the findings of the investigation of Plaintiff's harassment complaint. [4] In addition, Defendants rely on several other documents that they contend are matters of public record: (1) copies of the minutes of the October 27, 2020 City Council meeting and 2021 budget adopted at that meeting, which Defendants also claim are referenced in the Complaint; (2) a copy of a July 18, 2019 *Newsday* article, which Defendants also claim is referenced in the Complaint; and (3) a copy of Plaintiff's Charge of Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC Charge"), dated March 13, 2020. [5] Tenke has also embedded several links to City Council meetings on a video hosting platform, "Vimeo," a link to an article in the *Long Island Herald*, and the City Charter. (*See generally* Tenke's Mem. 3–9.)

[4]    (*See* Advertisement, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. B, Docket Entry No. 13-3; Correspondence, annexed to Radi Decl. as Ex. C, Docket Entry No. 13-4; Workplace Harassment Compl., annexed to Radi Decl. as Ex. D, Docket Entry No. 13-5; Findings of Workplace Harassment Compl., annexed to Radi Decl. as Ex. E, Docket Entry No. 13-6.)

[5]    (*See* Min. dated Oct. 27, 2020, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. F, Docket Entry No. 13-7; *Newsday* article dated July 18, 2019, annexed to Radi Decl. as Ex. G, Docket Entry No. 13-8; EEOC Charge, annexed to Radi Decl. as Ex. H, Docket Entry No. 13-9.)

The Court takes judicial notice of the EEOC Charge, City Charter, copies of the October 27, 2020 City Council meeting minutes [6] — including the 2021 budget adopted at that meeting — and the July 18, 2019 *Newsday* article, as they are matters of public record. *See Lively v. WAFRA Inv. Advisory Grp., Inc.,* 6 F.4th 293, 305 (2d Cir. 2021) ("[T]he district court may have taken judicial notice that [the complainant] filed complaints with the EEOC and in federal court ...." (citing *Massey v. Ojaniit,* 759 F.3d 343, 353 (4th Cir. 2014))); *see also Mike v. Drug Enforcement Admin.,* No. 19-CV-5407, 2022 WL 992528, at *4 n.11 (E.D.N.Y. Mar. 31,

2022) ("[T]he [c]ourt takes judicial notice of the fact of the publication ... in *USA Today*."); *King v. City of New York,* 581 F.Supp.3d 559 (S.D.N.Y. 2022) ("On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint. It may also take judicial notice of public records, such as complaints filed in state court and city council minutes." (citation omitted)); *Elite Union Installations, LLC v. National Fire Ins. Co.,* 559 F. Supp. 3d 211, 218 (S.D.N.Y. 2021) ("Courts may also 'take judicial notice of certain matters of public record ... includ[ing] 'things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, published reports, [and] records of administrative agencies.' " (first quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); and then quoting *Rahman v. Schriro,* 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014))); *Roth,* 489 F.3d at 509 (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991)); *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.,* 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015) (noting that "when a court takes judicial notice of documents in the public record at the [m]otion [t]o [d]ismiss stage," it may consider them "only to establish their existence and legal effect[ ] or to determine what statements they contain[ ] [but] not for the truth of the matters asserted" (quoting *Liang v. City of New York,* No. 10-CV-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013))); *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597, 612 & n.4 (S.D.N.Y. 2008) (taking judicial notice of several news articles, including magazines and noting that the court "may take judicial notice of newspaper articles for the fact of their publication" (quoting *In re Merrill Lynch & Co.,* 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003))), *aff'd,* 347 F. App'x 665 (2d Cir. 2009).

[6]    Other courts in this Circuit have considered City Council minutes matters of public record. *See King v. City of New York,* 581 F.Supp.3d 559 (S.D.N.Y. 2022) ("On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint. It may also take judicial notice of public records, such as complaints filed in state court and city council minutes." (citation omitted)); *Schubert v. City of Rye,* 775 F. Supp. 2d 689, 696 n.3 (S.D.N.Y. 2011) ("Second, the minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice.") (collecting cases).

2022 WL 3586559

**\*7** The Court declines to consider the other documents and videos because Plaintiff disputes their authenticity. *See Faulkner*, 463 F.3d at 134 (noting that courts may not consider extrinsic materials on a motion to dismiss where the authenticity is disputed on the record); *see Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 719–20 (S.D.N.Y. 2015) (rejecting videos where their authenticity was disputed even assuming they were integral); *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 397–98 (S.D.N.Y. 2015) (rejecting incident report, depositions, and misdemeanor complaint because they were disputed).

The Court also declines to convert these motions to dismiss into motions for summary judgment in light of Plaintiff's request for the parties to conduct discovery and submit additional materials, (Pl.'s Tenke Opp'n 7 n.3), as the parties have not been given a "reasonable opportunity to present all [pertinent] material." *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (quoting Fed. R. Civ. P. 12(d)) (reversing the district court's decision where the district court did not permit submission of all pertinent materials before converting motion to dismiss into motion for summary judgment).

### c. Title VII claims against the City

The City argues that Plaintiff's Title VII hostile work environment and retaliation claims fail because several of her alleged acts are time-barred, she has failed to exhaust her administrative remedies, and she fails to state hostile work environment or retaliation claims.

### i. Timeliness

The City argues that the Court should dismiss Plaintiff's Title VII claims to the extent that her claims are based on incidents that occurred more than 300 days before Plaintiff filed the EEOC Charge. (City's Mem. 2–4.) Because Plaintiff filed the EEOC Charge on March 13, 2020, the City contends that she cannot base her claims on any alleged discrete events that occurred before May 18, 2019, 300 days prior to that date, including the City's January 2018 failed attempt to amend parking regulations; public criticism by Cervini in February of 2018; public criticism by Basdavanos in July of 2018; and the City's summer 2018 response to a FOIL request. (*Id.* at 3.)

Plaintiff argues that discriminatory acts which may fall outside the statute of limitations are not time-barred if those acts are part of the "same unlawful employment practice and at least one act falls within the time period." (Pl.'s City Opp'n 3–4 (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019)).) In support, Plaintiff argues that because the Complaint alleges ongoing harassment based on her sex, her claims are timely under *Davis-Garett*. (*Id.*)

In New York, a federal employment discrimination claim is time-barred unless the plaintiff first files an EEOC charge within 300 days of the alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) ("Under Title VII, a plaintiff in New York must file a complaint with the EEOC within 300 days of a discriminatory act." (first citing 42 U.S.C. 2000e-5(e)(1); and then citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999))); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010). This requirement is analogous to a statute of limitations. *Vega*, 801 F.3d at 79; *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (dismissing as untimely claims based on conduct that occurred more than 300 days prior to the filing of EEOC charge).

**\*8** "[E]xpiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.' " *Davis-Garett*, 921 F.3d at 42; *see Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (holding that allegations concerning conduct that took place during the time-barred period may also be considered as " 'background evidence' in evaluating the merits of [a plaintiff's] discrimination claims" (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002))); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (explaining that background evidence from outside the limitations period "may be considered to assess liability on the timely alleged act" (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005))); *Everett v. N.Y.C. Dep't of Educ.*, No. 21-CV-7043, 2022 WL 2342693, at \*5 (S.D.N.Y. June 29, 2022) (considering acts outside of the statute of limitations as "background evidence"); *McGrier v. Cap. Cardiology*, No. 20-CV-1044, 2022 WL 2105854, at \*7 (N.D.N.Y. June 10, 2022) ("Though time-barred, discrete prior acts falling outside the limitations period may be used as 'background evidence in support of a timely claim.' " (quoting *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061)); *Marzano v. S. New England Tel. Co.*, No. 16-CV-1274, 2018 WL 4341149, at

*2 (D. Conn. Sept. 10, 2018) ("Of course, evidence of prior events may be considered for background purposes to the extent that they may shed light on the significance of events occurring within the statute of limitations period."); *Johnson v. Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-CV-00901, 2018 WL 306697, at *4 (D. Conn. Jan. 5, 2018) ("[A]ny adverse acts that occurred prior to [the statute of limitations period] may be considered ... only as background evidence to support any non-time-barred acts of discrimination or retaliation."); *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 13-CV-1594, 2016 WL 1466545, at *14 (N.D.N.Y. Apr. 16, 2016) ("The statute of limitations does not ... bar an employee from using ... prior acts as background evidence in support of a timely claim." (quoting *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061)).

In addition, a hostile work environment claim by its very nature involves repeated conduct over time rather than a discrete occurrence on a particular day. *See, e.g., Ferraro v. N.Y.C. Dep't of Educ.*, No. 13-CV-5837, 2015 WL 1476392, at *7 (E.D.N.Y. Mar. 31, 2015) (quoting *Morgan*, 536 U.S. at 115, 122 S.Ct. 2061). Such a claim is timely if at least one act contributing to the claim occurred within the limitations period. *See Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir. 2020) ("For hostile work environment claims, only one alleged act must fall within the statute of limitations, and so long as that act is part of the same unlawful practice as the earlier acts, the entire period of hostile environment may be considered."); *Patterson*, 375 F.3d at 220 (citing *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061) (same).

In her EEOC Charge, Plaintiff wrote that she was subjected to retaliation and discriminated against, has been "consistently and repeatedly harassed, belittled[,] and blocked from performing [her] job duties since January 17, 2018," filed a complaint with her employer, which was ignored, and was "treated ... poorly." (EEOC Charge at 1.) The City concedes several timely acts, (City's Mem. 3–4), which are part of the unlawful employment practices. Accordingly, the acts alleged in the Complaint prior to May 18, 2019 — the failure to be included in discussions about the parking spaces, (Compl. ¶ 31); public criticism by Cervini regarding the renovations of the City's batting cages, (*id.* ¶ 34); public criticism from Basdavanos' husband that Plaintiff should be fired because she did not staff "sufficient lifeguards" for the beaches, (*id.* ¶ 38); and the City's response to a FOIL request, (*id.* ¶¶ 40–43) — while untimely as discrete acts, are all part of Plaintiff's hostile work environment claim, and therefore are timely for purposes of Plaintiff's hostile work environment claim.[7]

[7] While discrete acts taking place prior to May 18, 2019 are time-barred for purposes of Plaintiff's Title VII retaliation claim, *see Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir. 2020) (affirming district court's ruling that Title VII disparate treatment and retaliation claims were time-barred), the Court nevertheless remains free to consider the discrete acts as "background evidence" for purposes of Plaintiff's retaliation claim. *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013).

### ii. Exhaustion of administrative remedies

*9 The City argues that the Court should dismiss Plaintiff's Title VII claims because she "failed to timely exhaust [her] administrative remedies" with the EEOC. (City's Mem. 2–4.) The City argues that Plaintiff fails to exhaust her claims as to: (1) her removal and reinstatement to the union in August of 2019, (2) her exclusion from meetings and project reassignment in late 2019 and 2020, and (3) the elimination of her position in October of 2020, effective January of 2021, because she never presented any of these allegations to the EEOC. (*Id.* at 3–4.)

Plaintiff contends that she exhausted her administrative remedies because her claims are "reasonably related" to those presented in the EEOC charge. (Pl.'s City Opp'n 4–5 (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)).)

Under Title VII, a complainant must "exhaust" her administrative remedies by filing a complaint with the EEOC or an authorized state agency prior to the commencement of a Title VII action in federal court, and that complaint must name the defendant. *See Edo v. Antika Pizzeria Astoria, Inc.*, 852 F. App'x 618, 619 (2d Cir. 2021) ("Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006))); *McPartlan-Hurson v. Westchester Cmty. Coll.*, 804 F. App'x 41, 43 (2d Cir. 2020) ("Pursuant to Title VII and the ADA, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC within 300 days of a discriminatory act." (citing 42 U.S.C. §§ 2000e-5(e)(1), 12117(a))); *Duplan v. City of New York*, 888 F.3d 612, 624 (2d Cir. 2018) ("Exhaustion is 'an essential element of Title VII's statutory

scheme.' " (quoting *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018))). However, "[c]laims not raised in an EEOC complaint ... may be brought in federal court if they are reasonably related to the claim filed with the agency." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 110 n.5 (2d Cir. 2018) (en banc) (alteration in original) (quoting *Williams*, 458 F.3d at 70), *aff'd sub nom. Bostock v. Clayton County*, 590 U.S. ---, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020); *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (same). "Reasonably related" claims are recognized in three situations: where (1) the alleged discriminatory conduct "would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination' "; (2) the claim is one of "retaliation by an employer against an employee for filing an EEOC charge"; and (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003); *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 458 (2d Cir. 2009) (same). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.' " *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008) (quoting *Deravin*, 335 F.3d at 202); *see also Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation." (citing *Williams*, 458 F.3d at 70)). Courts look at "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" to determine whether the claims are reasonably related. *Littlejohn*, 795 F.3d at 322 (alteration omitted) (quoting *Deravin*, 335 F.3d at 201); *Scott v. N. Manor Multicare Ctr., Inc.*, No. 15-CV-2495, 2018 WL 1627270, at *7, 2018 U.S. Dist. LEXIS 54730, at *17 (S.D.N.Y. Mar. 30, 2018) ("[T]he 'relatedness' analysis is 'intimately connected to the facts asserted in the EEOC complaint,' 'and does not depend on the boxes checked or labels applied by the plaintiff.' " (citation omitted) (first quoting *Williams*, 458 F.3d at 71; and then quoting *Carby v. Holder*, No. 11-CV-5775, 2013 WL 3481722, at *5 (S.D.N.Y. July 10, 2013))).

**\*10** In her EEOC Charge, Plaintiff indicated that she had experienced discrimination and retaliation based on her sex. (EEOC Charge at 1.) Plaintiff noted that the discrimination took place on October 10, 2019. (*Id.*) Plaintiff did not check the box indicating that the discrimination was a "continuing action," but when asked to add the particulars of her claim, Plaintiff specified that she had been subjected to retaliation and discrimination because she is female, and had been "consistently and repeatedly harassed, belitted[,] and blocked from performing [her] job duties since January 17, 2018 and most recently on March 9, 2020." (*Id.*) Plaintiff also wrote that she filed a complaint with her employer, which was ignored, and that she was "treated ... poorly." (*Id.*) In addition, Plaintiff noted that the male heads of departments and other male employees were "never questioned, disciplined, undermined[,] or prevented from performing their job duties, nor [were] they harassed or belittled at public meetings," unlike her. (EEOC Charge at 2.)

Plaintiff's timely allegations — removal and reinstatement to the union in August of 2019, exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021 — are "reasonably related" to the allegations in the EEOC Charge because the EEOC Charge detailed alleged discriminatory practices, retaliation, and a hostile work environment and provided "adequate notice" to the EEOC based on the dates and actions alleged in the EEOC Charge. *Williams*, 458 F.3d at 70 ("The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice.' "); *see Hoffman*, 443 F. App'x at 649 (ruling that a new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation). In her Complaint, Plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry*, 336 F.3d at 151. Thus, her allegations identified above "fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' " *Id.*; *see Littlejohn*, 795 F.3d at 322 (same).

Accordingly, the Court finds that Plaintiff has exhausted her administrative remedies as to her removal and reinstatement to the union in August of 2019, her exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021.

### iii. Hostile work environment claim

The City argues that Plaintiff fails to state to a hostile work environment claim, as the alleged incidents upon

which Plaintiff relies do not amount to severe or pervasive harassment, and are also "bereft" of any factual allegations plausibly demonstrating that the harassing incidents were gender-based. (City's Mem. 5–7.)

Plaintiff argues that she sufficiently states a hostile work environment claim because the conduct was severely or pervasively abusive and Defendants did not mistreat men. (Pl.'s City Opp'n 6–8.)

To state a hostile work environment claim, a plaintiff must "show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)); *see Duplan*, 888 F.3d at 627 (same); *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (same). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). The Second Circuit has cautioned that:

> **\*11** While the standard for establishing a hostile work environment is high, [the Second Circuit] ha[s] repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*

*Terry*, 336 F.3d at 148. A plaintiff must also show "that the complained of conduct ... creates such an environment because of the plaintiff's" protected characteristic. *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir. 2019). A court should consider the totality of the circumstances and factors such as "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Staten v. City of New York*, 653 F. App'x 78, 80 (2d Cir. 2016) (alteration in original) (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). In evaluating whether a plaintiff states a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[ ]" discrimination. *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3 (2d Cir. 2017) (citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010)) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

Based on the totality of the alleged conduct, Plaintiff plausibly alleges a hostile work environment claim on the basis of gender. Plaintiff claims that over a series of years, the City excluded her from meetings where she would normally be involved as a department head. (Compl. ¶¶ 31, 85–86.) Indeed, Plaintiff was excluded from a vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85), and was directed to turn over her files concerning the contamination project, (*id.* ¶ 86). In addition, one of her employees responsible for a major department project was reassigned to a different office, (*id.* ¶ 84). Further, following the start of the Covid-19 pandemic, when the City convened a meeting across departments to discuss the City's plan, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan even though Plaintiff's department supervised events and sports leagues with hundreds of participants. (*Id.* ¶ 97.) While ordinarily, exclusions from meetings do not sufficiently allege the level of harassment necessary to support a hostile work environment claim, *see, e.g.*, *Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Services*, 739 F. App'x 23, 27 (2d Cir. 2018) (ruling that plaintiff's allegations that her employer refused to send her to mandatory training, reduced her job responsibilities, and criticized her performance did not constitute a hostile work environment), under the circumstances of this case, Plaintiff adequately alleges an environment where she experienced "harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113. As the Recreation Director, because Plaintiff was responsible for "exercis[ing] general supervision over and responsibility"

for the City's recreational areas, playgrounds, and programs, (Compl. ¶ 16), excluding Plaintiff from meetings regarding matters for which she was directly responsible effectively prevented Plaintiff from performing her job duties. [8] Further, Plaintiff does not allege isolated incidents; rather, the incidents were "sufficiently continuous and concerted" over several years to support a finding that Plaintiff experienced a hostile work environment. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019); *see Feingold*, 366 F.3d at 150 (holding that an employee experienced pervasive discrimination where he was singled out on an "almost daily" basis through hostile remarks and overt animosity).

[8]   For example, in 2018, Plaintiff was excluded from planning and strategy regarding parking regulations, an issue that directly fell under her responsibilities. (Compl. ¶¶ 30–31.) In November of 2019, Plaintiff was also excluded from budget discussions in which she had previously been included and in addition was excluded from a meeting concerning a City recreation area, which fell under her responsibilities. (*Id.* ¶¶ 76–79.) In January of 2020, Plaintiff was excluded from a vendor meeting concerning contamination at one of the City's beaches and was ordered to turn over her files regarding the beach. (*Id.* ¶¶ 85–86.)

**\*12** Defendants also content that Plaintiff has not sufficiently alleged a hostile work environment on the basis of gender. (City's Mem. 6–7.) However, Plaintiff alleges examples of male employees receiving better treatment, including a male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being reprimanded, and a male employee unlawfully switching license plates on City vehicles, one of which was used for non-work related purposes and became involved in an accident, who was also not reprimanded or disciplined. (Compl. ¶ 46.) She further alleges that her gender was the basis for this treatment because "male employees were not reprimanded or criticized in any way for serious misconduct," (*id.* ¶ 45). Plaintiff sufficiently alleges differential treatment based on gender at the pleading stage. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 n.6 (2d Cir. 2010) ("A Title VII sexually hostile work environment claim ... requires a plaintiff to establish that the conduct at issue occurred 'because of the plaintiff's sex.' " (quoting *Patane*, 508 F.3d at 113)); *Patane*, 508 F.3d at 114 ("[A] plaintiff need only allege

that she suffered a hostile work environment because of her gender.").

Accordingly, viewing Plaintiff's allegations in their totality and drawing all inferences in her favor, Plaintiff plausibly alleges a hostile work environment claim.

### iv. Retaliation

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity and also argues that, other than the elimination of her position, most of the alleged incidents do not amount to adverse actions. (City's Mem. 8–10.) In addition, the City argues that, as to the elimination of Plaintiff's position, Plaintiff fails to plausibly allege a causal connection to her complaints of gender discrimination. (*Id.*)

Plaintiff argues that after she complained about discrimination, City officials "shrugged off" her complaints and then retaliated against her. (Pl.'s City Opp'n 9–15.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Claims of retaliation are analyzed under the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (applying *McDonnell Douglas* to retaliation claim); *Carr v. N.Y.C. Transit Auth.*, No. 16-CV-9957, 2022 WL 824367, at \*12 (S.D.N.Y. Mar. 18, 2022) (same). At the pleading stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Duplan*, 888 F.3d at 625 (quoting *Littlejohn*, 795 F.3d at 316); *see Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 19 (2d Cir. 2015) (same). The main question on a motion to dismiss is whether a plaintiff can establish a claim that has "[f]actual allegations [that] raise a right of relief above the speculative level." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010) (first alteration in original) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *see also Williams*, 458 F.3d at 71 ("[T]he requirements for establishing a prima facie case under *McDonnell Douglas* [do not] apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." (second alteration in original) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 511, 122 S.Ct.

992, 152 L.Ed.2d 1 (2002))); *Harris v. Office of N.Y. State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *17 n.29 (S.D.N.Y. Mar. 17, 2022) ("[T]he allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." (alteration in original) (quoting *Littlejohn*, 795 F.3d at 316)); *Pompey-Primus v. Success Acad. Charter Sch., Inc.*, No. 21-CV-3981, 2022 WL 504541, at *8 (S.D.N.Y. Feb. 17, 2022) ("Retaliation claims brought under Title VII ... are analyzed using the *McDonnell Douglas* burden-shifting framework .... [A]t the motion to dismiss stage, the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 154 (S.D.N.Y. 2004) ("The question that should be considered by this Court in connection with the [motion to dismiss] is whether [the plaintiff] has alleged a prima facie case for retaliation; not whether her claim will survive a *McDonnell Douglas* burden shifting analysis.").

**\*13** To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). At the pleading stage, the allegations need only give "plausible support to the reduced prima facie requirements." *Id.* "[F]or a retaliation claim to survive ... a motion to dismiss, the plaintiff must plausibly allege that: (1) [the] defendants discriminated — or took an adverse employment action — against [her], (2) because [s]he has opposed any unlawful employment practice." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 (2d Cir. 2016) (second two alterations in original) (quoting *Vega*, 801 F.3d at 90).

### 1. Participation in a protected activity

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity, as her "gripes were premised on personal animus and petty workplace grievances." (City's Mem. 8.)

Plaintiff argues that she reasonably and in good faith believed that she was being treated differently based on her gender and that her complaint was not a general grievance about working conditions, but a discrimination complaint. (Pl.'s City Opp'n 10–11.)

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII. *See Jagmohan v. Long Island R.R. Co.*, 622 F. App'x 61, 63–64 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan*, 622 F. App'x at 63–64 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (holding that Title VII "protects employees [who] ... make[ ] informal protests of discrimination, including making complaints to management, so long as the employee has 'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law' " (first quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000); and then quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998))). "[A]ttempts to assert ... rights against discrimination are protected activities." *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)).

In or around October of 2019, Plaintiff sent a letter to a City personnel officer, John Charon, detailing her alleged mistreatment and alleging that the treatment was based on "gender bias," and has therefore shown that she opposed unlawful employment practices. (Compl. ¶ 64); *see Frantti*, 850 F. App'x at 21 (holding that efforts to protest discriminatory practices are protected activities). Plaintiff sufficiently alleges that she made "protests of discrimination, including making complaints to management," *Summa*, 708 F.3d at 127, with a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *Gregory*, 243 F.3d at 701. Private complaints to internal personnel alleging discrimination constitute protected activity. *See Cousar v. New York-Presbyterian/ Queens*, No. 16-CV-1784, 2019 WL 4015440, at *15 (E.D.N.Y. Aug. 26, 2019) (finding that emails to human resources staff complaining of discrimination constitute protected activity), *aff'd*, 845 F. App'x 34 (2d Cir. 2021); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that ... complaints to supervisors constitute protected activity under Title VII.").

### 2. Adverse employment action

**\*14** The City argues that most of the acts that Plaintiff alleges are not adverse employment actions, except for the elimination of her position. (City's Mem. 8–10.)

Plaintiff contends that the threat of termination is also an adverse action for purposes of retaliation. (Pl.'s City Opp'n 11.)

Adverse employment actions are actions that "could well have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination." *Davis-Garett*, 921 F.3d at 44 (first quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006); and then citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165 (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

Plaintiff alleges that Tenke announced during a November 2019 meeting that Plaintiff would not be working for the City in 2020 and that the Parks Department, which Plaintiff headed, would be folded into the DPW. (*Id.* ¶ 80.) In view of the fact that Plaintiff was ultimately terminated and thus suffered an adverse employment action based on her termination, (Compl. ¶¶ 101, 103), the threat of termination is also an adverse employment action. *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 254 (W.D.N.Y. 2011) ("[T]hreats of termination or other punishment do not qualify as adverse actions where they were never carried through."); *cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (determining that threat of termination fell into category of "trivial harms" and "petty slights or minor annoyances" when the threat was never carried out); *McGrier*, 2022 WL 2105854, at \*18 (holding that the threat of termination "without any allegation that would permit an inference that the threat would be carried through" was insufficient to allege an adverse action).

Thus, Tenke's threat of termination in the November 2019 meeting and Plaintiff's termination, authorized in October of 2020 and made effective January of 2021, both constitute adverse employment actions. *See Rivera v. JP Morgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020) (affirming that an adverse employment action for Title VII retaliation purposes is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination," and that standard "covers a broader range of conduct than the adverse-action standard for claims of discrimination"); *O'Toole v. County of Orange*, 255 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) ("Defendant's conduct, considered as a whole, meets the 'objective' standard, as the 'employment consequences of a negative nature' resulting from making a complaint could chill other employees from speaking up." (quoting *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014))).

### 3. Causal connection between protected activity and adverse employment actions

**\*15** The City contends that Plaintiff fails to plausibly allege a causal connection between her discrimination complaint and the elimination of her position. (City's Mem. 9–10.)

Plaintiff argues that she has established a causal connection through temporal proximity and through a pattern of antagonism. (Pl.'s City Opp'n 11–15.)

To sufficiently plead that a defendant-employer took an adverse employment action "because" a plaintiff opposed an unlawful employment practice, a plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)). But-for causation does not require that retaliation "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 497 (E.D.N.Y. 2016) (same)).

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111,

117 (2d Cir. 2000)); *see also Terry*, 336 F.3d at 152 ("Proof of such a causal connection 'can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment ... such as disparate treatment of fellow employees who engaged in similar conduct.' '"" (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006))); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same).

"[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." *Feingold*, 366 F.3d at 156–57 (collecting cases); *see also Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." (first citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); and then citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010))); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) ("Ordinarily, causation may be inferred from close temporal proximity."). The Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship.").

**\*16** Where defendants are alleged to have retaliated at the first available opportunity, the window of temporal proximity can be extended. *See Grant v. Bethlehem Steel*, 622 F.2d 43, 45–46 (2d Cir. 1980) (holding that plaintiff established causal connection in Title VII retaliation case despite an eight month lapse between the protected activity and the adverse action when the defendant was unable to retaliate any sooner); *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at \*5 (S.D.N.Y. Aug. 5, 2009) (in the context of First Amendment retaliation, noting that a gap of nearly one year between protected activity and retaliatory action was plausible because defendant "had no earlier opportunity to retaliate against [p]laintiff for engaging in protected activity"); *Blanco v. Brogan*, 620 F. Supp. 2d 546, 556–57 (S.D.N.Y. 2009) (finding a causal connection for purposes of Title VII retaliation where there

was a gap of several months between the protected activity and alleged adverse actions because "police departments generally have well-defined procedures and labor union agreements which prevent management from taking arbitrary adverse employment actions against their employees" and "it would have been very difficult for the [p]olice [d]epartment here to retaliate against [the] [p]laintiff during the time period except in terms of promotion"); *McKenzie v. Nicholson*, No. 08-CV-773, 2009 WL 179253, at \*5 n.5 (E.D.N.Y. Jan. 26, 2009) ("The Court notes, however, that the Second Circuit has determined that an adverse action could be retaliatory in nature despite a significant time lapse if the employer took action at the first opportunity to do so." (citing *Grant*, 622 F.3d at 45–46)). A "pattern of antagonism" over the intervening period between protected activity and retaliatory treatment may also demonstrate the requisite causal connection. *Duplan*, 888 F.3d at 626 (considering "the facts as a whole" in Title VII retaliation case); *see Maxton v. Underwriter Labs. Inc.*, 4 F. Supp. 3d 534, 548 (E.D.N.Y. 2014) ("According to some courts, a plaintiff may also demonstrate a causal connection by showing a 'pattern of antagonism' over the intervening period." (quoting *Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at \*3 (S.D.N.Y. Feb. 3, 2004))); *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at \*14 (E.D.N.Y. Aug. 22, 2012) (same).

On October 15, 2019, Plaintiff sent a letter to a City personnel officer detailing the alleged mistreatment and alleging that the treatment was based on "gender bias," (Compl. ¶ 64), and within approximately one month at the November 2019 meeting, Tenke announced that Plaintiff would not work for the City in 2020 and that the Parks Department would be folded into the DPW, (*id.* ¶ 80). These facts plausibly allege "temporal proximity between" the October 2019 letter and November 2019 announcement and sufficiently establish a causal connection between Plaintiff's complaints and her threat of termination in November of 2019, which led to her eventual termination in January of 2021. *Feingold*, 366 F.3d at 156–57.

Moreover, although the announcement of Plaintiff's termination in October of 2020, (Compl. ¶¶ 101, 103), was a year after Plaintiff's October 2019 letter detailing her alleged mistreatment, and ordinarily would not support a finding of temporal proximity sufficient to establish causation, because there is evidence of a "pattern of antagonism" against Plaintiff over the intervening period, including the city's "stripping" her of responsibilities between the November 2019 meeting

2022 WL 3586559

and October of 2020 City Council meeting where Plaintiff's position was ultimately eliminated, (Compl. ¶ 83); Plaintiff being told that one of her employees responsible for a major department project was being reassigned to the DPW, (*id.* ¶ 84); and Plaintiff's exclusion from a vendor meeting concerning contamination at one of the beaches under her supervision and demands from DPW employees that Plaintiff had to turn over her files concerning the contamination project, (*id.* ¶¶ 85–86), the prolonged period does support a finding of temporal proximity. *Duplan*, 888 F.3d at 626; *see Reppert v. N.Y. State Dep't of State*, No. 19-CV-1518, 2021 WL 3165210, at *12 (N.D.N.Y. July 26, 2021) (finding that despite a gap of seventeen months between protected activity and adverse action, "evidence of an intervening pattern of antagonism" supported causality for purposes of the plaintiff's retaliation claim (quoting *Chan*, 2004 WL 213024, at *3)); *Maxton*, 4 F. Supp. 3d at 548 (finding that a pattern of antagonistic actions over a period culminating in adverse action can constitute causal connection for retaliation purposes). Thus, Plaintiff has sufficiently alleged temporal proximity to establish a causal connection between her complaint to the City's personnel officer, the threat to terminate her, and her actual termination.

**\*17** Accordingly, viewing Plaintiff's allegations in their totality, Plaintiff sufficiently alleges that she was subjected to retaliation under Title VII.

### d. NYSHRL hostile work environment and retaliation claims against Tenke

Tenke argues that the Court must dismiss Plaintiff's NYSHRL hostile work environment and retaliation claims against him because Plaintiff fails to plausibly allege an underlying violation, and therefore, there can be no aiding or abetting. (Tenke's Mem. at 12–13.)

Plaintiff does not address Tenke's aiding and abetting argument, (*see generally* Pl.'s Tenke Opp'n), but alleges in the Complaint that he subjected her to inferior terms and conditions of employment based on her gender and took adverse employment actions against her because of her complaints of workplace discrimination based on gender, (Compl. ¶¶ 124, 127).

In order for a defendant to be liable as an aider and abettor under section 296(6), a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal. *See Kelly G. v. Bd. of Educ. of City of Yonkers*, 99 A.D.3d 756, 952 N.Y.S.2d 229, 232 (App. Div. 2012); *Strauss v. N.Y. State Dep't of Educ.*, 26 A.D.3d 67, 805 N.Y.S.2d 704, 709 (App. Div. 2005); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 786 N.Y.S.2d 382, 397, 819 N.E.2d 998 (2004); *Baldwin v. Bank of Am., N.A.*, 42 Misc.3d 1203A, 984 N.Y.S.2d 630 (N.Y. Sup. Ct. 2013); *see also Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77 (2d Cir. 2014); *Falbaum v. Pomerantz*, 19 F. App'x 10, 15 (2d Cir. 2001); *Day v. MTA N.Y.C. Trans. Auth.*, No. 17-CV-7270, 2021 WL 4481155, at *14 (S.D.N.Y. Sept. 30, 2021) ("[L]iability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." (alteration in original) (quoting *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011))); *Mereigh v. N.Y. & Presbyterian Hosp.*, No. 16-CV-5583, 2017 WL 5195236, at *7 n.11 (S.D.N.Y. Nov. 9, 2017); *Irons v. Bedford–Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467, 2015 WL 5692860, at *32 (E.D.N.Y. Sept. 28, 2015); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013). This principle applies even when the defendants are entities. *See Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015) ("Under [section] 296(6), an individual or entity must 'actually participate[ ] in the conduct giving rise to a discrimination claim' to be held liable." (quoting *DiPilato v. 7–Eleven, Inc.*, 662 F. Supp. 2d 333, 353 (S.D.N.Y. 2009))).

Plaintiff brings NYSHRL claims against Tenke, but fails to allege a NYSHRL claim against the City. (*See* Compl. ¶¶ 124, 127.) Thus, Plaintiff has failed to establish the existence of a primary violation of the NYSHRL by an employer, and therefore her claims against Tenke fail. *See Forrest*, 786 N.Y.S.2d at 395, 819 N.E.2d 998 (dismissing a claim against an individual for violation of NYSHRL where plaintiff failed to allege violations against entity); *see also McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 74 (S.D.N.Y. 2020) (finding that the plaintiff adequately pled a claim for aiding and abetting sexual harassment against the individual defendant by pleading claims of sexual harassment against the defendant corporate entity as principal); *France v. Touro Coll.*, No. 14-CV-4613, 2016 WL 1105400, at *9 (E.D.N.Y. Feb. 16, 2016) ("[I]ndividual liability under the NYSHRL cannot attach without corresponding liability for the employer enterprise."), *report and recommendation adopted*, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016).

**\*18**  Accordingly, the Court grants Tenke's motion and dismisses Plaintiff's NYSHRL hostile work environment and retaliation claims against him. [9]

> [9]  Tenke argues that he is entitled to absolute immunity and qualified immunity with respect to the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.) Because there is no aiding and abetting liability, the Court declines to address the issue of Tenke's immunity arguments for the purposes of Plaintiff's NYSHRL claims.

### e. Section 1983 claims against both Defendants

Plaintiff brings First Amendment retaliation claims against Tenke and the City, a Fourteenth Amendment hostile work environment claim against Tenke and the City, and a Fourteenth Amendment retaliation claim against Tenke, [10] all pursuant to section 1983. (Compl. ¶¶ 115–20, 122–23, 126.)

> [10]  Plaintiff seeks to amend the Complaint to assert a Fourteenth Amendment retaliation cause of action against the City, which she omitted due to an "apparent drafting oversight." (*See* Decl. of Matthew Weinick ¶ 7, Docket Entry No. 16.) The Court grants Plaintiff's request to amend her Complaint and file an Amended Complaint asserting the Fourteenth Amendment retaliation claim against the City, as there is no prejudice in light of the similar section 1983 claims brought against it under *Monell*.

Defendants seek to dismiss all of Plaintiff's section 1983 claims. (City's Mem. 16–19.)

Under section 1983, individuals may bring a private cause of action against persons acting "under color of state law" to recover money damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was

committed by a person acting under color of state law." *Vega*, 801 F.3d at 87–88; *see also Collymore v. City of New York*, 767 F. App'x 42, 45 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 87–88).

### i. Tenke's claims of legislative and qualified immunity

Tenke argues that he is entitled to legislative immunity and qualified immunity based on the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.)

Plaintiff argues that (1) legislative immunity cannot be used to insulate "bad actors from unlawful employment decisions," (Pl.'s Tenke Opp'n 9–11), and (2) qualified immunity does not apply because Tenke violated clearly established laws, (*id.* at 11–13).

### 1. Legislative immunity

Legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) (quoting *Bogan v. Scott–Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)). The Supreme Court has established that under the functional test of absolute legislative immunity, "whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." *Olma v. Collins*, 499 F. App'x 98, 100 (2d Cir. 2012) (quoting *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007)) (citing *Bogan*, 523 U.S. at 54–55, 118 S.Ct. 966); *see also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 559 (D. Conn. 2008) ("The enforcement policies may have been flawed, and the [d]efendant [c]ommissioners may have acted in bad faith, as is alleged by the [p]laintiffs, but legislative immunity is absolute and does not depend on these considerations.").

**\*19**  Legislative immunity covers all aspects of the legislative process, including "[m]eeting with persons outside the legislature — such as executive officers, partisans, political interest groups, or constituents — to discuss issues that bear on potential legislation" and "participating in

party caucuses to form a united position on matters of legislative policy [and] assist legislators in the discharge of their legislative duty." *Almonte*, 478 F.3d at 107 (concluding that "legislative immunity cloaks not only the vote on the budgetary resolutions, but also any [secret] discussions the [c]ouncil members may have held, and any agreements they may have made, regarding the new budget in the months preceding the actual vote"); *see also Bogan*, 523 U.S. at 55, 118 S.Ct. 966 (finding that the mayor's introduction of budget was legislative even though the mayor was an executive official); *Olma*, 499 F. App'x at 100 (holding that the appellants acted in a legislative capacity "when they prepared and submitted to the [c]ity [c]ouncil the proposed budget amendment and accompanying memo suggesting elimination of the position filled by [the appellee]"); *Anderson Grp., LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332, 345 (N.D.N.Y. 2008) ("[T]o the extent the board defendants partook in the [c]ouncil's zoning decisions by voting on and issuing zoning recommendations to the [c]ouncil, they are also entitled to legislative immunity."), *aff'd in part sub nom. Anderson Grp., LLC v. Lenz*, 336 F. App'x 21 (2d Cir. 2009).

However, legislators are not immune from suit for administrative acts. *See Manzi v. DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997). Acts are administrative if they " 'impact ... particular individuals rather than ... a community,' or [if] 'the factors considered in adopting the legislation relate to specific individuals, instead of general policy implications.' " *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1219–20 (2d Cir. 1994) (quoting *Orange Lake Assocs., Inc. v. Kirkpatrick*, 825 F. Supp. 1169, 1174 (S.D.N.Y. 1993)); *Anderson Grp., LLC*, 557 F. Supp. 2d at 345 (holding that downzoning of a region "was a purely legislative act" but that "action[s] taken on the [plaintiff's] special use permit by the [b]oard [were] administrative in nature ... [even though they] had implications for the public at large"). "[P]ersonnel decisions ... are administrative, and therefore not immune to liability, if they are directed at a particular employee and do not adopt or implement a broader legislative policy." *Bierce v. Town of Fishkill*, 656 F. App'x 550, 554 (2d Cir. 2016). In *Bierce*, the board voted to eliminate two positions from the police department, citing budgetary concerns, affecting "just two employees." *Id.* The Second Circuit found that the board was not entitled to legislative immunity. *Id.* The *Bierce* court distinguished *Bogan*, 523 U.S. at 46–47, 118 S.Ct. 966, where the elimination of an employee's position "occurred as part of a larger budgetary package that proposed freezing the salaries of all municipal employees and eliminating 135 positions." *Id.*

As the Supreme Court has explained, the purpose of legislative immunity is to protect legislators from "deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." *Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Consequently, when sued in their personal capacity, "[l]ocal legislators, like their counterparts on the state and regional levels, are entitled to absolute immunity for their legislative activities." *Almonte*, 478 F.3d at 106 (citing *Bogan*, 523 U.S. at 49, 118 S.Ct. 966). However, local governments, municipalities, or officials sued in their official capacity are not entitled to legislative immunity. *See Olma*, 499 F. App'x at 100; *Almonte*, 478 F.3d at 106 ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances where they are sued in their official capacities.' " (alterations in original) (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012))); *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 73–74 (2d Cir. 1992) (explaining that an official-capacity claim is in substance a claim against the municipality, which cannot assert immunity, either absolute or qualified, as a defense to liability under section 1983); *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 403 (E.D.N.Y. 2018) (stating that legislative immunity is limited to personal suits based on legislative acts).

**\*20** Tenke is not entitled to absolute legislative immunity for the claim against him in his individual capacity. In October of 2020, Tenke told Plaintiff that he would be eliminating her position from the 2021 budget without conferring with the City Council, and Plaintiff was the only department head terminated. (Compl. ¶¶ 101–03.) Although Tenke asserted that layoffs were the only solution in light of the City's budget issues, only five other employees were "slated for layoff," and none of them were department heads. (*Id.* ¶¶ 104, 109–10.) In contrast to the facts of *Bogan*, Defendants do not allege any mass freezing or the elimination of multiple positions other than Plaintiff's and those of five other low-level employees. *Bogan*, 523 U.S. at 46–47, 118 S.Ct. 966. In fact, similar to *Bierce*, the 2021 budget terminated only a handful of individuals. *Bierce*, 656 F. App'x at 554. Further, even before Tenke's decision to eliminate Plaintiff's position in October of 2020, Tenke had announced in November of 2019 that Plaintiff would not be working for the City the following year, prior to the alleged budget crisis created by

2022 WL 3586559

the Covid-19 pandemic, (Compl. ¶¶ 78–80), and while there was still an "economic boom" and not even "a hint of the coming economic stresses caused by the pandemic," (*id.* ¶ 81). In view of the fact that Tenke told Plaintiff as early as November of 2019 that she would be terminated and not working for the City the following year and then told her on October 9, 2020 that he would be eliminating her position from the 2021 budget before conferring with the City Council, and because Plaintiff was the only department head whose position was eliminated, and only six employees in total were slated for layoff, Plaintiff has plausibly alleged that Tenke's actions were specific to Plaintiff rather than legislative in nature. *See Orange Lake Assocs., Inc.*, 21 F.3d at 1219–20 (stating that legislative immunity is unavailable where legislation relates to "specific individuals, instead of general policy implications"); *cf. Lorusso v. Borer*, 359 F. Supp. 2d 121, 128 (D. Conn 2005) (finding that the mayor was entitled to legislative immunity where his recommendation of the budget "eliminate[d] an entire class of job and job title, which has consistently been afforded absolute legislative immunity"). Further, even if Tenke acted in good faith, what matters is the nature of the act, rather than the motive or intent of the official performing it. *See Bogan*, 523 U.S. at 54–55, 118 S.Ct. 966 (holding that legislative immunity does not depend on motive or intent); *Olma*, 499 F. App'x at 100 (stating that the test for determining legislative immunity does not depend on the official's identity, motive, or intent, but the nature of the act in question).

Accordingly, Tenke is not entitled to legislative immunity.

## 2. Qualified immunity

"Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "Thus, pursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), when an official raises qualified immunity as a defense, the court must consider whether: '(1) ... the official violated a statutory or constitutional right, and (2) ... the right was "clearly established" at the time of the challenged conduct.' " *Id.* (citations omitted) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)); *see also Chamberlain ex rel. Estate*

*of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) ("Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))); *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (same). "To determine whether defendants enjoy qualified immunity, '[the court] consider[s] the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law.' " *Chamberlain*, 960 F.3d at 110 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)). "[G]overnment officials or employees who make decisions that are discretionary, but not judicial in nature, are entitled to qualified immunity unless there is bad faith or the action is taken without a reasonable basis." *Sutter v. Dibello*, No. 18-CV-817, 2021 WL 930459, at *35 (E.D.N.Y. Mar. 10, 2021) (quoting *Russell v. Westchester Cmty. Coll.*, No 16-CV-1712, 2017 WL 4326545, at *13 (S.D.N.Y. Sept. 27, 2017)); *see Alhovsky v. Paul*, 406 F. App'x 535, 537 (2d Cir. 2011) ("New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." (alterations in original)); *Russell*, 2017 WL 4326545, at *13 (same). Qualified immunity may only be granted at the motion to dismiss stage if "the facts supporting the defense appear on the face of the complaint ... [and] 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1484 (2d Cir. 1992)); *see also Brown v. Wetz*, No. 18-CV-11178, 2021 WL 964922, at *15 (S.D.N.Y. Mar. 15, 2021) ("Accordingly, it is not clear from the face of the complaint that [defendant], who is alleged to have discriminated against [the p]laintiff ..., is entitled to qualified immunity.").

**\*21** Tenke is not entitled to qualified immunity. As discussed both above and further below, the right to be free from employment discrimination and retaliation "were all clearly established at the time Tenke acted." (Pl.'s Tenke Opp'n 12 (citing *Heffernan v. City of Paterson*, 578 U.S. 266, 136 S.Ct. 1412, 1417–18, 194 L.Ed.2d 508 (2016); then citing *Vega*, 801 F.3d at 84; then citing *Kaytor*, 609 F.3d at 548–50; and then citing *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006)).) Because it does not "appear[ ] beyond doubt that [Plaintiff] can prove no set of facts in support of [her] claim that would entitle [her]

to relief," the Court declines to grant qualified immunity to Tenke. *McKenna*, 386 F.3d at 436; *see Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 130 (2d Cir. 2004) (holding that individual defendants were not entitled to qualified immunity because it was "eminently clear" by 2001 that "individuals have a constitutional right to be free from sex discrimination"); *DiLegge v. Gleason*, 131 F. Supp. 2d 520, 522 (S.D.N.Y. 2001) (finding that the right to be "free from discrimination in employment" and the right to be free from retaliation were clearly established). The Court recognizes that although Tenke is "not entitled to qualified immunity on the face of the complaint ... 'a factual basis for qualified immunity may arise as the proceedings develop.' " *Terranova v. New York*, 144 F. App'x 143, 146–47 (2d Cir. 2005) (quoting *Velez v. Levy*, 401 F.3d 75, 101 (2d Cir. 2005)); *see Brown*, 2021 WL 964922, at *15 (denying motion as to qualified immunity where it was "not clear from the face of the complaint" that defendant was entitled to qualified immunity); *Dipinto v. Westchester County*, No. 18-CV-00793, 2020 WL 6135902, at *11 (S.D.N.Y. Oct. 19, 2020) (same).

Accordingly, at this stage in the proceedings, the Court denies Tenke's motion to dismiss based on qualified immunity.

### ii. Personal involvement of Tenke

Tenke argues that Plaintiff fails to plausibly allege his personal involvement in alleged constitutional violations and therefore all of Plaintiff's claims brought against him under section 1983 should be dismissed. (Tenke's Mem. 12–13.) In support, Tenke argues that while he proposed the budget that laid off Plaintiff and others, he did not vote on the budget, and the budget would have passed with or without his vote, as it was approved by members of the City Council. (*Id.* at 12.) In addition, Tenke contends that he cannot be liable for merely proposing a budget eliminating Plaintiff's position, as he did not have the power to unilaterally remove Plaintiff or refuse to reappoint her. (Tenke's Reply 3.)

Plaintiff contends that because Tenke recommended Plaintiff's termination, he was involved in the deprivation of rights and thus is liable under section 1983. (Pl.'s Tenke Opp'n 8–9.) In support, Plaintiff argues that as mayor, Tenke has authority over employment issues, and, in any event, the City is not required to approve Tenke's budget, since "[i]f the council does not approve his budget by a date set by law, the budget becomes law." (*Id.* at 8–9 & n.4.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Dubois v. Beaury*, No. 21-CV-2096, 2022 WL 1701497, at *4 (2d Cir. May 27, 2022) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *see Florence v. Seggos*, No. 21-834, 2022 WL 2046078, at *3 (2d Cir. June 7, 2022) ("To state a claim under section [1983] ... the complaint must plausibly allege [the d]efendants' 'personal involvement' in the wrongful acts at issue." (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004))); *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) ("[T]he 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)), *as amended* (Feb. 24, 2016). A plaintiff must allege the direct participation or personal involvement of each of the defendants in the alleged constitutional deprivation. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Farrell*, 449 F.3d at 484 (same). As the Second Circuit has made clear, "there is no special rule for supervisory liability," and to find a state official liable under section 1983, "a plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). Being in the chain of command is not sufficient to satisfy personal involvement as the "violation must be established against the supervisory official directly." *Id.*; *see also Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *33 (S.D.N.Y. Mar. 26, 2021) ("[I]n light of *Tangreti*, [the p]laintiff must establish that [the defendant] committed a constitutional violation through his own conduct, rather than through his supervision of [others]."); *Hunter v. Telefore*, No. 21-CV-78, 2021 WL 878745, at *3 (E.D.N.Y. Mar. 8, 2021) ("[T]he [Second] Circuit recently held that, following the Supreme Court's decision in *Iqbal*, a plaintiff must sufficiently allege a supervisory official's *direct* involvement in an alleged constitutional violation to state an actionable claim against that official." (emphasis in original) (citing *Tangreti*, 983 F.3d at 618). Direct participation provides a basis of liability where the defendant personally participated with "knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted) (citing *Gaston v. Coughlin*, 249 F.3d 156, 165–66 (2d Cir. 2001)).

**\*22** Plaintiff plausibly alleges that Tenke participated directly in her termination by recommending that her position be eliminated from the budget. Tenke told Plaintiff in October of 2020 that he would be eliminating her position from the 2021 budget without conferring with the City Council, and even earlier, in November of 2019, had announced that Plaintiff would not be working for the City the following year. (Compl. ¶¶ 101–02, 78, 80.) When the City Council met and discussed Tenke's budget in October of 2020, several members "pointed out other ways to reduce costs" other than laying off Plaintiff and others, but Tenke rejected these alternatives. (*Id.* ¶¶ 105–06.) Even if, as Tenke claims, he abstained from the voting itself, (Tenke's Reply 3), by proposing the budget and shaping the budgetary discussions of the City Council, Tenke plausibly participated directly in the alleged constitutional violation, *see Tangreti*, 983 F.3d at 618, rather than simply being in the chain of command, *id.* [11] Tenke's direct involvement in proposing the budget that terminated Plaintiff plausibly alleges that "through [his] own individual actions," he played a role in Plaintiff's alleged constitutional violations. *Tangreti*, 983 F.3d at 618.

[11] Moreover, under the Glen Cove City Charter, the mayor is required to "present to the City Council a proposed budget for the ensuing fiscal year," and if the City Council fails to adopt the budget, it is the mayor's proposed budget which is considered to be adopted. Glen Cove City Charter § C9-6.

Construing the facts in the light most favorable to Plaintiff, Plaintiff has plausibly alleged Tenke's personal involvement for purposes of her section 1983 claims.

### iii. First Amendment claims against Tenke and the City

Defendants contend that Plaintiff "fail[s] to state a plausible retaliation claim under the First Amendment based on [either] her perceived political affiliation [or her] gender discrimination complaint." (City's Mem. 10–15.) They argue that Plaintiff's First Amendment gender retaliation claim fails because (1) Plaintiff's complaint about alleged gender discrimination was made in her position as an employee rather than a citizen and was therefore not protected as it pertained only to her own situation, (2) the only adverse action Plaintiff claims is her termination, and her claims that she was excluded from meetings and had a project reassigned are not actionable, and (3) Plaintiff fails to plausibly allege causation. (*Id.* at 14–15; City's Reply 8–9.) Defendants also

argue that Plaintiff fails to sufficiently allege that she suffered from political retaliation, because she does not allege that she "actually (or was perceived to have) participated in any political activity." (City's Mem. 11; *see* Tenke's Mem. 1 ("[Plaintiff's] First Amendment political retaliation claim fails because she does not allege any political activity or affiliation for which she was allegedly retaliated against.").)

Plaintiff argues that because she complained of gender discrimination to the press, the complaint was protected by the First Amendment. (Pl.'s City Opp'n 18.) In addition, Plaintiff argues that Defendants terminated her after they formed a belief that she was "conducting political operations against them." (*Id.* at 15–20.) In support, Plaintiff contends that "Defendants believed that Belyea's complaint of discrimination was a political attack launched with the assistance of a 'known political operative,' " and believed the press release "was an example of partisan politics" and came "directly from the campaign manager of the Republican slate." (*Id.* at 17.)

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity." *Specht v. City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)); *see Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)) (same); *see also Eyshinskiy v. Kendall*, 692 F. App'x 677, 677–78 (2d Cir. 2017); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). "To establish a First Amendment retaliation claim for political association in the public employment context, a plaintiff must show that: (1) he was engaged in protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal connection between the protected activity and the adverse employment decision." *Bierce*, 656 F. App'x at 552; *see Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (stating the three-part test for First Amendment political retaliation).

### 1. First Amendment retaliation claim on the basis of Plaintiff's gender discrimination complaint

### A. Plaintiff sufficiently alleges that she engaged in protected speech when she issued a press release

**\*23** The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. 228, 237, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). Thus, the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if the employee speaks "[1] as a citizen [2] on a matter of public concern.' " *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951); *see Specht*, 15 F.4th at 600 ("The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities."); *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018) (same); *see also Eyshinskiy*, 692 F. App'x at 678 ("The first inquiry encompasses two separate questions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee. If the answer to either question is no, that is the end of the matter.' " (citation omitted) (quoting *Matthews*, 779 F.3d at 172)); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that ... the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest ...."); *Best*

*Payphones Inc. v. Dobrin*, 410 F. Supp. 3d 457, 474 (E.D.N.Y. 2019) (same).

### (1) Plaintiff's internal complaint

Plaintiff has not sufficiently alleged that her internal letter to a City personnel officer complaining of gender discrimination against her was made as a citizen on a matter of public concern. Her letter "detail[ed] ... [her] mistreatment from January [of] 2018 to [October of 2019]," and alleged that "[her] treatment was based on 'gender bias.' " (Compl. ¶ 64.) This does not constitute protected speech, since Plaintiff was complaining of a personal matter as an employee. *See Corrado v. N.Y. State Unified Court Sys.*, No. 12-CV-1748, 2014 WL 4626234, at \*10 (E.D.N.Y. Sept. 15, 2014) ("Complaints of gender discrimination in the workplace are not matters of 'public concern' where they relate to a personal employment grievance." (citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993))). This internal complaint "does not pertain to a matter of public concern" because it is "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of [her] employment." *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (quoting *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999)). Other than one generalized paragraph alleging a "serious and dangerous pattern" of gender discrimination, (Compl. ¶ 65), Plaintiff does not allege that she raised other concrete instances of general discrimination in her letter, other than her personal experiences. *See Spencer v. Philemy*, 540 F. App'x. 69, 70 (2d Cir. 2013) ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances' " (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)); *Peterson v. N.Y.C. Dep't of Educ.*, No. 18-CV-1515, 2020 WL 2559835, at \*8 (E.D.N.Y. May 20, 2020) ("[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize [their] employee grievance[s]." (alterations in original) (quoting *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951)); *Adams v. N.Y. State Educ. Dep't*, 705 F. Supp. 2d 298, 302–03 (S.D.N.Y. 2010) (holding that the plaintiff's speech was not protected where it "concerned personal grievances"); *cf. Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (finding that the plaintiff's letters to the police chief constituted protected

activity where plaintiff specifically detailed instances of discrimination that affected other Hispanic officers). The fact that Plaintiff sent the letter to her employer further indicates that the letter is not a matter of public concern. "[A] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (quoting *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011)).

**\*24** Thus, Plaintiff's internal letter was not protected speech.

### (2) Plaintiff's press release

#### 1. Plaintiff plausibly spoke as a citizen

The Court finds it plausible that Plaintiff spoke as a citizen, rather than as a public employee, in issuing a press release, which was issued separately from Plaintiff's internal complaint and spoke generally about sex discrimination in the workplace, a topic that did not fall under the scope of Plaintiff's employment duties. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane*, 573 U.S. at 237, 134 S.Ct. 2369 (quoting *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). "The critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 240, 134 S.Ct. 2369.

Plaintiff's issuance of a press release concerning sex discrimination and harassment of female City employees, (Compl. ¶ 61), written with a former City employee and with a friend involved in public relations, (*id.* ¶ 62), was not part of Plaintiff's "employment responsibilities" as Recreation Director, where her duties involved supervising the Parks Department, (*id.* ¶¶ 16, 31), staffing lifeguards for beaches, (*id.* ¶ 38), and renovating public facilities such as bathrooms, (*id.* ¶¶ 40–42). *Specht*, 15 F.4th at 600. There is no indication that this was "part-and-parcel" of Plaintiff's ability to exercise her "official duties" as Recreation Director. *Montero*, 890 F.3d at 396 (quoting *Weintraub v. Bd. of Educ. of City School Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010))).

Plaintiff therefore plausibly spoke as a citizen for purposes of First Amendment protection when she issued a press release

with a former City employee and a friend involved in public relations.

#### 2. Plaintiff spoke on a matter of public concern

The Court finds it plausible that Plaintiff's speech was made on a matter of public concern. On October 2, 2019, Plaintiff and Clarson issued a press release concerning "ongoing sex discrimination and harassment of female City employees." (Compl. ¶ 61); *see Bull v. Barone*, No. 03-CV-2034, 2008 WL 11491595, at \*6 (D. Conn. Mar. 25, 2008) (finding that a statement released to the public complaining about working conditions and employment policies addressed "matters of public concern, not merely internal workplace grievances"). Plaintiff and Clarson worked with a friend "experienced with public relations issues" to issue the press release. (Compl. ¶ 62.)

Considering the "content, form, and context" of the press release, the Court finds that it arguably merits constitutional protection. *Connick v. Myers*, 461 U.S. 138, 145–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Unlike the facts alleged about the internal letter, where Plaintiff "detail[ed]" her mistreatment on the basis of gender, (*id.* ¶ 64), Plaintiff alleges that the press release "concern[ed] ongoing sex discrimination and harassment of female City employees," including Clarson, (*id.* ¶ 61). The "intended audience" of Plaintiff's October 2, 2019, press release, which was the general public, combined with the allegations about the content of the press release, indicate that Plaintiff sought to "inform the public on a matter of political, social, or community interest." *Specht*, 15 F.4th at 601; *cf. Pedrosa v. City of New York*, No. 13-CV-1890, 2014 WL 99997, at \*12 (S.D.N.Y. Jan. 9, 2014) (finding that the plaintiff's complaints of workplace sexual harassment were not protected where they "concerned only [the p]laintiff's own situation and did not hint at broader problems"). Further, the fact that Plaintiff later sent an individual letter to the City's personnel officer regarding her individual grievances also suggests that her press release was not "calculated to redress personal grievances," but rather, had a broader public purpose. *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999); *see Kantha v. Blue*, 262 F. Supp. 2d 90, 101 (S.D.N.Y. 2003) ("[C]omplaints concerning gender discrimination are protected if the employee ... sought 'relief against pervasive or systemic misconduct by a public agency or public officials,' or her speech was 'part of an overall effort ... to correct allegedly unlawful practices or bring them to

2022 WL 3586559

public attention." (quoting *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 420 (7th Cir. 1988))); *Brennan v. Straub*, 246 F. Supp. 2d 360, 366 (S.D.N.Y. 2003) (denying motion to dismiss where plaintiff's testimony on behalf of another City employee did not only relate to the plaintiff's personal grievances). Finally, *Newsday* reported on the story on October 17, 2019. (Compl. ¶ 70); *see San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) ("These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.").

**\*25** In view of the fact that Plaintiff spoke about "current government policies and activities," namely discrimination and harassment against female City employees, the Court finds that this served as a matter of public concern and that her speech was therefore protected. *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003); *Gala v. City of New York*, 525 F. Supp. 3d 425, 430 (E.D.N.Y. 2021) (quoting *Johnson*, 342 F.3d at 112).

Accordingly, Plaintiff has sufficiently alleged that her press release was protected speech.

### B. Plaintiff alleges that she suffered adverse employment actions

In the context of a First Amendment retaliation claim, "a public employee plaintiff alleging retaliation in violation of the First Amendment [need not] demonstrate a material change in employment terms or conditions." *Zelnik*, 464 F.3d at 227. Rather, the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*"— that the action would dissuade a reasonable employee from speaking out. *Id.*; *Specht*, 15 F.4th at 604 (same). Put another way, an adverse action is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Nixon v. Blumenthal*, 409 F. App'x 391, 392 (2d Cir. 2010); *see A.S. v. City Sch. Dist. of Albany*, --- F. Supp. 3d --- (N.D.N.Y. 2022) ("In this context, an 'adverse action' is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " (quoting *Cox*, 654 F.3d at 273)). Examples of such actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011)

(quoting *Morris*, 196 F.3d at 110); *see Gunn v. Bescler*, No. 16-CV-6206, 2022 WL 563189, at \*9 (W.D.N.Y. Feb. 24, 2022) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." (alteration in original) (quoting *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007))). However, "lesser actions may also be considered adverse employment actions," since "a combination of seemingly minor incidents [can] form the basis of a constitutional retaliation claim once they reach a critical mass." *Zelnik*, 464 F.3d at 226–27 (first quoting *Morris*, 196 F.3d at 110; and then quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)); *see Kiernan v. Town of Southampton*, 734 F. App'x 37, 41–42 (2d Cir. 2018) (" '[L]esser actions may also be considered adverse employment actions' such as a negative job evaluation. Curtailment of job responsibilities may also be adverse." (internal citations omitted)).

Plaintiff sufficiently alleges that her termination and the threat of her termination are adverse employment actions. Defendants do not contest that Plaintiff's termination, which was authorized in October of 2020 and made effective January of 2021, was an adverse action. As discussed above in addressing Plaintiff's Title VII retaliation claim, Tenke's announcement at a meeting in November of 2019 that Plaintiff would be terminated is an adverse action for the purposes of First Amendment retaliation, as it would deter a reasonable employee from exercising her constitutional rights and is "more disruptive than a mere inconvenience or an alteration of job responsibilities," particularly in light of the fact that Plaintiff was ultimately terminated, as discussed above. *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). [12]

[12] Defendants also argue that Plaintiff's claims that she "was excluded from meetings and had a project reassigned from her are not actionable." (City's Mem. 15.) Plaintiff, however, only contends that termination and threats of termination were adverse actions for First Amendment purposes, and the Court only considers these actions. (Pl.'s City Opp'n 19.)

### C. Plaintiff sufficiently alleges causation

**\*26** "To permit an inference of causation, a plaintiff must show that the protected [speech] 'was a substantial motivating

factor in the adverse employment action.' " *Specht*, 15 F.4th at 605 (quoting *Morris*, 196 F.3d at 110); *Kiernan*, 734 F. App'x at 42 ("To demonstrate a causal connection a plaintiff must show that the protected speech [or conduct] was a substantial motivating factor in the adverse ... action." (first alteration in original) (quoting *Smith*, 776 F.3d at 118)); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167–68 (2d Cir. 2006) (same); *see also Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 726 (2d Cir. 2013). "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." *Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012); *see also Specht*, 15 F.4th at 605 ("A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time. We have previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation." (citation omitted)); *Catanzaro v. City of New York*, 486 F. App'x 899, 902 (2d Cir. 2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse action.' " (quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011))); *Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 288 (E.D.N.Y. 2012) (holding that a plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action, and "[t]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,' and a court must 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of each particular case' " (alterations and citations omitted) (first quoting *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001); and then quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))); *see also Callahan v. Hum. Res.*, No. 20-CV-1881, 2022 WL 445819, at *2 (D. Conn. Feb. 14, 2022) ("[A plaintiff] can meet her burden by alleging either direct evidence of retaliation, or indirect evidence that the adverse employment decision and the protected activity were close in time."). However, a plaintiff cannot solely "rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004); *see also Whitfield v. Imperatrice*, 477 F. App'x. 806, 809 (2d Cir. 2012) (finding causal connection not demonstrated for purposes of First Amendment retaliation claim where plaintiff relied "solely on his own speculation, which is insufficient to defeat a summary judgment motion" (citing *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002))).

As discussed above in relation to Plaintiff's Title VII retaliation claims, Plaintiff has sufficiently alleged that there is a causal connection between the press release, issued in October of 2019, and both the threat of her termination in November of 2019 and her ultimate termination in October of 2020 and made effective in January of 2021 due to a pattern of antagonism and the fact that Plaintiff was laid off at the first available opportunity.[13]

[13]   For example, Plaintiff alleges that she was "stripp[ed]" of her responsibilities. (Compl. ¶ 83). Plaintiff also alleges that she was told that one of her employees responsible for a major department project was reassigned to the DPW, (*id.* ¶ 84), that she was excluded from a vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85), and that DPW employees demanded that Plaintiff turn over her files concerning the contamination project, (*id.* ¶ 86). Further, following the start of the Covid-19 pandemic, when the City convened a meeting across departments to discuss the City's plan, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan even though Plaintiff's department supervised events and sports leagues with hundreds of participants. (*Id.* ¶¶ 95–97.)

Accordingly, the Court denies Defendants' motions with regard to Plaintiff's First Amendment retaliation claims on the basis of her press release.

### 2. First Amendment political retaliation

"[A plaintiff's] political retaliation claims are analyzed in the same manner as all First Amendment retaliation claims." *Lorusso*, 359 F. Supp. 2d at 130–31 (citing *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005)). Affiliating oneself with a political party is protected against retaliation by the First Amendment. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (ruling that political affiliations are constitutionally protected from government retaliation); *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) ("A public employee generally may

2022 WL 3586559

not be dismissed on account of her party affiliation, because such action violates the employee's First Amendment rights absent a showing that 'party affiliation is an appropriate requirement for the effective performance of the public office involved.' " (quoting *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)); *Camacho v. Brandon*, 317 F.3d 153, 160–61 (2d Cir. 2003) (differentiating the protected affiliations of low-level political employers from the unprotected affiliations of policymakers); *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995) ("As a general rule, public employees may not be dismissed for the exercise of their First Amendment rights.").

**\*27**  Plaintiff's claim of political retaliation fails, as she does not allege that she has engaged in any protected political activity. Plaintiff does not allege that she is a member of any political party and in fact alleges that she worked "successfully" with four different administrations from both major political parties. (Compl. ¶ 20.) Plaintiff argues that Defendants "believed that [her] complaint of discrimination was a political attack launched with the assistance of a 'known political operative.' " [14] (Pl.'s City Opp'n 17.) However, Plaintiff does not allege that this press release was politically motivated, and although she was assisted by a Republican who had worked with a previous Republican administration, Plaintiff does not allege any political language in the press release, and there are no allegations that Defendants perceived her to be affiliated with the Republican Party. Thus, Plaintiff fails to allege that she engaged in any political activity that would warrant retaliation. *See Bierce*, 656 F. App'x at 551 (noting that plaintiff alleged that he had been demoted for politically supporting the town supervisor and supporting her reelection campaign); *Rusk v. N.Y. State Thruway Auth.*, 37 F. Supp. 3d 578, 585 (W.D.N.Y. 2014) ("Nevertheless, there is no evidence set forth that the [p]laintiff's political activity or background played any role in his termination.... The [p]laintiff offers mere speculation that the change in leadership ... from Republican to Democratic served a role in his termination.") (dismissing plaintiff's political retaliation claim under section 1983); *Bearss v. Wilson*, No. 08-CV-248, 2010 WL 11523749, at \*9 n.2 (D. Vt. Aug. 10, 2010) ("Even assuming these statements [in which the defendant alleged that the plaintiff was a 'political insider,' among others] were made ..., they do not demonstrate that [the plaintiff] engaged in political affiliation worthy of First Amendment protection; nor are they sufficient to support [the plaintiff's] claim that [the defendant] viewed her as a political foe and attempted to terminate her as a result of such view."); *cf. Lorusso*, 359 F. Supp. 2d at 131 (finding that the plaintiff's speech was

a matter of public concern "because the right to vote for [a] candidate of your choosing without fear of reprisal is a protected First Amendment right that implicates fundamental freedoms").

[14]  Plaintiff alleges that Tenke retaliated against her because he perceived her as a "holdover" obstructionist employee. (Compl. ¶ 116.) However, Plaintiff does not allege that Tenke referred to *her* as a holdover, but instead used the term to refer to the "City controller's office, still headed by Clarson [in July of 2019]." (*Id.* ¶¶ 51–52.) Plaintiff also alleges that a Councilwoman made comments that the press release was "another example of partisan politics" and that the press release came "directly from the campaign manager of the Republican slate." (*Id.* ¶ 71.) However, this does not support Plaintiff's claim against Tenke or the City, particularly in view of the fact that the Councilwoman is not a Defendant to this suit and Plaintiff does not allege that the Councilwoman voted for the budget in question.

Plaintiff's reliance on *Heffernan*, 578 U.S. at 266, 136 S.Ct. 1412, and *Morin v. Tormey*, 626 F.3d 40, 42 (2d Cir. 2010) is misplaced. (*See* Pl.'s City Opp'n 16.) In *Heffernan*, 578 U.S. at 268, 136 S.Ct. 1412, an employee was demoted because a government official incorrectly believed that the employee had supported a particular candidate for mayor, a clearly political act. As the Supreme Court found, the "Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Id.* at 270, 136 S.Ct. 1412, 1417–18. In *Morin*, the state judge defendant demanded that plaintiff, a clerk in the New York State Unified Court System, "provide negative information about [the Democratic candidate for state supreme court justice]" and emphasized that the Democratic candidate was running against "good Republican friends" of his. 626 F.3d at 42. The defendant also asked the plaintiff whether she "was a good Republican." *Id.* The court found that the plaintiff's refusal to "spy on judges during a judicial election" and "engage in political activity involving the courts," which led to her being fired, was political activity in light of the defendant's clear political aims and demand for political loyalty. *Id.* at 44.

The *Heffernan* court ruled that even though the employer had made a mistake about the employee's actual political affiliations, he could still bring a First Amendment retaliation claim based on how their perceptions affected him. 578

U.S. at 273, 136 S.Ct. 1412. Notably, the Supreme Court assumed that the "activities that [the employee's] supervisors *thought* he had engaged in are of a kind that they cannot constitutionally prohibit or punish," namely joining, working for, or contributing to a political party or candidate. *Heffernan*, 578 U.S. at 270, 136 S.Ct. 1412. The press release issued by Plaintiff regarding gender discrimination, while protected speech as discussed above, is not protected political activity. *See Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 296 (S.D.N.Y. 2019) (finding the plaintiff's reliance on *Heffernan* misplaced because the "protected activity in *Heffernan* was picking up a political campaign sign, or 'joining, working for or contributing to the political party and candidates,' " and while the plaintiff's activities were "speculated" to be motivated by political affiliation, such speculation did not turn the activities into political activities). In addition, Plaintiff does not allege any demands for party loyalty or overt political demands, as in *Morin*. Further, while the court in *Morin* ruled that the "right to be free from retaliation based on political affiliation is not limited to members of an opposing political party," the plaintiff in that case "asserted her right not to be pressed into political activity," which does not mirror the facts that Plaintiff alleges. *Id.* at 44. These cases provide no support for Plaintiff's claim.

**\*28**  Accordingly, the Court grants Defendants' motions as to Plaintiff's First Amendment political retaliation claim.

### iv. Fourteenth Amendment claims [15]

[15]  Other than arguing that he is entitled to immunity, as discussed above, Tenke does not address Plaintiff's Fourteenth Amendment claims against him. (*See generally* Tenke's Mem.) The Court therefore only addresses the City's motion as to this claim.

The City argues that Plaintiff's Fourteenth Amendment hostile work environment and retaliation claims are pre-empted by Plaintiff's Title VII claims because they are based only on the alleged violations of Title VII. (City's Mem. 4–5.)

Plaintiff argues that her claims are not duplicative of her Title VII claims. (Pl.'s City Opp'n at 6.)

"A [section] 1983 action may not ... be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII."

*Patterson*, 375 F.3d at 225 (citing *Saulpaugh*, 4 F.3d at 143); *see also Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017) ("[E]very circuit to consider this exact question has held that, while a plaintiff may use [section] 1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII ... statutory rights cannot be vindicated through [section] 1983." (footnote omitted)); *Urli v. Town of Hempstead Sanitary Dist. No. 7*, No. 20-CV-0960, 2021 WL 4311141, at \*6 (E.D.N.Y. Sept. 22, 2021) ("Section 1983 may not be used to enforce Title VII."); *Rivera v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 19-CV-11624, 2020 WL 7496282, at \*4 (S.D.N.Y. Dec. 21, 2020) (quoting *Patterson*, 375 F.3d at 225) (same). However, a Title VII plaintiff is not precluded from bringing a "concurrent [section] 1983 cause of action," such as a claim for denial of equal protection, as long as the section 1983 claim is based on a "distinct violation of a constitutional right." *Patterson*, 374 F.3d at 225 (first quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994); and then citing *Saulpaugh*, 4 F.3d at 143).

Plaintiff brings a section 1983 claim to vindicate her rights under the Fourteenth Amendment but does not allege in the Complaint whether she brings an equal protection violation or a due process violation, thus failing to plead a "distinct" violation of a constitutional right. *Cf. Saulpaugh*, 4 F.3d at 143–44 ("[The Plaintiff] has properly grounded a [s]ection 1983 claim on the Equal Protection Clause ..."); *Gierlinger*, 15 F.3d at 34 ("For example, in some circumstances a [section] 1983 claim may be properly grounded on a violation of the Equal Protection Clause of the Fourteenth Amendment based on sexual harassment in the workplace."); *Rivera*, 2020 WL 7496282, at \*4 ("Plaintiff asserts four claims, all for alleged violations of the Equal Protection Clause of the Fourteenth Amendment brought pursuant to [section] 1983."). Plaintiff states in her opposition paper that her "equal protection rights" under the Fourteenth Amendment were violated, but does not plead this in her Complaint, or allege any accompanying facts. (Pl.'s Tenke Opp'n 12; *see* Pl.'s City Opp'n 5.)

**\*29**  Accordingly, the Court grants the City's motion and dismisses without prejudice Plaintiff's section 1983 claims brought under the Fourteenth Amendment.

### v. The City's *Monell* liability

The City contends that Plaintiff fails to allege a section 1983 claim against it because she fails to plausibly state an underlying violation and fails to allege the actions of any final policymaking officials that resulted in her rights being violated. (City's Mem. 16–19.)

Plaintiff argues that the City is liable because the City could not have voted "absent Tenke's acts," making him a final policymaker, and the City itself acted through the acts of the City Council. (Pl.'s City Opp'n 20–23.)

To establish a municipal liability claim, a plaintiff is required to plead and prove three elements: "(1) an official policy or custom that (2) cause[s] [the plaintiff] to be subjected to (3) a denial of a constitutional right." *Torcivia v. Suffolk County*, 17 F.4th 342, 354–55 (2d Cir. 2021) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (same); *see also Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) ("To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019))). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *McLennon v. City of New York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016); *see O'Kane v. Plainedge Union Free Sch. Dist.*, 827 F. App'x 141, 142–43 (2d Cir. 2020) (finding that failure to "take appropriate action to prevent or sanction violations of constitutional rights" amounts to deliberate indifference (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012))); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick*, 757 F.3d at 62 (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones*, 691 F.3d at 81 (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"In order to prevail against a municipality based on the acts of a public official, a § 1983 plaintiff must prove, inter alia, that the constitutional injury was caused 'pursuant to official municipal policy of some nature,' or by a municipal policymaker with 'final policymaking power' over the challenged action." *Massena v. Bronstein*, 545 F. App'x 53, 55 (2d Cir. 2013) (citations omitted) (first quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); and then quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)); *see also Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (" '[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly'; municipal liability, however, 'attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986))); *Schwab v. Smalls*, 435 F. App'x 37, 40 (2d Cir. 2011) (finding that plaintiff failed to sufficiently plead *Monell* liability where she did "not adequately allege[ ] that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing of District employees"); *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."). A plaintiff only needs to identify one action by a decisionmaker who possesses final authority to "establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Montero*, 890 F.3d at 403); *see Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992) (holding that "a single act" could form the "basis of municipal liability ... [s]o long as the single challenged act was the decision of a municipal policymaker" (citing *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292); *Pignone v. Village of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *3 (S.D.N.Y. Mar. 6, 2014) ("Even one act by a municipal policymaker may constitute a municipal 'policy,' so long as that policymaker possessed final authority to establish municipal policy in the area at issue." (citing *Pembaur*, 475 U.S. at 481–83, 106

S.Ct. 1292)); *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 204 (E.D.N.Y. 2013) ("It is well settled that municipal liability may be established based on the single acts of a municipal official with 'final policymaking authority.' " (collecting cases)). "The question of whether an official has final policymaking authority is a question of law." *Massena*, 545 F. App'x at 55; *see Agosto*, 982 F.3d at 98 ("Whether the official in question possessed final policymaking authority is a legal question." (citing *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000))).

**\*30** For the purposes of municipal liability, Tenke's proposed budget, which eliminated Plaintiff's position, was the decision of a "municipal official[ ] with decision-making authority" because of his final authority throughout the budgetary process. *McLennon*, 171 F. Supp. 3d at 94; *Iacovangelo*, 624 F. App'x at 13–14; *see Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy."). Tenke proposed the budget and plausibly had final authority throughout the process; for example, during the budget decision process, several council members proposed ways to reduce costs other than terminating positions such as Plaintiff's, but Tenke rejected those alternatives as "not viable." (Compl. ¶ 106.) Further, it was Tenke who told Plaintiff he was eliminating her position from the 2021 budget. (*Id.* ¶ 101.) He plausibly was a final policymaker for the 2021 budget terminating Plaintiff's position. *See Gronowski*, 424 F.3d at 296–97 ("[The mayor's] actions undoubtedly represent government policy. Because he has final authority over hiring and firing decisions, which are discretionary matters, his decisions in this area constitute the municipality's final actions."); *Chiaravallo v. Middletown Transit Dist.*, No. 18-CV-1360, 2019 WL 4278937, at \*9 (D. Conn. Sept. 10, 2019) ("Although the [c]ity's [c]harter may limit [the mayor's] authority... [the plaintiff] plausibly alleges that [the mayor's] actions circumvented any limitation on his power ... and therefore constituted a 'policy' under Section 1983."); *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 323 (S.D.N.Y. 2019) ("[The p]laintiff alleges that she was told [the executive officer] made the decision to terminate [the p]laintiff's employment, suggesting he has final authority over hiring and firing decisions.... At the motion-to-dismiss stage, [the p]laintiff's allegation that [the executive officer] has authority over firing decisions is sufficient to assert liability for her allegedly unlawful termination."). Thus, in crafting the 2021 budget, Tenke made "a deliberate choice ... from among various alternatives," *Hines*, 520 F.

App'x at 7, and therefore was responsible for establishing final government policy with respect to budgetary decisions for the City, *Agosto*, 982 F.3d at 98. While Tenke may not have had a vote on the proposed budgets under the City Council, (*see* City Charter § C2-4(E)), his itemized budget containing the elimination of Plaintiff's position plausibly was the "act of a person with policymaking authority for the municipality." *Missel*, 351 F. App'x at 545 ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008))).

Accordingly, Plaintiff has plausibly alleged a *Monell* claim and the Court therefore denies Defendants' motion to dismiss the claim.

### f. Punitive damages

Tenke argues that the Court should strike Plaintiff's request for punitive damages, as Plaintiff fails to assert any facts plausibly alleging that he acted with "evil motive or intent" or "reckless or callous indifference." (Tenke's Mem. 18 (quoting *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir. 2003)).) The City argues that as a government entity, it is immune from punitive damages. (City's Mem. 19.)

Plaintiff argues that punitive damages should not be dismissed on a motion to dismiss. (Pl.'s Tenke Opp'n 13.)

Because punitive damages are a form of damages, and not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is "procedurally premature." *Jones v. City of New York*, No. 18-CV-1937, 2020 WL 1644009, at \*17 (S.D.N.Y. Apr. 2, 2020) (quoting *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019)) (denying defendants' motion to dismiss plaintiff's request for punitive damages on the grounds that a motion to dismiss is addressed to a claim and not to a form of damages); *see Bernardi v. N.Y. State Dep't of Corr.*, No. 19-CV-11867, 2021 WL 1999159, at \*14 (S.D.N.Y. May 19, 2021) (denying motion to dismiss as premature with respect to plaintiff's punitive damages claims).

The Court therefore denies Defendants' motion with respect to Plaintiff's punitive damages claim.

### III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss. The Court dismisses Plaintiff's NYSHRL claim against Tenke, First Amendment political retaliation claim against Tenke and the City, and Fourteenth Amendment claims against the City, without prejudice. The Court denies Defendants' motions with respect to Plaintiff's Title VII retaliation and hostile work environment claims against the City and First Amendment retaliation claim brought under section 1983 against Tenke and the City on the basis of her gender discrimination complaint. The Court also denies Defendants' motion with respect to Plaintiff's punitive damages claim. The Court grants Plaintiff's request to amend her Complaint to include a Fourteenth Amendment retaliation claim against the City.

SO ORDERED:

### All Citations

Slip Copy, 2022 WL 3586559

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 199 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

2017 WL 3535296
United States District Court, S.D. New York.

Shakitta HOLMES, Plaintiff,
v.
ASTOR SERVICES FOR CHILDREN & FAMILIES,
Renee Fillette, PhD, Edward Pruitt, Dianne Wolff, NPP,
Kate Bagshaw, and Katherine Rider, RN, Defendants.

No. 16-CV-2260 (CS)
|
Signed 08/16/2017

**Attorneys and Law Firms**

Jimmy Miguel Santos, Law Offices of Jimmy M. Santos, PLLC, Cornwall, New York, Counsel for Plaintiff.

Laura Wong-Pan, Thomas, Drohan, Waxman, Petigrow & Mayle, LLP, Hopewell Junction, New York, Counsel for Defendants.

**OPINION AND ORDER**

CATHY SEIBEL, U.S.D.J.

**\*1** Before the Court is Defendants' Motion for Summary Judgment. (Doc. 68.) For the following reasons, the Motion is GRANTED.

**I. BACKGROUND**

The following facts, which are based on Defendants' Local Rule 56.1 Statement, (Doc. 69 ("56.1 Stmt.")), and supporting materials, are undisputed.

**A. Staffing Issues at Astor Services for Children & Families ("Astor")**

Plaintiff is a registered Licensed Practical Nurse ("LPN") who worked in Astor's health clinic, which services a Residential Treatment Facility ("RTF") and Residential Treatment Center ("RTC") in Rhinebeck, New York. (56.1 Stmt. ¶¶ 1, 2, 10.) Astor's RTF is overseen by the New York State Office of Mental Health ("OMH"). (*Id.* ¶ 2.) Plaintiff was hired as a child care worker in 2002, and assumed the higher-paid position of LPN in 2007. (*Id.* ¶ 11; Doc. 73 ("Wong-Pan Decl.") Ex. Y at 19:24-20:12.) There are several differences between LPNs and RNs, including

more extensive educational requirements for RNs, (56.1 Stmt. ¶ 18), and duties that RNs can and LPNs cannot perform, including: assessing patients; completing a physical on a child; performing duties without an RN in the clinic; responding to situations involving physical restraints on children; reading skin tests used to diagnose tuberculosis; and treating children at the RTF, (*id.* ¶ 19). There is nothing that an LPN can do that an RN cannot. (*Id.* ¶ 20.) Astor had ceased hiring LPNs several years prior to the commencement of this action. (*See id.* ¶ 15.)

To comply with OMH requirements, Astor must maintain an operating certificate. (*Id.* ¶ 21.) On September 15-16, 2015 – approximately two weeks prior to the expiration of Astor's operating certificate—OMH visited Astor as part of its "focused provider monitoring" and determined that the RTF did not meet minimum standards for recertification because of "recurring challenges in the nursing department." (*Id.* ¶¶ 22-24 (quoting Wong-Pan Decl. Ex. U).) On September 30, 2015, OMH refused to reissue Astor's operating certificate. (*Id.* ¶ 25.) In response, Chief Operating Officer Renee Fillette, PhD issued a memorandum to the health clinic staff, stating that, "[u]nder no conditions whatsoever can there be any uncovered nursing shifts. There are no exceptions." (*Id.* ¶ 29.) On October 13, 2015, OMH representatives met with Dr. Fillette, Director of Nursing Dianne Wolff, Assistant Executive Director Edward Pruitt, Medical Director Dr. Suzanne Button, and others to address OMH's concerns. (*Id.* ¶¶ 4, 31.) At the meeting, Astor's representatives proposed to eliminate the LPN positions and hire more RNs, a step that an OMH auditor also suggested. (*Id.* ¶¶ 32, 33.) Shortly thereafter, Astor compiled and submitted to OMH a Performance Improvement Plan ("PIP") that "described incentives for RNs to assure coverage while new RNs are hired, and described a staffing analysis to ensure 24/7 RN coverage." (*Id.* ¶¶ 34, 35; Doc. 70 ("Bagshaw Aff.") Ex. A.)

On November 20, 2015, OMH sent Astor a letter explaining that it had evaluated Astor's implementation of the PIP and concluded that Astor "meets minimum standards for recertification," while noting that it would "continue to conduct focused monitoring to ensure sustained progress and compliance." (56.1 Stmt. ¶ 37; Bagshaw Aff. Ex. B.) On November 25, 2015, Wolff and Dr. Button sent a memorandum to Dr. Fillette and Pruitt recommending elimination of the LPN position. (56.1 Stmt. ¶ 38; Bagshaw Aff. Ex. C.) The final decision to eliminate the LPN position was made by Astor's Chief Executive Officer in or around December 2015, (56.1 Stmt. ¶ 41), with implementation

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 200 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

to occur by January 15, 2016, (*id.* ¶ 43). On or about December 16, 2015, Astor's Director of Human Resources Kate Bagshaw, (*id.* ¶ 5), and Pruitt met with Plaintiff to give her a letter informing her of the elimination of the LPN title, her right to be recalled, and her right to "retreat to the child care worker position," (*id.* ¶ 44), which Plaintiff declined to do, (*id.* ¶ 47). [1] Susanne LaBarbera, a Caucasian per diem LPN working at the health clinic, was also informed in writing that the LPN position was being eliminated, and that she would remain on a recall list for two years. (56.1 Stmt. ¶¶ 13, 45.) After the LPN title was eliminated, Astor hired at least two new RNs—one of whom is African-American, (*id.* ¶ 48) – which resolved the nurse staffing shortages, (*id.* ¶¶ 51-52).

[1]   The right to "retreat" was seemingly based on the collective bargaining agreement governing Plaintiff's position. (Ds' Mem. at 10; *see* Wong-Pan Decl. Ex. R.)

### B. Plaintiff's Employment Record

**\*2**  In 2013, Plaintiff was placed on a "Corrective Action Plan," and was written up for deficiencies in her work and for failing to follow proper procedures. (*Id.* ¶¶ 55-58.) In 2014, Plaintiff was written up for errors in following medication administration procedures and reporting medication errors. (*Id.* ¶¶ 59-60.) On March 20, 2015, Plaintiff and a Caucasian RN were written up when a child was restrained in the RTF, (*id.* ¶ 62), but Plaintiff testified that this write-up was not disciplinary in nature, (*id.* ¶ 63). At some point, the nursing supervisor opined that she thought Plaintiff should be terminated. (*Id.* ¶¶ 53, 61.)

On May 16, 2015, Plaintiff and Katherine Rider, RN, clashed at work. Plaintiff told Nina Asch, the scheduling coordinator and health clinic manager, that she did not want to work with Rider. (*Id.* ¶¶ 65-67.) Asch responded that she would try to find someone to cover for Plaintiff, and suggested that Plaintiff and Rider stay on opposite sides of the clinic throughout their shifts. (*Id.* ¶¶ 68-69.) Plaintiff retreated to a room where medications are stored, (*id.* ¶ 70), which is supposed to stay locked with nurses swiping their badges to enter, (*id.* ¶ 74), and stayed there for "most of the shift," playing music that she refused to turn down. (*Id.* ¶¶ 72, 75-76.) On May 17, 2015, Plaintiff returned to work, but Astor had called an RN in to cover for her in the belief that she was not coming in after the prior day's events. (*Id.* ¶¶ 80-81.) Plaintiff told the RN that she was going to stay, so the RN left. (*Id.* ¶ 82.) On May 18, 2015, Rider complained verbally

and sent an email to Asch complaining about Plaintiff's conduct. (*Id.* ¶¶ 83-84.) On July 8, 2015, Bagshaw and Pruitt interviewed Plaintiff about the May 16-17 incident, (*id.* ¶ 89), after having received accounts from Rider, Asch, Bagshaw, and the RN who was called in on May 17, (*id.* ¶¶ 86, 87, 89). Over the next several days, Plaintiff also received unrelated criticism from Astor's Director of Nursing Carolyn Clark about deficiencies in her nursing documentation. (*Id.* ¶¶ 79, 90, 93-98, 100.)

Because of the May 16-17 incident and the documentation problems, and with the counsel of her union representative, (*id.* ¶ 113), Plaintiff entered into a Stipulation of Agreement with Astor on August 6, 2015, (*id.* ¶ 102; Wong-Pan Decl. Ex. J), admitting to documentation deficiencies and acting "in a manner that was not appropriate in the workplace," and agreeing to a two-day suspension without pay, (56.1 Stmt. ¶¶ 101-05; Wong-Pan Decl. Ex. J).

### C. Plaintiff's Schedule Change

From August 2014 to at least May 2015, Astor permitted Plaintiff to have two days off each week, as well as every other weekend. (*Id.* ¶¶ 162, 164, 166.) At the end of May 2015, Clark asked Bagshaw whether the health clinic was required to continue Plaintiff's special schedule, in part because the difficulty in scheduling around Plaintiff's requested days off contributed to the ongoing nursing coverage issues. (*Id.* ¶¶ 167-69.) On July 13, 2015, Clark informed Plaintiff via email that Astor could no longer accommodate her special schedule, stating that she could "always make switches with other staff with approval," but that she should "limit [her] weekend shifts to one a month." (*Id.* ¶ 170 (quoting Wong-Pan Decl. Ex. I).) This email was forwarded to Wolff on August 31, 2015. (*Id.* ¶ 174.) The new schedule was to take effect on August 10, 2015. (*Id.* ¶ 171.)

### D. Plaintiff's July 8, 2015 Email

At some point on July 7, 2015, a call was made over the walkie talkie system for a nurse to respond to a restraint at a RTC unit because a child had fallen. (*Id.* ¶¶ 124, 135.) On that day, Plaintiff was the "primary nurse" staffed in the unit, meaning that she was responsible for that unit, (*id.* ¶ 129), and she responded to the call in a manner that did not compromise the child's safety, (*id.* ¶ 130). Common practice dictates that only one nurse need respond to such a call, (*id.* ¶ 128), and there is no rule or regulation requiring all nurses to respond to a call, (*id.* ¶¶ 141, 143). Also on July 7, 2015, Plaintiff responded to a separate call regarding a child who had fallen

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

and hit his head. (*Id.* ¶¶ 134-36.) Plaintiff testified that the child's safety was not at risk and that her response was timely and appropriate. (*Id.* ¶ 139.) On July 8, 2015, Plaintiff sent an email to Fillette regarding the two incidents that occurred the prior day, complaining that she had been the only nurse to respond and that fact showed a "poor work ethic." (*Id.* ¶ 119 (quoting Wong-Pan Ex. F); *see id.* ¶ 120.)

### E. Plaintiff's Discrimination Complaint

**\*3** Plaintiff submitted a written complaint of discrimination, which Astor received on September 14, 2015. (*Id.* ¶ 147.) After receiving the complaint, Bagshaw interviewed Plaintiff and inquired how Plaintiff was treated differently or retaliated against because of her race. (*Id.* ¶ 149.) Plaintiff responded that she was discriminated against because of meetings with human resources. (*Id.* ¶ 150.) Bagshaw interviewed several potential witnesses, including LaBarbera, and each responded that they did not believe Plaintiff was treated differently because of her race. (*Id.* ¶¶ 152-56.) On October 20, 2015, Bagshaw gave Plaintiff a letter summarizing her investigation, which concluded that Plaintiff was not subject to discrimination. (*Id.* ¶ 157; Wong-Pan Ex. O.) Plaintiff testified that she never heard any named Defendant make any racist statements, (Wong-Pan Decl. Ex. Y at 197:6-9), and Plaintiff's union representative testified that he had never heard Rider, Bagshaw, Fillette, or Pruitt (who is African American) make racist statements, (56.1 Stmt. ¶¶ 181, 184, 188, 195).

### F. Procedural History

On March 28, 2016, Plaintiff filed the Complaint in this action against Astor, Fillette, Pruitt, Wolff, Bagshaw, and Rider, (Doc. 1), alleging employment discrimination based on race, a hostile work environment, and retaliation under 42 U.S.C. § 1981, and whistleblower retaliation under New York Labor Law ("NYLL") §§ 740 & 741. Defendants answered on May 4, 2016, (Doc. 28), and the parties proceeded to discovery. Defendants filed the instant motion for summary judgment on January 30, 2017. (Doc. 68.) Plaintiff did not oppose the motion.[2]

[2]       Plaintiff's Counsel is directed to provide a copy of this Opinion and Order to Plaintiff.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A non-moving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).

"Failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). But in the typical case, failure to respond results in a grant of summary judgment once the Court assures itself that Rule 56's other requirements have been met. *See T.Y.*, 584 F.3d at 418.

## III. DISCUSSION

### A. Employment Discrimination Based On Race

#### 1. *Prima Facie* Case

Defendants argue that Plaintiff has not set forth a *prima facie* case of race discrimination, and that even if she had, there is a legitimate, non-discriminatory reason for Plaintiff's adverse employment action. (Doc. 72 ("Ds' Mem.") at 9-10.)

Discrimination claims brought under § 1981 are analyzed pursuant to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.[3] Under this framework, a plaintiff bears

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 202 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)
2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

the initial and minimal burden of establishing a *prima facie* case of discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). To make out a *prima facie* case, a plaintiff must show that, "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

3      "While *McDonnell Douglas* ... involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, courts have held that discrimination and retaliation claims brought under 42 U.S.C. § 1981 ... follow the same analysis." *Thomas v. N.Y.C. Health & Hosps. Corp.*, No. 02-CV-5159, 2004 WL 1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004).

**\*4** Once a *prima facie* case is established, a "rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Once the defendant proffers a legitimate, non-discriminatory reason, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001). The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.' " *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *Reeves*, 530 U.S. at 143.

Defendants do not contest that Plaintiff is a member of a protected class and was qualified for the LPN position.

Defendants are correct that Plaintiff's meetings with human resources and a schedule change do not constitute adverse employment actions. *See Adams-Martin v. Conn. Dep't of Developmental Servs.*, No. 10-CV-99, 2012 WL 878306, at *12 (D. Conn. Mar. 14, 2014) ("A disciplinary meeting, without any further consequence, is not a material change in the terms and conditions of employment."); *Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008) (no adverse employment action where there were minor changes to plaintiff's work schedule and weekends off); *Rivera v. Potter*, No. 03-CV-1991, 2005 WL 236490, at *5 n.5 (S.D.N.Y. Jan. 31, 2005) (unwanted schedule change is not adverse employment action). But Plaintiff's two-day suspension without pay after the May 16-17, 2015 incident and the elimination of the LPN position, after which Plaintiff was offered a position that paid less, (56.1 Stmt. ¶ 44; Wong-Pan Decl. Ex. Y at 19:24-20:12; *see id.* Ex. J), are adverse employment actions under § 1981. *See Robinson v. Dep't of Motor Vehicle*, No. 16-CV-1148, 2017 WL 2259767, at *11 (D. Conn. May 23, 2017) (two-day suspension qualifies as adverse action); *Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) (two-day suspension without pay treated as adverse employment action); *Gallo v. Second Taxing Dist. of City of Norwalk*, 507 F. Supp. 2d 164, 174 (D. Conn. 2007) (elimination of position and transfer to another department is adverse employment action).

Plaintiff fails to make out a *prima facie* case, however, because there are no circumstances surrounding either the two-day suspension or the elimination of the LPN position that give rise to an inference of discrimination. Factors contributing to an inference of discriminatory intent include, but are not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group;

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 203 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

or the sequence of events leading to the plaintiff's discharge.

*Leibowitz*, 584 F.3d at 502 (internal quotation marks omitted).

Here, because the LPN position was eliminated, Defendants have not sought to replace Plaintiff with someone of similar qualifications; to the contrary, RNs were hired after the LPNs were let go. *See Watt v. N.Y. Botanical Garden*, No. 98-CV-1095, 2000 WL 193626, at *5 (S.D.N.Y. Feb. 16, 2000) (no inference of discrimination where employer never sought or hired replacement for plaintiff); *see also Zuffante v. Elderplan, Inc.*, No. 02-CV-3250, 2004 WL 744858, at *7 (S.D.N.Y. Mar. 31, 2004) (employer did not fill plaintiff's prior position after department was eliminated). Neither Plaintiff nor her union representative has heard Defendants make racist remarks. (56.1 Stmt. ¶¶ 181, 184, 188, 195; Wong-Pan Decl. Ex. Y at 197:6-9.) Defendants did not treat similarly-situated employees outside Plaintiff's protected class any more favorably; LaBarbera, a Caucasian LPN, was treated in the same manner as Plaintiff. (*See* 56.1 Stmt. ¶¶ 13, 45, 46.) Because there are no indicators that might suggest an inference of discrimination, Plaintiff has not established a *prima facie* case of race discrimination. *See Collazo v. Cty. of Suffolk*, 163 F. Supp. 3d 27, 48-49 (E.D.N.Y. 2016) (where plaintiff had not alleged that a similarly-situated employee that engaged in the same behavior was not suspended, nor that any racially charged comments were made in close proximity to plaintiff's suspension, there was no evidence giving rise to an inference of discrimination); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 516 (S.D.N.Y. 2003) (plaintiff could not establish a *prima facie* case of discrimination where employee outside his protected class was treated identically).

2. Legitimate, Non-Discriminatory Reasons

**\*5** Even if Plaintiff could make out a *prima face* case of race discrimination, Defendants have provided a legitimate, non-discriminatory reason for the elimination of the LPN position and for Plaintiff's two-day suspension. Defendants provided evidence that they eliminated the LPN position to hire more RNs in an effort to address inadequate nursing staff coverage, which was jeopardizing Astor's OMH certification and was a step OMH itself suggested. (56.1 Stmt. ¶¶ 24, 33, 38, 46.) Similarly, Plaintiff was suspended as a result of the May 16-17 incident and multiple documentation errors, as she admitted in a signed Stipulation of Agreement, in

which she acknowledged the myriad reasons for her two-day suspension. (*See id.* ¶¶ 103-04; Wang-Pan Decl. Ex. J.) These legitimate non-discriminatory reasons for Plaintiff's adverse employment actions eradicate any presumption of discrimination. *See Taylor v. Family Residences & Essential Enters.*, No. 03-CV-6122, 2008 WL 268801, at *11 (E.D.N.Y. Jan. 30, 2008) (organization's decision not to offer plaintiff a specific position was legitimate and nondiscriminatory where working particular shift would have led to staffing problems); *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 385 (S.D.N.Y. 2007) (plaintiff's poor work performance and insubordinate behavior provide ample justification for suspension).

Typically, the *McDonnell Douglas* analysis would next shift the burden to Plaintiff to show that the Defendants' legitimate, non-discriminatory justifications for Plaintiff's adverse employment actions were mere pretexts for discrimination. "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus." *Leibowitz*, 584 F.3d at 504. But here, Plaintiff has failed to respond to Defendants' motion for summary judgment, and therefore, has not provided any evidence that Defendants' legitimate, non-discriminatory reasons for the elimination of the LPN position or Plaintiff's two-day suspension are pretextual. Accordingly, because Plaintiff has failed to satisfy her burden, Defendants are entitled to summary judgment on Plaintiff's race discrimination claim. *See Powell v. Consol. Edison Co. of N.Y., Inc.*, No. 97-CV-2439, 2001 WL 262583, at *8 n.10 (S.D.N.Y. Mar. 13, 2001) (where plaintiff failed to respond to proffered legitimate reason with evidence of pretext, court considered claims abandoned and dismissed); *see also Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (*per curiam*) (affirming grant of summary judgment based on plaintiff's failure to deny statements of fact pursuant to Rule 56.1).

**B. Hostile Work Environment**

To succeed on a hostile work environment claim, Plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 204 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

interferes with an employee's work performance." *Id.* at 23. Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

"To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "Pervasive" harassment is harassment that is " 'more than episodic,' " and instead " 'continuous and concerted.' " *Hayut*, 352 F.3d at 745 (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)). "The environment," however, "need not be unendurable or intolerable." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted). "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.* (internal quotation marks omitted). "[T]he Second Circuit has cautioned [that] the existence of a hostile work environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Hill v. Taconic Developmental Disabilities Servs. Office*, 181 F. Supp. 2d 303, 321 (S.D.N.Y. 2002) (citation and internal quotation marks omitted), *vacated on other grounds by* 57 Fed.Appx. 9 (2d Cir. 2003).

**\*6** Here, the record contains no evidence of any discriminatory abuse whatsoever throughout Plaintiff's tenure at Astor, thus defeating Plaintiff's hostile work environment claim. *See Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 518 (S.D.N.Y. 2016) (no hostile work environment where "there [were] no remarks, stray or otherwise, of a racial ... nature"), *aff'd*, No. 16-969-CV, 2017 WL 1755941 (2d Cir. May 4, 2017) (summary order); *Giscombe v. N.Y.C. Dep't of Educ.*, No. 12-CV-464, 2013 WL 829127, at \*5-6 (S.D.N.Y. Feb. 28, 2013) (no hostile work environment despite disciplinary actions taken against plaintiff because he showed no evidence of racially charged

remarks or similarly-situated plaintiffs outside the protected class being treated more favorably).

The elimination of the LPN position and Plaintiff's two-day suspension do not permit Plaintiff's hostile work environment claim to survive summary judgment. To the extent these events could be considered harassment, they are isolated instances that do not rise to the level of severe or pervasive. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (isolated instances of harassment ordinarily insufficient); *Braheney v. Town of Wallingford*, No. 00-CV-2468, 2004 WL 721834, at \*4 (D. Conn. Mar. 30, 2004) (four suspensions over three-year period insufficiently continuous and concerted to constitute hostile work environment). Further, "[e]ven if the [employer's] conduct w[as] objectively severe or pervasive, [Plaintiff]'s claim would still fail since[, as discussed above,] she has presented no evidence of having been subjected to the conduct because of her [race]." *Macshane v. City of N.Y.*, No. 05-CV-6021, 2015 WL 1298423, at \*26 (S.D.N.Y. Mar. 23, 2015), *aff'd sub nom, Herlihy v. City of N.Y.*, 654 Fed.Appx. 40 (2d Cir. 2010) (summary order); *see Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at \*59-60 (S.D.N.Y. Mar. 27, 2015) (summary judgment granted for defendants in hostile work environment claim where plaintiff offered no evidence that adverse employment actions were motivated by gender or national origin), *aff'd*, No. 15-1328-CV, 2017 WL 2889483 (2d Cir. July 7, 2017) (summary order). Thus, summary judgment is granted on Plaintiff's hostile work environment claim.

**C. Retaliation**

Finally, § 1981 retaliation claims are also analyzed using the *McDonnell Douglas* burden-shifting framework. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Cruz v. Oxford Health Plans, Inc.*, No. 03-CV-8863, 2008 WL 509195, at \*10 (S.D.N.Y. Feb. 26, 2008).

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she was engaged in activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by defendants. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "To establish an adverse employment action for purposes of a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged

2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 224 (E.D.N.Y. 2014) (alteration omitted) (internal quotation marks omitted). A plaintiff may establish the causal connection indirectly by showing that the protected activity was closely followed by the retaliation, or directly by showing evidence of retaliatory animus. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

**\*7** Plaintiff alleges that Defendants retaliated against her after she reported discriminatory conduct in September 2015 by eliminating the LPN position, imposing a two-day suspension, subjecting her to meetings with Human Resources, and forcing her to change her schedule. (Doc. 1 ¶¶ 26, 28, 30.) Defendants do not dispute that Plaintiff's discrimination complaint is a protected activity under § 1981 or that Plaintiff suffered an adverse employment action. Nonetheless, Plaintiff's claim fails because there is no causal connection between Plaintiff's protected activity and her adverse employment actions, and even if there were, Defendants have offered legitimate, non-retaliatory reasons for these actions.

First, Plaintiff's schedule change, human resources meetings, and two-day suspension occurred before she engaged in any protected activity. Plaintiff signed the Stipulation of Agreement accepting her suspension on August 6, 2015, (56.1 Stmt. ¶ 102), was informed on July 13, 2015 via email that her "special scheduling" would be terminated on August 10, 2015, (*id.* ¶¶ 170-71), and alleges that she attended disciplinary meetings on unspecified dates beginning in May 2015, (Doc. 1 ¶ 26).[4] Astor did not receive her discrimination complaint, however, until September 14, 2015. (56.1 Stmt. ¶ 147.) Because these allegedly retaliatory events all occurred before Plaintiff engaged in any protected activity, no causal connection can be established between them and her complaint of discrimination. *See Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action. It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended *prior* to the commencement of any protected activity.") (emphasis in original). Accordingly, Plaintiff failed to establish a *prima facie* case of retaliation with regard to her two-day suspension.

4     The Complaint alleges that the hostile work environment began "in or about May 2015, and increasingly more so after July 8, 2015." (*Id.*) To the extent that any disciplinary meetings took place after Plaintiff filed her discrimination complaint in September 2015 (which is unclear from the record), there is no evidence from which a reasonable juror could conclude that anything occurred at such meetings that would have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

Second, Plaintiff presents no evidence from which it could be inferred that the elimination of the LPN position was causally related to Plaintiff's discrimination complaint. While causation may be established through a showing that the retaliatory act closely followed the protected activity, *see Cosgrove*, 9 F.3d at 1039, Plaintiff's discrimination complaint was received by Astor on September 14, 2015, (56.1 Stmt. ¶ 147), and the LPN position was eliminated three months later in December 2015, (*id.* ¶¶ 39-41). The Second Circuit has cited with approval the proposition that a three month gap can "negate any inference of causation," *see Brown v. City of N.Y.*, 622 Fed.Appx. 19, 20 (2d Cir. 2015) (summary order) (citing *Williams v. City of N.Y.*, No. 11-CV-9679, 2012 WL 3245448, at \*11 (S.D.N.Y. Aug. 8, 2012)), and courts in this Circuit "have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation," *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases).

**\*8** Further, even if the adverse action is regarded as having occurred in October 2015 when Defendants proposed the elimination of the LPN position, (*see* 56.1 Stmt. ¶¶ 31-32), an inference of causation is defeated "if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory [employment action]," *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see Li-Wei Kao v. Erie Comm. Coll.*, No. 11-CV-415, 2015 WL 3823719, at \*19 (W.D.N.Y. June 18, 2015) (intervening event between protected activity and plaintiff's termination broke causal connection based on temporal proximity). On the undisputed facts, any reasonable fact-finder would conclude that there were substantial intervening events between Plaintiff's September 2015 discrimination complaint and the elimination of the LPN position in December 2015. In that time, OMH had refused to reissue

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 206 of 235

Holmes v. Astor Services for Children & Families, Not Reported in Fed. Supp. (2017)
2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

an operating certificate to Astor, in part due to concerns over inadequate coverage in the nursing department. (56.1 Stmt. ¶¶ 24, 25, 27.) Defendants then determined that eliminating the LPN position, a step recommended by OMH, (*id.* ¶ 33), and substituting RNs, would help resolve the staffing issues, (*id.* ¶ 38). OMH's refusal to reissue an operating certificate and the consequences that followed from it serve to break any inference of a causal connection between Plaintiff's complaint and the elimination of the LPN position.

Finally, even if Plaintiff did establish a *prima face* case of retaliation, Defendants have provided a legitimate, non-discriminatory reason for the elimination of the LPN position, as discussed *supra* Section III.A.2, and Plaintiff has not shown that reason to be pretextual. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1981 retaliation claim.

**D. Plaintiff's State Law Claim**

In addition to her claims under federal law, Plaintiff brought a claim under the New York State whistleblower statute, NYLL §§ 740 & 741. The "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction where

all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Having determined that all of the claims over which this Court has original jurisdiction should be dismissed on summary judgment, I decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law cause of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)). Accordingly, Plaintiff's state law claim is dismissed without prejudice.

IV. **CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED. The federal claims are dismissed with prejudice and the state claim is dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 68), enter judgment for Defendants, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3535296, 2017 Fair Empl.Prac.Cas. (BNA) 286,998

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 964207
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramiah BROWN, Plaintiff,
v.
7-ELVEN INCORP., Tim Hortons,
and Brad Goldstein, Defendants.

5:20-CV-1339 (TJM/ML)
|
Signed 03/15/2021

**Attorneys and Law Firms**

Jeramiah Brown, Watertown, NY, pro se.

**DECISION & ORDER**

Thomas J. McAvoy, Sr. U.S. District Judge

**\*1** Petitioner filed this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and New York state law, alleging that Defendants discriminated against him because of his disability, defamed him, and violated an agreement to settle a previous federal claim Plaintiff brought regarding the discrimination at issue in this case. Plaintiff also attempted to state a claim for judicial misconduct, alleging that a judge who presided over an earlier matter had damaged his case. The Court referred the matter to the Hon. Miroslav Lovric, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, dated December 15, 2020, recommends that the Court dismiss with prejudice Plaintiff's Second Amended Complaint. See dkt. # 10. Magistrate Judge Lovric finds that Plaintiff knowingly and willfully agreed to settle the claims raised in this lawsuit when he resolved an earlier matter filed in this District, and that the settlement agreement contained an enforceable waiver preventing him from filing the claims raised here. In addition, Judge Lovric found that, even if Plaintiff had properly named Magistrate Judge Andrew T. Baxter as a defendant in this matter, Magistrate Judge Baxter would be immune to suit. Because the Court lacked diversity jurisdiction over Plaintiff's remaining state-law claims, Magistrate Judge Lovric recommended that the Court dismiss those claims as

well. Finally, Magistrate Judge Lovric found that amending the Complaint would be futile and recommended dismissing the action.

Petitioner filed objections to the Report-Recommendation. See dkt. # 12. When a party objects to a magistrate judge's Report-Recommendation, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the other issues raised in the Petitioner's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lovric for the reasons stated in the Report-Recommendation, with the exception that, having dismissed the federal-question claims in this case, the Court explicitly declines to exercise supplemental jurisdiction over any state law claims. Courts "may decline to exercise supplemental jurisdiction ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Courts must consider 'the values of judicial economy, convenience, fairness, and comity' when deciding whether to exercise supplemental jurisdiction." Kroshnyi v. U.S. Pack Courier Servs., 771 F.3d 93, 102 (2d Cir. 2014) (quoting Carnegie-mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). Still, "if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as well.' " Brzak v. UN, 597 F.3d 107, 113-114 (2d Cir. 2010) (quoting Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008)). Those claims will therefore be dismissed without prejudice to repleading in an appropriate state forum.

**\*2** It is therefore **ORDERED** that Plaintiff's objections to the Report-Recommendation of Magistrate Judge Lovric, dkt. # 12, are hereby OVERRULED. The Report-Recommendation, dkt. # 10, is hereby ACCEPTED and ADOPTED. The Plaintiff's Second Amended Complaint is hereby DISMISSED with prejudice insofar as Plaintiff raises ADA claims and claims against Magistrate Judge Andrew T. Baxter. Plaintiff's state-law claims are DISMISSED without prejudice to re-pleading in an appropriate non-federal forum.

**IT IS SO ORDERED.**

2021 WL 964207

**All Citations**

Slip Copy, 2021 WL 964207

---

**End of Document**                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4039450
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramiah BROWN, Plaintiff,

v.

7-ELEVEN INCORP, Tim Hortons, Defendants.

5:20-CV-553 (TJM/ML)
|
Signed 07/17/2020

**Attorneys and Law Firms**

Jeramiah Brown, Watertown, NY, pro se.

### DECISION & ORDER

Thomas J. McAvoy, Sr. U.S. District Judge

**\*1**  The Court referred this *pro se* civil action, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., to Magistrate Judge Miroslav Lovric for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that the Defendants breached a settlement agreement that resolved an earlier case between the parties. Defendants are Plaintiff's former employers.

Magistrate Judge Lovric's Report-Recommendation, dkt. # 7, issued on June 18, 2020, finds that Plaintiff has failed to allege subject-matter jurisdiction and recommends that the Court dismiss the case without prejudice to repleading.

Plaintiff did not object to the Report-Recommendation, and the time for such objections has passed. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

Accordingly,

The Report-Recommendation of Magistrate Judge Lovric, dkt. # 7, is hereby **ACCEPTED** and **ADOPTED**. Plaintiff's Complaint is hereby **DISMISSED** without prejudice to repleading. Plaintiff shall file any amended complaint within thirty days of the date of this order or the Court will consider him to have abandoned the case. The Clerk of Court is directed to close the case if Plaintiff fails to file an amended complaint by that date.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4039450

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF NEW YORK

JERAMIAH BROWN,

        Plaintiff,               Civil Action No.: 5:19-cv-1160 LEK/ATB

v.                               Judge Andrew T. Baxter

TIM HORTONS, 7-ELEVEN

        Defendant.

_____/

## STIPULATION OF DISMISSAL

Plaintiff Jeramiah Brown ("Brown") and Defendant 7-Eleven, Inc., dba Tim Hortons ("7-Eleven"), by its attorneys, jointly stipulate and agree to the dismissal of all claims by Brown in this action against 7-Eleven, Inc., with prejudice. Each party shall bear its own costs and attorneys' fees.

Dated: October ___, 2019

                             Respectfully submitted,

**Jeramiah Brown**             **7-Eleven, Inc.**

By: _Jeramiah Brown_      By: _/s/ Christina M. Verone Juliano_
     Plaintiff                  Attorney for 7-Eleven, Inc.

323 South Massey Street         IT IS SO ORDERED:
Watertown, New York 13601
Telephone: (315) 517-4228
jeramiahsbrown1@gmail.com

                             Lawrence E. Kahn
                             Senior U.S. District Judge

                             Dated:   November 05, 2019

**17A Fed. Prac. & Proc. Juris. § 4235 (3d ed.)**

Federal Practice and Procedure (Wright & Miller) | April 2022 Update

Jurisdiction and Related Matters

Chapter 12. Relations of State and Federal Courts
Vikram David Amar

**D. Federal Actions to Restrain State Officers**

# § 4235 Three-Judge Court Acts—History and Purpose—Application Of Present Statutes

The mounting volume of three-judge court cases and the increased dissatisfaction with that procedure led Congress, in 1976, virtually to end the use of those courts.[1] The statutes that had required three-judge courts for constitutional challenges to state laws and administrative orders and to Acts of Congress, 28 U.S.C.A. §§ 2281, 2282, were repealed. Section 2284, which had previously prescribed the composition and procedure for three-judge courts, now also provides when a district court of three judges shall be convened. Such a court is provided only "when otherwise required by Act of Congress" or "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."[2]

The continued provision of a three-judge court "when otherwise required by Act of Congress" has reference principally to certain provisions of the Civil Rights Act of 1964[3] and the Voting Rights Act of 1965, as amended,[4] that require or permit a three-judge court, although there are a few other rare instances in which an Act of Congress requires a three-judge court.[5] An argument can be made that these three-judge courts are also not necessary and could have been abolished without loss.[6] However the only reservations about repeal of the three-judge provisions generally came from the National Association for the Advancement of Colored People, which urged that three-judge courts were still needed to protect minorities from the local bias and parochialism of some federal judges. Examination persuaded even staunch advocates of civil rights that the bill that finally became law would not impair the enforcement of civil rights,[7] but since the number of three-judge court cases under these other Acts of Congress is insignificant, it was symbolically desirable to preserve the provision for a few three-judge court cases in the modern civil rights and voting statutes.

The provision of a three-judge court for reapportionment cases was explained by the Senate Judiciary Committee on the ground that "it is the judgment of the committee that these issues are of such importance that they ought to be heard by a three-judge court and, in any event, they have never constituted a large number of cases."[8] Whether these cases are of such importance as to require a three-judge court is a matter on which reasonable people may differ,[9] but it is certainly true that the number of three-judge courts that will be required for reapportionment cases is very small indeed.[10]

The portion of the statute requiring a three-judge court for reapportionment cases speaks of "an action challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."[11] This ought to include all federal constitutional challenges that could result in a reapportionment.[12] The use of "statewide" was explained by the Senate Judiciary Committee.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 212 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. & ...

Where such a body exercises its powers over the entire State, this section requires that three judges hear cases challenging apportionment of its membership. Apportionment of a body that deals only with matters of local concern and representative of a county, district, or city, would not require three judges, even though the body derives its power from a State statute. [13]

A "legislative body," for purposes of this language, is apparently any statewide elected body performing governmental functions that are not almost wholly judicial or wholly executive and to which the "one man-one vote" principle extends. [14] All that is required is that the action be one "challenging the constitutionality" of the apportionment. Unlike the former three-judge court statutes, there is no requirement that injunctive relief be sought. Thus a suit for a declaratory judgment that an apportionment is unconstitutional will now require a three-judge court. [15]

In Brown v. Plata in 2011, in the highly charged context of unconstitutional prison overcrowding in California, the Court gave some background and procedural analysis of the three-judge court provisions in the Prison Litigation Reform Act (PLRA), observing that the PLRA places limits on the ability of federal courts to order reduction of prison populations, that "only a three-judge court may enter an order limiting a prison population," and that "[b]efore a three-judge court may be convened, a district court must first have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders," and also that the district court agree that three judges are required. [15.50]

The procedural provisions for three-judge courts, which were formerly 28 U.S.C.A. § 2284, have been made 28 U.S.C.A. § 2284(b) and significantly revised. The new subsection (b) is taken verbatim from the proposals of the American Law Institute, [16] with one minor exception, [17] and thus the Institute's explanation of its proposal is a useful source of guidance on the meaning of the changes that were made. [18]

The most difficult question about three-judge courts arises at the outset. Must a party request a three-judge court in a case for which such a court is required by 28 U.S.C.A. § 2284(a) or should the district judge act on his own in initiating the procedure to convene a three-judge court in a case in which it is required? This is not a problem in cases under the Civil Rights Act 1964, which calls for a three-judge court only on request of the Attorney General or, in some instances, the defendant. [19] It is, however, a problem in cases under the Voting Rights Act of 1965 and the other statutes that appear to make a three-judge court mandatory, including the provision of § 2284(a) itself for reapportionment cases. [20]

Under the pre-1976 statute the three-judge requirement was regarded as jurisdictional. [21] Although it was very common for a party to suggest the necessity of a three-judge court, the parties were not required to do so. Although the statute then said that the district judge should set in motion the steps for convening a three-judge court on "the filing of the application," the application referred to was "the application for injunction or other relief" and was not an application for a three-judge court. [22] It was the duty of the court, not the parties, to decide whether three judges were required. [23] If a single judge acted in a case that should have been heard by three judges, either because the parties did not request a three-judge court or because the single judge mistakenly thought the case was not within the statute, the three judges of the court of appeals could not affirm or reverse on the merits but were required to remand for a new hearing before the statutory three-judge court. [24] This was rightly called "the most obnoxious feature of the entire three-judge scheme" [25] and led Judge Friendly, writing for the Second Circuit, to say that if necessary, despite the decisions to this effect, "we would be disposed to reexamine whether * * * so bizarre a result was truly demanded." [26]

Whether that remains the rule today for reapportionment cases, and for other cases in which the Act of Congress providing for a three-judge court does not specify that a request must be made, is not clear. Section 2284(a) says a three-judge court "shall be convened." This sounds mandatory and thus jurisdictional. But § 2284(b) begins by saying that in actions "required to be heard and determined" by a three-judge court, the procedure is to be "as follows." What follows, in § 2284(b)(1), is that "(u)pon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge." This certainly seems to suggest that if there is no request for three judges, the single judge can act.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 213 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. & ...

It is easier to explain how this happened than what it means. The procedural provisions of § 2284(b) were, as has been noted, taken virtually verbatim from the American Law Institute proposals. [27] But in those proposals the substantive provision on when three judges are needed made this dependent upon a request by the defendant in suits challenging state laws. [28] When Congress acted it adopted its own substantive provision and joined it to the Institute's procedural provisions.

There is absolutely nothing in the legislative history that bears on this question one way or the other. It is not even possible to guess what Congress would have wished to do had it thought about this point since in some recent statutes it has called for a request for three judges [29] while in others it has not. [30]

Until this question is authoritatively resolved, undoubtedly the cautious course for a district court in a reapportionment case or other case in which an Act of Congress seems to make a three-judge court mandatory would be to have such a court convened, even in the absence of request. Even if a single judge can hear a case in the absence of request, a decision by three judges would be valid [31] and appeal of their decision to the Supreme Court would provide that Court with an early opportunity to announce whether a case otherwise within § 2284(a) but in which no request for three judges was made is a case "required by any Act of Congress to be heard and determined by a district court of three judges." [32] The old rule that the three-judge court provision was mandatory was wasteful and senseless. Since there is now new statutory language with enough inconsistency in it to justify either interpretation and since there is no legislative history to indicate that Congress wanted to preserve the old rule, the Supreme Court should hold that in all cases under § 2284 a request for three judges is required and that the three-judge provision is not jurisdictional. [33] In the unlikely event that Congress really wants to impose three judges on litigants in a case in which they are happy to have the matter decided by a single judge, Congress can easily amend the statute to require that result.

When a request for three judges is presented to the district judge before whom an action is pending, it is for him to determine whether the case is one in which § 2284(a) requires three judges. If he considers that it is, he must immediately notify the chief judge of the circuit, who will then designate two other judges, at least one of whom must be a circuit judge, to sit with the judge to whom the request was made as the three-judge court. [34] It has always been clear that the single judge must decide in the first instance whether a case is one in which three judges are required [35] although that question can be reconsidered by the three-judge court after it is convened and it can dissolve itself and return the case to the single judge if it does not think a three-judge court is required by statute. The Supreme Court has held that where a suit is "an action challenging the constitutionality of the apportionment of congressional districts," the district judge was required to refer the case to a three-judge panel under 28 U.S.C. § 2284(a), which allows no exception. The district judge dismissed the complaint not because he thought he lacked jurisdiction, but because he thought the allegations failed to state a claim on the merits. Reversing Fourth Circuit precedent, the Court made clear that a judge must determine only whether a request for three judges has been made and whether the claim is so insubstantial that the federal courts lack subject matter jurisdiction, not whether the claim is viable or not. [35.50] Under the former statute there was some question about the role of the chief judge of the circuit. In some circuits it was thought that he must make an independent determination of the necessity for three judges before designating a three-judge court [36] while in others it was believed that his role was purely ministerial and that he was required to designate two other judges whenever the single judge asked him to do so. [37] The new language of § 2284(b) was deliberately chosen to adopt the latter view and make it clear that the single judge is to consider whether three judges are required but that the chief judge of the circuit is not. [38]

In deciding whether to notify the chief judge that a three-judge court is required, the single judge is not limited to determining whether the case falls within § 2284(a). He may not dismiss the case on the merits [39] but he can dismiss, without calling for three judges, if the claim is so insubstantial that it does not invoke federal jurisdiction, [40] although the Supreme Court in recent cases has indicated that cases in which dismissal on this ground is proper will be rare indeed. [41] The single judge can also dismiss if the plaintiff lacks standing or the suit is otherwise not justiciable in the district court. [42]

In Bailey v. Patterson [43] the Supreme Court extended the principle that the single judge can dismiss if the claim was insubstantial to hold that a single judge could enjoin enforcement of a statute "where prior decisions make frivolous any claim that a state statute on its face is not unconstitutional." [44] Although the reasoning of Bailey is shaky, [45] its result was salutary. Bailey was a challenge to a statute requiring racial segregation in transportation. It would have been a waste of judicial resources to call together three judges to preside over the foregone result of holding that segregation statutes are invalid. But efforts to determine how far, if at all, the Bailey principle extended beyond race cases were not successful. Judge Friendly's attempt to rationalize

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 214 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Bailey by saying that three judges are not required when "the decision could not possibly go in any manner save one"[46] was noted by the Supreme Court with the tart observation that by quoting the remark the Court "does not intimate any approval of the radical expansion of Bailey that it appears to represent."[47]

Fortunately these problems have lost their significance with the 1976 restriction on the use of three-judge courts. Neither party is likely to request a three-judge court if the unconstitutionality of the challenged practice is conceded.[48] Suits under the civil rights and voting statutes are suits involving discrimination and are squarely within the Bailey principle. It is unlikely that apportionment of congressional districts or statewide legislative bodies will be so patently and obviously unconstitutional as to come within the Bailey principle, unless there has been a total failure to reapportion in response to new decennial census figures.[49] But even if this were ever to happen, it would seem that the sounder construction would be that three judges are required. Congress singled out these reapportionment cases from all other constitutional litigation because it thought they are "of such importance that they ought to be heard by a three-judge court,"[50] and there is no indication in the legislative history that Congress intended to temper its conclusion about this class of cases by a Bailey-type loophole. Even if the apportionment were patently unconstitutional, there are still delicate problems of remedy,[51] for which Congress presumably wanted three judges. Thus it should be held that three judges are required to grant relief in all of the reapportionment cases specified in § 2284(a), regardless of the obviousness of the constitutional violation.[52]

If a three-judge court is convened and the action is against a state, or officer or agency thereof, at least five days' notice of hearing of the action must be given by registered or certified mail to the governor and attorney general of the state.[53] In any case in which the constitutionality of a state statute affecting the public interest is drawn in question, whether the case is one for a single judge or for a three-judge court, if the state or an agency, officer, or employee of the state is not a party, the court must certify the fact of the pendency of the action to the attorney general of the state and permit the state to intervene and be heard on the issue of constitutionality.[54]

For many years the statute had provided that the hearing in three-judge court cases should be "given precedence" and "held at the earliest practicable day." This was repealed in 1984, as part of a general repeal of the numerous statutes then on the books giving precedence to various kinds of cases.[55]

When it adopted the 1976 amendments, Congress was of the view, previously urged by commentators,[56] that even in cases that must ultimately be decided by three judges, it is desirable "to allocate as many functions as possible to a single district judge, consistent with the statutory purpose."[57] These functions are spelled out in § 2284(b)(3).[58]

If irreparable damage will otherwise result, a single judge may grant a temporary restraining order to remain in force until the three-judge court has heard and determined an application for a preliminary injunction.[59] The notice provisions of Rule 65(b) for temporary restraining orders[60] apply to such an order.[61]

A single judge may also conduct all proceedings except the trial, and may make all orders permitted by the Civil Rules except as prohibited by § 2284(b)(3), but any action of the single judge may be reviewed by the full court at any time before final judgment.[62] A single judge may not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction,[63] or enter judgment on the merits.[64] The single judge may not stay an action pending decision by the Supreme Court of a similar case[65] nor may he order abstention pending state proceedings. This is a question for the three-judge court.[66]

After the three-judge court has given its judgment, it cannot be modified by the single judge.[67] However the single judge has power to act to enforce the judgment of the three judges.[68]

If there is a claim in a case that must be heard by a three-judge court, that court has power to decide other claims in the case that, standing alone, would require only a single judge.[69] It need not exercise this power. If it has disposed of the claim that required three judges, it may dissolve itself and remand to the single judge the other claims.[70] Indeed in Hagans v. Lavine,[71] a decision

that came down in 1974 when the Court was keenly conscious of the increased burden of three-judge courts, the Court approved a complicated practice by which the single judge in the first instance may consider those claims that do not require three judges and then call for the convening of a three-judge court only if the claims he has initially considered do not dispose of the case. [72]

It is possible to conceive of cases under the 1976 statute in which claims for which three judges are required will be joined with others a single judge could hear. Presumably the former rules apply, although the practice approved in Hagans might well be regarded as a needless complexity now that cases for three judges will be few in number. [73]

There is some authority that a three-judge court is "not bound by any judicial decisions other than those of the United States Supreme Court." [74] Far the more common view, however, though reached without much discussion, is that the three-judge court is sitting as a district court and is bound by decisions of the court of appeals for its circuit. [75] The decision of the three-judge court itself carries no greater weight as precedent than any other decision of a district court. [76]

The 1976 legislation did not change the statutory provision that any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in an action required by Act of Congress to be heard and determined by a district court of three judges. [77] In the years immediately prior to 1976 the Court, in an effort to rid itself of as many direct appeals as possible, had developed a bewildering and constantly changing variety of rules on what orders were directly appealable to it and what were reviewable in the courts of appeals. [78] With three-judge courts now virtually eliminated, it is to be hoped that the provision for direct appeal will be given a straight forward reading shorn of the complications introduced by the recent cases. [79]

Westlaw. © 2022 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

[1]   **Action by Congress**
Act of Aug. 12, 1976, Pub.L. 94-381, 90 Stat. 1119.

See Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 65 Geo.L.J. 971.

In enacting the 1976 statute requiring convening of three-judge courts when action is filed challenging constitutionality of apportionment of congressional districts or apportionment of any statewide legislative body, Congress intended to reduce sharply class of cases requiring convening of three-judge court. City of Philadelphia v. Klutznick, D.C.Pa.1980, 503 F.Supp. 657.

Congress has been successful in reducing the number of cases heard by a three-judge court. The largest number of three-judge hearings in one year was 320 cases in 1973. See § 4234 n. 28. The number in each of the last five years is as follows, with the total number given first, and following it, in parentheses, the number of civil rights cases, reapportionment cases, and all other.

1981—35 (31, 1, 3)

1982—62 (19, 42, 1)

1983—27 (16, 9, 2)

1984—35 (16, 17, 2)

1985—10 (8, 2, 0)

1986—18 (14, 1, 3)

Ann.Rep., Director of the Administrative Office of the United States Courts, 1985, p. 195, Table 52; id., 1986, p. 126, Table S-22.

2          **When required**

28 U.S.C.A. § 2284(a).

A three-judge court was convened to entertain action against the Virginia Board of Elections and various other entities and officials challenging the constitutionality of Virginia's districting of its House of Delegates in ⚑ Virginia House of Delegates v. Bethune-Hill, 139 S. Ct. 1945, 204 L. Ed. 2d 305 (2019).

A three-judge court was properly convened in a constitutional challenge to North Carolina congressional district lines in ⚑ Cooper v. Harris, 137 S. Ct. 1455, 197 L. Ed. 2d 837 (2017).

A three-judge court was properly convened in a constitutional challenge to "the apportionment of [a] statewide legislative body [the Virginia legislature]" in ⚑ Bethune-Hill v. Virginia State Bd. of Elections, 137 S. Ct. 788, 197 L. Ed. 2d 85 (2017).

The Fifth Circuit held that a straightforward reading of the three-judge statute is that it applies only when the constitutionality of apportionment is being challenged. Therefore, the defendants faced a "steep climb" in convincing the court to be the first ever to read the statute as applying to a case challenging a district's lines only under the Voting Rights Act. Thomas v. Bryant, 919 F.3d 298 (5th Cir. 2019), **citing Wright, Miller, Cooper & Amar**.

The Second Circuit has held that the three-judge requirement in 28 U.S.C. § 2284 in an action challenging the apportionment of congressional districts is jurisdictional. The text of § 2284 uses typically jurisdictional language, and there is no reason to think that when, in 1976, Congress amended the three-judge statute, it intended to make this requirement non-jurisdictional. Kalson v. Paterson, 542 F.3d 281 (2d Cir. 2008).

⚑ Brown v. Florida, D.C.Fla.2002, 208 F.Supp.2d 1344.

Winters v. Illinois State Bd. of Elections, D.C.Ill.2001, 197 F.Supp.2d 1110, judgment affirmed 2002, 122 S. Ct. 1433, 535 U.S. 967.

⚑ Robertson v. Bartels, D.C.N.J.2001, 150 F.Supp.2d 691.

In an action filed after enactment of the Three-Judge Court Act of 1976, a single district judge may completely dispose of actions seeking permanent injunctions or declaratory relief against the operation of state statutes that allegedly violate the Fourteenth Amendment; three-judge courts need be convened only in limited circumstances, such as in reapportionment matters and in certain Civil Rights Act cases. ⚑ Green v. Klinkofe, D.C.Ind.1976, 422 F.Supp. 1021.

3          **Civil Rights Act of 1964**

A three-judge court is mandatory if requested by the Attorney General of the United States in actions under the public accommodations and equal employment provisions of this statute. 42 U.S.C.A. §§ 2000a-5(b), 2000e-6(b).

A three-judge court is mandatory if requested by either the Attorney General of the United States or the defendant in any case in which the Attorney General is seeking a finding of a pattern or practice of discrimination in voting. 42 U.S.C.A. § 1971(g).

4          **Voting Rights Act of 1965**

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 217 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

A three-judge court in the District of Columbia is required in all cases in which a state seeks to be relieved from the operation of the statute under § 4(a), or seeks a declaration under § 5 that a change in voting qualifications or procedure will not have a discriminatory effect. 🚩 42 U.S.C.A. §§ 1973b(a), 🚩1973c.

The provision for a three-judge court in suits by the Attorney General challenging poll taxes, 42 U.S.C.A. § 1973h(c), has been obsolete since adoption of the Twenty-Fourth Amendment.

A three-judge court must hear an action by the Attorney General for a restraining order or injunction against a state using a test or device as a precondition to voting. 42 U.S.C.A. § 1973aa-2.

A three-judge court had been required in cases brought by the Attorney General to enforce the Twenty-Sixth Amendment. 🚩42 U.S.C.A. § 1973bb-2(a)(2). Repealed Aug. 6, 1975, P.L. 94–73, § 407, 89 Stat. 405.

🚩 Perry v. Perez, 132 S. Ct. 934, 181 L. Ed. 2d 900 (2012).

The Supreme Court has held that private individuals may bring actions under § 5 of the Act challenging changes in state voting laws that have not been approved by the Attorney General and that these suits must also be heard by a three-judge court though they need not be in the District of Columbia. 🚩 Allen v. State Board of Elections, 1969, 89 S.Ct. 817, 826–830, 393 U.S. 544, 554–563, 22 L.Ed.2d 1.

District court lacked jurisdiction over former presidential candidate's claim that national political party's delegate-selection rules for its convention violated preclearance requirement of Voting Rights Act; rather, such claim had to be heard by three-judge panel because it was not obviously frivolous or wholly insubstantial, except as to entities that were not "covered jurisdictions" under Act. 🚩 LaRouche v. Fowler, C.A.D.C.1998, 152 F.3d 974, 987, **citing Wright, Miller & Cooper.**

🚩⚠ Martinez v. Bush, D.C.S.D.Fla.2002, 234 F.Supp.2d 1275.

Navajo Nation v. Arizona Independent Redistricting Com'n, D.C.Az.2002, 230 F.Supp.2d 998.

North Carolina State Bd. of Elections v. United States, D.C.D.C.2002, 208 F.Supp.2d 14.

Georgia v. Ashcroft, D.C.D.C.2002, 204 F.Supp.2d 4, judgment affirmed 2003, 123 S. Ct. 868, 537 U.S. 1100, 154 L. Ed. 2d 768.

Bone Shirt v. Hazeltine, D.C.S.D.2002, 200 F.Supp.2d 1150.

Holley v. City of Roanoke, D.C.Ala.2001, 149 F.Supp.2d 1310.

To invoke a three-judge court, plaintiff's claim under § 5 must allege a lack of preclearance. Jones v. Alabama, D.C.Ala., 2001 WL 303533, *6 n. 14.

Curtis v. Smith, D.C.Tex.2000, 121 F.Supp.2d 1054.

Virginia v. Reno, D.C.D.C.2000, 117 F.Supp.2d 46, judgment affirmed 2001, 121 S. Ct. 749, 531 U.S. 1062, 148 L. Ed. 2d 653.

Three-judge panel convened for purpose of government's action to enjoin violation of Voting Rights Act lacked jurisdiction over city's claim that Act was unconstitutional, in view of panel's narrow jurisdictional mandate. 🚩U.S. v. State of La., D.C.La.1997, 952 F.Supp. 1151, 1159, affirmed 1997, 117 S.Ct. 2476, 521 U.S. 1101, 138 L.Ed.2d 986.

🚩 U.S. v. State of Texas, D.C.Tex.1976, 422 F.Supp. 917.

**Compare**

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 218 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

The Fifth Circuit held that a straightforward reading of the three-judge statute is that it applies only when the constitutionality of apportionment is being challenged. Therefore, the defendants faced a "steep climb" in convincing the court to be the first ever to read the statute as applying to a case challenging a district's lines only under the Voting Rights Act, Thomas v. Bryant, 919 F.3d 298 (5th Cir. 2019), **citing Wright, Miller, Cooper & Amar**.

5    **Other rare instances**

A three-judge court is provided for in the Fairness in Asbestos Injury Resolution Act of 2006, S. 3274.

A three-judge court is required for any suit by a Member of Congress challenging on constitutional grounds an order under the Gramm-Rudman-Hollings Act, 2 U.S.C.A. § 922. Synar v. U.S., D.C.D.C.1986, 626 F.Supp. 1374, 1378 n. 1, affirmed 1986, 106 S.Ct. 3181, 478 U.S. 714, 92 L.Ed.2d 583.

A three-judge court is required in suits to implement the Presidential Election Campaign Fund Act of 1971, 26 U.S.C.A. § 9011(b)(2).

The statute to permit Senator Saxbe to serve as Attorney General though the salary of that office had been increased during his term in the Senate provided that any challenge to the constitutionality of his service as Attorney General should be heard by a court of three judges. Act of Dec. 10, 1973, Pub.L. 93- 178, § 2, 87 Stat. 697.

The Special Court established by the Regional Rail Reorganization Act of 1973 was a court of three judges established by the Judicial Panel on Multidistrict Litigation, 45 U.S.C.A. § 719(b), with direct appeal to the Supreme Court.

Blanchette v. Connecticut Gen. Ins. Corps., 1974, 95 S.Ct. 335, 343 n. 7, 419 U.S. 102, 110 n. 7, 42 L.Ed.2d 320.

16 U.S.C.A. § 831x was amended in 1968 to remove the unique provision of a court of three judges, all from the district court, to hear exceptions to the award of compensation by the commissioners in a TVA condemnation proceeding.

Actions to challenge the Bipartisan Campaign Reform Act of 2002 are brought before a three-judge court. McConnell v. Federal Election Commission, D.C.D.C.2003, 251 F.Supp 2d 176.

Actions challenging the constitutionality of the Child Internet Protection Act are heard by three-judge courts. U.S. v. American Library Ass'n, 2003, 123 S.Ct. 2297, 539 U.S. 194, 156 L.Ed.2d 221.

The Prison Litigation Reform Act contains provisions which require a three-judge court in accordance with the provisions of 28 U.S.C. § 2284 before a prisoner release order may be issued in any civil action in federal court with respect to prison conditions. Castillo v. Cameron County, C.A.5th, 2001, 238 F.3d 339.

6    **Could have been abolished**

See Jacoby, Recent Proposals and Legislative Efforts to Limit Three-Judge Court Jurisdiction, 1975, 26 Case West.Res.L.Rev. 32, 53–58.

7    **Not impair civil rights**

See the remarks of Representatives Kastenmeier, Railsback, and Drinan. 1976, 122 Cong.Rec. 25056 to 25058.

8    **Importance of cases**

S.Rep. No. 204, 94th Cong., 1st Sess., 1975, p. 9, 1976 U.S.Code Cong. & Admin.News 1988, 1996.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 219 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

The report from the House Judiciary Committee, H.R.Rep. No. 94-1379, 94th Cong., 2d Sess., 1976, does not discuss why reapportionment cases are being kept in three-judge courts.

9    **Can differ**
     See Jacoby, Recent Proposals and Legislative Efforts to Limit Three-Judge Court Jurisdiction, 1975, 26 Case West.Res.L.Rev. 32, 58. That article also quotes, at 39–40, the varying views on this point expressed in testimony to the Senate Committee by Judge J. Skelly Wright, Judge Henry J. Friendly, and Professor Charles Alan Wright.

10   **Very small**
     See the statistics in note 1 above. As those statistics show, the number of reapportionment cases heard by a three-judge court will increase in the second year following a decennial census.

11   **Reapportionment**
     28 U.S.C.A. § 2284(a).

     Branch v. Smith, 2003, 123 S.Ct. 1429, 538 U.S. 254, 155 L.Ed.2d 407.

     Georgia v. Ashcroft, 2003, 123 S.Ct. 2498, 539 U.S. 461, 156 L.Ed.2d 428.

     Rodriguez v. Pataki, D.C.N.Y.2003, 280 F.Supp.2d 89, affirmed D.C.N.Y.2003, 293 F. Supp. 2d 302.

     Navajo Nation v. Arizona Independent Redistricting Com'n, D.C.Az.2002, 230 F.Supp.2d 998.

     Martinez v. Bush, D.C.S.D.Fla.2002, 234 F.Supp.2d 1275.

     Contention by Commonwealth of Massachusetts and its registered voters that method for allocating House of Representative seats among 50 states violated constitutionally grounded principle of "one person, one vote" was "apportionment claim" that under § 2284, was to be heard by three-judge panel of the district court. Massachusetts v. Mosbacher, D.C.Mass.1992, 785 F.Supp. 230, reversed on other grounds 1992, 112 S.Ct. 2767, 505 U.S. 788, 120 L.Ed.2d 636.

     Action challenging constitutionality of Congress' apportionment of Congressional districts among states was appropriate for submission to three-judge court. Montana v. U.S. Dept. of Commerce, D.C.Mont.1991, 775 F.Supp. 1358, 1360, reversed on other grounds 1992, 112 S.Ct. 1415, 503 U.S. 442, 118 L.Ed.2d 87.

12   **Federal constitutional challenges**
     "Thus, the correct construction of amended section 2284 requires a three-judge court whenever a successful constitutional challenge would require a state to adjust the mathematical correspondence between the members of a legislative body and the districts of the state. Such an adjustment could involve the number or shape of the districts, the number of members of the legislative body, or the number of members per district. So construed, the types of challenges covered by the new statute include those of the Reynolds-type legislative malapportionment as well as challenges to legislative malapportionment caused by unit voting, multimember districts, and gerrymandering." Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 65 Geo.L.J. 971, 979.

     A claim that apportionment of the state House of Representatives violates the Fifteenth Amendment must be heard by a three-judge court. Armour v. Ohio, C.A.6th, 1991, 925 F.2d 987.

The statute would not seem to require a three-judge court if a state legislative apportionment is challenged only on state constitutional grounds, even if there is a federal defense against the challenge. Cavanagh v. Brock, D.C.N.C.1983, 577 F.Supp. 176, 180 n. 3.

Where city, its mayor, several elected representatives, and individual resident citizens brought action challenging accuracy of 1980 census, alleging that because of inaccurate count city would be underrepresented when state and federal legislative redistricting occurred but where no existing apportionment was challenged, allegations of complaint did not entitle plaintiffs to three-judge court on theory that they were raising constitutional issues relating to an apportionment of legislative districts. City of Philadelphia v. Klutznick, D.C.Pa.1980, 503 F.Supp. 657.

Issue as to constitutionality of census practices was one for a single district judge, rather than a three-judge court, since it did not involve any state action apportioning congressional districts. Federation for American Immigration Reform v. Klutznick, D.C.D.C.1980, 486 F.Supp. 564, appeal dismissed 100 S.Ct. 3005, 447 U.S. 916, 65 L.Ed.2d 1109.

District court's jurisdiction to hear actions "challenging the constitutionality of * * * the apportionment of any statewide legislative body" is limited to federal constitutional claims. Sullivan v. Crowell, D.C.Tenn.1978, 444 F.Supp. 606.

13     **Meaning of "statewide"**
S.Rep. No. 204, 94th Cong., 1st Sess., 1975, p. 9, 1976 U.S.Code Cong. & Admin.News 1988, 1996.

Although a three-judge court is required in an action by a private citizen under § 5 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c, it is not required in an adversary action invoking the equity jurisdiction of a district court to order reapportionment of a county governing body. Watson v. Commissioners Court of Harrison County, C.A.5th, 1980, 616 F.2d 105.

14     **"Legislative body"**
See Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 65 Geo.L.J. 971, 980–983.

15     **Declaratory judgment**
The pre-1976 cases holding that three judges were not required if only a declaratory judgment were sought are cited in § 4234 n. 16.

28 U.S.C.A. § 1253, the direct appeal provision from three-judge courts, was not amended in 1976. It allows direct appeal only from orders granting or denying an interlocutory or permanent injunction. Thus if only a declaratory judgment is sought three judges will be required to hear the case but it may be that appeal will be to the court of appeals. It is to be hoped, however, that the rules about appeal from three-judge court declaratory judgments will be altered in light of the new setting created by the 1976 legislation, however awkward the situation created by the failure of Congress to do anything to § 1253. See § 4040.

**But see**
There is a surprising statement in Sharrow v. Peyser, D.C.N.Y.1977, 443 F.Supp. 321, 323 n. 4, affirmed C.A.2d, 1978, 582 F.2d 1271, that the 1976 amendments of the three-judge statutes did not alter the rule that three judges are not needed to determine whether a declaratory judgment of malapportionment should be issued.

15.50     **Brown v. Plata case**
Brown v. Plata, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011) **(citing Wright, Miller, Cooper and Amar)**.

16     **ALI proposals**

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 221 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

American Law Institute, Study of the Division of Jurisdiction between State and Federal Courts, Official Draft 1969, § 1375. Hereafter in this section this work is cited as "ALI Study."

17    **One minor exception**
28 U.S.C.A. § 2284(b)(3) omits one sentence from ALI Study § 1375(c) that would have authorized a single judge to order a stay of an action pursuant to the Institute's versions of the Tax Injunction Act, 28 U.S.C.A. § 1341, and the Johnson Act, 28 U.S.C.A. § 1342. See §§ 4237 and 4236. There is nothing in the legislative history to indicate why this departure from the ALI proposals was made.

18    **Useful source of guidance**
See the Commentary on the ALI proposals at ALI Study, pp. 326–330.

19    **1964 act**
See note 3 above.

20    **Appear mandatory**
See notes 4 and 5 above.

21    **Jurisdictional**
McLucas v. DeChamplain, 1975, 95 S.Ct. 1365, 1370, 421 U.S. 21, 27–29, 43 L.Ed.2d 699.

Goosby v. Osser, 1973, 93 S.Ct. 854, 861, 409 U.S. 512, 522–523, 35 L.Ed.2d 36.

Stratton v. St. Louis Southwestern Ry. Co., 1930, 51 S.Ct. 8, 10, 282 U.S. 10, 15, 75 L.Ed. 135.

Ex parte Metropolitan Water Co. of West Virginia, 1911, 31 S.Ct. 600, 603, 220 U.S. 539, 545, 55 L.Ed. 575.

Riss & Co. v. Hoch, C.C.A.10th, 1938, 99 F.2d 553, 555.

22    **Meaning of "application"**
Bell v. Waterfront Comm. of New York Harbor, C.A.2d, 1960, 279 F.2d 853, 857.

23    **Duty of court**
Grove Press, Inc. v. Flask, C.A.6th, 1969, 417 F.2d 1062.

Borden Co. v. Liddy, C.A.8th, 1962, 309 F.2d 871, 876–877, certiorari denied 83 S.Ct. 951, 372 U.S. 953, 9 L.Ed.2d 977.

Bell v. Waterfront Comm. of New York Harbor, C.A.2d, 1960, 279 F.2d 853, 856–857.

Aaron v. Cooper, C.A.8th, 1958, 261 F.2d 97, 105.

Burruss v. Wilkerson, D.C.Va.1968, 301 F.Supp. 1237.

24    **Remand for new hearing**
Goosby v. Osser, 1973, 93 S.Ct. 854, 861, 409 U.S. 512, 522–523, 35 L.Ed.2d 36.

Kennedy v. Mendoza-Martinez, 1963, 83 S.Ct. 554, 559, 372 U.S. 144, 153, 9 L.Ed.2d 644.

Holiday Magic, Inc. v. Warren, C.A.7th, 1974, 497 F.2d 687.

Borden Co. v. Liddy, C.A.8th, 1962, 309 F.2d 871, certiorari denied 83 S.Ct. 951, 372 U.S. 953, 9 L.Ed.2d 977.

25    **"Most obnoxious feature"**

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 222 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Currie, The Three-Judge District Court in Constitutional Litigation, 1964, 32 U.Chi.L.Rev. 1, 77.

**See also**
"If the party for whose benefit the three-judge court is required has not asked for such a benefit, and has come to a court of appeals where three judges will pass on the merits of his position, there is no point in sending the matter back to be heard again in the district court. See Offermann v. Nitkowski, 378 F.2d 22, 25 (2d Cir.1967). In addition, the present rule is inconsistent with the salutary doctrine that questions of jurisdiction should be raised and determined at the outset." ALI Study, p. 331.

26    **"So bizarre a result"**

⚑ Sardino v. Federal Reserve Bank of N.Y., C.A.2d, 1966, 361 F.2d 106, 114, certiorari denied 87 S.Ct. 203, 385 U.S. 898, 17 L.Ed.2d 130.

27    **Taken from ALI**
See text above at notes 16 to 18.

28    **Dependent on request**
See ALI Study §§ 1374, 1375(a), 1376(a).

The ALI deliberately set out to abolish "the present doctrine that the three-judge court requirement is jurisdictional." ALI Study, p. 329, and see also p. 331.

However the ALI proposals did not call for a request for three judges in suits other than those challenging state laws in which a three-judge court is "otherwise required by Act of Congress" and its Commentary noted that "(t)here is no provision for a request by one or the other of the parties in the Voting Rights Act of 1965, and the three-judge requirement will be mandatory in cases within the relevant sections of that statute." ALI Study, p. 332.

29    **Called for request**
See note 3 above.

30    **Not required request**
See notes 4 and 5 above.

31    **Would be valid**
See § 4234 n. 2.

32    **Required to be heard**
28 U.S.C.A. § 1253.

The appellant would not lose his right of appeal even if the Supreme Court holds, as it is hoped it will, that in the absence of a request three judges are not required. Prior to the 1976 changes in the law the question of appealability was so confused that prudent lawyers always protected themselves by filing notices of appeal with both the Supreme Court and the court of appeals. ALI Study, pp. 333–334. But if a lawyer failed to protect himself by doing this, and appealed only to the Supreme Court in a case that it found should have been appealed to the court of appeals, the Court regularly saved him from himself by vacating the decree and remanding the case to the court that had heard it for entry of a fresh decree from which appellants could then perfect a timely appeal to the court of appeals. E.g., ⚑ MTM, Inc. v. Baxley, 1975, 95 S.Ct. 1278, 1281, 420 U.S. 799, 804, 43 L.Ed.2d 636; Stamler v. Willis, 1969, 89 S.Ct. 677, 393 U.S. 407, 21 L.Ed.2d 627; ⚑ Phillips v. U.S., 1941, 61 S.Ct. 480, 484, 312 U.S. 246, 254, 85 L.Ed. 800.

33    **Should not be jurisdictional**
"In any event the new statute appears to remove the basis for the Mendoza rule. For while the statute says that in the designated cases a three-judge court 'shall be convened,' it also requires the trial judge to call for two colleagues only 'upon the filing of a request for three judges'—apparently by either party." Currie, Federal Jurisdiction in a Nutshell, 2d ed. 1981, p. 219.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 223 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

This conclusion is reached also by Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 63 Geo.L.J. 971, 975, although he does not mention that the opening phrase of § 2284(b)(1) makes this result easier to achieve than it would otherwise be.

**But see**

Although § 2284 seems to contemplate 'the filing of a request for three judges' by a party and a determination by the district judge of the need for such a court, the 'shall' language of the statute quoted above appears to make the convening of such a court a jurisdictional requirement once it becomes clear that there exists a non-frivolous constitutional challenge to the apportionment of a statewide legislative body." Armour v. Ohio, C.A.6th, 1991, 925 F.2d 987, 989.

34 **Composition of court**

The requirement that the single judge to whom the request was originally presented be a member of the three-judge court is not jurisdictional. Hicks v. Miranda, 1975, 95 S.Ct. 2281, 2286 n. 5, 422 U.S. 332, 338 n. 5, 45 L.Ed.2d 223.

35 **Single judge must decide**

The propriety of a three-judge court is a jurisdictional issue always open to review. Massachusetts v. Mosbacher, D.C.Mass.1992, 785 F.Supp. 230, 235, reversed on other grounds 1992, 112 S.Ct. 2767, 505 U.S. 788, 120 L.Ed.2d 636. The district court said: "We are not as free as the commentators to enact our policy preferences." 785 F.Supp. at 235 n. 2, **citing Wright, Miller & Cooper** for a contrary view.

Single-judge district court to whom request for three-judge court is made pursuant to § 5 of Voting Rights Act has authority to determine if three-judge court is required. Montgomery v. Leflore County Republican Executive Committee, D.C.Miss.1991, 776 F.Supp. 1142

Majuri v. U.S., 1970, 91 S.Ct. 245, 400 U.S. 943, 27 L.Ed.2d 248.

Fort v. Daley, C.A.7th, 1970, 431 F.2d 1128.

Merced Rosa v. Herrero, C.A.1st, 1970, 423 F.2d 591.

Simkins v. Gressette, D.C.S.C.1980, 495 F.Supp. 1075, affirmed C.A.4th, 1980, 631 F.2d 287.

Sharrow v. Peyser, D.C.N.Y.1977, 443 F.Supp. 321, affirmed C.A.2d, 1978, 582 F.2d 1271.

California Teachers Assn. v. Newport Mesa Unified School Dist., D.C.Cal.1971, 333 F.Supp. 436.

If the single judge thinks three judges are not required or otherwise fails to have a three-judge court convened, his failure to do so is reviewable in the court of appeals. Gonzalez v. Automatic Employees Credit Union, 1974, 95 S.Ct. 289, 295, 419 U.S. 90, 100, 42 L.Ed.2d 249.

Chief judge of circuit could not convene three-judge district court on motions of plaintiffs, on ground that constitutional question was involved, where district judge, to whom applications of plaintiffs for three-judge district court had been made, had not notified the chief judge of the applications, because the district judge was of opinion that such notification was not required because no substantial constitutional question was presented for disposition by three-judge district court, and remedy of plaintiffs was by appeal or for a writ, if appropriate. Schneider v. Herter, C.A.1960, 283 F.2d 368, 109 U.S.App.D.C. 4, certiorari denied 81 S.Ct. 1924, 366 U.S. 963, 6 L.Ed.2d 1255.

Absent notification by district judge that in his view a particular case before him requires a three-judge court, the chief judge of the circuit has no authority to constitute such a court upon basis of his own

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 224 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

judgment that the statute requires such a tribunal for the disposition of a pending case. Sinatra v. New Jersey State Comm. of Investigation, D.C.N.J.1970, 311 F.Supp. 678.

Before giving notice to chief judge of circuit as provided for in this section pertaining to convening of a three-judge court, district judge to whom application for injunction is presented should consider whether claim that the statute is unconstitutional is substantial or plainly unsubstantial. Mills v. Agnew, D.C.Md.1968, 286 F.Supp. 107.

**But see**
Rather than require appeal to fifth circuit from order of district judge refusing to certify case to chief judge for convening three-judge court, chief judge would constitute a three-judge court under special order committing determination of question of three-judge court initially to the three-judge court. City of Gainesville, Ga. v. Southern Ry. Co., D.C.Ga.1969, 296 F.Supp. 763.

35.50    **Shapiro**

Shapiro v. McManus, 136 S. Ct. 450, 193 L. Ed. 2d 279 (2015).

36    **Independent determination**
Chief Judge Biggs of the Third Circuit so held in the following cases: Kirk v. Board of Educ., D.C.Pa.1964, 236 F.Supp. 1020; Miller v. Smith, D.C.Pa.1965, 236 F.Supp. 927, leave to file petition for mandamus refused 1965, 86 S.Ct. 92, 382 U.S. 805, 15 L.Ed.2d 113; Fiumara v. Texaco, Inc., D.C.Pa.1965, 240 F.Supp. 325.

Chief Judge Bazelon of the District of Columbia Circuit took the same view. Hobson v. Hansen, D.C.Cir.1966, 256 F.Supp. 18.

37    **Purely ministerial**
Chief Judge Brown of the Fifth Circuit took this view. Smith v. Ladner, D.C.Miss.1966, 260 F.Supp. 918.

See also Jackson v. Choate, C.A.5th, 1968, 404 F.2d 910.

Chief Judge Aldrich of the First Circuit took the same view. Merced Rosa v. Herrero, C.A.1st, 1970, 423 F.2d 591, 593 n. 2.

38    **Chief judge not to consider**
"Under these proposals, therefore, the role of the chief judge is entirely ministerial. He has immediately at hand information as to which circuit judge or judges of his circuit would be available for three-judge court duty. It is therefore desirable that he designate the judges to serve on the court, rather than leaving this to the district judge, as was originally done under the 1911 and 1913 statutes, it is not desirable that he pass judgment on whether three judges are required. This can be more authoritatively done by the three-judge court itself after it has been constituted.

"Thus, in clause (1) of this subsection, unlike the present statute, 28 U.S.C. § 2284(1), there is a deliberate lack of parallelism. Clause (1) of this bill says that the district judge 'shall unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges …. ' Since the district judge is expressly given power of decision, and since the chief judge is not, there should be no possibility of misconstruction of this clause." S.Rep. No. 94-204, 94th Cong., 1st Sess., 1975, p. 13, 1976 U.S.Code Cong. & Admin.News 1988, 2000 to 2001.

This identical passage, which is based on ALI Study, p. 329, appears in H.R.Rep. No. 94-1379, 94th Cong., 2d Sess., 1976, p. 7.

39    **Cannot dismiss on merits**
28 U.S.C.A. § 2284(b)(3) provides that the single judge shall not "enter judgment on the merits."

Schneider v. Rusk, 1963, 83 S.Ct. 621, 372 U.S. 224, 9 L.Ed.2d 695.

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 225 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Stratton v. St. Louis Southwestern Ry., 1930, 51 S.Ct. 8, 282 U.S. 10, 75 L.Ed. 135.

Ex parte Metropolitan Water Co. of West Virginia, 1911, 31 S.Ct. 600, 220 U.S. 539, 55 L.Ed. 575.

Where single judge found that there was not a substantial question raised and by scope of opinion went to merits and in effect entered a declaratory judgment dismissing case which necessarily involved determination that Wisconsin Department of Agriculture regulation was valid, and a determination as to injunctive relief, single judge erroneously invaded province of three-judge court, requiring that three-judge court be convened. Holiday Magic, Inc. v. Warren, C.A.7th, 1974, 497 F.2d 687.

Responsibility of district judge in determining whether to request a three-judge district court is narrow and by no means extends to consideration of merits of question presented, and court's inquiry is appropriately limited to determining whether constitutional question raised is substantial, whether complaint at least formally alleges basis for equitable relief and whether case presented otherwise comes within requirements of this chapter. Anderson v. Richardson, C.A.6th, 1972, 454 F.2d 596.

On receiving complaint that plaintiff had been expelled from public school under unconstitutional statute which allegedly allowed expulsion without notice and due process hearing prior to expulsion, sole function of federal district judge was to determine whether or not allegations raised substantial federal question, and three-judge court should have been convened, and district judge erred in making determination that hearing that provided due process under circumstances involved had been accorded. Calloway v. Briggs, C.A.7th, 1971, 443 F.2d 296, certiorari denied, 92 S.Ct. 230, 404 U.S. 916, 30 L.Ed.2d 190.

40    **Claim insubstantial**

Duckworth v. State Admin. Bd. of Election Laws, C.A.4th, 2003, 332 F.3d 769.

Duckworth v. State Bd. of Elections, D.C.Md.2002, 213 F.Supp.2d 543, judgment affirmed C.A.4th, 2003, 332 F.3d 769.

"In general, a three-judge panel must be convened to hear a suit brought pursuant to § 5 of the Voting Rights Act. A three-judge district court, however, is not required if the court concludes that the plaintiff's § 5 claims are insubstantial, frivolous, or clearly without merit. 'Individuals must not be allowed to obtain a three-judge court, with its concomitant burdens, simply by intoning the catchwords of § 5. This court has an obligation to examine the complaint to determine whether it states a substantial claim.' " DeJulio v. Georgia, D.C.Ga.2001, 127 F.Supp.2d 1274, 1300, affirmed in part, reversed in part on other grounds C.A.11th, 2001, 276 F.3d 1244, judgment affirmed C.A.11th, 2002, 290 F.3d 1291, certiorari denied 123 S.Ct. 413, 537 U.S. 948, 154 L.Ed.2d 293.

Ex parte Bransford, 1940, 60 S.Ct. 947, 310 U.S. 354, 84 L.Ed. 1249.

California Water Serv. Co. v. City of Redding, 1938, 58 S.Ct. 865, 304 U.S. 252, 82 L.Ed. 1323.

Ex parte Poresky, 1933, 54 S.Ct. 3, 290 U.S. 30, 78 L.Ed. 152, rehearing denied 1961, 81 S.Ct. 1090, 366 U.S. 922, 6 L.Ed.2d 245.

Jones v. Branigin, C.A.6th, 1970, 433 F.2d 576, certiorari denied 91 S.Ct. 1205, 401 U.S. 977, 28 L.Ed.2d 327.

Maryland Citizens for a Representative General Assembly v. Governor of Md., C.A.4th, 1970, 429 F.2d 606.

American Commuters Assn. v. Levitt, C.A.2d, 1969, 405 F.2d 1148.

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 226 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Claims that South Carolina senate reapportionment plan adopted following the McCollum decision was unconstitutional as regards multimember election districts, at large elections for numbered seats, with majority run-off requirements and retention of county boundaries was frivolous and did not require convening of three-judge court notwithstanding additional contention 1972, there being no serious contention that no blacks had been elected since or offer of any proof that black citizens were not permitted complete participation in the entire political process. Simkins v. Gressette, C.A.4th, 1980, 631 F.2d 287.

Government's claim under the Voting Rights Act of 1965 was wholly insubstantial and properly dismissed by a single judge. U.S. v. Saint Landry Parish School Bd., C.A.5th, 1979, 601 F.2d 859.

When the Supreme Court has previously determined that a case does not present a federal question of substance, a three-judge court is not required to be convened and a single district judge may dismiss the petition. Only if intervening decisions have drawn into question the continued vitality of the earlier ruling are plaintiffs entitled to further consideration. Hall v. Thornton, C.A.4th, 1971, 445 F.2d 834.

Single judge, who had participated with two other judges in earlier unappealed from three-judge court decision dismissing for lack of substantial federal question case presenting issue as to whether requiring nonresident students at Iowa institutions of higher learning to pay higher tuition than Iowa residents deprived nonresidents of rights under equal protection and interstate privilege and immunity clauses of U.S.C.A. Const.Amend. 14, and who had no doubt as to the validity of earlier decision, was warranted in applying doctrine of stare decisis to case before him presenting same issue and dismissing case for want of federal jurisdiction. Johns v. Redeker, C.A.8th, 1969, 406 F.2d 878, certiorari denied 90 S.Ct. 113, 396 U.S. 853, 24 L.Ed.2d 102.

Denial of three-judge district court in case involving validity of statute was not improper when Supreme Court had recently affirmed an earlier three-judge case involving same issue. Glisson v. Mayor and Councilmen of Town of Savannah Beach, Tybee Island, Ga., C.A.5th, 1965, 346 F.2d 135.

Suit by bonding company, challenging the constitutionality of a statute making it unlawful to engage in the business of bail bondsman, did not raise a substantial federal question and single judge could dismiss the suit. Johnson Bonding Co. v. Commonwealth of Ky., D.C.Ky.1976, 420 F.Supp. 331.

### Rare indeed

Hagans v. Lavine, 1974, 94 S.Ct. 1372, 415 U.S. 528, 39 L.Ed.2d 577, on remand C.A.2d, 1974, 505 F.2d 727.

Goosby v. Osser, 1973, 93 S.Ct. 854, 409 U.S. 512, 35 L.Ed.2d 36.

Since neither the legal nor the factual aspects of plaintiff's claim under § 5 of the Voting Rights Act of 1965 was wholly insubstantial, the single judge erred in dismissing the case without convening a three-judge court. League of United Latin American Citizens (LULAC) of Texas v. Texas, C.A.5th, 1997, 113 F.3d 53.

Washington v. Confederated Tribes of the Colville Indian Reservation, 1980, 100 S.Ct. 2069, 447 U.S. 134, 65 L.Ed.2d 10, rehearing denied 1980, 101 S.Ct. 25, 448 U.S. 911, 65 L.Ed.2d 1172.

See vol. 13B, § 3564.

### See also

Connolly v. Pension Benefit Guaranty Corp., C.A.9th, 1982, 673 F.2d 1110, on remand D.C.Cal.1984, 631 F.Supp. 640.

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 227 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Precedential effect of federal district court decisions did not render three-judge court claim insubstantial, since lower federal court decisions may not be used for such purpose; rather, insubstantiality must rest upon decisions of Supreme Court. United States v. Texas, D.C.Tex.1976, 422 F.Supp. 917.

42   **Not justiciable**

"Here the three-judge court dismissed the complaint for lack of 'standing.' This ground for decision, that the complaint was nonjusticiable, was not merely short of the ultimate merits; it was also, like an absence of statutory subject-matter jurisdiction, a ground upon which a single judge could have declined to convene a three-judge court, or upon which the three-judge court could have dissolved itself, leaving final disposition of the complaint to a single judge." Gonzalez v. Automatic Employees Credit Union, 1974, 95 S.Ct. 289, 295, 419 U.S. 90, 100, 42 L.Ed.2d 249.

Provisions requiring a three-judge court in certain cases require existence of federal subject-matter jurisdiction of district court, and, in order to determine whether to request a three-judge court, district judge must initially find that plaintiffs with standing have presented a case or controversy. Crossen v. Breckenridge, C.A.6th, 1971, 446 F.2d 833, on remand D.C.Ky.1972, 344 F.Supp. 587.

Single judge could dismiss a case that was exclusively in the jurisdiction of the Customs Court. Eastern States Petroleum Corp. v. Rogers, C.A.D.C.1959, 265 F.2d 593, leave to file petition for mandamus refused 1959, 80 S.Ct. 93, 361 U.S. 805, 4 L.Ed.2d 56.

Single judge could dismiss where the requisite amount was not in controversy. Jacobs v. Tawes, C.A.4th, 1957, 250 F.2d 611.

Where it was determined that plaintiff lacked standing to challenge constitutionality of apportionment of congressional district and therefore failed to present a substantial claim, convening of three-judge court to entertain such challenge was not warranted. Sharrow v. Fish, D.C.N.Y.1980, 501 F.Supp. 202, affirmed C.A.2d, 1981, 659 F.2d 1062.

Single judge dismissed challenge to apportionment of congressional district for lack of standing. Sharrow v. Peyser, D.C.N.Y.1977, 443 F.Supp. 321, affirmed C.A.2d, 1978, 582 F.2d 1271.

Giles v. Ashcroft, D.C.D.C.2002, 193 F.Supp.2d 258.

A single judge may act alone on a motion to dismiss for failure to join indispensable parties. American Civil Liberties Union of Md. v. Board of Public Works of State of Md., D.C.Md.1972, 357 F.Supp. 877.

Three-judge court need not be convened where plaintiff lacked standing. Hart v. Kennedy, D.C.Okl.1970, 314 F.Supp. 823.

Single judge dismissed action where plaintiffs lacked standing. American Commuters Assn. v. Levitt, D.C.N.Y.1967, 279 F.Supp. 40, affirmed C.A.2d, 1969, 405 F.2d 1148.

Single judge could dismiss for want of jurisdiction suit to enjoin collection of taxes that was barred by 26 U.S.C.A. § 7421(a). National Council on Facts of Overpopulation v. Caplin, D.C.D.C.1963, 224 F.Supp. 313, mandamus denied 84 S.Ct. 976, 376 U.S. 948, 11 L.Ed.2d 977.

**Cf.**

In cases in which a three-judge certification is sought, before determining such certification the single district judge to whom the case is assigned for all trial purposes must hear and determine a motion to dismiss a complaint for failure to state a claim or to strike it for grossly inexcusable violation of the general rules of pleading. Silver v. Queen's Hospital, D.C.Hawaii 1971, 53 F.R.D. 223.

**Equitable relief**

Inappropriateness of equitable relief was a proper basis to refuse to convene three-judge court to pass on challenge to South Carolina Senate reapportionment plan where plaintiffs waited two days before opening of primary election filing period of 16 days before the deadline to sue, hearing occurred after

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 228 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

closing of filings and only five and one-half weeks before primary elections, plaintiffs relied heavily on results of 1976 election but waited more than three years to sue on eve of 1980 elections; suit would cause major disruption of the election and 1980 census would likely require reapportionment. Simkins v. Gressette, C.A.4th, 1980, 631 F.2d 287.

**43**     **Bailey case**

1962, 82 S.Ct. 549, 369 U.S. 31, 7 L.Ed.2d 512.

**44**     **Make frivolous**

82 S.Ct. at 551, 369 U.S. at 33.

**See also**

In a dictum in Gonzalez v. Automatic Employees Union, 1974, 95 S.Ct. 289, 293 n. 14, 419 U.S. 90, 96 n. 14, 42 L.Ed.2d 249, the Court described Bailey as holding that "three judges are not in fact necessary where the unconstitutionality of the statute is obvious and patent."

**45**     **Reasoning shaky**

The Court said in Bailey: "The statute comes into play only when an injunction is sought 'on the ground of the unconstitutionality' of a statute. There is no such ground when the constitutional issue presented is essentially fictitious." 82 S.Ct. at 551, 369 U.S. at 33. But it may be asked on what ground the injunction is issued except that of the unconstitutionality of the statute.

**46**     **"Any manner save one"**

Utica Mut. Ins. Co. v. Vincent, C.A.2d, 1967, 375 F.2d 129, 131 n. 1, certiorari denied 88 S.Ct. 63, 389 U.S. 839, 19 L.Ed.2d 102.

**47**     **"Radical expansion"**

McLucas v. DeChamplain, 1975, 95 S.Ct. 1365, 1370 n. 9, 421 U.S. 21, 29 n. 9, 43 L.Ed.2d 699.

**48**     **Unconstitutionality conceded**

Prior to the 1976 amendments it was held that three judges were not required where unconstitutionality was conceded. Gates v. Collier, C.A.5th, 1974, 501 F.2d 1291, affirmed C.A.5th, 1976, 525 F.2d 965.

**49**     **Not within Bailey**

"The Bailey rationale, we feel, was not meant to be applied where the alleged unconstitutionality can only be determined following an extensive examination of the facts involved. (As in the case of the review of a state apportionment plan.)" Gong v. Kirk, C.A.5th, 1967, 375 F.2d 728, 729 n. 2.

**See also**

In a case involving reapportionment of a state legislature, the Supreme Court said that "(s)ubject matter of this kind is regular grist for the three-judge court * * *." Chapman v. Meier, 1975, 95 S.Ct. 751, 759, 420 U.S. 1, 14, 42 L.Ed.2d 766, on remand D.C.N.D.1975, 407 F.Supp. 649.

Three-judge court was appropriately convened where there had been a total failure on the part of the state to reapportion. Shayer v. Kirkpatrick, D.C.Mo.1982, 541 F.Supp. 922, 925, **citing Wright, Miller & Cooper,** affirmed without opinion 1982, 102 S.Ct. 2228, 456 U.S. 966, 72 L.Ed.2d 841.

**Compare**

Without any elaboration or explanation, the court in Bussie v. McKeithen, C.A.5th, 1971, 457 F.2d 796, judgment vacated 1972, 92 S. Ct. 1980, 407 U.S. 191, 32 L. Ed. 2d 648, said: "We hold that the district court correctly determined that the case was properly before him as a single judge." The case was one for reapportionment of a state legislature.

Case 5:22-cv-00762-BKS-TWD     Document 11     Filed 10/12/22     Page 229 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

There were cases holding that a single judge could act where the apportionment of a county board of supervisors or a school board was patently unconstitutional. Lodico v. Board of Supervisors of County of Rockland, D.C.N.Y.1966, 256 F.Supp. 440; Dameron v. Tangipahoa Parish Police Jury, D.C.La.1970, 315 F.Supp. 137. Challenges to the apportionment of these local governmental bodies will always be for a single judge under the 1976 statute.

50    **Importance of cases**
See note 8 above.

51    **Delicate problems of remedy**
See Stout v. Hendricks, D.C.Ind.1964, 235 F.Supp. 556, 558.

52    **All reapportionment cases**
See ALI Study, p. 326

Shayer v. Kirkpatrick, D.C.Mo.1982, 541 F.Supp. 922, described note 50 above, affirmed without opinion 1982, 102 S.Ct. 2228, 456 U.S. 966, 72 L.Ed.2d 841.

It is not inconsistent with this conclusion that the Bailey rule ought not to apply to reapportionment cases to hold that the single judge can dismiss if the challenge to the apportionment is so lacking in substance that the federal court does not have jurisdiction. Maryland Citizens for a Representative General Assembly v. Governor of Md., C.A.4th, 1970, 429 F.2d 606. But as pointed out in the text at note 42 above, a very rigorous standard is now applied before dismissal on that ground is proper, and few apportionment challenges are likely to be dismissed under this standard.

53    **Notice to state officials**
28 U.S.C.A. § 2284(b)(2).

Hall v. New York, C.A.2d, 1966, 359 F.2d 26, certiorari denied 87 S.Ct. 161, 385 U.S. 879, 17 L.Ed.2d 106.

Notice to the governor and attorney general are required when the constitutionality of a state statute is being called into question but if they have no responsibility for the enforcement or execution of the challenged statute they are not properly named as defendants. Johnson Bonding Co., Inc. v. Kentucky, D.C.Ky.1976, 420 F.Supp. 331.

Five-day notice provision of this section relating to composition and procedure of three-judge district court was waived when defendants filed their answer to complaint and made a general appearance through counsel at trial. Broughton v. Brewer, D.C.Ala.1969, 298 F.Supp. 260.

No particular form of notice is required. Consolidated Freight Lines, Inc. v. Pfost, D.C.Idaho 1934, 7 F.Supp. 629.

Federal statute requiring that state governor and attorney general be given at least five days' notice of hearing if action, to be heard by three-judge court because involving constitutionality, involves enforcement, operation, or execution of state statutes or administrative orders was complied with, where after defendants had been served, attorney general entered an appearance, defendants' brief was filed 14 days in advance of hearing on motion to dismiss, and no hearing had been set on application for injunction. Boddie v. Connecticut, D.C.Conn.1968, 286 F.Supp. 968, reversed on other grounds 1971, 91 S.Ct. 780, 401 U.S. 371, 28 L.Ed.2d 113.

54    **Permit state to intervene**
28 U.S.C.A. § 2403(b).

Although this statute was not adopted until 1976, it was assumed prior to adoption of the statute that the state could intervene in these circumstances. Crown Kosher Super Market of Mass., Inc. v. Gallagher,

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 230 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

D.C.Mass.1959, 176 F.Supp. 466, 492, reversed on other grounds 1961, 🚩 81 S.Ct. 1122, 366 U.S. 617, 6 L.Ed.2d 536.

55       **Statute repealed**
28 U.S.C.A. § 2284(b)(2), as amended by Act of Nov. 8, 1984, Pub.L. 98- 620, Title IV, § 402(29)(E), 98 Stat. 3359.

56       **Previously urged by commentators**
ALI Study, p. 330.

Currie, The Three-Judge District Court in Constitutional Litigation, 1964, 32 U.Chi.L.Rev. 1, 20–29.

Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 1963, 77 Harv.L.Rev. 299, 306.

57       **Functions of single judge**
S.Rep. No. 94-204, 94th Cong., 1st Sess., 1975, p. 13, 1976 U.S.Code Cong. & Admin.News 1988, 2001, quoting from the Harvard Note cited note 57 above. The same language appears in H.R.Rep. No. 94-1379, 94th Cong., 2d Sess., 1976, p. 7.

58       **Spelled out**
The statute is based on what previously appeared in 28 U.S.C.A. §§ 2284(b)(3), (5).

Ordinarily it will be the single judge before whom the action was commenced who will exercise these powers, but the present statute says only "a single judge." The prior statute allowed the judge to whom an application for an interlocutory injunction was made to grant a temporary restraining order but allowed "any one of the three judges of the court" to perform the other functions that were appropriate for one judge.

59       **Temporary restraining order**
28 U.S.C.A. § 2284(b)(3).

🚩 Page v. Bartels, C.A.3d, 2001, 248 F.3d 175.

Borden Co. v. Liddy, C.A.8th, 1962, 309 F.2d 871, certiorari denied 83 S.Ct. 951, 372 U.S. 953, 9 L.Ed.2d 977.

Moldenhauer v. Provo, D.C.Minn.1970, 326 F.Supp. 480.

Anderson v. Vaughn, D.C.Conn.1970, 333 F.Supp. 703.

McCann v. Paris, D.C.Va.1965, 244 F.Supp. 870.

If a single judge oversteps his limited authority under three-judge district court statute, a court of appeals may correct his error, and, in addition, a temporary restraining order issued pursuant to this section is reviewable in a court of appeals to the extent that any such order is reviewable under provisions relating to final decisions of district courts and to interlocutory decisions. 🚩 Hicks v. Pleasure House, Inc., 1971, 92 S.Ct. 5, 404 U.S. 1, 30 L.Ed.2d 1.

Where Florida Commissioner of Agriculture contended that determination of validity of his regulation which placed quota restriction on sales for the warehouses of tobacco grown out of state was matter for three-judge court, restraining order against enforcement of the regulation issued by single judge district court would be in effect only until three-judge court was convened. Moye v. Conner, D.C.Fla.1971, 329 F.Supp. 1255.

**But see**

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 231 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

In Collins v. Bolton, D.C.Ill.1968, 287 F.Supp. 393, 404, the court apparently overlooked what was then 28 U.S.C.A. § 2284(b)(3) when it declared that it was without power to issue any order after having determined that the case was one for a three-judge court.

**60**    **Notice provisions**
See vol. 11, § 2952.

**61**    **Provisions applicable**
Rule 65(e) says that the Civil Rules "do not modify * * * Title 28, U.S.C., § 2284, relating to actions required by Act of Congress to be heard and determined by a district court of three judges." Thus the provision in Rule 65(b) about the duration of a temporary restraining order does not apply in three-judge court cases since the statute, 28 U.S.C.A. § 2284(b)(3), provides that a temporary restraining order issued by a single judge "shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction."

But the statute is silent as to notice that a temporary restraining order is being sought, and on matters on which the statute is silent the Civil Rules should be held fully applicable. See vol. 13, § 2959.

**Contra:**
Tennessee Public Service Comm. v. U.S., D.C.Tenn.1967, 275 F.Supp. 87, 89.

**62**    **Powers of single judge**
28 U.S.C.A. § 2284(b)(3).

A single judge has the power to resolve a post-judgment Rule 60(b) motion. McCorvey v. Hill, D.C.N.D.Tex.2003, 2003 WL 21448388.

**63**    **Preliminary injunction**
Smith v. Dudley, C.C.A.8th, 1937, 89 F.2d 453.

**64**    **Prohibited to single judge**
28 U.S.C.A. § 2284(b)(3).

When a court is presented with an action involving both statutory Voting Rights Act and constitutional challenges to the apportionment of a statewide legislative body, both sets of claims must be heard by a three-judge district court, and a single district judge cannot reach the merits of the statutory claim unless the single judge concludes that the constitutional claims are legally frivolous. Because statutory voting rights challenges to statewide legislative apportionment are generally inextricably intertwined with constitutional challenges to such apportionment, all such claims are properly considered a single "action" within the meaning of 28 U.S.C. § 2284, under which an action challenging the constitutionality of apportionment requires the convening of a three-judge panel. Therefore, when a single district judge is faced with both types of claims, the judge may not resolve the statutory issues in isolation while reserving the constitutional claims to a three-judge district court. Instead, the single district judge must adhere to statutory limitations on his or her authority. Page v. Bartels, C.A.3d, 2001, 248 F.3d 175.

Backus v. Spears, C.A.4th, 1982, 677 F.2d 397.

Where there was no final three-judge court judgment ordering any affirmative relief, a single judge may not order that relief, even though authorized to do so by the three-judge court. Yuan Jen Cuk v. Lackner, C.A.9th, 1976, 537 F.2d 1064, on remand D.C.N.D.1977, 448 F.Supp. 4.

Single judge cannot amend rules as to campus speakers adopted by a three-judge court. Molpus v. Fortune, D.C.Miss.1970, 311 F.Supp. 240, affirmed C.A.5th, 1970, 432 F.2d 916.

In area of reapportionment litigation, three-judge jurisdiction subsists through the remedy that is sought and until it is finally granted or denied. Stout v. Hendricks, D.C.Ind.1964, 235 F.Supp. 556.

**65**    **Stay action**

Case 5:22-cv-00762-BKS-TWD    Document 11    Filed 10/12/22    Page 232 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Svejkovsky v. Tamm, C.A.1963, 326 F.2d 657, 117 U.S.App.D.C. 114.

66        **Abstention**

⚑ Ryan v. State Bd. of Elections, C.A.7th, 1981, 661 F.2d 1130.

Greenspan v. Klein, C.A.3d, 1977, 550 F.2d 856, on remand D.C.N.J.1977, 442 F.Supp. 860.

Apel v. Murphy, C.A.1st, 1975, 526 F.2d 71, on remand D.C.R.I.1976, ⚑ 70 F.R.D. 651.

"When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute." ⚑ Idlewild Bon Voyage Liquor Corp. v. Epstein, 1962, 82 S.Ct. 1294, 1296, 370 U.S. 713, 715, 8 L.Ed.2d 794.

"Abstention" is issue that deals with merits of claim and must be heard by three-judge panel and not by single judge hearing motion to convene three-judge court. Bjarsch v. Di Falco, D.C.N.Y.1969, 300 F.Supp. 960.

Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 1963, 77 Harv.L.Rev. 299, 309.

**"Our Federalism"**
The Supreme Court had said in 1974 that three judges are "normally required even if the decision is to dismiss under Younger-Samuels principles, since an exercise of discretion will usually be necessary * * *." ⚑ Steffel v. Thompson, 1974, 94 S.Ct. 1209, 1214 n. 7, 415 U.S. 452, 457 n. 7, 39 L.Ed.2d 505. But in 1975 the Court found it unnecessary to decide whether a single judge may dismiss on the ground that federal intervention is improper in light of principles of "Our Federalism." ⚑ MTM, Inc. v. Baxley, 1975, 95 S.Ct. 1278, 1280 n. 7, 420 U.S. 799, 802 n. 7, 43 L.Ed.2d 636. Justice White, in a concurring opinion, would have overruled Idlewild and held that a single judge can act on this ground. ⚑ 95 S.Ct. at 1281–1283, 420 U.S. at 805–807.

The problem ought not to recur, since while the doctrines of "Our Federalism" have provided many surprises—see §§ 4251 to 4255—it is difficult to conceive of a case within the narrow area in which three-judge courts are now required in which considerations of "Our Federalism" would require dismissal of a federal action. Abstention of the Pullman type—see § 4242—is conceivable, though unlikely, in what are now three-judge court cases. See U.S. v. Texas, D.C.Tex.1977, 430 F.Supp. 920.

67        **Cannot modify judgment**
Molpus v. Fortune, D.C.Miss.1970, 311 F.Supp. 240, affirmed C.A.5th, 1970, 432 F.2d 916.

See note 65 above.

"It would be highly anomalous if jurisdiction were not here, for then it would follow that a single judge could invalidate a reapportionment plan that had been evolved or approved, and was required so to be, by a three-judge court some time before." ⚑ Chapman v. Meier, 1975, 95 S.Ct. 751, 759, 420 U.S. 1, 14, 42 L.Ed.2d 766.

Determination by the three-judge court that several, if not all, of the plaintiffs had a real interest in the controversy and had a right to maintain the action and that intervenors had a right to intervene precluded reconsideration of that issue by the single judge on a motion for taxation of costs. Kenny v. U.S., D.C.N.J.1954, 118 F.Supp. 907.

68        **Enforce judgment**

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 233 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

After a three-judge court had ruled for defendants on the merits, a single judge could assess damages and costs against the plaintiffs and their injunction bond sureties. Public Service Comm. v. Brashear Freight Lines, Inc., 1941, 61 S.Ct. 784, 312 U.S. 621, 85 L.Ed. 1083.

Pabst v. Campbell, D.C.Ind.1957, 150 F.Supp. 71.

Although special statute gave jurisdiction, over action to quiet title to Indian lands, to three-judge court, once three-judge court had entered its judgment it had fulfilled statutory purpose for which additional judges were called, writ of assistance could be granted by single judge, and single judge's denial of relief was within appellate jurisdiction of court of appeals. Hamilton v. Nakai, C.A.9th, 1971, 453 F.2d 152, certiorari denied 92 S.Ct. 2044, 406 U.S. 945, 32 L.Ed.2d 332.

In proceeding on a motion for an order fixing a time limit for compliance with an order enjoining discrimination previously entered in an action to enjoin racial segregation in the public schools, district judge properly ruled that three judge court that had entered injunctive order need not be reconvened. Allen v. County School Bd. of Prince Edward County, C.A.4th, 1957, 249 F.2d 462, certiorari denied 78 S.Ct. 539, 355 U.S. 953, 2 L.Ed.2d 530.

There is no statutory basis for convening a three-judge District Court to hear civil contempt proceedings ancillary to suits prosecuted under Civil Rights Act of 1964, and civil contempt proceedings thereunder are to be heard by district court in due and normal course of ordinary jurisdiction. Willis v. Pickrick Restaurant, D.C.Ga.1964, 234 F.Supp. 179.

Single judge can tax costs on behalf of party who was successful before the three-judge court. Kenny v. U.S., D.C.N.J.1954, 118 F.Supp. 907.

**Attorney's fees**
Although action was tried before three-judge court, issue of attorney fees could be properly determined by a single judge. Mader v. Crowell, D.C.Tenn.1981, 506 F.Supp. 484.

Gerena-Valentin v. Koch, D.C.N.Y.1983, 554 F.Supp. 1017, affirmed C.A.2d 1984, 739 F.2d 755.

69     **Power to decide all claims**
Lake Carriers Assn. v. MacMullan, 1972, 92 S.Ct. 1749, 406 U.S. 498, 32 L.Ed.2d 257.

Zemel v. Rusk, 1965, 85 S.Ct. 1271, 381 U.S. 1, 14 L.Ed.2d 179.

United States v. Georgia Public Serv. Comm., 1963, 83 S.Ct. 397, 371 U.S. 285, 9 L.Ed.2d 317.

Campbell v. Hussey, 1961, 82 S.Ct. 327, 368 U.S. 297, 7 L.Ed.2d 299.

Florida Lime & Avocado Growers, Inc. v. Jacobsen, 1960, 80 S.Ct. 568, 362 U.S. 73, 4 L.Ed.2d 568.

Sterling v. Constantin, 1932, 53 S.Ct. 190, 287 U.S. 378, 77 L.Ed. 375.

Gebhardt, Pendent Claims in Three Judge Court Litigation, 1973, 30 Wash. & Lee L.Rev. 487.

Institutionalized Juveniles v. Secretary of Public Welfare, D.C.Pa.1980, 87 F.R.D. 463, 465, **quoting Wright, Miller & Cooper.**

Three-judge court, convened to hear a federal constitutional challenge to reapportionment of a state legislature, would exercise pendent jurisdiction to hear claim that reapportionment violated the state constitution. Sullivan v. Crowell, D.C.Tenn.1978, 444 F.Supp. 606.

70     **Remand to single judge**

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 234 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

Rosado v. Wyman, 1970, 90 S.Ct. 1207, 397 U.S. 397, 25 L.Ed.2d 442.

**Compare**

Three-judge district court, which had jurisdiction over two counts asserting claims under the Voting Rights Act, declined to exercise jurisdiction over incumbents candidates' challenge to one-year district residency requirement of the New Jersey Constitution, which would otherwise be determined by a single district judge. Robertson v. Bartels, D.C.N.J.2001, 148 F.Supp.2d 443, judgment affirmed 2002, 122 S. Ct. 914, 534 U.S. 1110, 151 L. Ed. 2d 881.

**But compare**

Page v. Bartels, C.A.3d, 2001, 248 F.3d 175.

Even if a three-judge court convened to hear a challenge to the constitutionality of the apportionment of congressional districts had authority to hear a challenge to the constitutionality of a budget rider, a "wholly different" congressional action, the court would not exercise jurisdiction over that claim. Adams v. Clinton, D.C.D.C.1999, 40 F.Supp.2d 1.

71    **Hagans case**

1974, 94 S.Ct. 1372, 415 U.S. 528, 39 L.Ed.2d 577, on remand C.A.2d, 1974, 505 F.2d 727.

72    **Only if not dispositive**

94 S.Ct. at 1382–1383, 415 U.S. at 543–545.

73    **Former rules apply**

The problem is discussed, and views somewhat contrary to that stated in the text about Hagans expressed, in Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 63 Geo.L.J. 971, 987–993.

74    **Bound only by Supreme Court**

Jehovah's Witnesses in State of Wash. v. King County Hospital, D.C.Wash.1967, 278 F.Supp. 488, 504–505, affirmed without opinion 1968, 88 S.Ct. 1260, 390 U.S. 598, 20 L.Ed.2d 158.

75    **Decisions of its circuit**

Lewis v. Rockefeller, C.A.2d, 1970, 431 F.2d 368, 371.

Russell v. Hathaway, D.C.Tex.1976, 423 F.Supp. 833, 835.

Hopson v. Schilling, D.C.Ind.1976, 418 F.Supp. 1223, 1235 n. 15.

Athanson v. Grasso, D.C.Conn.1976, 411 F.Supp. 1153.

Wilczynski v. Harder, D.C.Conn.1971, 323 F.Supp. 509, 513 n. 8.

76    **No greater weight**

Farley v. Farley, C.A.3d, 1973, 481 F.2d 1009, 1012.

Remick Music Corp. v. Hotel Corp. of Nebraska, D.C.Neb.1944, 58 F.Supp. 523, 541–542, affirmed C.C.A.8th, 1946, 157 F.2d 744.

77    **Direct appeal**

28 U.S.C.A. § 1253.

Case 5:22-cv-00762-BKS-TWD   Document 11   Filed 10/12/22   Page 235 of 235

§ 4235 Three-Judge Court Acts—History and..., 17A Fed. Prac. &...

See Williams, The New Three-Judge Courts of Reapportionment and Continuing Problems of Three-Judge-Court Procedure, 1977, 63 Geo.L.J. 971, 993–996.

78          **Bewildering rules**

E.g., 🚩Philbrook v. Glodgett, 1975, 95 S.Ct. 1893, 1898 n. 8, 421 U.S. 707, 712 n. 8, 44 L.Ed.2d 525.

🚩MTM, Inc. v. Baxley, 1975, 95 S.Ct. 1278, 420 U.S. 799, 43 L.Ed.2d 636.

🚩Gonzalez v. Automatic Employees Credit Union, 1974, 95 S.Ct. 289, 419 U.S. 90, 42 L.Ed.2d 249.

🚩Perez v. Ledesma, 1971, 91 S.Ct. 674, 678 n. 3, 401 U.S. 82, 87 n. 3, 27 L.Ed.2d 701.

🚩Mitchell v. Donovan, 1970, 90 S.Ct. 1763, 398 U.S. 427, 26 L.Ed.2d 378.

See Judge Friendly's characterization of recent Supreme Court decisions in this area as "a new puzzlement in this never-never land." 🚩Stone v. Philbrook, C.A.2d, 1975, 528 F.2d 1084, 1090.

79          **Shorn of complications**
            See § 4040.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.