UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JERAMIAH BROWN,

                                        Plaintiff,

                                                                5:22-cv-00762 (BKS/TWD)

v.

UPS UNITED PARCEL SERVICE, INCORP.,

                                        Defendant.

_____

APPEARANCES:

JERAMIAH BROWN
  *Plaintiff, pro se*
35033 Eddy Road
Lot 85
Theresa, NY 13691

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

I.      **INTRODUCTION**

On July 20, 2022, Jeramiah Brown ("Plaintiff") commenced this *pro se* action against

UPS United Parcel Service, Incorp. ("Defendant" or "UPS") asserting claims under the

Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA").  (Dkt.

No. 1.)  Plaintiff simultaneously moved for leave to proceed *in forma pauperis* ("IFP") and for

the appointment of counsel.  (Dkt. Nos. 2, 3.)

On July 29, 2022, the undersigned issued an Order and Report-Recommendation (1)

granting Plaintiff's IFP application for purposes of initial review, (2) denying Plaintiff's motion

for the appointment of counsel without prejudice, and (3) recommending that Plaintiff's

complaint be dismissed with leave to amend.  (Dkt. No. 6 at 9-10.)  Plaintiff filed objections.

(Dkt. No. 7.)  By Memorandum-Decision and Order issued September 6, 2022, the Hon. Brenda K. Sannes, Chief United States District Judge, adopted the Report-Recommendation and dismissed Plaintiff's complaint with leave to amend.  (Dkt. No. 8.)

On September 20, 2022, Plaintiff filed the first amended complaint ("FAC") asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII").  (Dkt. No. 9.)  On October 12, 2022, the undersigned issued a Report-Recommendation and Order recommending, *inter alia*, dismissal of Plaintiff's FAC with leave to amend.  (Dkt. No. 11.) Plaintiff filed objections.  (Dkt. No. 12.)  By Memorandum-Decision and Order issued November 7, 2022, Chief Judge Sannes adopted the Report-Recommendation in its entirety. (Dkt. No. 13.)

On December 5, 2022, Plaintiff filed the second amended complaint ("SAC"), which has been referred to the undersigned for review, along with a motion to proceed IFP.  (Dkt. Nos. 14, 15.)  For the reasons discussed below, the Court grants Plaintiff's IFP application and recommends that Plaintiff's SAC be accepted in part for filing and otherwise dismissed without further leave to amend.

## II.    IFP APPLICATION

A court may grant IFP status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  Upon review, Plaintiff has submitted a completed and signed IFP application, which demonstrates economic need.  (Dkt. No. 15.) Accordingly, Plaintiff's IFP Application is granted.[1]

---

[1]  Plaintiff should note that although the application to proceed IFP has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees. At this juncture, and for reasons stated herein, the Court declines to recommend that the District Court issue a bar order under 28 U.S.C. § 1651.  (*See* Dkt. No. 13 at 6.)  *See also Brown v. Fat Dough Incorp.*, No. 5:22-cv-00761 (BKS/ML), ECF Dkt. No. 12.  Nevertheless, Plaintiff is

## III.    SUFFICIENCY OF THE SAC

### A.    Standard of Review

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

Additionally, when reviewing a complaint, a court may look to the Federal Rules of Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief must contain "a short and plain statement of the claim showing that the

reminded that proceeding IFP is a privilege that is extended to litigants at the discretion of the Court.  *See Brown v. Fat Dough Incorp.*, No. 5:22-cv-00761 (BKS/ML), ECF Dkt. No. 6 at 4-5.

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The purpose of Rule 8 "is to give fair

notice of the claim being asserted so as to permit the adverse party the opportunity to file a

responsive answer, prepare an adequate defense and determine whether the doctrine of res

judicata is applicable." *Hudson v. Artuz*, No. 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y.

Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995)

(other citations omitted)).  Although "[n]o technical form is required," the Federal Rules make

clear that each allegation contained in the pleading "must be simple, concise, and direct."  Fed.

R. Civ. P. 8(d).  Further, Rule 10 of the Federal Rules provides in pertinent part:

> A party must state its claims or defenses in numbered paragraphs,
> each limited as far as practicable to a single set of circumstances.
> A later pleading may refer by number to a paragraph in an earlier
> pleading.  If doing so would promote clarity, each claim founded
> on a separate transaction or occurrence – and each defense other
> than a denial – must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).  This serves the purpose of "provid[ing] an easy mode of identification for

referring to a particular paragraph in a prior pleading[.]" *Flores v. Graphtex*, 189 F.R.D. 54, 54

(N.D.N.Y. 1999) (quotation marks and citations omitted).

    "In reviewing a complaint . . . the court must accept the material facts alleged in the

complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v.

Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

    Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam)

(reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint

sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed.  *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee).  "Legal frivolity . . . occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint."  *Aguilar v. United States*, No. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory . . . or factual contentions lack an arguable basis.").

### B.    Summary of the SAC

Construed liberally, the SAC alleges Plaintiff's civil rights were violated by UPS and Robert Milne ("Milne").  (Dkt. No. 14.)  The SAC consists of a form complaint pursuant to Title VII, along with twenty-five additional single spaced typed pages.  *Id*.  The paragraphs are not numbered nor limited to a single set of circumstances.  *See id*.

The SAC is materially similar to the FAC, except the SAC provides additional allegations in support of the previously dismissed Title VII claims.  (*Compare* Dkt. No. 14 at 3, 6-23 *with* Dkt. Nos. 1 at 3, 9 at 6-14.)

Generally, Plaintiff alleges he was discriminated against based on his sex and disability. (Dkt. No. 14 at 2.)  Plaintiff indicates the conduct complained of in this action includes the termination of his employment, unequal terms and conditions of his employment, retaliation, and harassment.  *Id*.  Plaintiff identifies as gender non-binary, was born with thrombocytopenia with absent radius ("TAR"), and was diagnosed with a traumatic brain injury in 2014.  *Id*. at 3.

According to Plaintiff, he was hired by UPS as a "Personal Seasonal Delivery Driver" on November 1, 2021.  *Id*.  On November 3, 2021, he reported to duty at a UPS Warehouse in Watertown, New York.  *Id*.  Milne, an employee of UPS, "harassed" Plaintiff based on his "Age, weight, appearance, Disability, and Physical appearance" and "Sex and Sexual Orientation, and National Origin."  *Id*. at 3, 7.  Milne "harassed" and asked Plaintiff questions about his disability, commented on the "thinness" of his hand, and inquired whether he would be able to fulfill the job duties of a Personal Seasonal Delivery Driver.  *Id*. at 6.  Milne "made" Plaintiff "wait in the office over 60 minutes" only to be told that he "could not work and would be scheduled a Road test" with Cole Worden ("Worden"), a UPS driver, the following day.  *Id*.  Plaintiff was not paid for November 3, 2021, and Ashely Janish ("Janish"), a UPS Regional Headquarter Human Resources Agent, did not respond to Plaintiff's emails about his concerns.  *Id*. at 7-8.

Plaintiff alleges Milne "made degrading and humiliating Jokes to [Plaintiff] . . . due to Disability and Gender Identity based on plaintiff's appearance."  *Id*. at 6.  Milne compared Plaintiff's appearance to that of "McKenzie", a female Human Resource Agent for UPS who "oversees hiring and firing Seasonal Personal Drivers" for the Watertown warehouse.  *Id*. at 6. Plaintiff claims Milne "created a hostile work environment" by yelling at McKenzie for hiring Plaintiff "due to the selections [Plaintiff] made on his Application with UPS . . . and due to [his] appearance" and because Plaintiff was hired instead of another employee's son.  *Id*. at 6-7.

On November 4, 2021, Plaintiff reported to Worden for the Road test. *Id*. at 7. Plaintiff claims Worden "created unequal terms of conditions of employment" and a"Hostile Work environment" because only Plaintiff was "subjected to a Road test" due to his "Age, disability, Sex, Appearance and Gender Identity." *Id*. Before the Road test, Worden made "inappropriate jokes and humiliated" Plaintiff about his "capabilities of handling packages." *Id*. Worden also asked Plaintiff if he could "open his car door fast, Organize Packages Fast, Walk/Run Fast, Handle Customer interactions" and inquired how Plaintiff would "approach a Customer with Packages" and how Plaintiff would "arrive to work." *Id*. On November 4, 2021, Janish refused to respond to Plaintiff's email requests and failed to address Plaintiff's questions and concerns about his employment, thereby creating a "hostile work environment." *Id*. at 8.

On November 17, 2021, Plaintiff filed a New York State Division of Human Rights ("NYSDHR") Complaint "due to the Unequal terms of Condition of employment, Human Resource retaliating to acknowledge [Plaintiff's] Employment Concerns, and Human Resource Discriminating against [Plaintiff] with employment opportunities and positions as a Seasonal Personal Delivery Driver hired on 11/01/2021 by" UPS. *Id*. at 8. However, "[n]othing was resolved" because McKenzie "lied and stated" Plaintiff was not an employee of UPS during a March 15, 2022, telephone conference between NYSDHR Investigator Tammy Reed, Plaintiff, McKenzie, and UPS's attorney, Ya Li, Esq., of Dismore and Shohl, LLP. *Id*. According to Plaintiff, the "evidence and exhibits" "show proof" that he is "still currently an employee of UPS." *Id*.[2]

---

[2] Plaintiff states the Clerk "did not upload all of the exhibits correctly or accurately" and refers to "98 pages of Evidence with exhibits from A-G." (Dkt. No. 14 at 23.) Out of special solicitude as a *pro se* litigant, the Court has considered the exhibits attached to the original complaint and FAC exhibits as part of its sufficiency review herein notwithstanding that "an

After the March 15, 2022, telephone conference, the "harassment" from UPS employees "increased." *Id*. at 9. His property was "destroyed, littered, and individuals were stalking [Plaintiff's] property and residency." *Id*. In the summer of 2022, after Plaintiff received a "right to sue letter" and filed his original complaint, "flowers were destroyed that [Plaintiff] planted in memory of a family death." *Id*.

Additionally, although Plaintiff made a "confidential report" on December 10, 2021, via the UPS Help Line, "no one" from UPS has tried to follow-up with Plaintiff regarding his employment concerns and issues. *Id*.

As a result of the foregoing, Plaintiff has "lost wages" and "accumulated living expense debts and other debt" including costs for winter apparel that he bought for the Seasonal Personal Delivery Driver position and moving related expenses. *Id*. at 9-10. As relief, Plaintiff seeks $300,000.00 in damages. *Id*. at 10. For a more complete summary, reference is made to the SAC.

### C.    Claims Pursuant to Title VII

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (concluding "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second").

---

amended complaint ordinarily supersedes the original, and renders it of no legal effect." *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The Court liberally construes the SAC as asserting three claims pursuant to Title VII: (1) hostile work environment, (2) discriminatory discharge, and (3) retaliation.  (Dkt. No. 14 at 12-14.)

### 1.    Individual Liability

As an initial matter, "individual defendants cannot be held personally liable under Title VII."  *Milner-Koonce v. Albany City Sch. Dist.*, No. 1:21-CV-1271 (LEK/CFH), 2022 WL 7351196, at *3 (N.D.N.Y. Oct. 13, 2022) (citing *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (affirming the district court's dismissal of "Title VII claims against the individual defendants") (other citations omitted)); *Chisholm v. Stryker*, No. 22-CV-2705(JMA) (SIL), 2022 WL 3647288, at *4 n.2 (E.D.N.Y. Aug. 24, 2022) ("[I]t is long established that individuals are not subject to liability under Title VII.").

As such, it is recommended that any Title VII claims against Milne be dismissed with prejudice.[3]  *See* 28 U.S.C. § 1915(e)(2)(B).

### 2.    Hostile Work Environment

To state a *prima facie* case of discrimination under Title VII, a plaintiff must allege "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  "Specifically, Plaintiff must show either that he suffered an

---

[3]  Worden, Janisch, and McKenzie are not listed as defendants in the caption of the SAC.  (*See* Dkt. No. 14 at 1.)  To the extent the SAC could be construed as asserting Title VII claims against Worden, Janish, or McKenzie, the Court also recommends dismissing any claims with prejudice because, as noted, "individual defendants cannot be held personally liable under Title VII." *Chauca v. Abraham*, 841 F.3d 86, 89, n.1 (2d Cir.) (citation omitted).  *See* 28 U.S.C. § 1915(e)(2)(B).

adverse job action under circumstances giving rise to an inference of discrimination on the basis

of race, color, religion, sex, or national origin, or . . . demonstrate that harassment on one or more

of these bases amounted to a hostile work environment." *Morren v. New York Univ.*, 20-CV-

10802, 2022 WL 1666918, at *14 (S.D.N.Y. Apr. 29, 2022) (quoting *Feingold v. New York*, 366

F.3d 138, 149 (2d Cir. 2004)), *report-recommendation adopted*, 2022 WL 1665013 (S.D.N.Y.

May 25, 2022).

"To state hostile work environment claim, a plaintiff must plead facts tending to show

that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an

environment that a reasonable person would find hostile or abusive; (2) creates an environment

that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

because of the plaintiff's sex, or another protected characteristic." *Robinson v. Harvard Prot.*

*Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012); *see also Feingold*, 366 F.3d at 149-50.

On initial review of the FAC, this Court found Plaintiff failed to plausibly allege

Defendants' conduct was motivated by a protected characteristic. (Dkt. No. 11 at 12.) For

example, in the FAC Plaintiff claimed Milne, Janish, and McKenzie treated him unfairly on

November 3, 2021, because of his "[s]ex and [s]exual orientation." *Id.* But "Plaintiff advanced

no specific factual allegations indicating what Defendants did or said to suggest the alleged

harassment on November 3, 2021, was motivated by his sex and sexual orientation." *Id.* As

such, the undersigned found that "[a]bsent some non-conclusory factual allegations linking

Defendants' conduct to Plaintiff's sex or sexual orientation, the FAC fails to state a claim for

hostile work environment." *Id. See, e.g., Merisier v. Kings Cty. Hosp.*, No. 16-CV-7088, 2017

WL 4857565, at *2 (E.D.N.Y. Oct. 25, 2017) ("As Merisier has not adequately alleged that she

was discriminated against on the basis of her membership in a protected class, the complaint, as

filed, fails to state a claim for relief and must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)."); *Fox v. Albany Med. Ctr.*, No. 1:17-CV-0798 (TJM) (DEP), 2017 WL 4417751, at *3 (N.D.N.Y. Sept. 11, 2017) (recommending the dismissal of plaintiff's hostile work environment claim because "there [wa]s nothing in her complaint to link the harassment she experienced with any protected classification"), *report-recommendation adopted*, 2017 WL 4417679 (N.D.N.Y. Oct. 3, 2017).

Here, Plaintiff again alleges that on November 3, 2021, UPS employees Milne, Janish, and McKenzie treated him unfairly and "created a hostile work environment" and adds more details about what Milne allegedly said to Plaintiff including that his body and hands were "thin"; he "looked and sounded feminine"; he looked like McKenzie, a female; and he should be "working behind a desk." (*See, e.g.*, Dkt. No. 14 at 6.)

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, the Court recommends that a response be required to Plaintiff's hostile work environment claim pursuant to Title VII.

### 3.    Discriminatory Discharge

As set forth above, Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To make out a *prima facie* case of discrimination under Title VII, Plaintiff must allege "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he

suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150.

While Plaintiff is not required to make out a *prima facie* case of discrimination at the pleading stage, he must allege facts that "give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see generally Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (concluding plaintiff failed to state a claim where she "failed to plead any facts that would create an inference that any adverse action taken by any defendant was based upon her gender").

As noted, on initial review of the FAC, this Court found Plaintiff failed to plausibly allege the conduct at issue was motivated by a protected characteristic. (Dkt. No. 11 at 12.) *See, e.g.*, *Weekes v. JetBlue Airways Corp.*, No. 21-CV-1965, 2022 WL 4291371, at *9 (E.D.N.Y. Sept. 16, 2022) (dismissing plaintiff's Title VII discrimination claim as inadequately pled because he did not "allege any facts that would permit the Court to infer causation between Plaintiff's membership in any protected class and the adverse employment actions he faced"); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 554 (W.D.N.Y. 2016) (same).

Here, construed liberally, Plaintiff alleges he was subjected to adverse employment actions because of his appearance and gender identity that no other Personal Seasonal Delivery Driver was subjected to and he was not scheduled for shifts. (Dkt. No. 14 at 7.)

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, the undersigned recommends that a response be required to Plaintiff's discriminatory discharge claim pursuant to Title VII.

###### 4.    Retaliation

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  To state a *prima facie* case of retaliation pursuant to Title VII, a plaintiff must establish (1) he participated in a protected activity; (2) his protected activity was known to his employer; (3) the employer thereafter subjected him to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  "At the pleading stage, the allegations in the complaint need only give plausible support to the[se] . . . *prima facie* requirements."  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018); *see also Belyea v. City of Glen Cove*, No. 20-CV-5675, 2022 WL 3586559, at *12 (E.D.N.Y. Aug. 22, 2022).  So, to adequately state a claim for Title VII retaliation at the pleading stage, a plaintiff must plausibly allege "(1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice."  *Duplan*, 888 F.3d at 625; *see also Belyea*, 2022 WL 3586559, at *13.

Both formal and internal complaints are sufficient to satisfy the first prong as protected activity.  *See McKenna v. Santander Inv. Sec., Inc.*, No. 21-CV-0941, 2022 WL 2986588, at *10 (S.D.N.Y. July 28, 2022) ("Protected activity need not consist of a formal complaint of discrimination; an 'internal complaint to company management' can constitute a protected activity under Title VII.").

On initial review of the FAC, this Court found Plaintiff failed to adequately allege Defendants took an adverse employment action against him *because* he opposed an employment practice made unlawful by Title VII.  (Dkt. No. 11 at 15.)  In relevant part, Plaintiff alleged in the FAC that *after* he suffered an "adverse employment [action] from Robert Milne," he complained about it to the NYSDHR.  *Id*. at 13.  In his objections, Plaintiff asserted for the first time that *after* filing the NYSDHR complaint, he suffered an adverse action, i.e., he was not scheduled for "future shifts."  (Dkt. No. 9 at 13-14, Dkt. No. 12 at 2; Dkt. No. 13 at 4.)  The District Court noted that while an allegation of reduced hours may allow an inference that a plaintiff suffered an adverse action, Plaintiff's newly asserted factual allegations regarding denials of shifts did not save his retaliation claim because there were no allegations of retaliatory animus and Plaintiff did not indicate *when* Defendants allegedly denied Plaintiff shifts and, therefore, there was no basis for inferring causal connection based on the close temporal proximity between the filing of the NYSDHR complaint and the alleged denial of shifts.  (Dkt. No. 13 at 5.)  *See, e.g.*, *Feliciano v. City of New York*, No. 14-cv-6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015 ("[W]hen no additional facts are pled, temporal proximity ordinarily requires that the allegedly retaliatory act occur within two months of the plaintiff's protected activity.").

Now, in the SAC, construed liberally, Plaintiff alleges he made several informal complaints via email to Janish on November 3, 2021, and November 4, 2021, regarding the "hostile work environment" and "unequal terms" of employment, and thereafter, he was subjected to an adverse employment action.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff*, 537 F.3d at 191, and

without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, the Court recommends that a response be required to Plaintiff's retaliation claim pursuant to Title VII.

**D.    Other Statutes in the SAC**

The SAC also references, *inter alia*, the following six statutes: (1) the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621-634 ("ADEA"); (2) the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA); (3) the Workforce Investment Act, 29 U.S.C. § 2801 et seq. ("WIA"); (4) the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA"); (5) the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff et seq. ("GINA"); and (6) the ADA.  However, to the extent the SAC is liberally construed as asserting claims pursuant to those statutes, *see Sealed Plaintiff*, 537 F.3d at 191, the Court recommends that they be dismissed for the reasons set forth below.[4]

**1.    ADEA**

The ADEA bars an employer from discharging an employee because of age.[5]  29 U.S.C. § 623(a) (1976); *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 919, 921-22 (2d Cir. 1981).  In order to establish a *prima facie* case of age discrimination in violation of the ADEA, a plaintiff must show: (1) that she was within the protected age group (more than forty years old); (2) that she was qualified for the position; (3) that she experienced adverse employment action; and (4)

---

[4]  *See also Brown v. Fat Dough Incorp.*, No. 5:22-cv-00761 (BKS/ML), ECF Dkt. No. 14.

[5]  Similar to Title VII, individuals are not subject to liability under the ADEA and the ADA.  *See Scalercio-Isenberg v. Morgan Stanley Servs. Grp. Inc.*, No. 19-CV-6034, 2019 WL 6916099, at *7 (S.D.N.Y. Dec. 19, 2019) ("As a matter of law, none of the individual defendants can be held liable under Title VII, the ADA, or the ADEA."); *Garibaldi v. Anixter, Inc.*, 407 F. Supp. 2d 449, 451 (W.D.N.Y. 2006) ("[T]here is no individual liability under any of the federal anti-discrimination statutes, including Title VII, the ADA, and the ADEA.").

that such action occurred under circumstances giving rise to an inference of discrimination. *See Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010) (citing *Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 134 (2d Cir. 2000)).

Here, Plaintiff does not allege that he is in a protected class, nor does he set forth any facts plausibly suggesting that his employment was terminated on the basis of his age. Plaintiff has therefore failed to allege a plausible claim for age discrimination under the ADEA, and the Court recommends dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 2.    FDCPA

To state a claim under the FDCPA, "a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA." *Felberbaum v. Sequium Asset Solutions*, No. 21-CV-9513, 2023 WL 167559, at *3 (S.D.N.Y. Jan. 11, 2023) (citing *Cohen v. Ditech Fin. LLC*, No. 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y. Mar. 24, 2017)).

The SAC fails to allege facts plausibly suggesting that (1) Plaintiff is a person who was the object of efforts to collect a consumer debt, (2) Defendant is a debt collector, or (3) that Defendant engaged in an act or omission in violation of the FDCPA. (*See generally* Dkt. No. 14.) *See Komatsu v. Urban Pathways, Inc.*, No. 22-CV-9080, 2023 WL 419699, at *9 (S.D.N.Y. Jan. 26, 2023) (citing 15 U.S.C. 1692e ("In cases where the FDCPA applies, it prohibits deceptive and misleading practices by 'debt collectors.'"). As a result, to the extent the SAC is construed as alleging a claim pursuant to the FDCPA, the Court recommends it be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 3.    WIA

The non-discrimination provision of the WIA provides:

> [n]o individual shall be excluded from participation in, denied the benefits of, subjected to discrimination under, or denied employment in the administration of or in connection with, any [program or activity funded under the WIA] because of race, color, religion, sex (except as otherwise permitted under title IX of the Education Amendments of 1972), national origin, age, disability, or political affiliation or belief.

29 U.S.C. § 2938(a)(2).  "But there is no private right of action under this section.  Instead, the Secretary of Labor and Attorney General are charged with enforcement."  *McCrudden v. ETrade Fin. Corp.*, No. 13-CV-8837, 2014 WL 3952903, at *4 (S.D.N.Y. Aug. 12, 2014) (citing 29 U.S.C. § 2938(b)-(c); *Machie v. Nguyen*, 824 F. Supp. 2d 146, 151 (D.D.C. 2011); *McGowan v. New Jersey*, No. 08-CV-5841, 2009 WL 1687663, at *8 (D.N.J. June 16, 2009); *Borrero-Rodriguez v. Montalvo-Vazquez*, 275 F. Supp. 2d 127, 132 (D.P.R. 2003)).

As a result, the Court recommends that, to the extent the SAC is construed as alleging a claim pursuant to the WIA, it be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 4.    EPA

The EPA prohibits employers from "discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work.'"  *Chepak v. Metro. Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (quoting 29 U.S.C. § 206(d); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).  To establish an EPA claim, a plaintiff must make an initial showing that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort and responsibility; and (3) the jobs are performed under similar working conditions."  *Chepak*, 555 F. App'x at 76 (quoting *Belfi*, 191 F.3d at 135).  "At the pleading stage . . . a plausible EPA claim must include

'sufficient factual matter, accepted as true' to permit 'the reasonable inference' that the relevant employees' job content was 'substantially equal.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 256 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Substantial similarity is not based on mere "overlap in titles or classifications." *E.E.O.C.*, 768 F.3d at 255. Instead, a female employee's "actual job content" must be substantially equal to her male comparators. *Id*.

Here, the SAC is devoid of factual allegations plausibly suggesting Defendant paid different wages to employees of the opposite sex from Plaintiff. As a result, to the extent the SAC is construed as asserting a claim pursuant to the EPA, the Court recommends that it be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 5. GINA

GINA makes it unlawful for an employer "to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee . . . because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1). GINA defines "genetic information" to include: (1) an employee's genetic tests; (2) the genetic tests of the employee's family members; or (3) the manifestation of a disease or disorder in the employee's family members. *See Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *10 (S.D.N.Y. May 22, 2017) (citing 42 U.S.C. § 2000ff(4)), *report-recommendation adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017). To establish a claim under GINA, a plaintiff must plead and prove "(1) that []he was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from [his] genetic tests." *Allen v. Verizon Wireless*, No. 12-CV-0482, 2013 WL 2467923, at *23 (D. Conn. June 6, 2013) (citation omitted).

Here, the SAC fails to allege facts plausibly suggesting UPS or any employee had any knowledge of Plaintiff's genetic information or that Plaintiff was discharged or deprived of employment opportunities because of information from his genetic tests. As a result, to the extent the SAC is construed as asserting a claim pursuant to GINA, the Court recommends that it be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 6. ADA

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability in regard to," among other things, "the hiring . . . or discharge of employees." 42 U.S.C. § 12112(a); *see generally* 42 U.S.C. §§ 12111(2), (5) (defining "Covered entity" and "Employer"). It also prohibits covered employers from discriminating against a "qualified individual on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also prohibits covered employers from discriminating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

"[T]o establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that 'substantially limits one or more major life activities[.]'" *Wega v. Ctr. for Disability Rts.*, No. 06-CV-6375, 2009 WL 3199684, at *7 (W.D.N.Y. Sept. 30, 2009) (quoting 42 U.S.C. § 12102(2)(A)), *aff'd*, 395 F. App'x 782 (2d Cir. 2010) (summary order). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "The mere presence of a medical condition does not establish that a plaintiff is disabled." *O'Donnell v. King B 100, LLC*, No. 14-CV-1345 (TJM), 2016 WL 7742779, *9 (N.D.N.Y. May 3, 2016) (citations omitted).

On initial review of the original complaint, the Court found Plaintiff failed to state a claim for discriminatory discharge, failure to make reasonable accommodation, and retaliation under the ADA. (Dkt. Nos. 6, 8.) To the extent the SAC is liberally construed as asserting a claim pursuant to the ADA, the Court recommends that it be dismissed for failure to state a claim upon which relief may be granted. In short, Plaintiff has not cured the deficiencies identified in the July 29, 2022, Report-Recommendation. (Dkt. No. 6; *see also* Dkt No. 8.)

Here, Plaintiff summarily asserts that he is "disabled" but does not explain how his disability "substantially limits a major life activity." Plaintiff has failed to plausibly allege that he was "otherwise qualified" for the Personal Seasonal Delivery Driver position with or without reasonable accommodation. (*See generally* Dkt. No. 14.) Nor has he plausibly alleged an adverse employment action *by reason* of his alleged disability. *Id*. There are no plausible allegations in the SAC to support a finding that UPS and its employees were aware of Plaintiff's alleged disability. *See Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003) (elements of ADA and claims include the requirement that "discrimination was due to [plaintiff's] disability." (citation omitted)).

As a result, to the extent the SAC is construed as asserting a claim pursuant to the ADA, the Court recommends that it be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

**IV.    CONCLUSION**

For the reasons set forth herein, the Court finds only Plaintiff's Title VII claims against Defendant UPS survive initial review and require a response.  Because Plaintiff has already been afforded two opportunity to amend, the Court recommends that all remaining claims be dismissed.

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion to proceed IFP (Dkt. No. 15) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 14) be **ACCEPTED** for filing to the extent it asserts claims pursuant to the Title VII of the Civil Rights Act alleging a hostile work environment, discriminatory discharge, and retaliation against Defendant UPS; and it further

**RECOMMENDED** Plaintiff's Title VII claims against Defendant UPS **SURVIVE** initial review and require a response; and it is further

**RECOMMENDED** that Plaintiff's Title VII claims asserted against Milne and other individuals identified in the second amended complaint but not listed as defendants be **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**RECOMMENDED** that all remaining claims be **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**

Dated: March 28, 2023
Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

---

[6]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility,
Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New
York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action
pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's
complaint alleges defendants violated his constitutional rights
while he was an inmate at Green Haven Correctional
Facility. [1] Plaintiff's complaint was dismissed *sua sponte*
by Judge Thomas P. Griesa on June 26, 1995 pursuant to 28
U.S.C. § 1915(d). On September 26, 1995, the Second Circuit
Court of Appeals vacated the judgment and remanded the case
to the district court for further proceedings.

[1] Plaintiff is presently incarcerated at Sullivan
Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on
January 31, 1996. Defendants moved to dismiss the complaint
pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996.
Thereafter, the case was reassigned to Judge Jed S. Rakoff
on February 26, 1997. On February 26, 1998, Judge Rakoff
granted defendants' motion to dismiss, but vacated the
judgment on April 10, 1998 in response to plaintiff's motion
for reconsideration in which plaintiff claimed that he never
received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was
referred to me for general pretrial purposes and for a Report
and Recommendation on any dispositive motion. Presently
pending is defendants' renewed motion to dismiss. Plaintiff
filed a reply on July 6, 1998. For the reasons discussed
below, plaintiff's complaint is dismissed without prejudice,
and plaintiff is granted leave to replead within thirty (30) days
of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the
Green Haven Correctional Facility mess hall on March 14,
1995. (Complaint at 4.) He alleges that he was struck with
a pipe and a fork while in the "pop room" between 6:00
p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends
that the attack left him with 11 stitches in his head, chronic
headaches, nightmares, and pain in his arm, shoulder, and
back. (*Id.*) Plaintiff also states that Sergeant Ambrosino
"failed to secure [the] area and separate" him from his
attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz
is that he "fail [sic] to qualify as warden." (Complaint at
4.) Plaintiff names Commissioner Coombes as a defendant,
alleging Coombes "fail [sic] to appoint a qualified warden
over security." (Amended Complaint at 5.) Plaintiff further
alleges that Dr. Manion refused to give him pain medication.
(Complaint at 5.) Plaintiff seeks to "prevent violent crimes"
and demands $6,000,000 in damages. (Amended Complaint
at 5.)

Defendants moved to dismiss the complaint, arguing that: (1)
the Eleventh Amendment bars suit against state defendants
for money damages; (2) the plaintiff's allegations fail to state
a claim for a constitutional violation; (3) the defendants are
qualifiedly immune from damages; and (4) plaintiff must
exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and
10 of the Federal Rules of Civil Procedure and dismiss the
complaint without prejudice and with leave to amend. Federal
Rule 8 requires that a complaint contain "a short and plain
statement of the claim showing that the pleader is entitled to
relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to
give fair notice of the claim being asserted so as to permit the

1998 WL 832708

adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.*[2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

[2]    Rule 10 states:

(b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible

that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429

1998 WL 832708

U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. v. $6,787.00 in U.S. Currency, N.D.Ga., February 13, 2007

1999 WL 1067841
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Francisco AGUILAR, Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant.

Nos. 3:99–MC–304 (EBB), 3:99–MC–408 (EBB).
|
Nov. 8, 1999.

*Dismissal of Plaintiff's Complaints*

BURNS, Senior J.

 **\*1** Francisco Aguilar, pro se, seeks leave to proceed in forma pauperis ("IFP") to press two meritless complaints against the government, which is prosecuting related civil forfeiture actions against his properties. Although Aguilar is otherwise financially eligible, the court dismisses these complaints sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B) because the purported claims are frivolous, baseless and irremediable.

*Background*

Would-be plaintiff Aguilar is no stranger to this court. He is currently serving a forty-year sentence for drug trafficking at the federal penitentiary in Leavenworth, Kansas. *See United States v. Tracy,* 12 F.3d 1186, 1189 (2d Cir.1993) (affirming conviction and sentence). In connection with his conviction for narcotics offenses, the government filed civil forfeiture actions pursuant to 21 U.S.C. § 881(a) in 1990 and 1991 against four of Aguilar's Connecticut properties, which have since been sold. With the help of CJA-appointed counsel, Aguilar has vigorously defended each of these four actions, three of which remain pending before this court, and are scheduled for trial in January 2000.[1]

[1]    *See United States v. One Parcel Of Property Located At 2030–32 Main St.,* No. 5:90–cv–544(EBB) (pending); *United States v. One Parcel Of Property Located At 8 Drumlin Rd.,* No. 5:90–

cv–545 (EBB) (pending); *United States v. One Parcel Of Property Located At 2034–38 Main St.,* No. 5:90–cv–546(EBB) (pending); *see also United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158(EBB) (closed).

Now Aguilar seeks to take the offensive by filing these purported claims against the government, and serving the current property owners as well as the Assistant United States Attorney who is prosecuting the related forfeiture cases. This court denied without prejudice Aguilar's initial complaint, which was erroneously captioned "United States v. One Parcel Of Property Located At 414 Kings Hwy.," one of the cases already docketed and then pending. *See* Order of June 15, 1999. Upon refiling an amended complaint (the "Amended Complaint") with the appropriate caption, Aguilar also filed a second complaint (the "Second Complaint"), seeking the same relief and asserting essentially the same claims against the government for bringing the other three forfeiture cases. The clerk returned these pleadings because Aguilar failed to complete the IFP forms. *See* Order of August 25, 1999. After Aguilar cured these pleading deficiencies, miscellaneous docket numbers were assigned to the complaints.

In Aguilar's Amended Complaint—the one originally filed against his own property at 414 Kings Highway—Aguilar seeks return of the property, compensatory damages and $100,000,000 in punitive damages "to deter the United States of America from committing a similar Abuse of Power." Aguilar pleads his case in four "Articles," asserting sundry state and federal "constitutional" claims, including conversion, false pretenses, mail fraud, and breach of fiduciary duty. The Amended Complaint also suggests an allegation that the government falsified and deliberately omitted known material facts from its probable cause affidavit in "disregard" of 19 U.S.C. § 1615, the statute outlining the burden of proof in administrative forfeiture proceedings.

The Second Complaint—the one related to the government's seizure of the other three properties—seeks similar equitable and monetary relief, including return of the properties, compensation for "suffering," "usurpation," denial of his use and enjoyment of the properties and lost rents, and one billion dollars in punitive damages. Liberally construed, the Second Complaint simply repeats the claims of the Amended Complaint except for one additional allegation: that Aguilar was entitled to, and did not receive, a hearing prior to the seizure and sale of his properties.

*Discussion*

A. *§ 1915(e)(2)(B) Standards*

**\*2** The Prisoner Litigation Reform Act ("PLRA") mandates dismissal of an IFP action if it: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B) (as amended in 1996). Prior to the adoption of the PLRA, district courts had discretion to dismiss frivolous actions; now they are required to do so. *See* Pub.L. 104–134, 110 Stat. 1321 (1996) (making dismissal of frivolous actions mandatory, and also requiring dismissal for failing to state a claim or seeking damages from an immune defendant). Because Aguilar's claims qualify for dismissal under all three of these prongs, the standards for each are set out in turn.

1. *Frivolous or Malicious*

A complaint is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989) (interpreting § 1915(d), later redesignated as § 1915(e)(2)(B)(i), to preclude "not only the inarguable legal conclusion, but also the fanciful factual allegation"). Factual frivolity occurs where "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833). Legal frivolity, by contrast, occurs where "the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Livingston,* 141 F.3d at 327 (internal quotes and citation omitted); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999) (upholding dismissal as frivolous where "[t]he complaint's conclusory, vague, and general allegations ... d[id] not [ ] suffice to establish" plaintiff's claims).

In addition to frivolous claims, the court must also dismiss any malicious claims, i.e., where "[t]he manifest purpose of appellant's complaint [i]s not to rectify any cognizable harm, but only to harass and disparage." *Tapia–Ortiz,* 185 F.3d at 11.

2. *Failure To State A Claim*

An IFP action must also be dismissed sua sponte if it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Star v. Burlington Police Dep't,* 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (summarily affirming dismissal made pursuant to § 1915(e)(2)(B)(ii) of purported due process challenge that failed to state a claim). As in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a § 1915(e)(2)(B)(ii) dismissal is warranted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

**\*3** Pro se complaints, such as these, however, must be read broadly, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), and may not be dismissed "simply because the court finds the plaintiff's allegations unlikely." *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1982) (construing pre-PLRA complaint as frivolous). Therefore,

> a pro se plaintiff who is proceeding in forma pauperis should be afforded the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim [under § 1915(e)(2)(B)(ii) ], unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

*Gomez v. USAA Federal Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam) (vacating § 1915(e)(2)(B)(ii) dismissal where "the district court did not give th[e] pro se litigant an opportunity to amend his complaint, and because [the court] cannot rule out the possibility that such an amendment will result in a claim being successfully pleaded").

3. *Relief Against An Immune Defendant*

Dismissal of an IFP case is also required where plaintiff seeks monetary damages against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii); *see also, Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998) (affirming dismissal pursuant to § 1915(e)(2)(B)(iii) of official-capacity claims in § 1983 civil rights action because "the Eleventh Amendment immunizes state officials sued for damages in their official capacity"). Here, even if Aguilar's claims had any merit, the complaints must be dismissed nevertheless

1999 WL 1067841

because each seeks monetary damages from the United States, which is immune from such relief. *See Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 139 (2d Cir.1999) (noting "[t]he sovereign immunity of the United States may only be waived by federal statute").

B. *Dismissal Standards Applied*

Aguilar's complaints are devoid of any arguable basis in law or fact. Most of his factual allegations—to the extent they are even comprehensible—are conclusory, vague and baseless. For example, he purports to allege: "The United States of America has misused its power against the Francisco Aguilar's Intangible Rights." (Amended Complaint at 2); and "The United States of America overpassed its bound of its authority and make a tyrannic use of its powers." (Second Complaint at 4). Even the Second Circuit has recognized Aguilar's prior handiwork to be "so indisputably lacking in merit as to be frivolous within the meaning of 28 U.S.C. § 1915(e)." *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 97–6004 (2d Cir. April 23, 1997) (mandate [Doc. No. 167] dismissing appeal of Aguilar's motion to enjoin state default proceedings).

Only two allegations asserted by Aguilar are even arguably actionable: the lack-of-probable-cause argument in the Amended Complaint and the due process claim in the Second Complaint. Both of these, however, must be dismissed because each fails to state a claim for which relief may be granted.

1. *Probable Cause*

**\*4** The one potentially cogent legal claim that can be derived from a liberal reading of the Amended Complaint has already been conclusively decided by the court and is therefore barred from relitigation. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158 (denying lack-of-probable-cause argument in motion to dismiss [Doc. No. 64] in 1993, and in motions for summary judgment [Doc. Nos. 55, 96] in 1996). Here again, Aguilar reiterates his allegation that the government's affidavit in support of probable cause was tainted because it failed to disclose that the 414 Kings Highway property was subject to a mortgage held by People's Bank, and therefore could not have been purchased with funds traceable to drug sales.

After the government voluntarily dismissed that forfeiture action, this court initially ordered the sale proceeds of the property disbursed to Aguilar. *See id.,* Order of Oct. 25, 1996

[Doc. No. 151]. The bank appealed the order and, during the pendency of the appeal, secured a default judgment in state court against Aguilar. *See People's Bank v. Aguilar,* No. CV–96–0337761–S (Conn.Super.Ct.1997). On the Bank's appeal from this court's disbursal of proceeds to Aguilar, the Second Circuit reversed and remanded. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* 128 F.3d 125, 128 (2d Cir.1997). On remand, in accordance with the Second Circuit mandate, this court disbursed the proceeds from the sale of 414 Kings Highway to the bank in partial satisfaction of Aguilar's debt owed on the defaulted mortgage. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158, 1999 WL 301704 (D.Conn. May 11, 1999).

Because the lack-of-probable-cause claim, perfunctorily adverted to in Aguilar's otherwise meritless Amended Complaint, has already been addressed in the *414 Kings Highway* forfeiture case, the court will not consider it again. As such, it must be dismissed because it fails to state a claim for which this court could grant further relief.

2. *Due Process*

In addition to his now-stale probable cause allegation about 414 Kings Highway, Aguilar claims in the Second Complaint that he was wrongfully denied a hearing prior to the seizure and sale of the other three properties. However, the constitutional right to a preseizure hearing in civil forfeiture proceedings was not recognized until 1993, two years after the seizure in this case. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that Fifth Amendment Due Process protections apply to civil forfeiture proceedings against real property). Even if such due process protections applied retroactively, Aguilar's challenge to the sale of the properties would lack merit because exigent circumstances required their interlocutory sale.

In civil forfeiture proceedings "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." *Id.* at 62, 114 S.Ct. at 505; *see also United States v. One Parcel Of Property Located At 194 Quaker Farms Rd.,* 85 F.3d 985, 988 (2d Cir.1996) ("[a]bsent exigent circumstances, a hearing, with notice to record owners, is held before seizure."). "To establish exigent circumstances, the Government must show that less restrictive measures—i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interest in preventing the sale,

destruction, or continued unlawful use of the real property." *Id.* at 62, 114 S.Ct. at 505.

 **\*5** Aguilar's properties addressed in the Second Complaint were seized because there was probable cause that each had been used to facilitate the offenses for which he was convicted. *See* 21 U.S.C. § 881(a)(7) (1999). This civil forfeiture statute authorizes interlocutory sale of seized properties by two methods, which are incorporated by reference into the statute. *See* 21 U.S.C. § 881(b) (authorizing seizure of property subject to civil forfeiture upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; 21 U.S.C. § 881(d) (authorizing seizure and summary sale governed by the customs laws codified in the Tariff Act of 1930, 19 U.S.C. §§ 1602–1619). Though the source of authority differs, the standards for sale under each are virtually indistinguishable.

Rule E(9)(b) of the Maritime Rules permits the interlocutory sale of seized property if such property

> is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is [sic] excessive or disproportionate, or if there is unreasonable delay in securing the release of property....

Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b). Section 1612(a) of the customs laws, by contrast, provides for seizure and summary sale whenever it appears that such property

> is liable to perish or to waste or to be greatly reduced in value by keeping, or that the expense of keeping the same is disproportionate to the value thereof....

19 U.S.C. § 1612(a) (1999).

Here, the Chief Deputy United States Marshal certified that the properties located at both 2030–32 Main St., Bridgeport (No. 5:90–cv–544), and 8 Drumlin Rd., Westport (No. 5:90–cv–545), were abandoned and therefore subject to vandalism,

deterioration and depreciation. *See* 2/20/91 Declaration in Support of Motion for Interlocutory Sale [Doc. Nos. 28 (5:90–cv–544), 31 (5:90–cv–545) ] at ¶¶ 4, 5. The marshal also certified that the mortgage obligations exceeded by over $ 1,000 per month the rental income of the 2034–38 Main St., Bridgeport (No. 5:90–cv–546), property, which was several months in arrears and had little or no equity. *See* 2/21/90 Declaration in Support of Motion for Interlocutory Sale [Doc. No. 27 (5:90–cv–546) ] at ¶ 4. This court found these reasons sufficiently exigent to order the interlocutory sales. *See* 8/1/90 Order for an Interlocutory Sale [Doc. Nos. 34 (5:90–cv–544), 50 (5:90–cv–545), 31 (5:90–cv–546) ]. Interlocutory sale was thus warranted under both Rule E(9)(b) and § 1612(a) because the two abandoned properties were liable to deteriorate or lose value and the mortgage liabilities of the rented property were disproportionate in comparison to its value. *Cf. United States v. Esposito,* 970 F.2d 1156, 1161 (2d Cir.1992) (vacating order of interlocutory sale of forfeited home where "there was no finding that t[he amount expended for maintenance and repairs] was excessive or disproportionate").

 **\*6** Aguilar's claim that he was wrongfully denied an opportunity to be heard prior to the sale of his properties is therefore not a cognizable due process challenge because the exigency of the properties' abandonment and disproportionate cost of upkeep required their interlocutory sale. Thus, sua sponte dismissal is warranted because Aguilar's due process claim fails to state a remediable cause of action.

3. *Other Claims*

The remainder of Aguilar's claims are frivolous and can be disposed of readily. To the extent Aguilar's claim invoking 19 U.S.C. § 1615 can be construed as challenging the constitutionality of shifting the burden to the claimant upon the government's showing of probable cause, the Second Circuit has "h[e]ld that it does not violate due process to place the burden of proving an innocent owner affirmative defense on the claimant." 194 Quaker Farms Rd., 85 F.3d at 987. In addition, the tort claims for false pretenses and conversion are not actionable as these are intentional torts to which the limited waiver of sovereign immunity of the Federal Tort Claims Act ("FTCA") is inapplicable. *See* 28 U.S.C. § 2680(h); *see also Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) ("the FTCA does not authorize suits for intentional torts based on the actions of Government prosecutors"). Furthermore, because the United States government is not a fiduciary and owes no associated duties to Aguilar, his breach of fiduciary duty allegation against the government fails to state a claim. Finally, Aguilar also fails to state a valid mail

fraud claim as that criminal code provision, 18 U.S.C. § 1341, may only be prosecuted by the government, not against it.

*Conclusion*

For the foregoing reasons, Aguilar's complaints [Nos. 3:99–mc–304 and 3:99–mc–408] are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) because they present frivolous allegations, none of which state a cognizable claim, and seek monetary relief from an immune defendant. Because the court cannot definitively rule out the possibility that amendment to the pleadings might result in an actionable claim, *see Gomez,* 171 F.3d at 796, these dismissals are made without prejudice and may be replead after the conclusion of the related forfeiture proceedings.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1067841

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 7351196
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Samantha C. MILNER-KOONCE, Plaintiff,

v.

ALBANY CITY SCHOOL
DISTRICT, et al., Defendants.

No. 1:21-CV-1271 (LEK/CFH)
|
Signed October 13, 2022

**Attorneys and Law Firms**

Samantha C. Milner-Koonce, 58 Kent Street, Albany, New York 12206, Plaintiff pro se.

**REPORT-RECOMMENDATION and ORDER**

Christian F. Hummel, United States Magistrate Judge

## I. Background

*\*1*  Plaintiff pro se Samantha C. Milner-Koonce ("plaintiff") commenced this action on November 29, 2021, with the filing a complaint and an application to proceed in forma pauperis ("IFP"). See Dkt. No. 1 ("Compl."); Dkt. No. 2. In a Report-Recommendation and Order dated May 12, 2022, the undersigned: (1) granted plaintiff's IFP application; (2) ordered that plaintiff's Americans with Disabilities Act ("ADA") retaliation claim and Family Medical Leave Act ("FMLA") claim against defendant Albany City School District ("School District") proceed; (3) recommended that plaintiff's claims against the School District for discrimination under the ADA, Equal Pay Act ("EPA"), Genetic Information Nondiscrimination Act ("GINA"), and Title VII, and state law intentional infliction of emotional distress claim be dismissed without prejudice and with leave to amend; and (4) recommended that the claims against defendant Honeywell Law Firm be dismissed with prejudice and without leave to amend. See Dkt. No. 5. Plaintiff filed objections to the Report-Recommendation and Order, see Dkt. No. 7, and on June 29, 2022, Senior District Judge Kahn adopted the Report-Recommendation and Order in its entirety. See Dkt. No. 9. Presently before the Court is plaintiff's amended complaint for review pursuant to 28 U.S.C. § 1915. See Dkt. No. 10 ("Am. Compl.").

## II. Initial Review of Amended Complaint

### A. Legal Standard

Section 1915 [1] of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

[1]   The language of 1915 suggests an intent to limit availability of IFP status to prison inmates. See 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. See, e.g., Fridman v. City of N.Y., 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

Where, as here, the plaintiff proceeds pro se, "the court must construe his [or her] submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). This does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds on which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se litigants are "not exempt ... from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

**\*2** Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought...." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 55 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too [ ] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). The Second Circuit has held that "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the

complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted). If dismissal is warranted and the plaintiff is pro se, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

### B. Plaintiff's Amended Complaint

Plaintiff's amended complaint is nearly identical to her original complaint, with the only cognizable differences being (1) she describes her disabilities and a workplace incident that resulted in her needing to take medical leave, and (2) she names individual defendants and does not explicitly name the School District as a defendant. See Am. Comp. at 2-7. In summary, plaintiff contends that Kaweeda Adams, the Superintendent of the School District; Lori McKenna, the "Assistant Superintendent of Middle School"; Matthew Petrin, a Human Resources Administrator; Andrea West, a Human Resources Assistant Administrator; and William Rivers, the Stephen and Harriet Myers Middle School Principal discriminated and retaliated against plaintiff because of her numerous disabilities and her use of medical leave. See id. at 2. Plaintiff asserts that on May 17, 2018, to separate students during a fight, plaintiff was forced to hold a door closed using her hands, back, buttocks, and left shoulder, hip, and foot. See id. at 3-4, ¶ 7. Plaintiff states that she suffers from anxiety, depression, a blood clot disorder, and shoulder, back, neck, and knee impairments. See id. at 4-7, ¶¶ 9-26. Plaintiff seeks "general damages," punitive damages, and payment for "all filing fees, services and or other fees associated with the filing of this claim." Id. at 40-41. Plaintiff asserts (1) discrimination, retaliation, and hostile work environment claims under the ADA; (2) a Title VII discrimination claim; (3) an FMLA claim; (4) a GINA claim; (5) discrimination, retaliation, and hostile work environment claims under the New York State Human Rights Law ("NYSHRL"); and (6) parallel claims under the New York City Human Rights Law ("NYCHR"). See id. at 1, 36. [2]

[2]    For a complete recitation of the facts, the undersigned incorporates by reference its May 12, 2022, Report-Recommendation and Order. See Dkt. No. 5 at 4-15. To the extent plaintiff's amended complaint contains additional allegations, they will

be addressed in the undersigned's analysis of the relevant claims.

**\*3** In plaintiff's list of defendants, she does not name "Albany City School District" and lists only the individual defendants. Am. Compl. at 2. However, plaintiff lists the individual defendants' addresses as the School District, she repleads factual allegations directly against the School District, and she seeks, in part, "[g]eneral damages, for the failure to act, intervene, and or regulate, the bullying, harassment, pain and suffering plaintiff endured during the 2020-2021 school year under the supervision of principal Rivers and at the hands of Albany City School District[.]" Id. at 40, ¶ 184 (emphasis omitted). Given the special solicitude afforded to pro se plaintiffs, the undersigned construes plaintiff's amended complaint against the five named individual defendants and the School District. As such, the Clerk of Court is ordered to reinstate the School District as a defendant on the docket.

## C. Analysis [3]

[3]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### 1. ADA Retaliation Claim and FMLA Claim against the School District

Following initial review of plaintiff's original complaint, Judge Khan adopted the undersigned's Report-Recommendation and Order and ordered that plaintiff's ADA retaliation claim and FMLA claim proceed. See Dkt. No. 9 at 12; see also Dkt. No 5 at 30. Plaintiff has sufficiently realleged the supporting facts for both claims in her amended complaint; therefore, the undersigned need not address those claims against the School District already permitted to proceed. The undersigned makes no determination on the merits of either claim.

### 2. Title VII Claim

Plaintiff states that "[t]his is a civil action seeking judgment, relief and/or damages brought pursuant to the Employment Discrimination Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for employment

discrimination based on national origin." Am. Compl. at 1, ¶ 1. As an initial matter, "individual defendants cannot be held personally liable under Title VII." Chauca v. Abraham, 841 F.3d 86, 89, n.1 (2d Cir.) (citation omitted), as amended (Nov. 8, 2016), certified question accepted, 68 N.E.3d 76 (2016), and certified question answered, 89 N.E.3d 475 (2017). As such, it is recommended that the purported Title VII claim against the individual defendants be dismissed with prejudice. See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004) (affirming the district court's dismissal of "Title VII claims against the individual defendants.").

As against the School District, "Title VII provides, in relevant part, that '[i]t shall be an unlawful employment practice for an employer' to take adverse action against an employee because of that employee's 'race, color, religion, sex, or national origin.' " Vill. of Freeport v. Barrella, 814 F.3d 594, 606 (2d Cir. 2016) (quoting 42 U.S.C. § 2000e-2(a)). "The Supreme Court has defined 'national origin' in this context to mean 'the country where a person was born, or, more broadly, the country from which his or her ancestors came.' " Shah v. Wilco Sys., Inc., 76 F. App'x 383, 385 (2d Cir. 2003) (summary order) (quoting Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973)) (affirming dismissal of Title VII claims where the plaintiff "conceded that her national origin is Indian, even though she is a naturalized American citizen. [The plaintiff] can, therefore, claim only national origin discrimination as an Indian, rather than as an American. Yet she alleges only discrimination against her as an American. Even if we were to look to whether [the defendant] perceived [the plaintiff] as being of American national origin, [the plaintiff] has not alleged that [the defendant] so perceived her.").

In her original complaint, plaintiff did not specify the protected class under which she was seeking to bring her Title VII claim. See generally Compl.; see also Dkt. No. 5 at 22-23. In her amended complaint, plaintiff specifies that she seeks to bring a claim under Title VII "for employment discrimination based on national origin." Am. Compl. at 1, ¶ 1. Plaintiff includes a header in her factual recitation titled, "Malfeasance, Misfeasance and Nonfeasance, Americans with Disability Act (ADA) – Title VII of the Civil Rights Act[.]" Id. at 34. Plaintiff does not, however, state what her national origin is. See generally Am. Compl; see Lee v. Sony BMG Music Ent., Inc., 557 F. Supp. 2d 418, 424 (S.D.N.Y. 2008) (dismissing "national origin-based discrimination claims brought under state, local and federal law" because the "[p]laintiff does not plead what her national

origin is, so the Court cannot assess whether plaintiff states a claim for national origin discrimination."); Sealy v. State Univ. of N.Y. At Stony Brook, 408 F. Supp. 3d 218, 224-25 (E.D.N.Y. 2019) (dismissing Title VII claim because the "[p]laintiff's [ ] complaint does not even include information identifying his national origin, or the nationality of those [the p]laintiff claims were treated more favorably than him."), aff'd, 834 F. App'x 611 (2d Cir. 2020) (summary order). Further, there are no allegations in plaintiff's amended complaint that indicate that the School District's actions were because of plaintiff's undefined national origin. See generally Am. Compl.; see Lebowitz v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 158, 176 (E.D.N.Y. 2017) (explaining that the "[p]laintiffs fail to plead any additional facts that would suggest that [the d]efendants placed [took adverse actions] because [a plaintiff] is Russian."). As such, it is recommended that any purported Title VII claim based on national origin be dismissed with prejudice.

### 3. GINA Claim

 **\*4** Under GINA, it is "an unlawful employment practice for an employer 'to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee.' " Welch v. Bio-Reference Lab'ys, Inc., No. 1:19-CV-846 (BKS/DJS), 2019 WL 4805533, at \*2 (N.D.N.Y. Oct. 1, 2019) (quoting 42 U.S.C. § 2000ff-1(a)(1)), report and recommendation adopted, 2019 WL 6134359 (N.D.N.Y. Nov. 19, 2019); see Dkt. No. 5 at 23-24. "Genetic information is defined as 'information about—(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual.' " Allen v. Verizon Wireless, No. 3:12-CV-482 (JCH), 2013 WL 2467923, at \*23 (D. Conn. June 6, 2013) (quoting 42 U.S.C. § 2000ff). "To state a claim under GINA, [the p]laintiff must allege '(1) that she was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from [the p]laintiff's genetic tests.' " Welch, 2019 WL 4805533, at \*2 (citations omitted).

As to the individual defendants, research has not revealed a case within the Second Circuit that has addressed individual liability under GINA. However, district courts in other circuits have explained that "[b]ecause GINA incorporates the

Title VII definition of 'employer,' ... GINA has also been held not to provide for individual liability." Kirkman v. Faurecia Emissions Control Techs., Inc., No. 1:19-CV-00069 (SNLJ), 2020 WL 1275618, at \*4 (E.D. Mo. Mar. 17, 2020) (collecting cases); see also Harrison v. City of Baton Rouge-Par. of E. Baton Rouge, No. 17-CV-487 (JWD/RLB), 2019 WL 1757553, at \*4 (M.D. La. Apr. 3, 2019) (footnote omitted) ("The [c]ourt recommends that all of [the p]laintiff's claims against the individual Directors of the City [d]efendants be dismissed with prejudice as there is no individual liability under any of the remaining federal statutes (GINA, Title VII, and the ADA)."), report and recommendation adopted, 2019 WL 1756534 (M.D. La. Apr. 19, 2019). The undersigned agrees that because GINA adopts Title VII's definition of "employer" and there is no individual liability under Title VII, there is no individual liability under GINA. See 42 U.S.C. § 2000ff(2)(B)(i) ("The term "employer" means--(i) an employer (as defined in section 2000e(b) of this title)"); 42 U.S.C. § 2000e(b) (Title VII's definition of employer). Thus, the undersigned recommends dismissing plaintiff's GINA claim against the individual defendants with prejudice.

Plaintiff contends that "Ms. West was aware of plaintiff's grandson being diagnosed with ADHD, Impulse Disorder, a Learning Disability, Anxiety and Depression (Special needs she stated) she assumed plaintiff as well could possibly be genetically challenged or have 'special needs'." Am. Compl. at 40, ¶ 185. Plaintiff states that Ms. West asked plaintiff is she knew what "intermittent meant. Plaintiff was taken aback and went silent for a brief moment as she was shocked at Ms. West question. Plaintiff felt Ms. West was challenging her intelligence as did Mr. Rivers." Id. at ¶ 186. Plaintiff asserts that "Ms. West also knows plaintiff holds a General Equivalency Diploma instead of a high school diploma. Once again Ms. West played with the knowledge[ ] she possessed to play upon plaintiff[']s[ ] intelligence just as she did when she made [plaintiff] believe she was concerned about her comfortability." Id. at ¶ 187.

"[E]vidence of a family member's disease diagnosis is only considered 'genetic information' if used to determine the likelihood of disease in another individual." Allen, 2013 WL 2467923, at \*23. "It is not considered 'genetic information' if it 'is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual.' " Id. (quoting Poore v. Peterbilt of Bristol, LLC, 852 F. Supp. 2d 727, 731 (W.D. Va. 2012) (determining that the plaintiff's "Complaint fails to state a violation of GINA because ... there

is no allegation that [the defendant] used [the plaintiff's] wife's diagnosis to forecast the tendency of any other individual to contract multiple sclerosis....")). "For discrimination based on family medical history to violate GINA, the family medical condition must have a genetic predisposition and the employer must have believed that the medical information at issue had a genetic basis." Baum v. Dunmire Prop. Mgmt., Inc., No. 21-CV-00964 (CMA/NYW), 2022 WL 889097, at *7 (D. Colo. Mar. 25, 2022); see also Tedesco v. Pearson Educ., Inc., No. 21-CV-199, 2021 WL 2291148, at *6 (E.D. La. June 4, 2021) (dismissing GINA claim because the plaintiff did not allege that the purported "disease at issue," suicide, "had a genetic cause.").

**\*5** Plaintiff fails to state a claim for relief under GINA because (1) there is no allegation or indication that plaintiff's grandson's ADHD, learning disability, anxiety, or depression are genetic; (2) there is no support in the Amended Complaint for plaintiff's assertion that Ms. West "assumed plaintiff as well could possibly be genetically challenged"; and (3) there is no allegation that the School District took actions against plaintiff because of genetic information. Am. Compl. at 40, ¶ 185; see also Iwaniszek v. Pride Transp., Inc., No. 2:17-CV-02918 (JCM/BNW), 2021 WL 634991, at *6 (D. Nev. Feb. 17, 2021) ("[The] plaintiff alleges no facts showing that he was discriminated against based on his or his family's genetic tests or diseases that run in his family. He does not explain how any discriminatory conduct is related to his genetic information."). As such, the undersigned recommends dismissing plaintiff's GINA claim against the School District with prejudice.

### 4. ADA Claims against Individual Defendants

The Second Circuit has not explicitly addressed whether there is individual liability under Title I of the ADA. See Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc., 531 F. Supp. 3d 522, 535 (N.D.N.Y. 2021) ("Although the Circuit has been less forthcoming about individual liability under the ADA, at the least it has held that its retaliation provision borrows from Title VII to such an extent that individual liability is also unavailable to retaliation claims.") (citing Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010) (holding that the "retaliation provision of the ADA ... cannot provide for individual liability")). However, "[b]ased on the Second Circuit's guidance thus far, district courts under its supervision have routinely held that there is no individual liability at all under the ADA[.]" Sears-Barnett, 531 F. Supp.

3d at 535; see also Arcuri v. Schoch, No. 6:15-CV-0798 (DNH/TWD), 2015 WL 5652336, at *5 (N.D.N.Y. Sept. 24, 2015) (collecting cases) ("Although the Second Circuit has yet to explicitly address [the issue], many district courts in this circuit, as well as other circuit courts, have held that individual defendants may not be held personally liable for alleged violations of Title I of the ADA."). As the Second Circuit has not stated otherwise and in line with the district courts concluding as such, the undersigned recommends dismissing the purported ADA claims against the individual defendants as there is no individual liability under the ADA. See Stanford v. N.Y.S. Off. of Child. & Fam. Servs., No. 1:17-CV-1000 (MAD/CFH), 2017 WL 10299121, at *5 (N.D.N.Y. Oct. 24, 2017) ("[I]nsofar as plaintiff seeks to bring ADA claims against the individual defendants, it is recommended that all such claims be dismissed with prejudice."), report and recommendation adopted, 2018 WL 3031844 (N.D.N.Y. June 19, 2018); Gandhi v. NYS Unified Ct. Sys., No. 1:20-CV-120 (LEK/DJS), 2020 WL 1169355, at *3 (N.D.N.Y. Mar. 11, 2020) ("[T]he Court recommends that [the p]laintiff's claim under the ADA against the individual [d]efendants be dismissed because individuals are not subject to liability under Title I of the ADA."), report and recommendation adopted, 2020 WL 2124140 (N.D.N.Y. May 5, 2020).

### 5. FMLA Claim against Individual Defendants

"Section 2615(a)(1) of the FMLA states that '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.' " Potenza v. City of N.Y., 365 F.3d 165, 167 (2d Cir. 2004) (quoting 29 U.S.C. § 2615(a)(1)).

The regulations promulgated pursuant to the FMLA explain that " '[i]nterfering' with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," and that "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."

**\*6** Id. (quoting 29 C.F.R. § 825.220(b), (c)) (alterations in original). "An individual may be held liable under the FMLA only if [he or] she is an 'employer,' which is defined as encompassing 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer[.]' " Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 422 (2d Cir. 2016) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I); citing 29 C.F.R. § 825.104(d)). The inquiry

is "whether the alleged employer possessed the power to control the worker in question, with an eye to the economic reality presented by the facts of each case." Id. (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)). To answer this inquiry, the Court should "consider a nonexclusive and overlapping set of factors intended to encompass the totality of circumstances,": "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (citation omitted). "No one of the four factors standing alone is dispositive ... and any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." Id. at 422-23 (citation omitted). "In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer 'controlled in whole or in part [the] plaintiff's rights under the FMLA.' " Id. at 423 (citation omitted).

"Under these principles, individual liability is not limited to those who grant or deny a leave but may extend to those who participate in retaliation for the exercise of FMLA benefits." Ziccarelli v. NYU Hosps. Ctr., No. 15-CV-9307 (JGK), 2021 WL 797668, at *8 (S.D.N.Y. Feb. 27, 2021) (collecting cases) (determining that two defendants were "employers" under the FMLA because one individual "updated" the plaintiff "on the status of his leave" and "the crux of his FMLA interference claim is that because of" the defendants' actions, the plaintiff "was compelled to cut his first leave short[ ]" and the two defendants were "involved in [the plaintiff's] review and testified to the meaningful role she played in the reorganization of the [ ] department"; but an individual who had a single act of supervision by "assign[ing the plaintiff] one difficult task and, when he failed to perform, she reported it to" the other two defendants, "and directed them to note this on his record[ ]" was not an "employer"); cf. Sutter v. Dibello, No. 18-CV-817(SJF/AKT), 2021 WL 930459, at *17 (E.D.N.Y. Mar. 10, 2021) (quoting Smith v. Westchester Cnty., 769 F. Supp. 2d 448, 475-76 (S.D.N.Y. 2011) ("Since 'the economic reality test is a factual inquiry that does not bear on the sufficiency of pleadings, ... to survive a motion to dismiss, [the p]laintiff need not allege sufficient facts to satisfy the economic reality test; instead, he must simply plead that the proposed Individual Defendants had substantial control over the aspects of employment alleged to have been violated.' ")).

**a. Defendants Adams, McKenna, and Petrin**

Ms. Adams is the Superintendent for the School District, Ms. McKenna is the "Assistant Superintendent of Middle School," and Mr. Petrin is the Human Resources Administrator. Am. Compl. at 2, ¶ 3. Plaintiff's allegations concerning Ms. Adams consist solely of her contention that Mr. Rivers stated he was going to submit his "Counseling Memorandum" to Ms. Adams and plaintiff emailed her response to the memorandum, by "CC", to Ms. Adams. Id. at 27, ¶ 109; 28, ¶ 117; 35, ¶ 151. As to Ms. McKenna, Mr. Rivers and plaintiff e-mailed, by "CC", Ms. McKenna concerning the "Counseling Memorandum" and response, and Mr. Rivers stated that he was going to formally submit his memorandum to her. See id. at 27, ¶ 109; 28, ¶ 117. There are no other factual allegations concerning either individual that indicates that they had any control over plaintiff's leave requests, work duties, pay, or transfer. See generally Am. Compl. As such, it is recommended that plaintiff's FMLA claims against individual defendants Adams and McKenna be dismissed without prejudice.

As to Mr. Petrin, in November 2020, plaintiff complained to Ms. West that she received medical leave information to her e-mail and stated that she was only supported to receive that information via U.S Postal mail. See Am. Compl. at 11, ¶ 44. Plaintiff e-mailed her complaint to Mr. Petrin, via "CC". See id. Plaintiff also states that on January 22, 2021, she spoke to Mr. Rivers about whether her increase in job responsibilities was accompanied with a pay raise, and he stated that it was "an HR issue[.]" Id. at 9-10, ¶ 39. In her e-mailed response to Mr. Rivers' "Counseling Memorandum," on April 5, 2021, plaintiff recited her recollection from the January meeting: Mr. Rivers told plaintiff to reach out to Mr. Petrin if she wanted to discuss a raise and she advised Mr. Rivers that she would reach out to Mr. Petrin. Id. at 27, ¶ 109; 31, ¶ 132. Mr. Rivers and plaintiff also e-mailed, via "CC", Mr. Petrin their respective "Counseling Memorandum" and response. See id. at 27, ¶ 109; 34, ¶ 151. Mr. Rivers also stated that he was going to submit the memorandum to Mr. Petrin. See id. at 28, ¶ 117.

**\*7** Plaintiff has not alleged that Mr. Petrin had any control over the aspects of her employment that she contends were violated such as her pay, work responsibilities, requests for medical leave, or transfer. See generally Am. Compl.; see also Sutter, 2021 WL 930459, at *17. As such, the undersigned recommends dismissing the purported FMLA claim against individual defendant Petrin without prejudice.

### b. Defendants West and Rivers

As to individual defendants West and Rivers, plaintiff has sufficiently plead their control over her conditions of employment such that the undersigned recommends allowing the FMLA claim against them to proceed. Plaintiff states that Ms. West is the Human Resource Assistant Administrator and Mr. Rivers is the Stephen and Myers Middle School Principal. See Am. Compl. at 2, ¶ 3. Plaintiff alleges that Ms. West communicated when plaintiff's leave requests were granted or denied; "provided plaintiff with a lecture, performance expectations and then proceeded to inform plaintiff of her being paid" for specific days; sent to plaintiff a list of work expectations; informed plaintiff when her leave had run out and that she was not allowed to take leave intermittently; and discussed plaintiff's transfer possibilities. Id. at 11, ¶¶ 42-44, 46; 13, ¶ 52; 17-18, ¶¶ 74-75; 36-37; ¶¶ 159-64. As to Mr. Rivers, plaintiff contends that he signed her out of the online time management system for a workday; he provided her lists of job expectations; he informed her of when she was out of available medical leave; and he told her that all concerns regarding medical leave and requests to leave work early should go through him and the administration. See id. at 12, ¶ 48; 16, ¶ 67, 26, ¶ 107; 28, ¶ 116. At this early stage, the undersigned concludes that these allegations are sufficient to establish individual liability and recommends allowing the FMLA claim to proceed against defendants West and Rivers.

### 6. NYCHRL Claims

New York City Human Rights Law makes it "an unlawful discriminatory practice [ ] [f]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status of any person" "[t]o refuse to hire or employ or to bar or to discharge from employment such person" or "[t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C., N.Y., Code § 8-107(a)(2)-(3). "To state a claim under the NYCHRL, the [p]laintiff must allege that the [d]efendant discriminated against her 'within the boundaries of New York City'." Robles v. Cox & Co., 841 F. Supp. 2d 615, 623 (E.D.N.Y. 2012) (quoting Shah v. Wilco Sys., Inc., 806 N.Y.S.2d 553, 558 (1st Dep't 2005))

(citing Fried v. LVI Servs., Inc., No. 10-CV-9308, 2011 WL 4633985, at *12 (S.D.N.Y. Oct. 4, 2011) ("The NYCHRL expressly limits the applicability of its protections to acts that occur within the boundaries of New York City.")). "[T]o determine the location of the discrimination under the NYCHRL, courts look to the location of the impact of the offensive conduct." Curto v. Med. World Commc'ns, Inc., 388 F. Supp. 2d 101, 109 (E.D.N.Y. 2005); see also Kraiem v. JonesTrading Institutional Servs. LLC., 492 F. Supp. 3d 184, 200 (S.D.N.Y. 2020) (citation and quotation marks omitted) (dismissing NYCHRL claims where the alleged conduct did not occur "among those who work in the city.").

**\*8** There are no allegations in plaintiff's amended complaint concerning New York City. See generally Am. Compl. As such, the undersigned recommends dismissing plaintiff's purported NYCHRL claims with prejudice.

### 7. Supplemental Jurisdiction Over the NYSHRL Claims

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); see Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004) (citation and quotation marks omitted) ("A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative facts."). A court "may decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of State law," "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction," "the district court has dismissed all claims over which it has original jurisdiction," "or [ ] in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). "When deciding whether to exercise supplemental jurisdiction over a claim, a district court should 'consider and weigh ... the values of judicial economy, convenience, fairness, and comity.' " Langella v. Mahopac Cent. Sch. Dist., No. 18-CV-10023 (NSR), 2020 WL 2836760, at *14 (S.D.N.Y. May 31, 2020) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

Plaintiff's NYSHRL claims arise from the same set of facts as her ADA and FMLA claims. See generally Am. Compl.

Judicial economy, convenience, fairness, and comity weigh in favor of the Court exercising supplemental jurisdiction as plaintiff's FMLA, ADA, and NYSHRL claims apply similar, if not identical, standards. See Langella, 2020 WL 2836760, at *14 ("As it relates to [the p]laintiff's NYSHRL claims, the standards between the ADA, ADEA, RA, and NYSHRL are virtually identical (as discussed below) and would be applied to the same set of facts. Moreover, because the standards are identical, deciding the NYSHRL claims would not require an investment of additional judicial resources, and there would be no comity issues triggered.") (citing Oliver v. N.Y.S. Police, No. 1:19-CV-233 (BKS/DJS), 2020 WL 1849484, at *10 (N.D.N.Y. Apr. 13, 2020) ("However, where, as here, the 'standards of liability are identical under [federal law] and the NYSHRL[,] deciding the state-law claims does not require the investment of additional judicial resources,' and there is no 'substantial comity concern raised by this Court's application of state law with which courts in this District are eminently familiar,' the Court concludes 'the values of judicial economy, convenience, fairness, and comity,' support the exercise of supplemental jurisdiction over [the p]laintiff's NYSHRL claims.")). The undersigned is recommending that plaintiff's ADA and FMLA claims be permitted to proceed; thus, the undersigned also recommends that the Court exercise supplemental jurisdiction over the NYSHRL claims that are sufficient to survive initial review.

### 8. ADA and NYSHRL Claims against the School District

#### a. Discrimination

 *9  "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004). Thus, the undersigned will address the claims in tandem. See, e.g., Novick v. Vill. of Wappingers Falls, N.Y., 376 F. Supp. 3d 318, 341-42 (S.D.N.Y. 2019). Plaintiff states that defendants "[d]id not accommodate my disability[,]" "[p]rovided me with terms and conditions of employment different from those of similar employees[,]" and "[h]arassed me or created a hostile work environment[.]" Am. Compl. at 2, ¶ 5.

#### b. Unequal Terms and Conditions of Employment

"To establish a prima facie case of discrimination based upon unequal terms and conditions of employment, a plaintiff must show that:" "(a) the employer is subject to the ADA; (b) she suffers from a disability within the meaning of the ADA; (c) there was an inference of discrimination; and (d) she suffered a materially adverse change in the terms or conditions of her employment." Johnson v. City of N.Y. 326 F. Supp. 2d 364, 368 (E.D.N.Y. 2004). "To be materially adverse[,] a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)), abrogated on other grounds as recognized in Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 43-44 (2d Cir. 2019). " 'A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " Id. (quoting Crady, 993 F.2d at 136).

"Increased responsibilities and excessive scrutiny, without more, do not constitute an adverse employment action." Workneh v. Pall Corp., 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012) (citing Dauer v. Verizon Commc'ns Inc., 613 F. Supp. 2d 446, 461 (S.D.N.Y. 2009) (observing that "[c]ourts in this circuit have found that reprimands ... and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation")). "Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." Hall v. N.Y.C. DOT, 701 F. Supp. 2d 318, 336 (E.D.N.Y. 2010) (internal quotations and citation omitted).

Further, "an involuntary transfer may constitute an adverse employment action if the plaintiff 'show[s] that the transfer created a materially significant disadvantage' with respect to the terms of her employment." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (citation omitted). However, "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action[.]" Id. (citation omitted). "[T]he Second Circuit has held that an inference of discrimination may be drawn either

from (1) direct evidence of discriminatory intent, or (2) a showing by the plaintiff that [she] was subjected to disparate treatment ... [compared to persons] similarly situated in all material respects to ... [herself]." Fox v. State Univ. of N.Y., 686 F. Supp. 2d 225, 230 (E.D.N.Y. 2010) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).

*10 Plaintiff's amended complaint alleges a claim for unequal terms and conditions of employment sufficient to survive initial review. See generally Am. Compl. Plaintiff alleges that she has multiple impairments—anxiety, depression, blood clotting disorder, and injuries to her neck, low back, left shoulder, hips, and knees—that impact her ability to walk, run, jump, sit, stand, concentrate, and remain calm. See Am. Compl. at 4-7, ¶¶ 9-26. Her allegations are sufficient to establish a disability under the ADA. See Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam) (footnote omitted) ("The ADA defines 'disability' to include, among other things, 'a physical or mental impairment that substantially limits one or more major life activities.' "). Plaintiff's contends that because of plaintiff's use of medical leave and leaving work early because of pain from her disabilities, she was denied intermittent leave, signed out of work by Mr. Rivers, was not paid for her increase in job responsibilities, was required to submit a daily list of the job assignments she completed, her desk was relocated, her belongings were moved, her name was removed from her mailbox, and she was eventually forced to transfer job locations and work different hours. See id. at 9-10, ¶¶ 38-39, 12, ¶ 48; 15, ¶¶ 61-63; 18, ¶ 73; 25, ¶ 102. Plaintiff asserts that Mr. Rivers threatened her in the March 24, 2021, meeting and in the Counseling Memorandum. See Am. Compl. at 26, ¶ 106; 28, ¶¶ 116-17. Plaintiff also asserts that she was transferred from Myers Middle School to "NSES" and "Thomas Obrien Academy of Science and Technology aka Toast." Am. Compl. at 37, ¶ 160. Plaintiff asserts that she needed a ten-month position instead of a twelve-month position to care for her grandson over the summer and the only ten-month positions were "NSES" and Delaware Elementary School. Id. At this early stage, this is sufficient to allege a materially adverse change to the conditions and terms of her employment.

Plaintiff does not allege direct discrimination—that anyone ever made inappropriate comments concerning a disability. See generally Am. Compl. However, plaintiff alleges that she was treated differently, supervised, scrutinized, her job was threatened, and she was transferred because of her use of medical leave. See Chisholm v. Stryker, No. 22-CV-2705 (JMA/SIL), 2022 WL 3647288, at *3 (E.D.N.Y. Aug. 24, 2022) (collecting cases) ("Courts in this Circuit have routinely dismissed discrimination claims where the plaintiff's allegations ... fail to suggest discriminatory intent."). But see Morris v. City of N.Y., 153 F. Supp. 2d 494, 504 (S.D.N.Y. 2001) ("Given [the] defendants' overt references to [the] plaintiff's sick record, evidence of [the] defendants' knowledge that [the] plaintiff's sick days were closely related to his disability, the fact that one of [the] plaintiff's two disciplinary charges was more than eight years old at the time of the promotion decision, and the record as a whole, a jury might reasonably infer that [the] defendants' decision not to promote [the] plaintiff was motivated, at least in part, by discrimination on the basis of a record of disability."). As this early stage, this is sufficient to state a claim for disability discrimination. Thus, it is recommended that the claim be permitted to proceed.

### c. Failure to Accommodate

Under the ADA and NYSHRL, to establish a failure to accommodate claim, plaintiff

> must show that: "(1) [s]he is a person with a disability under the meaning of the ADA [or the NYSHRL]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

Berger v. N.Y.C. Police Dep't, 304 F. Supp. 3d 360, 368-69 (S.D.N.Y. 2018) (quoting Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir. 2015)).

Plaintiff's amended complaint has alleged a failure to accommodate claim sufficient to survive initial review. Plaintiff sufficiently alleges a disability. See supra at 22. The School District had notice of plaintiff's requests for leave as alleged through her use of medical leave and the School District "direct[ing], request[ing], and pa[ying] for" two independent medical examinations of plaintiff. Am. Compl. at 5, ¶ 21; 7, ¶ 25. Plaintiff asserts that she sought a reasonable accommodation through her requests for "intermittent leave" to attend physical therapy. Id. at 13-14, ¶ 55; see Vangas v. Montefiore Med. Ctr., 6 F. Supp. 3d 400, 414 (S.D.N.Y. 2014) ("[A] reasonable allowance of time for medical leave may, in appropriate circumstances, constitute a reasonable accommodation...."). Plaintiff alleges that she was informed that "the requested leave could not be taken intermittently."

Am. Compl. at 13, ¶ 54. This is sufficient to state a claim for failure to accommodate but the undersigned makes no determination as to the success of the claim on the merits.

### d. Hostile Work Environment

**\*11** "To prevail on a hostile work environment claim, [the plaintiff] must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) (quoting Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)). "A plaintiff alleging a hostile work environment claim under the ADA [ ] 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.' " Id. (quoting Alfano, 294 F.3d at 373). The Court should "look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.' " Id. (alterations in original) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Where ... a co-worker, as opposed to a supervisor or manager, harasses the plaintiff, the "employer is directly liable for [the] employee's unlawful harassment if the employer was negligent with respect to the offensive behavior [,]" Vance v. Ball State Univ., 570 U.S. 421, 427 (2013), i.e., "if the employer failed to provide a reasonable avenue for complaint or failed to take appropriate remedial action" about harassment of which it knew, or in the exercise of reasonable care should have known. Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (quotations and citation omitted).

Haggod v. Rubin & Rothman, LLC, No. 14-CV-34L (SJF/AKT), 2014 WL 6473527, at \*21 (E.D.N.Y. Nov. 17, 2014) (internal citation omitted). "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." Id. (citation omitted).

To state hostile work environment claim under the ADA, "[t]he plaintiff must also allege facts suggesting that the harassing conduct was motivated by animus directed at his disability." Hendrix v. Pactiv LLC, 488 F. Supp. 3d 43, 53 (W.D.N.Y. 2020) (quoting Zako v. Encompass Digital Media, Inc., No. 19-CV-844, 2020 WL 3542323, at \*13 (D. Conn. June 30, 2020)); see also Sosa v. N.Y.C. Dep't of Educ., 368 F. Supp. 3d 489, 525 (E.D.N.Y. 2019) ("The problems with [the plaintiff's complaint] ... imperil her disability hostile work environment claim. [The plaintiff] has failed to allege that the abusive incidents were because of any disability that she had. This claim, therefore, must be dismissed."); Gonzalez v. City of N.Y., 377 F. Supp. 3d 273, 298 (S.D.N.Y. 2019) ("[T]he conduct that [the plaintiff] alleges in support of his hostile work environment claim—whether considered in isolation or in the aggregate—does not meet the requisite standard. According to the complaint, [the defendant] failed to grant [the plaintiff's] leave and sent him e-mails frequently.... That [the plaintiff] got emails from his boss and did not get all of the leave he requested do not suggest the kind of trauma against which a hostile work environment claim guards.").

At this early stage, plaintiff has alleged facts concerning a hostile work environment sufficient to survive initial review. Plaintiff contends that Ms. Kristy Koldis asked plaintiff to do work that plaintiff was not supposed to do and "ridiculed plaintiff for not moving fast enough." Am. Compl. at 25, ¶100. She asserts that Mr. Rivers did not intervene upon receipt of Ms. Koldis' e-mails to plaintiff. See id. at ¶ 101. There are no allegations that Ms. Koldis' actions had any relation to plaintiff's disabilities. However, plaintiff also alleges that she was not permitted to take intermittent leave; when she returned from one stint of medical leave, her desk was changed, her belongings were missing, and her name was taken off of her mailbox; plaintiff was required to e-mail a list of the tasks she accomplished in a workday; plaintiff was sent lists of tasks to accomplish; plaintiff was required to fill out Covid-19 forms through her e-mail and told she could not complete a written form; Mr. Rivers "accused [plaintiff] of abusing time"; plaintiff would call the office and no one would answer or the phone would ring for a long time before anyone would answer; Mr. Rivers complained of plaintiff's time usage in the "Counseling Memorandum" that was sent to other individuals; and Mr. Rivers stated that plaintiff "created a 'constant disruptive, uncomfortable, and inefficient work environment.' " Id. at 13-14, ¶¶ 55-56, 14-15, ¶¶ 57-63, 18, ¶ 73; 19, ¶ 82; 21, ¶ 87-88; 25, ¶ 102-103; 26, ¶ 107; 27, ¶ 110, 113.

 **\*12**  These allegations are sufficient for purposes of initial screening to state a hostile work environment claim based on plaintiff's disability; thus, the undersigned recommends that the claim be permitted to proceed. However, the undersigned makes no determination as to whether the claim would survive a properly supported dispositive motion.

### 9. New York State Human Rights Law Claims

#### a. Harassment against the School District

The NYSHRL prohibits an employer from "subject[ing] any individual to harassment because of an individual's [ ] race, creed, color, national origin, ... disability, [or] predisposing genetic characteristics, ... regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims." N.Y. Exec. Law § 296(1)(h). "Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories.... Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared." Id.

Under this "more liberal standard" for hostile work environment claims, plaintiff has alleged sufficient information to survive initial review. Weekes v. JetBlue Airways Corp., No. 21-CV-1965 (MKB), 2022 WL 4291371, at *13 (E.D.N.Y. Sept. 16, 2022) (concluding that the plaintiff sufficiently alleged a hostile work environment claim under the NYSHRL where he "alleges[d] that [the d]efendants 'creat[ed] a hostile work environment' because of his requests for accommodation for his disability and that [the defendants], among others, treated him less well by ignoring his complaints and requests for accommodation."). As such, the undersigned recommends allowing plaintiff's hostile work environment claim under the NYSHRL to proceed.

#### b. Retaliation against the School District

Retaliation claims under the NYSHRL are governed by the same standard as ADA retaliation claims. See Cornetta v. Town of Highlands, 434 F. Supp. 3d 171, 185 (S.D.N.Y. 2020) (citations and quotation marks omitted) (citations omitted) ("The ADA prohibits employers from discriminat[ing]

against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. The NYSHRL contains a similar provision against retaliation, and is governed by the same standard[.]"). Therefore, for the same reasons stated in the undersigned's May 12, 2022, Report-Recommendation and Order, which ordered plaintiff's ADA retaliation claim to proceed, the undersigned recommends that plaintiff's NYSHRL retaliation claim against the School District be permitted to proceed. See Dkt. No. 5 at 19-20; see also Brizzi v. Utica Mut. Ins. Co., 529 F. Supp. 3d 44, 56-57 (E.D.N.Y. 2021) (affirming and dismissing certain NYSHRL claims based on the court's determination concerning the parallel ADA claims).

#### c. Individual Defendants Discrimination, Hostile Work Environment, and Retaliation

Unlike the ADA, "[t]he NYSHRL provides for personal liability as long as the conduct that gave rise to the claim involved direct participation from the individual defendant." Malcolm v. Rochester City Sch. Dist., 388 F. Supp. 3d 257, 263 (W.D.N.Y. 2019), aff'd, 828 F. App'x 810 (2d Cir. 2020) (summary order). "Under the NYSHRL, an individual can be liable where the defendant (i) is considered an 'employer,' or (ii) aided and abetted the unlawful discriminatory acts of others[.]" Livingston v. City of N.Y., 563 F. Supp. 3d 201, 256 (S.D.N.Y. 2021) (quoting N.Y. Exec. Law § 296(6)). "An individual defendant may be liable as an 'employer' under the NYSHRL 'when that individual has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others,' i.e., the power to hire or fire." Id. (quoting Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 57 (2d Cir. 2012)). "As to [a] discrimination claim, '[a] supervisor's failure to take adequate remedial measures' in response to a complaint of discrimination has been deemed 'actual participation' under NYSHRL § 296(6)." Imperato v. Otsego Cnty. Sheriff's Dep't, No. 3:13-CV-1594 (BKS/DEP), 2016 WL 1466545, at *28 (N.D.N.Y. Apr. 14, 2016) (quoting Parra v. City of White Plains, 48 F. Supp. 3d 542, 555 (S.D.N.Y. 2014)).

 **\*13**  Under a theory of aiding and abetting, "it is unlawful 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or to attempt to do so.' " Livingston, 563 F. Supp. 3d at 256

(quoting N.Y. Exec. Law § 296(6)). "The Second Circuit has held that 'this language allow[s] a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff.' " Id. (alteration in original) (quoting Feingold v. N.Y., 366 F.3d 138, 158 (2d Cir. 2004)). "[A] plaintiff may succeed in a claim under the NYSHRL by showing the employer entity's having encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps 'circular[ly]', proves individual liability under the aiding and abetting provision of Section 296(6)." Johnson v. Cnty. of Nassau, 82 F. Supp. 3d 533, 536 (E.D.N.Y. 2015); see Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys., 588 F. Supp. 2d 419, 426-27 (E.D.N.Y. 2008) (acknowledging that this theory of liability "creates a strange and confusing circularity where the person who has directly perpetrated the [unlawful discrimination] only becomes liable through the employer whose liability in turn hinges on the conduct of the direct perpetrator").

### i. Defendants Adams, McKenna, and Petrin

There are no allegations in plaintiff's amended complaint concerning Ms. Adams, Ms. McKenna, or Mr. Petrin having the authority to hire or fire plaintiff, participating in the discriminatory or retaliatory conduct, or failing to take adequate remedial measures. See generally Am. Compl. Plaintiff asserts that they were each aware of defendant Rivers' "Counseling Memorandum" and plaintiff's response, but this is insufficient to allege that they participated in the conduct or failed to act on it. See id. at 27, ¶ 109; 35, ¶ 151. Plaintiff also contends that in her " 'Agreement' between Albany Public School United Employees and the Albany Public School District Dated July 1, 2015 – June 30, 2020" and "July 1, 2020 – June 30, 2024" " '[a]ny member who is being considered for a transfer initiated by the District may request an appointment with the Superintendent, or his/her designee, to discuss the matter prior to a final determination.' Plaintiff was never afforded this opportunity as the contract/agreement states she was entitled to." Id. at 36, ¶¶ 157-158. Plaintiff does not allege that the agreement gave Ms. Adams, the superintendent, any authority over plaintiff's transfer or that she was required, but failed, to intervene in the allegedly discriminatory or retaliatory conduct. See generally Am. Compl. As the amended complaint does not allege that Ms. Adams, Ms. McKenna, or Mr. Petrin had the authority

to hire or fire plaintiff, directly participated in the allegedly discriminatory or retaliatory conduct, or that they had the authority to intervene and failed to do so, it is recommended that the NYSHRL claims against them be dismissed without prejudice.

### ii. West and Rivers

Plaintiff does not allege that either Ms. West or Mr. Rivers had the authority to hire or fire plaintiff. See generally Am. Compl. As such, it is unlikely that they could be held directly liable under the NYSHRL. See Schaper v. Bronx Lebanon Hosp. Ctr., 408 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) (explaining that "[a]lthough [the d]efendant [ ] was [the p]laintiff's direct supervisor, her title is not sufficient to impose individual liability under the NYSHRL.... [The defendant] did not have the authority to hire or fire employees. Instead, she simply could make hiring and firing recommendations."). However, plaintiff has sufficiently alleged Ms. West's and Mr. River's participation in the conduct that gives rise to plaintiff's discrimination and retaliation claims. See Williams v. PMA Companies, Inc., (citation omitted) 564 F. Supp. 3d 32, 57 (N.D.N.Y. 2021) ("[A] coworker who 'lacks the authority to either hire or fire the plaintiff may still be held liable as an aider-abettor under NYSHRL § 296(6) if he actually participates in the conduct giving rise to a discrimination claim.' "). As such, the undersigned recommends permitting the NYSHRL claims to proceed against individual defendants Rivers and West. The undersigned makes no determination as to the merits of the claims.

### III. Leave to Amend

**\*14** "A *pro se* complaint should not be dismissed 'without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " Bennett v. Mnuchin, No. 6:20-CV-243 (BKS/TWD), 2020 WL 1674068, at *1 (N.D.N.Y. Apr. 6, 2020) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)), report and recommendation adopted, 2020 WL 3046046 (N.D.N.Y. June 8, 2020), reconsideration denied, 2020 WL 4432662 (N.D.N.Y. July 31, 2020). "[G]ranting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend h[er] pleading. Moreover, an opportunity to amend should be denied where 'the problem ... is substantive

such that [b]etter pleading will not cure it.' " Abascal v. Hilton, No. 9:04-CV-1401(LEK/GHL), 2008 WL 268366, at *8 (N.D.N.Y. Jan. 30, 2008) (footnotes and quotation marks omitted), aff'd sub nom. Abascal v. Jarkos, 357 F. App'x 388 (2d Cir. 2009) (summary order).

Plaintiff was afforded an opportunity to amend her original complaint. See Dkt. No. 9 at 12. Plaintiff names new defendants in her amended complaint and raises new state law claims. See Am. Compl. at 1-2. Affording plaintiff the "special solicitude" that is given to pro se plaintiff's, the undersigned recommends providing plaintiff an opportunity to amend her amended complaint as it relates to her FMLA and NYSHRL claims against individual defendants Adams, McKenna, and Petrin. However, as to her NYCHRL claims, plaintiff did not include in her original or amended complaints any allegations that relate, or even suggest a relation, to New York City. See generally Compl.; Am. Compl. As such, the undersigned recommends denying leave to amend any purported NYCHRL claims. Additionally, as to her Title VII and GINA claims against the School District, plaintiff was afforded an opportunity to amend her complaint and she has failed to plead facts that plausibly allege a violation of either statute. Thus, it is recommended that she not be afforded an additional opportunity to amend.

Should the District Judge adopt this Report-Recommendation and Order, plaintiff is advised that any second amended complaint will supersede and replace the amended complaint in its entirety. Plaintiff is not permitted to incorporate by reference any portion of earlier complaints and may not attempt to replead claims that have already been dismissed by this Court with prejudice. Any claims that are not repled that were dismissed by this Court will be deemed abandoned.

### IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**RECOMMENDED,** that the plaintiff's ADA claims against the individual defendants and Title VII, GINA, and NYCHRL claims against the School District and individual defendants be **DISMISSED with prejudice and without leave to amend**; and it is further

**RECOMMENDED**, that plaintiff's claims against individual defendants Kaweeda Adams, Lori McKenna, and Matthew

Petrin be **DISMISSED without prejudice and with leave to amend**; and it is further

**RECOMMENDED**, that all other claims be **PERMITTED TO PROCEED**; [4] and it is further

[4]     Pursuant to the undersigned's May 12, 2022, Report-Recommendation and Order and Judge Kahn's June 29, 2022, Memorandum-Decision and Order, plaintiff's ADA retaliation claim and FMLA claim against the School District were ordered to proceed. See Dkt. Nos. 5, 9.

**ORDERED**, that the Clerk of Court not issue service of the amended complaint; and it is further

**RECOMMENDED**, that should the District Judge adopt this Report-Recommendation and Order, plaintiff be given thirty (30) days from the date of the Order adopting this Report-Recommendation and Order to file a second amended complaint, and if plaintiff does not file a second amended complaint, (1) it will be deemed as an abandonment of any claims for which leave to replead has been granted and will result in dismissal of the claims without further order by the Court, and (2) the matter be returned to the Magistrate Judge for service of the amended complaint for any claims that were permitted to proceed in the amended complaint; and it is further

 **\*15  ORDERED**, that the Clerk of Court reinstate Albany City School District as a defendant on the docket; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [5]

2022 WL 7351196

5      If you are proceeding <u>pro se</u> and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. <u>Id.</u> § 6(a)(1)(c).

**All Citations**

Slip Copy, 2022 WL 7351196

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3647288
Only the Westlaw citation is currently available.
For Online Publication Only
United States District Court, E.D. New York.

Thomas J. CHISHOLM, II, Plaintiff,
v.
Patrick STRYKER, et al., Defendants.

22-CV-2705 (JMA) (SIL)
|
Signed August 24, 2022

**Attorneys and Law Firms**

Thomas J. Chisholm, II, West Babylon, NY, Pro Se.

**MEMORANDUM & ORDER**

AZRACK, United States District Judge:

**\*1** Before the Court is the renewed in forma pauperis application filed by Thomas J. Chisholm, II ("Plaintiff") pursuant to the Court's July 12, 2022 Order. (ECF Nos. 9-10.) Upon review, the Court finds that Plaintiff's reported financial position qualifies him to proceed with this action without prepayment of the filing fee. Accordingly, the Court grants Plaintiff's renewed in forma pauperis application. However, for the reasons that follow, the Court finds that Plaintiff has not set forth a plausible claim for relief. Accordingly, the amended complaint is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

**I. Background**

**A. Relevant Procedural History**
Plaintiff's amended complaint names Patrick Stryker, as CEO of A.B.C. Employment Agency ("Stryker"), the A.B.C. Employment Agency ("the Agency"), and Woodcrest Estates ("Woodcrest" and collectively, "Defendants") as Defendants and is submitted on the Court's complaint form for employment discrimination claims with an additional nine-typed pages and includes a copy of the Determination and Notice of Rights from the U.S. Equal Employment Opportunity Commission ("EEOC"). (ECF No. 7.) Plaintiff checked the box on the form to allege that his claims are brought pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII")

as well as other unspecified federal, state, and city or county laws. (Id. at ¶ II.) Plaintiff also checked the boxes on the form to allege that, during the period from September 27, 2020 to September 29, 2020, his employment was terminated, he suffered unequal terms and conditions of his employment, and that the Defendants retaliated against him on account of his race and color, which Plaintiff alleges is African-American. (Id. ¶¶ III.) According to the amended complaint, Plaintiff filed a charge with the EEOC on or about December 21, 2020 and he received a Notice of Right to Sue on February 14, 2022. (Id. ¶ IV and at 17-18.)

**B. The Amended Complaint** [1]

[1]    The following facts are taken from the amended complaint and are presumed to be true for the purposes of this Memorandum and Order.

This action arises from the termination of Plaintiff's temporary job placement as a Maintenance Mechanic at Woodcrest. (Id. at 8 and in toto.) According to the amended complaint, Stryker, as "C.E.O./President" of the Agency, phoned Plaintiff on September 3, 2020 and offered him the position and explained that the temporary position could become permanent if Plaintiff "worked hard, arrived on time and was capable of the assignments." (Id. at 8, 13.) Plaintiff alleges that he "performed a stellar job every day", was "early every single day and approach[ed] each assignment with pride and respect for my co-workers and important residents who lived [at Woodcrest]. (Id. at 9, 14.) Plaintiff alleges that in the short time he was employed, he had "befriended" a few unidentified residents who Plaintiff claims expressed "surprise[ ] that a Black man was even hired at Woodcrest and to be very careful because they believed Woodcrest staff was partial to such or it seems so." (Id.)

**\*2** Approximately three weeks into Plaintiff placement at Woodcrest, on or about September 27, 2020, Plaintiff was assigned to accompany the on-site superintendent "Raul" to change out a refrigerator from an apartment unit. (Id.) When Plaintiff and Raul arrived with the new refrigerator at the door of the apartment, there was a "Red Dot" which Plaintiff alleges was a signal for "no entry" while the occupant was not at home. (Id.) After no one answered the doorbell, Plaintiff claims he suggested to Raul that they not enter and return when the resident was at home. According to the amended complaint, Raul insisted that they enter and complete the task since Raul had the key. (Id.) Once inside, Plaintiff describes that Raul removed the contents from the old refrigerator and placed them in the sink and on the counters causing other

items such as pictures, calendars, and other papers to be "strewn about." (Id.) The old refrigerator was dismantled and removed and the new one was installed at which time Plaintiff and Raul left. (Id.)

Shortly thereafter, the resident of that unit "flagged" Plaintiff and Raul down, yelled and cursed at them, and questioned why they had entered her apartment without permission. (Id. at 10.) She further complained that the doors of the new refrigerator were installed incorrectly and that a "crystal figurine that her deceased husband collected and left to her [was] suddenly missing." (Id.) The resident then contacted the property manager, Mary Schultz, who instructed Plaintiff and Raul to come to the office where she allegedly expressed her belief that they did not take the figurine. (Id.) The next day, while Plaintiff and Raul were together in a truck, Mary called Raul and Plaintiff allegedly overheard her tell Raul to come to the office but to leave Plaintiff "behind in the shop." (Id.) While Raul and Mary were meeting, Plaintiff alleges he took "a 2 hour lunch" break. (Id. at 10-11.)

Later that day, at approximately 6 or 7 p.m., Stryker called Plaintiff and informed him that he would no longer be working at Woodcrest. (Id. at 11.) When Plaintiff questioned Stryker, the amended complaint alleges that Stryker told Plaintiff that "it has something to do with a figurine." (Id.) When Plaintiff protested, Stryker alleged told Plaintiff it is also because "you have no driver's license." (Id.) When Plaintiff objected and reminded Stryker that Plaintiff had emailed a copy of his driver's license and Social Security card prior to commencing his employment, Plaintiff alleges that Stryker "became more upset." (Id.) Plaintiff alleges that he then told Stryker that his rights were being violated and that he believes his termination is "because of [his] African American status." (Id. at 12.)

For relief, Plaintiff seeks the termination of employment of Schultz and Raul "if [they are] still employed" as well as $5 million from each Defendant and additional punitive damages and any other relief "deemed just and proper by this honorable institution." (Id. ¶ V at 6.)

## II. Discussion

### A. *In Forma Pauperis* Application

Upon review of Plaintiff's declaration in support of his renewed application to proceed *in forma pauperis*, the Court finds that Plaintiff is qualified to commence this action without prepayment of the filing fee. 28 U.S.C. § 1915(a)(1).

Therefore, Plaintiff's renewed application to proceed *in forma pauperis* is granted.

### B. Standard of Review

The in forma pauperis statute requires that a court dismiss an action if it determines that it "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). The Court must dismiss the action as soon as it makes such a determination.

Pro se submissions are afforded wide interpretational latitude and should be held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam); see also Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997). In addition, the court is required to read a plaintiff's pro se amended complaint liberally and interpret it as raising the strongest arguments it suggests. United States v. Akinrosotu, 637 F.3d 165, 167 (2d Cir. 2011) (per curiam) (citation omitted).

**\*3** The Supreme Court has held that pro se complaints need not even plead specific facts; rather the complainant "need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotation marks and citations omitted); cf. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). However, a pro se plaintiff must still plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678. While " 'detailed factual allegations' " are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Id. at 678 (quoting Twombly, 550 U.S. at 555).

### C. Title VII

Title VII makes it an unlawful for an employer to refuse to hire, discharge, or otherwise discriminate against any individual with respect to employment because of such individual's race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1). In order to state a claim for

2022 WL 3647288

employment discrimination under Title VII, a plaintiff must allege (1) that he is a member of a protected class, (2) that he was qualified for the position at issue, (3) that he suffered an adverse employment action, and (4) that the circumstances give rise to an inference of discriminatory motivation. Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); see Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78 (2d Cir. 2015) ("[I]n a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, or national origin was a motivating factor in the employment decision."). While plaintiff is not required to demonstrate a prima facie case of discrimination at the pleading stage, he must allege facts that "give plausible support to a *minimal* inference of discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original).

The "sine qua non of a ... discriminatory action claim under Title VII is that the discrimination must be *because of*" the employee's protected characteristic. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam) (emphasis in original). Accordingly, a claim for discrimination under Title VII is properly dismissed where the plaintiff fails "to plead any facts that would create an inference that any adverse action taken by any defendant was based upon" the protected characteristic. Id. Here, as is readily apparent, Plaintiff has not alleged any facts from which the Court could reasonably construe circumstances surrounding the termination of Plaintiff's employment that give rise to an inference of discrimination. Indeed, Plaintiff acknowledges that his employment was "temporary" and alleges no facts suggesting that any of the Defendants' actions were motivated at all by Plaintiff's race. (ECF No. 7 at 8, 13 and in toto.)

Courts in this Circuit have routinely dismissed discrimination claims where the plaintiff's allegations, like here, fail to suggest discriminatory intent. See, e.g., Pantane, 508 F.3d at 112 & 112 n. 3 (finding that the district court correctly noted that "[p]laintiff failed to allege even the basic elements of a discriminatory action claim."); Lucas v. Apple Food Serv. of New York, LLC, No. 15-CV-4007(SJF)(AKT), 2015 WL 6507495, at *3 (E.D.N.Y. Oct. 27, 2015) (finding "the complaint fails to plead any facts linking defendant's conduct, i.e., the suspension of plaintiff without pay for two (2) weeks and termination of her employment, to plaintiff's race, color, gender, religion or pregnancy, or supporting a reasonable inference that defendant discriminated against plaintiff because of those protected characteristics.") (citing

Hedges v. Town of Madison, 456 F. App'x 22, 24 (2d Cir. Jan.13, 2012) (summary order) (affirming dismissal, inter alia, of the plaintiff's ADA claim on the basis that he "ha[d] not adequately pleaded discrimination on the basis of disability" because he "alleg[ed] not a single fact in support of his claims of discriminatory treatment which might conceivably give notice of the basis of his claims to the defendants"); Berkery v. Archdiocese of Hartford, 352 F. App'x 487, 490 (2d Cir. 2009) (summary order) (affirming dismissal of the plaintiff's ADA claim because the complaint presented no allegations linking the defendant's employment decision to the plaintiff's disability or supporting an inference of disability discrimination); Samuel v. Bellevue Hosp. Ctr., 366 F. App'x 206, 207 (2d Cir. Feb.17, 2010) (summary order) (affirming dismissal of the plaintiff's employment discrimination claim on the basis that he "failed to allege sufficient facts to render plausible his conclusory assertion that the defendants discriminated against him on the basis of his membership in a protected class.")); see also Maldonado v. George Weston Bakeries, 441 F. App'x 808, 808-09 (2d Cir. 2011) (summary order) (affirming dismissal of pro se complaint where plaintiff alleged that other employees involved in similar altercations were given preferential treatment, but did not allege that this preferential treatment was due to race or age); Kouakou v. Fideliscare N.Y., 920 F. Supp. 2d 391 (S.D.N.Y. 2012) (dismissing pro se complaint where comments alleged in complaint did "not create an inference that the denial of [p]laintiff's requested transfer were motivated by his race or national origin, particularly where [p]laintiff [did not allege that employer granted transfer requests of similarly situated employees outside of plaintiff's racial group]"); Palmer v. Safetec of Am., Inc., No. 11-CV-702, 2012 WL 2994060, at *7 (W.D.N.Y. May 31, 2012) (report and recommendation) (dismissing complaint where plaintiff "fail[ed] to allege any facts that could plausibly be construed as establishing [that] Plaintiff's discharge was based on his membership in any of the protected classes [at issue]," and noting that plaintiff failed "to identify or to otherwise specify" employees outside of plaintiff's protected classes who received preferential treatment or engaged in similar misconduct), adopted by 2012 WL 2994057 (W.D.N.Y. July 20, 2012).

**\*4** Given that absence of any facts suggesting that the termination of Plaintiff's temporary employment was motivated, even in part, by discriminatory animus, he has not alleged a plausible claim for relief. Nor has Plaintiff alleged that others were treated more favorably, including Raul, whose employment status is apparently unknown to

Plaintiff. (See ECF No. 7 at ¶ V.) Accordingly, the amended complaint is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). [2]

[2]     In addition, it is long established that individuals are not subject to liability under Title VII. See Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004); Jones-Khan v. Westbury Bd. of Educ., No. 21-CV-3908(JMA)(JMW), 2022 WL 280646, at *7 (E.D.N.Y. Jan. 31, 2022) (dismissing Title VII claims against individual defendants because there is no individual liability under Title VII); Gioia v. Singh, No. 20-CV-4014(JMA)(SIL), 2021 WL 602701, at *2 (E.D.N.Y. Feb. 16, 2021) (" 'Title VII does not impose liability on individuals.' ") (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)) (add'l citation omitted). Accordingly, Plaintiff's Title VII claim against Stryker is not plausible and is dismissed for this additional reason.

**D. State Law Claims**

Although Plaintiff does not include any other laws apart from Title VII in the amended complaint, he did, however, check the boxes on the form to allege that his claims are also brought pursuant to unspecified other federal, state, and local laws. (ECF No. 7 at 4.) The Court presumes that Plaintiff intends to assert discrimination claims under the New York State Human Rights Law, N.Y. Executive Law § 296 ("NYSHRL"). Discrimination claims under the NYSHRL are analyzed under the same framework and pleading standard as Title VII claims. See, e.g., Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n. 1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims brought under Title VII [and] ...New York Executive Law § 296 [NYSHRL] ..."). Accordingly, for the reasons set forth above, Plaintiff has not alleged a plausible claim under the NYSHRL either and any such claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

With regard to any other remaining state law claims, under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, courts "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims

over which it has original jurisdiction." Id. § 1367(c); (c)(3); see Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011). The Supreme Court explained: "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, given the absence of a viably pled federal law claim, the interests of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction at this time over any other state law claims that may be reasonably construed from the amended complaint. Accordingly, the Court declines to exercise supplemental jurisdiction over any other potential state-law claims contained in Plaintiff's amended complaint, apart from the NYSHRL claim which the Court has already dismissed, and thus dismisses any such claims without prejudice.

**E. Leave to Amend**

**\*5**  A pro se plaintiff should ordinarily be given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). Here, the Court has carefully considered whether Plaintiff should be granted leave to amend his complaint. In an abundance of caution, Plaintiff is granted leave to file a second amended complaint in accordance with this Memorandum and Order. Plaintiff shall: (1) clearly label his submission "Second Amended Complaint"; (2) include the same docket number as this Order, 22-CV-2705(JMA)(SIL); and (3) file it within thirty (30) days from the date of this Order. Plaintiff is cautioned that the second amended complaint will completely replace the present amended complaint and, therefore, he must include all claims against any Defendants he seeks to pursue in the second amended complaint and shall include factual allegations concerning the challenged conduct pertaining to each Defendant. If Plaintiff does not file a second amended complaint within the time allowed, judgment shall enter and this case will be closed.

Plaintiff is encouraged to consult with the Hofstra Law Pro Se Clinic located in the Central Islip Courthouse, which can provide free information, advice, and limited scope legal

2022 WL 3647288

assistance to non-incarcerated pro se litigants. The Court notes that the Pro Se Clinic is not part of, nor affiliated with, the United States District Court. The Clinic offers services such as: providing brief legal counseling; advising you about potential federal claims prior to filing suit; explaining federal court rules and procedures; and reviewing and editing draft pleadings. Consultations with the Pro Se Clinic can be conducted remotely via telephone. If you wish to contact the Pro Se Clinic to make an appointment, email them at PSLAP@Hofstra.edu or leave a message at (631) 297-2575.

### III. Conclusion

For the forgoing reasons, the Plaintiff's renewed application to proceed in forma pauperis is granted. However, Plaintiff's amended complaint is dismissed sua sponte in its entirety without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii) for failure to state a claim for relief. Plaintiff is granted leave to file a second amended complaint in accordance with this Memorandum and Order. If Plaintiff elects to further amend his complaint, he shall clearly label his submission "Second Amended Complaint," include the same docket number as this Order, 22-CV-2705(JMA)(SIL), shall file

it within thirty (30) days from the date of this Order. Plaintiff is cautioned that the second amended complaint will completely replaces the prior complaints. Therefore, Plaintiff must include all claims against any Defendants he seeks to pursue in the second amended complaint. If Plaintiff does not file an amended complaint within the time allowed, judgment shall enter and this case will be closed.

The Court declines to exercise supplemental jurisdiction over any remaining state law claims alleged in the complaint and therefore the state law claims are dismissed without prejudice. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3647288

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1666918
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,
v.
NEW YORK UNIVERSITY,
UCATS Local 3882, Defendants.

No. 20-CV-10802 (JPO) (OTW)
|
Signed 04/29/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree Deakins, New York, NY, for Defendant New York University.

Gregory Ainsley, Robert T. Reilly, Serge Ambroise, Ambroise Law, Rachel Sonia Paster, Cohen, Weiss and Simon LLP, New York, NY, for Defendant Ucats Local 3882.

<u>**REPORT AND RECOMMENDATION**</u>

ONA T. WANG, United States Magistrate Judge:

**\*1  To the Honorable J. PAUL OETKEN, United States District Judge:**

### I. INTRODUCTION

Plaintiff Darwyn M. Morren brings this action against the defendants, New York University ("NYU"), and UCATS Local 3882 ("UCATS"). (ECF 2). Plaintiff alleges that: (1) Defendants discriminated against Plaintiff on the basis of race and national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the New York City Human Rights Law ("NYCHRL"), and the New York State Human Rights Law ("NYSHRL"); (2) Defendants discriminated against Plaintiff under the Americans with Disabilities Act ("ADA"), the NYCHRL, and the NYSHRL; (3) Defendants violated the Family and Medical Leave Act of 1993; (4) NYU breached a contract by terminating him; (5) UCATS breached the Collective Bargaining Agreement ("CBA") with NYU by failing to submit grievances on his behalf; (6) UCATS breached their duty of fair representation to Plaintiff (ECF 2, ECF 25); (7) Defendants conspired to deprive Plaintiff of equal protection under 42 U.S.C. § 1985

(ECF 25); (8) Defendants violated Plaintiff's Civil Rights under Civil Rights Law § 79-n (ECF 25); and (9) negligent infliction of emotional distress against both Defendants. (ECF 25). Plaintiff seeks "compensatory damages in the sum of $100,000,000 [f]or emotional and psychological distress. [P]lus any punitive damages which is exclusive of the $100,000,000 demand." (Am. Compl. 6).

### II. PROCEDURAL HISTORY

Plaintiff filed a Charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 25, 2020. (ECF 2). Plaintiff alleges that he received his Rights of Notice to Sue from the EEOC, dated September 21, 2020, on September 28, 2020. (ECF 2).

On December 18, 2020, Plaintiff filed his *pro se* Complaint against Defendants NYU and UCATS. (ECF 2). The Honorable John P. Cronan referred this case to me for General Pretrial Management and Dispositive Motion on April 14, 2021.[1] (ECF 15). Plaintiff filed his First Amended Complaint on June 4, 2021, which adds additional details, but no additional claims. (ECF 25 (hereinafter "Am. Compl.")). On June 9, 2021, the parties agreed to a briefing schedule for Defendants' motions to dismiss the Amended Complaint. (ECF 29, 33). Plaintiff requested a 31-day extension of the briefing schedule because of health concerns, which I granted on July 7, 2021. (ECF 37, 38). The day Defendants' submissions were due (August 9, 2021), Plaintiff attempted to amend his First Amended Complaint, without the Court's leave and without Defendants' consent. (ECF 40, 43). I denied this request as untimely.[2] (ECF 43).

[1]  The case was reassigned earlier this year to Judge Oetken.

[2]  I reviewed ECF 40, Plaintiff's Proposed Second Amended Complaint, and do not find that Plaintiff's Proposed Second Amended Complaint alleges additional facts that would have been material to this Report & Recommendation.

Defendants filed their respective Motions to Dismiss on August 9, 2021, in accordance with the amended briefing schedule. (ECF 46, 48). Ten days later, Plaintiff sought another extension to file his opposition, which I granted.[3] (ECF 55, 60). Plaintiff filed his opposition on October 7, 2021, and Defendants filed their replies on October 28, 2021. (ECF 65, 68, 70).

3    Plaintiff alleged on October 7, 2021 that NYU was continuing to retaliate against him by sending the "answer to [his] complaint to his old address." (ECF 65 at 1). NYU filed an Affirmation and a "true and correct copy of the confirmation that Defendant's Motion to Dismiss papers were delivered" to Plaintiff's address listed on the docket. (ECF 71).

### III. FACTUAL BACKGROUND [4]

4    For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, *see Krassner v. 2nd Ave Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and draws all inferences in the Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

**\*2** Plaintiff identifies as an "Afro-Caribbean male (black/[A]frican descent), of Trinidadian [n]ational [o]rigin" with ADHD. (Am. Compl. 22). [5] He began working at NYU's Bobst Library in November 2016 as an "ADRSS" (Access Delivery Resource Sharing Services) assistant. (Am. Compl. at 22). His job responsibilities included "various administrative tasks in the library, including checking out, shelving, unshelving, and stacking books; creating and managing patrons' accounts; working in the course reserves section amongst other responsibilities." (Am. Compl. 23 at ¶ 1). Upon starting work, Plaintiff joined UCATS, where Linda Wambaugh was his union representative. (Am. Compl. 23 at ¶ 2). NYU terminated Plaintiff's employment effective on December 13, 2019. (Am. Compl. 33 at ¶ 49).

5    To reduce the likelihood of confusion, all citations to the Amended Complaint reference PDF page numbers, ranging from one (1) to thirty-nine (39) (the entirety of ECF 25 in one PDF). Plaintiff did not include paragraph numbers until page 22. Accordingly, citations to the Amended Complaint on or after page 22 will also include paragraph citations.

#### *1. Plaintiff is Assigned a Less Convenient Work Schedule.*

Plaintiff reported to several individuals when he worked at NYU. (Am. Compl. at 23 ¶ 1). His immediate supervisor was Patricia Warrington. (Am. Compl. 23 at ¶ 1). Plaintiff and Warrington both reported to the circulation manager, Deborah

Caesar, who was later replaced by Frances Rodriguez. (Am. Compl. 23 at ¶ 1).

In December 2016, Plaintiff met with "management" [6] and was told that he "exceeded expectations" in performance and attendance. (Am. Compl. 23 at ¶ 3). At this meeting, Plaintiff complained that two coworkers were "affecting teamwork/morale," and were "ma[king] [the workplace] a hostile work environment." [7] (Am. Compl. 23 at ¶ 3). "Management" responded by telling Plaintiff, "don't worry about it, and just worry about yourself." [8] (Am. Compl. 23 at ¶ 3).

6    Plaintiff does not identify or define "management," nor does he identify subsequent work reviews at which he was informed he was performing adequately.

7    Plaintiff does not identify these individuals nor does he detail any incidents in connection with this complaint.

8    Management also asked that Plaintiff not wear his coat/jacket while working, even though he was cold, because the security guard had complained about the way "it looked" on Plaintiff. (Am. Compl. 23 at ¶ 3).

Around December 2016 or January 2017, Gary Speizale, Plaintiff's coworker, complained about the shift schedule. (Am. Compl. 23 at ¶ 4). Plaintiff alleges that, as a result, Plaintiff's schedule was changed so that he no longer had consecutive days off, while his coworkers, including Speizale, did. (Am. Compl. 23 at ¶ 4). Plaintiff complained to Warrington, Caesar, and Rodriguez that the new schedule was unfair, but "they" told Plaintiff that the schedule was based on seniority, and Plaintiff had the "least amount of seniority" among his coworkers because he was "the most recent hire." (Am. Compl. 23 at ¶ 4). Plaintiff complained to Wambaugh about the schedule, explaining that he was not the most recent hire, but she also said that Speizale was senior to Plaintiff. [9] (Am. Compl. 23–24 at ¶ 4). The Union did not file a grievance on Plaintiff's behalf. [10] (Am. Compl. 24 at ¶ 4).

9    Plaintiff does not allege whether Speizale was in fact senior to him, nor does he allege why his supervisors and union representative thought Speizale was senior to Plaintiff. Plaintiff also

does not allege facts about other similarly situated coworkers and their work schedules.

[10]   Article 34 of the CBA governs the Grievance and Arbitration Procedure with UCATS. (ECF 49-1, CBA at 27).

### 2. Plaintiff is Reprimanded for Taking a Previously-Scheduled Trip to a "Religious Festival."

**\*3** Plaintiff told his employer "[b]efore [he] [s]tarted employment" in November 2016 that he had plans to attend an annual "Cultural and Religious Festival/carnival [sic]" in Trinidad. (Am. Compl. 24 at ¶ 6). Before he began working, Plaintiff alleges that he was told that he could attend this event, and that he would be paid during his absence. [11] (Am. Compl. 24 at ¶ 6). Then, in February 2017, days before attending the "Cultural and Religious Festival/carnival in Trinidad," "they" told Plaintiff that he would not be paid for the time off he was taking. [12] (Am. Compl. 24 at ¶ 6). Plaintiff went to the festival, but "was accused of misusing sick time" and upon his return, was told that he would be terminated. (Am. Compl. 24 at ¶ 8). "[Plaintiff] explained that [he] was only doing what Rodriguez told [him] to do, and that in any event, [he] had a doctor's note." (Am. Compl. 24 at ¶ 8). Ultimately, Plaintiff was not "disciplined." (Am. Compl. 24 at ¶ 8).

[11]   Plaintiff alleges extremely similar facts occurred in 2018. (Am. Compl. 10). It is unclear whether these facts are for the same event in 2017 and Plaintiff misstates the date, or whether this is a different event entirely.
Plaintiff alleges that in 2018, he asked Rodriguez for unpaid time off to attend a "religious holiday," and his request was denied. (Am. Compl. 10). Plaintiff "brought up the fact that Gary Speizale gets his religious requests approved" but Plaintiff was told "to worry about [himself]." (Am. Compl. 10). Plaintiff alleges that Rodriguez told Plaintiff to "call out sick for those days," and told Plaintiff that he would not need a doctor's note. (Am. Compl. 10). Plaintiff followed Rodriguez's suggestion and upon returning, Caesar told Plaintiff that he had abused sick days and NYU "will have to let [him] go if [he doesn't] have a doctor's note." (Am. Compl. 10). Plaintiff alleges that he reported he was

sick, produced a doctor's note, and therefore was not terminated. (Am. Compl. 10).
Plaintiff does not allege any additional facts about what Rodriguez advised him to do regarding his sick time and the festival, what doctor he saw, or what sickness, if any, he experienced.

[12]   Plaintiff does not identify "they," or whether "they" were supervisors.

Plaintiff also alleges that in July 2019, he requested time off for his vacation to Trinidad in February 2020, which Rodriguez denied. (Am. Compl. 15). Plaintiff alleges that Caesar had approved Plaintiff's request the past three years (which is inconsistent with his earlier allegations). (Am. Compl. 15). Plaintiff halved the vacation days he initially requested and later cancelled his flight because with fewer days, the cost was higher. (Am. Compl. 15).

### 3. Plaintiff's Probation is Extended.

In February 2017, Plaintiff complained to NYU and UCATS "that [his] probation period had been extended." (Am. Compl. 24 at ¶ 7). Caeser and Rodriguez told Plaintiff that the extension was because of his "performance issues." (Am. Compl. 24 at ¶ 7). Plaintiff was unaware of any performance issues because he had allegedly been told "numerous of times [sic] that [he] performed [his] job duties beyond expectations and [his] attendance was perfect, unlike others on probation and ... their probation wasn't extended." (Am. Compl. 24 at ¶ 7). Plaintiff also complained about his "coworkers not getting along with one another" at this time. (Am. Compl. 24 at ¶ 7). In response, Rodriguez told Plaintiff, "You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around." (Am. Compl. 24 at ¶ 7). Plaintiff alleges that at the time, Warrington added, "Why don't you just go back to Trinidad to live since you['re] always complaining about what we do here?" (Am. Compl. 15). When Plaintiff told Wambaugh about this interaction, she told him that "the Employer would have fired [him]," and only had not because Plaintiff "had ADHD, [and] they did not want any complaints." [13] (Am. Compl. 24 at ¶ 7). Plaintiff ultimately completed his probationary period in April 2017. (Am. Compl. 24 at ¶ 7).

[13]   Plaintiff does not provide any facts about when or to whom he disclosed his ADHD disability.

He also does not plead the original length of his probationary period.

### 4. Plaintiff Grows Increasingly Suspicious of His Coworkers and Others.

**\*4** Plaintiff alleges that one to two months into his employment (in December 2016 or January 2017), Plaintiff "complained numerous times about coworkers making false statements and claims in order to get [him] fired and sabotage [his probation]." (Am. Compl. 24 at ¶ 5). Between 2017 and 2018, Plaintiff "repeatedly complained to Caesar that Rodriguez" was trying to get him "disciplined or fired." (Am. Compl. 24 at ¶ 8). Caesar's response was that Plaintiff should "not worry about it." (Am. Compl. 24 at ¶ 8). Plaintiff does not state who else, if anyone, tried to get him fired or what statements Rodriguez or others made.

On three occasions between late 2018 and April 1, 2019, Plaintiff complained to Rodriguez and Caesar that "some full-time coworkers seemed to be manipulating students and student-workers to do illegal things, who worked in the library, to look at [him] and treat [him] in a different or suspicious way." (Am. Compl. 25 at ¶¶ 10–12). Plaintiff also complained about Chris Crowe, a Union Representative (who also allegedly lived with Speizale), engaging in this behavior. (Am. Compl. 25 at ¶ 11). Plaintiff further complained that on multiple occasions he was being "stalked" by coworkers and students, and mistreated by students, staff, and professors. (Am. Compl. 25 at ¶ 13). This included allegations that: (1) "students came into the library and pointed and laughed at [Plaintiff]"; (2) students "were recording [Plaintiff]"; and (3) a student bumped into him and another student recorded the incident, "almost as if to catch [Plaintiff] doing something to the student who bumped [him]." (Am. Compl. 25 at ¶ 13). Plaintiff verbally reiterated these complaints to Rodriguez and Caesar for the next two months. (Am. Compl. 25 at ¶ 14). Rodriguez and Caesar did not escalate the complaints; rather, Caesar called Plaintiff "paranoid." (Am. Compl. 25 at ¶ 14). Plaintiff also complained to Wambaugh, who told Plaintiff that there was "no grievance[s] that could be filed about [his] coworkers, students, and professors doing this to [him]." (Am. Compl. 25 at ¶ 14).

At some unspecified time, Plaintiff alleges that he complained to Wambaugh about his coworkers stalking him, sabotaging his work, and making derogatory comments to him. In response, Wambaugh allegedly said, "they just don't like you" and "they don't have to be nice to you." (Am. Compl.

9). Wambaugh did not file a grievance about Plaintiff's complaint. (Am. Compl. 9).

Plaintiff filed formal written complaints about the above actions in June and July 2019 to Rodriguez and Caesar, which complaints were then forwarded to Human Resources ("HR"). (Am. Compl. 25–26 at ¶ 15). Plaintiff did not feel comfortable discussing the matter with HR, however, because he "believed[d] that management was involved in the mistreatment." (Am. Compl. 26 at ¶ 15). Around this time, Plaintiff also complained to Wambaugh that: (1) a new student coworker was stalking Plaintiff; and (2) Caesar was dating a coworker who was harassing Plaintiff. [14] (Am. Compl. 26 at ¶¶ 16, 17). Wambaugh said that the Union could not file a grievance about the stalking, and that the Union and NYU knew about Caesar's relationship, but "there was nothing that could be done." (Am. Compl. 26 at ¶¶ 16, 17). A few weeks later, Rodriguez took over Caesar's role as circulation manager and Caesar began working in HR. (Am. Compl. 26 at ¶ 18).

[14]   Plaintiff does not identify any of these individuals.

"At around the same time," Plaintiff alleges "that [his] electronic devices and personal, NYU email accounts and other accounts had been hacked by the Employer." [15] (Am. Compl. 26 at ¶ 19). Plaintiff believes he was hacked because on one occasion Plaintiff could not log into his NYU email, and on another occasion, he "learned that an NYU VPN had been created with [his] work ID and password" when he was not at work. (Am. Compl. 26 at ¶ 19).

[15]   Plaintiff alleges that he "heard people in the library discussing videos [he] had watched, or things on [his] social media [ac]counts and email accounts and electronic devices, that no one but [Plaintiff] should have knowledge of." (Am. Compl. 26 at ¶ 19). He also alleges that "Amazon web IP addresses [were] popping up on [his] phone and laptop that weren't there before." (Am. Compl. 26 at ¶ 19).

**\*5** After moving apartments in July 2019, Plaintiff alleges that NYU was sending people to stalk his whereabouts. [16] (Am. Compl. 26–27 at ¶ 20). In response to Plaintiff's complaints about this behavior, Warrington told Plaintiff "that [he] was paranoid," and Wambaugh "asked [Plaintiff] what this had to do with the Union." (Am. Compl. 27 at ¶ 20). Wambaugh did not file a grievance. (Am. Compl. 27 at ¶ 20). Plaintiff alleges, however, that after he complained about the

stalking, "the Employer changed [his] address in its system back to [his] old address in the Bronx" even though he "never gave them [his] Queens address, but [he] ha[s] mailings from the Union [a]nd NYU with [his] Queens [a]ddress." (Am. Compl. 27 at ¶ 21).

[16] Plaintiff said that "[he] noticed people on the train looking at [him], standing next to [him], raising their phones at [him] as if they were recording [him], stomping in front of [him], and engaging in other activity that [he] viewed as an effort to agitate [him]. [He] suspected that the Employer was involved in this because it was the same behavior [he] was experiencing at the library [a]nd only started after [his] initial complaints." (Am. Compl. 27 at ¶ 20).

At some unspecified time, Plaintiff told Rodriguez that he was having sleeping issues. (Am. Compl. 28 at ¶ 26). Plaintiff then alleges that in July or August 2019, Rodriguez recommended that Plaintiff receive treatment from his psychiatrist regarding his sleeping issues. [17] (Am. Compl. 38 at ¶ 72).

[17] Plaintiff alleges "[t]he meds the psychiatrist prescribed [Plaintiff], shouldn't have been prescribed, as [he] wasn't diagnosed with any of the ailments [that mandated] the medication." (Am. Compl. 38 at ¶ 72). Plaintiff further alleges that the psychiatrist had omitted all of his "confessions of the stalking from NYU" and other misconduct by Defendants but Plaintiff does not say why the psychiatrist did this. (Am. Compl. 38 at ¶ 72).

### 5. Plaintiff Arrives at Work Late and Takes Time Off.

On September 30, 2019, Rodriguez told Plaintiff that he noticed Plaintiff had been "late a couple times" and warned Plaintiff that if it continued he would be "disciplined." (Am. Compl. 27 at ¶ 23). Plaintiff responded that he "always got to the desk on time, as per [his] schedule, to deal with library patrons," but Rodriguez said that "didn't matter." (Am. Compl. 27 at ¶ 23). Plaintiff told Rodriguez "that other employees had more late arrivals than [he] did, [and] were not disciplined," but Rodriguez "told [Plaintiff] not to worry about other workers." (Am. Compl. 27 at ¶ 23). Plaintiff expressed to Rodriguez that he was "going through a lot," including that he was being stalked to and from work, his devices were being hacked, and he was "traumatized by the harassment at work." [18] (Am. Compl. 27 at ¶ 23). Rodriguez suggested that Plaintiff apply for FMLA leave. [19] (Am. Compl. 27 at ¶ 23). Plaintiff alleges that he applied for FMLA leave in early October 2019. (Am. Compl. 28 at ¶ 25).

[18] Plaintiff does not identify or describe specific acts that he believes constitute harassment other than the stalking and hacking events, and specific arguments and altercations, described in this section and Section III.11.

[19] At this meeting, Rodriguez asked Plaintiff to sign "the verbal warning," but Plaintiff said he wanted to speak with a Union representative first. (Am. Compl. 27 at ¶ 23). Rodriguez then "shredded the verbal warning she asked [Plaintiff] to sign." (Am. Compl. 27 at ¶ 23).

At another unspecified time, Plaintiff received "troubling texts" from a number he believes was "pretending to be someone else in [his] contacts." (Am. Compl. 28 at ¶ 26). The texts made "derogatory statement[s], [20] "question[ed]" whether Plaintiff was actually sick, and "stat[ed] that [his] meds are the reason [he] can't get any sleep." (Am. Compl. 28 at ¶ 26). Plaintiff intimates that Rodriguez is the unidentified sender because he told Rodriguez he was not getting any sleep "because of the ongoing harassment from NYU." (Am. Compl. 28 at ¶ 26).

[20] The text messages stated "[N _ _ _ S] are not even human no more" and accused Plaintiff of being "involved in 'a whole lot of gang shit.' " (Am. Compl. 28 at ¶ 26).

**\*6** In early October 2019, Plaintiff took some sick days. (Am. Compl. 28 at ¶ 27). On October 12, 2019, Plaintiff's coworker, Freddie Olivia, approached Plaintiff, "put [him] in a chokehold from behind," and asked him where he had been the past few days. [21] (Am. Compl. 28 at ¶ 27). Plaintiff told Olivia that he was "concerned" that he was being harassed at work, and also complained that his "work in the Course Reserve Department ... was not being used effectively" because no one would "ever take the books outor [sic] barely." (Am. Compl. 28 at ¶ 27). Plaintiff does not describe what his "work in the Course Reserve Department" entails.

[21]  Plaintiff thinks NYU "was using Olivia to spy on [him] to see why [he] wasn't at work." (Am. Compl. 28 at ¶ 27).

In the days following this interaction, Plaintiff alleges that "faculty members came up to [him] on several occasions and nervously told [him] why they weren't using their Course Reserve items." (Am. Compl. 28 at ¶ 28). Plaintiff also alleges that items were showing up "on [his] account when [he] wasn't doing Course Reserve work." [22] (Am. Compl. 28 at ¶ 28).

[22]  Plaintiff further "suspect[ed] that this was all part of the Employer's campaign to retaliate against [him]." (Am. Compl. 28 at ¶ 28). Plaintiff does not explain the nature of his "Course Reserve" work, the relevance or significance of his conversations with these faculty members, or how these alleged facts constitute retaliation.

### 6. Plaintiff is Suspended for Fighting at Work.

On November 1, 2019, Plaintiff alleges that Olivia was "staring over [his] shoulder and following [his] movements." (Am. Compl. 28–29 at ¶ 29). Plaintiff confronted Olivia about this behavior and Olivia responded by "aggressively trying to [i]ncite a fight [with Plaintiff] and [saying], 'So [w]hat's up?!' " (Am. Compl. 29 at ¶ 29). Plaintiff began to walk away when another coworker, Robert Jameson, ran toward Plaintiff and "grabbed and/or pushed [Plaintiff]." (Am. Compl. at 29 ¶ 29). Plaintiff claims to have self-recorded audio of this interaction. (Am. Compl. 29 at ¶ 31).

That same day, Plaintiff was working alongside Adjoa Walker, a student-worker. (Am. Compl. 29 at ¶ 30). Plaintiff repeatedly asked Walker to help him check out customers until Walker began crying. (Am. Compl. 29 at ¶ 30). Plaintiff asked whether Walker was okay, and "suspect[ed] that she was crying because she was torn between harassing and agitating [him], at the request of the Employer, and doing her job." (Am. Compl. 29 at ¶ 30). Later that day, Plaintiff was called to HR where he met with Katie O'Brien, the Assistant Director of HR, and Enrique Yanez, the Director of HR. [23] (Am. Compl. 29 at ¶ 31). The exact order of the following events is unclear:

- O'Brien and Yanez left the room during the meeting because a security guard asked to speak with Plaintiff alone. (Am. Compl. 29 at ¶ 31).

- Plaintiff told the security guard that "[he] had a legal right to union representation if they were going to discipline [him], and that [he] didn't want to start the meeting" without representation. (Am. Compl. 29 at ¶ 31).

- When Plaintiff requested his Union Representative join the meeting, the meeting "was called to an end." (Am. Compl. 29 at ¶ 31).

- The security guard escorted Plaintiff out of the room. (Am. Compl. 29 at ¶ 31).

No grievance was filed by Wambaugh following this incident. [24] (Am. Compl. 29 at ¶ 32).

[23]  Plaintiff does not "recall if they told [him] that it was because of the incident with Freddy [O]livia, but in the event they didn't, [he] understood that was what the meeting was about, because it was the only incident that happened that day." (Am. Compl. 29 at ¶ 31).

[24]  Plaintiff alleges that Wambaugh "should have known to file a grievance" for "racial discrimination," for him, since she "had the audio evidence" of the fight with Jameson. (Am. Compl. at 29 ¶ 32).

**\*7**  Plaintiff then alleges a series of HR meetings involving Yanez, O'Brien, Rodriguez and possibly others, but does not coherently state the topic of each meeting or the events at each meeting. (Am. Compl. 30). On November 6, 2019, a meeting was scheduled between Plaintiff, Yanez, O'Brien, and a shop steward to discuss the November 1, 2019 incident with Jameson. (Am. Compl. 29–30 at ¶ 33). Plaintiff sent an audio file of the incident to those present. (Am. Compl. 30 at ¶ 33).

From November 6 to November 19, Plaintiff does not state whether he was working, suspended, or on unpaid leave. On November 14, 2019, Yanez and O'Brien asked to meet with Plaintiff because they "had new information on the case." (Am. Compl. 30 at ¶ 34). Plaintiff responded that he was not comfortable coming to the building because of the "[r]egular harassment [he] had been suffering from NYU", and that he "was under the weather[ ]." (Am. Compl. 30 at ¶ 34). On November 18, 2019, Plaintiff was called into

a scheduled meeting via conference call with Wambaugh and O'Brien to discuss a complaint Rodriguez made about Plaintiff "ma[king]" Walker cry. (Am. Compl. 30 at ¶ 35). At the meeting, Plaintiff explained to O'Brien "that [he] just asked the student to help with the long line which is her job." (Am. Compl. 30 at ¶ 35). O'Brien reminded Plaintiff of the policy regarding how many patrons must be present for him to ask for help (which Plaintiff argued was incorrect). (Am. Comp. 30 at ¶ 35). Plaintiff additionally notes that "O'Brien stated that [Rodriguez] said she thinks [Plaintiff] felt guilty about what [he] did to the student, and labeled [his] concerns about the student as 'small talk.' " (Am. Compl. 30 at ¶ 35). At some point, O'Brien sent Plaintiff an email allowing him to return to work the next day. (Am. Compl. 30 at ¶ 36). In this email, Plaintiff was given a "final" warning.[25] (Am. Compl. 30 at ¶ 36). Plaintiff claims that aside from the warning about his attendance, "this is the only warning [he] had ever received." (Am. Compl. 30 at ¶ 36).

[25]     Plaintiff does not explain what the "final warning" threatened. Plaintiff states that he told O'Brian that "[he] didn't understand how [he] was getting a final warning and suspension, when [he] had audio of the incident which proves that [he] didn't threaten or touch anyone." (Am. Compl. 30 at ¶¶ 36–38).

On November 19, 2019, Plaintiff returned to work. (Am. Compl. 30 at ¶ 37). Plaintiff "immediately" attended a meeting with O'Brien, Yanez, and Wambaugh at which O'Brien told Plaintiff that he was suspended for three days because [Plaintiff] exhibited threatening and violent behavior."[26] (Am. Compl. 30 at ¶ 36). Plaintiff does not clearly allege whether his suspension was because of the fight with Jameson or his interaction with Walker. (Am. Compl. 30 at ¶ 36). Wambaugh also informed O'Brien "that the Union was filing a grievance over [his] suspension." (Am. Compl. 30 at ¶ 38). The grievance concerned the November 19, 2019 suspension and the final written warning. HR notified Plaintiff on December 9, 2019 that "the November 19 grievance had been closed, and that the Employer was denying the grievance." (Am. Compl. 31 at ¶ 41). (ECF 49-2, Exhibit 2 (November 21, 2019 Step 2 Grievance at 59).

[26]     It is unclear whether this was a new suspension, or a continuation of another suspension.

### 7. Plaintiff Suspects Additional Foul Play from Coworkers.

On November 30, 2019, Plaintiff recognized an application ("app") on his phone that was also on his NYU work computer, although he claims that *he* never installed the app. (Am. Compl. 31 at ¶ 39).[27]

[27]     Plaintiff additionally notes that on December 9, 2019, his "phone(s) had been installed as a modems [sic]," (Am. Compl. 31 at ¶ 41), but Plaintiff does not explain what this means.

*8  On December 10, 2019, Plaintiff asked Warrington if he could leave early that day "because [he] wasn't feeling good as [he was] being harassed by [his] coworkers, who were stalking [him]." (Am. Compl. 31 at ¶ 43). Warrington said no. (Am. Compl. 31 at ¶ 43). Rodriguez then asked Plaintiff to attend a meeting with HR. (Am. Compl. 31 at ¶ 43). Plaintiff said he needed Wambaugh to represent him, and the meeting was rescheduled for the next day. (Am. Compl. 31 at ¶ 44). Plaintiff asked to reschedule to either a different time the next day, or to December 16. (Am. Compl. 31–32 at ¶ 44). Neither O'Brien, Yanez, nor Rodriguez responded to this request. (Am. Compl. 32 at ¶ 44).

### 8. Plaintiff's Employment is Suspended at Least a Second Time, and then Terminated.

Plaintiff does not clearly allege the order of the following events:

• On December 11, 2019, Plaintiff "saw some of the same suspicious Amazon IP addresses."[28] (Am. Compl. 32 at ¶ 47). Plaintiff alleges, however, that one of the "IP addresses" was "traceable to the Massachusetts Institute of Technology, which is an NYU partner [and that] (this IP hacked [Plaintiff's] personal email again on 5/21/20)." (Am. Compl. 32 at ¶ 47).

• At some point between December 10 and 12, 2019, Plaintiff was emailing "multiple parties" about "the harassment and retaliation that was ongoing" when Rodriguez approached Plaintiff and told him he could leave and would be paid for the rest of the time that he was scheduled to work. (Am. Compl. 32 at ¶ 45). Plaintiff again asked Rodriguez the time of the

December 11 meeting.[29] (Am. Compl. 32 at ¶ 45). Rodriguez walked away and "about two minutes later [Plaintiff] heard her speaking by the entrance of the circulation Dept and use the words 'black man being aggressive.' " (Am. Compl. 32 at ¶ 45). Fifteen minutes later, two security guards and two NYPD officers arrived at the scene and stated that there was a complaint about Plaintiff "being aggressive, and trespassing." (Am. Compl. 32 at ¶ 45). Plaintiff responded that he worked there and that he was being harassed. (Am. Compl. 32 at ¶ 45). O'Brien cancelled the tentatively set December 11, 2019 HR meeting. (Am. Compl. 32 at ¶ 47).

• Plaintiff states that he was suspended because "the Employer knew, through its control of [his] devices, [he] discovered the Amazon web IP addresses logged into [his] personal and NYU email accounts." (Am. Compl. 32 at ¶ 47).

• Plaintiff asked Wambaugh "how [he] could be suspended without a meeting." (Am. Compl. 32 at ¶ 47).

[28]  Plaintiff does not explain, and the Court cannot discern, the significance of the "suspicious Amazon IP addresses."

[29]  Plaintiff does not allege the purpose of the December 11 meeting with the Union and Human Resources. This meeting was previously scheduled for December 10, 2021, where Plaintiff requested Human Resources be present, and Human Resources rescheduled it. (Am. Compl. 31 at ¶ 43).

On December 14, 2019, Plaintiff saw an email regarding his termination effective on December 13, 2019. (Am. Compl. 33 at ¶ 49). The email stated that "[Plaintiff] denied [a] meeting with management and HR ... and that [he] was aggressive and insubordinate ... which required the Employer to call the police to escort [him] out of the building." (Am. Compl. 33 at ¶ 49). Plaintiff alleges that "[his] suspension was converted to a termination because the Employer, having hacked [his] phone, knew that [he] had gone to the doctor to start FMLA leave, which would have given [him] job protection, and also went [to] a lawyer on December 12." (Am. Compl. 33 at ¶ 49).

*9. Plaintiff Engaged in a Post-Termination Grievance Process.*

On December 19, 2019, Plaintiff asked Wambaugh "how [he] could be terminated without even having the suspension meeting." (Am. Compl. 33 at ¶ 51). Wambaugh told Plaintiff that she would file a grievance about Plaintiff's suspension and termination.[30] (Am. Compl. 33 at ¶ 52). Plaintiff also asked Wambaugh to "file a grievance alleging ADHD discrimination," which Wambaugh said she would do. (Am. Compl. at 33 ¶ 51); (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance)). Plaintiff alleges that he "turned down" severance and unemployment benefits. (Am. Compl. 33 at ¶ 51).

[30]  Plaintiff also asked Wambaugh about "the final warning grievance, and the Employer's failure to respond to the information request in time." (Am. Compl. 33 at ¶ 51). Plaintiff does not clarify what information he sought and whether any information was conveyed by Wambaugh.

*9  On December 20, 2019, Plaintiff reached out to Wambaugh about the status of his suspension and termination grievances. (Am. Compl. 33 at ¶ 52). Plaintiff requested a grievance be filed about the grievance process along with an ADHD discrimination grievance.[31] (Am. Compl. 34 at ¶¶ 51, 53, 57) On the same day, Peter Lanzo, a New York State United Teachers representative, was assigned to Plaintiff's case. (Am. Compl. 34 at ¶ 54). Plaintiff asked Lanzo to give him access to his NYU email records,[32] which Plaintiff was initially denied because he was "rightfully terminated." (Am. Compl. 34 at ¶ 53); (Am. Compl. 36 at ¶ 62). Lanzo responded that he would speak with NYU regarding the email account access. (Am. Compl. 36 at ¶ 62).

[31]  Plaintiff alleges that Wambaugh told Plaintiff that she was not going to file the ADHD discrimination grievance and that she had not known that Plaintiff had ADHD. (Am. Compl. 33–34 at ¶ 52).

[32]  Plaintiff wanted his NYU emails because he sought proof that Defendants were being dishonest about the grievances they filed. (Am. Compl. 13). Plaintiff suggests that Defendants withheld his emails so that he "wouldn't have proof during arbitration." (Am. Compl. 13).

On January 6, 2020, Plaintiff informed Lanzo that the grievances UCATS filed were missing important information; on January 22, 2020, Plaintiff asked that they be corrected.[33] (Am. Compl. 34 at ¶ 56); (Am. Compl. 35 at ¶ 58).

The grievances were amended to reflect this missing information [34] on January 23, 2020. (Am. Compl. 35 at ¶ 58).

33    Plaintiff also had intended to file a grievance about the grievance process, which Lanzo allowed, but Wambaugh said was not done. (Am. Compl. 33 at ¶ 51); (Am. Compl. 34 at ¶ 57).

34    The amended document shows the provision violated changed from "Article 5 – No Discrimination and all other Articles that apply" to "Article 37 – Health and Safety." The nature of grievance was further amended from "Mr. Morren was discriminated against based on having a disability" to "The university failed in its obligation and policy's [sic] to maintain a healthy and safe working conditions [sic]." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance) (Amended 1/22/2020 Step 1 Grievance)).

In May 2020, Plaintiff spoke with Lanzo and Marc Laffer, Lanzo's supervisor, who assured Plaintiff that the grievances were filed on time. (Am. Compl. 36 at ¶ 64). Lanzo and Laffer suggested that Plaintiff start the grievance process without the emails. (Am. Compl. 36 at ¶ 64). Plaintiff does not plead any facts about the grievance process, its timing, or any other details. Plaintiff alleges that he had wanted to set up a meeting with "management," which Lanzo suggested was not a good idea. (Am. Compl. 36 at ¶ 64).

A few days later, Plaintiff received an email from O'Brien asking Plaintiff to confirm a grievance meeting that Lanzo had attempted to schedule. (Am. Compl. 36–37 at ¶ 65). Plaintiff declined the meeting because he did not want to move forward with the meeting without his emails. (Am. Compl. 37 at ¶ 65).

Around the end of May or beginning of June 2020, Plaintiff alleges that he emailed Lanzo alerting him that the grievances were filed late. (Am. Compl. 37 at ¶ 66). Plaintiff alleges that Lanzo said, "let's see if the employer notices." (Am. Compl. 37 at ¶ 66). Lanzo "took responsibility for the grievances being filed late." (Am. Compl. 37 at ¶ 66).

Plaintiff alleges that his suspension and termination grievances are still open and that the grievances he asked Wambaugh to file were never filed. (Am. Compl. 37 at ¶ 67).

*10. Plaintiff's Other Factual Allegations*

On or about September 30, 2019, Rodriguez suggested that Plaintiff take FMLA leave. (Am. Compl. 27 at ¶ 23). Plaintiff asked Rodriguez for instructions, and Rodriguez told Plaintiff that he needed "to get certification" from his medical provider. (Am. Compl. 27 at ¶ 23). Wambaugh told Plaintiff the same thing. (Am. Compl. 27 at ¶ 24). Plaintiff also alleges that both Rodriguez and Wambaugh incorrectly gave him FMLA instructions that applied to non-union employees. (Am. Compl. 28 at 17). Plaintiff alleges that he applied for FMLA leave through "Lincoln Financial" in early October, but did not hear anything back for several months. (Am. Compl. 29 at ¶ 25).

**\*10**  On December 12, 2019, Plaintiff was "in the process" of pursuing FMLA leave and visited a health care provider. (Am. Compl. 32–33 at ¶ 48). Plaintiff mentions that he has a diagnosis of ADHD, but that the doctor also "wanted to include a diagnosis of insomnia and major depression," which Plaintiff avers he had "never been tested for or diagnosed with." (Am. Compl. 32–33 at ¶ 48). Plaintiff's medical provider said that he would send Plaintiff's diagnosis to the insurance company so that Plaintiff could pursue FMLA leave. (Am. Compl. 32–33 at ¶ 48). On or about December 24, 2019, Plaintiff called Lincoln Financial to see if they received his FMLA leave request, which they said they did not. (Am. Compl. 34 at ¶ 54).

On December 26, 2019, however, Lincoln Financial notified Plaintiff that his claim had been denied "because [he] was no longer employed." [35] (Am. Compl. 34 at ¶ 54). Then in February 2020, Plaintiff "learned that Lincoln Financial ... without [his] permission, opened up another claim for [him], and approved a leave claim, which [he] wasn't qualified for or asked for ([i]nsurance fraud)." (Am. Compl. 35 at ¶ 61). Through his own research, Plaintiff "learned the FMLA instructions given to [him] by [NYU] and [UCATS] was [sic] in fact incorrect information, which was later confirmed by Lanzo." (Am. Compl. 36 at ¶ 61). Plaintiff confronted Lincoln Financial and NYU. Plaintiff alleges Lincoln Financial apologized; NYU never responded. [36] (Am. Compl. 36 at ¶ 61).

35    Plaintiff further alleges:
    "[T]hey said I requested FMLA while I was employed, they said that was false. Lincoln

Financial also informed me that their point of contact at the Employer was Enrique Yanez. NYU, between the 24th and the 26th, how did they get in contact with Enrique Yanez, At home on his personal time? [A]nd, I note that Yanez is not the person who handles leave claims at NYU. As such, I believe that my claim was denied because the Employer is retaliating against me." (Am. Compl. 34 at ¶ 54).

36   Plaintiff then alleges:

"I believe that the approval of the short-term claim was part of the Employer's retaliation against me. I also believe that the Employer was engaged in a conspiracy with my doctor to retaliate against me, which led to medical malpractice, doctoring of my medical records, and prescribing me with medication for ailments I was not diagnosed with, which causes suicide and other life threatening diseases. Maliciously [i]nciting a suicide attempt is attempted murder." (Am. Compl. 36 at ¶ 61).

### 11. Plaintiff's Other Allegations of Stalking, Harassment, and Spying.

Plaintiff alleges that from April 2019 to February 4, 2020, several unidentified individuals had acted on Defendants' behalf to stalk and harass Plaintiff, but does not tie these allegations to any Defendants:

• On February 4, 2020, Plaintiff went to T-Mobile, where the representative helping him engaged in "unusual conversation" and had spent an hour setting up Plaintiff's phone when it should have only taken 10 minutes. (Am. Compl. 35 at ¶ 59).

• During this interaction, a man with sunglasses standing across the street kept looking at Plaintiff, and got into his car when Plaintiff walked past him. (Am. Compl. 35 at ¶ 59).

• On February 5, 2020, Plaintiff's phone had "the same amazon.com [IP] addresses that were being used by [NYU] in [his] phone[.]" (Am. Compl. 35 at ¶ 59).

• On February 9, 2020, Plaintiff was at a store across from a different T-Mobile store where someone "follow[ed] ... and harass[ed]" him in the store, which other patrons allegedly noticed. (Am. Compl. 35 at ¶ 60).

• Plaintiff's landlord, Tevia Clarke, who is an NYU alumna, has "harass[ed] ... and agitat[ed]" Plaintiff from July 2019 to April 2020, by "hacking [Plaintiff's] electronic devices and taking and/or tampering with ... packages sent to [his] house ... calling [him] 'weird' or stating [he is] crazy ... [and] constantly trying to start arguments in the apartment to get a violent reaction out of [him]." (Am. Compl. 37 at ¶ 68).

**\*11**   • Plaintiff alleges that one time he had not been receiving messages from Clarke and when he made her aware of this, "she pressed something on her phone and all of the text messages from her and other people, voicemails came thr[ough] at the exact same time." (Am. Compl. 37 at ¶ 68).

• On April 27, 2020, Plaintiff alleges "[he] saw Tevia Clarke Verizon IP address in [his] personal VPN account ... which is linked to [his] personal email address and is password protected." (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that Clarke is being bribed by Defendants to retaliate against him. (Am. Compl. 37 at ¶ 68). To support this allegation, Plaintiff notes that "[he] received mailings from the Union in May 2019 or June 2019, which had the Queens address on it, even though [he] did not move or change [his] address until mid July 2019." (Am. Compl. 37 at ¶ 68). Further, Plaintiff alleges Clarke gave Plaintiff's address to NYU UCATS. (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that "NYU has been contacting lawyers to either not take or diminish [his] case at[ ]least since December 2019 ... since filing [his] case on 12/18/20." (Am. Compl. 38 at ¶ 74).

• On January 31, 2021, Plaintiff discovered text messages from Cindy Morren (his sister and an NYU student) and his mother, in which Cindy was texting from Plaintiff's phone number through iMessage and "pretending to be [Plaintiff] and pretending to have a good relationship with [his] mother." (Am. Compl. at 38). Plaintiff alleges that his sister got his Apple ID through his ex-girlfriend, who also worked at NYU. (Am. Compl. 38 at ¶ 74).

• Plaintiff alleges that on June 3, 2021, his mother "called mental help officials." (Am. Compl. 39 at ¶ 74). Plaintiff alleges that "[he] was not mentally ill and that she was

just trying to harass [him] and deter [him] from making further complaints ...." (Am. Compl. 39 at ¶ 74).

• Plaintiff alleges in 2019-2020, Defendant NYU contacted his psychiatrist Dr. Rudoy "to diminish [his] complaints, and prescribe [him] wrong medication for illness he or his other doctors never diagnosed [Plaintiff] with." (Am. Compl. 39 at ¶ 74). Plaintiff was prescribed the medication in August 2019 following his complaints to Defendant NYU. (Am. Compl. 39 at ¶ 74). According to Plaintiff, Dr. Rudoy did not document any of Plaintiff's complaints and did not tell Plaintiff why. (Am. Compl. 39 at ¶ 74).

### IV. DISCUSSION

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* " '[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

**\*12** As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Therefore, this Court must interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal citations omitted). "However, the liberal treatment afforded to *pro se* litigants does not excuse a *pro se* party 'from compliance with relevant rules of procedural and substantive law.' " *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (quoting *Maisonet v. Metro Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009)). Accordingly, the Court may not "invent factual allegations that a plaintiff has

not pled." *Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-4642 (PMH), 2021 WL 229672, at \*4 (S.D.N.Y. Jan. 22, 2021) (alterations and quotations omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). As mentioned, however, the Court may consider facts raised in opposition papers, depending on the circumstances. *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018).

In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.*, 930 F.Supp. 2d 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss....").

### *1. Breach of Duty of Fair Representation*

Plaintiff brings a "hybrid" claim against UCATS and NYU under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and based on a union's duty of fair representation, arising from the National Labor Relations Act ("NLRA"). Liberally construed, Plaintiff alleges that NYU violated the CBA when it discriminated against him, and that UCATS breached its duty of fair representation when it: (1) failed to file grievances on Plaintiff's behalf, and (2) misled Plaintiff about the deadline for filing grievances. (Am. Compl. 12–14).

### i. Applicable Law

The duty of fair representation arises out of a union's status as the exclusive bargaining agent with the employer. *See Greco v. Commc'ns Workers of Am., Loc.*, 1104, 824 F.Supp. 2d 351, 356 (E.D.N.Y. 2011). Accordingly, the duty requires a labor organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998) (quotation marks omitted).

It is well established that an employee can sue their employer for breach of a CBA. *Smith v. Evening News Ass'n.*, 371 U.S. 195 (1962). Usually, an employee must exhaust any grievance or arbitration process set forth in the CBA before bringing suit. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). In *DelCostello v. International Brotherhood of Teamsters*, however, the Supreme Court recognized that such an exhaustion requirement may result in an "unacceptable injustice" when the union representing the employee in these processes acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello*, 462 U.S. at 164. In such a case, an employee can sue both the employer and the union, regardless of the grievance or arbitration proceeding. *Id.* In doing so, the plaintiff must allege that the union has breached its duty of fair representation and that the employer has breached its CBA. *Id.* A plaintiff has six months from the time he "knew or should have known of the breach of the duty of fair representation" to bring suit. *See White v. White Rose Food a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997).

 **\*13** Breach of duty of fair representation is difficult to plead because "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," subject to good faith and honesty in exercising its discretion. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). A breach of this duty only occurs if a union's conduct toward a member of the collective bargaining unit are "shown to have arbitrarily, discriminatorily, or in bad faith foreclosed the employee's opportunities to vindicate such wrong through the grievance process." *Castro v. New York City Bd. of Educ.*, 777 F. Supp. 1113, 1118 (S.D.N.Y.), No. 89-CV-4114 (KTD), *aff'd*, 923 F.2d 844 (2d Cir. 1990). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372–73 (1990).

To support allegations of discrimination in a breach of duty of fair representation claim, a plaintiff must plead facts that show a defendant's conduct was motivated by discriminatory animus. *Rivera v. Communications Workers of America*, No. 16-CV-1673, 2017 WL 4338754, at \*5 (E.D.N.Y. Sept. 29, 2017). A plaintiff must then allege "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 (quoting *Spellacy*, 156 F.3d at 126).

ii. Plaintiff's Fair Representation Claims are Time-Barred.

As an initial matter, all of Plaintiff's claims for breach of duty of fair representation are time-barred. This Circuit has established that a plaintiff's duty of fair representation claim accrues "at the latest" by the date of his National Labor Relations Board ("NLRB") charge. *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003) ("His bringing of the NLRB charge establishes that he had actual knowledge of the breach by [the date of his NLRB filing]. It is beyond dispute that his claim had accrued by that date.").

Plaintiff filed an unfair labor practice ("ULP") charge with the NLRB on **June 15, 2020**, alleging that UCATS failed to fairly represent him. (See ECF 65, Ex. 5 (Plaintiff's filed EEOC Charge)). As a matter of law, Plaintiff knew or should have known of UCATS's alleged breach of the duty of fair representation when he filed his ULP. Plaintiff filed his Complaint on **December 18, 2020**. Thus, any alleged breaches that Plaintiff knew or should have known about before **June 18, 2020** (6 months prior to the date of this action), are time-barred. Plaintiff does not argue that this statute of limitations should be tolled. Accordingly, his claim of a breach of duty of fair representation stemming from his June 15, 2020 NLRB charge should be dismissed. *See Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003). [37] Accordingly, I recommend that Plaintiff's claims against UCATS for breach of their duty of fair representation be dismissed. Additionally, because Plaintiff's claims against UCATS are "inextricably interdependent" with his claim against NYU, I recommend that Plaintiff's claim for breach of the CBA against NYU also be dismissed. *See DelCostello*, 462 U.S. at 164; *Tomney v. Int'l Ctr. For Disabled*, 357 F.Supp. 2d 721, 738 ("The Union did not violate its DFR, and so Tomney's claims against [the employer] for violating the CBA are dismissed.").

[37]     Allegations about Wambaugh allegedly giving Plaintiff the "incorrect FMLA leave Request Instructions (Am. Compl. at 6), and UCATS' failure to file a grievance—all of which occurred before June 18, 2020 (Am. Compl. at ¶¶ 7, 9, 14–16, 17, 20, 37–38, 40, 41) (Am. Compl. at 6)—are time barred.

Even if these claims were not time-barred, however, Plaintiff has not alleged any facts that

support his claim that UCATS declined to file grievances on Plaintiff's request *with an improper intent, purpose, or motive.* Without any supporting facts, this assertion is conclusory, and insufficient to state a claim for breach of the duty of fair representation. *See Stoner v. Walsh,* 772 F. Supp. 790, 806–07 (S.D.N.Y. 1991) (Mukasey, J.). Where Plaintiff alleges slightly more, the allegations are still conclusory and circular, and should be dismissed.

### 2. Breach of Contract

**\*14** Reading the Complaint most liberally, Plaintiff may be seeking to bring additional breach of contract claim(s) against NYU and UCATS. Plaintiff makes references to the "Union" or "Ucats" contract, but does not include any other facts about, or even references to, any other contracts. (Am. Compl. 20) ("WRONGFUL TERMINATION PURUSANT TO ... BREACH OF CONTRACT"); (Am. Compl. 24 at ¶ 5) ("I complained about potential contract violations to the Employer and to the Union ...."); (Am. Compl. 23 at ¶ 4) ("which it states in the Ucats Contract"); (Am. Compl. at 14) ("The Union Contract does not contain a clear and unmistakable waiver of my right to sue.").

NYU is correct that any state-law breach of contract claim Plaintiff brings against NYU is preempted by Section 301 of the LMRA. (ECF 46 at 20). Although the LMRA does not preempt claims for a violation of the CBA, if Plaintiff is claiming that Defendants violated the CBA, those claims are time barred. *See* Section V. *Cunningham v. Local 30, Int'l Union of Operating Eng'rs,* 234 F.Supp.2d 383, 395 (S.D.N.Y. 2002). Similarly, to the extent Plaintiff complains about UCATS's failure to pursue grievances on his behalf, these would be claims for breach of fair duty of representation, addressed in Section 1, *supra*.

### 3. Employment Discrimination

To state a claim for employment discrimination, a plaintiff must allege that: (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action ("AEA"), and (iv) there are facts suggesting an inference of discriminatory motivation. [38] *Littlejohn v. City of N.Y.,* 795 F.3d 297, 311 (2d Cir. 2015). Specifically, Plaintiff must show either that he "suffered

an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ... demonstrat[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir. 2001)). Similarly, to state a claim for disability discrimination, Plaintiff would need to plausibly allege that (1) Defendants are subject to the relevant statutes; (2) he suffers from a disability within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. [39]

[38]   Employment discrimination claims under Section 1981 and the NYSHRL are analyzed under the same framework as Title VII. *McGill v. University of Rochester,* 600 F. App'x 789, 790 (2d Cir. 2015). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination [to] plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks omitted). "[T]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Carter v. Verizon,* no. 13-CV-7579 (KPF), 2015 WL 247344, at *5 (S.D.N.Y. Jan. 20, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.,* 552 F. App'x 100, 102 (2d Cir. 2014)).

[39]   Aside from the NYSHRL and NYCHRL having a broader definition of "disability," "[t]he standard for pleading a claim for disability discrimination under the NYSHRL and the NYCHRL is virtually identical to the ADA." *Marquez v. Starrett City Assocs.,* 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017).

**\*15** To survive a motion to dismiss, a plaintiff must allege facts that plausibly suggest that the employer discriminated against him *because of* his race, national origin, or disability. *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 85 (2d Cir. 2015). "An inference of discrimination can arise from circumstances including, but not limited to,

the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The evidence necessary to satisfy this initial burden is "minimal and *de minimis*." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotations omitted). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If defendant does so, the burden shifts back to the plaintiff to demonstrate that defendant's reason is merely a pretext for discrimination or retaliation. *Id.* In other words, the Court only evaluates "pretext" if Plaintiff adequately alleges a *prima facie* case.

Evaluating his claims under those laws, Plaintiff fails to allege that he experienced any adverse employment action under circumstances that give rise to an inference of discrimination. (Am. Compl. 13). Plaintiff complains that: (1) he was unable to take vacations or sick leave for "religious/cultural event[s]" in Trinidad; (2) his seniority was miscalculated resulting in a less convenient schedule; (3) he experienced a "hostile work environment" because he had been subjected to derogatory comments, was "mocked daily," "ostracized," harassed, cyberstalked, and stalked; (4) NYU "retaliated" against Plaintiff for complaining about these events by "wrongfully suspend[ing] [him] twice" and eventually terminating his employment; and (5) NYU failed to provide him reasonable accommodations for his ADHD (Am. Compl. 14). I evaluate all of Plaintiff's claims for discrimination on the basis of race or national origin first, and then turn to Plaintiff's disability discrimination claim.

### i. Plaintiff Does not Allege Discrimination on the Basis of Race or National Origin

I evaluate Plaintiff's first two discrimination claims under a disparate treatment analysis, and in the alternative, a disparate impact analysis. *See Gonzalez v. Police Com'r Bratton*, 2000 WL 1191558, at *20 (S.D.N.Y. Aug. 22, 2000) (acknowledging hostile work environment and disparate treatment claims are "distinct" from one another and

"require[ ] different pleading and proof"); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 n.10 (S.D.N.Y. 2009) ("[I]t bears emphasis that the analysis of adverse employment actions involving disparate treatment claims is different [from] that involving retaliation claims."). Notwithstanding the differences between disparate treatment and retaliation, "[t]he burden of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp. ...*" *Shah v. New York State Dep't of Civ. Serv.*, 341 F. App'x 670, 673 (2d Cir. 2009).

### a. Plaintiff does not Allege Defendants Had a Full Prohibition on Vacation or Restricted his Sick Leave.

Plaintiff alleges that in 2017 or 2018, Plaintiff went to a "Religious/Cultural" festival in Trinidad. Rodriguez instructed Plaintiff to use sick leave during his absence and said Plaintiff would not need a doctor's note. (Am. Compl. 10 & 24 at ¶ 8). Plaintiff alleges that he complained that his coworker, Speziale was treated differently because he "gets religious requests approved" while he did not. Upon return, Caesar told Plaintiff NYU "will have to let [him] go if [he doesn't] have a doctor's note" for the time he was out. (Am. Compl. 10). Ultimately, Plaintiff reported that he was sick, produced a doctor's note, and therefore was not terminated for taking his trip[s] to Trinidad. (Am. Compl. 10).

**\*16** Although it is unclear whether Plaintiff actually lost or was denied vacation time, a loss or denial of vacation time "does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F.Supp. 2d 256, 261 (S.D.N.Y. 2011); *see Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019). Courts in this District have declined to recognize an employer's denial of a vacation request as an adverse employment action where this denial did not constitute a "complete bar" on a plaintiff's taking vacation. *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *see also Roff v. Low Surgical & Med. Supply, Inc.*, No. CV-033655 (SJF) (JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004). Plaintiff here did not allege that NYU completely forbade him from taking vacation; indeed, Plaintiff states at one point that NYU approved Plaintiff's request to go to Trinidad for this event three years in a row. (Am. Compl. 15).

*b. Plaintiff's Seniority Miscalculation
Does Not Result in an AEA.*

Plaintiff alleges that he was given a worse work schedule than his coworkers, who were less senior to him. (Am. Compl. 23 at ¶ 4). Plaintiff states that both NYU supervisors and UCATS's representative Wambaugh believed Speizale to be senior to Plaintiff, which Plaintiff disputed. Loss of "seniority" in this context is not an adverse employment action because unfavorable work schedules are not an adverse employment action, and Plaintiff alleges no other ramifications or less favorable treatment because of the seniority miscalculation. See *Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CV-7735, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) (finding denial of transfer to position with better hours was not an adverse employment action) *aff'd*, 514 F. App'x 33 (2d Cir. 2013); *Daniels v. Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at *8 (D. Conn. Aug. 17, 2015) ("[Plaintiff] also suggests that the ... position is a 'preferred working schedule for officers,' but an unfavorable schedule is not an adverse employment action.") (citing *Albuja v. Nat'l Broad. Co. Universal*, 851 F.Supp. 2d 599, 608 (S.D.N.Y. 2012)).

*c. None of the Alleged Adverse Employment Actions
Give Rise to an Inference of Discrimination.*

Even if changes to Plaintiff's vacation time and work schedule were considered adverse employment actions, Plaintiff still does not state a claim for employment discrimination because none of Plaintiff's alleged AEAs—including suspension, termination, and hostile work environment—occurred under circumstances that give rise to an inference in discrimination. [40] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.' " *Id.* "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.' " *Sollazzo v. Just Salad Rest.*, No. 15-CV-252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03-CV-1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004)). A

plaintiff also "must show that [his] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d. Cir. 2000). While "all material respects" varies, a plaintiff must typically "plead comparators' relevant experience and length of employment in order to raise an inference of discrimination." *LeeHim v. New York City Dep't of Educ.*, No. 17-CV-3838 (PAE), 2017 WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017).

[40]   Indeed, "[b]eing forced to endure a hostile work environment is one type of adverse employment action." *Dietrich v. City of New York*, No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020).

**\*17** The Amended Complaint lacks factual allegations to support an inference that similarly situated non-Black or non-disabled employees were treated differently from Plaintiff. The only comparator Plaintiff alleges is Gary Speizale, who he alleges is white, less senior to him, and gets his holiday vacation time approved. (Am. Compl. 10). Plaintiff conclusorily alleges that Speizale is "similarly situated" to him in "all material respects," and does not identify any other comparator. *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815 (KPF), 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (finding plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenure, or experiences). Accordingly, the Complaint's conclusory allegations of differential treatment are insufficient to plausibly suggest an inference of discrimination with regard to work schedule or denial of travel to Trinidad. *See id.*; *see also Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68–69 (2d Cir. 2015); *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 408 (S.D.N.Y. 2014).

Similarly, Plaintiff does not allege discrimination under a disparate impact theory. To do so, Plaintiff must allege that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This requires: (i) identifying a specific employment practice or policy; (ii) demonstrate that a disparity exists; and (iii) alleging a causal relationship between the two. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). To demonstrate a disparity sufficient to withstand a motion to dismiss, plaintiffs must allege statistical evidence or allege that a "neutral employment practice denied equal employment opportunities to a small number of members of a protected

class compared to similarly-situated colleagues." *Gordon v. City of N.Y.*, No. 14-CV-6115 (JPO) (JCF), 2016 WL 4618969, at *23 (S.D.N.Y. Sept. 2, 2016).

Plaintiff has not identified any employment practice or policy related to vacation time or his work schedule.[41] *See African Am. Legal Defense Fund v. N.Y. State Dep't of Educ.*, 8 F.Supp. 2d 330 (S.D.N.Y. 1998) (dismissing Title VII disparate impact claim where plaintiff failed to allege any statistics to support allegations that facially neutral hold-harmless provisions had a disparate impact on minorities). Accordingly, I recommend Plaintiff's race and national origin discrimination claims be dismissed.

[41]    While Plaintiff alleges that he sought to file a grievance about the grievance process, he does not allege any facts about the process and procedure for filing grievances, or how the process was allegedly different for him due to his membership in a protected class. (Am. Compl. 34–35 at ¶ 53, 57).

### ii. Plaintiff Fails to Allege a Hostile Work Environment.

To state a claim for a hostile work environment under § 1983, § 1981, Title VII, or the NYSHRL, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Bermudez v. City of New York*, 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

*18   The standards for a union's liability for hostile work environment are different from those governing the liability of an employer. Under Title VII, a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e–2(c)(3). To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union.[42] *See Agosto v. Correctional Officers Benevolent Ass'n*, 107 F.Supp. 2d 294, 307 (S.D.N.Y. 2000); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *21–22 (S.D.N.Y. Sept. 26, 2018).

[42]    The case law governing a union's liability for hostile work environment under the NYSHRL and NYCHRL is less clear. Most cases, however, hold that NYSHRL and NYCHRL claims against a union "are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and non-discriminatory manner." *Gallardo v. AEG Mgmt. Brooklyn, LLC*, No. 16-CV-4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (collecting cases).

#### a. Plaintiff Does Not Adequately Allege that NYU or UCATS Stalked or Harassed Plaintiff, or Hacked Plaintiff's Electronic Devices.

Plaintiff's allegations that he was stalked, harassed, and hacked are conclusory. *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 3757120, at *10 (S.D.N.Y. June 17, 2015), *R&R adopted*, No. 14-CV-3592 RA, 2015 WL 4579147 (S.D.N.Y. July 29, 2015) (finding plaintiff's allegations that certain conduct "allow[ed] 'criminal host(s) to steal the site content' ... 'manipulate users' web activity," "lose control of her email account, and [ ] be subject to email spam" conclusory). Plaintiff's allegations here—that numerous people, including T-Mobile employees; Plaintiff's roommate/landlord, psychiatrist, sister, or mother; and/or strangers on the subway are hired by Defendants to stalk and harass him—are wholly unsupported by facts and do not state a claim for a hostile work environment.[43] The Court understands that Plaintiff describes these instances in support of his *belief* that there is an ongoing conspiracy

against Plaintiff to create a hostile work environment for him. Plaintiff's beliefs—however strongly he may hold them—are not facts. *Gallop v. Cheney,* 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic' or 'delusional.' ") (quoting *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992)); *Tessema v. Env't Prot. Agency,* No. 1:20-CV-9700 (MKV), 2021 WL 2666855, at *4 (S.D.N.Y. June 29, 2021), *appeal dismissed sub nom. Tessema v. United States Env't Prot. Agency,* No. 21-1729, 2021 WL 6427942 (2d Cir. Dec. 16, 2021) (finding that Plaintiff's claims that the EPA has tortured him and subjected him to human experiments involving exposure to hazardous pollutants were "fanciful" in nature and "clearly warrants dismissal"); *Mercier v. Mercier,* No. 07-CV-0523, 2007 WL 1582267, at *1–2 (N.D.N.Y. May 25, 2007) (Kahn, J.); *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."); *see also Banks v. Mental Health Clinicians,* No. 11–CV–7848, 2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, *inter alia,* that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with "punitive intentions") (internal quotation marks omitted).

[43]    Generally, an employer is not liable as a matter of law for harassment resulting "from nonwork-related, off-duty interactions between co-employees, because those actions are not part of the work environment." *See Devlin v. Teachers' Ins. & Annuity Ass'n of Am.,* No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion for summary judgment on the plaintiff's sexual harassment claim because, *inter alia,* the plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).

**\*19** Additionally, Plaintiff has failed to allege sufficient facts from which one could reasonably conclude that the alleged hostile conduct was *because of* Plaintiff's membership in protected classes. *See Wilson v. JPMorgan Chase Bank, N.A.,* No. 20-CV-4558 (JMF), 2021 WL 918770, at *5 (S.D.N.Y. Mar. 10, 2021).

*b. Plaintiff Does Not Adequately Allege Discriminatory Comments That Rise to a Hostile Work Environment.*

Plaintiff also does not plead sufficient facts to support a hostile work environment claim against NYU (and therefore UCATS) arising from allegedly discriminatory comments because the conduct about which Plaintiff complains is not severe or pervasive.[44] *See Benzinger v. Lukoil Pan Americas, LLC,* 447 F. Supp. 3d at 99. Plaintiff alleges he was subject to several derogatory statements and was "ostracized," stalked, harassed, and hacked at work. (Am. Compl. 20). *See also* Am. Compl. 22 ("was labeled a criminal, threatening, violent, aggressive, unprofessional all which are racial sterotypes[sic]/profiles for person(s) of [A]frican descent"; Am. Compl. 20 ("Management and my coworkers would say things like 'why don't you go back to your country since you keep complaining', or 'you don't fit the culture here.' "); Am. Compl. 24 at ¶ 7 (" 'You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around' "); Am. Compl. 15 ("Why don't you just go back to Trinidad to live since [you're] always complaining about what we do here."); Am. Compl. 32 at ¶ 45 (Rodriguez used the words 'black man being aggressive' "); Am. Compl. 11 ("subjected to numerous disparaging comments from 4/2/19 to 12/10/19").

[44]    To the extent any part of Plaintiff's claims under the NYSHRL fall under the less demanding NYCHRL standard, his claims also fail for the reasons discussed herein. The burden to state a claim under the NYCHRL is somewhat less demanding, requiring the plaintiff to allege: (i) that the plaintiff was "treated less well than other employees;" and (ii) that such treatment was because of the plaintiff's protected class. *Wilson v. JPMorgan Chase Bank, N.A.,* No. 20-CV-4558, 2021 U.S. Dist. LEXIS 45132, at *13 (S.D.N.Y. Mar. 10, 2021).

Because Plaintiff's Complaint is at times vague and repetitive, I cannot discern for many of the claims the speaker, context, or frequency of these comments. Accordingly, Plaintiff fails to state a claim for hostile work environment based on the comments identified here.

iii. Plaintiff Does not Adequately Allege Retaliation.

To establish a claim of retaliation under § 1981, Title VII and the NYSHRL, Plaintiff must allege facts that plausibly suggest that: (i) he participated in protected activity, (ii) he suffered an adverse employment action, and (iii) there was a causal connection between his engaging in the protected activity and the adverse employment action. [45] *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see also Wilson*, 2021 U.S. Dist. LEXIS 45132, at *13.

[45]   Plaintiff must also establish these elements under the NYCHRL, except that instead of an adverse employment action, he need only prove that "something happened that would be reasonably likely to deter a person from engaging in protected activity." Wilson, 2021 U.S. Dist. LEXIS 45132, at *20.

**\*20** Liberally construing the Complaint, Plaintiff claims that he was suspended and fired for seeking to file grievances (or otherwise complaining) about mistreatment in the workplace. *See* Am. Compl. 12 ("[Plaintiff has] complained about a hostile workplace, Harassment, Retaliation, Discrimination and my complaints were either wrongfully labeled as meritless or I was deceitfully told they were filed when they were not."). [46] It is well settled that filing "[a] union grievance can constitute protected activity if it concerns discrimination, but union grievances that complain of matters other than discrimination do not constitute protected activity for purposes of Title VII." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790 (PMH), 2020 WL 2131771, at *4 (S.D.N.Y. May 4, 2020) (quoting *Mack v. Paris Maint. Co. Inc.*, No. 14-CV-6955, 2016 WL 8650461, at *9 (S.D.N.Y. Feb. 22, 2016), *R&R adopted*, No. 14-CV-6955, 2016 WL 1071030 (S.D.N.Y. Mar. 17, 2016)).

[46]   Even though Plaintiff has not pleaded a *prima facie* case for discrimination that would, under *McDonnell Douglas*, shift the burden to Defendants to provide a legitimate non-discriminatory reason for Plaintiff's suspension and termination, Plaintiff nonetheless acknowledges that NYU's proffered reasons for his suspensions and termination were because of Plaintiff's interpersonal conflicts with coworkers. (Am. Compl. 30 at ¶ 37, 38).

Plaintiff does not adequately allege that he engaged in protected activity. Although Plaintiff alleges that coworkers made racially charged comments to him, Plaintiff does not

provide facts about when he sought to file a grievance for this conduct, or for any other **discriminatory conduct** that he endured based on his race or national origin. Although Plaintiff sought to file many grievances with UCATS, in the majority of the alleged instances, Plaintiff only states that UCATS did not or could not file a grievance—not that he sought to file a grievance because of discrimination on the basis of race or national origin. (Am. Compl. 24 at ¶ 4); (Am. Compl. 25 at ¶ 14); (Am. Compl. 9); (Am. Compl. 26 at ¶ 17); (Am. Compl. 27 at ¶ 20); (Am. Compl. at 30 ¶ 32). Only on three occasions does Plaintiff plead slightly more. Specifically, Plaintiff alleges that: (1) Defendants "maliciously misled [him] into thinking the grievances were filed when they weren't" so that both parties could avoid a breach of a duty of fair representation claim (Am. Compl. 9); (2) Wambaugh "did not file a grievance for racial discrimination, which *she should have known* to [do because] she had the audio evidence" of the fight between Plaintiff, Olivia, and Jameson (Am. Compl. 29 at ¶ 32) (emphasis added); and (3) UCATS violated their duty of fair representation in May 2020 because some grievances UCATS allegedly filed were "not actual grievances and lack sig[ ]natures by all parties." (ECF 68). Plaintiff does not allege any facts that suggest UCATS's decision not to file a grievance for Plaintiff was motivated by discriminatory animus. [47] Accordingly, I recommend that Plaintiff's Retaliation claim be dismissed.

[47]   In fact, only Plaintiff's January 16, 2020 Grievance Form states that Plaintiff "was discriminated against based on having a disability." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance). The Grievance does not reference Plaintiff's race or national origin, at all.

### iv. Plaintiff's Disability Discrimination Claim Fails.

Plaintiff does not adequately plead disability discrimination under the ADA, the NYCHRL or the NYSHRL. Plaintiff does not allege that the Defendants are subject to the ADA, that he was in fact disabled under the ADA, or that he suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination. [48]

[48]   Among other things, Plaintiff neither pleads when he made his employer aware of his ADHD nor

how his ADHD is related to any alleged adverse employment action.

**\*21** A person has a "disability" within the meaning of the ADA if he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;" or if he is (C) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Plaintiff has not alleged that his ADHD has impacted him in any way. [49]

[49]   Even if Plaintiff has a disability under the broader NYSHRL definition in light of his ADHD diagnosis (ECF 65-7 at 1), it is unnecessary for me to evaluate this since Plaintiff fails to allege any adverse employment action giving rise to an inference of disability discrimination. *See Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109 (JCF), 2007 WL 1149979, at \*19 (S.D.N.Y. Apr. 18, 2007), *aff'd sub nom. Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008).

Moreover, Plaintiff does not plead any facts that support his allegation that Defendants denied him any reasonable accommodation. To state a claim for failure to accommodate, "a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." *Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), *aff'd sub nom. Howard v. United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016). Here, Plaintiff merely restates the legal standard that employer generally have a duty to accommodate employees with disabilities and checks a box that the Defendants denied him accommodations. (Am. Compl. 5, 14). This is conclusory and insufficient.

Although Plaintiff's November 21, 2019 Step 2 Grievance states that he "was discriminated against based on having a disability," his supporting reasons include that he was "stalked, bullied, harassed[ ], character defamed, privacy breached," among other things. (ECF 49-3 at 3). As addressed above, these allegations are fanciful and should be dismissed. *Gallop*, 642 F.3d at 368 (2d Cir. 2011). Accordingly,

I recommend that the Court dismiss Plaintiff's disability discrimination claims.

### *4. FMLA Interference*

Plaintiff believes that UCATS and NYU violated the FMLA because they denied his initial claim, but then approved an FMLA application for Plaintiff that Plaintiff claims he never made. These allegations do not support a claim for FMLA violations against either defendant. To state an FMLA interference claim, Plaintiff must establish: (i) that he is an eligible employee under the FMLA; (ii) that the defendant is an employer as defined by the FMLA; (iii) that he was entitled to take leave under the FMLA; (iv) that he gave adequate notice to the defendant of his intention to take leave; **and** (v) that he was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff's claim against UCATS fails because Plaintiff has not (and cannot) allege that UCATS is an "employer" within the meaning of the FMLA. *Eckert v. United Auto. Workers Loc. Union 897*, No. 04-CV-538S, 2005 WL 2126295, at \*9 (W.D.N.Y. Sept. 1, 2005) (concluding that a union that represented plaintiff's interests and acted on his behalf "relative to [Plaintiff's] employment" is "precisely the opposite" of an employer under the FMLA); *see also Latella v. Nat'l Passenger R.R. Corp. (Amtrak)*, 94 F. Supp. 2d 186, 190 (D. Conn. 1999) (rejecting an argument for breach of duty of fair representation against a union for "not advising him of his rights under the FMLA" because "no private right of action exists for a violation of the FMLA's notice requirements against an employer or a union."). Accordingly, Plaintiff's FMLA claim is not applicable against UCATS, and I recommend that it be dismissed.

**\*22** Plaintiff's claim against NYU also fails. Plaintiff does not allege any facts that identify how NYU interfered with his FMLA rights or resulted in a denial of Plaintiff's benefits. Plaintiff alleges that he applied for FMLA leave in early October 2019, after a September 30, 2019 conversation between Plaintiff and Rodriguez. (Am. Compl. 28 at ¶¶ 23, 25). Plaintiff also alleges that on December 12, 2019 he visited a doctor in "pursu[it] [of] FMLA leave." (Am. Compl. 32–33 at ¶ 48). Plaintiff does not allege whether the FMLA leave he was pursuing in December 2019 was a part of the same request or not. Plaintiff's operative complaint is devoid of any allegations regarding his FMLA process for the two

months immediately preceding Plaintiff's termination. NYU terminated Plaintiff's employment on December 13, 2019. (Am. Compl. 33 at ¶ 49). At most, Plaintiff alleges that Rodriguez "deliberately" gave him "the wrong Fmla [sic] request instructions ... which interfered with [his] FMLA rights entitlement." (Am. Compl. 17).

NYU is correct, however, that failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). Plaintiff makes the conclusory statement that Rodriguez's and Wambaugh's errors "interfered with [his] FMLA rights entitlement," but does not allege how being provided non-union employee instructions affected Plaintiff's pursuit of FMLA leave when he knew that he was a union employee. (Am. Compl. 17). Because of conflicting and incoherent allegations, I cannot discern from Plaintiff's pleadings: (1) what Rodriguez's FMLA instructions were; (2) when he requested FMLA leave; or (3) any October 2019 request was approved or denied. Accordingly, I recommend that Plaintiff's FMLA interference claim be dismissed.

### 5. Conspiracy under *Section 1985(3)*.

Plaintiff fails to assert a *§ 1985* claim against both defendants for the same reason: he fails to allege any facts that suggest either defendant acted in agreement with anyone, or acted with an intent to deprive Plaintiff of any of his rights under the law. As stated in Section VII, Plaintiff also does not allege that any party acted with discriminatory animus.

To state a claim under *§ 1985(3)*, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privileges of a citizen of the United States." *Trautz v. Weisman*, 819 F. Supp. 282, 290 (S.D.N.Y. 1993). The conspiracy must further be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Cuoco v. U.S. Bureau of Prisons*, No. 98-CV-9009 (WHP), 2001 WL 167694, at *3 (S.D.N.Y. Feb. 16, 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The claim must be pleaded with "at least some

degree of particularity ... [to] establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014). This requires "establish[ing] the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Id.* (quoting *Roach*, at 147 (2d Cir. 1999). An explicit agreement is not necessary but may be shown through a "general conspiratorial objective" among the participants in the conspiracy. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1999) (quoting *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990)). A plaintiff must further allege that the defendant's "overt acts ... were reasonably related to the promotion of the claimed conspiracy." *Id.* (quoting *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999). In making this claim, a plaintiff must adequately allege "the most fundamental aspect of a conspiracy: an agreement." *Gropper*, 12 F. Supp. 3d at 671. The Court will not simply infer an agreement from violations of the laws because that would essentially "permit every civil rights case to become a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts." *Id.* at 671.

**\*23** Plaintiff alleges that he complained to UCATS about the hostile work environment he experienced, but UCATS told him his concerns were meritless, or told Plaintiff they filed grievances when they had not. (Am. Compl. 9, 12). Defendants' "dishonesty," Plaintiff alleges, is a "clear sign of a conspiracy to deprive [him] of [his] rights." (Am. Compl. 12). While Plaintiff was upset by UCATS's responses that they either would not or could not file a grievance for some of the events about which Plaintiff complained, Plaintiff does not allege sufficient facts to withstand a motion to dismiss. Plaintiff fails to state any facts with particularity that suggest UCATS and NYU employees worked *in concert* (either totally within UCATS, totally within NYU, or some combination of UCATS and NYU) to *deprive* Plaintiff of his constitutional rights.

Plaintiff's allegations are limited to conclusory statements. Complaints that state "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2017 WL 4011395, at *8, (S.D.N.Y. Sept. 11, 2017); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic.' or 'delusional.' ") (quoting

*Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Evidence to support a conspiracy may be "when, where or with whom an unlawful agreement was made" or "any specific acts performed in furtherance of the alleged unlawful agreement." *Almonte v. Florio*, No. 02-CV-6722 (SAS), 2004 WL 60306, at *5 (S.D.N.Y. Jan. 13, 2004). None of that is present. Plaintiff does not adequately allege that UCATS or NYU acted in furtherance of a conspiracy to deprive him of his constitutional rights because his allegations are conclusory. As discussed, the Complaint does not adequately allege that NYU or UCATS's actions were motivated by a racial animus. *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at *16 (S.D.N.Y. Mar. 1, 2018). Accordingly, I recommend that Plaintiff's § 1985 claim against UCATS be dismissed.

### 6. Civil Rights Violation Under Civil Rights Law Section 79-n.

Civil Rights Law § 79-n creates a cause of action against anyone who "summons a police officer ... without reason to suspect a violation of the penal law, any other criminal conduct, or an imminent threat to a person or property," "because of a belief or perception regarding," *inter alia*, race or disability. Civil Rights Law § 79-n. To state a claim under CRL § 79-n, a plaintiff must allege that a defendant (1) intentionally committed, (2) damage to a person or property, (3) 'because of a belief or perception regarding [that person's] ... [protected characteristic].' " *Le v. Triza Elec. Corp.*, No. 19-CV-5134 (ARR) (PK), 2020 WL 1274977, at *3 (E.D.N.Y. Mar. 16, 2020). Section 79-n does not provide a remedy "where existing discrimination laws already provide protection, such as in employment ... decisions. Unless a plaintiff could show bias-related violence or intimidation in the hiring ... decision ... [they] could not bring an action under this new section." *Governor's Approval Memorandum*, No. 7, ch. 227, filed with Assembly Bill Number 529.

Plaintiff's Section 79-n claim fails because of the availability of other statutory remedies in the employment context. Even if it did not, Plaintiff would still fail to state a claim. Plaintiff alleges that Rodriguez "falsely summoned" an NYPD officer "to arrest [him] and or escort [him] out for criminal trespassing" as he was writing an email about the hostile work environment he was experiencing. (Am. Compl. 12 at ¶ 6). Rodriguez is not a defendant in this action.[50] Even if this behavior extended to NYU, Plaintiff does not assert that NYU intentionally threatened Plaintiff

because of his protected characteristics.[51] As best as I can discern, Plaintiff alleges that he was suspended on or before December 11, 2019 because NYU knew, "through its control of [Plaintiff's] devices," that Plaintiff knew NYU hacked his devices. (Am. Compl. 32 at ¶ 47). By Plaintiff's own account, his employment was suspended, and his supervisor suggested he leave. When he did not leave, he overheard Rodriguez say, "black man being aggressive" and NYPD officers appeared to "arrest [him] for criminally trespassing."[52]

50   Plaintiff does not allege any facts involving UCATS and the Court cannot discern any Civil Rights § 79-n claim against them.

51   As Defendants point out, at least one court has dismissed a Section 79-n claim because it was brought against an organization and not an individual. *Morrison v. Shalach*, 67 Misc. 3d 451, 457, 124 N.Y.S.3d 512 (N.Y. Sup. Ct. Westchester Cty. 2020).

52   Plaintiff compares his experience to that of his coworkers Speizale and Wambold, who he alleges could come into the building "on their days off," use the workstations, and were "never asked to leave" or have NYPD "called to arrest them for criminally trespassing. (Am. Compl. 32 at ¶ 46). But Plaintiff's comparison falls short in this instance because Plaintiff was not given a day off when he was told to leave—he had already been suspended from working at NYU.

### 7. Negligent Infliction of Emotional Distress.

**\*24** Plaintiff brings claims against both NYU and UCATS for negligent infliction of emotional distress ("NIED"). Plaintiff alleges that he experienced emotional distress because of the "employment discrimination" he experienced at NYU. (Am. Compl. 13).

As an initial matter, Plaintiff's NIED claim against NYU is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"). *See* N.Y. Work. Comp. Law § 11. The WCL provides the exclusive remedy for an employee who is injured "by the negligence or wrong of another in the same employ." *Rivera v. Baccarat, Inc.*, No. 95-CIV-9478 (MBM), 1996 WL 251850, at *4, (S.D.N.Y. May 10, 1996). WCL precludes Plaintiff from

recovering from claims of NIED that arise out of workplace conduct. *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014); *Stevens v. New York*, 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009); *see Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (finding negligence claim for hostile work environment barred by exclusivity of workers compensation). While the Court is sympathetic to Plaintiff's distress, Plaintiff's allegations arise out of alleged workplace conduct. Accordingly, the claim is barred by the WCL and must be dismissed.

Plaintiff's NIED claim against UCATS also fails. First, while Plaintiff makes this claim against "NYU **and UCATS**" (Am. Compl. 25 at 13), he does not provide facts that support any allegation that UCATS as an entity or a UCATS employee did anything that would support a claim for negligent infliction of emotional distress. (Am. Compl. 25 at 13–14). While Plaintiff alleges that he was being stalked and is experienced a hostile work environment (allegations that appear to be targeted at NYU, not UCATS), these allegations are conclusory. *See Goodrich v. Long Island R.R. Co.*, No. 10 Civ. 2195 (SAS), 2010 WL 2473593, at *1, (S.D.N.Y. June 17, 2010) (following Plaintiff's coworker posting on a public bulletin board his positive HIV status, Plaintiff withdrew his NIED claim, conceding he " 'was never placed in fear of imminent bodily harm, nor did he ever suffer any physical impact' "). To the extent Plaintiff is alleging UCATS acted negligently by failing to file grievances for Plaintiff, as discussed, UCATS has wide discretion in those decisions, and Plaintiff does not adequately allege that they abused their discretion. *See supra* Section 1.

### V. Conclusion and Recommendation

For the reasons stated above, I recommend that the Motion be **GRANTED**. Although *pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated," *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002), amendment may be denied upon a finding of futility. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271–72 (2d Cir. 1996). I do not recommend that Plaintiff be given leave to amend his conspiracy claim because his allegations, even liberally construed, are still fanciful and factually frivolous. *See Kraemer v. City of New York*, No. 19-CV-6671 (VEC), 2020 WL 1974204, at *4 (S.D.N.Y. Apr. 24, 2020) ("While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources.") (finding Plaintiff's allegations

of coordinated efforts by police, AMC movie theaters, T-Mobile, Starbucks, NYU and others to "surveil, mock, and harass Plaintiff" frivolous). Similarly, because Plaintiff's fair representation claims are time-barred, leave to amend would also be futile.

**\*25** Because Plaintiff is proceeding *pro se*, however, I recommend that he be given **one final opportunity** to replead only his **Discrimination Claims for Hostile Work Environment and Retaliation, and his FMLA Claims,** and that he be directed to file a proposed second amended complaint within 30 days of Your Honor's final disposition of this motion. To the greatest extent possible, Plaintiff's amended complaint must allege facts to support that his claims, including:

(1) Identifying the NYU or UCATS employees, if any, who engaged in the specific discriminatory conduct; and

(2) Identifying and describing the specific acts by the NYU or UCATS employees that constitute discriminatory acts.

### VI. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable J. Paul Oetken, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Oetken.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS** <u>WILL</u> **RESULT IN A WAIVER OF OBJECTIONS AND** <u>WILL</u> **PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Defendants. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by mail and file proof of

service on the docket within seven days. Alternatively, if circumstances related to the ongoing COVID-19 pandemic prevents their service, they must file a letter on the docket instead.

**All Citations**

Slip Copy, 2022 WL 1666918

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1665013
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY, et al., Defendant.

20-CV-10802 (JPO)
|
Signed 05/25/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C., New York, NY, for
Defendant.

ORDER ADOPTING REPORT
AND RECOMMENDATION

J. PAUL OETKEN, District Judge:

**\*1** *Pro se* Plaintiff Darwyn M. Morren sues New York
University and UCATS Local 3382 under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42
U.S.C. § 1981; the Americans with Disabilities Act of 1990,
42 U.S.C. § 12101 *et seq.*; the Family and Medical Leave Act
of 1993, 29 U.S.C. § 2601 *et seq.*; the Labor Management
Relations Act, 29 U.S.C. § 185; 42 U.S.C. § 1985; the
Immigration Reform and Control Act of 1986, 8 U.S.C.
§ 1101 *et seq*; the New York State Human Rights Law,
N.Y. Exec. Law § 290 *et seq.*, the New York City Human
Rights Law, N.Y. City Admin. Code § 8-101 *et seq*; and
New York Civil Rights Law § 79-n. Plaintiff also brings
claims for breach of contract and negligent infliction of
emotional distress. (*See* Dkt. No. 25 ("Am. Compl"); Dkt. No.
25-1 ("Pl.'s Memo") 4-14.) Defendants have each moved to
dismiss the amended complaint for failure to state a claim.
(*See* Dkt. No. 47 ("UCATS Mot."); Dkt. No. 53 ("NYU
Mot.").) In a report and recommendation, Magistrate Judge
Ona T. Wang has recommended that Defendants' motions to
dismiss be granted. (*See* Dkt. No. 76 ("R. & R.") at 49.)

Plaintiff objects to the report and recommendation only on
the grounds that (i) he did not file a motion to amend his
complaint; (ii) he did not receive Defendants' motions to
dismiss; and (iii) UCATS Local 3882 did not process his
grievances. (*See* Dkt. No. 79 ("Pl.'s Objections") at 1-2.)
In reviewing a report and recommendation, a district judge
"must determine de novo any part of the magistrate judge's
disposition that has been properly objected to." Fed. R. Civ. P.
72(b). In reviewing a *pro se* party's submissions, the court is
"obligated to afford a special solicitude," *Tracy v. Freshwater*,
623 F.3d 90, 101 (2d Cir. 2010), so such submissions are
read "to raise the strongest arguments that they suggest,"
*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d
Cir. 2006) (per curiam).

Plaintiff's objections here are without merit. Magistrate Judge
Wang's report and recommendation concerns Defendants'
motions to dismiss the amended complaint, not any motion to
further amend the complaint. (*See* R. & R. at 49.) Defendants
filed these motions on ECF, and Plaintiff had consented to the
electronic service of court documents through ECF. (*See* Dkt.
No. 3.) Finally, Plaintiff does not meaningfully contest that
his claims against UCATS Local 3882 relating to the failure
to process his grievances are time-barred. Plaintiff brings
a claim that UCATS breached its duty of representation, but
a plaintiff has only six months to bring suit from the time
he "knew or should have known of the breach of the duty
of fair representation." *White v. White Rose Food a Div. of
DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997). Such a
claim accrues "at the latest" by the date of a National Labor
Relations Board ("NLRB") charge. *Kovowras v. N.Y. Times
Co.*, 328 F.3d 50, 55 (2d Cir. 2003). Plaintiff filed an unfair
labor practice charge with the NLRB on June 15, 2020. (*See*
Dkt. No. 49-5 ("NLRB Charge").) In that charge, he alleged
that UCATS failed to fairly represent him. (*See id.* at 2.)
Plaintiff had until December 15, 2020, to bring suit, but he
did not do so. (*See* Dkt. No. 1 ("Compl").) Accordingly, even
if Plaintiff's allegations are true, his claim must be dismissed.

**\*2** The remainder of the report and recommendation is
adopted in full. Where there is no objection, a district court
reviews for clear error. See Fed. R. Civ. P. 72(b), Advisory
Committee's Notes (1983) ("When no timely objection is
filed, the court need only satisfy itself that there is no
clear error on the face of the record in order to accept the
recommendation."); *see also Borcsok v. Early*, 299 F. App'x
76, 77 (2d Cir. 2008). Magistrate Judge Wang's thorough and
well-reasoned report presents no errors, clear or otherwise.

For the foregoing reasons, Plaintiff's objections are overruled
and Judge Wang's Report and Recommendation (Dkt. No.

76) is ADOPTED in full. Defendants' motions to dismiss are GRANTED. Further, for the reasons explained by Judge Wang, Plaintiff is granted leave to amend his discrimination claims for hostile work environment and retaliation and his FMLA claims, provided that he must file a proposed second amended complaint repleading those claims within thirty days after the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 47 and 53.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1665013

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 75 of 251

Merisier v. Kings County Hospital, Not Reported in Fed. Supp. (2017)

2017 WL 4857565

2017 WL 4857565
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Marie MERISIER, Plaintiff,

v.

KINGS COUNTY HOSPITAL, Defendant.

16-CV-7088 (RRM) (RML)

|

Signed 10/25/2017

**Attorneys and Law Firms**

Marie Merisier, Jamaica, NY, pro se.

### MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, United States District Judge

**\*1** Plaintiff Marie Merisier, proceeding *pro se*, brings this employment discrimination action against her employer, Kings County Hospital. (*See* Compl. (Doc. No. 1).) Her request to proceed *in forma pauperis* is granted solely for the purpose of this Order. For the reasons stated below, Merisier's complaint is dismissed with leave to replead within 30 days of the date of entry of this Order.

### BACKGROUND

Merisier commenced this action by filing a form complaint for employment discrimination actions and checking the box to initiate an action under Title VII of the Civil Rights Act of 1964. (Compl. at 3.) [1] Merisier checked the boxes indicating discriminatory conduct consisting of unequal terms and conditions of employment and retaliation. (Compl. at 4.) In the section to allege discrimination, she neither checks any of the boxes nor specifies any basis for discrimination. (Compl. at 5.) In the space to describe the facts of her case, Merisier states: "Since my employment at this agency I have been treated differently from my peers." (Compl. at 6.) She does not indicate how long she was employed with her current employer. She states that she was assaulted by an employee on September 23, 2015, but that the administration penalized her instead of the other employee. (*Id.*) She states: "Administration has continuously ... tried to defame my character by trying to make me out to be a violent person

with these false allegations where there is video footage of everything that has taken place but refuse to provide it because it will show that I'm continuously being bullied/harassed and now assaulted." (*Id.*) Merisier alleges that she filed a complaint with the Division of Human Rights, but that the investigator told her that a decision had been made "based on lack of evidence in support of my claims." (*Id.*) She does not allege that the harassment or disciplinary action were based on her race, color, sex, religion, or national origin.

[1]    For ease of reference, all pages refer to the Electronic Filing System ("ECF") pagination.

### DISCUSSION

A complaint filed *in forma pauperis* may be dismissed "at any time" upon determination that the action "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In evaluating whether a pleading states a claim for relief, "a court must accept as true all factual allegations contained in a complaint but need not accept legal conclusions." *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to nudge a plaintiff's claims "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

**\*2** *Pro se* complaints, like other pleadings, must contain sufficient factual allegations to meet the plausibility standard. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). However, "[a] document filed *pro se* is 'to be liberally construed,' ... and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Thus, a court must read a *pro se* complaint with "special solicitude," *Ruotolo v. I.R.S.*, 28 F. 3d 6, 8 (2d Cir. 1994), and must interpret it to raise the strongest claims it suggests. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006). Where a liberal reading of the pleading "gives any indication that a valid claim might be stated," the Court must

2017 WL 4857565

grant leave to amend it at least once. *See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* (quotation marks omitted).

Title VII provides in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin

*42 U.S.C.A. § 2000e-2(a).* In order to state a claim under Title VII, Merisier must establish (1) that she is a member of the protected class, (2) that she was qualified for the position, (3) that she was subject to an adverse employment decision, and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination. *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir. 2001). To state a cause of action for hostile work environment under Title VII, abusive conduct in the workplace must also be related to the plaintiff's membership in a protected class. *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999). "Disrespectful, harsh, and unfair treatment in the workplace alone does not state a claim for violation of federal employment law." *Rissman v. Chertoff,* No. 08-CV-7352 (DC), 2008 WL 5191394, at *2 (S.D.N.Y. Dec. 12, 2008).

Merisier's complaint fails to state a claim under Title VII. In the instant complaint, Merisier has not identified herself as a member of a protected class, nor has she presented any facts indicating that she was discriminated against on that basis. The only potentially abusive behavior she reports is that an unidentified employee shoved her and that she faced disciplinary action as a result of the incident. She has not alleged that this treatment was based on her membership in a protected class.

Nothing in Merisier's complaint, as submitted, suggests that the different treatment she has experienced in her employment was related to her membership in a protected class or that she was discriminated against on the basis of such membership. As Merisier has not adequately alleged that she was discriminated against on the basis of her membership in a protected class, the complaint, as filed, fails to state a claim for relief and must be dismissed pursuant to *28 U.S.C. § 1915(e)(2)(B).*

In light of Merisier's *pro se* status, the Court grants leave to file an amended complaint. In order to state a claim for employment discrimination pursuant to Title VII, she must allege that she is a member of a protected class and present facts that would support her claim that the harassment she faced was because of membership in that group. Because Merisier already has a complaint alleging racial discrimination in employment that remains pending, any claims asserted in a possible amended complaint in the instant action must not overlap with or duplicate the claims she asserted in her prior complaint.

**CONCLUSION**

**\*3** For the reasons set forth above, the complaint is dismissed for failure to state a claim pursuant to *28 U.S.C. § 1915(e)(2)(B).* Merisier is granted leave to file an amended complaint within 30 days from the date of this Order. The new complaint should be captioned as an "Amended Complaint," and bear the same docket number as this Order. Any amended complaint completely replaces the original complaint. No summons shall issue at this time, and all further proceedings shall be stayed for 30 days. Failure to plead sufficient facts in the amended complaint to give rise to a claim will result in dismissal of this action, and, if Merisier fails to file an amended complaint within 30 days, judgment shall enter. The Court certifies pursuant to *28 U.S.C. § 1915(a)(3)* that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully directed to send Merisier a copy of this order, together with a form complaint for employment discrimination actions, and note the mailing on the docket.

SO ORDERED.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 77 of 251

**Merisier v. Kings County Hospital, Not Reported in Fed. Supp. (2017)**
2017 WL 4857565

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4857565

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

2017 WL 4417679

2017 WL 4417679
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'Drea FOX, Plaintiff,

v.

ALBANY MEDICAL CENTER, et al., Defendants.

1:17-CV-0798 (TJM/DEP)
|
Signed 10/03/2017

**Attorneys and Law Firms**

K'Drea Fox, Waterford, NY, pro se.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**I. INTRODUCTION**

 **\*1** This *pro se* employment action was referred to the Hon. David E. Peebles, Chief United States Magistrate Judge. In his September 11, 2017 Report, Recommendation and Order, Magistrate Judge Peebles granted plaintiff's *in forma pauperis* application and, after conducting a 28 U.S.C. § 1915(e) initial review, recommended that:

> (1) All of plaintiff's Title VII claims asserted against the individual defendants in this action be DISMISSED without leave to replead;

> (2) Plaintiff's Title VII discrimination and hostile work environment claims asserted against defendant Albany Medical Center be DISMISSED with leave to replead; and

> (3) In the event plaintiff does not avail herself of the opportunity to file an amended complaint, the case proceed only with respect to plaintiff's Title VII retaliation claim asserted against defendant Albany Medical Center.

Ord., Rep. & Rec., dkt. # 5, p. 13 (dkt. # 5).

Magistrate Judge Peebles also informed Plaintiff that any amended complaint will "replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court." Id. p. 12 (citing Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.")).

Plaintiff did not file objections to the Report, Recommendation and Order [dkt. # 5], and the time to do so has expired. However, Plaintiff filed an amended complaint which include claims only against Albany Medical Center. See dkt. # 6.

**II. DISCUSSION**

After examining the record, this Court has determined that the Report, Recommendation and Order is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ADOPTS** the Report, Recommendation and Order [dkt. # 5] for the reasons stated therein. Thus, it is hereby

**ORDERED** that

> (1) All of plaintiff's Title VII claims asserted against the individual defendants named in the complaint are DISMISSED without leave to replead, and the individual defendants are terminated from this action;

> (2) Plaintiff's Title VII discrimination and hostile work environment claims asserted in the complaint against defendant Albany Medical Center are DISMISSED with leave to replead; and

> (3) Plaintiff's amended complaint [dkt. # 6] is referred to Magistrate Judge Peebles for a 28 U.S.C. § 1915(e) initial review.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4417679

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4291371
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Roy WEEKES, Plaintiff,

v.

JETBLUE AIRWAYS CORPORATION,
Frank Ayala and Warren Green, in their
official and individual capacities, and John
Doe and Jane Doe, individually, Defendants.

21-CV-1965 (MKB)
|
Signed September 16, 2022

**Attorneys and Law Firms**

Tisha M. Jackson, Law Office of Tisha Jackson, New York, NY, for Plaintiff.

Raymond Joseph Berti, Akerman LLP, New York, NY, for Defendants Jetblue Airways Corporation, Frank Ayala, Warren Green.

### MEMORANDUM & ORDER

MARGO K. BRODIE, United States District Judge:

 **\*1** Plaintiff Roy Weekes commenced the above-captioned action on November 24, 2020, against JetBlue Airways Corporation ("JetBlue"), Frank Ayala and Warren Green in their official and individual capacities, and John and Jane Doe individually, in New York State Supreme Court, Kings County, alleging claims of discrimination, retaliation, failure to provide reasonable accommodations, and negligent and intentional infliction of emotional distress. (Summons & Compl., annexed to Notice of Removal as Ex. A, Docket Entry No. 1-1.) JetBlue, Ayala, and Green removed the action to the Eastern District of New York on April 12, 2021. (Notice of Removal, Docket Entry No. 1.) On July 9, 2021, Plaintiff filed an amended complaint alleging that Defendants discriminated and retaliated against him based on his age, race, gender, and disability and failed to provide reasonable accommodations in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") [1] ; the New

York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"). (Am. Compl. ¶¶ 1–2, Docket Entry No. 14.) Plaintiff also brings aiding and abetting claims under the NYSHRL and NYCHRL, interference claims under the NYCHRL, and state law claims of negligent and intentional infliction of emotional distress ("NIED" and "IIED," respectively). (Id. ¶¶ 228–31, 246–53, 278–80.)

[1]    Plaintiff subsequently withdrew his cause of action under the ADEA. (Pl.'s Opp'n to Defs.' Mot. 1 n.1, Docket Entry No. 21.) However, he maintains his age discrimination and hostile work environment claims under the NYSHRL and NYCHRL.

Defendants move to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiff opposes the motion. [2] For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

[2]    (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 23; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 23-1; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 21; Defs.' Reply Mem. in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 24.)

### I. Background

#### a. The parties

Plaintiff is an African-American male who is over sixty years old and has suffered from asthma for over thirty years. [3] (Am. Compl. ¶¶ 40–43.) On or about October 9, 2007, Plaintiff was hired by JetBlue as a Grounds Operations employee. (Id. ¶ 44.) Plaintiff loaded and offloaded bags and luggage onto and off aircraft, worked in the "bag room," and performed "lavatory and water services." (Id. ¶¶ 44–45.) Plaintiff was recognized by JetBlue for his work and was awarded one of JetBlue's "Lift Awards" for his "exceptional" work performance in 2017, 2018, and 2019. (Id. ¶ 49.) Plaintiff "readily assisted other employees and volunteered for duties and responsibilities requested by some of his supervisors and managers." (Id. ¶ 50.) He never received any warnings or suspensions. (Id.)

2022 WL 4291371

3  The Court assumes the truth of the factual allegations in the Amended Complaint for the purposes of this Memorandum and Order.

**\*2** JetBlue is "the seventh largest airline in the United States by passengers carried." (*Id.* ¶ 11.) It operates over 1,000 flights daily and serves 100 domestic and international destinations in the United States, Mexico, the Caribbean, Central America, and South America. (*Id.*) JetBlue's principal place of business is in Long Island City, New York. (*Id.* ¶ 10.) Ayala was a manager at JetBlue with managerial and/or supervisory responsibilities over Plaintiff during all relevant times. (*Id.* ¶¶ 18–22, 24–26.) Ayala worked as a Manager for Drug & Alcohol Compliance. (*Id.* ¶ 23.) Green was the Manager of Ground Operations at JetBlue with managerial and/or supervisory responsibilities over Plaintiff during all relevant times. (*Id.* ¶¶ 27–35.)

**b. October 15, 2019 incident and breathalyzer tests**

On October 15, 2019, Plaintiff was working in the bag room handling bags on Belt #4. (*Id.* ¶ 52.) At approximately 10 PM, as Plaintiff was driving out of the bag room to deliver bags to the aircraft, one of the bag doors malfunctioned on Belt #4. (*Id.* ¶ 53.) The door to the bag room had been malfunctioning for weeks and Plaintiff did not cause the accident. (*Id.* ¶ 54.) Plaintiff believes that JetBlue was aware of the malfunctioning door but did not take steps to properly fix it. (*Id.*) Plaintiff immediately reported the incident to Loudes Torres, JetBlue's Supervisor of Ground Operations. (*Id.* ¶ 55.)

At approximately 10:30 PM, Harold Pettiton, JetBlue's Supervisor of Safety, met with Plaintiff and took him to his office. (*Id.* ¶ 56.) Pettiton informed Plaintiff that in compliance with JetBlue's drug testing policies and procedures, Plaintiff had to take a drug test and Pettiton had to call someone to administer the test. (*Id.* ¶¶ 57–58.) Plaintiff contends that he was "not the subject of a random drug test" and that his drug test should have been conducted in accordance with the post-accident regulations, policies, and procedures maintained by JetBlue and mandated by the United States Department of Transportation (the "DOT"). (*Id.* ¶¶ 59–60.) Plaintiff informed Pettiton that he did not drink any alcohol or use any drugs and that the door for the bag room "simply malfunctioned." (*Id.* ¶ 63.)

At approximately 11:15 PM, Joyce Lall, an "employee, contractor, independent contractor, and/or agent of JetBlue" arrived to perform the drug test. (*Id.* ¶¶ 64–65.) Lall requested that Plaintiff take a "breathalyzer" test. (*Id.* ¶ 68.) Plaintiff fully complied but had difficulty blowing into the breathalyzer because he was asthmatic and suffering from severe nasal and sinus polyps. (*Id.* ¶¶ 69–72.) Plaintiff informed Lall that he was having difficulty breathing and was scheduled to have surgery the following day, October 16, 2019. (*Id.* ¶ 71.) Plaintiff then told Lall that his chest was tightening and asked whether there was another way that he could take the test, since JetBlue's and DOT's drug testing policies allow alcohol tests to be performed by either saliva or breath. (*Id.* ¶¶ 74–75.) Lall observed Plaintiff's "physical distress" while taking the breathalyzer test. (*Id.* ¶ 76.) Lall called Ayala, who was the Manager for Drug & Alcohol Compliance, and left the room to speak with Ayala in private for about three to five minutes. (*Id.* ¶¶ 77–78.) Lall then returned to the room and told Plaintiff that Ayala wished to speak with him. (*Id.*)

Plaintiff informed Ayala that he did not use any alcohol or illegal drugs, that he was asthmatic, and that he "was coughing, having difficulty breathing, and his chest was tightening." (*Id.* ¶¶ 79–80.) Plaintiff asked Ayala whether he could take the breathalyzer test another way. (*Id.* ¶ 81.) He also informed Ayala that he was scheduled to have surgery the next day. [4] (*Id.*) Ayala "completely and summarily refused to discuss ... any other methods of testing and dismissively told Plaintiff" that if he could not blow into the breathalyzer, they would "just have to part ways." (*Id.*) Plaintiff alleges that Ayala treated him in a "dismissive and hostile manner" and "refused to engage Plaintiff in any dialogue regarding the existence of an alternative form of testing." (*Id.* ¶¶ 82–83.)

4  Plaintiff alleges that he was scheduled to have surgery "later that day," but the Court presumes that this is an error, as Plaintiff otherwise indicates that he was scheduled to have surgery the following day, and underwent surgery on October 16, 2019. (Am. Compl. ¶¶ 81, 94, 111.)

**\*3** Lall performed the test on Plaintiff twice, but due to Plaintiff's asthma, he had difficulty blowing enough air into the breathalyzer. (*Id.* ¶ 84.) Lall called Ayala again and left the room for five minutes. (*Id.* ¶ 85.) She then returned to the room. (*Id.*) Ayala informed Lall that she had to administer the breathalyzer test three times. (*Id.* ¶ 86.) Plaintiff asked Lall if he could take the test in another way but she stated that she

"only had the equipment for the breathalyzer" and that "he had only one more chance to pass the test." (*Id.* ¶ 87.) Plaintiff had difficulty blowing enough air into the breathalyzer for the third test. (*Id.* ¶ 88.) Defendants did not "document or observe any signs of intoxication such as slurred speech." (*Id.* ¶ 176.)

After Plaintiff took the breathalyzer test three times, Lall requested that Plaintiff take a urine test, which came back negative. (*Id.* ¶¶ 89–90.) Despite this, Ayala immediately suspended Plaintiff and told him that he should not report to work until further notice. (*Id.* ¶¶ 91–92.) Ayala informed Plaintiff that he would have to take a "shy lung" examination and that he would contact Plaintiff with information on where and when to take the shy lung examination. (*Id.* ¶ 93.)

On October 15, 2019, while turning in his employment credentials, Plaintiff was told by other supervisors that "they never heard of an employee being terminated with a negative 'pee' result." (*Id.* ¶ 189.)

### c. Plaintiff's subsequent examination by JetBlue doctors

Plaintiff underwent outpatient surgery on October 16, 2019 for severe nasal and sinus polyps. (*Id.* ¶¶ 94, 110.) On or about October 22, 2019, Ayala told Plaintiff to make an appointment at the Concentra Newark New Jersey clinic (the "Clinic") for a shy lung exam. (*Id.* ¶ 95.) "Upon information and belief," the Clinic conducts alcohol and drug testing for JetBlue, has a contract or agreement to administer such testing for JetBlue, conducts other medical examinations of JetBlue employees for JetBlue, and has a contract or agreement to "provide medical care or perform medical examinations or medical reviews of JetBlue employees for JetBlue." (*Id.* ¶¶ 99–102.) Plaintiff explained that he was recovering from surgery and asked whether he could attend a testing facility or doctor's office closer to home. (*Id.* ¶ 96.) Ayala refused and directed Plaintiff to visit the Clinic, "which was in another state over two ... hours away" and which required him to take two trains and a bus. (*Id.* ¶ 97.)

On October 24, 2017, Plaintiff went to the Clinic but was told upon arriving that JetBlue had not scheduled or approved his appointment.[5] (*Id.* ¶¶ 103–04.) The Clinic called JetBlue to confirm that Plaintiff was sent there by the company to take a shy lung exam. (*Id.* ¶ 106.) Plaintiff waited for over an hour to see a doctor and then was examined by Dr. Purvee Patel. (*Id.* ¶¶ 108, 111.) Plaintiff provided her with documentation from his primary care doctor and surgeon advising of his asthma

and recent surgery for severe nasal and sinus polyps. (*Id.* ¶ 110.) Dr. Patel spoke to Plaintiff's surgeon. (*Id.* ¶ 111.) In her medical evaluation report to JetBlue, Dr. Patel noted that JetBlue should consider sending Plaintiff for an independent pulmonology examination. (*Id.* ¶ 120.) Dr. Patel also noted that JetBlue should consider repeating the breathalyzer test, but that there should not be any testing done for up to six to eight weeks due to Plaintiff's surgery on October 16. (*Id.* ¶ 121.) Plaintiff asked Dr. Patel for a complete copy of the medical report and findings, but Dr. Patel told Plaintiff that she would only give her report to JetBlue because they "were the ones paying her." (*Id.* ¶¶ 122–23.)

5       Plaintiff alleges that Ayala "deliberately failed to properly schedule" his appointment. (Am. Compl. ¶ 107.)

**\*4** Plaintiff claims that Ayala and JetBlue were required to provide the examining physician with "certain information and instructions." (*Id.* ¶¶ 111–14.) Plaintiff alleges that JetBlue and Ayala: (1) did not instruct Dr. Patel or the Clinic that Plaintiff was required to take a breathalyzer test but was unable to provide enough air to complete the test, (2) did not inform Dr. Patel of the consequences for a refusal to take the required alcohol test, and (3) did not ensure that Plaintiff was examined by a doctor with expertise in the medical issues raised by Plaintiff's inability to pass the breathing test, since Dr. Patel is a family medicine specialist rather than a doctor with an expertise in pulmonology or respiratory ailments. (*Id.* ¶¶ 115–19.) Plaintiff "never refused to participate or take any drug test or medical exam." (*Id.* ¶ 126.)

### d. Plaintiff's medical documentation

Plaintiff provided JetBlue with additional documentation of his medical condition. (*Id.* ¶ 132.) By letter dated October 22, 2019, Plaintiff's doctor certified that he had been under medical care for asthma for thirty years (the "October 22 Letter"). (*Id.* ¶ 133.) At least twice, Plaintiff "had to be incubated for acute bronchial asthma." (*Id.*) The letter provided contact information for the doctor and noted that she could be reached if Defendants had any questions. (*Id.*) By letter dated October 23, 2019, Plaintiff's medical surgeon noted that he was "under his care for severe nasal/sinus polyps" and that due to Plaintiff's condition, he had been unable to complete the breathalyzer test administered on October 15 (the "October 23 Letter"). (*Id.* ¶ 134.) JetBlue and Ayala did not contact Plaintiff's doctors. (*Id.* ¶ 135.)

### e. Plaintiff's termination

On or about October 25, 2019, Plaintiff told Ayala that he "could not afford to lose [his] job ... so close to retirement." (*Id.* ¶ 136.) He expressed that he felt as though he was being treated unfairly and questioned why he was being singled out and treated differently from other colleagues who passed the urine test and were not terminated. (*Id.*) He told Ayala that he would reach out for help and report him. (*Id.*)

On or about October 27, 2019, Ayala called Plaintiff to inform him that he was going to be terminated and that he should expect a call from one of his supervisors. (*Id.* ¶ 137.) Plaintiff again stated that he did not use any alcohol or illegal drugs and had difficulty breathing due to asthma; he asked for a reasonable accommodation such as taking the test again or taking a different test. (*Id.* ¶¶ 137–39.)

The following day, Plaintiff received a call from Green, the Manager of Ground Operations, who told Plaintiff that he had spoken to Ayala and that Plaintiff would be fired. (*Id.* ¶ 145.) Plaintiff again explained the events of October 15, 2019, including his medical condition. (*Id.* ¶ 146.) Plaintiff asked Green to reconsider his termination, but Green refused. (*Id.* ¶¶ 148–50.) Plaintiff told Green that he was going to reach out to Crew Relations "because he felt that he was being treated unfairly" but Green did not "report or thoroughly investigate Plaintiff's claims of unfair treatment, discrimination, and harassment." (*Id.* ¶¶ 151–52.)

After his conversation with Green, Plaintiff reached out to several JetBlue departments to report that he was the subject of discrimination. (*Id.* ¶¶ 153–54.) Plaintiff also told both Ayala and Green that he was going to report the discriminatory conduct to human resources. (*Id.* ¶ 157.) On October 29, 2019, Plaintiff sent an email to JetBlue's "People Department" and Crew Relations, among others, informing them that he had been unable to complete the breathalyzer test because of his asthma and that his urine test had come back negative. (*Id.* ¶¶ 158, 161.) He also stated that his doctors had provided letters about his medical condition but that these letters had been ignored. (*Id.* ¶ 162.) No one contacted Plaintiff regarding his report and claims of discrimination. (*Id.* ¶ 164.)

**\*5** On November 1, 2019, JetBlue terminated Plaintiff for violation of company policy. (*Id.* ¶ 167.) Plaintiff received a letter from JetBlue dated November 7, 2019, stating:

> Recently you participated in a drug and/or alcohol test in accordance with the JetBlue Airways drug and alcohol compliance program. As you are aware, a physician's review could not establish a valid medical reason for your inability to provide a sufficient breath sample. This is considered a refusal to test.

(*Id.* ¶ 168.) The letter also provided contact information for a substance abuse professional. (*Id.*)

Plaintiff alleges that he was treated less favorably than other younger, white Ground Operations employees, such as Phil Patankoliau. [6] (*Id.* ¶ 179.) Plaintiff also alleges that other Ground Operations employees with Plaintiff's duties and responsibilities have been involved in similar vehicle accidents but were not held to "heightened scrutiny and discriminatory practices." (*Id.* ¶ 180.) Other employees, such as Emmanuel Tuner, were subjected to drug testing after a vehicle accident but were not terminated after passing the urine test. [7] (*Id.*)

[6]  Plaintiff does not allege comparable conduct by Mr. Patankoliau. (*See generally* Am. Compl.)

[7]  Plaintiff does not allege Mr. Tuner's race. (*Id.*)

### f. Post-termination actions

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about August 24, 2020 (the "EEOC Charge"), (*id.* ¶ 36), and received a Notice of Right to Sue on or about August 27, 2020, (*id.* ¶ 37). Plaintiff timely commenced the action within ninety days of receiving the Notice of Right to Sue. (*Id.* ¶ 38.) Plaintiff also served a copy of his Amended Complaint on the New York City Human Rights Commission and Corporation Counsel of the City of New York pursuant to New York City Administrative Code § 8-502(c). (*Id.* ¶ 39.) Plaintiff alleges that he was discriminated against because of his race,

age, gender, and actual and/or perceived disability. (*Id.* ¶¶ 182–85.) Plaintiff also claims that Defendants refused him a reasonable accommodation, such as conducting a saliva test. (*Id.* ¶¶ 199–200.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff's favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reins. Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). Although all allegations contained in the Amended Complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

### b. Discrimination claims under the ADA, Title VII, NYSHRL, and NYCHRL

**\*6** Defendants argue that Plaintiff's age, race, gender, and disability discrimination claims under the ADA, Title VII, NYSHRL, and NYCHRL should be dismissed because "Plaintiff does not plausibly allege any facts that even remotely suggest that he was terminated because of his membership in those classes." (Defs.' Mem. 8–11.) Further, Defendants argue that Plaintiff fails in his attempts to allege similarly-situated comparators because he fails to provide any further details about the comparators, including their ages, disabilities, employment histories and backgrounds, and supposedly preferential treatment. (*Id.* at 9–10.) Finally, Defendants argue that Plaintiff's discrimination claims should also be dismissed because from the face of the Amended Complaint, it is clear that JetBlue terminated Plaintiff based

on a "legitimate, non-discriminatory reason," namely Dr. Patel's determination that "Plaintiff had intentionally refused to complete the drug and alcohol test provided to him on October 15." (*Id.* at 11.)

Plaintiff contends that his claims for disability discrimination are actionable, as he has a disability as defined under the ADA, NYSHRL, and NYCHRL. (Pl.'s Opp'n 1–3.) He also argues that at all relevant times, "Defendants were aware that [Plaintiff] is a Black man over the age of [sixty]" and that how he was treated, including the difficulty he faced in pursuing his appointment at the Clinic, "reveals that his race, gender, and age were also motivating factors." (*Id.* at 11.) Plaintiff also argues that he was treated less favorably than his co-workers, including a "white[,] younger ground operation crew member" who was not held to heightened scrutiny.[8] (*Id.* at 17.)

[8]    Plaintiff does not provide additional information about the conduct and allegedly preferential treatment.

### i. ADA, NYSHRL, and NYCHRL disability discrimination claims

#### 1. ADA claim

To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010); *see Gorbea v. Verizon N.Y. Inc.*, No. 20-CV-3486, 2021 WL 4851389, at \*2 (2d Cir. Oct. 19, 2021) (listing the four requirements for a prima facie ADA case and quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam)); *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 643 (2d Cir. 2021) (same); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 48–49 (2d Cir. 2014) (outlining requirements for prima facie case under the ADA) (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record

of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include standing, lifting, bending, speaking, and working. *Id.* § 12102(2)(A). Under the EEOC's regulations, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA and 'is not meant to be a demanding standard.' " *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 n.3 (2d Cir. 2014) (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(i)). As a result, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)); *see Woolf*, 949 F.3d at 94 (noting that "the definition of 'disability' is not an exacting one").

**\*7** The parties do not dispute that (1) JetBlue is subject to the ADA; (2) Plaintiff suffers from a disability within the definition of the ADA, namely asthma; and (3) Plaintiff was qualified to perform the essential functions of his job, with or without reasonable accommodations. The Court therefore only considers the fourth prong, whether Plaintiff suffered an adverse employment action because of his disability.

Plaintiff has sufficiently alleged the causality element of a prima facie case. Plaintiff experienced adverse employment actions by being suspended and terminated. (Am. Compl. ¶¶ 91, 167); *see Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (holding that an adverse employment action for purposes of a discrimination claim is a "materially adverse change in the terms and conditions of employment" and includes "termination of employment, a demotion ..., [or] a less distinguished title"). Plaintiff has also plausibly alleged that he suffered these adverse employment actions because of his disability. He was unable to complete his mandatory breathalyzer test due to his asthma, told Lall and Ayala about his disability, and was suspended as a result of not being able to take the test. (Am. Compl. ¶¶ 70–71, 80–87, 91.) After being suspended, he was ordered to take a "shy lung" examination, which Plaintiff was ultimately unable to do because he could not perform spirometry or other breathing tests for several weeks following his surgery for nasal polyps. (*Id.* ¶¶ 91–93, 121.) Dr. Patel, the examining physician, recommended that Plaintiff be sent for an independent pulmonology examination and that JetBlue consider repeating the breathalyzer test after a few weeks. (*Id.* ¶¶ 120–21.) JetBlue refused to consider alternative options to the breathalyzer and terminated Plaintiff's employment. (*Id.*

¶¶ 138, 148–50.) As JetBlue stated in Plaintiff's termination letter, a "physician's review could not establish a valid medical reason for [his] inability to provide a sufficient breath sample" and this was "considered a refusal to test." (*Id.* ¶ 168.)

Plaintiff has met his burden of giving "plausible support to a minimal inference of discriminatory motivation," *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)). By alleging that he was suspended and fired because of his inability to take a breathalyzer test, he has sufficiently alleged that the "adverse action[s] [were] imposed because of [his] disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)). Further, "[t]erminating a disabled employee ... who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA." *Kinneary*, 601 F.3d at 156 (alterations in original) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000)).

## 2. NYSHRL and NYCHRL claims

Because Plaintiff has alleged a disability claim under the ADA, he has also alleged disability claims under the less demanding NYSHRL and NYCHRL.

Historically, discrimination claims under the NYSHRL were "largely subject to the same analysis [courts] apply under Title VII." *Reyes v. Westchester County Health Care Corp.*, No. 21-0410, 2021 WL 4944285, at \*2 (2d Cir. Oct. 25, 2021) (citing *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)); *see Williams v. MTA Bus Co.*, No. 17-CV-7687, 2020 WL 1922911, at \*5 (S.D.N.Y. Apr. 20, 2020) (same). However, in June of 2019, New York State amended the NYSHRL, "the effect of which is to render the standard for claims [brought under the NYSHRL] closer to the standard under the NYCHRL." [9] *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at \*5 n.4 (S.D.N.Y. Aug. 29, 2019); *DeAngelo v. MAXIMUS/NY Medicaid Choice*, No. 19-CV-7957, 2022 WL 3043665, at \*12 n.15 (S.D.N.Y. Aug. 2, 2022) (discussing the more liberal post-amendment standard under the NYSHRL); *see also* A8421/S6577 (as amended by S6594/A8424). As to the NYCHRL, "courts must construe the NYCHRL 'liberally for the accomplishment of the uniquely broad and remedial

purposes thereof.' " *Harris v. N.Y.C. Hum. Res. Admin.*, No. 20-CV-2011, 2022 WL 3100663, at *8 (S.D.N.Y. Aug. 4, 2022) (quoting *Leroy v. Delta Airlines, Inc.*, 36 F.4th 469, 474 (2d Cir. 2022)). However, under the NYCHRL, a "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 110 (2d Cir. 2013); *see also Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (acknowledging standard for NYCHRL discrimination claims). To establish a claim under the NYCHRL, the plaintiff must show that the employer treated him or her "less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8; *Harris*, 2022 WL 3100663, at *8 ("To count as being treated 'less well,' a plaintiff must merely plausibly allege 'differential treatment that is more than trivial, insubstantial, or petty.' " (quoting *Torre v. Charter Commc'ns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020))). Even under this more forgiving pleading standard, a plaintiff must still plausibly allege that he was treated less well "at least in part *because* of [his] [belonging to a protected class].' " *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39, 40 n.27 (App. Div. 2009)).

9      The amendments apply to claims accruing after October 11, 2019, *see Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019), and therefore apply to Plaintiff's claims, which accumulated on or after October 15, 2019. (*See generally* Am. Compl.)

**\*8** Because the standard for pleading a disability discrimination claim under the NYSHRL and NYCHRL is more lenient than the ADA standard, Plaintiff sufficiently pleads NYSHRL and NYCHRL disability discrimination claims. *See Jones*, 838 F. App'x at 644 n.1 (holding that courts considering NYCHRL claims must "constru[e] [NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible" (quoting *Ya-Chen Chen*, 805 F.3d at 75)).

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's ADA, NYSHRL, and NYCHRL discrimination claims. [10]

10     Defendants also argue that Plaintiff's claim should be dismissed because JetBlue terminated Plaintiff "based on a legitimate, non-discriminatory reason." (Defs.' Mem. 11.) While this is a relevant consideration on a motion for summary judgment,

it is not one that the Court considers at the motion to dismiss stage. *Cf. McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (noting that at the summary judgment stage, a "plaintiff must offer ... a prima facie case; the employer must offer ... a legitimate non-discriminatory reason for the discharge; and the plaintiff must then ... carry the burden of persuasion that the proffered reason is a pretext"). At the motion to dismiss stage, a plaintiff's burden is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("[A] plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.' " (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))).

### ii. Title VII, NYSHRL, and NYCHRL race, age, and gender discrimination claims

#### 1. Title VII race and gender claims

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) "[he] is a member of a protected class; (2) [he] was qualified for the position [he] held; (3) [he] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *see Zheng-Smith v. Nassau Health Care Corp.*, No. 20-CV-3544, 2021 WL 4097316, at *1 (2d Cir. Sept. 9, 2021) (listing the four criteria to establish a prima facie case of discrimination under Title VII); *see also Doe v. City of New York*, 473 F. App'x 24, 27 (2d Cir. 2012) (same). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *see Farooq v. City of New York*, No. 20-3185, 2022 WL 793117, at *2 (2d Cir. Mar. 16, 2022) (affirming that the facts required to form a prima facie discrimination case under Title VII "need only give plausible support to a minimal inference of discriminatory motivation"); *Kelleher v. Fred A. Cook, Inc.*,

[939 F.3d 465, 468 (2d Cir. 2019)](#) ("A plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.' " (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005)))

**\*9** While the parties do not dispute that (1) Plaintiff, as a Black male, belongs to protected classes under Title VII, (2) Plaintiff was qualified for his position with JetBlue, and (3) Plaintiff suffered adverse employment actions, the parties dispute whether the adverse employment actions occurred under circumstances giving rise to an inference of discrimination on the basis of either race or gender. However, even under Plaintiff's "minimal" burden at the motion to dismiss stage, Plaintiff does not allege any facts that would permit the Court to infer causation between Plaintiff's membership in any protected class and the adverse employment actions he faced. Plaintiff alleges that he was "treated differently because he is an African American male," (Am. Compl. ¶ 187), that "Plaintiff's ... race ... and gender were factors in Plaintiff's termination," (*id.* ¶ 182), and that he was "discriminated against because of his race ... and gender," (*id.* ¶ 185), but provides no facts to support his conclusory assertions. *See Vega*, 801 F.3d at 84 (stating that "a discrimination complaint ... must at a minimum assert nonconclusory factual matter" (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014))); *Richards v. Dep't of Educ. of N.Y.C.*, No. 21-CV-338, 2022 WL 329226, at \*6 (S.D.N.Y. Feb. 2, 2022) (stating that a complaint "must offer more than 'labels and conclusions' " or " 'naked assertion[s] devoid of 'further factual enhancement' " in order to survive dismissal (quoting *Twombly*, 550 U.S. at 555, 557)); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 554 (W.D.N.Y. 2016) ("Plaintiff has failed to meet her pleading burden of supporting an inference of discriminatory intent, because her claims are not supported by anything other [than] her own conclusory assertions that she was discriminated against on the basis of her race and national origin. Plaintiff has failed to plausibly plead a minimal inference of discriminatory motivation.").

While Plaintiff alleges that he was treated less favorably than "white similarly[-]situated Ground Operations employees" and other members outside of his protected classes, (Am. Compl. ¶ 179), Plaintiff fails to allege that any of the identified employees engaged in comparable conduct or how they allegedly received preferential treatment. *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (finding that the plaintiff failed to assert a Title VII discrimination claim because the plaintiff did not sufficiently allege that allegedly similarly-situated employees engaged in comparable conduct).

Thus, Plaintiff fails to state a Title VII discrimination claim on the basis of his race or gender.

## 2. NYSHRL and NYCHRL age, gender, and race discrimination claims

Plaintiff fails to allege that he was treated "less well" as a result of his age, gender, or race and provides no facts that would permit the Court to infer differential treatment on these bases. *See Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 242 (S.D.N.Y. 2017) ("Nevertheless, a plaintiff must still 'plead facts sufficient to support an inference that he has been treated less well at least in part *because of* a protected trait." (quoting *Bell v. McRoberts Protective Agency, Inc.*, No. 15-CV-0963, 2016 WL 7192083, at \*5 (S.D.N.Y. Dec. 12, 2016)). Plaintiff therefore fails to plead NYSHRL or NYCHRL age, gender or race discrimination claims. [11]

> [11] Because the NYSHRL was amended with the directive that "its provisions should be construed liberally," *Deveaux v. Skechers USA, Inc.*, No. 19-CV-9734, 2020 WL 1812741, at \*3 n.3 (S.D.N.Y. Apr. 9, 2020), and to bring the standard "closer to that of the [NYCHRL]," *Livingston v. Roosevelt Union Free Sch. Dist.*, No. 17-CV-4189, 2020 WL 1172642, at \*11 n.5 (E.D.N.Y. Jan. 15, 2020), and although the Court recognizes that the NYSHRL and NYCHRL standards are not interchangeable, because the NYSHRL was amended to more closely resemble the NYCHRL, the Court analyzes both claims under the NYCHRL standard.

Accordingly, the Court grants Defendants' motion and dismisses Plaintiff's Title VII gender and race claims and his NYSHRL and NYCHRL age, gender, and race claims.

### c. Failure-to-accommodate claim under the ADA

Defendants argue that Plaintiff's failure-to-accommodate claim should be dismissed because an air carrier should not be lawfully required to waive its post-accident drug and alcohol testing policies where an employee claims to be medically unable to complete this testing and where a third-party medical provider confirms that the employee's

claims are invalid. (Defs.' Mem. 11–16.) They contend that JetBlue had no obligation to accommodate Plaintiff or engage in the interactive accommodations process because such an accommodation would mean deviating from the DOT's drug and alcohol testing procedures. (*Id.* at 14.)

**\*10**  Plaintiff contends that Defendants "had a duty to provide a reasonable accommodation" and that he immediately and directly notified his employer that he was in need of a reasonable accommodation due to his medical condition. (Pl.'s Opp'n 6.) He notes that Ayala "refused to engage in an interactive dialogue to assess Plaintiff's needs," (*id.*), and that Green also failed to engage in an interactive dialogue, investigate Plaintiff's claims of unfair treatment, or report Plaintiff's claims to human resources. (*Id.* at 20.) Plaintiff argues that providing him with an accommodation would not have been an undue burden and in fact would have complied with JetBlue's own policy, which notes that the alcohol test can be done by saliva or breath. (*Id.* at 7.)

To establish a prima facie case of failure to accommodate under the ADA, the plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation"; and (4) "his employer refused to make a reasonable accommodation." *Woolf*, 949 F.3d at 93 (first citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); and then citing *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)); *see also Knope v. Garland*, No. 20-CV-3274, 2021 WL 5183536, at \*2 (2d Cir. Nov. 9, 2021) (listing four-pronged test to establish a prima facie case of discrimination based on an employer's failure to accommodate); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (same). In addition, "the plaintiff must show 'the connections between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action.' " *Clark v. Coca-Cola Bevs. Ne., Inc.*, No. 20-CV-4040, 2022 WL 92060, at \*4 (2d Cir. Jan. 10, 2022) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019)); *Knope*, 2021 WL 5183536, at \*2 (same). Reasonable accommodation "may include ... modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." *Molina v. City of Rochester*, 764 F. App'x 49, 51 (2d Cir. 2019) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92,

97 (2d Cir. 2009)). In a failure-to-accommodate claim, "the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment.' " *McMillan*, 711 F.3d at 126 (alterations in original) (quoting *McBride*, 583 F.3d at 97). "This burden is not heavy: 'It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' " *Id.* at 127 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

The parties do not dispute that (1) JetBlue is subject to the ADA, (2) Plaintiff was disabled within the meaning of the ADA, and (3) Plaintiff was otherwise qualified to perform the essential features of his job. In addition, Plaintiff sufficiently alleges that Defendants were aware of his disability and his requests for reasonable accommodations. (*See* Am. Compl. ¶¶ 70–71 ("Plaintiff informed ... the drug test [administrator] that he was asthmatic" and that "he was having difficulty breathing due to his asthma."), ¶¶ 79–81 ("Plaintiff informed Ayala that ... [h]e was asthmatic," "that he was coughing, having difficulty breathing, and his chest was tightening," and "asked Ayala if he could take the breathing test another way since he was coughing and his chest was tightening."), ¶ 146 ("Plaintiff ... explained [to Green] that he had trouble breathing into the 'breathalyzer' due to his asthma and other medical ailments."), ¶ 161 (providing the October 29, 2019 email that Plaintiff wrote to the People Department and Crew Relations regarding his asthma and surgery to remove nasal polyps, which led to the results for the breathalyzer test coming back insufficient on three occasions).)

**\*11**  Further, Plaintiff sufficiently alleges a potential accommodation that Defendants failed to provide in the form of a saliva test. After informing a JetBlue employee during his breathalyzer test that he could not breathe and therefore could not complete the test due to his disability, Defendants could have performed a saliva test and then, as Dr. Patel recommended in her report to JetBlue, repeated the breathing test if necessary weeks after Plaintiff's surgery. (Am. Compl. ¶ 121.) JetBlue's own policy states that alcohol tests "are done by saliva or breath," but "Defendants did not conduct a saliva test" even after Plaintiff asked Ayala if "he could take the breathing test another way." (*Id.* ¶¶ 81, 200–01.) Defendants cite to DOT regulations which provide that their testing could have been done by saliva or breath. (*See* Defs.' Mem. 13 ("As an employee, you are considered to have refused to take an alcohol test if you '[f]ail to provide an adequate amount of saliva or breath for any alcohol test required by this part or

DOT agency regulations[.]' " (quoting 49 CFR § 40.261(a)(3))).)

Moreover, this accommodation is reasonable and does not impose an undue hardship, as it is identified as an alternative by both DOT and JetBlue policies. Thus, Plaintiff has established a clear connection between the failure to grant this accommodation, his inability to return to work, and his suspension and termination. Plaintiff has therefore met his burden at the motion to dismiss stage. *See Limauro v. Con. Ed. Co. of N.Y., Inc.*, No. 20-CV-3558, 2021 WL 466952, at *8 (S.D.N.Y. Feb. 9, 2021) ("All that plaintiffs must do at the motion to dismiss stage is plead the existence of a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' " (quoting *Shaywitz v. Am. Bd. of Psychiatry and Neurology*, 675 F. Supp. 2d 376, 390 (S.D.N.Y. 2009))); *Novick v. Village of Wappingers Falls*, 376 F. Supp. 3d 318, 337 (S.D.N.Y. 2019) (stating that at the motion to dismiss stage, a plaintiff "bears only the burden of identifying an accommodation" (quoting *Borkowski*, 63 F.3d at 139)).

Accordingly, the Court denies Defendants' motion as to Plaintiff's ADA failure-to-accommodate claim.

### d. Hostile work environment claims under the ADA, Title VII, NYSHRL, and NYCHRL

Defendants argue that the Amended Complaint does not appear to assert a hostile work environment claim, but even if it did, such a claim would fail and should be dismissed because it is "bereft of any factual allegations regarding any relevant decision-maker's supposed discriminatory animus." (Defs.' Mem. 8 n.3.)

Plaintiff alleges that JetBlue engaged in unlawful employment practices under Title VII, NYCHRL, and NYSHRL by "causing a hostile work environment," (Am. Compl. ¶¶ 212, 225, 238). Plaintiff also alleges that JetBlue "created a hostile environment in violation of Plaintiff's rights under the ADA." (*Id.* ¶ 264.) Plaintiff addresses his hostile work environment claim in two lines of his opposition brief, noting that the Court should not "set[ ] the bar too high." (Pl.'s Opp'n 19 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).)

#### i. ADA and Title VII hostile work environment claims

"The analysis of hostile work environment claims under [the ADA] is the same as the analysis under Title VII." *Harris*, 2022 WL 3100663, at *12 n.16. To prevail on a hostile work environment claim under the ADA or Title VII, the plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox*, 918 F.3d at 74 (alteration in original) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)); *see Hawkins-El v. N.Y.C. Transit Auth.*, No. 18-CV-7167, 2021 WL 4222400, at *7 (E.D.N.Y. Sept. 16, 2021) (describing test for finding a hostile work environment under the ADA); *Tsatsani v. Walmart, Inc.*, No. 19-CV-9063, 2020 WL 6688939, at *11 (S.D.N.Y. Oct. 26, 2020) ("A plaintiff asserting a hostile work environment claim under the ADA 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.' " (quoting *Fox*, 918 F.3d at 74)); *see also Tillery v. N.Y.S. Off. of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 27 (2d Cir. 2018) (holding that to establish a hostile work environment claim under Title VII, "a plaintiff must produce enough evidence to show that 'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' " (alterations in original) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010))); *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (holding that conduct must be both objectively severe or pervasive and subjectively perceived to be abusive). Under the totality of the circumstances, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) ("[W]e must consider ... 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))).

### 1. Title VII claim

**\*12**  Plaintiff has failed to plausibly allege a hostile work environment claim under Title VII. Plaintiff fails to allege that any allegedly discriminatory conduct was a result of Plaintiff's race or gender and thus his claim fails. *See Tillery*, 739 F. App'x at 27 ("A plaintiff must also demonstrate that [ ]he was subjected to the hostility because of [his] membership in a protected class." (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999))); *Alfano*, 294 F.3d at 377 ("It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."); *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 498 (E.D.N.Y. 2019) (dismissing the plaintiff's Title VII hostile work environment claims because the plaintiff failed to allege "that a hostile work environment was created and existed because of [her] protected status" (alteration in original) (quoting *De La Pena v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 418 (E.D.N.Y. 2013))).

Accordingly, the Court dismisses Plaintiff's Title VII hostile work environment claim.

### 2. ADA claim

Plaintiff plausibly alleges an ADA hostile work environment claim. Plaintiff alleges that (1) he had to take the breathalyzer test despite his complaints of asthma and nasal polyps as well as tightness in the chest, (Am. Compl. ¶¶ 69–74); (2) Ayala "dismissively told [him]" that if he could not blow into the breathalyzer, they would "have to part ways," and suspended him, (*id.* ¶¶ 81, 91); (3) he was ordered to visit the Clinic, which is over two hours away from him, despite his recovery from surgery, (*id.* ¶¶ 96–97); (4) he arrived at the Clinic and there was no appointment scheduled for him, (*id.* ¶¶ 103–04); (5) Dr. Patel recommended both that JetBlue direct Plaintiff to see a pulmonologist and avoid testing him for several weeks following his surgery, (*id.* ¶¶ 120–21); (6) Green refused to consider his medical conditions during the phone call when he terminated Plaintiff, (*id.* ¶¶ 147–51); and (7) his email to Crew Relations and the People Department complaining of disability discrimination was ignored, (*id.* ¶¶ 161–64). Most significantly, Plaintiff alleges that he was ultimately terminated as a result of these actions. (*Id.* ¶ 167.) "Even an isolated act may be so serious that

it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 918 F.3d at 74; *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 606 (2d Cir. 2006) ("[A] single incident was so severe that it could have created a hostile work environment even in isolation, unrepeated and unaccompanied by other conduct."); *Guerrero Toto v. NorthStar Demolition & Remediation*, 366 F. Supp. 3d 449, 465 (W.D.N.Y. 2019) (same). Plaintiff's termination was sufficiently "serious" that it rises to the level of severity or pervasiveness required for a claim. *Alfano*, 294 F.3d at 374 (stating that an isolated act must be "very serious" to constitute a hostile work environment claim). Accordingly, Plaintiff has plausibly pled a hostile work environment claim under the ADA.

Accordingly, the Court dismisses Plaintiff's Title VII hostile work environment claim but denies Defendants' motion as to his ADA hostile work environment claim.

### ii. NYSHRL and NYCHRL hostile work environment claims

Harassment constitutes an "unlawful discriminatory practice" where "it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more ... protected categories." *Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C.*, No. 21-CV-394, 2022 WL 3214924, at \*10 (S.D.N.Y. Aug. 9, 2022). The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a). *See Nguedi v. Fed. Reserve Bank of N.Y.*, 813 F. App'x 616, 617–18 (2d Cir. 2020) (noting when courts review either discriminatory treatment or hostile work environment claims under the NYCHRL, they must "analyze whether a plaintiff is treated 'less well' because of a discriminatory intent" (quoting *Mihalik*, 715 F.3d at 110)); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims."). The federal "severe or pervasive standard of liability" does not apply to NYCHRL claims. [12] *Mihalik*, 715 F.3d at 113.

[12]    As noted above, for claims filed on or after October 11, 2019, the NYSHRL was amended to more closely resemble the NYCHRL. The NYSHRL now provides that harassment is

unlawful "regardless of whether such harassment would be considered severe or pervasive." N.Y. Exec. L. § 296(1)(h).

### 1. Age, gender, and race hostile work environment claims

**\*13** Plaintiff fails to allege any facts that would permit the Court to infer that he experienced a hostile work environment on the basis of race, gender, or age, and therefore, even under the reduced requirements for NYSHRL and NYCHRL hostile work environment claims, Plaintiff fails to state NYSHRL or NYCHRL race, gender, or age hostile work environment claims.

### 2. Disability hostile work environment claim

However, under this more liberal standard, which requires analyzing whether a plaintiff is treated "less well" and does not require a finding of "severe or pervasive" conduct, Plaintiff sufficiently alleges facts in support of NYSHRL and NYSHRL hostile work environment claims on the basis of disability. In his Amended Complaint and in his opposition, Plaintiff alleges that Defendants "creat[ed] a hostile work environment" because of his requests for accommodation for his disability and that Green and Ayala, among others, treated him less well by ignoring his complaints and requests for accommodation. (Am. Compl. ¶¶ 81, 147–51, 238.) At the motion to dismiss stage, this is sufficient to plead NYSHRL and NYCHRL hostile work environment claims based on his disability. *See Kugel v. Queens Nassau Nursing Home Inc.*, 568 F. Supp. 3d 253, 264 (E.D.N.Y. 2021) (finding that the plaintiff's hostile work environment claim on the basis of disability succeeded "[u]nder NYCHRL's more forgiving standard"); *Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 183 (E.D.N.Y. 2017) (permitting NYCHRL claims to proceed where the plaintiffs claimed that they received differential treatment).

Thus, the Court dismisses Plaintiff's NYSHRL and NYCHRL age, gender, and race hostile work environment claims but denies Defendants' motion to dismiss Plaintiff's disability hostile work environment claim.

### e. ADA retaliation claim

Defendants argue that Plaintiff's retaliation claim under the ADA fails for a number of reasons. [13] (Defs.' Mem. 16.) First, Plaintiff does not plausibly allege any retaliatory animus from Defendants. (*Id.*) Second, Defendants required him to submit to drug and alcohol testing before he allegedly engaged in any protected activity. (*Id.* at 17.) Third, Defendants terminated him based on their understanding and a "third-party medical provider's evaluation of Plaintiff" that Plaintiff was able to successfully complete the breathalyzer but failed to do so. (*Id.* at 17–18.) Fourth, the retaliation claim is redundant of Plaintiff's failure-to-accommodate claim. (*Id.* at 18.)

[13]     Plaintiff also brings retaliation claims under Title VII, the NYSHRL, and NYCHRL, all of which fail. While Plaintiff brings a claim under Title VII, the only potential protected activities he alleges are his requests for accommodation on the basis of his disability, as he admits in his opposition papers. (Pl.'s Opp'n 9.) Because "Title VII does not prohibit discrimination or retaliation on the basis of a disability," *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 152 (E.D.N.Y. 2018), the Court dismisses Plaintiff's Title VII retaliation claim. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) ("[A] complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII[.]"); *Muszak v. Sears, Roebuck & Co.*, 63 F. Supp. 2d 292, 300 (W.D.N.Y. 1999) ("[A] Title VII retaliation claim must be for actions protected by Title VII, and, quite simply (unlike the ADA that has its own retaliation prohibition), Title VII does not protect a request for an accommodation on the basis of an alleged disability." (footnotes omitted)). Further, "[u]nder both New York State and New York City Human Rights Laws, a request for reasonable accommodation is not a protected activity for purposes of a retaliation claim." *Witchard v. Montefiore Med. Ctr.*, 960 N.Y.S.2d 402, 403–04 (App. Div. 2013); *see D'Amico v. City of New York*, 73 N.Y.S.3d 540, 558–59 (App. Div. 2018) (same). While the New York City Council amended the NYCHRL to "make[ ] [it] clear that requesting a reasonable accommodation is a protected activity," *Piligian v. Icahn Sch. of Med. at Mt. Sinai*, 490 F. Supp. 3d 707, 722 (S.D.N.Y. 2020), the amendment became effective on November 11, 2019 and is not retroactive; thus it does not apply to Plaintiff's claims, which accrued in October of 2019 through

his termination on November 1, 2019. *See Limauro v. Con. Ed. Co. of N.Y., Inc.*, No. 20-CV-3558, 2021 WL 466952, at *10 (S.D.N.Y. Feb. 9, 2021) ("But that amendment had not yet taken effect at the time [the plaintiff] made his [accommodation] requests to [his employer], and there is no indication that the New York City Council intended for the amended NYCHRL to apply retroactively. Thus, [the court] must adhere to the New York courts' prior interpretation of the statutes." (citation omitted)); *Mejia v. City of New York*, No. 17-CV-2926, 2020 WL 2837008, at *13 (E.D.N.Y. May 30, 2020) ("[A] request for a reasonable accommodation is not a protected activity for purposes of a retaliation claim [under the NYSHRL or NYCHRL]." (quoting *Witchard*, 960 N.Y.S.2d at 403–04)). The Court therefore dismisses Plaintiff's NYSHRL and NYCHRL retaliation claims.

**\*14** Plaintiff argues that requesting a reasonable accommodation constitutes protected activity and that he did so before he was suspended. (Pl.'s Opp'n 9.) Plaintiff also contends that he was suspended without pay within hours of requesting a reasonable accommodation. (*Id.* at 9–10.)

To establish a prima facie case of retaliation under the ADA, a plaintiff "must show that he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action." *Ibela v. Allied Universal*, No. 21-CV-1995, 2022 WL 1418886, at *2 (2d Cir. May 5, 2022) (quoting *Fox*, 918 F.3d at 72–73); *Clark*, 2022 WL 92060, at *5 (same); *Norman v. NYU Langone Health Sys.*, No. 20-CV-3624, 2021 WL 5986999, at *4 (2d Cir. Dec. 17, 2021) (discussing factors of an ADA retaliation claim). "A plaintiff bears only a minimal burden in making this prima facie showing." *Perez v. City of New York*, 843 F. App'x 406, 407 (2d Cir. 2021) (first citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); and then citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

The Court considers each factor below.

### 1. Protected activity

"Activities protected by the ADA include complaints of ADA discrimination, including complaints ... that the employer's actions violated the ADA, and requests for reasonable accommodation." *Flieger v. E. Suffolk BOCES*, 693 F.

App'x 14, 18 (2d Cir. 2017); *see Treglia*, 313 F.3d at 720 ("[A]ttempts to assert ... rights against discrimination are protected activities."); *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (same); *see also Fox*, 918 F.3d at 73 (stating that the plaintiff engaged in a protected activity when he sent an "email and administrative complaint"); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan v. Long Island R.R. Co.*, 622 F. App'x 61, 63–64 (2d Cir. 2015) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). "Requesting a reasonable accommodation of a disability is an ADA-protected activity." *Rodriguez v. Atria Senior Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012) (citing *Weixel v. Bd. of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002)); *see Ibela*, 2022 WL 1418886, at *2 ("Seeking a reasonable accommodation constitutes protected activity under the ADA."); *Weixel*, 287 F.3d at 149 ("[P]laintiffs ... allege that they were seeking reasonable accommodation [on the basis of] disability — which constitutes protected activity under [the ADA].").

Plaintiff has adequately alleged that he engaged in protected activity. On October 15, 2019, Plaintiff asked Lall and Ayala several times whether there was another way to take the breathalyzer test because his chest was getting tighter and he suffered from asthma. (Am. Compl. ¶¶ 70–74, 80–81, 87.) On October 25, Plaintiff told Ayala that he was "being treated unfairly" and that "he was going to reach out for help and report him." (*Id.* ¶ 136.) On October 27, Plaintiff again asked if anything could be done "such as taking the test again or [a] different test." (*Id.* ¶ 138.) On October 28, Plaintiff explained the situation to Green and asked him to "take his medical condition into consideration." (*Id.* ¶¶ 146–48.) On October 29, he emailed the People Department, Crew Relations, and others, stating that he had been unable to perform his breathalyzer test and stating that his medical documentation had not been "taken into consideration." (*Id.* ¶¶ 161–62.) These requests for reasonable accommodation and complaints of unfair treatment constitute protected activity. *See Treglia*, 313 F.3d at 720 ("[A]ttempts to assert ... rights against discrimination are protected activities."); *see Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (noting that requesting a reasonable accommodation of a disability is an ADA-protected activity); *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015) ("Requests for disability

accommodation and complaints, whether formal or informal, about working conditions related to one's alleged disability are protected activities." (quoting *Gorbea v. Verizon N.Y., Inc.*, No. 11-CV-3758, 2014 WL 917198, at *11 (E.D.N.Y. Mar. 10, 2014))).

### 2. Adverse employment actions

**\*15** "In the context of ... ADA retaliation claims, [the Second Circuit has] described an adverse employment action as 'a materially adverse change in the terms and conditions of employment.' " *Baum v. Rockland County*, 161 F. App'x 62, 64 (2d Cir. 2005). Adverse employment actions include, but are not limited to, suspension and discharge from employment. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001) (holding that for purposes of an ADA retaliation claim, an "adverse employment action" broadly includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))); *Muller v. Costello*, 187 F.3d 298, 315 (2d Cir. 1999) (holding that other adverse actions beyond discharge could be considered for purposes of an ADA retaliation claim); *Weissman v. Dawn Joy Fashions Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (finding that claims of refusal to rehire or denials of employment were adverse actions for purposes of ADA retaliation claims).

Plaintiff alleges that he was suspended on October 15, 2019, (Am. Compl. ¶ 91), and terminated on November 1, 2019, (*id.* ¶ 167). Both constitute adverse employment actions. *See Rodriguez*, 887 F. Supp. 2d at 512 ("Of course, there is no dispute that termination is an adverse employment action."); *Clark*, 96 F. Supp. 3d at 262 ("[The] [p]laintiff's termination constitutes ... an adverse decision taken against [the] [p]laintiff."); *see also Rosenfield v. N.Y.S. Div. of Veterans' Affs.*, No. 18-CV-1299, 2020 WL 8911057, at *6 (N.D.N.Y. May 28, 2020) (stating that "defendants' suspension of plaintiff without pay" was an adverse action); *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 485–86 (E.D.N.Y. 2016) (considering a suspension to be an adverse action for purposes of retaliation under the ADA); *Lovejoy-Wilson*, 263 F.3d at 223–24 (finding that the plaintiff established a prima facie case of retaliation under the ADA where she was suspended).

### 3. Causal connection

To establish a prima facie case of retaliation under the ADA, a plaintiff must show "that a causal connection existed between the protected activity and the adverse action." *Baum*, 161 F. App'x at 64 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)). A causal connection in retaliation claims can be shown: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky*, 921 F.3d at 353 (quoting *Littlejohn*, 795 F.3d at 319). The plaintiff must provide "sufficient evidence of a causal nexus between [his] protected activity and the alleged adverse employment actions he suffered." *Clark*, 2022 WL 92060, at *5 (quoting *Fox*, 918 F.3d at 73). "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy-Wilson*, 263 F.3d at 224 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see Ibela*, 2022 WL 1418886, at *2 ("[A] plaintiff can indirectly establish a causation connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (quoting *Gorman-Bakos v. Cornell Co-Op Ext. of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001))) (finding that a gap of two months between a protected activity and adverse action was sufficient to plausibly allege causation); *Pistello v. Bd. of Educ.*, 808 F. App'x 19, 21–22 (2d Cir. 2020) (considering dates of protected activities in relation to adverse employment actions and permitting the plaintiff's ADA retaliation claim to proceed).

**\*16** Plaintiff requested a reasonable accommodation to the breathalyzer test on October 15, 2019, and that same evening, he was suspended. (Am. Compl. ¶¶ 74, 81, 87, 91.) In addition, Plaintiff made requests for reasonable accommodations on October 25, 27, 28, and 29, complained about unfair treatment, and was terminated effective November 1, 2019. (*Id.* ¶¶ 136, 136–39, 145–49, 161–62, 167.) At the pleadings stage, this temporal proximity is sufficient to infer causation, *see Thomson v. Odyssey House*, No. 14-CV-3857, 2015 WL 5561209, at *22 (E.D.N.Y. Sept. 21, 2015) ("The close temporal proximity between the complaints and [the plaintiff's] termination is sufficient to

meet her minimal burden at this stage of the litigation."), particularly because Plaintiff had not faced adverse job actions or reprimands prior to his requests for reasonable accommodation, *cf. Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). *See Clark*, 96 F. Supp. 3d at 262 (finding that a gap of "several days" between the protected activity and the adverse action was sufficient to satisfy the causal element to establish a prima facie case of ADA retaliation).

Accordingly, the Court finds that Plaintiff has sufficiently alleged a retaliation claim under the ADA and denies Defendants' motion to dismiss this claim.

### f. NYCHRL interference claim, NYSHRL and NYCHRL aiding and abetting claims, and state law tort claims

Defendants argue that because Plaintiff has failed to rebut Defendants' arguments or address his NYCHRL interference claim, NYSHRL and NYCHRL aiding and abetting claims, and state law claims for NIED and IIED, he has waived these claims.[14] (Defs.' Reply 1–2.)

[14]   Plaintiff alleges that Defendants violated the NYCHRL provision that prohibits individuals from "coerc[ing], intimidat[ing], threaten[ing] or interfer[ing] with[ ] any person in the exercise or enjoyment of ... any right granted or protected." (Am. Compl. ¶¶ 250–53.) In addition, Plaintiff brings NYSHRL and NYCHRL aiding and abetting claims, alleging that Defendants aided and abetted discriminatory and retaliatory conduct. (*Id.* ¶¶ 228–31, 246–49.) Finally, Plaintiff brings NIED and IIED claims on the grounds that the "conduct described ... was extreme and outrageous and severely affected Plaintiff's sense of self and emotional well-being." (*Id.* ¶¶ 278–79.)

Plaintiff has not addressed Defendants' arguments, and accordingly, the Court finds that Plaintiff, who is represented by counsel, has abandoned these claims. *See BYD Co.*

*Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue." (quoting *Kao v. Brit. Airways, PLC*, No. 17-CV-232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018))); *MYL Litig. Recovery I LLC v. Mylan N.V.*, No. 19-CV-1799, 2020 WL 1503673, at *7 (S.D.N.Y. Mar. 30, 2020) ("[The plaintiff] has failed to respond to this argument in its opposition. Accordingly, any argument opposing [the defendant's] position here is waived." (citing *Kao*, 2018 WL 501609, at *5)); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 452 (E.D.N.Y. 2014) ("Plaintiff does not respond to this argument and the [c]ourt therefore construes Plaintiff's failure to respond as an abandonment of this claim."); *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

### III. Conclusion

For the reasons stated above, the Court grants Defendants' motion and dismisses Plaintiff's (1) Title VII discrimination claims based on gender and race and NYSHRL and NYCHRL discrimination claims based on age, gender, and race; (2) Title VII hostile work environment claims based on gender and race, and NYSHRL and NYCHRL hostile work environment claims based on age, gender, and race; (3) Title VII, NYSHRL, and NYCHRL retaliation claims; and (4) NYCHRL interference claim; NYSHRL and NYCHRL aiding and abetting claims; and state law claims for IIED and NIED.

**\*17**  The Court denies Defendants' motion as to Plaintiff's (1) ADA discrimination claim; (2) NYSHRL and NYCHRL disability discrimination claims; (3) ADA failure-to-accommodate claim; (4) ADA hostile work environment claim; (5) NYSHRL and NYCHRL hostile work environment claims based on disability; and (6) ADA retaliation claim.

### All Citations

Slip Copy, 2022 WL 4291371

---

2022 WL 3586559
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Darcy BELYEA, Plaintiff,

v.

The CITY OF GLEN COVE and Timothy Tenke in
his individual and official capacities, Defendants.

20-CV-5675 (MKB)
|
Signed August 22, 2022

**Attorneys and Law Firms**

Matthew Brian Weinick, Famighetti & Weinick, PLLC,
Melville, NY, for Plaintiff.

Mark A. Radi, Meltzer Lippe Goldstein & Breitstone, LLP,
Mineola, NY, Steven C. Stern, Sokoloff Stern LLP, Carle
Place, NY, for Defendants.


**<u>MEMORANDUM & ORDER</u>**

MARGO K. BRODIE, United States District Judge

**\*1** I. Background ...
a. The parties 3

b. Plaintiff's early employment with the City 3

c. 2018 actions alleged by Plaintiff 4

d. 2019 actions alleged by Plaintiff 6

e. 2020 actions alleged by Plaintiff 8

II. Discussion 10
a. Standard of review 10

b. Consideration of documents other than the Complaint 10

c. Title VII claims against the City 15

  i. Timeliness 15

  ii. Exhaustion of administrative remedies 18

  iii. Hostile work environment claim 22

  iv. Retaliation 25

    1. Participation in a protected activity 28

    2. Adverse employment action 29

    3. Causal connection between protected activity and adverse employment actions 31

d. NYSHRL hostile work environment and retaliation claims against Tenke 35

e. Section 1983 claims against both Defendants 37

  i. Tenke's claims of legislative and qualified immunity 38

    1. Legislative immunity 38

    2. Qualified immunity 42

  ii. Personal involvement of Tenke 44

  iii. First Amendment claims against Tenke and the City 47

    1. First Amendment retaliation claim on the basis of Plaintiff's gender discrimination complaint 49

    A. Plaintiff sufficiently alleges that she engaged in protected speech when she issued a press release 49

    (1) Plaintiff's internal complaint 50

    (2) Plaintiff's press release 51

    1. Plaintiff plausibly spoke as a citizen 51

    2. Plaintiff spoke on a matter of public concern 52

    B. Plaintiff alleges that she suffered adverse employment actions 54

    C. Plaintiff sufficiently alleges causation 56

    2. First Amendment political retaliation 58

  iv. Fourteenth Amendment claims 62

  v. The City's *Monell* liability 63

f. Punitive damages 68

### III. Conclusion 69

Plaintiff Darcy Belyea commenced the above-captioned action on November 20, 2020, (Compl., Docket Entry No. 1), against Defendants the City of Glen Cove (the "City") and Timothy Tenke, in his individual and official capacities as the mayor of Glen Cove. Plaintiff alleges claims of gender discrimination, retaliation, hostile work environment and free speech violations pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"), and 42 U.S.C. § 1983, based on her workplace environment and her termination as Recreation Director from the City during Tenke's tenure as mayor. (Id. ¶¶ 10, 26, 115–27.)

The City and Tenke separately move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [1] Plaintiff opposes the motions. [2] For the reasons set forth below, the Court grants in part and denies in part Defendants' motions to dismiss.

[1]    (City's Mot. to Dismiss ("City's Mot."), Docket Entry No. 12; City's Mem. in Supp. of City's Mot. ("City's Mem."), Docket Entry No. 12-2; City's Reply in Further Supp. of City's Mot. ("City's Reply"), Docket Entry No. 17; Tenke's Mot. to Dismiss ("Tenke's Mot."), Docket Entry No. 13; Tenke's Mem. in Supp. of Tenke's Mot. ("Tenke's Mem."), Docket Entry No. 13-10; Tenke's Reply in Further Supp. of Tenke's Mot. ("Tenke's Reply"), Docket Entry No. 18.)

[2]    (Pl.'s Mem in Opp. to City's Mot. ("Pl.'s City Opp'n"), Docket Entry No. 15; Pl.'s Mem. in Opp. to Tenke's Mot. ("Pl.'s Tenke Opp'n"), Docket Entry No. 14.)

#### I. Background

**\*2** The Court assumes the truth of the factual allegations in the Complaint for the purposes of this Memorandum and Order.

#### a. The parties

Plaintiff is a female residing in Glen Cove in Nassau County, New York. (Compl. ¶ 6.) The City employs hundreds of employees and operates approximately nineteen departments to administer the city government. (Id. ¶ 8.) Tenke, a Democrat, is the mayor and chief executive officer and a resident of Nassau County. (Id. ¶¶ 9, 27.)

#### b. Plaintiff's early employment with the City

The City hired Plaintiff as the Recreation Director in November of 1996, and Plaintiff began her first day of work on January 2, 1997. (Id. ¶¶ 10–11.) Recreation Director is a civil service position, subject to the rules and requirements of New York's Civil Service laws and regulations. (Id. ¶ 12.) The Recreation Director position is not appointed annually, unlike some other department head positions, and "exercises general supervision over" and has responsibility for the City's recreational areas, playgrounds, and programs, including City recreational events. (Id. ¶¶ 15–16.) Plaintiff is a member of the collective bargaining unit, identified as "CSEA." (Id. ¶ 17.) After a brief period of probation, Plaintiff became a permanent employee, and the position was then "controlled by N.Y. Civil Service Law § 75 ('Section 75')." (Id. ¶ 13.) Section 75 prohibits the City from terminating an employee without first issuing charges and then providing a hearing on the charges, with some exceptions. (Id. ¶ 14.)

For the first twenty-one years of her employment, Plaintiff performed her job "in an exemplary manner." (Id. ¶ 18.) Plaintiff was "not disciplined or reprimanded, and her personnel record [was] unblemished." (Id. ¶ 19.) From 1997 to 2017, Plaintiff worked "successfully" with four different administrations from both major political parties. (Id. ¶ 20.) Residents have "lauded" her work performance. (Id. ¶¶ 22–23.)

In January of 2016, the CSEA instructed then-mayor Reginald Spinello to remove Plaintiff as a dues-paying member of the CSEA. (Id. ¶ 24.) Spinello declined to take action because he believed the issue "was really between [Plaintiff] and the union." (Id. ¶ 25.)

Plaintiff's work conditions "changed for the worse" "[a]lmost immediately" after Tenke took office as mayor in January of 2018 and City officials worked to undermine and circumvent her. (Id. ¶¶ 28–29.) For example, that month, Tenke and the deputy mayor, Maureen Basdavanos, sought to amend parking regulations at the City stadium parking lot, and although Plaintiff "should have been involved in such discussions," Tenke and Basdavanos excluded her. (Id. ¶¶ 30–31.)

#### c. 2018 actions alleged by Plaintiff

In February of 2018, a "close friend and ally of Tenke," Michael Cervini, began a "campaign of disinformation about [Plaintiff]'s work leading the renovation of the City's batting cages." (*Id.* ¶ 32.) Cervini publicly criticized Plaintiff's work but praised the mayor, including in a full-page advertisement in the local newspaper. (*Id.* ¶ 34.) Plaintiff asked Tenke to confront Cervini, but the conduct did not stop. [3] (*Id.* ¶ 36.)

[3] Plaintiff does not allege "whether Tenke took action or not." (Compl. ¶ 36.)

**\*3** At a City Council meeting in July of 2018, Basdavanos' husband accused Plaintiff of not caring about the safety of residents and stated that she should be fired because she did not staff "sufficient lifeguards" for the beaches. (*Id.* ¶ 38.) At that time, there was an ongoing national lifeguard shortage, which was affecting municipalities across Long Island. (*Id.* ¶ 39.)

That summer, a citizen requested documents concerning bathroom renovations being supervised by Plaintiff pursuant to the Freedom of Information Law ("FOIL"). (*Id.* ¶ 40.) Instead of "allowing the FOIL request to proceed in the normal course," Basdavanos sent the documents directly to the resident, who used these documents "to allege that [Plaintiff] should be fired for mismanaging the project." (*Id.* ¶ 41.) Plaintiff contends that the project was "doomed" because of a defunct outside contractor, and that although she had sought assistance from Tenke, the city attorney, and the building department to force the contractor's hand in completing the work, they took no action, leaving Plaintiff to "take the blame for the contractor's failures." (*Id.* ¶¶ 42–43.)

Plaintiff contends that these issues were directed at her based on her gender, because "historically," the mayor supported male employees and would "maintain order at meetings and other events" when residents criticized these employees but did not do the same for Plaintiff. (*Id.* ¶ 45.) In addition, male employees were not reprimanded or criticized for serious misconduct, while Defendants "tacitly condoned and/ or provoked" residents' unwarranted criticisms of Plaintiff. (*Id.*) Examples of male employees receiving better treatment included a male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being

reprimanded, and a male employee not being reprimanded or disciplined for unlawfully switching license plates on City vehicles, one of which was used for non-work-related purposes and involved in an accident. (*Id.* ¶ 46.)

In December of 2018, Tenke attempted to fire the City's controller, Sandra Clarson, but was unable to do so because it would have violated the City Charter. (*Id.* ¶¶ 47–48.) The following summer, *Newsday* reported that Tenke's paychecks did not include certain required deductions for health insurance benefits, but Tenke alleged he was not aware of the error and blamed Clarson's office, saying that this was "what happen[ed] when a duly elected mayor [was] forced to use a holdover political appointee to provide financial checks and balances for the [C]ity." (*Id.* ¶¶ 49–52.) He called this "pure obstructionist politics." (*Id.* ¶ 52.) Tenke attempted to fire Clarson again while she was on vacation, but Clarson temporarily returned to work following an order by a Nassau County Court judge. (*Id.* ¶¶ 54–55.)

#### d. 2019 actions alleged by Plaintiff

In August of 2019, the CSEA asked Tenke to remove Plaintiff's CSEA member status and cease collecting her union dues, as the union was concerned that Plaintiff had brought Section 75 charges against a subordinate CSEA employee for misconduct and believed that such conduct compelled her dismissal from the union. (*Id.* ¶¶ 56–57.) Tenke immediately acquiesced to the demand and revoked Plaintiff's membership. (*Id.* ¶ 58.) Two weeks later, Plaintiff met with CSEA officials to explain her position, and the CSEA retracted its prior demand and told Tenke that he should reinstate Plaintiff. (*Id.* ¶¶ 59–60.)

**\*4** On October 2, 2019, Clarson, who by then was no longer the City controller, together with Plaintiff, issued a press release concerning "ongoing sex discrimination and harassment of female City employees." (*Id.* ¶ 61.) A friend who had worked with the previous Republican administration assisted in issuing the press release. (*Id.* ¶¶ 62–63.) Tenke refuted the claims and asserted that Plaintiff's press release was a "political attack." (*Id.* ¶ 68.) Councilwoman Marsha Silverman also believed that the press release was "politically motivated and unsubstantiated." (*Id.* ¶ 69.) *Newsday* reported on the story on October 17, 2019. (*Id.* ¶ 70.) On October 15, 2019, Plaintiff sent a letter to a City personnel officer, John Charon, "detailing much of [Plaintiff's] mistreatment from January [of] 2018 to then" and alleging that the treatment

was based on "gender bias." (*Id.* ¶ 64.) The letter outlined the basis for Plaintiff's discrimination allegations, and, in addition, noted that:

> There is a serious and dangerous pattern of proficient and accomplished women working in this administration that are consistently harassed and bullied. Yet, male employees are not reprimanded in any way, even when their offenses are clearly blatant insubordination or border on criminal.

(*Id.* ¶ 65.)

The City did not include Plaintiff in budget talks in the fall of 2019, even though department heads, including Plaintiff, were traditionally involved in budget discussions. (*Id.* ¶¶ 75–77.) In November of 2019, Tenke and other City officials met to discuss one of the City's recreation areas, but Plaintiff was not included in the meeting. (*Id.* ¶¶ 78–79.) At the meeting Tenke announced that Plaintiff would not be working for the City in 2020 and that the Parks Department would be folded into the Department of Public Works (the "DPW"). (*Id.* ¶ 80.) Plaintiff alleges that "Tenke was laying the groundwork to remove [her] in one of the only ways permitted by the Civil Service rules." (*Id.* ¶ 81.)

On December 19, 2019, attorneys for the City contacted Plaintiff, acknowledging receipt of her complaint and setting up twelve hours of interviews to discuss her allegations of sex discrimination. (*Id.* ¶ 82.) Within weeks, Tenke began "stripping" Plaintiff of her duties. (*Id.* ¶ 83.) For example, on December 31, 2019, Plaintiff was told that one of her employees responsible for a major department project was being reassigned to the DPW. (*Id.* ¶ 84.) On January 8, 2020, City officials excluded Plaintiff from a vendor meeting concerning contamination at one of the beaches under her supervision, and the next day, DPW employees told her she had to turn over her files concerning the contamination project. (*Id.* ¶¶ 85–86.) When Plaintiff asked why, the employees "blamed" Basdavanos and Grant Newburger, the Public Relations officer. (*Id.* ¶ 87.)

**e. 2020 actions alleged by Plaintiff**

On January 13, 2020, Plaintiff spoke with Louis Saulino, the DPW director, about the contamination project. (*Id.* ¶ 88.) Saulino told Plaintiff that he needed her in the meetings, was "aggravated" by Tenke's handling of the meetings and exclusion of Plaintiff from the meetings, and wanted nothing to do with assuming any of Plaintiff's responsibilities, as he had enough work "on [his] plate." (*Id.* ¶ 89.) Saulino spoke with Tenke about including Plaintiff in the contamination meetings and Tenke agreed but insisted that Plaintiff should remain excluded from other project meetings, such as a bathroom renovation project at one of her parks. (*Id.* ¶¶ 90–91.)

Several days later, a member of one of the City's sports leagues informed Plaintiff that City residents had heard that the City intended to move her Department's office location to the basement of City Hall or off-site. (*Id.* ¶¶ 92–93.)

On March 9, 2020, shortly after the Covid-19 pandemic began, the City convened a meeting across departments to discuss the City's plan for the pandemic. (*Id.* ¶¶ 94–95.) Even though Plaintiff's department supervised events and sports leagues with hundreds of participants, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan. (*Id.* ¶ 97.)

**\*5** On May 5, 2020, Tenke ordered the auxiliary police to change the locks on a park facility. (*Id.* ¶ 98.) On July 28, 2020, Tenke proposed a resolution to publicize the results of the City's investigation into Plaintiff's complaints of discrimination, although Plaintiff alleges that "such documents should have remained confidential parts of the employee personnel file." (*Id.* ¶ 99.)

On October 9, 2020, Tenke told Plaintiff he was eliminating her position from the 2021 budget. (*Id.* ¶ 101.) Tenke asserted that the City was facing budget issues and that layoffs were the only solution. (*Id.* ¶ 104.) Plaintiff was the only department head terminated. (*Id.* ¶ 103.) In October of 2020, the City Council met and discussed the proposed budget, which included the layoffs. (*Id.* ¶ 105.) Several Council members pointed out other ways to reduce costs, but Tenke rejected those alternatives as "not viable." (*Id.* ¶ 106.) Tenke did not approach the CSEA, which could have offered cost-saving concessions, and did not approach department heads, who were usually asked to provide input about reducing budget costs. (*Id.* ¶¶ 107–08.) In addition to Plaintiff, five low-level laborers or clerks were set to be laid off. (*Id.* ¶ 109.)

2022 WL 3586559

Plaintiff contends that Defendants' actions have caused her to suffer from insomnia, headaches, dizzy spells, and weight gain. (*Id.* ¶ 114.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Vaughn*, 957 F.3d at 145 (same).

### b. Consideration of documents other than the Complaint

In support of his motion to dismiss, Tenke has submitted a number of documents and files that are not attached to the Complaint and asserts that the Court should consider them because they are public records and documents referenced in Plaintiff's Complaint. (Tenke's Mem. 10–11; Tenke's Reply 1–2.)

Plaintiff argues that the documents submitted are unauthenticated, and even if they were authenticated, several documents are not heavily relied upon "to frame the Complaint" and are "all tangential to the central issues." (Pl.'s Tenke Opp'n 6–8.)

In deciding a Rule 12(b)(6) motion, "the district court is normally required to look only to the allegations on the face of the complaint" but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding that courts may consider on a motion to dismiss "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" and other documents "integral" to the complaint (first quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010))); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." (alteration in original) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))). Disputes regarding the authenticity or accuracy of documents preclude a court's consideration on a motion to dismiss. *See DiFolco*, 622 F.3d at 111 (stating that to consider documentary evidence on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006))); *Beer*, 463 F.3d at 134 ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." (first quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); and then citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001))); *Structured Asset Sales, LLC v. Sheeran*, No. 20-CV-4329, 2021 WL 1199495, at *5 (S.D.N.Y. Mar. 30, 2021) (same); *DeLeon v. Teamsters Loc. 802, LLC*, No. 20-CV-24, 2021 WL 1193191, at *8 (E.D.N.Y. Mar. 29, 2021) (same); *F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 381 (E.D.N.Y. 2015) (stating that in order to consider documentary evidence on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible" (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 221 (N.D.N.Y. 2014))).

**\*6** In addition to his memorandum of law in support of his motion to dismiss, Tenke has submitted (and the City also

relies on, (*see* City's Mem.)) several documents Defendants contend are referenced in the Complaint: (1) an advertisement placed by Cervini in a local newspaper, which Defendants also claim is a matter of public record; (2) a copy of correspondence between CSEA and the City; (3) a copy of Plaintiff's internal workplace harassment complaint submitted to the City on October 15, 2019; and (4) a copy of the findings of the investigation of Plaintiff's harassment complaint. [4] In addition, Defendants rely on several other documents that they contend are matters of public record: (1) copies of the minutes of the October 27, 2020 City Council meeting and 2021 budget adopted at that meeting, which Defendants also claim are referenced in the Complaint; (2) a copy of a July 18, 2019 *Newsday* article, which Defendants also claim is referenced in the Complaint; and (3) a copy of Plaintiff's Charge of Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC Charge"), dated March 13, 2020. [5] Tenke has also embedded several links to City Council meetings on a video hosting platform, "Vimeo," a link to an article in the *Long Island Herald*, and the City Charter. (*See generally* Tenke's Mem. 3–9.)

[4]    (*See* Advertisement, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. B, Docket Entry No. 13-3; Correspondence, annexed to Radi Decl. as Ex. C, Docket Entry No. 13-4; Workplace Harassment Compl., annexed to Radi Decl. as Ex. D, Docket Entry No. 13-5; Findings of Workplace Harassment Compl., annexed to Radi Decl. as Ex. E, Docket Entry No. 13-6.)

[5]    (*See* Min. dated Oct. 27, 2020, annexed to Decl. of Mark Radi ("Radi Decl.) as Ex. F, Docket Entry No. 13-7; *Newsday* article dated July 18, 2019, annexed to Radi Decl. as Ex. G, Docket Entry No. 13-8; EEOC Charge, annexed to Radi Decl. as Ex. H, Docket Entry No. 13-9.)

The Court takes judicial notice of the EEOC Charge, City Charter, copies of the October 27, 2020 City Council meeting minutes [6] — including the 2021 budget adopted at that meeting — and the July 18, 2019 *Newsday* article, as they are matters of public record. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) ("[T]he district court may have taken judicial notice that [the complainant] filed complaints with the EEOC and in federal court ...." (citing *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014))); *see also Mike v. Drug Enforcement Admin.*, No. 19-CV-5407, 2022 WL 992528, at *4 n.11 (E.D.N.Y. Mar. 31,

2022) ("[T]he [c]ourt takes judicial notice of the fact of the publication ... in *USA Today*."); *King v. City of New York*, 581 F.Supp.3d 559 (S.D.N.Y. 2022) ("On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint. It may also take judicial notice of public records, such as complaints filed in state court and city council minutes." (citation omitted)); *Elite Union Installations, LLC v. National Fire Ins. Co.*, 559 F. Supp. 3d 211, 218 (S.D.N.Y. 2021) ("Courts may also 'take judicial notice of certain matters of public record ... includ[ing] 'things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, published reports, [and] records of administrative agencies.' " (first quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); and then quoting *Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014))); *Roth*, 489 F.3d at 509 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015) (noting that "when a court takes judicial notice of documents in the public record at the [m]otion [t]o [d]ismiss stage," it may consider them "only to establish their existence and legal effect[ ] or to determine what statements they contain[ ] [but] not for the truth of the matters asserted" (quoting *Liang v. City of New York*, No. 10-CV-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013))); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 & n.4 (S.D.N.Y. 2008) (taking judicial notice of several news articles, including magazines and noting that the court "may take judicial notice of newspaper articles for the fact of their publication" (quoting *In re Merrill Lynch & Co.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003))), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

[6]    Other courts in this Circuit have considered City Council minutes matters of public record. *See King v. City of New York*, 581 F.Supp.3d 559 (S.D.N.Y. 2022) ("On a motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint. It may also take judicial notice of public records, such as complaints filed in state court and city council minutes." (citation omitted)); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 696 n.3 (S.D.N.Y. 2011) ("Second, the minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice.") (collecting cases).

**\*7** The Court declines to consider the other documents and videos because Plaintiff disputes their authenticity. *See Faulkner*, 463 F.3d at 134 (noting that courts may not consider extrinsic materials on a motion to dismiss where the authenticity is disputed on the record); *see Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 719–20 (S.D.N.Y. 2015) (rejecting videos where their authenticity was disputed even assuming they were integral); *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 397–98 (S.D.N.Y. 2015) (rejecting incident report, depositions, and misdemeanor complaint because they were disputed).

The Court also declines to convert these motions to dismiss into motions for summary judgment in light of Plaintiff's request for the parties to conduct discovery and submit additional materials, (Pl.'s Tenke Opp'n 7 n.3), as the parties have not been given a "reasonable opportunity to present all [pertinent] material." *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (quoting Fed. R. Civ. P. 12(d)) (reversing the district court's decision where the district court did not permit submission of all pertinent materials before converting motion to dismiss into motion for summary judgment).

### c. Title VII claims against the City

The City argues that Plaintiff's Title VII hostile work environment and retaliation claims fail because several of her alleged acts are time-barred, she has failed to exhaust her administrative remedies, and she fails to state hostile work environment or retaliation claims.

### i. Timeliness

The City argues that the Court should dismiss Plaintiff's Title VII claims to the extent that her claims are based on incidents that occurred more than 300 days before Plaintiff filed the EEOC Charge. (City's Mem. 2–4.) Because Plaintiff filed the EEOC Charge on March 13, 2020, the City contends that she cannot base her claims on any alleged discrete events that occurred before May 18, 2019, 300 days prior to that date, including the City's January 2018 failed attempt to amend parking regulations; public criticism by Cervini in February of 2018; public criticism by Basdavanos in July of 2018; and the City's summer 2018 response to a FOIL request. (*Id.* at 3.)

Plaintiff argues that discriminatory acts which may fall outside the statute of limitations are not time-barred if those acts are part of the "same unlawful employment practice and at least one act falls within the time period." (Pl.'s City Opp'n 3–4 (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019)).) In support, Plaintiff argues that because the Complaint alleges ongoing harassment based on her sex, her claims are timely under *Davis-Garett*. (*Id.*)

In New York, a federal employment discrimination claim is time-barred unless the plaintiff first files an EEOC charge within 300 days of the alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) ("Under Title VII, a plaintiff in New York must file a complaint with the EEOC within 300 days of a discriminatory act." (first citing 42 U.S.C. 2000e-5(e)(1); and then citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999))); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010). This requirement is analogous to a statute of limitations. *Vega*, 801 F.3d at 79; *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (dismissing as untimely claims based on conduct that occurred more than 300 days prior to the filing of EEOC charge).

**\*8** "[E]xpiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.' " *Davis-Garett*, 921 F.3d at 42; *see Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (holding that allegations concerning conduct that took place during the time-barred period may also be considered as " 'background evidence' in evaluating the merits of [a plaintiff's] discrimination claims" (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (explaining that background evidence from outside the limitations period "may be considered to assess liability on the timely alleged act" (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005))); *Everett v. N.Y.C. Dep't of Educ.*, No. 21-CV-7043, 2022 WL 2342693, at \*5 (S.D.N.Y. June 29, 2022) (considering acts outside of the statute of limitations as "background evidence"); *McGrier v. Cap. Cardiology*, No. 20-CV-1044, 2022 WL 2105854, at \*7 (N.D.N.Y. June 10, 2022) ("Though time-barred, discrete prior acts falling outside the limitations period may be used as 'background evidence in support of a timely claim.' " (quoting *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061)); *Marzano v. S. New England Tel. Co.*, No. 16-CV-1274, 2018 WL 4341149, at

*2 (D. Conn. Sept. 10, 2018) ("Of course, evidence of prior events may be considered for background purposes to the extent that they may shed light on the significance of events occurring within the statute of limitations period."); *Johnson v. Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-CV-00901, 2018 WL 306697, at *4 (D. Conn. Jan. 5, 2018) ("[A]ny adverse acts that occurred prior to [the statute of limitations period] may be considered ... only as background evidence to support any non-time-barred acts of discrimination or retaliation."); *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 13-CV-1594, 2016 WL 1466545, at *14 (N.D.N.Y. Apr. 16, 2016) ("The statute of limitations does not ... bar an employee from using ... prior acts as background evidence in support of a timely claim." (quoting *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061)).

In addition, a hostile work environment claim by its very nature involves repeated conduct over time rather than a discrete occurrence on a particular day. *See, e.g.*, *Ferraro v. N.Y.C. Dep't of Educ.*, No. 13-CV-5837, 2015 WL 1476392, at *7 (E.D.N.Y. Mar. 31, 2015) (quoting *Morgan*, 536 U.S. at 115, 122 S.Ct. 2061). Such a claim is timely if at least one act contributing to the claim occurred within the limitations period. *See* *Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir. 2020) ("For hostile work environment claims, only one alleged act must fall within the statute of limitations, and so long as that act is part of the same unlawful practice as the earlier acts, the entire period of hostile environment may be considered."); *Patterson*, 375 F.3d at 220 (citing *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061) (same).

In her EEOC Charge, Plaintiff wrote that she was subjected to retaliation and discriminated against, has been "consistently and repeatedly harassed, belittled[,] and blocked from performing [her] job duties since January 17, 2018," filed a complaint with her employer, which was ignored, and was "treated ... poorly." (EEOC Charge at 1.) The City concedes several timely acts, (City's Mem. 3–4), which are part of the unlawful employment practices. Accordingly, the acts alleged in the Complaint prior to May 18, 2019 — the failure to be included in discussions about the parking spaces, (Compl. ¶ 31); public criticism by Cervini regarding the renovations of the City's batting cages, (*id.* ¶ 34); public criticism from Basdavanos' husband that Plaintiff should be fired because she did not staff "sufficient lifeguards" for the beaches, (*id.* ¶ 38); and the City's response to a FOIL request, (*id.* ¶¶ 40–43) — while untimely as discrete acts, are all part of Plaintiff's hostile work environment claim, and therefore are timely for purposes of Plaintiff's hostile work environment claim.[7]

[7]     While discrete acts taking place prior to May 18, 2019 are time-barred for purposes of Plaintiff's Title VII retaliation claim, *see* *Yu v. City of New York*, 792 F. App'x 117, 118 (2d Cir. 2020) (affirming district court's ruling that Title VII disparate treatment and retaliation claims were time-barred), the Court nevertheless remains free to consider the discrete acts as "background evidence" for purposes of Plaintiff's retaliation claim. *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013).

### ii. Exhaustion of administrative remedies

*9   The City argues that the Court should dismiss Plaintiff's Title VII claims because she "failed to timely exhaust [her] administrative remedies" with the EEOC. (City's Mem. 2–4.) The City argues that Plaintiff fails to exhaust her claims as to: (1) her removal and reinstatement to the union in August of 2019, (2) her exclusion from meetings and project reassignment in late 2019 and 2020, and (3) the elimination of her position in October of 2020, effective January of 2021, because she never presented any of these allegations to the EEOC. (*Id.* at 3–4.)

Plaintiff contends that she exhausted her administrative remedies because her claims are "reasonably related" to those presented in the EEOC charge. (Pl.'s City Opp'n 4–5 (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)).)

Under Title VII, a complainant must "exhaust" her administrative remedies by filing a complaint with the EEOC or an authorized state agency prior to the commencement of a Title VII action in federal court, and that complaint must name the defendant. *See* *Edo v. Antika Pizzeria Astoria, Inc.*, 852 F. App'x 618, 619 (2d Cir. 2021) ("Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006))); *McPartlan-Hurson v. Westchester Cmty. Coll.*, 804 F. App'x 41, 43 (2d Cir. 2020) ("Pursuant to Title VII and the ADA, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC within 300 days of a discriminatory act." (citing 42 U.S.C. §§ 2000e-5(e)(1), 12117(a))); *Duplan v. City of New York*, 888 F.3d 612, 624 (2d Cir. 2018) ("Exhaustion is 'an essential element of Title VII's statutory

Belyea v. City of Glen Cove, Slip Copy (2022)
Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 102 of 251
2022 WL 3586559

scheme.' " (quoting *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018))). However, "[c]laims not raised in an EEOC complaint ... may be brought in federal court if they are reasonably related to the claim filed with the agency." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 110 n.5 (2d Cir. 2018) (alteration in original) (quoting *Williams*, 458 F.3d at 70), *aff'd sub nom. Bostock v. Clayton County*, 590 U.S. ---, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020); *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (same). "Reasonably related" claims are recognized in three situations: where (1) the alleged discriminatory conduct "would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination' "; (2) the claim is one of "retaliation by an employer against an employee for filing an EEOC charge"; and (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003); *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 458 (2d Cir. 2009) (same). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.' " *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008) (quoting *Deravin*, 335 F.3d at 202); *see also Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation." (citing *Williams*, 458 F.3d at 70)). Courts look at "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving" to determine whether the claims are reasonably related. *Littlejohn*, 795 F.3d at 322 (alteration omitted) (quoting *Deravin*, 335 F.3d at 201); *Scott v. N. Manor Multicare Ctr., Inc.*, No. 15-CV-2495, 2018 WL 1627270, at *7, 2018 U.S. Dist. LEXIS 54730, at *17 (S.D.N.Y. Mar. 30, 2018) ("[T]he 'relatedness' analysis is 'intimately connected to the facts asserted in the EEOC complaint,' 'and does not depend on the boxes checked or labels applied by the plaintiff.' " (citation omitted) (first quoting *Williams*, 458 F.3d at 71; and then quoting *Carby v. Holder*, No. 11-CV-5775, 2013 WL 3481722, at *5 (S.D.N.Y. July 10, 2013))).

**\*10** In her EEOC Charge, Plaintiff indicated that she had experienced discrimination and retaliation based on her sex. (EEOC Charge at 1.) Plaintiff noted that the discrimination took place on October 10, 2019. (*Id.*) Plaintiff did not check the box indicating that the discrimination was a "continuing action," but when asked to add the particulars of her claim, Plaintiff specified that she had been subjected to retaliation and discrimination because she is female, and had been "consistently and repeatedly harassed, belittled[,] and blocked from performing [her] job duties since January 17, 2018 and most recently on March 9, 2020." (*Id.*) Plaintiff also wrote that she filed a complaint with her employer, which was ignored, and that she was "treated ... poorly." (*Id.*) In addition, Plaintiff noted that the male heads of departments and other male employees were "never questioned, disciplined, undermined[,] or prevented from performing their job duties, nor [were] they harassed or belittled at public meetings," unlike her. (EEOC Charge at 2.)

Plaintiff's timely allegations — removal and reinstatement to the union in August of 2019, exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021 — are "reasonably related" to the allegations in the EEOC Charge because the EEOC Charge detailed alleged discriminatory practices, retaliation, and a hostile work environment and provided "adequate notice" to the EEOC based on the dates and actions alleged in the EEOC Charge. *Williams*, 458 F.3d at 70 ("The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice.' "); *see Hoffman*, 443 F. App'x at 649 (ruling that a new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation). In her Complaint, Plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry*, 336 F.3d at 151. Thus, her allegations identified above "fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' " *Id.*; *see Littlejohn*, 795 F.3d at 322 (same).

Accordingly, the Court finds that Plaintiff has exhausted her administrative remedies as to her removal and reinstatement to the union in August of 2019, her exclusion from meetings and project reassignment in late 2019 and 2020, and the elimination of Plaintiff's position in October of 2020, effective January of 2021.

### iii. Hostile work environment claim

The City argues that Plaintiff fails to state to a hostile work environment claim, as the alleged incidents upon

which Plaintiff relies do not amount to severe or pervasive harassment, and are also "bereft" of any factual allegations plausibly demonstrating that the harassing incidents were gender-based. (City's Mem. 5–7.)

Plaintiff argues that she sufficiently states a hostile work environment claim because the conduct was severely or pervasively abusive and Defendants did not mistreat men. (Pl.'s City Opp'n 6–8.)

To state a hostile work environment claim, a plaintiff must "show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)); *see Duplan*, 888 F.3d at 627 (same); *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (same). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). The Second Circuit has cautioned that:

> **\*11** While the standard for establishing a hostile work environment is high, [the Second Circuit] ha[s] repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.

*Terry*, 336 F.3d at 148. A plaintiff must also show "that the complained of conduct ... creates such an environment because of the plaintiff's" protected characteristic. *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir. 2019). A court should consider the totality of the circumstances and factors such as "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Staten v. City of New York*, 653 F. App'x 78, 80 (2d Cir. 2016) (alteration in original) (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). In evaluating whether a plaintiff states a hostile work environment claim, the court must consider facially neutral conduct that might "bolster a harassment claim" when the facially neutral conduct is by the same individual who engaged in "overt[ ]" discrimination. *See Daniel v. T&M Prot. Res., LLC*, 689 F. App'x 1, 3 (2d Cir. 2017) (citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010)) (remanding with instructions to the district court to consider facially neutral incidents of harassment in analyzing the plaintiff's hostile work environment claim).

Based on the totality of the alleged conduct, Plaintiff plausibly alleges a hostile work environment claim on the basis of gender. Plaintiff claims that over a series of years, the City excluded her from meetings where she would normally be involved as a department head. (Compl. ¶¶ 31, 85–86.) Indeed, Plaintiff was excluded from a vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85), and was directed to turn over her files concerning the contamination project, (*id.* ¶ 86). In addition, one of her employees responsible for a major department project was reassigned to a different office, (*id.* ¶ 84). Further, following the start of the Covid-19 pandemic, when the City convened a meeting across departments to discuss the City's plan, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan even though Plaintiff's department supervised events and sports leagues with hundreds of participants. (*Id.* ¶ 97.) While ordinarily, exclusions from meetings do not sufficiently allege the level of harassment necessary to support a hostile work environment claim, *see, e.g.*, *Tillery v. N.Y. State Office of Alcoholism & Substance Abuse Services*, 739 F. App'x 23, 27 (2d Cir. 2018) (ruling that plaintiff's allegations that her employer refused to send her to mandatory training, reduced her job responsibilities, and criticized her performance did not constitute a hostile work environment), under the circumstances of this case, Plaintiff adequately alleges an environment where she experienced "harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113. As the Recreation Director, because Plaintiff was responsible for "exercis[ing] general supervision over and responsibility"

for the City's recreational areas, playgrounds, and programs, (Compl. ¶ 16), excluding Plaintiff from meetings regarding matters for which she was directly responsible effectively prevented Plaintiff from performing her job duties.[8] Further, Plaintiff does not allege isolated incidents; rather, the incidents were "sufficiently continuous and concerted" over several years to support a finding that Plaintiff experienced a hostile work environment. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019); *see Feingold*, 366 F.3d at 150 (holding that an employee experienced pervasive discrimination where he was singled out on an "almost daily" basis through hostile remarks and overt animosity).

[8]     For example, in 2018, Plaintiff was excluded from planning and strategy regarding parking regulations, an issue that directly fell under her responsibilities. (Compl. ¶¶ 30–31.) In November of 2019, Plaintiff was also excluded from budget discussions in which she had previously been included and in addition was excluded from a meeting concerning a City recreation area, which fell under her responsibilities. (*Id.* ¶¶ 76–79.) In January of 2020, Plaintiff was excluded from a vendor meeting concerning contamination at one of the City's beaches and was ordered to turn over her files regarding the beach. (*Id.* ¶¶ 85–86.)

**\*12** Defendants also content that Plaintiff has not sufficiently alleged a hostile work environment on the basis of gender. (City's Mem. 6–7.) However, Plaintiff alleges examples of male employees receiving better treatment, including a male employee causing the City to spend more than half a million dollars in health insurance premiums for retirees not entitled to receive these benefits and not being reprimanded, and a male employee unlawfully switching license plates on City vehicles, one of which was used for non-work related purposes and became involved in an accident, who was also not reprimanded or disciplined. (Compl. ¶ 46.) She further alleges that her gender was the basis for this treatment because "male employees were not reprimanded or criticized in any way for serious misconduct," (*id.* ¶ 45). Plaintiff sufficiently alleges differential treatment based on gender at the pleading stage. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 n.6 (2d Cir. 2010) ("A Title VII sexually hostile work environment claim ... requires a plaintiff to establish that the conduct at issue occurred 'because of the plaintiff's sex.' " (quoting *Patane*, 508 F.3d at 113)); *Patane*, 508 F.3d at 114 ("[A] plaintiff need only allege

that she suffered a hostile work environment because of her gender.").

Accordingly, viewing Plaintiff's allegations in their totality and drawing all inferences in her favor, Plaintiff plausibly alleges a hostile work environment claim.

### iv. Retaliation

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity and also argues that, other than the elimination of her position, most of the alleged incidents do not amount to adverse actions. (City's Mem. 8–10.) In addition, the City argues that, as to the elimination of Plaintiff's position, Plaintiff fails to plausibly allege a causal connection to her complaints of gender discrimination. (*Id.*)

Plaintiff argues that after she complained about discrimination, City officials "shrugged off" her complaints and then retaliated against her. (Pl.'s City Opp'n 9–15.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). Claims of retaliation are analyzed under the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (applying *McDonnell Douglas* to retaliation claim); *Carr v. N.Y.C. Transit Auth.*, No. 16-CV-9957, 2022 WL 824367, at \*12 (S.D.N.Y. Mar. 18, 2022) (same). At the pleading stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Duplan*, 888 F.3d at 625 (quoting *Littlejohn*, 795 F.3d at 316); *see Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 19 (2d Cir. 2015) (same). The main question on a motion to dismiss is whether a plaintiff can establish a claim that has "[f]actual allegations [that] raise a right of relief above the speculative level." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010) (first alteration in original) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *see also Williams*, 458 F.3d at 71 ("[T]he requirements for establishing a prima facie case under *McDonnell Douglas* [do not] apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." (second alteration in original) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 511, 122 S.Ct.

992, 152 L.Ed.2d 1 (2002))); *Harris v. Office of N.Y. State Comptroller*, No. 20-CV-8827, 2022 WL 814289, at *17 n.29 (S.D.N.Y. Mar. 17, 2022) ("[T]he allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." (alteration in original) (quoting *Littlejohn*, 795 F.3d at 316)); *Pompey-Primus v. Success Acad. Charter Sch., Inc.*, No. 21-CV-3981, 2022 WL 504541, at *8 (S.D.N.Y. Feb. 17, 2022) ("Retaliation claims brought under Title VII ... are analyzed using the *McDonnell Douglas* burden-shifting framework .... [A]t the motion to dismiss stage, the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 154 (S.D.N.Y. 2004) ("The question that should be considered by this Court in connection with the [motion to dismiss] is whether [the plaintiff] has alleged a prima facie case for retaliation; not whether her claim will survive a *McDonnell Douglas* burden shifting analysis.").

**\*13** To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). At the pleading stage, the allegations need only give "plausible support to the reduced prima facie requirements." *Id.* "[F]or a retaliation claim to survive ... a motion to dismiss, the plaintiff must plausibly allege that: (1) [the] defendants discriminated — or took an adverse employment action — against [her], (2) because [s]he has opposed any unlawful employment practice." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 (2d Cir. 2016) (second two alterations in original) (quoting *Vega*, 801 F.3d at 90).

### 1. Participation in a protected activity

The City argues that Plaintiff fails to plausibly demonstrate that she engaged in protected activity, as her "gripes were premised on personal animus and petty workplace grievances." (City's Mem. 8.)

Plaintiff argues that she reasonably and in good faith believed that she was being treated differently based on her gender and that her complaint was not a general grievance about working

conditions, but a discrimination complaint. (Pl.'s City Opp'n 10–11.)

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII. *See Jagmohan v. Long Island R.R. Co.*, 622 F. App'x 61, 63–64 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan*, 622 F. App'x at 63–64 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (holding that Title VII "protects employees [who] ... make[ ] informal protests of discrimination, including making complaints to management, so long as the employee has 'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law' " (first quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000); and then quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998))). "[A]ttempts to assert ... rights against discrimination are protected activities." *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)).

In or around October of 2019, Plaintiff sent a letter to a City personnel officer, John Charon, detailing her alleged mistreatment and alleging that the treatment was based on "gender bias," and has therefore shown that she opposed unlawful employment practices. (Compl. ¶ 64); *see Frantti*, 850 F. App'x at 21 (holding that efforts to protest discriminatory practices are protected activities). Plaintiff sufficiently alleges that she made "protests of discrimination, including making complaints to management," *Summa*, 708 F.3d at 127, with a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *Gregory*, 243 F.3d at 701. Private complaints to internal personnel alleging discrimination constitute protected activity. *See Cousar v. New York-Presbyterian/ Queens*, No. 16-CV-1784, 2019 WL 4015440, at *15 (E.D.N.Y. Aug. 26, 2019) (finding that emails to human resources staff complaining of discrimination constitute protected activity), *aff'd*, 845 F. App'x 34 (2d Cir. 2021); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that ... complaints to supervisors constitute protected activity under Title VII.").

Belyea v. City of Glen Cove, Slip Copy (2022)
Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 106 of 251
2022 WL 3586559

### 2. Adverse employment action

*14 The City argues that most of the acts that Plaintiff alleges are not adverse employment actions, except for the elimination of her position. (City's Mem. 8–10.)

Plaintiff contends that the threat of termination is also an adverse action for purposes of retaliation. (Pl.'s City Opp'n 11.)

Adverse employment actions are actions that "could well have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination." *Davis-Garett, 921 F.3d at 44* (first quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006)*; and then citing *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)*). "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks, 593 F.3d at 165* (citing *Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)*).

Plaintiff alleges that Tenke announced during a November 2019 meeting that Plaintiff would not be working for the City in 2020 and that the Parks Department, which Plaintiff headed, would be folded into the DPW. (*Id.* ¶ 80.) In view of the fact that Plaintiff was ultimately terminated and thus suffered an adverse employment action based on her termination, (Compl. ¶¶ 101, 103), the threat of termination is also an adverse employment action. *Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 254 (W.D.N.Y. 2011)* ("[T]hreats of termination or other punishment do not qualify as adverse actions where they were never carried through."); *cf. Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 571 (2d Cir. 2011)* (determining that threat of termination fell into category of "trivial harms" and "petty slights or minor annoyances" when the threat was never carried out); *McGrier, 2022 WL 2105854, at *18* (holding that the threat of termination "without any allegation that would permit an inference that the threat would be carried through" was insufficient to allege an adverse action).

Thus, Tenke's threat of termination in the November 2019 meeting and Plaintiff's termination, authorized in October of 2020 and made effective January of 2021, both constitute adverse employment actions. *See Rivera v. JP Morgan Chase, 815 F. App'x 603, 608 (2d Cir. 2020)* (affirming that an adverse employment action for Title VII retaliation purposes is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination," and that standard "covers a broader range of conduct than the adverse-action standard for claims of discrimination"); *O'Toole v. County of Orange, 255 F. Supp. 3d 433, 442 (S.D.N.Y. 2017)* ("Defendant's conduct, considered as a whole, meets the 'objective' standard, as the 'employment consequences of a negative nature' resulting from making a complaint could chill other employees from speaking up." (quoting *Cox v. Onondaga Cty. Sheriff's Dep't, 760 F.3d 139, 147 (2d Cir. 2014)*)).

### 3. Causal connection between protected activity and adverse employment actions

*15 The City contends that Plaintiff fails to plausibly allege a causal connection between her discrimination complaint and the elimination of her position. (City's Mem. 9–10.)

Plaintiff argues that she has established a causal connection through temporal proximity and through a pattern of antagonism. (Pl.'s City Opp'n 11–15.)

To sufficiently plead that a defendant-employer took an adverse employment action "because" a plaintiff opposed an unlawful employment practice, a plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega, 801 F.3d at 90* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)*). But-for causation does not require that retaliation "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id. at 91* (quoting *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013)*); *Pothen v. Stony Brook Univ., 211 F. Supp. 3d 486, 497 (E.D.N.Y. 2016)* (same)).

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn, 795 F.3d at 319* (quoting *Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111,*

117 (2d Cir. 2000)); *see also Terry*, 336 F.3d at 152 ("Proof of such a causal connection 'can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment ... such as disparate treatment of fellow employees who engaged in similar conduct.' """ (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006))); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same).

"[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." *Feingold*, 366 F.3d at 156–57 (collecting cases); *see also Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." (first citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); and then citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010))); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) ("Ordinarily, causation may be inferred from close temporal proximity."). The Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship.").

**\*16** Where defendants are alleged to have retaliated at the first available opportunity, the window of temporal proximity can be extended. *See Grant v. Bethlehem Steel*, 622 F.2d 43, 45–46 (2d Cir. 1980) (holding that plaintiff established causal connection in Title VII retaliation case despite an eight month lapse between the protected activity and the adverse action when the defendant was unable to retaliate any sooner); *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at \*5 (S.D.N.Y. Aug. 5, 2009) (in the context of First Amendment retaliation, noting that a gap of nearly one year between protected activity and retaliatory action was plausible because defendant "had no earlier opportunity to retaliate against [p]laintiff for engaging in protected activity"); *Blanco v. Brogan*, 620 F. Supp. 2d 546, 556–57 (S.D.N.Y. 2009) (finding a causal connection for purposes of Title VII retaliation where there

was a gap of several months between the protected activity and alleged adverse actions because "police departments generally have well-defined procedures and labor union agreements which prevent management from taking arbitrary adverse employment actions against their employees" and "it would have been very difficult for the [p]olice [d]epartment here to retaliate against [the] [p]laintiff during the time period except in terms of promotion"); *McKenzie v. Nicholson*, No. 08-CV-773, 2009 WL 179253, at \*5 n.5 (E.D.N.Y. Jan. 26, 2009) ("The Court notes, however, that the Second Circuit has determined that an adverse action could be retaliatory in nature despite a significant time lapse if the employer took action at the first opportunity to do so." (citing *Grant*, 622 F.3d at 45–46)). A "pattern of antagonism" over the intervening period between protected activity and retaliatory treatment may also demonstrate the requisite causal connection. *Duplan*, 888 F.3d at 626 (considering "the facts as a whole" in Title VII retaliation case); *see Maxton v. Underwriter Labs. Inc.*, 4 F. Supp. 3d 534, 548 (E.D.N.Y. 2014) ("According to some courts, a plaintiff may also demonstrate a causal connection by showing a 'pattern of antagonism' over the intervening period." (quoting *Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at \*3 (S.D.N.Y. Feb. 3, 2004))); *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at \*14 (E.D.N.Y. Aug. 22, 2012) (same).

On October 15, 2019, Plaintiff sent a letter to a City personnel officer detailing the alleged mistreatment and alleging that the treatment was based on "gender bias," (Compl. ¶ 64), and within approximately one month at the November 2019 meeting, Tenke announced that Plaintiff would not work for the City in 2020 and that the Parks Department would be folded into the DPW, (*id.* ¶ 80). These facts plausibly allege "temporal proximity between" the October 2019 letter and November 2019 announcement and sufficiently establish a causal connection between Plaintiff's complaints and her threat of termination in November of 2019, which led to her eventual termination in January of 2021. *Feingold*, 366 F.3d at 156–57.

Moreover, although the announcement of Plaintiff's termination in October of 2020, (Compl. ¶¶ 101, 103), was a year after Plaintiff's October 2019 letter detailing her alleged mistreatment, and ordinarily would not support a finding of temporal proximity sufficient to establish causation, because there is evidence of a "pattern of antagonism" against Plaintiff over the intervening period, including the City's "stripping" her of responsibilities between the November 2019 meeting

and October of 2020 City Council meeting where Plaintiff's position was ultimately eliminated, (Compl. ¶ 83); Plaintiff being told that one of her employees responsible for a major department project was being reassigned to the DPW, (*id.* ¶ 84); and Plaintiff's exclusion from a vendor meeting concerning contamination at one of the beaches under her supervision and demands from DPW employees that Plaintiff had to turn over her files concerning the contamination project, (*id.* ¶¶ 85–86), the prolonged period does support a finding of temporal proximity. *Duplan*, 888 F.3d at 626; *see Reppert v. N.Y. State Dep't of State*, No. 19-CV-1518, 2021 WL 3165210, at *12 (N.D.N.Y. July 26, 2021) (finding that despite a gap of seventeen months between protected activity and adverse action, "evidence of an intervening pattern of antagonism" supported causality for purposes of the plaintiff's retaliation claim (quoting *Chan*, 2004 WL 213024, at *3)); *Maxton*, 4 F. Supp. 3d at 548 (finding that a pattern of antagonistic actions over a period culminating in adverse action can constitute causal connection for retaliation purposes). Thus, Plaintiff has sufficiently alleged temporal proximity to establish a causal connection between her complaint to the City's personnel officer, the threat to terminate her, and her actual termination.

**\*17** Accordingly, viewing Plaintiff's allegations in their totality, Plaintiff sufficiently alleges that she was subjected to retaliation under Title VII.

### d. NYSHRL hostile work environment and retaliation claims against Tenke

Tenke argues that the Court must dismiss Plaintiff's NYSHRL hostile work environment and retaliation claims against him because Plaintiff fails to plausibly allege an underlying violation, and therefore, there can be no aiding or abetting. (Tenke's Mem. at 12–13.)

Plaintiff does not address Tenke's aiding and abetting argument, (*see generally* Pl.'s Tenke Opp'n), but alleges in the Complaint that he subjected her to inferior terms and conditions of employment based on her gender and took adverse employment actions against her because of her complaints of workplace discrimination based on gender, (Compl. ¶¶ 124, 127).

In order for a defendant to be liable as an aider and abettor under section 296(6), a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal. *See Kelly G. v. Bd. of Educ. of City of Yonkers*, 99 A.D.3d 756, 952 N.Y.S.2d 229, 232 (App. Div. 2012); *Strauss v. N.Y. State Dep't of Educ.*, 26 A.D.3d 67, 805 N.Y.S.2d 704, 709 (App. Div. 2005); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 786 N.Y.S.2d 382, 397, 819 N.E.2d 998 (2004); *Baldwin v. Bank of Am., N.A.*, 42 Misc.3d 1203A, 984 N.Y.S.2d 630 (N.Y. Sup. Ct. 2013); *see also Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77 (2d Cir. 2014); *Falbaum v. Pomerantz*, 19 F. App'x 10, 15 (2d Cir. 2001); *Day v. MTA N.Y.C. Trans. Auth.*, No. 17-CV-7270, 2021 WL 4481155, at *14 (S.D.N.Y. Sept. 30, 2021) ("[L]iability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." (alteration in original) (quoting *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011))); *Mereigh v. N.Y. & Presbyterian Hosp.*, No. 16-CV-5583, 2017 WL 5195236, at *7 n.11 (S.D.N.Y. Nov. 9, 2017); *Irons v. Bedford–Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467, 2015 WL 5692860, at *32 (E.D.N.Y. Sept. 28, 2015); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013). This principle applies even when the defendants are entities. *See Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015) ("Under [section] 296(6), an individual or entity must 'actually participate[ ] in the conduct giving rise to a discrimination claim' to be held liable." (quoting *DiPilato v. 7–Eleven, Inc.*, 662 F. Supp. 2d 333, 353 (S.D.N.Y. 2009))).

Plaintiff brings NYSHRL claims against Tenke, but fails to allege a NYSHRL claim against the City. (*See* Compl. ¶¶ 124, 127.) Thus, Plaintiff has failed to establish the existence of a primary violation of the NYSHRL by an employer, and therefore her claims against Tenke fail. *See Forrest*, 786 N.Y.S.2d at 395, 819 N.E.2d 998 (dismissing a claim against an individual for violation of NYSHRL where plaintiff failed to allege violations against entity); *see also McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 74 (S.D.N.Y. 2020) (finding that the plaintiff adequately pled a claim for aiding and abetting sexual harassment against the individual defendant by pleading claims of sexual harassment against the defendant corporate entity as principal); *France v. Touro Coll.*, No. 14-CV-4613, 2016 WL 1105400, at *9 (E.D.N.Y. Feb. 16, 2016) ("[I]ndividual liability under the NYSHRL cannot attach without corresponding liability for the employer enterprise."), *report and recommendation adopted*, 2016 WL 1117459 (E.D.N.Y. Mar. 21, 2016).

**\*18**  Accordingly, the Court grants Tenke's motion and dismisses Plaintiff's NYSHRL hostile work environment and retaliation claims against him. [9]

[9]  Tenke argues that he is entitled to absolute immunity and qualified immunity with respect to the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.) Because there is no aiding and abetting liability, the Court declines to address the issue of Tenke's immunity arguments for the purposes of Plaintiff's NYSHRL claims.

### e. Section 1983 claims against both Defendants

Plaintiff brings First Amendment retaliation claims against Tenke and the City, a Fourteenth Amendment hostile work environment claim against Tenke and the City, and a Fourteenth Amendment retaliation claim against Tenke, [10] all pursuant to section 1983. (Compl. ¶¶ 115–20, 122–23, 126.)

[10]  Plaintiff seeks to amend the Complaint to assert a Fourteenth Amendment retaliation cause of action against the City, which she omitted due to an "apparent drafting oversight." (See Decl. of Matthew Weinick ¶ 7, Docket Entry No. 16.) The Court grants Plaintiff's request to amend her Complaint and file an Amended Complaint asserting the Fourteenth Amendment retaliation claim against the City, as there is no prejudice in light of the similar section 1983 claims brought against it under Monell.

Defendants seek to dismiss all of Plaintiff's section 1983 claims. (City's Mem. 16–19.)

Under section 1983, individuals may bring a private cause of action against persons acting "under color of state law" to recover money damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was

committed by a person acting under color of state law." *Vega*, 801 F.3d at 87–88; *see also Collymore v. City of New York*, 767 F. App'x 42, 45 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 87–88).

### i. Tenke's claims of legislative and qualified immunity

Tenke argues that he is entitled to legislative immunity and qualified immunity based on the abolition of Plaintiff's job because, respectively, (1) he was acting in a legislative capacity in proposing the budget that eliminated Plaintiff's position, and (2) Plaintiff "failed to allege the violation of any clearly established constitutional or statutory rights." (Tenke's Mem. 14–18.)

Plaintiff argues that (1) legislative immunity cannot be used to insulate "bad actors from unlawful employment decisions," (Pl.'s Tenke Opp'n 9–11), and (2) qualified immunity does not apply because Tenke violated clearly established laws, (*id.* at 11–13).

### 1. Legislative immunity

Legislative immunity shields an official from liability if the act in question was undertaken "in the sphere of legitimate legislative activity." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) (quoting *Bogan v. Scott–Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)). The Supreme Court has established that under the functional test of absolute legislative immunity, "whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." *Olma v. Collins*, 499 F. App'x 98, 100 (2d Cir. 2012) (quoting *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007)) (citing *Bogan*, 523 U.S. at 54–55, 118 S.Ct. 966); *see also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 559 (D. Conn. 2008) ("The enforcement policies may have been flawed, and the [d]efendant [c]ommissioners may have acted in bad faith, as is alleged by the [p]laintiffs, but legislative immunity is absolute and does not depend on these considerations.").

**\*19**  Legislative immunity covers all aspects of the legislative process, including "[m]eeting with persons outside the legislature — such as executive officers, partisans, political interest groups, or constituents — to discuss issues that bear on potential legislation" and "participating in

party caucuses to form a united position on matters of legislative policy [and] assist legislators in the discharge of their legislative duty." *Almonte*, 478 F.3d at 107 (concluding that "legislative immunity cloaks not only the vote on the budgetary resolutions, but also any [secret] discussions the [c]ouncil members may have held, and any agreements they may have made, regarding the new budget in the months preceding the actual vote"); *see also Bogan*, 523 U.S. at 55, 118 S.Ct. 966 (finding that the mayor's introduction of budget was legislative even though the mayor was an executive official); *Olma*, 499 F. App'x at 100 (holding that the appellants acted in a legislative capacity "when they prepared and submitted to the [c]ity [c]ouncil the proposed budget amendment and accompanying memo suggesting elimination of the position filled by [the appellee]"); *Anderson Grp., LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332, 345 (N.D.N.Y. 2008) ("[T]o the extent the board defendants partook in the [c]ouncil's zoning decisions by voting on and issuing zoning recommendations to the [c]ouncil, they are also entitled to legislative immunity."), *aff'd in part sub nom. Anderson Grp., LLC v. Lenz*, 336 F. App'x 21 (2d Cir. 2009).

However, legislators are not immune from suit for administrative acts. *See Manzi v. DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997). Acts are administrative if they " 'impact ... particular individuals rather than ... a community,' or [if] 'the factors considered in adopting the legislation relate to specific individuals, instead of general policy implications.' " *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1219–20 (2d Cir. 1994) (quoting *Orange Lake Assocs., Inc. v. Kirkpatrick*, 825 F. Supp. 1169, 1174 (S.D.N.Y. 1993)); *Anderson Grp., LLC*, 557 F. Supp. 2d at 345 (holding that downzoning of a region "was a purely legislative act" but that "action[s] taken on the [plaintiff's] special use permit by the [b]oard [were] administrative in nature ... [even though they] had implications for the public at large"). "[P]ersonnel decisions ... are administrative, and therefore not immune to liability, if they are directed at a particular employee and do not adopt or implement a broader legislative policy." *Bierce v. Town of Fishkill*, 656 F. App'x 550, 554 (2d Cir. 2016). In *Bierce*, the board voted to eliminate two positions from the police department, citing budgetary concerns, affecting "just two employees." *Id.* The Second Circuit found that the board was not entitled to legislative immunity. *Id.* The *Bierce* court distinguished *Bogan*, 523 U.S. at 46–47, 118 S.Ct. 966, where the elimination of an employee's position "occurred as part of a larger budgetary package that proposed freezing the salaries of all municipal employees and eliminating 135 positions." *Id.*

As the Supreme Court has explained, the purpose of legislative immunity is to protect legislators from "deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." *Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Consequently, when sued in their personal capacity, "[l]ocal legislators, like their counterparts on the state and regional levels, are entitled to absolute immunity for their legislative activities." *Almonte*, 478 F.3d at 106 (citing *Bogan*, 523 U.S. at 49, 118 S.Ct. 966). However, local governments, municipalities, or officials sued in their official capacity are not entitled to legislative immunity. *See Olma*, 499 F. App'x at 100; *Almonte*, 478 F.3d at 106 ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances where they are sued in their official capacities.' " (alterations in original) (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012))); *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 73–74 (2d Cir. 1992) (explaining that an official-capacity claim is in substance a claim against the municipality, which cannot assert immunity, either absolute or qualified, as a defense to liability under section 1983); *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 403 (E.D.N.Y. 2018) (stating that legislative immunity is limited to personal suits based on legislative acts).

**\*20** Tenke is not entitled to absolute legislative immunity for the claim against him in his individual capacity. In October of 2020, Tenke told Plaintiff that he would be eliminating her position from the 2021 budget without conferring with the City Council, and Plaintiff was the only department head terminated. (Compl. ¶¶ 101–03.) Although Tenke asserted that layoffs were the only solution in light of the City's budget issues, only five other employees were "slated for layoff," and none of them were department heads. (*Id.* ¶¶ 104, 109–11.) In contrast to the facts of *Bogan*, Defendants do not allege any mass freezing or the elimination of multiple positions other than Plaintiff's and those of five other low-level employees. *Bogan*, 523 U.S. at 46–47, 118 S.Ct. 966. In fact, similar to *Bierce*, the 2021 budget terminated only a handful of individuals. *Bierce*, 656 F. App'x at 554. Further, even before Tenke's decision to eliminate Plaintiff's position in October of 2020, Tenke had announced in November of 2019 that Plaintiff would not be working for the City the following year, prior to the alleged budget crisis created by

the Covid-19 pandemic, (Compl. ¶¶ 78–80), and while there was still an "economic boom" and not even "a hint of the coming economic stresses caused by the pandemic," (*id.* ¶ 81). In view of the fact that Tenke told Plaintiff as early as November of 2019 that she would be terminated and not working for the City the following year and then told her on October 9, 2020 that he would be eliminating her position from the 2021 budget before conferring with the City Council, and because Plaintiff was the only department head whose position was eliminated, and only six employees in total were slated for layoff, Plaintiff has plausibly alleged that Tenke's actions were specific to Plaintiff rather than legislative in nature. *See Orange Lake Assocs., Inc.,* 21 F.3d at 1219–20 (stating that legislative immunity is unavailable where legislation relates to "specific individuals, instead of general policy implications"); *cf. Lorusso v. Borer,* 359 F. Supp. 2d 121, 128 (D. Conn 2005) (finding that the mayor was entitled to legislative immunity where his recommendation of the budget "eliminate[d] an entire class of job and job title, which has consistently been afforded absolute legislative immunity"). Further, even if Tenke acted in good faith, what matters is the nature of the act, rather than the motive or intent of the official performing it. *See Bogan,* 523 U.S. at 54–55, 118 S.Ct. 966 (holding that legislative immunity does not depend on motive or intent); *Olma,* 499 F. App'x at 100 (stating that the test for determining legislative immunity does not depend on the official's identity, motive, or intent, but the nature of the act in question).

Accordingly, Tenke is not entitled to legislative immunity.

### 2. Qualified immunity

"Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Jones v. Treubig,* 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "Thus, pursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), when an official raises qualified immunity as a defense, the court must consider whether: '(1) ... the official violated a statutory or constitutional right, and (2) ... the right was "clearly established" at the time of the challenged conduct.' " *Id.* (citations omitted) (quoting *Ricciuti v. Gyzenis,* 834 F.3d 162, 167 (2d Cir. 2016)); *see also Chamberlain ex rel. Estate*

*of Chamberlain v. City of White Plains,* 960 F.3d 100, 110 (2d Cir. 2020) ("Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))); *Garcia v. Does,* 779 F.3d 84, 92 (2d Cir. 2015) (same). "To determine whether defendants enjoy qualified immunity, '[the court] consider[s] the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law.' " *Chamberlain,* 960 F.3d at 110 (quoting *Terebesi v. Torreso,* 764 F.3d 217, 231 (2d Cir. 2014)). "[G]overnment officials or employees who make decisions that are discretionary, but not judicial in nature, are entitled to qualified immunity unless there is bad faith or the action is taken without a reasonable basis." *Sutter v. Dibello,* No. 18-CV-817, 2021 WL 930459, at *35 (E.D.N.Y. Mar. 10, 2021) (quoting *Russell v. Westchester Cmty. Coll.,* No 16-CV-1712, 2017 WL 4326545, at *13 (S.D.N.Y. Sept. 27, 2017)); *see Alhovsky v. Paul,* 406 F. App'x 535, 537 (2d Cir. 2011) ("New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." (alterations in original)); *Russell,* 2017 WL 4326545, at *13 (same). Qualified immunity may only be granted at the motion to dismiss stage if "the facts supporting the defense appear on the face of the complaint ... [and] 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1484 (2d Cir. 1992)); *see also Brown v. Wetz,* No. 18-CV-11178, 2021 WL 964922, at *15 (S.D.N.Y. Mar. 15, 2021) ("Accordingly, it is not clear from the face of the complaint that [defendant], who is alleged to have discriminated against [the p]laintiff ..., is entitled to qualified immunity.").

**\*21** Tenke is not entitled to qualified immunity. As discussed both above and further below, the right to be free from employment discrimination and retaliation "were all clearly established at the time Tenke acted." (Pl.'s Tenke Opp'n 12 (citing *Heffernan v. City of Paterson,* 578 U.S. 266, 136 S.Ct. 1412, 1417–18, 194 L.Ed.2d 508 (2016); then citing *Vega,* 801 F.3d at 84; then citing *Kaytor,* 609 F.3d at 548–50; and then citing *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 106 (2d Cir. 2006)).) Because it does not "appear[ ] beyond doubt that [Plaintiff] can prove no set of facts in support of [her] claim that would entitle [her]

to relief," the Court declines to grant qualified immunity to Tenke. *McKenna*, 386 F.3d at 436; *see Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 130 (2d Cir. 2004) (holding that individual defendants were not entitled to qualified immunity because it was "eminently clear" by 2001 that "individuals have a constitutional right to be free from sex discrimination"); *DiLegge v. Gleason*, 131 F. Supp. 2d 520, 522 (S.D.N.Y. 2001) (finding that the right to be "free from discrimination in employment" and the right to be free from retaliation were clearly established). The Court recognizes that although Tenke is "not entitled to qualified immunity on the face of the complaint ... 'a factual basis for qualified immunity may arise as the proceedings develop.' " *Terranova v. New York*, 144 F. App'x 143, 146–47 (2d Cir. 2005) (quoting *Velez v. Levy*, 401 F.3d 75, 101 (2d Cir. 2005)); *see Brown*, 2021 WL 964922, at *15 (denying motion as to qualified immunity where it was "not clear from the face of the complaint" that defendant was entitled to qualified immunity); *Dipinto v. Westchester County*, No. 18-CV-00793, 2020 WL 6135902, at *11 (S.D.N.Y. Oct. 19, 2020) (same).

Accordingly, at this stage in the proceedings, the Court denies Tenke's motion to dismiss based on qualified immunity.

### ii. Personal involvement of Tenke

Tenke argues that Plaintiff fails to plausibly allege his personal involvement in alleged constitutional violations and therefore all of Plaintiff's claims brought against him under section 1983 should be dismissed. (Tenke's Mem. 12–13.) In support, Tenke argues that while he proposed the budget that laid off Plaintiff and others, he did not vote on the budget, and the budget would have passed with or without his vote, as it was approved by members of the City Council. (*Id.* at 12.) In addition, Tenke contends that he cannot be liable for merely proposing a budget eliminating Plaintiff's position, as he did not have the power to unilaterally remove Plaintiff or refuse to reappoint her. (Tenke's Reply 3.)

Plaintiff contends that because Tenke recommended Plaintiff's termination, he was involved in the deprivation of rights and thus is liable under section 1983. (Pl.'s Tenke Opp'n 8–9.) In support, Plaintiff argues that as mayor, Tenke has authority over employment issues, and, in any event, the City is not required to approve Tenke's budget, since "[i]f the council does not approve his budget by a date set by law, the budget becomes law." (*Id.* at 8–9 & n.4.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Dubois v. Beaury*, No. 21-CV-2096, 2022 WL 1701497, at *4 (2d Cir. May 27, 2022) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *see Florence v. Seggos*, No. 21-834, 2022 WL 2046078, at *3 (2d Cir. June 7, 2022) ("To state a claim under section [1983] ... the complaint must plausibly allege [the d]efendants' 'personal involvement' in the wrongful acts at issue." (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004))); *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) ("[T]he 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)), *as amended* (Feb. 24, 2016). A plaintiff must allege the direct participation or personal involvement of each of the defendants in the alleged constitutional deprivation. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Farrell*, 449 F.3d at 484 (same). As the Second Circuit has made clear, "there is no special rule for supervisory liability," and to find a state official liable under section 1983, "a plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). Being in the chain of command is not sufficient to satisfy personal involvement as the "violation must be established against the supervisory official directly." *Id.*; *see also Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *33 (S.D.N.Y. Mar. 26, 2021) ("[I]n light of *Tangreti*, [the p]laintiff must establish that [the defendant] committed a constitutional violation through his own conduct, rather than through his supervision of [others]."); *Hunter v. Telefore*, No. 21-CV-78, 2021 WL 878745, at *3 (E.D.N.Y. Mar. 8, 2021) ("[T]he [Second] Circuit recently held that, following the Supreme Court's decision in *Iqbal*, a plaintiff must sufficiently allege a supervisory official's *direct* involvement in an alleged constitutional violation to state an actionable claim against that official." (emphasis in original) (citing *Tangreti*, 983 F.3d at 618). Direct participation provides a basis of liability where the defendant personally participated with "knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted) (citing *Gaston v. Coughlin*, 249 F.3d 156, 165–66 (2d Cir. 2001)).

**\*22**  Plaintiff plausibly alleges that Tenke participated directly in her termination by recommending that her position be eliminated from the budget. Tenke told Plaintiff in October of 2020 that he would be eliminating her position from the 2021 budget without conferring with the City Council, and even earlier, in November of 2019, had announced that Plaintiff would not be working for the City the following year. (Compl. ¶¶ 101–02, 78, 80.) When the City Council met and discussed Tenke's budget in October of 2020, several members "pointed out other ways to reduce costs" other than laying off Plaintiff and others, but Tenke rejected these alternatives. (*Id.* ¶¶ 105–06.) Even if, as Tenke claims, he abstained from the voting itself, (Tenke's Reply 3), by proposing the budget and shaping the budgetary discussions of the City Council, Tenke plausibly participated directly in the alleged constitutional violation, *see Tangreti*, 983 F.3d at 618, rather than simply being in the chain of command, *id.* [11] Tenke's direct involvement in proposing the budget that terminated Plaintiff plausibly alleges that "through [his] own individual actions," he played a role in Plaintiff's alleged constitutional violations. *Tangreti*, 983 F.3d at 618.

[11]    Moreover, under the Glen Cove City Charter, the mayor is required to "present to the City Council a proposed budget for the ensuing fiscal year," and if the City Council fails to adopt the budget, it is the mayor's proposed budget which is considered to be adopted. Glen Cove City Charter § C9-6.

Construing the facts in the light most favorable to Plaintiff, Plaintiff has plausibly alleged Tenke's personal involvement for purposes of her section 1983 claims.

### iii. First Amendment claims against Tenke and the City

Defendants contend that Plaintiff "fail[s] to state a plausible retaliation claim under the First Amendment based on [either] her perceived political affiliation [or her] gender discrimination complaint." (City's Mem. 10–15.) They argue that Plaintiff's First Amendment gender retaliation claim fails because (1) Plaintiff's complaint about alleged gender discrimination was made in her position as an employee rather than a citizen and was therefore not protected as it pertained only to her own situation, (2) the only adverse action Plaintiff claims is her termination, and her claims that she was excluded from meetings and had a project reassigned are not actionable, and (3) Plaintiff fails to plausibly allege causation. (*Id.* at 14–15; City's Reply 8–9.) Defendants also

argue that Plaintiff fails to sufficiently allege that she suffered from political retaliation, because she does not allege that she "actually (or was perceived to have) participated in any political activity." (City's Mem. 11; *see* Tenke's Mem. 1 ("[Plaintiff's] First Amendment political retaliation claim fails because she does not allege any political activity or affiliation for which she was allegedly retaliated against.").)

Plaintiff argues that because she complained of gender discrimination to the press, the complaint was protected by the First Amendment. (Pl.'s City Opp'n 18.) In addition, Plaintiff argues that Defendants terminated her after they formed a belief that she was "conducting political operations against them." (*Id.* at 15–20.) In support, Plaintiff contends that "Defendants believed that Belyea's complaint of discrimination was a political attack launched with the assistance of a 'known political operative,' " and believed the press release "was an example of partisan politics" and came "directly from the campaign manager of the Republican slate." (*Id.* at 17.)

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity." *Specht v. City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)); *see Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)) (same); *see also Eyshinskiy v. Kendall*, 692 F. App'x 677, 677–78 (2d Cir. 2017); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). "To establish a First Amendment retaliation claim for political association in the public employment context, a plaintiff must show that: (1) he was engaged in protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal connection between the protected activity and the adverse employment decision." *Bierce*, 656 F. App'x at 552; *see Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (stating the three-part test for First Amendment political retaliation).

### 1. First Amendment retaliation claim on the basis of Plaintiff's gender discrimination complaint

**A. Plaintiff sufficiently alleges that she engaged in protected speech when she issued a press release**

**\*23** The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. 228, 237, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). Thus, the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if the employee speaks "[1] as a citizen [2] on a matter of public concern.' " *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951); *see Specht*, 15 F.4th at 600 ("The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities."); *Montero v. City of Yonkers*, 890 F.3d 386, 395 (2d Cir. 2018) (same); *see also Eyshinskiy*, 692 F. App'x at 678 ("The first inquiry encompasses two separate questions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee. If the answer to either question is no, that is the end of the matter.' " (citation omitted) (quoting *Matthews*, 779 F.3d at 172)); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that ... the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest ...."); *Best*

*Payphones Inc. v. Dobrin*, 410 F. Supp. 3d 457, 474 (E.D.N.Y. 2019) (same).

**(1) Plaintiff's internal complaint**

Plaintiff has not sufficiently alleged that her internal letter to a City personnel officer complaining of gender discrimination against her was made as a citizen on a matter of public concern. Her letter "detail[ed] ... [her] mistreatment from January [of] 2018 to [October of 2019]," and alleged that "[her] treatment was based on 'gender bias.' " (Compl. ¶ 64.) This does not constitute protected speech, since Plaintiff was complaining of a personal matter as an employee. *See Corrado v. N.Y. State Unified Court Sys.*, No. 12-CV-1748, 2014 WL 4626234, at \*10 (E.D.N.Y. Sept. 15, 2014) ("Complaints of gender discrimination in the workplace are not matters of 'public concern' where they relate to a personal employment grievance." (citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993))). This internal complaint "does not pertain to a matter of public concern" because it is "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of [her] employment." *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (quoting *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999)). Other than one generalized paragraph alleging a "serious and dangerous pattern" of gender discrimination, (Compl. ¶ 65), Plaintiff does not allege that she raised other concrete instances of general discrimination in her letter, other than her personal experiences. *See Spencer v. Philemy*, 540 F. App'x. 69, 70 (2d Cir. 2013) ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances' " (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008))); *Peterson v. N.Y.C. Dep't of Educ.*, No. 18-CV-1515, 2020 WL 2559835, at \*8 (E.D.N.Y. May 20, 2020) ("[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize [their] employee grievance[s]." (alterations in original) (quoting *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951)); *Adams v. N.Y. State Educ. Dep't*, 705 F. Supp. 2d 298, 302–03 (S.D.N.Y. 2010) (holding that the plaintiff's speech was not protected where it "concerned personal grievances"); *cf. Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (finding that the plaintiff's letters to the police chief constituted protected

activity where plaintiff specifically detailed instances of discrimination that affected other Hispanic officers). The fact that Plaintiff sent the letter to her employer further indicates that the letter is not a matter of public concern. "[A] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (quoting *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011)).

**\*24** Thus, Plaintiff's internal letter was not protected speech.

### (2) Plaintiff's press release

#### 1. Plaintiff plausibly spoke as a citizen

The Court finds it plausible that Plaintiff spoke as a citizen, rather than as a public employee, in issuing a press release, which was issued separately from Plaintiff's internal complaint and spoke generally about sex discrimination in the workplace, a topic that did not fall under the scope of Plaintiff's employment duties. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane*, 573 U.S. at 237, 134 S.Ct. 2369 (quoting *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). "The critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 240, 134 S.Ct. 2369.

Plaintiff's issuance of a press release concerning sex discrimination and harassment of female City employees, (Compl. ¶ 61), written with a former City employee and with a friend involved in public relations, (*id.* ¶ 62), was not part of Plaintiff's "employment responsibilities" as Recreation Director, where her duties involved supervising the Parks Department, (*id.* ¶¶ 16, 31), staffing lifeguards for beaches, (*id.* ¶ 38), and renovating public facilities such as bathrooms, (*id.* ¶¶ 40–42). *Specht*, 15 F.4th at 600. There is no indication that this was "part-and-parcel" of Plaintiff's ability to exercise her "official duties" as Recreation Director. *Montero*, 890 F.3d at 396 (quoting *Weintraub v. Bd. of Educ. of City School Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010))).

Plaintiff therefore plausibly spoke as a citizen for purposes of First Amendment protection when she issued a press release

with a former City employee and a friend involved in public relations.

#### 2. Plaintiff spoke on a matter of public concern

The Court finds it plausible that Plaintiff's speech was made on a matter of public concern. On October 2, 2019, Plaintiff and Clarson issued a press release concerning "ongoing sex discrimination and harassment of female City employees." (Compl. ¶ 61); *see Bull v. Barone*, No. 03-CV-2034, 2008 WL 11491595, at *6 (D. Conn. Mar. 25, 2008) (finding that a statement released to the public complaining about working conditions and employment policies addressed "matters of public concern, not merely internal workplace grievances"). Plaintiff and Clarson worked with a friend "experienced with public relations issues" to issue the press release. (Compl. ¶ 62.)

Considering the "content, form, and context" of the press release, the Court finds that it arguably merits constitutional protection. *Connick v. Myers*, 461 U.S. 138, 145–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Unlike the facts alleged about the internal letter, where Plaintiff "detail[ed]" her mistreatment on the basis of gender, (*id.* ¶ 64), Plaintiff alleges that the press release "concern[ed] ongoing sex discrimination and harassment of female City employees," including Clarson, (*id.* ¶ 61). The "intended audience" of Plaintiff's October 2, 2019, press release, which was the general public, combined with the allegations about the content of the press release, indicate that Plaintiff sought to "inform the public on a matter of political, social, or community interest." *Specht*, 15 F.4th at 601; *cf. Pedrosa v. City of New York*, No. 13-CV-1890, 2014 WL 99997, at *12 (S.D.N.Y. Jan. 9, 2014) (finding that the plaintiff's complaints of workplace sexual harassment were not protected where they "concerned only [the p]laintiff's own situation and did not hint at broader problems"). Further, the fact that Plaintiff later sent an individual letter to the City's personnel officer regarding her individual grievances also suggests that her press release was not "calculated to redress personal grievances," but rather, had a broader public purpose. *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999); *see Kantha v. Blue*, 262 F. Supp. 2d 90, 101 (S.D.N.Y. 2003) ("[C]omplaints concerning gender discrimination are protected if the employee ... sought 'relief against pervasive or systemic misconduct by a public agency or public officials,' or her speech was 'part of an overall effort ... to correct allegedly unlawful practices or bring them to

public attention." (quoting *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 420 (7th Cir. 1988))); *Brennan v. Straub*, 246 F. Supp. 2d 360, 366 (S.D.N.Y. 2003) (denying motion to dismiss where plaintiff's testimony on behalf of another female employee did not only relate to the plaintiff's personal grievances. Finally, *Newsday* reported on the story on October 17, 2019. (Compl. ¶ 70); *see San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) ("These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.").

 **\*25** In view of the fact that Plaintiff spoke about "current government policies and activities," namely discrimination and harassment against female City employees, the Court finds that this served as a matter of public concern and that her speech was therefore protected. *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003); *Gala v. City of New York*, 525 F. Supp. 3d 425, 430 (E.D.N.Y. 2021) (quoting *Johnson*, 342 F.3d at 112).

Accordingly, Plaintiff has sufficiently alleged that her press release was protected speech.

## B. Plaintiff alleges that she suffered adverse employment actions

In the context of a First Amendment retaliation claim, "a public employee plaintiff alleging retaliation in violation of the First Amendment [need not] demonstrate a material change in employment terms or conditions." *Zelnik*, 464 F.3d at 227. Rather, the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*"— that the action would dissuade a reasonable employee from speaking out. *Id.*; *Specht*, 15 F.4th at 604 (same). Put another way, an adverse action is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Nixon v. Blumenthal*, 409 F. App'x 391, 392 (2d Cir. 2010); *see A.S. v. City Sch. Dist. of Albany*, --- F. Supp. 3d --- (N.D.N.Y. 2022) ("In this context, an 'adverse action' is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" (quoting *Cox*, 654 F.3d at 273)). Examples of such actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011)

(quoting *Morris*, 196 F.3d at 110); *see Gunn v. Bescler*, No. 16-CV-6206, 2022 WL 563189, at \*9 (W.D.N.Y. Feb. 24, 2022) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." (alteration in original) (quoting *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007))). However, "lesser actions may also be considered adverse employment actions," since "a combination of seemingly minor incidents [can] form the basis of a constitutional retaliation claim once they reach a critical mass." *Zelnik*, 464 F.3d at 226–27 (first quoting *Morris*, 196 F.3d at 110; and then quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)); *see Kiernan v. Town of Southampton*, 734 F. App'x 37, 41–42 (2d Cir. 2018) (" '[L]esser actions may also be considered adverse employment actions' such as a negative job evaluation. Curtailment of job responsibilities may also be adverse." (internal citations omitted)).

Plaintiff sufficiently alleges that her termination and the threat of her termination are adverse employment actions. Defendants do not contest that Plaintiff's termination, which was authorized in October of 2020 and made effective January of 2021, was an adverse action. As discussed above in addressing Plaintiff's Title VII retaliation claim, Tenke's announcement at a meeting in November of 2019 that Plaintiff would be terminated is an adverse action for the purposes of First Amendment retaliation, as it would deter a reasonable employee from exercising her constitutional rights and is "more disruptive than a mere inconvenience or an alteration of job responsibilities," particularly in light of the fact that Plaintiff was ultimately terminated, as discussed above. *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). [12]

[12]    Defendants also argue that Plaintiff's claims that she "was excluded from meetings and had a project reassigned from her are not actionable." (City's Mem. 15.) Plaintiff, however, only contends that termination and threats of termination were adverse actions for First Amendment purposes, and the Court only considers these actions. (Pl.'s City Opp'n 19.)

## C. Plaintiff sufficiently alleges causation

 **\*26** "To permit an inference of causation, a plaintiff must show that the protected [speech] 'was a substantial motivating

factor in the adverse employment action.' " *Specht*, 15 F.4th at 605 (quoting *Morris*, 196 F.3d at 110); *Kiernan*, 734 F. App'x at 42 ("To demonstrate a causal connection a plaintiff must show that the protected speech [or conduct] was a substantial motivating factor in the adverse ... action." (first alteration in original) (quoting *Smith*, 776 F.3d at 118)); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167–68 (2d Cir. 2006) (same); *see also Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 726 (2d Cir. 2013). "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." *Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012); *see also Specht*, 15 F.4th at 605 ("A plaintiff may prove causation by, among other things, showing that the adverse employment decision and the protected activity were close in time. We have previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation." (citation omitted)); *Catanzaro v. City of New York*, 486 F. App'x 899, 902 (2d Cir. 2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse action.' " (quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011))); *Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 288 (E.D.N.Y. 2012) (holding that a plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action, and "[t]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,' and a court must 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of each particular case' " (alterations and citations omitted) (first quoting *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001); and then quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))); *see also Callahan v. Hum. Res.*, No. 20-CV-1881, 2022 WL 445819, at *2 (D. Conn. Feb. 14, 2022) ("[A plaintiff] can meet her burden by alleging either direct evidence of retaliation, or indirect evidence that the adverse employment decision and the protected activity were close in time."). However, a plaintiff cannot solely "rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004); *see also Whitfield v. Imperatrice*, 477 F. App'x. 806, 809 (2d Cir. 2012) (finding causal connection not demonstrated for purposes of First Amendment retaliation claim where plaintiff relied "solely on his own speculation, which is insufficient to defeat a summary judgment motion" (citing *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002))).

As discussed above in relation to Plaintiff's Title VII retaliation claims, Plaintiff has sufficiently alleged that there is a causal connection between the press release, issued in October of 2019, and both the threat of her termination in November of 2019 and her ultimate termination in October of 2020 and made effective in January of 2021 due to a pattern of antagonism and the fact that Plaintiff was laid off at the first available opportunity. [13]

[13]      For example, Plaintiff alleges that she was "stripp[ed]" of her responsibilities. (Compl. ¶ 83). Plaintiff also alleges that she was told that one of her employees responsible for a major department project was reassigned to the DPW, (*id.* ¶ 84), that she was excluded from a vendor meeting concerning contamination at one of the beaches under her supervision, (*id.* ¶ 85), and that DPW employees demanded that Plaintiff turn over her files concerning the contamination project, (*id.* ¶ 86). Further, following the start of the Covid-19 pandemic, when the City convened a meeting across departments to discuss the City's plan, Plaintiff was excluded from this meeting and from the information provided at that meeting about the City's Covid-19 response plan even though Plaintiff's department supervised events and sports leagues with hundreds of participants. (*Id.* ¶¶ 95–97.)

Accordingly, the Court denies Defendants' motions with regard to Plaintiff's First Amendment retaliation claims on the basis of her press release.

**2. First Amendment political retaliation**

"[A plaintiff's] political retaliation claims are analyzed in the same manner as all First Amendment retaliation claims." *Lorusso*, 359 F. Supp. 2d at 130–31 (citing *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005)). Affiliating oneself with a political party is protected against retaliation by the First Amendment. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (ruling that political affiliations are constitutionally protected from government retaliation); *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) ("A public employee generally may

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 118 of 251
Belyea v. City of Glen Cove, Slip Copy (2022)
2022 WL 3586559

not be dismissed on account of her party affiliation, because such action violates the employee's First Amendment rights absent a showing that 'party affiliation is an appropriate requirement for the effective performance of the public office involved.' " (quoting *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980))); *Camacho v. Brandon*, 317 F.3d 153, 160–61 (2d Cir. 2003) (differentiating the protected affiliations of low-level political employers from the unprotected affiliations of policymakers); *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995) ("As a general rule, public employees may not be dismissed for the exercise of their First Amendment rights.").

**\*27** Plaintiff's claim of political retaliation fails, as she does not allege that she has engaged in any protected political activity. Plaintiff does not allege that she is a member of any political party and in fact alleges that she worked "successfully" with four different administrations from both major political parties. (Compl. ¶ 20.) Plaintiff argues that Defendants "believed that [her] complaint of discrimination was a political attack launched with the assistance of a 'known political operative.' "[14] (Pl.'s City Opp'n 17.) However, Plaintiff does not allege that this press release was politically motivated, and although she was assisted by a Republican who had worked with a previous Republican administration, Plaintiff does not allege any political language in the press release, and there are no allegations that Defendants perceived her to be affiliated with the Republican Party. Thus, Plaintiff fails to allege that she engaged in any political activity that would warrant retaliation. *See Bierce*, 656 F. App'x at 551 (noting that plaintiff alleged that he had been demoted for politically supporting the town supervisor and supporting her reelection campaign); *Rusk v. N.Y. State Thruway Auth.*, 37 F. Supp. 3d 578, 585 (W.D.N.Y. 2014) ("Nevertheless, there is no evidence set forth that the [p]laintiff's political activity or background played any role in his termination.... The [p]laintiff offers mere speculation that the change in leadership ... from Republican to Democratic served a role in his termination.") (dismissing plaintiff's political retaliation claim under section 1983); *Bearss v. Wilson*, No. 08-CV-248, 2010 WL 11523749, at \*9 n.2 (D. Vt. Aug. 10, 2010) ("Even assuming these statements [in which the defendant alleged that the plaintiff was a 'political insider,' among others] were made ..., they do not demonstrate that [the plaintiff] engaged in political affiliation worthy of First Amendment protection; nor are they sufficient to support [the plaintiff's] claim that [the defendant] viewed her as a political foe and attempted to terminate her as a result of such view."); *cf. Lorusso*, 359 F. Supp. 2d at 131 (finding that the plaintiff's speech was

a matter of public concern "because the right to vote for [a] candidate of your choosing without fear of reprisal is a protected First Amendment right that implicates fundamental freedoms").

14    Plaintiff alleges that Tenke retaliated against her because he perceived her as a "holdover" obstructionist employee. (Compl. ¶ 116.) However, Plaintiff does not allege that Tenke referred to *her* as a holdover, but instead used the term to refer to the "City controller's office, still headed by Clarson [in July of 2019]." (*Id.* ¶¶ 51–52.) Plaintiff also alleges that a Councilwoman made comments that the press release was "another example of partisan politics" and that the press release came "directly from the campaign manager of the Republican slate." (*Id.* ¶ 71.) However, this does not support Plaintiff's claim against Tenke or the City, particularly in view of the fact that the Councilwoman is not a Defendant to this suit and Plaintiff does not allege that the Councilwoman voted for the budget in question.

Plaintiff's reliance on *Heffernan*, 578 U.S. at 266, 136 S.Ct. 1412, and *Morin v. Tormey*, 626 F.3d 40, 42 (2d Cir. 2010) is misplaced. (*See* Pl.'s City Opp'n 16.) In *Heffernan*, 578 U.S. at 268, 136 S.Ct. 1412, an employee was demoted because a government official incorrectly believed that the employee had supported a particular candidate for mayor, a clearly political act. As the Supreme Court found, the "Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Id.* at 270, 136 S.Ct. 1412, 1417–18. In *Morin*, the state judge defendant demanded that plaintiff, a clerk in the New York State Unified Court System, "provide negative information about [the Democratic candidate for state supreme court justice]" and emphasized that the Democratic candidate was running against "good Republican friends" of his. 626 F.3d at 42. The defendant also asked the plaintiff whether she "was a good Republican." *Id.* The court found that the plaintiff's refusal to "spy on judges during a judicial election" and "engage in political activity involving the courts," which led to her being fired, was political activity in light of the defendant's clear political aims and demand for political loyalty. *Id.* at 44.

The *Heffernan* court ruled that even though the employer had made a mistake about the employee's actual political affiliations, he could still bring a First Amendment retaliation claim based on how their perceptions affected him. 578

U.S. at 273, 136 S.Ct. 1412. Notably, the Supreme Court assumed that the "activities that [the employee's] supervisors *thought* he had engaged in are of a kind that they cannot constitutionally prohibit or punish," namely joining, working for, or contributing to a political party or candidate. *Heffernan*, 578 U.S. at 270, 136 S.Ct. 1412. The press release issued by Plaintiff regarding gender discrimination, while protected speech as discussed above, is not protected political activity. *See Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 296 (S.D.N.Y. 2019) (finding the plaintiff's reliance on *Heffernan* misplaced because the "protected activity in *Heffernan* was picking up a political campaign sign, or 'joining, working for or contributing to the political party and candidates,' " and while the plaintiff's activities were "speculated" to be motivated by political affiliation, such speculation did not turn the activities into political activities). In addition, Plaintiff does not allege any demands for party loyalty or overt political demands, as in *Morin*. Further, while the court in *Morin* ruled that the "right to be free from retaliation based on political affiliation is not limited to members of an opposing political party," the plaintiff in that case "asserted her right not to be pressed into political activity," which does not mirror the facts that Plaintiff alleges. *Id.* at 44. These cases provide no support for Plaintiff's claim.

**\*28** Accordingly, the Court grants Defendants' motions as to Plaintiff's First Amendment political retaliation claim.

### iv. Fourteenth Amendment claims[15]

[15] Other than arguing that he is entitled to immunity, as discussed above, Tenke does not address Plaintiff's Fourteenth Amendment claims against him. (*See generally* Tenke's Mem.) The Court therefore only addresses the City's motion as to this claim.

The City argues that Plaintiff's Fourteenth Amendment hostile work environment and retaliation claims are pre-empted by Plaintiff's Title VII claims because they are based only on the alleged violations of Title VII. (City's Mem. 4–5.)

Plaintiff argues that her claims are not duplicative of her Title VII claims. (Pl.'s City Opp'n at 6.)

"A [section] 1983 action may not ... be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII."

*Patterson*, 375 F.3d at 225 (citing *Saulpaugh*, 4 F.3d at 143); *see also Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017) ("[E]very circuit to consider this exact question has held that, while a plaintiff may use [section] 1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII ... statutory rights cannot be vindicated through [section] 1983." (footnote omitted)); *Urli v. Town of Hempstead Sanitary Dist. No. 7*, No. 20-CV-0960, 2021 WL 4311141, at \*6 (E.D.N.Y. Sept. 22, 2021) ("[Section] 1983 may not be used to enforce Title VII."); *Rivera v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 19-CV-11624, 2020 WL 7496282, at \*4 (S.D.N.Y. Dec. 21, 2020) (quoting *Patterson*, 375 F.3d at 225) (same). However, a Title VII plaintiff is not precluded from bringing a "concurrent [section] 1983 cause of action," such as a claim for denial of equal protection, as long as the section 1983 claim is based on a "distinct violation of a constitutional right." *Patterson*, 374 F.3d at 225 (first quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994); and then citing *Saulpaugh*, 4 F.3d at 143).

Plaintiff brings a section 1983 claim to vindicate her rights under the Fourteenth Amendment but does not allege in the Complaint whether she brings an equal protection violation or a due process violation, thus failing to plead a "distinct" violation of a constitutional right. *Cf. Saulpaugh*, 4 F.3d at 143–44 ("[The Plaintiff] has properly grounded a [s]ection 1983 claim on the Equal Protection Clause ..."); *Gierlinger*, 15 F.3d at 34 ("For example, in some circumstances a [section] 1983 claim may be properly grounded on a violation of the Equal Protection Clause of the Fourteenth Amendment based on sexual harassment in the workplace."); *Rivera*, 2020 WL 7496282, at \*4 ("Plaintiff asserts four claims, all for alleged violations of the Equal Protection Clause of the Fourteenth Amendment brought pursuant to [section] 1983."). Plaintiff states in her opposition paper that her "equal protection rights" under the Fourteenth Amendment were violated, but does not plead this in her Complaint, or allege any accompanying facts. (Pl.'s Tenke Opp'n 12; *see* Pl.'s City Opp'n 5.)

**\*29** Accordingly, the Court grants the City's motion and dismisses without prejudice Plaintiff's section 1983 claims brought under the Fourteenth Amendment.

### v. The City's *Monell* liability

The City contends that Plaintiff fails to allege a section 1983 claim against it because she fails to plausibly state an underlying violation and fails to allege the actions of any final policymaking officials that resulted in her rights being violated. (City's Mem. 16–19.)

Plaintiff argues that the City is liable because the City could not have voted "absent Tenke's acts," making him a final policymaker, and the City itself acted through the acts of the City Council. (Pl.'s City Opp'n 20–23.)

To establish a municipal liability claim, a plaintiff is required to plead and prove three elements: "(1) an official policy or custom that (2) cause[s] [the plaintiff] to be subjected to (3) a denial of a constitutional right." *Torcivia v. Suffolk County*, 17 F.4th 342, 354–55 (2d Cir. 2021) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (same); *see also Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) ("To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019))). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *McLennon v. City of New York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016); *see O'Kane v. Plainedge Union Free Sch. Dist.*, 827 F. App'x 141, 142–43 (2d Cir. 2020) (finding that failure to "take appropriate action to prevent or sanction violations of constitutional rights" amounts to deliberate indifference (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012))); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick*, 757 F.3d at 62 (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones*, 691 F.3d at 81 (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"In order to prevail against a municipality based on the acts of a public official, a § 1983 plaintiff must prove, inter alia, that the constitutional injury was caused 'pursuant to official municipal policy of some nature,' or by a municipal policymaker with 'final policymaking power' over the challenged action." *Massena v. Bronstein*, 545 F. App'x 53, 55 (2d Cir. 2013) (citations omitted) (first quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); and then quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)); *see also Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (" '[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly'; municipal liability, however, 'attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986))); *Schwab v. Smalls*, 435 F. App'x 37, 40 (2d Cir. 2011) (finding that plaintiff failed to sufficiently plead *Monell* liability where she did "not adequately allege[ ] that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing of District employees"); *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."). A plaintiff only needs to identify one action by a decisionmaker who possesses final authority to "establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Montero*, 890 F.3d at 403); *see Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992) (holding that "a single act" could form the "basis of municipal liability ... [s]o long as the single challenged act was the decision of a municipal policymaker" (citing *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292); *Pignone v. Village of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *3 (S.D.N.Y. Mar. 6, 2014) ("Even one act by a municipal policymaker may constitute a municipal 'policy,' so long as that policymaker possessed final authority to establish municipal policy in the area at issue." (citing *Pembaur*, 475 U.S. at 481–83, 106

S.Ct. 1292)); *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 204 (E.D.N.Y. 2013) ("It is well settled that municipal liability may be established based on the single acts of a municipal official with 'final policymaking authority.' " (collecting cases)). "The question of whether an official has final policymaking authority is a question of law." *Massena*, 545 F. App'x at 55; *see Agosto*, 982 F.3d at 98 ("Whether the official in question possessed final policymaking authority is a legal question." (citing *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000))).

**\*30** For the purposes of municipal liability, Tenke's proposed budget, which eliminated Plaintiff's position, was the decision of a "municipal official[ ] with decision-making authority" because of his final authority throughout the budgetary process. *McLennon*, 171 F. Supp. 3d at 94; *Iacovangelo*, 624 F. App'x at 13–14; *see Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy."). Tenke proposed the budget and plausibly had final authority throughout the process; for example, during the budget decision process, several council members proposed ways to reduce costs other than terminating positions such as Plaintiff's, but Tenke rejected those alternatives as "not viable." (Compl. ¶ 106.) Further, it was Tenke who told Plaintiff he was eliminating her position from the 2021 budget. (*Id.* ¶ 101.) He plausibly was a final policymaker for the 2021 budget terminating Plaintiff's position. *See Gronowski*, 424 F.3d at 296–97 ("[The mayor's] actions undoubtedly represent government policy. Because he has final authority over hiring and firing decisions, which are discretionary matters, his decisions in this area constitute the municipality's final actions."); *Chiaravallo v. Middletown Transit Dist.*, No. 18-CV-1360, 2019 WL 4278937, at \*9 (D. Conn. Sept. 10, 2019) ("Although the [c]ity's [c]harter may limit [the mayor's] authority... [the plaintiff] plausibly alleges that [the mayor's] actions circumvented any limitation on his power ... and therefore constituted a 'policy' under Section 1983."); *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 323 (S.D.N.Y. 2019) ("[The p]laintiff alleges that she was told [the executive officer] made the decision to terminate [the p]laintiff's employment, suggesting he has final authority over hiring and firing decisions.... At the motion-to-dismiss stage, [the p]laintiff's allegation that [the executive officer] has authority over firing decisions is sufficient to assert liability for her allegedly unlawful termination."). Thus, in crafting the 2021 budget, Tenke made "a deliberate choice ... from among various alternatives," *Hines*, 520 F.

App'x at 7, and therefore was responsible for establishing final government policy with respect to budgetary decisions for the City, *Agosto*, 982 F.3d at 98. While Tenke may not have had a vote on the proposed budgets under the City Council, (*see* City Charter § C2-4(E)), his itemized budget containing the elimination of Plaintiff's position plausibly was the "act of a person with policymaking authority for the municipality." *Missel*, 351 F. App'x at 545 ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008))).

Accordingly, Plaintiff has plausibly alleged a *Monell* claim and the Court therefore denies Defendants' motion to dismiss the claim.

### f. Punitive damages

Tenke argues that the Court should strike Plaintiff's request for punitive damages, as Plaintiff fails to assert any facts plausibly alleging that he acted with "evil motive or intent" or "reckless or callous indifference." (Tenke's Mem. 18 (quoting *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir. 2003)).) The City argues that as a government entity, it is immune from punitive damages. (City's Mem. 19.)

Plaintiff argues that punitive damages should not be dismissed on a motion to dismiss. (Pl.'s Tenke Opp'n 13.)

Because punitive damages are a form of damages, and not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is "procedurally premature." *Jones v. City of New York*, No. 18-CV-1937, 2020 WL 1644009, at \*17 (S.D.N.Y. Apr. 2, 2020) (quoting *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019)) (denying defendants' motion to dismiss plaintiff's request for punitive damages on the grounds that a motion to dismiss is addressed to a claim and not to a form of damages); *see Bernardi v. N.Y. State Dep't of Corr.*, No. 19-CV-11867, 2021 WL 1999159, at \*14 (S.D.N.Y. May 19, 2021) (denying motion to dismiss as premature with respect to plaintiff's punitive damages claims).

2022 WL 3586559

The Court therefore denies Defendants' motion with respect to Plaintiff's punitive damages claim.

### III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss. The Court dismisses Plaintiff's NYSHRL claim against Tenke, First Amendment political retaliation claim against Tenke and the City, and Fourteenth Amendment claims against the City, without prejudice. The Court denies Defendants' motions with respect to Plaintiff's Title VII retaliation and hostile work environment claims against the City and First Amendment retaliation claim brought under section 1983 against Tenke and the City on the basis of her gender discrimination complaint. The Court also denies Defendants' motion with respect to Plaintiff's punitive damages claim. The Court grants Plaintiff's request to amend her Complaint to include a Fourteenth Amendment retaliation claim against the City.

SO ORDERED:

**All Citations**

Slip Copy, 2022 WL 3586559

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    29

2022 WL 2986588
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Erin MCKENNA, Plaintiff,

v.

SANTANDER INVESTMENT
SECURITIES, INC., et al., Defendants.

21cv941 (DLC)
|
Signed July 28, 2022

**Attorneys and Law Firms**

For the plaintiff: Wigdor LLP, Valdi Licul, John S. Crain, 85 Fifth Ave., Ste. Fifth Floor, New York, NY 10003.

For the defendants: Nelson Mullins Riley & Scarborough LLP, Mitchell Boyarsky, Nicole Phe, 280 Park Ave 15 Floor West, New York, NY 10017.

OPINION AND ORDER

DENISE COTE, District Judge:

 **\*1** Defendants Santander Investment Securities, Inc., Santander Holdings USA, Inc. ("SHUSA") (together, "Santander") and Omar Kariuki ("Kariuki") (collectively "Defendants") have moved for summary judgment on all claims asserted against them by plaintiff Erin McKenna ("McKenna" or "Plaintiff"). McKenna alleges that the Defendants failed to provide her with a reasonable accommodation for her high-risk pregnancy, subjected her to pregnancy discrimination, and retaliated against her in violation of federal, state, and city antidiscrimination statutes. For the reasons set forth below, the motion is granted in part.

**Background**

The following facts are undisputed or taken in the light most favorable to the Plaintiff, unless otherwise noted. McKenna began working at Santander Investment Securities, Inc. in May 2018 as a salesperson on the Fixed Income sales desk. McKenna was part of the Investment Grade ("IG") Sales team and a "primary and essential function" of McKenna's role was to execute trades.

As a member of the Fixed Income Sales team, McKenna was expected to work from Santander's offices in Manhattan. Under the Santander Investment Securities ("SIS") Fixed Income Sales & Trading Front Office Manual, off-premises trading is defined as "the execution of trades through telephone lines (e.g., trading over cellular or personal telephone lines or via on or off-site e-mail) whereby the execution is not recorded on the SIS voice systems or the execution of trades is off site of SIS." Off-premises trading is "generally not permitted." The enumerated events in which it may occur include

> (1) Times of financial emergency;
> (2) Acts of God; (3) Contingency or unexpected development in the global financial markets; (4) On holidays in NY (when Latam markets are open) or; (4) after hours which could adversely affect [Santander]'s position whereby a trader (or Salesperson, at their client's request) needs to execute a trade off-premise he/she must be authorized to do so prior to closing the transaction by the Head of Fixed Income (approval must be obtained in writing).

The Front Office Manual describes the "appropriate procedures" to follow to execute off-premises trades.

In late 2018, McKenna disclosed her pregnancy to William ("Bill") Garvey, the Head of Investment Grade Trading and her manager at the time. During the early months of 2019, McKenna contends that Garvey allowed her to come into the Santander office whenever she could and to otherwise work remotely. Defendants contend that Garvey did not give McKenna permission to work remotely.

In early 2019, McKenna received a bonus of $170,000 for the year 2018. According to the terms of McKenna's offer letter, she was eligible "to receive a discretionary bonus with a reference of $200,000, payable in accordance with SIS policy with respect to the payment of bonuses" for 2018. Accordingly, for 2018, McKenna received $30,000 less than the amount listed in the offer letter.

On March 7, 2019, Garvey sent McKenna a text message requesting "[a]ny word on whether or not you can come back to work?" McKenna responded that she was still advised not to return to the office because of concerns that "stairs and train" could cause labor. On March 8, Garvey emailed Human Resources,

> **\*2** Erin has been instructed by her doctor that she cannot take the train in to work due to complications from her pregnancy. It's likely this will remain the case until she has the baby (due date first week of June). I have instructed her that she is unable to execute any transactions while she is out of the office.

On March 12, Catherine Baer from Human Resources emailed McKenna to request that she get in touch with the benefits team and send Human Resources a copy of her doctor's instructions. The next day, Baer emailed McKenna to thank her for talking earlier and referenced a meeting set to occur later in the day. On Tuesday, March 19, Baer wrote that she had not heard back from McKenna. Baer noted in the email that McKenna's position "is not one that has the ability to work remote" and asked McKenna whether there were "any other accommodations" her doctor was requesting. McKenna responded on the same day that she was going to see the doctor on Thursday and would get a note at that time. Baer responded that "everyone is trying to figure out a solution that will work" and asked whether "Uber or another ride share service" is an option.

On March 21, McKenna requested that Santander provide a car service two days a week. She noted that her husband could drive her into work twice a week if Santander could provide a car service the other two days. Baer responded that, until the completed forms are received, Human Resources wouldn't be able to review her request.

McKenna procured a physician's certification for a pregnancy related accommodation that same day. McKenna's doctor stated that McKenna "needs to be provided with transportation and has been cleared to return to work 4 days a week." The form describes several medical conditions related to McKenna's pregnancy that "restrict her ability to perform at full capacity." The doctor notes that McKenna "should not be

lifting anything at all, climbing or pushing/pulling." A second note from the same doctor, also dated March 21, states that McKenna "has been cleared to go back to work 4 days a week as long as she is provided with transportation."

On April 2, Beatriz Retamar from Human Resources emailed McKenna to say she "had some news, but still figuring out before telling you." Retamar requested McKenna's help with "one thing" and asked whether McKenna could "figure out if you have any branch near your home comfortable for you to go." Retamar noted that "remote working is not an option even with the fingerprint, and CITRIX ... because we can't control the 'environment', meaning who can have access to that non public information." On April 3, McKenna responded to Retamar's email and said "I think I am all good now to commute. I just have to take it easy but I am out of the critical time for the baby." McKenna noted that there did not seem to be any branches near her house but that she "should be back to a regular schedule." Retamar forwarded the email to others in Human Resources. On April 3, Molinari responded to the email thread, "Case is closed".

Omar Kariuki assumed responsibility for both the Emerging Markets and Fixed Income Sales teams around March 2019 and became McKenna's supervisor. On April 5, McKenna emailed Minuesa, the Head of Markets in the U.S. and Kariuki's manager, and Kariuki regarding coverage for her Midwestern accounts while she was on maternity leave. In the April 5 email, McKenna wrote,

> **\*3** I sat down with Jeff Barker yesterday to discuss his helping to back me up on my Midwest accounts while I am out on maternity leave. Omar asked me to do this last week before he left and I was more than happy to do so to make sure my accounts are efficiently covered in my absence. However, it left me concerned that my client list was going to be substantially changed <u>as a result of my time off after having a baby</u>.... [W]hen Jeff mentioned that he would be covering IG accounts in addition to EM going forward and that he specifically covers Northwestern Mutual I was concerned. For instance, this is one [of] my biggest accounts

> that I opened.... I have done both
> EM and IG trades with Northwestern
> Mutual since I have been here. From
> our conversations, I was under the
> impression that Jeff would be helping
> back me up while I was out, but now
> it seems like he's going to be taking
> over some of my accounts even when
> I come back.

(Emphasis supplied). Kariuki responded that the message Barker relayed was wrong and McKenna's account list would remain intact while she was out on leave.

On April 29, McKenna told the Defendants that she had obtained a doctor's note. The note, which is dated April 24, advises McKenna "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all. This is due to medical complications of her pregnancy." There is no evidence that McKenna provided this note to the Defendants. McKenna gave birth on May 6, and began her maternity leave.

McKenna returned from maternity leave on August 12, 2019. A week earlier, on August 4, Minuesa emailed Kariuki about undertaking a restructuring of the sales team. In his email, he said that "[l]ooking at the activity in secondary markets and the 2H of the year, our priorities should be focused in ... re-structuring of team (low-production sales persons)."

In February 2020, McKenna received a bonus for the year 2019 of $165,000. This was $5,000 less than her 2018 bonus.

In February 2020, Santander returned to the discussion of restructuring the Investment Grade Sales team. In a February 24 email, Christina Yahn, Vice President of Human Resources, refers to a meeting with Juan Minuesa and Kariuki about "a proposed restructure to the Institutional Sales team." Yahn states that "[g]iven the client/revenue focus of the team, we need to begin the recruitment process and secure final candidates before we can notify the current employees of the impacts to their roles." The Plaintiff contends that she was identified at that time as a "current employee" who would lose employment in this restructuring. Beginning in March 2020, Santander transitioned to remote work in response to the COVID-19 Pandemic.

On August 25, 2020, Kariuki and Minuesa emailed Yahn to set aside time to discuss "personnel changes to the sales team." The parties agree that in those discussions Santander identified McKenna as a person who would lose her job in the restructuring. Documents reflect that the three individuals met on September 1 at 10:30 a.m., and that the next day Yahn sent Kariuki a template for a new organization chart.

On September 2, Santander held a meeting, attended by McKenna, regarding "the new protocol" for returning to work in the office during the pandemic. McKenna emailed Yahn after the meeting to explain that she had "just found out" she was again pregnant. McKenna requested that they wait to discuss her return to the Santander office until after her September 17 doctor's appointment. Yahn responded that it "ma[de] sense to revisit" her return to the office after the September 17 appointment. Yahn wrote "I assume you haven't yet told the team of your good news, so I can just mention to Omar that you and I discussed a return to be confirmed after 9/17 without mentioning any details."

On September 16, Yahn sent a text message to Shannon Cruz, another employee on Yahn's Human Resources team, detailing the sequence of events leading up to McKenna's pregnancy announcement. Yahn stated that

> **\*4**  Omar told me like 2 weeks ago
> he wanted to [l]et go Jeff Barker and
> Erin McKenna.... I cannot tell Omar
> she's pregnant bc it's her thing to do,
> but need to factor in the implications
> of it with letting her go.

On September 17, McKenna wrote to Yahn that she "was going back to the doctor in 2 weeks to be monitored" because she is "high risk." McKenna noted that her doctor had asked if they "could revisit a return to work after my first trimester (end of October) since this is a critical time." McKenna said she would receive a note from her doctor shortly. Yahn responded that she did "not need to see the note at this time."

On October 12, Kariuki sent an email to Yahn noting that he and Minuesa had "decided to ... exit the two people in IG discussed." On October 19, McKenna sent Kariuki a Bloomberg message and disclosed her pregnancy. Having just learned that McKenna was pregnant, Kariuki sent Yahn an email with the subject "Does this change anything?" and included McKenna's message regarding her pregnancy in the body of the text.

Santander proceeded with its decision to terminate McKenna's employment. A "Severance Decision Form" dated October 28, prepared by Yahn and Kariuki, lists McKenna and Barker as the "impacted" team members. An October 28 draft of the restructuring documents includes a request by Yahn regarding McKenna. She asks Omar to "talk through the business results that you provided at the end of September? I want to understand Tom Steckroth's mandate and current volume and YTD results when compared to Erin's."

On November 4, Yahn sent Molinari a description of the revised business rationale for the organizational changes being made to the Investment Sales team. The document notes that

> [w]e have identified that we have a need to enhance the focus of the IC3s to of course be Sales centric, including a need for stronger secondary sales results.... Therefore, based on assessment of the remaining IC3 incumbents, one of the IC3 level positions will be impacted to undergo an upgrade to help build the existing credit business including driving up secondary sales while also excelling in working in a matrixed and manual operations dependent environment.... Erin McKenna's role has been identified to be upgraded with an incumbent with the above skills and competencies.

(Emphasis supplied.) The document lists McKenna as one of the "impacted team member(s)." On November 6, 2020, McKenna was fired.

On February 3, 2021, McKenna filed this lawsuit. The complaint asserts claims against all Defendants for interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), discrimination and retaliation under the New York State Human Rights Law, Executive Law § 290 et seq. (the "NYSHRL"), and discrimination and retaliation under the Administrative Code of the City of New York § 8-107 et seq.

(the "NYCHRL"). It also asserts claims under NYSHRL and NYCHRL against Kariuki for aiding and abetting.

On February 4, 2021, McKenna filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") as amended by the Pregnancy Discrimination Act of 1978 ("PDA") and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"). On April 26, McKenna received a Notice of Right to Sue from the EEOC.

**\*5** On May 24, McKenna filed an amended complaint adding claims against Santander for discrimination and retaliation under the ADA and Title VII. Following that amendment, McKenna principally claims (1) a failure to accommodate her pregnancy beginning on March 8, 2019 by rescinding permission for her to work from home and refusing to provide or reimburse car transportation to work; (2) discrimination against her for her 2019 pregnancy and pregnancy leave by reducing two bonuses, refusing to return certain accounts to her portfolio when she returned to work in 2019, and terminating her employment in 2020; (3) discrimination against her for her 2020 pregnancy by terminating her employment; and (4) permanently reassigning many of her accounts, lowering her bonuses, and terminating her employment in retaliation for two statements she made in early 2019.

On March 28, 2022, the Defendants moved for summary judgment on all claims. The motion became fully submitted on May 11. [1]

[1]     On June 21, Plaintiff filed a motion to strike certain documents from the summary judgment record. The motion to strike is moot given the rulings in this Opinion.

### Discussion

Summary judgment may only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the

nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). In the context of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). See also Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016).

### I. The Statutes of Limitations

Among her claims, McKenna alleges that the Defendants violated her rights under the ADA and Title VII. A claim under Title VII or the ADA must be dismissed as untimely if a plaintiff has not filed a complaint with the EEOC within 180 days of the alleged discriminatory or retaliatory act or filed a complaint with an appropriate state or local agency within 300 days of the occurrence of the alleged illegal act.[2] The Second Circuit has held that Title VII and ADA charges filed with the EEOC in New York are deemed to be simultaneously filed with the appropriate New York state agency pursuant to the EEOC's regulations and are therefore entitled to the 300 day limitations period. Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 327-28 (2d Cir. 1999).

[2]    Under Title VII and the ADA, a plaintiff may only benefit from the 300 day limitations period for such claims -- as opposed to the 180 day limitations period -- if she has first sought relief from an appropriate state or local administrative agency. See 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a).

The Plaintiff also brings a federal claim under the FMLA. The statute of limitations for interference and retaliation claims under the FMLA is two years. See 29 U.S.C. § 2617(c)(1). A three-year statute of limitations period applies, however, if a plaintiff proves a "willful" violation of the FMLA. See id. § 2617(c)(2).

*6   Finally, the Plaintiff brings various state and city law claims. "[C]laims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).

Generally, each discrete discriminatory or retaliatory act that violates federal law "gives rise to a freestanding [federal] claim with its own filing deadline." Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir. 2012). Therefore, where a plaintiff's claims are premised on "discrete discriminatory or retaliatory acts such as termination, failure to promote, denial of transfer, or refusal to hire," those claims may be barred by the statute of limitations "if they occurred prior to the 300-day period even though they may be related to acts that occurred within the permissible 300-day period." Davis-Garett v. Urb. Outfitters, Inc., 921 F.3d 30, 42 (2d Cir. 2019) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002)).

### A. Application

McKenna filed her EEOC complaint on February 4, 2021. Therefore, any claims under the ADA and Title VII arising from acts occurring before April 10, 2020 -- 300 days before she filed her complaint with the EEOC -- are time barred. Since McKenna's ADA claim relates to her 2019 pregnancy, it is time-barred. Any Title VII claims arising from the 2019 reassignment of McKenna's accounts or her 2018 and 2019 bonuses are also time-barred. Her Title VII claim arising from the termination of her employment is timely. All of McKenna's claims under the FMLA, NYSHRL, and NYCHRL are timely.

### II. Disability Discrimination

McKenna asserts that the Defendants, in violation of the ADA, NYSHRL, and NYCHRL, failed to provide her in the period following March 7, 2019 with a reasonable accommodation in connection with her 2019 pregnancy. The Defendants move for summary judgment on these claims because McKenna does not qualify as disabled, has failed to show that a reasonable accommodation existed that would have allowed her to perform the essential functions of her job at home, and has failed to show that the Defendants refused a request for an accommodation. This motion is granted on the ground that McKenna has failed to show that Santander refused to reasonably accommodate her pregnancy.

## A. Legal Standard

The ADA prohibits "discriminat[ion] against a qualified individual" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This provision "requires employers to take certain affirmative steps to assist employees with disabilities," which include reasonably accommodating "the known physical or mental limitations of an otherwise qualified individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." Bey v. City of New York, 999 F.3d 157, 165 (2d Cir. 2021) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, a disability is defined "to include, inter alia, a physical or mental impairment that substantially limits one or more major life activities." Hamilton v. Westchester Cnty., 3 F.4th 86, 92 (2d Cir. 2021) (citation omitted). Pursuant to the ADA Amendments Act ("ADAAA"), passed by Congress in 2008, "the term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(d)(1)(i)(2016). "[T]he term 'substantially limits' is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA." Hamilton, 3 F.4th at 92. "[F]or purposes of an actual disability claim, a 'disability' shorter than six months in duration now can be actionable under the ADA." Id.

*7  Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques ..." N.Y. Exec. Law § 292(21). The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. The term "physical, medical mental, or psychological impairment means ... [a]n impairment of any system of the body; including, ... the reproductive system." N.Y.C. Admin. Code § 8-102.

To establish a prima facie case for failure to provide a reasonable accommodation, the plaintiff must establish: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the employer refused to make such accommodations. See Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020).

"Where the employee's disability is known to the employer, the ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Stevens v. Rite Aid Corp., 851 F.3d 224, 231 (2d Cir. 2017) (citation omitted). "[T]he ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 98 (2d Cir. 2015).

Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims. See Fox v. Costco Wholesale Corp., 918 F.3d 65, 76 (2d Cir. 2019). The NYCHRL provides "greater protection against disability-based discrimination." Jacobsen v. New York City Health & Hosps. Corp., 22 N.Y.3d 824, 833–34 (N.Y. 2014). Under both the NYSHRL and NYCHRL, however, "the employer's response to the employee's request and any ensuing dialogue about the impact of the proposed accommodation on the employer's business inform the determination of whether a reasonable accommodation exists." Id. at 835.

## B. Application

Due to the medical complications arising from her 2019 pregnancy, McKenna has presented evidence that she was disabled for the purposes of the NYSHRL and NYCHRL.[3]

> Although pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended.... [I]t is likely that a number of pregnancy-related impairments that impose work-related restrictions will be substantially limiting, even though they are only temporary.

EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues (EEOC, June 25, 2015).

3        McKenna's ADA claim is time barred.

The Defendants assert that McKenna is required to establish a long-term or permanent impact on her health to show that she had a disability. But a "short-term injury can qualify as an actionable disability under the ADA." Hamilton, 3 F.4th at 93. See also 28 C.F.R. § 35.108(d)(ix)(2016).

McKenna, however, has failed to show that the Defendants refused to afford her a reasonable accommodation for her disability beginning on March 8, 2019. According to McKenna, Garvey allowed her to work from home in the period between January and March 7, 2019. [4] On March 7, Garvey texted McKenna to inquire whether she could return to work. After McKenna advised Garvey that her doctor told her she could not commute by train, Human Resources became involved and asked for a copy of the doctor's instructions. The doctor's note that McKenna provided to Santander on March 21 did not indicate that McKenna was unable to leave her home to work. It indicated instead that McKenna could work four days a week at an office so long as she was provided with transportation.

4        The Defendants, supported by Garvey's deposition testimony, dispute McKenna's assertion that Garvey ever permitted McKenna to work from home in early 2019.

 *8  The Plaintiff has not presented evidence to raise a question of fact that at any point in the weeks that followed March 21 that the Defendants refused the requested accommodation. The Human Resources personnel asked McKenna whether there was a Santander branch near her home. The next day, on April 3, McKenna responded and said "I think I am all good now to commute" and she could be back to her "regular schedule." With that response, McKenna effectively withdrew her request for an accommodation.

McKenna appears to make two arguments to support her disability claim. First, she appears to argue that she should have been allowed to work from home until she gave birth. She contends she was permitted by her supervisor to do so between January and March of 2019. The Defendants dispute that McKenna was ever permitted to work from home and point to Santander's strict prohibition against out-of-office trading in its Manual. In any event, McKenna's disability

claim is premised on the period following March 7, 2019, and McKenna's evidence is that her doctor permitted her to work in an office during this period so long as she used appropriate transportation. As explained, the Plaintiff has not proffered evidence that the Defendants failed to reasonably accommodate her disability in this period.

Second, McKenna appears to rely on an April 24, 2019 doctor's note that advised her "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all." The Plaintiff advised the Defendants on April 29 that she had a doctor's note, but there is no evidence that the Plaintiff ever presented the note to the Defendants. Instead, she describes it as evidence of her state of mind. If McKenna wanted an accommodation of her disability on April 29, having told Santander on April 3 that her need for an accommodation had ended, she had to provide the doctor's note to Santander. McKenna has failed to offer evidence that the Defendants refused a request for an accommodation at any time between April 29 and May 6, the date on which McKenna gave birth to her child.

### III. Pregnancy Discrimination

McKenna asserts that the Defendants discriminated against her due to her pregnancies, in violation of Title VII, NYSHRL, and NYCHRL. The adverse actions she identifies as following her 2019 pregnancy are the refusal to return all of her accounts to her when she returned to work in 2019 from her pregnancy leave, reducing her bonuses for the years 2018 and 2019, and firing her in 2020. She asserts that the adverse action taken against her in connection with her 2020 pregnancy was the termination of her employment.

The Defendants contend that McKenna has failed to establish a prima facie case for pregnancy discrimination related to either her 2019 or 2020 pregnancy and that she has not refuted the legitimate business reasons they have given for their business decisions. The Defendants' motion is granted in part. The Title VII claim related to the 2019 pregnancy is time barred. The motion is also granted as to all claims arising from the 2020 pregnancy. The motion is denied with respect to the 2019 pregnancy for claims brought under NYSHRL and NYCHRL.

### A. Legal Standard

Title VII makes it unlawful for an employer to "fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII was amended by the Pregnancy Discrimination Act ("PDA") to enact Congress's determination that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684 (1983).

**\*9** Claims brought under Title VII are "analyzed using the familiar burden-shifting scheme adopted by the Supreme Court in McDonnell Douglas Corp. v. Geren, 411 U.S. 792 (1973)." Walsh v. N.Y.C. Housing Auth., 828 F.3d 70, 75 (2d Cir. 2016) (citation omitted). To establish a prima facie case of discrimination, a plaintiff need only allege: "(1) that she is a member of a protected class, (2) that she was qualified for the position ..., (3) that she suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). Under Title VII, an employer is liable where the employee's pregnancy or related condition at least "partly ... motivated" an employment decision. Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008). "It suffices ... to show that the motive to discriminate was one of the employer's motives, even if the employer had other, lawful motives that were causative of the employer's decision." Lenzi v. Systemax, Inc., 944 F.3d 97, 107 (2d Cir. 2019) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013)).

A "denial or reduction of a bonus" can constitute an adverse employment action. Davis v. New York City Dep't of Educ., 804 F.3d 231, 236 (2d Cir. 2015). "The fact that the employer has discretion whether to grant bonuses or raises does not support the conclusion that an employer may freely allocate them on the basis of" discrimination. Id. at 235–36.

"If the plaintiff establishes a prima facie case, a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." Lenzi, 944 F.3d at 107 (citation omitted). "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." Id. at 107–08 (citation omitted).

Discrimination claims brought under the NYSHRL are "analytically identical" to Title VII claims. Id. at 107 n.7 (2d

Cir. 2019). Claims brought under the NYCHRL are analyzed using the same framework as Title VII and NYSHRL claims, Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009), but "must be reviewed independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted). The NYCHRL does not require that a plaintiff prove an adverse employment action. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). Rather, "the plaintiff need only show differential treatment -- that she is treated 'less well' -- because of a discriminatory intent." Id. at 110 (citation omitted).

    B. Application
McKenna has presented sufficient evidence to raise a question of fact as to whether the Defendants discriminated against her as a result of her 2019 pregnancy by reducing her bonuses below the amount she would otherwise have been given, by failing to return some of her accounts to her when she returned from maternity leave, and by planning for and then implementing the termination of her employment in 2020. While the Defendants have provided legitimate reasons for each of those decisions, the disputed issues of fact must be resolved at trial.

McKenna's claims related to her 2020 pregnancy, however, must be dismissed. McKenna cannot show that her 2020 pregnancy motivated, even partly, the decision to fire her. Santander began to work on a restructuring plan for McKenna's position many months before McKenna became pregnant and many months before she advised anyone at Santander that she was pregnant. McKenna contends that Santander had identified her as someone to fire in February 2020. The parties agree that by August 2020, Santander had identified McKenna as someone who would lose her job in the restructuring. McKenna did not advise the Santander Human Resources department of her pregnancy until September and her supervisor until October 19. Because McKenna has identified no evidence to support a claim that her 2020 pregnancy played any role on Santander's decision to terminate her employment, her claims based on her 2020 pregnancy must be dismissed.

**\*10** McKenna argues that, although Santander employees took steps "to coordinate McKenna's ouster" in August, Kariuki did not "actually" terminate her employment until November 6, 2020, eighteen days after she told him about her pregnancy. To prove discrimination, McKenna must show

that the Defendants' decision to terminate her employment was motivated by discriminatory intent. In this case, the date on which she was actually informed on their decision is not relevant. Therefore, the Defendants are entitled to summary judgment on the Title VII, NYSHRL and NYCHRL discrimination claims arising from the 2020 pregnancy.

### IV. Retaliation

McKenna asserts that the Defendants retaliated against her in violation of the ADA, Title VII, NYSHRL, and NYCHRL for protesting unequal treatment. The Defendants contend that these claims fail. They assert that the federal claims are time-barred and that McKenna cannot demonstrate the causal connection between any protected activity and any alleged adverse action. The NYSHRL and NYCHRL claims survive in part; the federal claims are dismissed as time-barred.

### A. Legal Standard

To make out a prima facie retaliation case under Title VII, the ADA, or NYSHRL the plaintiff "must show that (1) [s]he was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." Agosto v. New York City Dep't of Educ., 982 F.3d 86, 104 (2d Cir. 2020) (citation omitted); see Fox v. Costco Wholesale Corp., 918 F.3d 65, 72–73 (2d Cir. 2019) (ADA retaliation claim); Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL). Once the plaintiff has established a prima facie case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013). If the defendant does so, the plaintiff must then show that this "non-retaliatory reason is a mere pretext for retaliation." Id.

An employee's complaint "may qualify as protected activity" under Title VII "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted). Protected activity need not consist of a formal complaint of discrimination; an "internal complaint to company management" can constitute a protected activity under Title VII. Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992). The plaintiff's complaint, however, cannot have been so generalized that the employer "could not reasonably have understood that she was

complaining of conduct prohibited by Title VII." Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (citation omitted).

For a retaliation claim to survive summary judgment, the plaintiff must show "a causal connection between the protected activity" and the "adverse action" complained of. Agosto, 982 F.3d at 104 (citation omitted). Causation must be proved "according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Zann Kwan, 737 F.3d at 845 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

The adverse-action standard for retaliation "covers a broader range of conduct than does the adverse-action standard for claims of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015). It is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). With respect to adverse actions in the retaliation context, the Supreme Court has cautioned that:

> **\*11** Context maters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable

employee from complaining about discrimination.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) (citation omitted).

The NYCHRL prohibits "retaliat[ion] or discriminat[ion] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Leroy v. Delta Air Lines, Inc., 36 F.4th 469, 474 (2d Cir. 2022) (citation omitted). "[C]ourts must analyze NYCHRL claims separately and independently from any federal ... claims," because the NYCHRL is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Mihalik, 715 F.3d at 109 (citation omitted).

   B. Application

McKenna has presented evidence that she was retaliated against for purposes of the NYSHRL and NYCHRL in connection with her April 5, 2019 statement to Santander. [5] She may pursue these claims with respect to the Defendants' decision on what clients should be returned to her portfolio upon her return from maternity leave.

[5]     McKenna's Title VII and ADA claims are time barred.

In opposing the motion for summary judgment, McKenna identifies two occasions on which she contends she engaged in protected activity. McKenna first claims that she engaged in protected activity in early 2019 when she asked to work from home during her pregnancy. Next, McKenna asserts that she engaged in a protected activity on April 5, 2019, when she sent an email to Minuesa and Kariuki, expressing concern that she may permanently lose her accounts "as a result of my time off after having a baby."

While the April 5 email qualifies as a protected activity, McKenna fails to show that she engaged in any other protected activity in early 2019. At no point in the FAC or in the evidence submitted in opposition to this motion for summary judgment does McKenna explain what she said in early 2019 that might qualify as protected activity. She does not report what she said in making a request to work from home and, in fact, does not cite any specific conversation in which she complained of discrimination or unfair treatment, even in the most general terms. While informal protests of discrimination can constitute protected activity, McKenna fails to show that she made even an informal protest.

McKenna's retaliation claims under the NYSHRL and NYCHRL appear to rest on an assertion that she suffered four materially adverse actions as a result of the April 5 email. They are (1) the permanent reallocation of some of her accounts during her 2019 pregnancy leave; (2) the payment in early 2020 of a diminished bonus for the year 2019; (3) identification of the plaintiff for termination of employment beginning on February 25, 2020; and (4) the termination of employment in October 2020. [6]

[6]     McKenna also cites as an adverse action the receipt of a less than expected bonus for the year 2018. Since that bonus was decided upon and distributed before April 5, 2019, the retaliation claims based on that bonus must be dismissed.

*12  Each of these four actions is a materially adverse employment action for purposes of a retaliation claim. They are also adverse actions with respect to the surviving discrimination claims. Of the four actions, however, only the permanent reallocation of her accounts is sufficiently tethered to her April 5 activity to support a retaliation claim. While the Defendants have provided legitimate business reasons for the account allocations in 2019, the Plaintiff has presented evidence to raise a question of fact to support her retaliation claims and those disputed issue of fact must be resolved at trial.

The Plaintiff does not make any developed argument in support of her claim that the 2020 decisions regarding her bonus and the termination of her employment were motivated, at least in part, by the April 5, 2019 email. The Plaintiff's evidence links these actions, if at all, to her 2019 pregnancy and maternity leave, not to the email. While all of these events are to some extent interwoven, the length of time between the single expression of McKenna's fear about the reallocation of her accounts in her April 5, 2019 email and the 2020 events is too great to permit a jury to link the events through anything but speculation.

Case 5:22-cv-00762-BKS-TWD  Document 23  Filed 03/28/23  Page 133 of 251
McKenna v. Santander Investment Securities, Inc., Slip Copy (2022)

2022 WL 2986588

### V. Interference and Retaliation Under the Family Medical Leave Act

McKenna asserts that the Defendants interfered with her rights under the FMLA and retaliated against her for exercising those rights. The Defendants contend that both of McKenna's claims under the FMLA fail because she continued to work for over a year after her FMLA leave and has not presented evidence to refute the legitimate business reasons it has given for the termination of her employment.

### A. Legal Standard

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016) (citation omitted).

> [T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

Id. Denial of FMLA benefits is interpreted flexibly. "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Interference also includes "discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA]," Id. § 825.220(a)(2), and "induc[ing] employees to waive[ ] their prospective rights under FMLA." Id. § 825.220(d).

"To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse

employment action occurred under circumstances giving rise to an inference of retaliatory intent." Graziadio, 817 F.3d at 429 (citation omitted). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." Id.

> In a general sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. 'Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as ex ante and ex post protections for employees who seek to avail themselves of rights granted by the FMLA.

*13 Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d Cir. 2017).

### B. Application

McKenna's FMLA interference claim must be dismissed. She has identified no action by the Defendants that interfered with her taking any FMLA-protected leave or obtaining other FMLA benefits. McKenna argues that the Defendants interfered with her FMLA rights when they reallocated her accounts. But, as the Defendants observe, that contention is actually a retaliation claim.

McKenna has presented evidence to raise a question of fact as to her FMLA retaliation claim. She has presented sufficient evidence from which a jury could find that the Defendants retaliated against her for her absences from the workplace in 2019 by permanently reallocating some of her accounts, reducing her 2019 bonus and terminating her employment. While the Defendants have explained each of these actions, the disputed issues of fact must be resolved at trial.

## VI. Aiding and Abetting

McKenna argues that Kariuki can be liable under NYSHRL and NYCHRL for discrimination as both a primary and a secondary actor. "[A]n individual cannot aid and abet his or her own violation of the Human Rights Law." Hardwick v. Auriemma, 983 N.Y.S.2d 509, 513 (1st Dep't. N.Y. 2014). As plaintiff sued Kariuki personally, and those claims remain in the lawsuit, he cannot have aided and abetted his own alleged acts of discrimination and retaliation. The Defendants' motion for summary judgment on McKenna's aiding and abetting claims is granted.

### **Conclusion**

The Defendants' March 28 motion for summary judgment is granted in part. The Defendants are granted summary judgment on the following claims: (1) Discrimination in violation of Title VII and the PDA against Santander; (2) Retaliation in violation of Title VII against Santander; (3) Discrimination in violation of ADA against Santander; (4) Retaliation in violation of ADA against Santander; (5) Aiding and abetting claim in violation of NYSHRL against Kariuki; (6) Aiding and abetting under NYCHRL against Kariuki; (7) Disability discrimination in violation of NYSHRL against all Defendants; (8) Disability discrimination in violation of NYCHRL against all Defendants; (9) Interference under the FMLA against all Defendants.

The following claims will proceed to trial: (1) Discrimination in violation of NYSHRL as to the 2019 pregnancy against all Defendants; (2) Retaliation in violation of NYSHRL against all Defendants; (3) Discrimination in violation of NYCHRL as to the 2019 pregnancy against all Defendants; (4) Retaliation in violation of the NYCHRL against all Defendants; (5) Retaliation under the FMLA against all Defendants.

### **All Citations**

Slip Copy, 2022 WL 2986588

---

2015 WL 4393163
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Luis FELICIANO, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 14 Civ. 6751(PAE).
|
Signed July 15, 2015.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Luis Feliciano, a Lieutenant employed by the New York City Sheriff's Department (the "Department"), brings this employment discrimination suit against the City of New York (the "City") and several officials. The lawsuit arises out of the Department's decision, in November 2012, not to promote Feliciano to Under–Sheriff. Feliciano claims a discriminatory failure to promote, a hostile work environment, and retaliation, the last claim based partly on Feliciano's having previously brought discrimination lawsuits against the City. He brings these claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N .Y. City Admin. Code § 8–101 *et seq.* ("NYCHRL"). He also alleges violations of his Fourteenth Amendment rights under 42 U.S.C. §§ 1981 and 1983, and of his First and Fifth Amendment rights under 42 U.S.C. § 1983.

Defendants now move to dismiss Feliciano's Amended Complaint. For the reasons set forth below, with respect to Feliciano's claims brought against the City under Title VII, the NYSHRL, and the NYCHRL, the Court dismisses the hostile work environment claim, denies the motion to dismiss the discriminatory failure to promote claim, and narrows but does not dismiss the retaliation claim. The Court dismisses all claims brought under §§ 1981 and 1983 against the City and against the individual defendants.

## I. Background

## A. Facts [1]

[1]    These facts are drawn from Feliciano's Amended Complaint. Dkt. 18. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff, Feliciano. *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012).

### 1. The Parties

Feliciano, a Hispanic man, has worked for the City since 1993. Dkt. 18 ("Am.Compl."), ¶¶ 16–17. Since 2001, he has been employed as a Lieutenant in the Sheriff's Department, which is the office primarily responsible for civil law enforcement in New York City. *Id.* ¶ 20. He holds a bachelor's degree and a juris doctor. *Id.* ¶ 56. Feliciano has a clean disciplinary record and extensive experience in multiple positions within the Department, where he is the second-most senior Lieutenant. *Id.* ¶¶ 33, 45. Before the November 2012 decision not to promote him that forms the basis of this lawsuit, Feliciano had sued the City for discrimination twice —in 2006 and 2009. *Id.* ¶¶ 23, 34. Those lawsuits settled—in 2007 and 2010, respectively. *Id.*

Defendants are the City of New York and five employees, whom Feliciano sues in their individual and official capacities: Joseph Fucito, Edgar Domenech, Paul Mulqueen, David Frankel, and Peter Sammarco. *Id.* ¶¶ 5–11. Fucito and Domenech each served as Sheriff of the Department at different relevant times. *Id.* ¶¶ 8, 10. Mulqueen is an Under–Sheriff. *Id.* ¶ 9. Frankel is the Commissioner of the New York City Department of Finance, *id* . ¶ 7, to which the Department reports. *Id.* ¶ 4. Sammarco is the Chief of Staff of the Department; he serves as a panelist when candidates interview for positions in the Department. *Id.* ¶ 42.

### 2. Feliciano's 2006 and 2009 Discrimination Lawsuits Against the City

**\*2** Because Feliciano's claims include that he was retaliated against for bringing two previous lawsuits against the City, *id.* 37, the Court briefly recaps those lawsuits.

In 2006, Feliciano was one of several plaintiffs who sued, claiming race discrimination and retaliation by the City and the Department between 2001 and 2005. *Id.* ¶ 23. This lawsuit settled in 2007. *Id.* In 2009, Feliciano sued individually, claiming race discrimination, retaliation, and hostile work

environment, based on the Department's failure to promote him to Under–Sheriff in 2008. *Id.* 27–34. Feliciano there alleged that the Sheriff had deliberately changed the method of selection halfway through the promotion process so as to undermine him. *Id.* ¶ 28. That lawsuit settled in 2010. *Id.* ¶ 34.

### 3. Feliciano's Failure in 2012 to Obtain a Promotion

In November 2012, an opening became available in the Department for the position of Under–Sheriff. *Id.* ¶ 38. Feliciano applied for the position.[2] Two candidates were selected to be interviewed: Mulqueen, who is white, and Julio Lopez, who is Hispanic. *Id.* ¶ 40. Both candidates were less experienced than Feliciano. *Id.* ¶ 43. Mulqueen had been a Lieutenant for two years; Lopez was still in his probationary period as a Lieutenant. *Id.* ¶¶ 47, 52. In December 2012, following his interview, Mulqueen was hired for the position. *Id.* ¶ 53. Feliciano's disciplinary record is superior to Mulqueen's; Mulqueen was once disciplined for improperly supervising a Deputy Sheriff who had mismanaged a real estate sale, *id.* ¶ 47. Feliciano is also more educated than Mulqueen, who does not hold a college degree, *id.* ¶ 56.

2    Feliciano oddly does not explicitly allege that he applied for the position, but the implication is evident from the balance of his Amended Complaint.

After being passed over for promotion, Feliciano complained to Fucito, who then served as Sheriff. *Id.* ¶ 8. In response, Fucito told Feliciano that "if you were selected for an interview people would think it is because you brought two lawsuits." *Id.* ¶ 60.

In early 2013, Feliciano was transferred to the Bronx. *Id.* ¶ 62.

### 4. Mulqueen's Supervision of Feliciano and Alleged Retaliatory Acts

Mulqueen was, "at all times," Feliciano's supervisor. *Id.* ¶ 9. After he was promoted to Under–Sheriff, Mulqueen changed the procedure by which the Department processed orders of protection that it received.[3] *Id.* ¶ 67. Previously, orders had been processed as they came in, and only orders that could be served within 24 hours were to be served "ASAP"; after his promotion, Mulqueen directed that *all* incoming orders be served "ASAP." *Id.* Feliciano was repeatedly criticized for failing to prioritize incoming orders as Mulqueen had ordered, and this undermined him in supervising his own subordinates. *Id.*

3    Orders of protection are "issued by the court to limit the behavior of someone who harms or threatens to harm another person. [They are] used to address various types of safety issues, including, but not limited to situations involving domestic violence ." New York State Unified Court System, *Obtaining an Order of Protection, available at* https://www.nycourts.gov/faq/ orderofprotection.shtml (last visited July 15, 2015). The Department's duties include serving orders of protection. NYC Finance, *Serving Process, available at* http://www1.nyc.gov/ site/finance/Sheriff-courts/ Sheriff-serving-legal-papers.page (last visited July 15, 2015). Solely for background and context, the Court takes judicial notice of these facts. *See, e.g., Ross v. Am. Exp. Co.,* 35 F.Supp.3d 407, 435 n. 27 (S.D.N.Y.2014) ("Courts may take judicial notice of data contained in Government reports."); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,* No. 07 Civ. 10470(SAS), 2013 WL 6869410, at *4 (S.D.N.Y. Dec. 30, 2013) ("Courts routinely take judicial notice of data on government websites."); *Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.,* 777 F.Supp.2d 424, 432 n. 6 (E.D.N.Y.2011) (taking judicial notice of state agency website).

Mulqueen also twice prevented Feliciano from earning overtime. First, on the Monday after Mulqueen learned that Feliciano had filed a complaint about the 2012 promotion process with the Equal Employment Opportunity Commission ("EEOC"), Mulqueen came to the Sheriff's office and stated that "there was no need for [Feliciano] to be there"; this prevented Feliciano from earning overtime that day. *Id.* ¶ 64. Second, on another unspecified occasion, Mulqueen adjusted Feliciano's schedule to an eight-hour shift, preventing him from earning overtime that day. *Id.* ¶ 66.

### B. Procedural History

**\*3** On August 26, 2013, Feliciano filed a charge with the EEOC. *Id.* ¶ 14. On May 20, 2014, Feliciano received a right-to-sue notice from the EEOC. *Id.* ¶ 15. On August 20, 2014, Feliciano filed his original complaint. Dkt. 1. On October 17, 2014, defendants moved to dismiss. Dkt. 13. On November 7, 2014, Feliciano filed an Amended Complaint, which is the operative complaint here. Dkt. 18.

On November 28, 2014, the defendants moved to dismiss the Amended Complaint, Dkt. 28, and submitted a supporting

brief, Dkt. 29 ("Def .Br."). On December 12, 2014, Feliciano filed a brief in opposition. Dkt. 34 ("Pl.Br."). On December 19, 2014, the defendants submitted a reply brief. Dkt. 35 ("Def. Reply Br") On June 3, 2015, the Court held argument.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558.

In considering a motion to dismiss, a court must accept as true all factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.,* enough to make the claim plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010) (citing *Twombly,* 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records* ).

To survive a motion to dismiss, "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Twombly,* 550 U.S. at 569 (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002)). Nevertheless, the elements of a prima facie case "provide an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." *Sommersett v. City of New York,* No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011).

## III. Discussion

**\*4** Feliciano brings failure to promote, retaliation, and hostile work environment claims against the City under Title VII, the NYSHRL, and the NYCHRL. The Court addresses the claims in that sequence. Feliciano also brings constitutional claims under both 42 U.S.C. § 1981 and 42 U.S.C. § 1983. The Court addresses those claims as brought first against the individual defendants, and then against the City. [4]

> [4]  Feliciano does not, and cannot, bring claims against the individual defendants under Title VII. *See Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004). He also has not brought claims against the individual defendants under either the NYSHRL or the NYCHRL.

The Court analyzes the claims under Title VII and the NYSHRL together, because the standards for liability under these statutes are the same. [5] The NYCHRL standard, however, is lower than the federal standard, *see, e.g., Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109–10 (2d Cir.2013); therefore, to the extent a particular allegation states a claim under federal law, the parallel claim under the NYCHRL also necessarily states a claim. Where, however, a Title VII claim is dismissed, a separate analysis is needed to determine whether the parallel NYCHRL allegation states a claim. *See id.* at 109.

> [5]  "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 107 n. 10 (2d Cir.2011) (citation omitted).

### A. Failure to Promote

Feliciano brings two claims of a discriminatory failure to promote—one based on race, the other on national origin. [6] Because these two claims arise from the same facts and are subject to the same legal standard, the Court reviews them together.

> [6]  As to both claims, Feliciano alleges, as to his protected characteristic, simply that he is Hispanic. Am. Compl. ¶ 4. Most courts that have addressed the issue have concluded that "whether being Hispanic constitutes a race or a

national origin category is a semantic distinction," *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F.Supp.2d 455, 459 (S.D.N.Y.1998), and that claims under either category can be brought based on a plaintiff's Hispanic origin. *See, e.g., id.; Serrano v. N.Y.S. Dep't of Envtl. Conservation,* No. 12 Civ. 1592(MAD)(CFH), 2013 WL 6816787, at *4 (N.D.N.Y. Dec. 20, 2013); *Morales v. N.Y.S. Dep't of Labor,* 865 F.Supp.2d 220, 241 n. 6 (N.D.N.Y.2012); *accord Deravin v. Kerik,* 335 F.3d 195, 202 (2d Cir.2003) ("[B]ecause racial categories may overlap significantly with nationality or ethnicity, the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible.") (internal quotation marks and citations omitted) (referring to *Alonzo* with approval). *But see Casanova v. Gen. Mills Rest., Inc.,* No. 94 Civ. 4386(FB), 1997 WL 473840, at *1 n. 1 (E.D.N.Y. Aug. 15, 1997) (finding that term "Hispanic" refers only to race).

To establish a prima facie case of discriminatory failure to promote under Title VII, a plaintiff must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (citation omitted). "[I]n establishing a prima facie case the plaintiff must show that '[he] applied for an available position for which [he] was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.' " *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir.1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

Here, only the last element is at issue. Defendants do not dispute that the Amended Complaint adequately pleads that Feliciano is a member of a protected class, that he applied for the position of Under–Sheriff, that he was denied the promotion, and that the City continued to seek, and eventually selected, an applicant with similar qualifications. The Amended Complaint also extensively pleads facts as to Feliciano's experience and qualifications for the position. Am. Compl. ¶¶ 33, 43, 48–50. But defendants dispute whether, as to the facts pled, the decision not to promote Feliciano occurred under circumstances giving rise to an inference of discrimination. *See* Def. Br. 9.

Under governing Second Circuit precedent, Feliciano has pled sufficient facts to show an inference of discrimination. The Circuit has held that when a plaintiff applies for and is denied a position, the fact that the position was filled by someone outside of the plaintiff's protected class is itself enough to give rise to such an inference. *See Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001); *see also Soderberg v. Gunther Int'l, Inc.,* 124 F. App'x 30, 31 (2d Cir.2005) (summary order) (burden to establish a prima facie case of discrimination is *de minimis,* and filling of position by employee 20 years junior to plaintiff was enough to support an inference of age discrimination); *Diaz v. N.Y.C. Transit Auth.,* 98 F. App'x 58, 59 (2d Cir.2004) (summary order) (finding inference of discrimination when the Transit Authority hired two younger white men instead of the 48–year–old African–American plaintiff); *Ellis v. Century 21 Dep't Stores,* 975 F.Supp.2d 244, 271 (S.D.N.Y.2013) (finding inference of discrimination when plaintiff expressed interest in a position, which was offered to a candidate outside the plaintiff's protected class a few days later). Here, it is undisputed that Mulqueen, who was selected as Under–Sheriff, is not Hispanic and thus is not in Feliciano's protected class. Given this Circuit's standard, the Amended Complaint, although otherwise barren of factual allegations indicative of discrimination, has pled a prima facie case of discriminatory failure to promote.

**\*5** Defendants' argument for dismissal is not that there is no inference of discrimination inherent in Mulqueen's promotion over Feliciano, but that any inference of discrimination is negated by the fact that a member of Feliciano's protected class (Lopez) *was* selected for an interview. *See* Def. Br. 10. But on a motion to dismiss, where there has been no discovery into facts that would shed light on defendants' intent, this argument cannot carry the day. Further, "courts have consistently emphasized that the ultimate issue [in Title VII cases] is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001) (emphasis in original). Therefore, that another Hispanic was eventually selected for an interview, although potentially probative at trial, is insufficient to defeat Feliciano's pleading at this stage.

The First Circuit's decision in *Chadwick v. WellPoint, Inc.,* 561 F.3d 38 (1st Cir.2009), illustrates the doctrinal point well. There, the plaintiff—a mother of four children-claimed that her employer failed to promote her based on gender

discrimination. *Id* . at 42. She alleged that she was denied a promotion "because of a sex—based stereotype that women who are mothers, particularly of young children, neglect their jobs in favor of their presumed childcare responsibilities." *Id.* In moving for summary judgment, the defendant-employer pointed out that the employee whom it did promote (over the plaintiff) was also a mother. *Id.* at 42 n. 4. But the First Circuit gave no weight to that fact in denying the employer's summary judgment motion. It stated: "[The employer's] assertion that [the promotee] was a mother of two does not receive weight in our assessment of the summary judgment motion for several reasons. First, it is not at all clear that this is relevant for our analysis, as the Supreme Court has emphasized that '[t]he principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole.' " *Id.* (quoting *Connecticut v. Teal,* 457 U.S. 440, 453–54 (1982)). "In other words," the First Circuit explained, "discrimination against one employee cannot be remedied solely by nondiscrimination against another employee in that same group." *Id.* (citing *Brown,* 257 F.3d at 252).

Defendants correctly note that the First Circuit in *Chadwick* did not categorically hold irrelevant the fact that the successful candidate was a member of the protected class, stating instead that it was "not at all clear" whether that candidate's status was relevant. Def. Reply Br.

3 (quoting *Chadwick,* 561 F.3d at 42 n. 4). But the relevance, if any, to that fact in a particular promotion decision cannot be determined on the pleadings. *Chadwick,* in fact, held that the fact that the prevailing applicant was a member of the same class could not be given weight even at the summary judgment stage, following discovery. And the facts pled by Feliciano are even less favorable to the employer than those in *Chadwick* because, unlike in *Chadwick,* the member of the protected group on whom the City relies (Lopez) was *not* ultimately chosen for the position, but was merely the runner-up.

*\*6* Defendants also note that the Amended Complaint has pled facts that may be read to support plausible non-discriminatory explanations for Feliciano's failure to be promoted, most notably that he, on the merits, was not among the top two candidates and therefore did not obtain a final interview. Def. Br. 10. But on a motion to dismiss, where a prima facie case has been pled, the Court cannot find as matter of fact that a defendant's motives were non-discriminatory so as to defeat that inference. "Whether there

existed non-pretextual, non-discriminatory explanations for the defendants' employment decisions ... is not properly decided on a motion to dismiss for failure to state a claim." *Green v. District Council 1707,* 600 F. App'x 32, 33 (2d Cir.2015) (summary order) (quoting *Brown v. Daikin Am. Inc.,* 756 F.3d 219, 230–31 (2d Cir.2014)).

Because Feliciano has pled a prima facie case of discriminatory failure to promote under Title VII, the motion to dismiss is denied as to his Title VII, NYSHRL, and NYCHRL claims of such a failure against the City.

### B. Retaliation

To plead a prima facie case of retaliation under Title VII, a complaint must satisfactorily plead these elements: (1) "participation in a protected activity known to the defendant"; (2) "an employment action disadvantaging the plaintiff"; and (3) "a causal connection between the protected activity and the adverse employment action." *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004) (internal quotation marks omitted). Although the Amended Complaint here is not a model of clarity, it appears to assert four possible acts of retaliation: (1) Feliciano's transfer to the Bronx, (2) excessive supervision of Feliciano by Mulqueen, (3) the denial of overtime by Mulqueen, and (4) the decision not to promote Feliciano to Under–Sheriff in November 2012. Am. Compl. ¶¶ 60, 62, 64, 66. The Court addresses these acts in turn.

### 1. Transfer to the Bronx

Feliciano alleges that "in retaliation for his complaints and prior lawsuits," he was transferred to the Bronx in early 2013. *Id.* ¶ 62. However, the Amended Complaint falters as to the first and second elements of a Title VII retaliation claim.

The Amended Complaint identifies two instances of protected speech that ostensibly motivated defendants to retaliate against him. *Id.* First, Feliciano argues that he was transferred to the Bronx in retaliation for complaining to Fucito about being passed over for promotion. *Id.* However, as pled, this complaint was not a protected activity. For protest about an employment act to be considered protected activity, the plaintiff must believe in good faith that the underlying employment practice is unlawful. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'g, P.C.,* 716 F.3d 10, 14 (2d. Cir.2013); *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998). A failure to promote is unlawful under Title VII when it is based on, *inter alia,* an individual's race or national origin. *See* 42 U.S.C. §

2000e–2. But the Amended Complaint nowhere alleges that Feliciano protested his non-promotion to Fucito because he believed his employer's behavior was unlawful. It alleges only that Feliciano "complained about being passed over for promotion." Am. Compl. ¶ 60. Feliciano does not allege that he believed he had been passed over because of his status as a Hispanic.

*7  In any event, even assuming that the Amended Complaint adequately pled such a belief by Feliciano at the time he complained to Fucito, it fails to plead that this was conveyed to Fucito. "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct protected by Title VII." *Galdieri,* 136 F.3d at 292. Even assuming that Feliciano believed his non-promotion was unlawful, he had to effectively communicate this belief to Fucito when he complained, as opposed to simply complaining about the outcome of the hiring decision. *See Douglass v. Rochester City Sch. Dist.,* 522 F. App'x 5, 8 (2d Cir.2013) (summary order) (letter to a human relations officer requesting a change of supervisor without specifically mentioning unlawful mistreatment held not protected activity). The Amended Complaint's anodyne allegation that Feliciano "complained about being passed over for promotion," Am. Compl. ¶ 60, does not suffice to plead that the City or Fucito were on notice of Feliciano's belief that his non-promotion had been the product of discrimination.

The second instance of protected speech that the Amended Complaint identifies as having motivated Feliciano's transfer to the Bronx is the fact that he had earlier filed two discrimination lawsuits against the City. *Id.* ¶ 62. The filing of these lawsuits qualifies as protected activity, *see* 42 U.S.C. § 2000–e3; *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 65 (2d Cir.1992); *DeCintio v. Westchester Cnty. Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987), and the City necessarily knew about these lawsuits. But the transfer to the Bronx, as alleged in the Amended Complaint, does not constitute an adverse employment action. A transfer of an employee to a new location can qualify as an adverse employment action when it is "a change in working conditions ... more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galyaba v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation omitted). As such, even "[a] lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." *Patrolmen's Benevolent Ass'n of City of N.Y v. City of New York,* 310 F.3d 43, 51 (2d Cir.2002); *see also Lore v. City of Syracuse,* 670 F.3d 127, 170 (2d Cir.2012) ("The transfer of an employee from an 'elite' position to one that is 'less prestigious ... with little opportunity for professional growth' is sufficient to permit a jury to infer that the transfer was a materially adverse employment action.") (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006)). The Amended Complaint does not, however, allege any facts indicating that the transfer to the Bronx adversely affected Feliciano. Beyond the conclusory allegation that "in retaliation for his complaints and prior lawsuits, Plaintiff was transferred to the Bronx in early 2013," Am. Compl. ¶ 62, Feliciano does not provide any information as to how the transfer impacted him. Because he does not allege any difference in pay, responsibilities, prestige, or any other factor that would indicate he was at all negatively affected, the Court holds that Feliciano has not shown that the transfer to the Bronx was adverse.

*8  Accordingly, Feliciano's Amended Complaint does not plead sufficient facts to support a claim under Title VII or the NYSHRL that his 2013 transfer to the Bronx was retaliatory.

Feliciano's NYCHRL claim of retaliatory transfer must be analyzed independently. *Mihalik,* 715 F.3d at 113. A prima facie case of retaliation under the NYCHRL requires the plaintiff to show that "(1) [he] participated in a protected activity known to defendants; (2) defendants took an action that disadvantaged him; and (3) a causal connection exists between the protected activity and the adverse action." *Fletcher v. Dakota, Inc.,* 948 N.Y.S.2d 263, 269 (1st Dep't 2012); *accord Mihalik,* 715 F.3d at 112; *Albunio v. City of New York,* 889 N.Y.S.2d 4, 5–6 (1st Dep't 2009), *aff'd,* 947 N.E.2d 135 (N.Y.2011).

As with Title VII retaliation, speaking out in opposition to discrimination is a protected activity under the NYCHRL. *See* N.Y. City Admin. Code § 8–107–7. NYCHRL claims must be reviewed considering the totality of the circumstances, *Mihalik,* 715 F.3d at 113, and the New York Court of Appeals has held that an employee can oppose his employer's discrimination without expressly mentioning discrimination as the source of his discontent. *See Albunio,* 947 N.E.2d at 138 (finding that plaintiff took action opposing employer's discrimination toward a prospective employee even though plaintiff did not specifically mention discrimination as a reason for disapproving of employer's conduct); *Fletcher,* 948

N.Y.S.2d at 271 ("[U]nder the city HRL, a jury may infer from other evidence that a plaintiff's activity is in fact opposition to discrimination even where the plaintiff does not say so in so many words.") (internal quotation marks omitted); *accord Mihalik,* 715 F.3d at 112. Accordingly, Feliciano's failure to explicitly indicate to Fucito that he was complaining about his non-promotion on discrimination grounds does not itself sink his NYCHRL claim of retaliation.

In fact, although Feliciano's allegations as to the first element are thinly pled, they appear to pass muster under the NYCHRL's lenient standard. Drawing all inferences in Feliciano's favor, and giving due attention to the context (Feliciano's filing of previous discrimination lawsuits, including based on a similar failure to promote), Fucito's response suggests that he understood Feliciano's complaint to concern discrimination. It is therefore reasonable to infer that Feliciano was "opposing discrimination" when he complained to Fucito about his nonpromotion.

However, Feliciano's claim of retaliatory transfer, as pled, does not make out the second element—a disadvantageous action. To be sure, the NYCHRL's standard for what constitutes disadvantageous conduct is significantly broader than the Title VII standard. The text of the NYCHRL specifies that an alleged retaliatory act "need not result in ... a materially adverse change in the terms and conditions of employment" in order to be actionable. N.Y. City Admin. Code § 8–107–7. And the Appellate Division, First Department has stated that "no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity.'" *Williams v. N.Y.C. Housing Auth.,* 872 N.Y.S.2d 27, 34 (1st Dep't 2009). Here, however, Feliciano has not pled *any* facts that would allow an inference that he was disadvantaged by his transfer. Although it is easy to imagine reasons why a transfer could be disadvantageous —*e.g.,* it might result in a change in title, responsibilities, or compensation, or a much longer commute, *see Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006); *Terry v. Ashcroft,* 336 F.3d 128, 146 (2d Cir.2003)—it would be pure speculation—rather than fair inference—to assume any of them existed here. Accordingly, because the Amended Complaint lacks any allegation supporting a finding of disadvantageous action, the Court finds that Feliciano has failed to plead enough facts to support a claim of retaliatory transfer under the NYCHRL.

**2. Excessive Scrutiny**

**\*9** Feliciano next claims that Mulqueen retaliated against him by excessively scrutinizing him in the workplace. That claim also fails to support a retaliation case under Title VII because, as pled, there was no *materially* adverse action, as the law requires. *See White,* 548 U.S. at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."); *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 567 (2d Cir.2011). The standard for a materially adverse action is whether an act "could ... have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 209 (2d Cir.2006).

The Amended Complaint alleges only that Mulqueen "repeatedly criticized" Feliciano for not completing protection orders in time. Am. Compl. ¶ 67. It contains no further allegations as to this point. It is well settled, however, that mere criticism of an employee's work performance does not rise to the level of an adverse employment action. *See Chang v. Safe Horizons,* 254 F. App'x 838, 839 (2d Cir.2007) (summary order); *Lucenti v. Potter,* 432 F.Supp.2d 347, 364 (S.D.N.Y.2006); *see also Stoddard v. Eastman Kodak Co.,* 309 F. App'x 475, 479 (2d Cir.2009) (summary order) ("very unlikely" that alleged close scrutiny, without more, constituted adverse employment action); *Constance v. Pepsi Bottling Co. of N.Y.,* No. 03 Civ. 5009(CBA)(MDG), 2007 WL 2460688, at *36 n. 15 (E.D.N.Y. Aug. 24, 2007) (doubting whether excessive surveillance on the job can constitute adverse employment action); *Dixon v. City of New York,* No. 03 Civ. 343(DLI)(VVP), 2008 WL 4453201, at *16 (E.D.N.Y. Sept. 30, 2008) (excessive scrutiny, without more, does not constitute adverse employment action). The Court therefore holds that Feliciano fails to state a claim for retaliation in excessive scrutiny under Title VII and the NYSHRL.

As already noted, Feliciano's NYCHRL claim must be reviewed independently. However, even assuming *arguendo* that that claim meets the more lenient standard of the NYCHRL for disadvantageous action,[7] Feliciano's claim under the NYCHRL also fails because it does not show any causal connection. The Amended Complaint does not allege what protected activity, if any, Feliciano was being retaliated against for when Mulqueen excessively scrutinized him. As with his claim of retaliatory transfer to the Bronx, only his complaint to Fucito upon being denied promotion

and his past filing of two lawsuits could serve as the protected activity forming the basis for the retaliation. The facts pled in the Amended Complaint do not show a causal connection between either instance of protected conduct and the alleged retaliatory act.

[7]     The Second Circuit has stated that "even a single comment may be actionable in the proper context," *Mihalik,* 715 F.3d at 113, and Feliciano complains of several instances of criticism by Mulqueen. Accepting as true the facts pled, a jury could reasonably find that Mulqueen's scrutiny deterred Feliciano from further opposing his employer's perceived discriminatory practices.

First, to the extent that Feliciano's claim is premised on the protected conduct of complaining to Fucito about the failure to promote him, there is no indication that Mulqueen was aware of that complaint. And, even assuming that Mulqueen was aware, Feliciano does not point to any direct evidence that would show a causal connection between the comment to Fucito and the excessive scrutiny. Absent direct evidence of causal connection, Feliciano could, in theory, point to temporal proximity as an indirect indicator of causal connection. *See Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP,* 987 N.Y.S.2d 338, 343 (1st Dep't 2014). However, Feliciano does not provide the date of any of the times he was allegedly criticized by Mulqueen, nor does he allege when Mulqueen's change in policies was implemented. It is therefore impossible for the Court to determine the temporal proximity of the alleged retaliatory acts to the protected conduct. "Simply stating that the NYCHRL encompasses a broader standard does not absolve [plaintiff] from putting forth evidence tending to show a causal connection between [his protected act] ... and the alleged retaliatory actions." *EEOC v. Bloomberg, L.P.,* 967 F.Supp.2d 816, 862 (S.D.N.Y.2013); *see also Adams v. City of New York,* 837 F.Supp.2d 108, 128 (E.D.N.Y.2011) ("The broad remedial purpose of the NYCHRL does not change the requirement for causal connection between the protected activity and the adverse employment action.").

**\*10**  To the extent that Feliciano's NYCHRL claim is based on his filing of two past lawsuits, he again does not point to any direct evidence of causal connection. Feliciano cannot rely on temporal proximity to show causation because "it is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.,* 641 F.Supp.2d 269, 288

(S.D.N.Y.2009) (citation omitted). Under both federal and state law, where no additional facts are pled, temporal proximity ordinarily requires that the allegedly retaliatory act occur within two months of the plaintiff's protected activity. *Compare Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 224 (2d Cir.2001) (temporal proximity sufficient to support causation when retaliatory act occurred less than a month after protected conduct), *and Kim,* 987 N.Y.S.2d at 343 ("[P]laintiff's termination two months after the second complaint may establish the necessary causal nexus between the protected activity and her discharge.") (citations omitted), *with Stoddard,* 309 F. App'x at 480 (causal connection not adequately pled when protected activity occurred two months before the alleged adverse action), *and O'Reilly v. Consol. Edison Co. of N.Y., Inc.,* 173 F. App'x 20, 22 (2d Cir.2006) (summary order) (causal connection not adequately pled when protected activity occurred three months before the alleged retaliatory conduct). Here, the alleged retaliatory act occurred years after the protected activity—the lawsuits were filed in 2006 and 2009 and settled in 2007 and 2010, respectively.

Because the Complaint fails to show any causal connection between the protected conduct and the alleged retaliation, Feliciano's claim for excessive scrutiny under the NYCHRL also fails.

### 3. Denial of Overtime

Feliciano next claims that Mulqueen denied him overtime in retaliation for filing an EEOC charge. Am. Compl. ¶ 63. Filing a complaint with the EEOC is a protected activity. *See* 42 U.S.C. § 2000e–3. But, on the facts pled, the denial of overtime work to Feliciano does not constitute an adverse action under Title VII.

The Amended Complaint alleges that Feliciano was denied overtime work on two days, *see* Am. Compl. ¶¶ 64, 66; as to one of these instances, however, it does not allege that it took place after the protected activity, let alone when, *id.* ¶ 66. The Amended Complaint's well-pled allegations therefore consist of only one instance of denial of overtime.[8]  Denial of overtime *can* amount to an adverse employment action. *See, e.g., Mazyck v. Metro. Transp. Auth.,* 893 F.Supp.2d 574, 589 (S.D.N.Y.2012); *Little v. Nat'l Broad. Co.,* 210 F.Supp.2d 330, 379 (S.D.N.Y.2002). But the circumstances in those cases involved repeated denials, not a denial of overtime on a single day. Courts are divided as to whether a *single* instance of denial of overtime constitutes a materially adverse

employment action. *Compare Kohutka v. Town of Hempstead,* 994 F.Supp.2d 305, 314 (E.D.N.Y.2014) (allegation that plaintiff was denied overtime pay, even on one occasion, could be enough to meet the materially adverse standard), *and Gordon v. U.S. Capitol Police,* 778 F.3d 158, 162–63 (D.C.Cir.2015) (denial of two days of overtime, totaling a $850 loss for plaintiff, was a materially adverse action), *with Merritt v. N.Y.C. Transit Auth.,* No. 06 Civ. 5548(RRM) (LB), 2008 WL 4508258, at*5 (E.D.N.Y. Sept. 30, 2008) (deprivation of overtime of less than two hours held not enough to be an adverse action), *and Galvan v. Comty. Unit Sch. Dist. No. # 300,* 46 F.Supp.3d 836, 841 (N.D. Ill 2014) (in the Seventh Circuit, "[l]ost overtime is a materially adverse employment action only if the plaintiff shows that the overtime was a 'significant and recurring part of an employee's total earnings similar to a raise' ") (quoting *Lewis v. City of Chicago,* 496 F.3d 645, 653–54 (7th Cir.2007)).

8        The Amended Complaint generically alleges that "Mulqueen purposely deprived Plaintiff of overtime opportunities," Am. Compl. ¶ 63, but this unspecific and conclusory statement does not permit the Court to infer a broad pattern of denial of overtime work. *See Iqbal,* 556 U.S. at 678 ("[C]omplaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' ") (quoting *Twombly,* 550 U.S. at 557).

**\*11** On the facts pled here, the one instance in which Feliciano was denied overtime work is not enough to be material. Unlike the complaint in *Gordon,* the Amended Complaint is silent as to the amount or value of overtime lost. It does not indicate whether the lost opportunity was for a few minutes of work, for an hour, or for more. Feliciano has not pled facts to support that the denial rose above a "minor workplace inconvenience." *Avillan v. Donahoe,* 483 F. App'x 637, 638 (2d Cir.2012) (summary order). The Amended Complaint's sparse allegations do not support that the denial of overtime in this case was sufficient to "dissuade[ ] a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination," *Kessler,* 461 F.3d at 209. The Court therefore dismisses Feliciano's Title VII and NYSHRL retaliation claim to the extent it is based on the denial of overtime.

Feliciano's claim of retaliatory denial of overtime under the NYCHRL must be analyzed separately. While "even a single comment may be actionable under the proper context,"

*Mihalik,* 715 F.3d at 113, a Complaint still must provide enough facts for "a jury [to be able to] reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity,' " *Williams,* 872 N.Y.S.2d at 34 (citation omitted). As explained above, Feliciano fails to identify the amount of time lost as well as the value to Feliciano of the overtime lost. Nor does the context of the denial by Mulqueen support finding the alleged retaliatory action disadvantageous. Feliciano alleges only that Mulqueen "stated that he would supervise and there was no need for Plaintiff to be there." Am. Compl. ¶ 64. Absent any other allegations, and mindful that "courts may still dismiss truly insubstantial cases [under the NYCHRL]," *Mihalik,* 715 F.3d at 113 (internal quotation marks omitted), Feliciano's undeveloped allegations fail to state a claim for retaliatory denial of overtime under the NYCHRL.

**4. Failure to Promote**

The final instance of retaliation alleged in the Amended Complaint is the failure to promote Feliciano in November 2012, which is claimed to have been in retaliation for his 2006 and 2009 lawsuits. Am. Compl. ¶ 60. Feliciano's filing of lawsuits claiming discrimination was a protected activity, and Feliciano undisputedly experienced an adverse employment action when he was denied promotion to Under–Sheriff The parties dispute, however, whether Feliciano has adequately pled a causal connection between the lawsuits and the failure to promote.

Temporal proximity here provides only limited support for an inference of retaliation because Feliciano's lawsuits were filed at least three years, and were settled at least two years, before the decision not to promote him. To be sure, courts apply a more lenient standard to temporal proximity when the allegedly retaliatory act was a non-promotion, as opposed to a termination. That is because while an employer who wishes to fire an employee is apt to do so immediately after the act, "opportunities for retaliation do not necessarily immediately present themselves" in the context of promotion. *Mandell v. County of Suffolk,* 316 F.3d 368, 384 (2d Cir.2003); *see also Raneri v. McCarey,* 712 F.Supp.2d 271, 280 (S.D.N.Y.2010) (finding valid retaliation claim, despite passage of two years following protected activity). The Amended Complaint here does not allege whether, prior to 2012, there had been intervening opportunities to retaliate against Feliciano for his lawsuits, and if so, how his supervisors responded. It would present a close question whether the passage of time here, considered alone, would permit a trier of fact to find the

2015 WL 4393163

decision not to promote Feliciano in 2012 derived from his lawsuits.

**\*12** The Amended Complaint, however, does allege an additional fact. It alleges that, in response to Feliciano's complaints about his non-promotion, Fucito, the Sheriff, told Feliciano that "if you were selected for an interview people would think it is because you brought two lawsuits." Am. Compl. ¶ 60.

In a retaliation case, causation can also be shown "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Galimore,* 641 F.Supp.2d at 288 (citing *Gordon v. N.Y. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000)). Here, Feliciano argues, Fucito's statement is such evidence. The Court agrees. To be sure, as defendants note, Fucito's statement on its face does not explicitly recite a retaliatory motive. It can be read in multiple ways. As defendants note, the statement does not, on its face, admit that Feliciano merited the promotion over the prevailing applicant (Mulqueen) or the runner-up (Lopez). Fucito's statement can be read to mean that Feliciano was not given a courtesy interview so as not to send a message that candidates who filed lawsuits could be given preference in the hiring process. As defendants further note, the Amended Complaint is also elliptical about Fucito's role in the hiring process, and whether his statements reflected any knowledge as to how the decision not to promote Feliciano was reached. On the other hand, Fucito was, as alleged, the Sheriff at the time that Feliciano was not promoted to Under–Sheriff Am. Compl. ¶ 8. And Fucito's statement does reflect that, notwithstanding the passage of time, Feliciano's two lawsuits against the City were still remembered among his supervisors. It supports finding causal connection here, because, as in *Mandell,* the facts pled "suggest[ed] that negative attitudes towards [the plaintiff] caused by [his protected conduct] lingered for ... years." *Mandell,* 316 F.3d at 383.

Although the question is reasonably close, in light of *Mandell,* the Court holds that the Amended Complaint has adequately pled causation. On a motion to dismiss, drawing "all inferences in the plaintiff's favor," *Allaire Corp.,* 433 F.3d at 249–50, it is reasonable to infer that Fucito, as the Sheriff, would have knowledge of the reasons behind promotion decisions made by officials under his supervision, and that his statement bespoke that Feliciano's prior lawsuits had played some role in the Department's reasons for not promoting him. *See, e.g., Ellis v. Knight Transp., Inc.,* No. 11 Civ. 1300(AWI)(MJS), 2012 WL 6554382, at \*3 (E.D.Cal. Dec. 14, 2012)

(reasonable to infer that company's Vice–President of Human Resources, given his position, would know about the reasons for an employee's termination).

The Court accordingly narrows Feliciano's retaliation claim, so as to limit that claim to one of retaliatory failure to promote him based on his having filed two previous discrimination lawsuits. With the claim thus limited, it is viable as pled. The Court therefore denies defendants' motion to dismiss Feliciano's Title VII, NYSHRL, and NYCHRL retaliation claims, as limited herein.

### C. Hostile Work Environment

**\*13** A hostile work environment claim under Title VII:

> [R]equires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. *Leibovitz v. N.Y.C. Transit Auth.,* 252 F.3d 179, 188 (2d Cir.2001) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)); *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999). This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry,* 115 F.3d at 149 (citation and internal quotation marks omitted). Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. *Brennan,* 192 F.3d at 318; see also *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (noting that "we have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment").

*Alfano v. Costello,* 294 F.3d 365, 373–74 (2d Cir.2002). In analyzing a hostile work environment claim, the Court must "assess the totality of the circumstances, considering a variety of factors, including the frequency of the

2015 WL 4393163

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 102 (2d Cir.2010) (internal quotation marks and citation omitted).

The Amended Complaint does not allege facts that meet (or even approach) this standard. It does not supply any specific examples as to how Feliciano's work environment was hostile. Instead, it references Feliciano's other claims and states generally that defendants engaged in "various severe and hostile actions towards Plaintiff." Am. Compl. ¶¶ 79, 110. This general, conclusory allegation does not advance Feliciano's cause. And construing the Amended Complaint generously, the occurrences to which his hostile work environment claim appears to advert include, at most, (1) the change in office policies with regards to orders of protection, which limited Feliciano's responsibility, (2) the criticism Feliciano endured for failing to issue protection orders "ASAP," and (3) the change in Feliciano's duties, which added to his workload the duties normally assumed by another officer. *See* Pl. Br. 19.

 **\*14**  These claims are a far cry from reciting a hostile work environment claim under Title VII. There is no allegation that any of these acts was motivated by Feliciano's race, national origin, or exercise of a protected activity. And the acts alleged "lack the pervasiveness, ridicule, or intimidation necessary to create a hostile work environment." *Mendez–Nouel v. Gucci Am., Inc.,* No. 10 Civ. 3388(PAE), 2012 WL 5451109, at \*10 (S.D.N.Y. Nov. 8, 2012). Because of these deficiencies, the Amended Complaint falls well short of the standard required for a hostile work environment claim to survive dismissal.

The NYCHRL, too, "is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik,* 715 F.3d at 113 (internal citations omitted); *see also Bloomberg L.P.,* 967 F.Supp.2d at 836; *Williams,* 872 N.Y.S.2d at 39–40 (core issue in NYCHRL discrimination claims is whether a plaintiff has been unequally treated based on his or her protected status). Here, the Amended Complaint does not allege that the limited acts on which its hostile work environment claim is based were discriminatory. The NYCHRL claim therefore cannot survive. Defendants' motion to dismiss Feliciano's hostile work environment claims is therefore granted in its entirety.

**D. Liability under 42 U.S.C. §§ 1981 and 1983**
As noted, Feliciano also brings claims under both §§ 1981 and 1983. Claims of discrimination, retaliation, and hostile work environment under these statutes match those under Title VII. *See Lewis v. City of Norwalk,* 562 F. App'x 25, 29 (2d Cir.2014) (summary order) (analyzing Title VII and § 1983 retaliation claims under the same framework); *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010) (retaliation claims under § 1981 implicate same standard as retaliation under Title VII); *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (discrimination and hostile work environment claims implicate same standard under § 1981 and § 1983 as under Title VII). But to hold a defendant liable in an individual or official capacity under these statutes, more must be shown, as explained and applied below.

At the outset, the Court notes that because Feliciano has failed adequately to plead a hostile work environment claim under Title VII, his §§ 1981 and 1983 hostile work environment claims also must be dismissed. *Patterson,* 375 F.3d at 225. Similarly, to the extent that the Court has narrowed Feliciano's retaliation claim based on Title VII, his §§ 1981 and 1983 claims of retaliation must also be narrowed.

The Court first addresses Feliciano's claims under §§ 1981 and 1983 against individual defendants, and then addresses the liability under these statutes of the City and of defendants sued in their official capacities.

**1. Individual Liability**
To hold a defendant liable in his individual capacity under §§ 1981 or 1983, a plaintiff must establish not just a substantive violation of law, but also the personal involvement of the defendant in that violation. *Patterson,* 375 F.3d at 229. Personal involvement can be established by showing that:

 **\*15**  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant

was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Here, the Amended Complaint brings claims against Frankel, Fucito, Mulqueen, Domenech, and Sammarco in their individual capacities. However, the Amended Complaint contains no facts specific to Frankel and Domenech, other than their job titles. *See* Am. Compl. 7, 10. Feliciano attempts to rescue these claims in his brief opposing dismissal, asserting that Domenech "made the final decision" as to which candidate would be promoted, and that Frankel, as Commissioner of the Department of Finance, failed to stop the discrimination against Feliciano. *See* Pl. Br. 22 n. 6, 23. It is axiomatic, however, that the *Complaint* must plead "enough facts to state a claim to relief that is plausible on its face," *Twombly,* 550 U.S. at 570, and that "a party may not amend its pleadings in its briefing papers," *Maguire v. A.C. & S., Inc.,* No. 14 Civ. 7578(PAE), 2014 WL 6611748, at *4 (S.D.N.Y. Nov. 21, 2014) (quoting *Roche Diagnostics GmbH v. Enzo Biochem, Inc.,* 992 F.Supp.2d 213, 219 (S.D.N.Y.2013)). Because the Amended Complaint here fails to specify the role played by Frankel and Domenech in alleged discriminatory or retaliatory conduct towards Feliciano, the motion to dismiss is granted as to all §§ 1981 and 1983 claims against them in their individual capacities.

As to Fucito, Mulqueen, and Sammarco, the Amended Complaint makes only generic allegations against these defendants with respect to claims of a discriminatory failure to promote. *See, e.g.,* Am. Compl. ¶¶ 82–83. It does not allege the personal involvement of any named individual defendant. Mulqueen and Fucito are not identified as participants in that decision, in any way. As for Sammarco, he is alleged to be "one of the panelists who interview candidates for promotion," Am. Compl. ¶ 42; however, Feliciano alleges that he was not selected for an interview, *id.* ¶ 40, and there is no allegation that Sammarco played any role in the antecedent decision of whom to select for an interview, the point at which Feliciano is alleged to have been eliminated from contention. The Amended Complaint therefore also fails to plead personal involvement by Sammarco in any relevant act. [9]

[9]

As with Domenech and Frankel, Feliciano attempts to buttress these claims in his brief opposing dismissal, but the Court cannot consider such allegations. *See, e.g., Weir,* 2008 WL 3363129, at *9.

The Court therefore dismisses the §§ 1981 and 1983 claims of national origin and racial discrimination against Fucito, Mulqueen, and Sammarco in their individual capacities.

**\*16** For similar reasons, Feliciano's §§ 1981 and 1983 retaliation claims must be dismissed: The Amended Complaint fails to allege any personal involvement by these defendants in the sole act of retaliation that the Court has held viable—the allegedly retaliatory failure to promote. The Court therefore dismisses all §§ 1981 and 1983 claims of retaliation against Fucito, Mulqueen, and Sammarco in their individual capacities.

### 2. Official and Municipal Liability

When the defendant sued for discrimination, retaliation, or hostile work environment under §§ 1981 and 1983 is a municipality or an individual sued in his official capacity, the plaintiff must show that the challenged acts were performed pursuant to a municipal policy or custom. *See Patterson,* 375 F.3d at 226 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733–36 (1989); *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 692–94 (1978)). The Amended Complaint never so alleges. Feliciano does argue, in his brief opposing dismissal, that the City's failure to promote him on two occasions, combined with the allegations in his two prior lawsuits, bespeak a "pattern and practice" by the City of discrimination against Hispanic employees. Pl. Br. 21. But even if the Court could consider such allegations in a legal brief, they would not state a claim because, to plead a *Monell* claim, it is insufficient to cite to past lawsuits only without elaborating on the outcome of the suits or the municipal entity's response to the claims therein. *See, e.g., Jean–Laurent v. Wilkerson,* 461 F. App'x 18, 22–23 (2d Cir.2012) (summary order) (holding citation to multiple similar lawsuits predating the current claim not probative of existence of a policy or custom); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir.1986) (evidence of past claims, *together* with evidence of the City's response to those claims, was relevant).

Significantly, the Amended Complaint does not point to any evidence of a municipal policy or custom, let alone any policy or custom of engaging in acts akin to those pled here. The

2015 WL 4393163

Court therefore grants the motion to dismiss Feliciano's §§ 1981 and 1983 claims against the City and other defendants in their official capacities.

## II. Conclusion

For the foregoing reasons, the Court grants the motion to dismiss the following claims in the Amended Complaint: (1) the hostile work environment claim under Title VII, the NYSHRL, and the NYCHRL; and (2) all claims brought under §§ 1981 and 1983, whether against the City or the individual defendants. The Court narrows but does not dismiss the retaliation claim brought against the City under Title VII, the NYSHRL, and the NYCHRL. The Court denies the motion to dismiss the discriminatory failure to promote claim.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 28.

The case will now proceed to discovery. By July 22, 2015, the parties shall jointly submit a proposed case management plan, consistent with the Court's individual practices, *see* http://www .nysd.uscourts.gov/judge/Engelmayer, contemplating the close of fact discovery by November 23, 2015. A next conference in the case will be held on December 18, 2015, at 9 a.m., which will function as a pre-motion conference in the event that either party has submitted a letter indicating an intention to move for summary judgment, *see* http://www.nysd.uscourts.gov/judge/Engelmayer, and which otherwise will be used to set a trial date and deadlines for the filing of pre-trial submissions.

**\*17** SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4393163

---

End of Document        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 167559
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lazar FELBERBAUM, Plaintiff,

v.

SEQUIUM ASSET SOLUTIONS and
LVNV FUNDING LLC, Defendants.

21-cv-9513 (NSR)
|
Signed January 11, 2023

**Attorneys and Law Firms**

Eliyahu R. Babad, Stein Saks, PLLC, Hackensack, NJ, for
Plaintiff.

Brendan Hoffman Little, Lippes Mathias LLP, Buffalo, NY,
for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Lazar Felberbaum ("Plaintiff") commenced the
instant action against Defendants Sequium Asset Solutions,
LLC ("Defendant Sequium") and LVNV Funding LLC
("Defendant LVNV") (collectively, "Defendants") alleging
claims arising under the Fair Debt Collection Practices
Act, 15 U.S.C. § 1692, et seq. ("FDCPA"). (Complaint
("Compl.") (ECF No. 1).) Before the Court is Defendants'
motion pursuant to Federal Rule of Civil Procedure 12(c)
for judgment on the pleadings. For the following reasons,
Defendants' motion is GRANTED, and Plaintiff's Complaint
is dismissed.

**BACKGROUND**

The following facts are derived from the Complaint and are
accepted as true for the purposes of this motion except as
otherwise noted.

Plaintiff is a New York resident who "allegedly" incurred a
debt to non-party Citibank, N.A. ("Citibank"), which arose
primarily out of personal credit transactions. (Compl. at ¶¶ 7,
16.) The debt became "deliquen[t]" on January 15, 2009. (Id.

at Ex. A.) Defendant LVNV later purchased this delinquent
debt and contracted with Defendant Sequium to collect the
debt originally owed to Citibank and now owed to Defendant
LVNV. (Id. at ¶¶ 19, 23.)

On or around December 4, 2020, Defendants sent Plaintiff
a collection letter (the "Letter") regarding the alleged debt,
which read as follows:

> This notice is being sent to you by a collection
> agency. Please be advised that LVNV Funding LLC,
> the Current Creditor-Debt Purchaser, has purchased the
> account referenced above. Our records further indicate that
> the judgment that was awarded on 12/13/2013 remains
> unresolved. This is the date on which the balance became
> due.

> (Id. at ¶ 24, Ex. A.)

The judgment referenced in the Letter totaled $27,212.94. (Id.
at ¶ 25, Ex. A.) The Letter stated a "Total Due" in the amount
of $27,212.94 (id. at ¶ 26.), but the Letter did not state whether
interest was accruing on this amount (id. at ¶¶ 27–29.). In the
Letter, Defendants offered to settle the existing debt for 65%
of the "Total Due." (Id. at ¶ 45.) Defendants, however, did
not (1) include a deadline by which Plaintiff had to accept the
offer or (2) otherwise state that the offer would expire at a
later unspecified date. (Id. at ¶¶ 46–47.)

Plaintiff alleges the "amount stated as due is ... false,
deceptive, misleading, and unfair." (Id. at ¶ 39.) In particular,
Plaintiff asserts that Defendants did not disclose that interest
was accruing on the balance at the New York post-judgment
rate of "nine per centum per annum." (Id. at ¶ 31.) As a
result, the actual amount due was $49,051.33.[1] (Id. at ¶
33.) Plaintiff further avers that Defendants would "not have
allowed Plaintiff to accept the settlement offer at any time"
and would "refuse to honor the offer" should Plaintiff accept.
(Id. at ¶¶ 49, 57.) The offer, alleges Plaintiff, was "illusory"
and "merely a collection tactic" "to coerce" Plaintiff into
paying the debt or to "sow ... confusion." (Id. at ¶ 62–63.)

1   This estimated balance represents the accrued
    interest as of November 17, 2021, when Plaintiff
    filed the Complaint. (Compl. at ¶ 33.)

**\*2** Defendants answered the Complaint (ECF Nos. 9 & 11)
and now move for judgment on the pleadings pursuant to Rule
12(c) of the Federal Rules of Civil Procedure. (ECF No. 19.)

2023 WL 167559

Defendants also move to strike Plaintiff's sur-reply (ECF No. 24), which Plaintiff styled as a "Notice of Supplemental Authority" and filed in opposition to Defendants' Rule 12(c) motion (ECF No. 23-1). Although Plaintiff did not seek leave to file a sur-reply, *see* Rule 3(B) of this Court's Individual Practices in Civil Cases, this Court nonetheless DENIES Defendant's Motion to Strike Plaintiff's Sur-Reply and deems Plaintiff's sur-reply papers accepted for the purposes of adjudicating the present Rule 12(c) motion.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). [2] "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.' " *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The standard for analyzing a motion for judgment on the pleadings under Rule 12(c) is identical to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *see also* Fed. R. Civ. P. 12(b)(6).

[2]

Defendant Sequium attaches two exhibits to its answer. (*See* ECF Nos. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).) Because Plaintiff had no notice of the exhibits prior to their filing, this Court declines to consider them in adjudicating the present 12(c) motion. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders *they had notice* and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion.") (emphasis added)).

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide

the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. 678 (quoting *Twombly*, 550 U.S. at 555). Likewise, "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

**\*3** The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692e. To achieve this, the FDCPA imposes, "among other things, certain notice and timing requirements on efforts by 'debt collectors' to recover outstanding obligations." *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 58 (2d Cir. 2004). Section 1692k of the FDCPA provides that "any debt collector who fails to comply with any provision of [the FDCPA] with respect to any person is liable to such person...." 15 U.S.C. § 1692k.

Moreover, a single violation is sufficient to establish liability under the FDCPA. *Wiener v. Bloomfield*, 901 F. Supp. 771, 778 (S.D.N.Y. 1995) (citing *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993)). "The court considers the frequency or number of violations only in calculating damages." *Id.* (citing 15 U.S.C. § 1692k(b)(1)). "The court may not, however, regardless of the number of violations,

2023 WL 167559

impose more than the $1,000 statutory penalty provided for actions such as these in the absence of actual damages." *Id.* (citing 15 U.S.C. § 1692k(a)(2)(A)).

To state a claim under the FDCPA, a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA. [3] *See Cohen v. Ditech Fin. LLC*, 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y Mar. 24, 2017). Plaintiff alleges that Defendants violated Sections 1692e, 1692e(2), e(10), 1692f, and 1692g of the FDCPA. *See* Compl. ¶¶ 79–93. For the reasons articulated below, the Court dismisses all of Plaintiff's claims.

[3]    Plaintiff adequately alleges the first two requirements. (*See* Compl. at ¶¶ 8–13, 23.)

Section 1692e of the FDCPA prohibits a debt collector from making a "false, deceptive, or misleading representation." 15 U.S.C. § 1692e. In particular, Section 1692e(2) prohibits "the false representation of the character, amount, or legal status of any debt," and Section 1692e(10) prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." "It is well established that the FDCPA imposes strict liability on debt collectors," meaning that Plaintiff "need not prove that the prohibited conduct was intentional." *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 528 (S.D.N.Y. 2013); *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector."); *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages.").

In the Second Circuit, two principles of statutory construction guide courts' assessments of alleged violations of Section 1692e: (1) the FDCPA is liberally construed to effectuate its purpose of consumer protection, and (2) collection notices are analyzed from the perspective of the "least sophisticated consumer." *Taylor v. Fin. Recovery Servs.*, 886 F.3d 212, 214 (2d Cir. 2018) (internal citation omitted). The least sophisticated consumer test is an objective one that "pays no attention to the circumstances of the particular debtor in question." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 234 (2d Cir. 2012). Despite the name, the least sophisticated

consumer is not wholly unsophisticated; they are "presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Kolbasyuk v. Capital Mgmt. Servs. LP*, 918 F.3d 236, 239 (2d Cir. 2019) (internal quotations and citation omitted). Applying the standard of the least sophisticated consumer, a debt collector's representation is misleading or deceptive "if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.' " *Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993)). There is also a materiality requirement, where courts focus on "whether the false statement would frustrate a consumer's ability to intelligently choose his or her response." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 86 (2d Cir. 2018) ("[M]ere technical falsehoods that mislead no one are immaterial and consequently not actionable under § 1692e.") (internal quotations and citations omitted).

**\*4** Before this Court is a narrow question: whether a debt collector violates the FDCPA when it fails to state that the interest clock is (or is not) running when offering to settle a debt for a sum certain. The Second Circuit recently addressed an identical question, holding that "debtors faced with a settlement offer are not misled by the failure to disclose that interest is accruing because ... payment of the amount indicated in a collection notice would extinguish the debt." *Cortez v. Forster & Garbus, LLP*, 999 F.3d 151, 155 (2d Cir. 2021). In so doing, the Second Circuit concluded "a settlement offer need not enumerate the consequences of failing to meet its deadline or rejecting it outright so long as it clearly and accurately informs a debtor that payment of a specified sum by a specified date will satisfy the debt." *Id.* at 156. At first glance, the Second Circuit's reasoning in *Cortez* appears to control the result in the instant case; here, as in *Cortez*, Defendants offered to settle the debt for a percentage of the amount shown as due and owing. If Plaintiff availed himself of Defendants' settlement offer, his "payment ... would extinguish the debt." *Id.* at 155.

In his sur-reply, Plaintiff argues *Cortez* is inapplicable because the offer letter at issue in *Cortez* included a *specific* date by which the debtor needed to avail himself of the offer. (ECF No. 23-1 at 1–2.) In effect, including a specific date in the offer notified the debtor as to how long the offer would remain open. By not including a specific date in the Letter, Plaintiff contends the Defendants were employing a "coercive collection tactic" in which Defendants would "not honor" Plaintiff's acceptance of their offer. (*Id.* at 2.)

2023 WL 167559

Plaintiff alleges as much in the Complaint, asserting that Defendants would not have honored Plaintiff's acceptance of their settlement offer in 1, 5, 10, 20, or 50 years. (Compl. at ¶¶ 49–54.) In other words, Plaintiff is concerned he will pay the settlement amount and then later find out Defendants (or their successors) have pocketed the payment without discharging Plaintiff's debt. (*See id.* at ¶¶ 57–63.) Plaintiff concludes Defendants' offer is "illusory" (id. at ¶ 62), and thus the Letter "violates the FDCPA." (ECF No. 23-1 at 2; *see generally* Compl.)

Plaintiff is incorrect. The Second Circuit in *Cortez* did not establish a bright line rule that every settlement offer must include a specific deadline for acceptance. The *Cortez* Court was not concerned with whether the offer included a specific acceptance date; instead, it was concerned with whether the settlement offer would mislead a debtor because "the offer set forth a payment deadline *but failed to disclose whether interest or fees would accrue if payment were tendered after the deadline.*" *Cortez, 999 F.3d at 156* (emphasis added). Ultimately, the Court reasoned that a settlement offer "need not enumerate" post-deadline interest and fees so long as the offer "clearly and accurately informs a debtor that payment of a specified sum by a specified date will satisfy the debt." *Id.* Put differently, so long as the offer has not lapsed and a debtor is entitled to pay a specified sum to satisfy a debt, a debt collector is not bound to "anticipate every potential collateral consequence that could arise in connection with the payment or nonpayment of a debt." *See id.*; *Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72, 77 (2d Cir. 2016) ("We hold that a debt collector will not be subject to liability under Section 1692e for failing to disclose that the consumer's balance may increase due to interest and fees if the collection notice ... clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date."); *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 194 (2d Cir. 2015) ("The Letter at issue here plainly states that the percentage saved is 'on your outstanding account balance.' The fact that a debtor may then have to pay tax on the amount saved is simply not deceptive in the context of what the savings are on a debtor's outstanding account balance.") (internal quotations omitted); *see also Taylor v. Fin. Recovery Servs., Inc.*, 886 F.3d 212, 215 (2d Cir. 2018) ("Construing the FDCPA in light of its consumer protection purpose, we hold that a collection notice that fails to disclose that interest and fees are not currently accruing on a debt is not misleading within the meaning of Section 1692e.").

**\*5** Here, Defendants' offer remains open, and as a result, Defendants have no present duty to inform Plaintiff of the amount of interest due on the account. [4] Plaintiff does not allege the settlement offer is closed at present. Instead, Plaintiff speculates that Defendants, who "retain[ ] the right to rescind the settlement offer at any time," "would not have allowed Plaintiff to accept the settlement offer." (Compl. at ¶¶ 48–61.) Plaintiff's allegations, however, are speculative and incorrect as a matter of law. Should Plaintiff accept Defendants' offer by paying the specified sum, Defendants cannot then revoke their offer. [5] *See Altman v. Zwicker & Assocs., P.C.*, No. 20 CV 6622 (VB), 2021 WL 3774120, at *4 (S.D.N.Y. Aug. 25, 2021) ("In other words, defendant could not have withdrawn the offer of sending an application if the consumer paid the allegedly outstanding debt without communicating such withdrawal to the consumer."). Until such time as Plaintiff accepts Defendants' offer by paying the specified sum, Defendants may revoke the offer, but only if they first give unambiguous notice of revocation to Plaintiff. *See, e.g., Cumis Ins. Soc., Inc. v. Citibank*, N.A., 921 F. Supp. 1100, 1106 (S.D.N.Y. 1996) ("A revocation is a clear manifestation of an intent not to perform, and once communicated to the offeree, terminates the offeree's power to accept the offer.") (citing Restatement (Second) of Contracts § 42 (1981)). Because Defendants cannot revoke the offer without first giving Plaintiff notice of their intent to do so, the Letter is not misleading. In fact, the Letter "clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date,"—here any date prior to Defendants giving notice of their intent to revoke the offer. *See Avila*, 817 F.3d at 77; *see also Weiss v. Sequium Asset Sols., LLC*, No. 21-CV-218(EK)(TAM), 2022 WL 1046260, at *3 (E.D.N.Y. Apr. 7, 2022) ("Indeed, the open-ended offer from the Defendants was more generous to [Plaintiff] than the defined expiration in *Cortez*, in that it gave [Plaintiff] longer than Mr. Cortez was afforded to accept the settlement offer."). In sum, Defendants' offer remains open, and Plaintiff is still entitled to pay $27,212.94—a sum certain—to extinguish all debts associated with his account.

[4]   Defendants' duty to report interest attaches when (1) Defendants revoke the open offer to accept payment of a sum certain to extinguish the debt, and (2) Defendants indeed charge interest on the principal balance. *See Avila*, 817 F.3d at 76 ("Because the statement of an amount due, without notice that the amount is already increasing due

to accruing interest or other charges, can mislead the least sophisticated consumer into believing that payment of the amount stated will clear her account, we hold that the FDCPA requires debt collectors, when they notify consumers of their account balance, to disclose that the balance may increase due to interest and fees."). In any event, it appears Defendants are estopped from charging interest on the balance-to-date. (*See* ECF No. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).)

5    Plaintiff alleges Defendant Sequium acts "on behalf of Defendant LVNV." (*See* Compl. at ¶ 23.) As such, Defendant LVNV is bound to honor the contract proposed to Plaintiff by Defendant Sequium on Defendant LVNV's behalf. *See, e.g., Minskoff v. Am. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996)* ("Under general principles of agency, the authority of an agent is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.") (internal quotations omitted).

Plaintiff's claim under Section 1692e fails. So too do Plaintiff's claims under Sections 1692f and 1692g. Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt any debt." "Unconscionable" here means "shockingly unjust or unfair" or "affronting the sense of justice, decency, or reasonableness." *Gallego v. Northland Group, Inc., 814 F.3d 123, 127–28 (2d Cir. 2016)*. Meanwhile, Section 1692g requires Defendants to state "the amount of the debt." For the reasons stated above, Plaintiff's allegations fail to show Defendants' collection notice containing an open offer—which has remained open for over two years and settles Plaintiff's debt interest-free at a sum certain—is "[s]hockingly unjust or unfair," or "affronting the sense of justice, decency, or reasonableness." *Id.* Accordingly, Defendants' Letter does not violate Section 1692f.

Insofar as Defendants' offer remains open and represents the sum certain owed by Plaintiff to extinguish the debt, Defendants also abide by the requirements of Section 1692g. *See Weiss, 2022 WL 1046260, at *4 (E.D.N.Y. Apr. 7, 2022)* (finding Defendants "comport[ed]" with requirements of Section 1692g where Defendants extended an open offer for Plaintiff to pay a specified amount to extinguish Plaintiff's debt).

## CONCLUSION

**\*6**  For the foregoing reasons, Defendants' motion for judgment on the pleadings is GRANTED. Defendants' motion to strike Plaintiff's sur-reply is DENIED.

**All Citations**

Slip Copy, 2023 WL 167559

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Cohen v. Ditech Financial LLC, Not Reported in Fed. Supp. (2017)

2017 WL 1134723

2017 WL 1134723
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Aaron COHEN, on behalf of himself and
all others similarly situated, Plaintiff,

v.

DITECH FINANCIAL LLC, and Rosicki,
Rosicki & Associates, P.C., Defendants.

15-CV-6828
|
Signed 03/24/2017

**Attorneys and Law Firms**

LAW OFFICES OF SHIMSHON WEXLER, PC, BY:
Shimshon Wexler, Esq., 315 W. Ponce de Leon Ave., Suite
250, Decatur, Georgia 30030, Attorney for Plaintiff.

BALLARD SPAHR LLP, BY: Justin Angelo, Esq., 919 Third
Avenue, Floor 37, New York, New York 10022, Attorneys for
Defendant Ditech Financial LLC.

RIVKIN RADLER, LLP, BY: Carol A. Lastorino, Esq., 926
RXR Plaza, Uniondale, New York 11556, Attorneys for
Defendant Rosicki, Rosicki & Associates, P.C.

<u>MEMORANDUM AND ORDER</u>

LEONARD D. WEXLER, UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff Aaron Cohen ("Cohen" or "Plaintiff")
commenced this action, on behalf of himself and as a putative
class action, alleging violations of the Fair Debt Collection
Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., by
defendants Ditech Financial LLC ("Ditech") and Rosicki,
Rosicki & Associates, P.C. ("Rosicki"). Specifically, he seeks
statutory damages, attorneys' fees, and costs for violations to §
1692e and § 1692g(a)(2) of the FDCPA. Currently before the
Court are each defendant's motion to dismiss pursuant Rule
12 (b)(6) of the Federal Rules of Civil Procedure. See Rosicki
Motion, Docket Entry ("DE") [24]; Ditech Motion, DE [29].
For the reasons set forth herein, both motions are granted and
the complaint is dismissed.

**I. BACKGROUND**

**A. Factual Allegations and State Foreclosure Action** [1]

[1]     The facts are taken from the Complaint and from
        documents related to the state court foreclosure
        action. See Curtis & Assocs., P.C. v. Law Offices
        of David M. Bushman, Esq., 758 F. Supp. 2d 153,
        158 n.4 (E.D.N.Y. 2010) (In deciding a motion
        to dismiss, the Court may, in addition to the
        complaint, consider documents incorporated by
        reference into the complaint as well as "documents
        submitted by the parties which are matters of
        public record or which are deemed included in the
        Complaint."), aff'd, 443 Fed.Appx. 582 (2d Cir.
        2011).

On or about August 11, 2005, Cohen incurred a debt in
the form of a mortgage loan. Complaint, DE [1], ¶ 15.
The mortgage was assigned on more than one occasion, the
last assignment occurring on June 10, 2013 to Green Tree
Servicing LLC ("Green Tree"). See Foreclosure Complaint
¶ 4, Declaration of Carol A. Lastorino ("Lastorino Decl."),
Ex. B, DE [25]. On March 11, 2015, Green Tree commenced
a foreclosure proceeding in state court (the "Foreclosure
Action") upon Plaintiff's default on his mortgage payments
in 2009. See Foreclosure Compl. ¶ 7. After the foreclosure
action was filed, Green Tree changed its name to Ditech. [2]

[2]     Ditech notes that Green Tree changed its name
        to Ditech effective August 31, 2015, see Ditech
        Memorandum of Law in Support at n.1, DE [30], a
        change acknowledged by Plaintiff in the complaint.
        See Compl. ¶ 18 ("Green Tree (which is now
        Ditech) ...").

After the foreclosure complaint was filed, Plaintiff received
two additional documents in furtherance of the Foreclosure
Action: a Certificate of Merit Pursuant to CPLR 3012-b
("Certificate") and a request for judicial intervention ("RJI").
Compl. ¶ 23. The Certificate is dated March 11, 2015,
bears the same caption as the Foreclosure Complaint, and
certifies that plaintiff Green Tree "is the creditor entitled to
enforce rights" under the pertinent documents. Certificate ¶2,
Lastorino Decl. Ex. C. The RJI uses the same caption as the
Foreclosure Complaint, indicates that the nature of the action
is a Real Property—Mortgage Foreclosure, and purports
to seek a "Residential Mortgage Foreclosure Settlement
Conference." Lastorino Decl. Ex. D. Green Tree is designated
as the Plaintiff, but there is no language identifying it as the
"creditor."

Cohen v. Ditech Financial LLC, Not Reported in Fed. Supp. (2017)

2017 WL 1134723

**\*2**  In the Foreclosure Action, Green Tree seeks *inter alia* that the mortgaged premises be sold, that plaintiff be paid monies owed from the proceeds of the sale, and that Aaron Cohen "be adjudged to pay any deficiency which may remain." Foreclosure Compl., Wherefore Cl.

**B. Complaint in This Action**

The complaint in the case before this Court alleges a single cause of action for violations of two sections of the FDCPA. Under § 1692e, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692g provides in pertinent part as follows:

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing

...

(2) the name of the creditor to whom the debt is owed

15 U.S.C. § 1692g(a)(2).

The basis of Plaintiff's complaint is that the creditor to whom the debt was owed at the time of the filing of the foreclosure complaint was Fannie Mae, not Green Tree. Compl. ¶¶ 21-22. Plaintiff claims that defendants violated § 1692e in that they "falsely stated that Green Tree Loan Servicing LLC was the creditor to whom the Plaintiff's debt ... was owed when, in fact, Green Tree Servicing, LLC was not the creditor to whom the Plaintiff's debt ... was owed." Compl. ¶ 31. In addition, after making an "initial communication," neither Rosicki nor Green Tree advised Plaintiff of the "correct name of the creditor to whom the debt is owed." Compl. ¶ 33.

**II. LEGAL STANDARDS**

Defendants seek dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The standards for analyzing a motion to dismiss are well-established. The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff. *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted). The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Hayden v. Paterson,* 594 F.3d

150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S at 679. A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery." *Iqbal,* 556 U.S at 678-679; *see also Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation "formulaic recitation of cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level."). While Rule 8 does not require "detailed factual allegations," it does require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

**III. DISCUSSION**

**\*3**  The FDCPA was enacted "with the aim of eliminating abusive practices in the debt collection industry." *Jacobson v. Healthcare Fin. Servs., Inc.,* 516 F.3d 85, 89 (2d Cir. 2008) (quoting 15 U.S.C. § 1692e). This legislation and its history "emphasize the intent of Congress to address the previously common and severe problem of abusive debt collection practices and to protect unsophisticated consumers from unscrupulous debt collection tactics." *Ehrlich v. Credit Prot. Ass'n, L.P.,* 891 F. Supp. 2d 414, 415 (E.D.N.Y. 2012) (citations omitted). The FDCPA "focuses on regulating interactions between 'debt collectors' and 'consumers.' " *Ellis v. Solomon and Solomon, P.C.,* 591 F.3d 130, 134 (2d Cir. 2010). To establish a claim under the FDCPA, a plaintiff must establish that: (1) he is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a "debt collector"; and (3) the defendant has engaged in some act or omission in violation of the FDCPA's requirements. *See Scaturro v. Northland Grp., Inc.,* 16-cv-1314, 2017 WL 415900, at \* (E.D.N.Y. Jan. 9, 2017).

The threshold question here is whether the communications at issue, filings during a foreclosure action, constitute an attempt to collect a debt within the meaning of the FDCPA. The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or

Cohen v. Ditech Financial LLC, Not Reported in Fed. Supp. (2017)

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 155 of 251

2017 WL 1134723

services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). While the note is a debt, the mortgage " 'is a type of security interest with real property as the collateral,' that a lender can take if a debtor does not fulfill a payment obligation; it 'is not a promise to pay a debt.' " *Hill v. DLJ Mortg. Capital, Inc.,* 15-CV-3083, 2016 WL 5818540, at *7 (E.D.N.Y. Sept. 30, 2016) (quoting *Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1216 (11th Cir. 2012)). In other words, "[t]he note represents the primary personal obligation of the mortgagor, and the mortgage is merely the security for such obligation." *Copp v. Sands Point Marina, Inc.,* 17 N.Y.2d 291, 293, 217 N.E.2d 654, 270 N.Y.S.2d 599 (1966).

In recognition of this distinction, a holder of a note secured by a mortgage has two remedies under New York law: "one at law in a suit on the debt as evidenced by the note, the other in equity to foreclose the mortgage." *Copp,* 17 N.Y.2d at 293; *see also Westnau Land Corp. v. U.S. Small Bus. Admin.,* 1 F.3d 112, 115 (2d Cir. 1993) ("under New York law, a creditor is required to elect between the remedies of an action for money damages on a debt or an equitable action to foreclose a mortgage that secures the debt."); *Wells Fargo Bank, N.A. v. Goans,* 136 A.D.3d 709, 24 N.Y.S.3d 386 (2d Dep't N.Y. App. Div. 2016) ("Where a creditor holds both a debt instrument and a mortgage which is given to secure the debt, the creditor may elect either to sue at law to recover on the debt, or to sue in equity to foreclose on the mortgage."). It is also clear that under New York law, a mortgage foreclosure is an equitable remedy and an action seeking that relief is equitable in nature. *See 4 B's Realty 1530 CR39, LLC v. Toscano,* 818 F. Supp. 2d 654, 659 (E.D.N.Y. 2011); *see also Notey v. Darien Constr. Corp.,* 41 N.Y.2d 1055, 364 N.E.2d 833, 396 N.Y.S.2d 169 (1977) ("An action to foreclose a mortgage is, of course, in equity").

Courts in this Circuit that have considered whether actions taken within a foreclosure action constitute debt collection "have held that 'the enforcement of a security interest through foreclosure proceedings that do not seek monetary judgments against debtors is not debt collection for purposes of the FDCPA.' " *Hill,* 2016 WL 5818540, at *7 (quoting *Boyd v. J.E. Robert Co.,* No. 05-CV-2455, 2013 WL 5436969, at *9 (E.D.N.Y. Sept. 27, 2013), *aff'd on other grounds,* 765 F.3d 123 (2d Cir. 2014)). This Court agrees with this reasoning. Here, Green Tree elected to commence an action to foreclose on the mortgage and the "communications" at issue were

made in the context of enforcing its security interest. As such, there was no attempt to enforce a debt actionable under the FDCPA.

**\*4** Plaintiff argues that the Foreclosure Action does seek a money judgment on the "debt" because it seeks a deficiency judgment against Cohen in the event that the proceeds of the sale of the mortgaged property are insufficient to satisfy the amount owed. Article 13 of the Real Property Actions and Proceedings Law ("RPAPL") governs actions to foreclose a mortgage in New York. It expressly provides that a final judgment in a foreclosure action may include a deficiency judgment against the person liable for the debt secured by the mortgage "of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of the proceeds." RPAPL § 1371(1). Plaintiff cites no case law to support the inference that this provision somehow affects the nature of the Foreclosure Action or changes it from an equitable proceeding to one at law. Indeed, such a result would violate New York's election of remedies framework. *See Boyd v. Jarvis,* 74 A.D.2d 937, 937, 426 N.Y.S.2d 142 (3rd Dep't 1980) (rejecting plaintiffs' attempt to commence a second action at law and noting that as they had elected to proceed in equity by seeking foreclosure, they should have sought a deficiency judgment in the foreclosure action); *see also Wyoming Cty. Bank & Trust Co. v. Kiley,* 75 A.D.2d 477, 481, 430 N.Y.S.2d 900, 903 (4th Dep't 1980) ("when a mortgage-secured creditor commences an equitable action to foreclose its mortgage, the action does not result in a 'money judgment' ").

In any event, under the facts presented in this case, the Court finds that the purposes of the FDCPA are not furthered by continuation of this action. Acknowledging the procedures and protections available in bankruptcy court, the Second Circuit has noted that given that "the FDCPA's purpose is to protect unsophisticated consumers from unscrupulous debt collectors, that purpose is not implicated when a debtor is instead protected by the court system and its officers." *Simmons v. Roundup Funding, LLC,* 622 F.3d 93, (2d Cir. 2010) (internal quotation and citation omitted). Applying the same reasoning, a District Court in Connecticut analyzed Connecticut law and determined that "mortgagors in a foreclosure proceeding likewise do not need protection from abusive collection methods that are covered under the FDCPA because the state foreclosure process is highly regulated and court controlled." *Derisme v. Hunt Leibert Jacobson P.C.,* 880

2017 WL 1134723

F. Supp. 2d 311, 327 (D. Conn. 2012). The same rationale is applicable to foreclosure proceedings in New York courts.

In the aftermath of the mortgage foreclosure crisis, New York passed the Foreclosure Prevention and Responsible Lending Act which strengthened and added protections for borrowers in jeopardy of losing their homes. Stronger notice provisions were implemented, covering a variety of circumstances and intending to protect borrowers. *See* RPAPL § 1303 (requiring "Help for Homeowners in Foreclosure" notice); RPAPL § 1304 (requiring additional notices in connection with subprime or non-traditional home loans); RPAPL § 1320 (requiring a special summons in actions to foreclose a mortgage on private residences). Certain filings with the Superintendent of Financial Services are also required. *See* RPAPL § 1306. The parties are now required to participate in mandatory, court-supervised settlement proceedings at which they Eire required to "negotiate in good faith to reach a mutually agreeable resolution, including but not limited to a loan modification, short sale, deed in lieu of foreclosure or any other loss mitigation, if possible." RPAPL § 3408. The New York court system can amply protect borrowers from any allegedly unscrupulous actions taken in the foreclosure proceeding. Accordingly, the purposes of the FDCPA are not implicated, especially where all the allegedly impermissible conduct occurred within the context of the foreclosure proceeding.

## IV. CONCLUSION

Both Defendants' motions to dismiss are granted, and the case is closed.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1134723

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 419699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Towaki KOMATSU, Plaintiff,

v.

URBAN PATHWAYS, INC.; Daniels Norelli Cecere
& Tavel PC; Neighborhood Association for Inter-
Cultural Affairs, Inc.; The City of New York; Ronald
Abad; Steven Banks; Barbara Beirne; Kristen Benjamin-
Solis; Martha Calhoun; Sharon Coates; Gary Cohen;
Marin Gerber; Allison Gill-Lambert; Anthony M.
Gonzalez; Allison Heilbraun; Joni Kletter; Lisa
Lombardi; Julio Manjarrez; Nigel Marks; Jeffrey
Mosczyc; Andrew Nastachowski; Molly Park; Kishea
Paulemont; Pinny Ringel; Harold Rosenthal; Ariana
Saunders; Ann Marie Scalia; Frederick Shack; Nancy
Southwell; Samuel Spitzberg; Eric Tavel, all sued in
their individual and official capacities. Nancy Bannon;
Anthony Cannataro; Lyle Frank; Shorab Ibrahim;
Gary Jenkins; Lawrence Marks; Maura Noll; Daniel
Tietz, all sued in their official capacities, Defendants.

22-CV-9080 (LTS)
|
Signed January 26, 2023

**Attorneys and Law Firms**

Towaki Komatsu, Bronx, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

 **\*1** Plaintiff, appearing *pro se*, brings this 338-page
complaint asserting violations of federal and state law.
Specifically, he seeks relief under 42 U.S.C. § 1983; the
Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692;
the civil provision of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1964; and New
York State and City law.

By order dated November 22, 2022, the Court granted
Plaintiff's request to proceed without prepayment of fees,
that is, *in forma pauperis*. For the reasons set forth below,

the Court dismisses the claims brought against all of the
defendants except the FDCPA claims, which are brought
against Defendants Daniels Norelli Cecere & Tavel PC
("DNCT"), Harold Rosenthal, Allison Heilbraun, and Eric
Tavel.

STANDARD OF REVIEW

The Court must dismiss an *in forma pauperis* complaint, or
any portion of the complaint, that is frivolous or malicious,
fails to state a claim on which relief may be granted, or
seeks monetary relief from a defendant who is immune from
such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v.
Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).
The Court must also dismiss a complaint when the Court lacks
subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the
Court is obliged to construe *pro se* pleadings liberally, *Harris
v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them
to raise the "strongest [claims] that they *suggest*," *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)
(internal quotation marks and citations omitted, emphasis in
original). But the "special solicitude" in *pro se* cases, *id.* at
475 (citation omitted), has its limits – to state a claim, *pro se*
pleadings still must comply with Rule 8 of the Federal Rules
of Civil Procedure, which requires a complaint to make a short
and plain statement showing that the pleader is entitled to
relief.

Moreover, in circumstances where "a court considers whether
to withdraw a *pro se* litigant's special status, it should
consider not only that litigant's lifetime participation in all
forms of civil litigation, but also his experience with the
particular procedural setting presented." *Sledge v. Kooi*, 564
F.3d 105, 109 (2d Cir. 2009). Thus, courts may "limit the
withdrawal of special status to specific contexts in which the
litigant's experience indicates that he may be fairly deemed
knowledgeable and experienced." *Id.*

BACKGROUND

**A. Plaintiff's Procedural History in This Court**
Plaintiff Towaki Komatsu has brought numerous actions in
this court, including an action recently dismissed by the
undersigned. *See Komatsu v. The City of New York*, ECF
1:22-CV-0424, 42 (S.D.N.Y. Jan. 3, 2023). That action, as

well as other actions Plaintiff filed in this court, concern Plaintiff's alleged unlawful exclusion from participating in public meetings held by the City of New York. *See, e.g., Komatsu v. The City of New York*, ECF 1:20-CV-7046 (ER) (S.D.N.Y.), *lv denied*, 22-1996 (2d Cir. Dec. 22, 2022) (denying leave to appeal, based on leave-to file sanction, "because the appeals do not depart from Petitioner's 'prior pattern of vexatious filings.' "); *Komatsu v. The City of New York*, ECF 1:18-CV-03698 (LGS) (GWG) (S.D.N.Y. Sept. 27, 2021) (ECF 627) (order involuntarily dismissing suit due to Plaintiff's vexatious conduct, including his repetitive voluminous and irrelevant filings), *aff'd*, 21-2479 (2d Cir. Mar. 1, 2022) ("[T]he appeal is DISMISSED because it 'lacks an arguable basis either in law or in fact.' *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)."). In the 20-CV-7046 action, Plaintiff was ordered to show cause why the action "should not be dismissed pursuant to the Court's inherent power to sanction vexatious litigants and/or failure to comply with court orders." *Id.* (ECF 208, at 4.) That matter has been briefed but to date is unresolved.

**\*2** Since December 20, 2020, Plaintiff has been subject to a prefiling injunction requiring him to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu,* ECF 1:20-CV-07046 (ER) (ECF 45).

**B. Plaintiff's Prior Litigation Involving Claims Raised in This New Action**
In addition to the litigation Plaintiff has pursued against the City of New York concerning his alleged exclusion from public meetings, Plaintiff also has pursued litigation against individuals employed by the City of New York, the State of New York, and private individuals regarding his lease agreement with Urban Pathways ("Urban"), subsequent state court litigation brought by Urban against Plaintiff, interactions with employees of New York City's Human Resources Administration ("HRA"), and interactions with employees of the New York State Office of Temporary and Disability Assistance ("OTDA"). Before filing this lawsuit, Plaintiff filed a similar action asserting claims against Urban and, as discussed below, naming many of the same defendants named here. *See Komatsu v. City of New York*, ECF 1:20-CV-6510, 2 (S.D.N.Y. Oct. 22, 2020) ("*Komatsu I*"). Accordingly, the Court will first describe the facts alleged in *Komatsu I*, and then turn to the facts alleged in this new action ("*Komatsu II*").

**C. *Komatsu I***

**1. Defendants**
On August 14, 2020, Plaintiff filed *Komatsu I*, where he asserted many of the claims that are re-asserted in *Komatsu II* and named many of the same defendants. The first group of defendants includes Urban, described by Plaintiff as "a private entity, business partner of HRA" (ECF 2, at 13), and the following six Urban employees: Frederick Shack, Chief Executive Officer; Lisa Lombardi and Nancy Southwell, Deputy Executive Directors; Ronald Abad, Chief Operating Officer; Kishea Paulemont, Program Director; and Sharon Coates, an employee. Plaintiff also sued DNCT, the law firm representing Urban in its litigation brought against Plaintiff in the Bronx County Housing Court, as well as two of the firm's lawyers, Allison Heilbraun and Eric Tavel.

Plaintiff also sued individuals employed with the City's HRA, including Steven Banks, the former Commissioner; three HRA lawyers, Marin Gerber, Jeffrey Mosczyc, and Ann Marie Scalia; and Kristin Benjamin-Solis, an HRA employee.

The final defendant whom Plaintiff also names in *Komatsu II* is Nancy Bannon, a New York State Supreme Court Justice. [1]

[1] Plaintiff named the following defendants in *Komatsu I* but not in *Komatsu II:* Marilyn Andzeski, Urban management agent; Molly McCracken, an employee with Services for the Underserved, Inc.; Avraham Schmeidler, an HRA employee; Wendell Vaughan, a law clerk; the New York State Office off Court Administration; the New York State Unified Court System; and Judge Brenda Spears, from the Bronx County Housing Court.

**2. Allegations**
The following facts are taken from the complaint filed in *Komatsu I*. [2]

[2] The allegations from *Komatsu I*, described in this order, relate to the allegations set forth in *Komatsu II*, and do not include each allegation set forth in *Komatsu I.*

In 2016, Plaintiff signed a lease with Urban to rent an apartment in the Bronx. Subsequent to Plaintiff's signing

the lease, Urban initiated two Housing Court proceedings in the Bronx County Housing Court ("Housing Court"). DNTC represented Urban in these two proceedings.

**\*3** In January 2017, HRA agreed to pay Plaintiff's storage expenses, incurred at CubeSmart, while Plaintiff resided in his Urban apartment. HRA later contested its agreement to pay for those expenses or to reimburse Plaintiff for the storage expenses he had already paid. Plaintiff litigated that issue in fair hearings before the OTDA, and then in the state courts in proceedings that he initiated under Article 78 of the New York Civil Practice Law and Rules ("Article 78"). On or about January 31, 2018, Defendant Judge Bannon dismissed Plaintiff's initial Article 78 proceeding. Plaintiff brought another proceeding that was pending before Defendant Judge Frank.

In addition to seeking damages, Plaintiff sought various forms of injunctive relief, including orders (1) directing the City of New York and Defendant Moscyzc to provide discovery in Plaintiff's state-court litigation, (2) staying his Housing Court proceedings, or in the alterative, transferring the state court action to this court; (3) directing Judge Bannon to provide an explanation regarding one of her decisions; and (4) directing the City of New York to cease all of its business with Urban.

### 3. Litigation History

On October 22, 2020, the Honorable Louis L. Stanton dismissed the complaint as frivolous, for failure to state a claim on which relief may be granted, for seeking monetary relief from defendants who are immune from such relief, and under the Anti-Injunction Act. *See* 28 U.S.C. § 1915(e)(2) (B)(i)-(iii); 28 U.S.C. § 2283. Plaintiff appealed the decision, and the United States Court of Appeals for the Second Circuit affirmed. *See Komatsu v. CubeSmart*, No. 20-3676-cv (2d Cir. Dec. 20, 2021) (mandate issued Jan. 31, 2022).

### D. *Komatsu II*

#### 1. Defendants

In this new action, Plaintiff brings the same claims, as well as new claims against the following defendants, whom he named in *Komatsu I*: (1) Urban and Urban employees Shack, Lombardi, Abad, Coates, Paulemont, and Southwell; (2) DNCT and DNCT lawyers Heilbraun and Tavel; (3) former Commissioner Banks, HRA employee Benjamin-Solis, and HRA lawyers Gerber, Mosczyc, and Scalia; and (4) Judge Bannon.

Plaintiff also brings new claims against additional defendants, who fall into the following seven categories: (1) additional HRA defendants – Gary Jenkins, HRA's Commissioner; Martha Calhoun, HRA's General Counsel; Allison Gil-Lambert, an HRA lawyer; Barbara Beirne, Deputy Chief Agency Contacting Officer for HRA, who is a lawyer; and Molly Park, an HRA employee; (2) additional Urban defendants - Ariana Saunders, Urban's Chief Compliance Officer, and Andrew Nastachowski and Gary Cohen, Urban employees; (3) the Neighborhood Association for Inter-Cultural Affairs, Inc. ("NAICA") and Julio Manjarrez, a NAICA lawyer, who represented Plaintiff during his Urban litigation in Housing Court; (4) a licensed process server, Anthony Gonzalez, who allegedly did not serve Plaintiff with legal papers; (5) individuals employed with the OTDA - Daniel Tietz, OTDA Commissioner; Nigel Marks and Samuel Spitzberg, OTDA lawyers; and Maura Noll, OTDA Administrative Law Judge; (6) an employee of the Community Affairs Unit of the Mayor's Office, Pinny Ringel; and (7) another DNCT lawyer, Harold Rosenthal.

Finally, Plaintiff names as defendants the following individuals, but only in their official capacities: (1) Anthony Cannotora, Acting Chief Judge of the State of New York; (2) Judge Lyle Frank, New York State Supreme Court; (3) Judge Shorab Ibrahim, Bronx County Housing Court; (4) Gary Jenkins, Commissioner of the New York City Department of Social Services ("DSS"); (5) Lawrence Marks, Chief Administrative Judge of the UCS; and (6) Joni Kletter, Administrative Law Judge and New York City attorney, and employee of former Mayor Bill de Blasio.

#### 2. Allegations

##### a. Urban and DNCT Defendants

**\*4** Plaintiff's allegations against the Urban and DNCT Defendants concern his litigation in Housing Court. He alleges that on August 16, 2019, Urban employee Coates "lied by fraudulently claiming that I owed Urban more than $30,000 in rent for my Urban apartment." (ECF 2, at 76.) "Urban used attorneys for DNCT to illegally commence [two lawsuits] as nonpayment proceedings against me. Due to mootness, [these lawsuits] must be dismissed with prejudice." (*Id.*)

Plaintiff alleges that more recently, on March 3, 2022, Plaintiff informed a representative at the Housing Court that Urban failed to provide him with legal papers; he seeks dismissal of a third action brought by Urban for failure to serve him such papers. He also seeks "a subpoena that would order Urban to provide me the video recordings that were recorded on 3/8/22 both in the lobby and stairwells in my building" to show that Defendant Gonzalez, a process server, did not in fact serve Plaintiff legal papers. (*Id.*)

Plaintiff contends that DNCT lawyers "committed continuing violations against me as they committed wire fraud ... and otherwise violated RICO ... the FDCPA," and New York State statutes. (*Id.* at 77.) He also contends that "Urban, DNCT, and their personnel committed multiple acts of wire fraud against me through legal filings that were filed by attorneys for Urban[.]" (*Id.*)

Finally, Plaintiff claims that the HRA and Urban Defendants are so intertwined as to suggest that Urban is "an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA." (*Id.* at 181.)

### b. HRA Defendants

Plaintiff's claims against the HRA Defendants concern HRA's alleged involvement in Plaintiff's litigation against Urban, that is: (1) Urban's alleged objection of justice; (2) interference with Plaintiff's ability to obtain counsel; (3) violation of his rights related to receiving discovery material; and (4) alleged fraud on the court by HRA lawyers. The majority of these claims arose on or before August 14, 2020, including nearly all of the claims against Banks and the claims against Benjamin-Solis. These claims include Plaintiff's CubeSmart litigation, which was the subject of Plaintiff's claims against HRA in *Komatsu I*.

With respect to the *pro bono* counsel allegation, Plaintiff asserts that, before former Commissioner Banks "resigned from HRA near the state of 2022 ... he repeatedly told me that he and HRA would" assist Plaintiff in securing *pro bono* counsel. (*Id.*) These efforts, Plaintiff contends, were unsuccessful in part because the HRA Defendants "engag[ed] in illegal acts against me pertaining to public meetings that have been public forums that include town hall meetings, resource fair meetings, and public hearings by illegally preventing [me] from lawfully attending them in the rooms in

which members of the public conducted them with Mr. Banks and other personnel[.]" (*Id.*)

The allegations against the HRA lawyers concern their representation of the City during Plaintiff's litigation against the City. These government lawyers include Beirne, Gil-Lambert, Gerber, Moszcyc, and Scalia. The claims against Park concern Park's informing Plaintiff, on September 13, 2022, that Plaintiff would not receive discovery in his OTDA proceeding. (*See id.* at 118.)

### c. OTDA Defendants

Plaintiff's claims against the OTDA Defendants concern Plaintiff's litigation with the OTDA, over which Judge Bannon presided and in which HRA lawyers represented the City of New York. These incidents occurred in 2017. (*See id.* at 128.) The Defendants involved in the alleged incidents include: OTDA Commissioner Tietz, sued in his official capacity; OTDA lawyers Marks and Spitzberg; and Administrative Law Judge Noll.

### d. Defendants former Commissioner Banks, Pinny Ringel, and Lori Kletter

 **\*5**  Plaintiff's claims against former Commissioner Banks also concern New York City public meetings involving public officials. For example, Plaintiff asserts that "I twice testified ... during City Council public hearings on 9/20/18 and 2/4/19 .... Mr. Banks was present on 2/4/19 while I testified about Mr. Vargas and deliberately turned the screen of my laptop to face Mr. Banks as I played a relevant video in conjunction with and support of my testimony." (*Id.* at 187.)

Those claims brought against Ringel and Kletter also arise rise out of interactions with City officials at public meetings, including on such meeting on November 16, 2021, when Ringel and Kletter "illegally prevented me from having a conversation with Mr. Banks during that meeting right after I talked with Mr. de Blasio during it while he stood next to Mr. [Eric] Adams." (*Id.* at 89.)

### e. NAICA Defendants

Plaintiff brings legal malpractice claims against NAICA and NAICA lawyer Manjarrez, who represented Plaintiff

Komatsu v. Urban Pathways, Inc., Slip Copy (2023)
2023 WL 419699

during one of the proceedings brought by Urban. (*Id.* at 79) ("Mr. Manjarrez confirmed that he was defying a directive that I had issued to him to obtain the video recordings that were recorded on 3/8/22 by video security cameras that are installed in public areas in my building" to prove that Defendant Gonzalez did not serve Plaintiff with legal papers.).

#### f. Process Server Gonzalez

Plaintiff brings claims against a process server who allegedly failed to serve legal papers relating to the Urban litigation. (*Id.* at 76) ("I wasn't served legal papers for Urban3 then by Defendant Anthony Gonzalez who claimed that he serve me legal papers[.]").

### 3. Claims

Plaintiff asserts Section 1983 Claims against: (1) The City of New York; (2) Urban and Urban employees Ronald Abad, Lisa Lombardi, Andrew Nastachowski, Ariana Saunders, Frederick Shack, Nancy Southwell, and Kishea Paulemont; (3) HRA Commissioner Gary Cohen, former HRA Commissioner Steven Banks, HRA lawyers Marin Gerber, Ann Marie Scalia, Jeffrey Mosczyc, and Allison Gill-Lambert, HRA employee Kristen Benjamin-Solis, HRA General Counsel Martha Calhoun, (4) Judges Nancy Bannon, Lyle Frank, Shorab Ibrahim, Joni Kletter, and Maura Noll; (5) OTDA lawyers Nigel Marks and Samuel Spitzberg; (6) HRA employee Molly Park; and (7) Mayor's Office employee Pinny Ringel.

Plaintiff's FDCPA claims are brought against the Urban and DNCT Defendants, that is, (1) Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, Nancy Southwell; and (2) DNCT and DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun.

Plaintiff's RICO claims are brought against City officials, NAIC Defendants, Urban Defendants, and DNCT Defendants.

Plaintiff also asserts various state law claims.

### DISCUSSION

#### A. Claims Brought Against State Defendants in Their Official Capacity Are Dismissed Under the Eleventh Amendment

Plaintiff brings claims against Judges Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim; Chief Administrative Judge Lawrence Marks; Administrative Law Judge Maura Noll; and Commissioner Daniel Tietz, in their official capacities. In *Komatsu I*, Plaintiff also brought several claims against New York State officials, in their official capacity. In dismissing those claims under the Eleventh Amendment, Judge Stanton explained that the claims brought against these State officials were not permitted under the Eleventh Amendment. *See Komatsu I*, 1:20-CV-6510, 10 ("Accordingly, the Court dismisses Plaintiff's claims under federal law against ... Justice Bannon, Judge Spears, and Defendant Vaughan, in their official capacities, under the doctrine of Eleventh Amendment immunity. 28 U.S.C. § 1915(e)(2)(B)(iii)."). Here, Plaintiff again brings official capacity claims against Judges Bannon, Cannataro, Frank, Ibrahim, Chief Administrative Judge Marks, Administrative Law Judge Noll, and Commissioner Tietz, notwithstanding his prior experience with this specific context. *Sledge*, 564 F.3d at 109. Because these claims are barred under the Eleventh Amendment, the Court dismisses all federal claims brought against these Defendants. 28 U.S.C. § 1915(e)(2)(B)(iii)

#### B. Plaintiff's Claims Against Government Attorneys Are Dismissed

 **\*6** Plaintiff's federal claims brought against Defendants Calhoun, Beirne, Gil-Lambert, Mosczyc, Gerber, Scalia, Marks, and Spitzberg arise from those defendants' legal advocacy representing the HRA and OTDA. In *Komatsu I*, Plaintiff brought similar claims against Mosczyc and Gerber, and Judge Stanton dismissed the claims because these two Defendants, as government lawyers, were absolutely immune from the relief Plaintiff sought from them. Undeterred by the dismissal of those claims in *Komatsu I*, Plaintiff continues to seek relief against government attorneys who are his adversaries in his state court litigation. As explained in *Komatsu I*, however, government attorneys are immune from suit under Section 1983 "when functioning as an advocate of the state [or local government] in a way that is intimately associated with the judicial process." *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006); *see Barrett v. United States*, 798 F.2d 565, 572–73 (2d Cir.1986) (absolute immunity for government attorney defending state in a civil lawsuit). Accordingly, the Court dismisses Plaintiff's federal

2023 WL 419699

claims against the government attorneys because they are immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

**C. Claims Brought Against HRA Employee Park**
The Court also dismissed the claims brought against Park, an HRA employee who allegedly informed Plaintiff that he was not entitled to discovery, because this Defendant is also immune from the relief Plaintiff seeks. Like the HRA lawyers, who are absolutely immune as government advocates, Parks is absolutely immune for damages where her conduct as an HRA employee was "intimately associated with the judicial process." *Mangiafico*, 471 F.3d at 396. Accordingly, the Court dismisses all claims against this Defendant. 28 U.S.C. § 1915(e)(2)(B)(iii).

**D. Claims Brought Against Administrative Law Judge Noll**
Plaintiff's claims under federal law against Judge Noll are barred under the doctrine of judicial immunity. Under this doctrine, judges are absolutely immune from suit for claims against them in their individual capacities for damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (applying judicial immunity to claims under § 1983); *Deem v. DiMella-Deem*, 941 F.3d 618, 620-21 (2d Cir. 2019) (same as to claims under § 1983 and § 1985), *cert denied*, 140 S. Ct. 2763 (2020). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209. This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation ...." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994).

Judicial immunity does not apply when a judge acts outside of his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff's claims against Judge Noll arise from her actions and decisions in OTDA proceedings, conduct that is well within the scope of judicial duties. Judge Noll is therefore immune from suit as to Plaintiff's claims against her under the

doctrine of judicial immunity. The Court dismisses Plaintiff's claims against Judge Noll because Plaintiff seeks monetary relief against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

**E. Claims Brought Against Former HRA Commissioner Banks and HRA employee Benjamin-Solis**

**1. Claims that arose before August 10, 2020 against Banks and Benjamin-Solis**
 **\*7** In *Komatsu I*, Plaintiff brought several claims against Banks and Benjamin-Solis that were considered on the merits by Judge Stanton and dismissed for failure to state a claim. *See* § 1915(e)(2)(B)(ii). In *Komatsu II*, Plaintiff brings the same claims against these Defendants, as well as new claims arising from the same conduct, that is, Plaintiff's litigation with HRA. These claims are barred under the doctrine of claim preclusion.[3]

3

> Although claim preclusion is an affirmative defense to be pleaded in a defendant's answer, *see* Fed. R. Civ. P. 8(c), the Court may, on its own initiative, raise the issue. *See, e.g., Grieve v. Tamerin*, 269 F.3d 149, 154 (2d Cir. 2001) (affirming district court's dismissal on grounds of issue preclusion even though defendant failed to plead that defense, and noting that "principles of preclusion involve" not only "the rights and interests of the parties," but also "important interests of the public and the courts in avoiding repetitive litigation and potentially inconsistent decisions").

Under the doctrine of claim preclusion, also known as "*res judicata*," a litigant may not bring a new case that includes claims or defenses that were or could have been raised in an earlier case in which the same parties were involved if that case resulted in a judgment on the merits. *Brown v. Felsen*, 442 U.S. 127, 131 (1979). Claim preclusion "prevents parties from raising issues that could have been raised and decided in a prior action – even if they were not actually litigated." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594, 206 L. Ed. 2d 893 (2020).

2023 WL 419699

Claim preclusion generally applies if: "(1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *In re Motors Liquidation Co.*, 943 F.3d 125, 130 (2d Cir. 2019) (citation and internal quotation marks omitted).

To determine if a claim could have been raised in an earlier action, courts look to whether the present claim arises out of the same transaction or series of transactions asserted in the earlier action, *see Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001), or, in other words, whether facts essential to the second suit were present in the first suit, *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983). "A party cannot avoid the preclusive effect *of res judicata* by asserting a new theory or a different remedy." *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017) (internal quotation marks and citation omitted).

All of Plaintiff's claims brought against Benjamin-Solis, and some of the claims brought against Banks, accrued before Plaintiff filed *Komatsu I*. Further, all of the claims brought against Benjamin-Solis and some of the claims brought against Banks in *Komatsu II* arise from the same series of transactions as the claims asserted against them in *Komatsu I*. Because Plaintiff did bring those claims, or could have brought those claims in *Komatsu I*, those claims are barred under the doctrine of claim preclusion.

### 2. Claims against Banks that accrued after August 14, 2020

Plaintiff brings new claims against Banks regarding his interactions with Banks at public meetings. Plaintiff is barred from bringing new claims against City officials regarding incidents occurring at public meetings, unless he receives permission to do so. Because Plaintiff did not seek permission to file new claims against these individuals, as discussed below in Section J, those claims are dismissed without prejudice.

**\*8** With respect to Bank's alleged interference with Plaintiff's retaining *pro bono* counsel, Plaintiff does not suggest a violation of a constitutional right. The Sixth Amendment, which provides a right to counsel in criminal cases, "does not govern civil cases." *Turner v. Rogers*, 564 U.S. 431, 441 (2011). Thus, to the extent Banks interfered with Plaintiff's retaining counsel, such interference does not implicate Plaintiff's rights under the United States Constitution. Accordingly, the claims against Banks

concerning *pro bono* counsel are dismissed for failure to state a claim.

### F. The City of New York and HRA Commissioner Jenkins

The Court dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, who is sued in his official capacity. When a plaintiff sues a municipality under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

To state a Section 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff alleges no facts showing that the City of New York violated any of his federal constitutional or statutory rights because of one of the City's policies, customs, or practices. The Court therefore dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, sued in his official capacity, for failure to state a claim on which relief may be granted.

### G. Section 1983 Claims Brought Against Private Defendants

Plaintiff brings Section 1983 claims against private individuals and entities, also named in *Komatsu I*, that is: Urban, Abad, Coates, Lombardi, Paulemont, Shack, and Southwell. Judge Stanton dismissed these claims for failure to state a claim because Plaintiff failed to show that any conduct by these private individuals could be considered state action. Now, Plaintiff reasserts similar claims against these same private individuals and also names additional

2023 WL 419699

private individuals, not named in *Komatsu I*, that is: Saunders, Nastachowski, and Cohen. Plaintiff still does not show, however, that these defendants' conduct can be considered state action. Thus, for the reasons set forth in Judge Stanton's order, dismissing the Section 1983 claims against the private individuals, the Court dismisses Plaintiff's claims against the individual defendants named in this action for failure to state a claim.

## H. Claims Under Civil RICO

Plaintiff asserts that Defendants have conspired against him, in violation of the civil provision of RICO. Plaintiff brought similar claims in *Komatsu I*, and Judge Stanton dismissed those claims because Plaintiff failed to show that Defendants engaged in any activity that would support any claim under civil RICO. In this action, Plaintiff also fails to state any facts suggesting a RICO violation. The Court therefore dismisses Plaintiff's claims under civil RICO for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

## I. Claims Under the Fair Debt Collection Practices Act ("FDCPA")

**\*9**  Plaintiff brings claims against the Urban and DNCT Defendants, asserting that they violated the FDCPA. He alleges that they falsely claimed in court that Plaintiff owed rent. He relies on a district court decision, in which a consumer sued a law firm that was a debt collector. *Lee v. Kucker & Bruh*, LLP, 958 F. Supp. 2d 524, 526 (S.D.N.Y. 2013) ("Defendant K & B is a law firm that primarily represents landlords in New York City. K & B is a debt collector as defined by the FDCPA.").

The FDCPA applies to consumer debt "arising out of ... transaction[s] ... primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 551 (S.D.N.Y. 2013) ("[T]he FDCPA is triggered when the obligation is a debt arising out of a consumer transaction"). In cases where the FDCPA applies, it prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692e. A debt collector is defined in Section 1692a(6) as: (1) a person whose principal purpose is to collect debts; (2) a person who regularly collects debts owed to another; or (3) a person who collects its own debts, using a name other than its own as if it were a debt collector. *See also Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) (holding that entities that regularly purchase debts originated by someone

else and then seek to collect those debts for their own account are not necessarily debt collectors subject to the FDCPA).

Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Conduct in violation of the statute includes, among other examples and without limitation, using violence or the threat of violence or other criminal means; using obscene or profane language "the natural consequence of which is to abuse the hearer or reader"; publishing a list of consumers who refuse to pay debts; or "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass" the person called. 15 U.S.C. § 1692d.

Plaintiff's claims against the Urban Defendants fails to state claims upon which relief may be granted because Plaintiff does not state facts suggesting that they are debt collectors. His claims against the DNCT Defendants, however, may state claims, if he can show that these defendants engaged in harassing conduct with respect to the alleged debt owed to Urban.

As discussed below, the Court grants Plaintiff leave to file an amended complaint as to his FDCPA claims against DNCT and the DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun. His FDCPA claims brought against Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, and Nancy Southwell are dismissed for failure to state a claim upon which relief may be granted.

## J. Claims Against former Commissioner Banks, Pinny Ringel, and Lori Kletter

Plaintiff's claims against former Commissioner Banks, Ringel and Kletter, that arise out of alleged conduct by New York City officials at public meetings, fall within the scope of Judge Ramos's order requiring Plaintiff to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45). These claims are therefore dismissed without prejudice because Plaintiff has not obtained permission to bring these claims against these defendants.

## K. Claims Under State Law

**\*10**  A district court may decline to exercise supplemental jurisdiction over claims under state law when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction ...." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). At this stage, it is premature to determine whether the Court will decline to exercise its supplemental jurisdiction over any claims under state law that Plaintiff is asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### LEAVE TO AMEND

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). The Court, having dismissed all of the claims brought against the DNCT Defendants except the FDCPA claims, finds that it would be futile to grant him leave to amend the non-FDCPA claims. Accordingly, the Court grants Plaintiff leave to file an amended complaint to assert his FDCPA claims against the DNCT Defendants. The amended complaint must only name the DNCT Defendants and only assert the FDCPA claims, and it may not exceed 20 pages. These limitations are imposed based on Plaintiff's litigation history in this court, where he reasserts the same claims against the same defendants following dismissal of such claims on the merits. The page-limitation is imposed because Plaintiff's pleadings, both in this action and prior actions, do not comply with Rule 8's requirement that his complaint consist of short and plain statements. *See Fed. R. Civ. P. 8(a)*.

Should Plaintiff submit an amended complaint that fails to comply with these requirements, the Court will direct the Clerk of Court to return Plaintiff's pleading and will provide him one more opportunity to submit an amended complaint that does not exceed 20 pages, names DNCT Defendants, and asserts FDCPA claims. If he fails to comply with the requirements a second time, the Court will dismiss the action for failure to comply with the Court's order.

### CONCLUSION

The Court dismisses Plaintiff's federal claims brought against Urban Pathways, Inc., Neighborhood Association For Inter-Cultural Affairs, Inc., The City Of New York, Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Ariana Saundersm, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim, Gary Jenkins, Lawrence Marks, Maura Noll, and Daniel Tietz, as frivolous, for failure to state a claim on which relief may be granted, and for seeking monetary relief from defendants that are immune from such relief. *See 28 U.S.C. § 1915(e)(B)(i)-(iii)*.

Those claims brought against Steve Banks, Penny Ringel, and Lorri Kletter that arise out of public meetings are dismissed without prejudice, pursuant to the prefiling injunction issued in *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45).

The Court grants Plaintiff leave to file an amended complaint that complies with the standards set forth above.

**\*11**  Plaintiff must submit the amended complaint, which may not exceed 20 pages, to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 22-CV-9080 (LTS).

An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____
Write the full name of each plaintiff.

-against-

_____

_____

_____
Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

_____CV_____
(include case number if one has been
assigned)

**AMENDED**

**COMPLAINT**

Do you want a jury trial?
☐ Yes    ☐ No

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore not contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include only: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 2/10/17

### I.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of
cases can be heard in federal court: cases involving a federal question and cases involving
diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United
States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332,
a case in which a citizen of one State sues a citizen of another State or nation, and the amount
in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may
be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐    Federal Question

☐    Diversity of Citizenship

### A.    If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

### B.    If you checked Diversity of Citizenship

#### 1.    Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
              (Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing
information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____ , is a citizen of the State of
              (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____ , is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

### II.    PARTIES

#### A.    Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____
First Name          Middle Initial       Last Name

_____
Street Address

_____
County, City                      State            Zip Code

_____
Telephone Number                  Email Address (if available)

Page 3

**B.  Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                     Zip Code

Defendant 2:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                     Zip Code

Defendant 3:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                     Zip Code

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Page 4

Page 6

Defendant 4:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                     Zip Code

**III. STATEMENT OF CLAIM**

Place(s) of occurrence:

Date(s) of occurrence:

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do to that harmed you. Attach additional pages if needed.

**V.  PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated                                              Plaintiff's Signature

First Name          Middle Initial        Last Name

Street Address

County, City                        State              Zip Code

Telephone Number                          Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 5

Page 7

2023 WL 419699

**All Citations**

Slip Copy, 2023 WL 419699

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 3952903
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Vincent P. McCRUDDEN, Plaintiff,

v.

E–TRADE FINANCIAL CORP, et al., Defendants.

No. 13cv8837.
|
Signed Aug. 12, 2014.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge.

**\*1** Plaintiff *pro se* Vincent P. McCrudden brings this action alleging violations of the Civil Rights Act of 1964, the Workforce Investment Act of 1998, and the Sherman Act. Defendants [1] move to dismiss the second amended complaint for failure to state a claim. For the following reasons, the motion is granted.

[1]   The many defendants in this action are AMP Global Clearing, LLC; Apex Clearing Corp.; Avail Trading Corp.; E*TRADE Financial Corp.; GAIN Capital Group, LLC; Insignia Futures & Options, Inc.; Institutional Liquidity, LLC; INTL FCStone Inc.; Ironbeam, Inc.; Lightspeed Trading, LLC; TD Ameritrade Holding Corp.; tradeMONSTER Group, Inc; and TradeStation Securities, Inc.

*BACKGROUND*

The motion papers allege government conspiracies, death threats, and an ostensibly innocent man imprisoned after being framed by the NSA. [2] But the facts alleged in the complaint, and relevant for the purpose of this motion to dismiss, are far more mundane. In 2013, McCrudden opened or attempted to open securities or futures trading accounts with each Defendant. Those Defendants who did not deny his application in the first place closed his accounts soon after he opened them. McCrudden alleges that refusing to establish trading accounts in his name was unlawful discrimination and violated antitrust laws.

[2]   In short, McCrudden pleaded guilty in 2012 to threatening officials at various financial regulatory organizations and served 28 months in federal prison. McCrudden maintains his innocence, arguing the threats were authored by the NSA. None of this is relevant to Defendants' motion.

McCrudden opened a TD Ameritrade account in April 2013. In July 2013, he received a letter stating TD Ameritrade was closing his account. McCrudden was unable to learn why TD Ameritrade closed his account.

McCrudden opened E*Trade accounts in May 2013. In June, E*Trade sent him a letter informing it was closing his accounts.. McCrudden alleges a telephone customer service representative refused to give him any reason for the termination and did not release the funds from his accounts. A month later, a corporate manager called McCrudden to apologize and stated the customer service representative had not followed E*Trade's protocol.

McCrudden opened an optionsXpress futures account in July 2013. In September, optionsXpress sent McCrudden an email stating it reserved the right to deny or retract business. McCrudden called the person who sent him the letter, but she would not give the reason she sent it.

Also in July 2013 McCrudden applied for a Tradestation account. A sales supervisor emailed him, stating Tradestation "made a business decision not to move forward" with his account. Second Am. Compl. ¶ 92. McCrudden attempted to follow up on Tradestation's reasons and was told in an email that "it is in keeping with firm policy that we do not reveal the reason we choose not to pursue or continue a business relationship with a client." Second Am. Compl. ¶ 93.

McCrudden opened an account with Lightspeed in September 2013. Three days later, Lightspeed told McCrudden it was an introducing broker for RJ O'Brien and asked him to open an account with RJ O'Brien, which he did. The next day, Lightspeed told McCrudden "several issues have come up from the compliance department" and asked him not to make trades, as his accounts had been restricted. Second Am. Compl. ¶ 80. Lightspeed later closed his accounts without providing a reason.

A broker at ATC Brokers solicited McCrudden to open a futures trading account in September 2013. McCrudden applied for an account, but ATC Brokers denied his

application. McCrudden alleges ATC Brokers is an introducing broker for GAIN Capital. McCrudden requested financial information from ATC Brokers, which it did not provide.

**\*2** Also in September 2013, McCrudden applied for a futures trading account with MBF. He alleges MBF is an introducing broker for FCStone. About two weeks after McCrudden's application, MBF responded by email and stated that after performing "due diligence," it would not open an account for him. McCrudden requested further information, but MBF's vice president, acting on behalf of FCStone, told him that FCStone does not disclose its reasons for rejecting account applications.

McCrudden opened a futures account with Global Futures in October 2013, which McCrudden states is an introducing broker for AMP Global. AMP Global closed the account in December. McCrudden was told only that his account "does not meet our current risk parameters." Second Am. Compl. ¶ 83.

McCrudden also applied for an Insignia account in October 2013. McCrudden alleges Insignia is an introducing broker for Ironbeam. The day after McCrudden applied, Insignia sent him an email stating it could not give him an account because of "past or pending regulatory actions" by the National Futures Association and the Commodity Futures Trading Commission. Second Am. Compl. ¶ 85.

Finally, McCrudden opened an account with Velocity Futures on October 15, 2013. He alleges Velocity Futures is an introducing broker to Institutional Liquidity. On October 18, Velocity Futures gave him a different account number and delayed his ability to begin trading. When he inquired as to his account's status in December, he was told his "account was denied by compliance," but he was not told why. Second Am. Compl. ¶ 90. The next day, Institutional Liquidity's CEO called McCrudden and said they could terminate a business relationship for any reason.

*DISCUSSION*

I. *Legal Standard*

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accented as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S.

544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Iqbal,* 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (internal punctuation omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 679). On a motion to dismiss, courts may consider "facts stated on the face of the complaint, in the documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

**\*3** A *pro se* complaint must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1980). Courts must liberally construe a *pro se* pleading "to raise the strongest arguments it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir.2014) (quoting *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013)).

II. *Title VI of the Civil Rights Act of 1964*

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a Title VI claim, a plaintiff must show (1) the defendants receive federal financial assistance, (2) their actions were discriminatory based on race, color, or national origin, (3) the discrimination was intentional, and (4) the discrimination was a "substantial or motivating factor" for defendants' actions. *Tolbert v. Queens College,* 242 F.3d 58, 69 (2d Cir.2001). A plaintiff alleging discrimination "must do more than recite conclusory assertions. In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994).

McCrudden does not allege his race, color, or national origin. He does not allege which of these was the basis of the

Defendants' "discrimination." He does not allege any reason to believe he was discriminated against on the basis of race, color, or national origin, and in fact in his opposition brief states he has "no idea the exact reason he was discriminated against." ECF No. 90 at 10. This does not give "rise to a plausible inference of [ ] discriminatory intent." *Yusuf,* 35 F.3d at 713.

Nor does McCrudden allege that Defendants operate programs or activities receiving federal assistance. The Department of Health & Human Services's regulations interpreting Title VI state that

> Federal financial assistance includes (1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

**\*4** 45 C.F.R. § 80.13. A Title VI plaintiff must allege he is the intended beneficiary of a specific program or activity which receives federal financial assistance. *Kelly v. Rice,* 375 F.Supp.2d 203, 209 (S.D.N.Y.2005). McCrudden alleges only that "defendants benefit directly or indirectly by Government, low cost funding." This is insufficient to establish that McCrudden is the intended beneficiary of federally-assisted programs or activities run by Defendants.

Because McCrudden has not alleged any of the elements of a Title VI discrimination claim, that claim is dismissed.

### III. *Workforce Investment Act of 1998*

The non-discrimination provision of the Workforce Investment Act of 1998 provides that

> [n]o individual shall be excluded from participation in, denied the benefits of, subjected to discrimination under, or denied employment in the administration of or in connection with, any [program or activity funded under the Workforce Investment Act] because of race, color, religion, sex (except as otherwise permitted under title IX of the Education Amendments of 1972), national origin, age, disability, or political affiliation or belief.

29 U.S.C. § 2938(a)(2). But there is no private right of action under this section. Instead, the Secretary of Labor and Attorney General are charged with enforcement. *See* 29 U.S.C. § 2938(b)–(c); *Machie v. Nguyen,* 824 F.Supp.2d 146, 151 (D.D.C.2011); *McGowan v. New Jersey,* Civil Action No. 08–5841, 2009 WL 1687663, at \*8 (D.N.J. June 16, 2009); *Borrero–Rodriguez v. Montalvo–Vazquez,* 275 F.Supp.2d 127, 132 (D.P.R.2003).

Moreover, McCrudden does not allege that any Defendant received funding under the Workforce Investment Act or that he was excluded from or denied employment in connection with any program or activity funded under the statute. This too is fatal to his claim. *Machie,* 824 F.Supp.2d at 151.

### IV. *Sherman Act*

McCrudden alleges violations of sections 1 and 2 of the Sherman Act. To have "antitrust standing," a plaintiff must have suffered "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). "The injury must reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.,* 429 U.S. at 477.

McCrudden's alleged injury is the Defendants' refusal to conduct business with him. But refusing an individual customer's business is not anticompetitive. *See Ruotolo*

*v. Fannie Mae,* 933 F.Supp.2d 512, 520 (S.D.N.Y.2013) ("[T]he antitrust laws were enacted for the protection of competition, not the protection of a single market participant like Plaintiff." (internal quotation marks and emphasis removed)). Because McCrudden has not suffered an injury the antitrust laws were intended to prevent, he does not have antitrust standing. His Sherman Act claims must therefore be dismissed.

V. *Leave to Replead*

**\*5** "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 53 (2d Cir.1999). In particular, a *pro se* complaint should not be dismissed without at least one opportunity to replead "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

McCrudden filed an amended complaint on February 6, 2014 (ECF No. 60). On February 27, 2014, Defendants sent this Court and McCrudden a pre-motion letter, as required by this Court's individual rules of practice, outlining their anticipated arguments for a motion to dismiss. (ECF No. 69). This Court

held a pre-motion conference on March 28, 2014, where Defendants elaborated on their arguments for dismissing the amended complaint. This Court granted McCrudden leave to file a second amended complaint to address those arguments, but cautioned that he would not be given leave to replead if the motion to dismiss the second amended complaint was granted. (ECF No. 83). And even a liberal reading of McCrudden's complaint gives no indication that he has a valid claim, making leave to replead futile. His claims are therefore dismissed with prejudice.

*CONCLUSION*

Defendants' motion to dismiss the second amended complaint is granted. McCrudden's claims are dismissed with prejudice. The Clerk of Court is directed to terminate all pending motions and mark this case closed.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3952903

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1687663
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Michael G. McGOWAN, Plaintiff,

v.

State of NEW JERSEY, et al., Defendants.

Civil Action No. 08–5841(FLW).
|
June 16, 2009.

West KeySummary

**1**    **Civil Rights** 🔑  Time for proceedings; limitations

An employer was entitled to dismissal of a job applicant's Title VII claim for race and age discrimination after it hired three younger, allegedly less qualified minorities over him. The applicant failed to file suit within 90 days of receipt of a right-to-sue letter from the Equal Employment Opportunity Commission. Thus, the applicant's claim was time-barred. Civil Rights Act of 1964, § 706(e)–(1), 42 U.S.C.A. § 2000e–5(e)–(1).

5 Cases that cite this headnote

**Attorneys and Law Firms**

Michael G. McGowan, Robbinsville, NJ, pro se.

Debra Marie McGarvey, Jane A. Greenfogel, Office of the New Jersey Attorney General, Trenton, NJ, William F. Maderer, David Andrew Cohen, Saiber LLC, Newark, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1**  Before the Court are Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) brought by defendants, State of New Jersey, Office of the Attorney General, New Jersey Department of Community Affairs ("DCA"), and Jon Corzine, (collectively "State Defendants")[1] and Defendant New Jersey Housing and Mortgage Finance Agency ("HMFA"), to dismiss the claims of *pro se* Plaintiff Michael G. McGowan ("McGowan"). In his ten-count Complaint[2], McGowan alleges: (1) violations of the Civil Rights Act of 1991; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of Title VII of the Civil Rights Act of 1964 ("Title VII"); (4) violations of the New Jersey Law Against Discrimination ("NJLAD"); (5) intentional infliction of emotional distress; (6) tortious interference with economic advantage; (7) violations of the First Amendment; (8) violations of the Fifth Amendment; (9) violations of the Age Discrimination Employment Act ("ADEA"); and (10) and violations of the Workforce Investment Act ("WIA") and Age Discrimination Act of 1975 ("Age Act") arising from alleged discriminatory conduct in Defendants' hiring practices. The Court has reviewed Defendants' Motions, which McGowan has not opposed, and for the reasons set forth below, HMFA's Motion is granted while State Defendants' Motion is granted in part and denied in part. In particular, State Defendants' Motion is denied with respect to McGowan's NJLAD claims of discrimination with regard to the DCA hirings of September 18, 2006 and February 2007. The Motion is granted with respect to all other claims.

1    The claims, as they relate to State Defendants, allege discriminatory conduct almost exclusively by DCA. As such, the DCA and State Defendants will be discussed interchangeably.

2    The Complaint includes Counts numbered One through Eleven, but lacks a "Count Four."

**I. FACTUAL BACKGROUND**
Since Defendants move to dismiss Plaintiff's claims pursuant to Fed.R.Civ.P. 12(b)(6), the following version of events assumes Plaintiff's allegations to be true; moreover, since Plaintiff is *pro se,* the Court will read his Complaint liberally. McGowan alleges that his employment with HMFA was "illegally terminated" by DCA commissioner Susan Bass–Levin in May of 2002. Compl. ¶ 11. He further alleges that, due to racial, political, and age-based discrimination, his subsequent attempts to gain new employment at DCA and to regain employment at HMFA were unsuccessful, despite outstanding qualifications. Compl. ¶ 27.

Specifically, McGowan alleges that Bass–Levin ordered the termination of his employment at HMFA in May of 2002, despite "stellar annual reviews" and significant achievements at his position. Compl. ¶ 11. He claims that Bass–Levin terminated numerous HMFA employees in order to make room for individuals with influential connections in the New Jersey Democratic Party, and that McGowan in particular was terminated due to the fact that he is a registered Republican. Compl. ¶¶ 11–12, 27. McGowan appears to use these facts as background evidence to support his claims of discrimination, which relate exclusively to Defendants' conduct during the hiring process when he applied for employment at DCA and reapplied for employment at HMFA. None of McGowan's claims are based on his 2002 termination from HMFA.[3] McGowan alleges that in 2006 he applied to the New Jersey Department of Personnel for a position at DCA. Compl. ¶ 16. He took a competitive qualification exam and received a Notification of Certification that he had finished with the highest score on the exam among all candidates statewide, earning him the number one ranking for consideration for DCA job openings. Compl. ¶ 16. The DCA interviewed McGowan on July 12, 2006, and although he was told that a second interview with the Division Director would be scheduled, he was informed on September 13, 2006, that another candidate had been selected for the position. Compl. ¶¶ 19–21.

[3] McGowan alleges that six employees that were terminated by HMFA filed an employment discrimination lawsuit against DCA, the State of New Jersey, and Bass–Levin, and that he did not join that suit. Compl. ¶ 14. To the extent that his claim is based on his termination from HMFA, it is time barred. Certainly, McGowan may not invoke the discovery rule because he clearly knew the existence of his claims at that time and that a similar lawsuit had been filed by other terminated employees.

**\*2** McGowan later learned that the DCA positions for which he had interviewed had been filled by three younger, less qualified minorities. Compl. ¶¶ 21–22. McGowan asserts that these individuals were less qualified because they scored lower than McGowan on the competitive placement exam. Compl. ¶ 10. McGowan further asserts that these individuals were hired on September 11, 2006, September 18, 2006, and February 2007. Compl. ¶¶ 21–22. The reason that DCA failed to hire him, according to McGowan, is at least partially due to the influence of Bass–Levin who "black-balled"

him for politically discriminatory reasons. Compl. ¶¶ 26, 38–42. McGowan also alleges that HMFA failed to even acknowledge his application for reemployment, initiated after his termination, because Bass–Levin had instructed HMFA personnel not to consider him. Compl. ¶¶ 52–62.

McGowan filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against DCA in July of 2007, alleging discrimination in its hiring practices (Compl. ¶¶ 63–74; State Defendants Ex. B), and the EEOC returned a dismissal of the charge and a right-to-sue letter to McGowan on March 3, 2008 (State Defendants Ex. C).

McGowan initiated this action in the Superior Court of New Jersey, Law Division, Mercer County on September 17, 2008. The case was then removed to this Court. Now, Defendants move to dismiss McGowan's Complaint in its entirety. McGowan has not filed opposition to these Motions.

## II. DISCUSSION

### A. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 1968 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of"

McGowan v. New Jersey, Not Reported in F.Supp.2d (2009)

2009 WL 1687663

the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 545).

**\*3** When a party fails to oppose a motion to dismiss for failure to state a claim, a court is still obligated to address the motion on its merits; thus, this Court must determine whether Plaintiff's claims fail to state a claim upon which relief can be granted pursuant to *Fed. R. Civ.* P. 12(b)(6). *West v. American Honda Motor Co.,* No. 08–0700, 2008 WL 4104683, at *2 (D.N.J. Aug.28, 2008) (citing *Stackhouse v. Mazurkiewicz,* 951 F.2d 29, 30 (3d Cir.1991)).

The Court is obligated to construe Plaintiff's *pro se* pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2004) ("[The Court will] apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."). However, *pro se* parties must still comply with the pleading standards as set forth in Federal Rule of Civil Procedure 8(a)(2), which requires the allegations in a complaint to set out a "short and plain statement of the claim." *Fed.R.Civ.P.* 8(a)(2). Notwithstanding this generous standard, a *pro se* party cannot rely on bald assertions or legal conclusions to survive a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). In applying 8(a), the Court "must determine whether, under any reasonable reading of the pleadings, the plaintiff[ ] may be entitled to relief, and ... must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citing *Holder v. Allentown,* 987 F.2d 188, 194 (3d Cir.1993)); *Eli Lily & Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 474 (D.N.J.1998) (citing *Nami* and *Holder* ).

## B. Plaintiff's Claims

### 1. Count One: Violation of the Civil Rights Act of 1991.

McGowan alleges that DCA hiring practices discriminated against him in violation of the Civil Rights Act of 1991, Pub.L. 102–166. Compl. ¶¶ 28–37. The Act, however, provides no private right of action, as it merely amended previously existing statutes, including Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.,* the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.,* and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*

Indeed, the Act's stated purposes include, among others, an intention "to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964." Pub.L. 102–166. Defendants argue, and this Court agrees, that this statute merely amends certain terms of previously existing statutes; it did not create a separate statute under which relief can be sought. Accordingly, McGowan's claims under the Civil Rights Act of 1991 are dismissed. McGowan's proper remedy lies within 42 U.S.C. § 1983. However, he did not plead such and the Court will not rewrite his claim for him, particularly where he has failed to oppose Defendants' Motions.

### 2. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing
**\*4** McGowan alleges that his application for employment failed, at least in part, because he was "black-balled" by Bass–Levin, subjected to unfair hiring practices, and passed-over in favor of younger, less qualified minority applicants. Compl. ¶¶ 38–42. These hiring practices, he alleges, represent a breach of the implied covenant of good faith and fair dealing. *Id.*

The Court agrees with Defendants that this claim must be dismissed, as Plaintiff alleges only that defendants failed to hire him. "The doctrine of good faith and fair dealing cannot ... create rights or obligations in the absence of a valid contract." *Pepe v. Rival Co.,* 85 F.Supp.2d 349, 390 (D.N.J.1999), *aff'd without opinion,* F.3d 1078 (3d. Cir.2001) (citations omitted). McGowan has failed to allege that a valid contract existed between himself and any of the Defendants; his claim, therefore, is dismissed.

### 3. Count Three: Violation of Title VII
McGowan alleges that Defendants failed to hire him based on his race and age by "target[ing] the hiring" of three younger, less qualified minorities over him, despite outstanding qualifications, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Compl. ¶¶ 43–51.

Defendants move to dismiss this claim on the grounds that McGowan has failed to comply with certain procedural requirements of Title VII. A plaintiff filing a discrimination suit pursuant to Title VII is required to file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory conduct. 42 U.S.C. § 2000–5(e)–(1). *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 108–11, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("An individual

2009 WL 1687663

[filing suit under Title VII] *must* file a charge [with the EEOC] within the statutory time period and serve notice upon the person against whom the charge is made." (emphasis added)). Where the EEOC has decided to dismiss a plaintiff's charge of discrimination, it will issue to the plaintiff a right-to-sue letter, the receipt of which gives the plaintiff 90 days to file suit against the party named in his charge of discrimination. 42 U.S.C.2000e–5(f)–(1). Title VII's requirement that a suit be filed within 90 days of receipt of the EEOC's right to sue letter acts as a statute of limitations on such claims, *Montecalvo v. Trump's Taj Mahal Casino,* No. 97–3876, 1997 WL 786985 at *1 (E.D.Pa. Nov.26, 1997) (citing *Mosel v. Hills Department Stores,* 789 F.2d 251, 253 (3d Cir.1986)), and the failure to timely comply with this requirement is cause for dismissal. *Phillippeaux v. County of Nassau,* 921 F.Supp. 1000, 1006 (E.D.N.Y.1996). *See e.g., Mosel, supra,* 789 F.2d at 253 (holding Title VII plaintiff's complaint untimely because it was filed 91 days after receipt of EEOC right-to-sue letter).

Though McGowan filed a charge of discrimination with the EEOC against DCA, he failed to file suit within 90 days of receipt of the right-to-sue letter. McGowan's EEOC right-to-sue letter was issued on March 3, 2008. Nowhere does McGowan allege when he received the letter. Nevertheless, *Fed.R.Civ.P.* 6(e) presumes that he received it three days after it was issued. *See Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) (applying Rule 6(e) presumption to receipt of an EEOC right-to-sue letter). His 90 days, therefore, began on March 6, 2008, and ran on June 4, 2008. McGowan, however, did not file his Complaint until September 17, 2008, thus his claim under Title VII is time barred.

**\*5** With respect to McGowan's Title VII claim against HMFA, he has not alleged that he filed the required charge of discrimination with the EEOC. Failure to comply with the statutory requirements of Title VII preclude McGowan from bringing his Title VII claim against HMFA. Therefore, it is dismissed.

### 4. Count Five: Violation of NJLAD

McGowan alleges violations of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1, *et seq.,* through claims of discrimination and hostile work environment alleged in connection with Defendants' failure to hire him as an employee. Compl. ¶¶ 52–62. Specifically, he alleges that DCA's failure to hire him and HMFA's failure to re-hire him represented "an intentional, pervasive, and continuing pattern of employment discrimination." Compl. ¶ 53.

As a preliminary matter, it is important to note that all of McGowan's claims relate exclusively to Defendants' conduct occurring after his termination from HMFA. His claims against DCA and HMFA all arise from alleged discrimination in their failure to hire and re-hire him, respectively.

McGowan's hostile work environment claims are dismissed as he has failed to allege that he was employed by DCA or HMFA at the relevant times. In order to establish a cause of action for hostile work environment under NJLAD, a plaintiff must show that the defendant subjected him to conduct so severe or pervasive that a reasonable person would believe that *the conditions of employment* have become hostile or abusive. *Shepard v. Hunterdon Developmental Ctr. ., 174 N.J. 1, 24, 803 A.2d 611 (2002)* (emphasis added). In other words, McGowan would have to be employed in order to assert claims of hostile work environment. As he did not allege that he was employed by any of the Defendants during the alleged unlawful conduct, these claims are dismissed.

Alternatively, McGowan alleges discrimination, in violation of NJLAD, based on Defendants' failure to hire him. To the extent that McGowan's discrimination claims relate to acts occurring prior to September 17, 2006, they are barred by the statute of limitations under NJLAD. A two-year statute of limitations period applies to each of McGowan's failure to hire claims because they are based on discrete events. *See Montells v. Haynes,* 133 N.J. 282, 292, 627 A.2d 654 (1993). In *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court stated that a refusal to hire, as is alleged here, is a discrete act. As such, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' " *Id.* at 114. Moreover, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113.

Here, McGowan asserts that DCA discriminated against him by hiring less qualified, younger minorities. He asserts specifically that these individuals were hired on September 11, 2006, September 18, 2006, and February 2007. Compl. ¶¶ 10, 21–22. Because he filed his Complaint on September 17, 2008, McGowan's claim relating to the September 11, 2006 hire is dismissed as time barred. This Court finds, however, that McGowan's discrimination claims based on DCA's hirings of September 18, 2006 and February 2007 must survive State Defendant's Motion to Dismiss, as they

fall within the relevant limitations period. State Defendants do not specifically address these claims in their Motion, but rather, they summarily assert that all of McGowan's NJLAD discrimination claims are time barred. This Court finds, however, that McGowan has pled sufficient facts for these claims to survive the Motion. An employment discrimination plaintiff need not plead a prima facie case of discrimination. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Indeed, the Third Circuit has held that an employment discrimination plaintiff need only plead facts sufficient to satisfy the notice pleading standard of *Fed.R.Civ.P.* 8(a). *Thomas v. Independence Twp.,* 463 F.3d 285, 295 (3d Cir.2006). Although the Supreme Court's holding in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) heightened the pleading standard under Rule 8(a), the Court specifically reaffirmed the holding in *Swierkiewicz* that a plaintiff in an employment discrimination case need not plead a prima facie case. *Twombly,* 550 U.S. at 569–70; *see Bell v. KA Indus. Services, LLC,* 567 F.Supp.2d 701, 706–7 (D.N.J.2008). Therefore, "the elements of the prima facie claim do not have to be proven, but merely must be plausible." *Bell,* 567 F.Supp.2d at 706–7 (citing *Twombly,* 550 U.S. at 569–70). Here, McGowan alleges that DCA hiring practices subjected him to racial and age-based discrimination due to the fact that DCA failed to hire him and instead hired younger minorities who received lower scores on the competitive placement exam. Compl. ¶ 10. He further alleges that the State and its agencies, including DCA, specifically targeted the hiring of minorities and that these practices have a disparate impact on caucasians. Compl. ¶¶ 49–51. Whether McGowan may be able to establish a prima facie case of employment discrimination is not at issue, since this is a 12(b)(6) motion, and the Court finds that the facts alleged by McGowan make a plausible claim of employment discrimination. As such, Defendants' motion in this regard is denied.

***6** As they relate to HMFA, McGowan's claims of discrimination allege only that he applied for several positions at HMFA for which he was well qualified, but never got the job because Bass–Levin had made sure he would not be considered. Compl. ¶ 60. He makes no allegation that age or race had any bearing on the employment decisions at HMFA. He, instead, relies on statistics to show a disparate impact on caucasians in New Jersey State employment (Compl. ¶ 61), but fails to allege that any minorities or younger persons were hired over him or indeed that race or age had any bearing on the hiring practice. In fact, he specifically alleges that HMFA had no contact with him during the hiring process and that it failed to acknowledge his application. Compl. ¶ 60. While the Court recognizes that McGowan need not establish a prima facie case in his pleadings, *Bell,* 567 F.Supp.2d at 706–7, he must still plead facts sufficient to meet the standard of *Fed.R.Civ.P.* 8(a). *Id.* McGowan has not pled any facts sufficient to raise his claims above a speculative level in this respect. Moreover, McGowan's claim as it relates to HMFA is based on the proposition that Bass–Levin adversely influenced the hiring process. His allegations, however, only support the inference that Bass–Levin discriminated against him based on political views and there is no indication of racial or age-based discrimination. "[T]he NJLAD prohibits employers from discriminating in employment on numerous bases, but these do not include political affiliation." *Siss v. County of Passaic,* 75 F.Supp.2d 325 (D.N.J.1999). Thus, McGowan's NJLAD claim of discrimination by HMFA is dismissed.

**5. Counts Six and Seven: Tort Claims**

McGowan alleges that Defendants intentionally inflicted upon him "a pervasive and routine discrimination in its hiring practices," thus subjecting him to intentional infliction of emotional distress. Compl. ¶¶ 63–65. He claims, further, that Defendants' subjected him to tortious interference with economic advantage through their hiring practices which allegedly discriminated against him based on his political affiliation, race, and age. Compl. ¶¶ 66–74.

Defendants move to dismiss these two tort claims for McGowan's failure to comply with the notice provisions of the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:1–1, *et seq.* The NJTCA provides the following with regard to notice of claims:

> A claim relating to a cause of action for ... injury or damage to person or to property shall be presented as provided in this chapter not later than the accrual of the cause of action ... *The claimant shall be forever barred from recovering against a public entity or public employee if: (a) He failed to file his claim with the public entity within 90 days of accrual of his claim* except as otherwise provided in section 59:8–9

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 178 of 251
McGowan v. New Jersey, Not Reported in F.Supp.2d (2009)
2009 WL 1687663

N.J. Stat. Ann. § 59:8–8 (emphasis added).

By its terms, the NJTCA requires that a notice of a claim be presented no later than 90 days after the accrual of the cause of action. "Accrual" of a claim occurs when, among other things, the tort is committed. N.J. Stat. Ann. § 59:8–1. Moreover, claims for intentional infliction of emotional distress and tortious interference with economic advantage are torts subject to the NJTCA. *See Velez v. City of Jersey City,* 180 N.J. 284, 286, 294–95, 850 A.2d 1238 (2004) (holding that the notice requirements of the of the of the NJTCA apply to common law intentional tort actions). Further, it is proper to dismiss a tort claim where plaintiff has failed to fulfill the notice requirements of the NJTCA. *Wilson v. NJ State Police,* No. 04–1523, 2006 WL 2358349 (D.N.J. Aug.15, 2006).

**\*7** Here, McGowan has not pled that he filed the required NJTCA notice within 90 days of the accrual of his cause of action. As such, McGowan's tort claims, Counts Six and Seven, are dismissed.

### 6. Counts Eight and Nine: Constitutional Claims

In Counts Eight and Nine of his Complaint, McGowan alleges that Defendants have violated his First and Fifth Amendment rights, respectively. Compl. ¶¶ 75–83. A claim that a party's Constitutional rights have been violated, however, must be pled under the statutory mechanism for such claims, 42 U.S.C. § 1983. *See American General Life and Accident Ins. Co. v. Ward,* 509 F.Supp.2d 1324, 1334–35 (N.D.Ga.2007) ("Where federal statutes provide a remedy to redress alleged constitutional violations, there can be no independent implied cause of action under the Constitution ." (internal citations omitted)).

McGowan has not pled his First Amendment claim under section 1983 and instead has pled violations of his constitutional rights directly under the Constitution. He has, therefore, failed to properly plead that claims and accordingly, it is dismissed without prejudice. Again, while the Court is aware of McGowan's *pro se* status, the Court will not discern a section 1983 claim for him because it appears that he has abandoned his claims by failing to oppose Defendants' Motions.

Furthermore, McGowan cannot bring a Fifth Amendment claim against Defendants because Defendants are State entities. The Fifth Amendment applies only to the Federal Government, *Barron v. City of Baltimore,* 32 U.S. 243, 7

Pet. 243, 8 L.Ed. 672 (1833), and as such, McGowan's Fifth Amendment claim is dismissed.

### 7. Count Ten: Violation of the ADEA

McGowan alleges that Defendants, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.,* have wrongfully discriminated against him in their hiring practices due to the fact that he was over fifty years of age. Compl. ¶¶ 84–88.

Defendants move to dismiss McGowan's ADEA claim on the same grounds as his Title VII claim. Similar to a Title VII discrimination claim, an aggrieved party under the ADEA is required to file a charge of discrimination with the EEOC prior to instituting a civil action against an employer. 29 U.S.C. § 626(d). Specifically, the statute states that "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]. *Id.* McGowan has not alleged that he filed a charge of discrimination against the HMFA and therefore, his ADEA claim against HMFA is dismissed.

McGowan's ADEA claim against DCA is time barred and as such, it is also dismissed. Like a Title VII claim, an aggrieved party has 90 days to file suit from the date of his receipt of the EEOC's right-to-sue letter. 29 U.S.C. § 621–624. Though he filed the requisite charge of discrimination against DCA, EEOC mailed McGowan a right—to-sue letter on March 3, 2008 and his 90 day filing period therefore expired on June 4, 2008. McGowan untimely filed his Complaint on September 17, 2008, more than three months after the limitations period had run. As such, this claim is also dismissed.

### 8. Count Eleven: Violation of the WIA and the Age Act

**\*8** Lastly, McGowan alleges violations of the Workforce Investment Act of 1998, 29 U.S.C. § 2801, *et seq.,* and the Age Act of 1975, 42 U.S.C. § 6101, *et seq.* because Defendants allegedly discriminated against him through their hiring practices while they received federal funding. Compl. ¶¶ 89–93.

Defendants move to dismiss McGowan's WIA claim on the grounds that the WIA provides no private remedy. Indeed, the purpose of the WIA:

is to provide workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation.

29 U.S.C. § 2811.

In order to achieve its goals, the WIA prohibits discrimination and the denial of employment on the basis of race, color, religion, sex, national origin, age, disability, or political affiliation or belief. 29 U.S.C. § 2938(a)(2). The provisions of the WIA provide for action to be taken by the Secretary of Labor when he/she finds that a State or recipient of funds has failed to comply with the discrimination provisions of section 2938(a)(2). *Borrero–Rodriguez v. Montalvo–Vasquez,* 275 F.Supp.2d 127, 130 (D.P.R.2003). Moreover, the WIA provides that the Secretary of Labor may refer the matter to the Attorney General, and the Attorney General may bring a civil action in any appropriate district court of the United States. *Id.* (citing 29 U.S.C. § 2938(c)).

In *Borrero–Rodriguez,* the court found that "neither the statute nor its regulations contain any private remedy through which the aggrieved persons can seek redress." More specifically, the court found that

> [a]lthough the regulations promulgated by the Secretary to implement the nondiscriminatory provisions of the WIA do establish administrative mechanisms meant to ensure compliance by the recipient, if compliance is not achieved because of the recipient's refusal, the only enforcement procedures are termination, denial or withholding of funds to the recipient or a possible referral of the matter to the Attorney General with a recommendation.

> These are the sole enforcement procedures. The statute does not give the alleged victim the right to sue.

*Id.* at 132. Therefore, because the WIA does not provide McGowan the right to sue, his claim under the WIA is dismissed.

Finally, Defendants move to dismiss McGowan's claim under the Age Act. The Age Act provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. Nowhere does the Age Act provide that its prohibitions on discrimination shall apply to employment discrimination. In fact, the Age Act specifically states the contrary:

> **\*9** Nothing in this chapter shall be construed to authorize action under this chapter by any Federal department or agency with respect to any employment practice of any employer, employment agency, or labor organization, or with respect to any labor-management joint apprenticeship training program.

42 U.S.C. § 6103(c)(1). As employment discrimination is precisely the basis for McGowan's claim under the Age Act, his claim is dismissed.

**C. Supplemental Jurisdiction**

Title 28 of the United States Code, Section 1367(c) states in relevant part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, [or] the district court has dismissed all claims over which it has original jurisdiction [.]" 28 U.S.C. § 1367(c). Moreover, absent some compelling circumstances, it is generally proper for the district court to decline to exercise supplemental jurisdiction. *See Shaffer v. Albert Gallatin Area Sch. Dist.,* 730 F.2d 910, 912 (3d Cir.1984) (holding that "pendant jurisdiction [over state law claims] should be declined where

the federal claims are no longer viable, absent 'absent circumstances' " (citation omitted)); *see also Hedge v. Musco,* 204 F.3d 109, 123 (3d Cir.2000) (recognized that if the district court has dismissed all claims over which it has original jurisdiction, the court must decline to decide pendent state claims unless "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").

Courts in this circuit have consistently declined to exercise supplemental jurisdiction over state claims when all federal claims have been decided. *See Hedge,* 204 F.3d at 122–23 (upholding district court's refusal to exercise supplemental jurisdiction over state law assault and battery claims after dismissing plaintiff's § 1983 claims); *V–Tech Serv., Inc. v. Street,* 215 Fed. Appx. 93, 96 (3d Cir.2007) (refusal to exercise supplemental jurisdiction over fraud, promissory estoppel, breach of contract, and unjust enrichment claims after dismissal of RICO claims); *Wall v. Dauphin County,* 167 Fed. Appx. 309, 313 (3d Cir.2006) (dismissal of state claims for lack of jurisdiction after dismissal of plaintiff's § 1983 and § 1985 claims); *Mosca v. Cole,* 384 F.Supp.2d 757,

770 (D.N.J.2005) (remanding remaining state LAD and other claims back to state court after plaintiff's § 1981, § 1985 and other federal claims were dismissed by the district court).

In this case, the only remaining claim is McGowan's NJLAD claim against the State Defendants arising out of two separate hiring decisions. In that regard, the Court declines to excercise supplemental jurisdiction. Thus, this claim is remanded to New Jersey Superior Court, Law Division, Mercer County.

### III. Conclusion

For the reasons stated herein, all of McGowan's claims against the HMFA are dismissed pursuant to *Fed.R.Civ.P.* 12(b)(6) and his claims against the State Defendants are dismissed with the exception of those claims under NJLAD not barred by the statute of limitations, as set forth herein.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1687663

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

2017 WL 2258374
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry GRIMES-JENKINS, Plaintiff,

v.

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Defendant.

16 Civ. 4897 (AT) (JCF)
|
Signed 05/22/2017

**Attorneys and Law Firms**

Hugh G. Jasne, Jasne & Florio, White Plains, NY, Victor Anthony Carr, Stock & Carr, Esqs, Mineola, NY, for Plaintiff.

Lorie Elizabeth Almon, Scott Roblan Rabe, Joanna Suzan Smith, Seyfarth Shaw LLP, New York, NY, for Defendant.

REPORT AND RECOMMENDATION

JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE

**\*1** TO THE HONORABLE ANALISA TORRES, U.S.D.J.: The plaintiff, Sherry Grimes-Jenkins, brings this action alleging employment discrimination, retaliation, and harassment in violation of a panoply of anti-discrimination statutes. The defendant has moved to dismiss the Amended Complaint in part and the plaintiff has cross-moved for leave to file a second amended complaint. For the reasons set forth below, I recommend that both motions be granted in part and denied in part.

Background

Ms. Grimes-Jenkins, a black West Indian woman, has been an employee of the Consolidated Edison Company of New York ("ConEd") since 1990. (Proposed Second Amended Verified Complaint ("Proposed SAC"), attached as Exh. B to Declaration of Hugh G. Jasne dated Dec. 23, 2016 ("Jasne Decl."), ¶¶ 10, 14). [1] She alleges that throughout her tenure at ConEd, she has been sexually harassed by ConEd employees (Proposed SAC, ¶¶ 16, 20, 26, 29, 34, 47, 57); her colleagues have made racist and sexist comments in the workplace (Proposed SAC, ¶¶ 17, 19, 22, 25, 38-39, 44, 60); she has

been denied training opportunities, access to facilities, and other favorable working conditions given to male employees (Proposed SAC, ¶¶ 17, 24-26, 31-32, 40, 50); she has been demoted, denied promotions, and denied wage increases because of her race, sex, and pregnancy (Proposed SAC, ¶¶ 38, 45, 52); she has been "written up," denied training, and threatened with termination because of injuries suffered on the job and medical conditions associated with her pregnancy (Proposed SAC, ¶¶ 27, 35-36, 43); and she has been retaliated against for reporting these alleged acts of discrimination and harassment. (Proposed SAC, ¶¶ 20-21, 33, 42-44, 59). She also alleges that she was sexually assaulted by a group of ConEd employees in 1991. (Proposed SAC, ¶ 15).

1    Unless otherwise indicated, the factual allegations in the Proposed Second Amended Complaint are identical to those in the Amended Complaint.

On April 3, 2014, the plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging sex and national origin discrimination and retaliation for reporting such discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). (Notice of Charge of Discrimination ("EEOC Charge"), attached as Exh. A to Declaration of Lorie E. Almon dated Nov. 18, 2016; Proposed SAC, ¶ 103). On April 12, 2016, the EEOC issued a Right to Sue Letter. (Proposed SAC, ¶ 106). The plaintiff commenced this action on June 23, 2016.

On August 30, 2016, the parties entered into a stipulation giving the plaintiff leave to file an amended complaint (Stipulation to File an Amended Complaint dated Aug. 30, 2016 ("Stipulation")), which she did on September 13, 2016. The Amended Complaint alleges (1) discrimination based on race, national origin, sex, and religion under Title VII; the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL") (first, second, ninth, and twelfth causes of action); [2] (2) quid pro quo harassment (sixth cause of action); (3) hostile work environment (seventh cause of action); (4) retaliation (eighth cause of action); (5) punitive damages under Title VII (tenth cause of action) [3] (6) intentional infliction of emotional distress (eleventh cause of action); [4] (7) discrimination under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (the "PDA") (twelfth cause of action); (8) discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA") (twelfth cause of action); (9) discrimination

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 182 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

under the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff et seq. ("GINA") (twelfth cause of action); (10) discrimination under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA") (twelfth cause of action); and (11) violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 et seq. ("ERISA") (twelfth cause of action).

2    The plaintiff also asserts facial discrimination, disparate treatment, and disparate impact as separate causes of action. (third, fourth, and fifth causes of action). As these are theories of discrimination, not independent causes of action, I consider them in connection with the plaintiff's discrimination claims.

3    Because this is a damages claim, not a distinct cause of action, I do not address it at this stage of the litigation. See Denis v. Home Depot, U.S.A., Inc., No. 10 CV 3227, 2014 WL 6632486, at *6 (E.D.N.Y. Nov. 21, 2014) ("Punitive damages are not a separate cause of action and, thus, courts generally find motions to strike punitive damages at the motion to dismiss stage to be premature.")

4    The plaintiff brings this claim under the heading of "severe emotional distress" (Amended Complaint ("FAC"), ¶¶ 112-119), which the defendant construes as a claim for emotional distress damages, not a separate cause of action. (Defendant Consolidated Edison Company of New York, Inc.'s Memorandum of Law in Support of Its Motion for Partial Dismissal of Plaintiff's Amended Complaint ("Def. Memo.") at 5 n.6). Under the this heading, however, the plaintiff alleges that (1) the defendant engaged in "outrageous conduct" (2) "for the purpose of causing severe emotional distress," which (3) actually "caus[ed] emotional distress" that was (4) severe. (FAC, ¶¶ 114-15, 117-18). These are the elements of an intentional infliction of emotional distress claim under New York Law. See Rentas v. Ruffin, 816 F.3d 214, 227 (2d Cir. 2016)

*2 On November 18, 2016, the defendant moved to dismiss the Amended Complaint in part, seeking dismissal of all of the plaintiff's claims except (1) the Title VII retaliation claim and hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred on or after June 7, 2013; and (2) the NYSHRL and NYCHRL

retaliation claims and hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred on or after June 23, 2013. (Def. Memo. at 3 n.1).

On December 23, 2016, together with her opposition to the motion to dismiss, the plaintiff cross-moved for leave to file a second amended complaint. The Proposed Second Amended Complaint replaces the plaintiff's religious discrimination claim with a discrimination claim based on her ethnicity. (Proposed SAC, ¶¶ 1, 14, 62, 99). It otherwise alleges the same causes of action as the Amended Complaint, though it reorganizes the claims under different headings, recharacterizes the discrimination claims under the FMLA, the ADA, and GINA as claims for "unlawful employment practices" (Compare FAC, ¶¶ 120-24, with Proposed SAC, ¶¶ 183-230), and clarifies that the quid pro quo harassment, hostile work environment, and retaliation claims are each brought pursuant to Title VII, the NYSHRL, the NYCHRL, the FMLA, the PDA, the ADA, and GINA. (Proposed SAC, ¶¶ 128, 139, 151-52, 158, 167).

Legal Standard

A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court's charge in ruling on a 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)). The court must construe the complaint in the light most favorable to the plaintiff, "taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).

B. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure provides that courts should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); accord Foman v. Davis, 371 U.S. 178, 182 (1962); Aetna Casualty & Surety Co. v. Aniero Concrete Co., 404 F.3d 566, 603 (2d Cir. 2005). "This

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 183 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.' " Williams v. Citigroup Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)). The court has broad discretion over motions to amend, see McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007), and may deny such a motion for the following reasons: (1) undue prejudice to the non-moving party, (2) futility, (3) bad faith or dilatory motive, (4) repeated failure to cure deficiencies by previous amendments, or (5) undue delay, United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016).

Here, the defendant opposes leave to amend on the grounds of futility and undue prejudice. Leave to amend should be denied as futile when the amended pleading would not survive a motion to dismiss under Rule 12(b)(6). IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group, PLC, 783 F.3d 383, 389 (2d Cir. 2015). Thus, the standard governing leave to amend is whether the amended pleading states a claim on which relief can be granted when all facts pled are accepted as true and construed in the light most favorable to the plaintiff. See Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 119 (2d Cir. 2012) (citing Ashcroft, 556 U.S. at 678-80). The defendant bears the burden of demonstrating that the proposed amendment is futile. See Allison v. Clos-ette Too, LLC, No. 14 Civ. 1618, 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015).

**\*3** In deciding whether the party opposing amendment would suffer undue prejudice, courts evaluate whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Hutter v. Countrywide Bank, N.A., 41 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) (quoting Monahan v. New York City Department of Corrections, 214 F.3d 275, 284 (2d Cir. 2000)). Courts also consider the particular procedural posture of the case. See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.' " (alteration in original) (quoting State Teachers Retirement Board v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981))); Grochowski v. Phoenix Construction, 318 F.3d 80, 86 (2d Cir. 2003) (upholding denial of leave to amend sought after discovery had closed and while summary judgment

motion was pending). The non-moving party bears the burden of demonstrating that undue prejudice would result if the proposed amendment were granted. Oneida Indian Nation of New York State v. County of Oneida, 199 F.R.D. 61, 77 (S.D.N.Y. 2000).

Discussion

The plaintiff concedes that the Proposed Second Amended Complaint, rather than adding new causes of action or new factual allegations, "merely clarifies the allegations contained in the Amended Complaint" in order to plead the claims "more artfully." (Plaintiff's Memorandum of Law Submitted in Opposition to Defendant's Motion for Partial Dismissal of Plaintiff's Amended Complaint and in Support of Plaintiff's Cross-Motion to Further Amend the Complaint ("Pl. Memo.") at 32). With the exception of the plaintiff's replacement of her religious discrimination claim with an ethnicity discrimination claim, this characterization of the Proposed Second Amended Complaint is accurate. Accordingly, with that exception, the defendant's motion to dismiss and the plaintiff's cross-motion for leave to amend present the same question—whether the allegations in the pleadings, which are substantively identical, state claims on which relief can be granted.[5] Cf. 3801 Beach Channel, Inc. v. Schvartzman, No. 05 CV 207, 2007 WL 2891119, at *11 (E.D.N.Y. Sept. 28, 2007) (denying leave to amend where there were "serious substantive legal defects" in the original complaint and "plaintiffs' counsel [made] clear [that] an amendment would do no more than reorganize and clarify the factual allegations and legal theories already set forth in the existing Complaint").

[5]    The plaintiff argues that the Amended Complaint (but not the Proposed Second Amended Complaint) should be construed liberally, like a pro se pleading, because her relationship with her lawyer was "on the rocks" at the time it was filed. (Pl. Memo. at 4-5). There is no law to support this proposition. Therefore, I do not evaluate the Amended Complaint under the more generous pleading standard afforded to pro se plaintiffs.

The plaintiff alleges numerous incidents of discrimination, retaliation, and harassment dating back to 1990. For reasons that will be discussed below, the statutes of limitations on all of the plaintiff's claims—with the exception of the ERISA claim—bar consideration of conduct that occurred before June 7, 2013, at the earliest. Accordingly, before considering whether the allegations in the plaintiff's pleadings state claims

on which relief can be granted, I will review the allegations concerning events that occurred since June 7, 2013.

The plaintiff alleges that certain conduct occurred "in 2013" without providing a specific month or day. [6] For example, in 2013, Devri Gibbs, another ConEd employee, asked a supervisor, Tye Barnes, in the plaintiff's presence if "he liked the plaintiff's 'big ass' " and "wants to fuck that big ass," to which Mr. Barnes responded, "Not everyone is into that." (Proposed SAC, ¶ 57). "Instead of action being taken in response to ... that episode, the plaintiff was isolated from other workers[ ] and told not to speak to anyone or she would be written up by management." (Proposed SAC, ¶ 57). That same year, four different supervisors—Tom McEnery, Thomas Nolan, Eric Galloza, and Cory Jaworsky—told the plaintiff that "they rated male mechanics higher than female mechanics," calling male mechanics "top of the barrel" and female mechanics "bottom of the barrel." (Proposed SAC, ¶ 58).

[6]   Viewing the facts in the light most favorable to the plaintiff, I treat such conduct as timely under statutes of limitations that bar consideration of conduct that occurred before a specific date in 2013.

**\*4** In 2014, the plaintiff alleges that she "was denied the opportunity to replace a supervisor who was leaving." (Proposed SAC, ¶ 52). The supervisor, named Vormittagg, told her, "[Y]ou don't want this job, you have young kids and[ ] cannot help your family." (Proposed SAC, ¶ 52). He then encouraged less qualified men to apply for the position. (Proposed SAC, ¶ 52). That same year, Mr. McEnery told other ConEd employees that the plaintiff "keeps getting pregnant so that she can get time off the job." (Proposed SAC, ¶ 60). Meanwhile, a manager named Howie Sheard told the plaintiff that she was "put into isolation" because she was "a trouble maker" who "turns people into the EEO." (Proposed SAC, ¶ 59). Mr. Sheard also stated, "I do not trust your ass ... because I do not want you running to the EEO saying I tried to grab you." (Proposed SAC, ¶ 59).

In April 2015, the plaintiff was denied a request to be transferred to the Bronx—the "most recent[ ]" of numerous requests to be transferred there, all of which "have been summarily and arbitrarily denied." (Proposed SAC, ¶ 21). The plaintiff alleges that she has been making these requests regularly since 1993, when she was involuntarily transferred

away from the Bronx for reporting sexual harassment by a supervisor named Nick Febrizio. (Proposed SAC, ¶¶ 20-21).

The remainder of the plaintiff's allegations either concern conduct before June 7, 2013, or allege that certain types of conduct occurred throughout the duration of her employment without discussing specific incidents since June 7, 2013. For example, she alleges that "for more than 20 years, [she] has been subjected to retaliation, harassment and hostile work environment" for reporting the 1991 sexual assault (Proposed SAC, ¶ 16); that "[b]eginning in 1993 and continuing to the present time," numerous supervisors referred to black female mechanics as "going to the fields" while referring to white male mechanics as "going to the job" (Proposed SAC, ¶ 22); and that "[t]hroughout [her] employment, the standard practice at the company was to keep the medical conditions of male employees strictly confidential, while opening, revealing and discussing in public the medical conditions of female employees." (Proposed SAC, ¶ 23).

A. Exhaustion of Administrative Remedies

As a prerequisite to bringing suit under Title VII, GINA, or the ADA, a plaintiff must first file a timely charge with the EEOC. See Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 146 (2d Cir. 2012) (Title VII); Yajaira Bezares C. v. Donna Karan Company Store LLC, Nos. 13 Civ. 8560, 13 Civ. 9123, 2014 WL 2134600, at \*5 (S.D.N.Y. May 22, 2014) (GINA); Benjamin v. Brookhaven Science Associates, LLC, 387 F. Supp. 2d 146, 154-55 (E.D.N.Y. 2005) (ADA). Accordingly, a plaintiff may only raise claims under these statutes if they were included in the EEOC charge or are "reasonably related" to it. Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003). Because the defendant bears the burden of proving the plaintiff's failure to exhaust administrative remedies, Broich v. Incorporated Village of Southampton, 650 F. Supp. 2d 234, 246 (E.D.N.Y. 2009), "a plaintiff is not required to explicitly plead or demonstrate exhaustion at the pleading stage," Arnold v. Research Foundation for the State University of New York, —— F. Supp. 3d ——, ——, 2016 WL 6126314, at \*8 (E.D.N.Y. 2016).

The EEOC charge in this case, which the defendant attached as an exhibit to its motion to dismiss, only alleges sex and national origin discrimination and retaliation under Title VII. (EEOC Charge). It does not allege discrimination under GINA, the ADA, or Title VII based on race, religion, or ethnicity. Accordingly, the defendant argues that those claims are barred by the plaintiff's failure to exhaust administrative remedies. (Def. Memo. at 9-10; Defendant's Memorandum

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 185 of 251

2017 WL 2258374

of Law in Opposition to Plaintiff's Cross-Motion to Further Amend the Amended Complaint ("Def. Opp. Memo.") at 7-8).

**\*5** The plaintiff counters that the Right to Sue Letter, which she attached as an exhibit to her opposition to the motion to dismiss and cross-motion for leave to amend, satisfies the exhaustion requirement because it states that it is "issued under Title VII, the ADA, or GINA." (Right to Sue Letter, attached as Exh. A to Jasne Decl.; Pl. Memo. at 5-10). In the alternative, she argues that the claims not explicitly mentioned in the EEOC charge are reasonably related to those in the charge. (Pl. Memo. at 5-10).

Although the plaintiff is not required to plead exhaustion, a court may in its discretion to convert a motion to dismiss into a motion for partial summary judgment on the issue of exhaustion of administrative remedies where both parties "submit[ ] and reference[ ] documents outside of the pleadings." Clemmer v. Fordham Bedford Community Services, No. 14 Civ. 2343, 2015 WL 273657, at \*3 n.1 (S.D.N.Y. Jan. 16, 2015). As both parties have submitted such documents and briefed the issue, I exercise my discretion to reach the issue here.

First, the plaintiff's attempt to rely on what appears to be boilerplate language in the Right to Sue Letter is without merit. As stated above, whether a plaintiff properly exhausted administrative remedies depends on the claims contained in the EEOC charge, not the Right to Sue Letter. There is no dispute that the charge did not raise claims under GINA, the ADA, or Title VII based on race, religion, or ethnicity.

Second, a claim is "reasonably related" to those in an EEOC charge when "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Littlejohn v. City of New York, 795 F.3d 297, 322 (2d Cir. 2015) (quoting Deravin, 335 F.3d at 200-01). This analysis focuses on "the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." Id. (alteration in original) (quoting Deravin, 335 F.3d at 201). Here, the EEOC charge does not describe the discriminatory conduct suffered by the plaintiff, such that it could have put the EEOC on notice to investigate claims of discrimination based on disability, genetic information, race, religion, or ethnicity. The mere assertion of claims based on sex and national origin is insufficient to give the EEOC notice to investigate claims based on different characteristics. [7] See

Buksha v. New York City Dep't of Corrections, No. 06 Civ. 5363, 2007 WL 2947982, at \*2 (S.D.N.Y. Oct. 9, 2007) (discrimination claims "based on different characteristics" and "different acts of alleged discrimination" are not " 'reasonably related' to the subject matter" in EEOC charges). Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's GINA, ADA, and Title VII race, religion, and ethnicity discrimination claims.

[7] Courts in this Circuit have recognized two other types of "reasonably related" claims: (1) where "the plaintiff alleges retaliation for filing an EEOC charge"; and (2) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Sahni v. Legal Services of the Hudson Valley, No. 14 Civ. 1616, 2015 WL 4879160, at \*6 (S.D.N.Y. Aug. 13, 2015) (quoting Butts v. City of New York Department of Housing, 990 F.2d 1397, 1402-03 (2d Cir. 1993)). Neither exception is relevant here.

B. Discrimination Claims

1. Title VII, PDA, [8] and NYSHRL

[8] The PDA amended Title VII to clarify that its prohibition on sex discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); Young v. United Parcel Service, Inc. ––– U.S. ––––, ––––, 135 S. Ct. 1338, 1345 (2015). Thus, analysis of the plaintiff's PDA claims is coextensive with that of her Title VII sex discrimination claims.

a. Statutes of Limitations

**\*6** To bring claims under Title VII, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1); National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). The plaintiff filed her EEOC charge on April 3, 2014. Thus, her Title VII claims are barred to the extent that they are based on conduct that occurred prior to June 7, 2013, 300 days before she filed her EEOC charge.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 186 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

The statute of limitations under the NYSHRL is three years. CPLR § 214(2); Taylor v. City of New York, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016). The plaintiff's NYSHRL claims are therefore barred to the extent that they are based on conduct that occurred prior to June 23, 2013, three years before she filed her complaint.

b. Merits

Courts in this Circuit analyze employment discrimination claims under Title VII and the NYSHRL according to the same standard. McGill v. University of Rochester, 600 Fed.Appx. 789, 790 (2d Cir. 2015); Taylor, 207 F. Supp. 3d at 303. To survive a motion to dismiss a discrimination claim under either statute, a plaintiff must allege that she suffered an "adverse employment action" and "sustain a <u>minimal</u> burden of showing facts suggesting an inference of discriminatory motivation." Littlejohn, 795 F.3d at 311; see also Taylor, 207 F. Supp. 3d at 304. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment" that "is more disruptive than a mere inconvenience or alteration of job responsibilities." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quoting Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)).

Only one timely allegation in the plaintiff's pleadings merits significant discussion as a discrimination claim: that Vormittagg discouraged her from applying for a promotion to his position in 2014.[9] To establish a <u>prima facie</u> case of a discriminatory failure to promote, a plaintiff must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Barrett v. Forest Laboratories, Inc., 39 F. Supp. 3d 407, 441 (S.D.N.Y. 2014) (quoting Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004)).

[9]     I do not analyze the denials of the plaintiff's requests to be transferred to the Bronx as a discrimination claim because she alleges that retaliation—not discrimination based on a protected characteristic—was the reason for the denials. (Proposed SAC, ¶¶ 20-21). I also do not analyze the purported statements of four

supervisors that they gave male mechanics higher ratings than female mechanics as a discrimination claim because the plaintiff does not allege that she suffered tangible negative consequences from receiving such a rating. See Siddiqi v. New York City Health & Hospitals Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action. However, 'negative evaluations, standing alone without any accompanying adverse results, are not cognizable.' " (citation omitted) (quoting Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001))).

*7  The plaintiff does not allege that she actually applied for Vormittagg's position or that her application was rejected. Rather, she alleges that she was discouraged from applying while less qualified men were encouraged to apply. Though Vormittagg's statement that the plaintiff would not want the job because she needs to take care of her children would satisfy the plaintiff's burden of showing discriminatory motivation, such discouragement alone does not constitute an adverse employment action under Title VII or the NYSHRL. See Rogers v. Fashion Institute of Technology, No. 14 Civ. 6420, 2016 WL 889590, at *9 (S.D.N.Y. Feb. 26, 2016) ("[A]lthough Plaintiff claims he expressed interest in a full-time position but was told not to apply, 'a plaintiff must allege that she applied for a specific position or positions and was rejected therefrom....' " (internal quotation marks omitted) (quoting Hughes v. Xerox Corp., 37 F. Supp. 3d 629, 643 (W.D.N.Y. 2014))); Johnston v. Carnegie Corp. of New York, No. 10 Civ. 1681, 2011 WL 1085033, at *11 (S.D.N.Y. Feb. 24, 2011) ("Even if Defendants discouraged Plaintiff from applying for other positions ..., such discouragement would not give rise to a claim for failure to promote."), report and recommendation adopted, 2011 WL 1118662 (S.D.N.Y. March 23, 2011). Therefore, the plaintiff's pleadings fail to state a timely, colorable discrimination claim under Title VII or the NYSHRL.

Nevertheless, the plaintiff argues that claims that accrued before the Title VII and NYSHRL statutes of limitations is actionable under the continuing violation doctrine (Pl. Memo. at 10-13), which provides that where "a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 187 of 251

act in furtherance of it." Washington v. County of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (alteration in original) (quoting Fitzgerald v. Henderson, 251 F.3d 345, 349 (2d Cir. 2001)). The doctrine applies to claims "composed of a series of acts that collectively constitute one unlawful [ ] practice." Gonzalez v. Hasty, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting Washington, 373 F.3d at 318). It "has generally been limited to situations where there are specific policies or mechanisms, such as discriminatory seniority lists or employment tests." Crosland v. City of New York, 140 F. Supp. 2d 300, 307 (S.D.N.Y 2001). Accordingly, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113. The doctrine applies "only if the plaintiff 'allege[s] ... some non-time-barred acts' contributing to the alleged violation." Gonzalez, 802 F.3d at 220 (alterations in original) (quoting Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)).

Here, the plaintiff does not allege that ConEd instituted any discriminatory policy or mechanism, much less that any non-time-barred acts contributed to such a policy or mechanism. Therefore, the continuing violation doctrine does not apply here. I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's Title VII and NYSHRL discrimination claims.

## 2. NYCHRL

### a. Statute of Limitations

Like the NYSHRL, the statute of limitations under the NYCHRL is three years. N.Y.C. Admin. Code § 8-502(d); Taylor, 207 F. Supp. 3d at 302. Thus, the plaintiff's NYCHRL claims are barred to the extent that they are based on conduct that occurred prior to June 23, 2013.

### b. Merits

Discrimination claims under the NYCHRL are governed by a more liberal standard than claims under Title VII and the NYCHRL. Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102, 109 (2d Cir. 2013). Therefore, "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City

standards." Id. "To establish a [ ] discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of [a protected characteristic].' " Id. at 110 (quoting Williams v. New York City Housing Authority, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); see also Taylor, 207 F. Supp. 3d at 304. Under this standard, a plaintiff need not allege that she suffered a materially adverse employment action to plead a discrimination claim. Mihalik, 715 F.3d at 114; Taylor, 207 F. Supp. 3d at 308.

**\*8** Still, courts applying this standard "must be mindful that the NYCHRL is not a 'general civility code.' " Mihalik, 715 F.3d at 110 (quoting Williams, 61 A.D.3d at 79, 872 N.Y.S.2d at 40). Accordingly, the NYCHRL permits defendants to establish, as an affirmative defense, "that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." Id. at 111 (internal quotation marks omitted) (quoting Williams, 61 A.D.3d at 80, 872 N.Y.S.2d at 41).

The plaintiff makes numerous timely allegations that she received inferior treatment because she is a woman. These include Vormittag discouraging her from applying for his supervisory position because "you have young kids and[ ] cannot help your family" (Proposed SAC, ¶ 52), Mr. Gibbs' lewd remarks to Mr. Barnes in her presence (Proposed SAC, ¶ 57), and supervisors in 2013 giving female mechanics lower ratings and calling them "bottom of the barrel" in her presence. (Proposed SAC, ¶ 58). These incidents amount to more than petty slights and trivial inconveniences, as they reflect a workplace in which the plaintiff was repeatedly demeaned and discouraged from opportunities to advance in the company because she is a woman. Thus, the plaintiff's pleadings state a colorable sex discrimination claim under the NYCHRL.

The only timely allegation that the plaintiff was treated less well than other employees on the basis of race is that she and other black women were referred to as "going to the fields," whereas white men were referred to as "going to the job," throughout the duration of her employment. [10] (Proposed SAC, ¶ 22). Though this allegation concerns only one offensive phrase that is not connected to any material adverse employment action, its arguable reference to slavery [11] makes it more than a petty slight or trivial inconvenience, particularly given that the plaintiff alleges that

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 188 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

the phrase was used throughout her time at ConEd by more than ten different supervisors. Thus, the plaintiff's pleadings also state a colorable claim of race discrimination under the NYCHRL. [12]

10    Viewing the facts in the light most favorable to the plaintiff, where the plaintiff alleges that conduct occurred repeatedly and "throughout the duration of her employment," I assume that at least some of the conduct occurred within the Title VII, NYSHRL, and NYCHRL limitations periods.

11    This is the plaintiff's interpretation of the phrase, which may be accepted on a motion to dismiss. It is at least equally probable that supervisors referred to "going into the field," meaning "out of the office," a term with no connotations of slavery. Evidence of the context in which it was used will ultimately shed light on the intended meaning of the phrase.

12    To the extent that allegations like Mr. Barnes' lewd remarks and references to the plaintiff as "going to the fields" appear to constitute harassment rather than discrimination, courts in this Circuit have recognized that " '[u]nder the NYCHRL, there are not separate standards for "discrimination" and "harassment" claims.' Instead, 'there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based' on a protected characteristic." Johnson v. Strive East Harlem Employment Group, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (citations omitted) (quoting Clarke v. InterContinental Hotels Group, PLC, No. 12 Civ. 2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013)). I analyze the NYCHRL discrimination and harassment claims separately only because the continuing violation doctrine applies in different ways to discrimination and harassment claims under the NYCHRL.

*9  As with her Title VII and NYSHRL claims, the plaintiff argues that the continuing violation doctrine permits consideration of conduct that occurred before the statute of limitations. (Pl. Memo. at 10-13). The continuing violation doctrine is given a broader construction under the NYCHRL than under Title VII or the NYSHRL. Taylor, 207 F. Supp. 3d at 302-03; Mohamed v. NYU, No. 14 Civ. 8373, 2015 WL 5307391, at *3 n.8 (S.D.N.Y. Sept. 10, 2015). Under the NYCHRL, "[o]therwise time-barred discrete acts can be considered timely 'where specific and related instances of

discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.' " Sotomayor v. City of New York, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (quoting Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)). Courts tend to find that discrete instances of discrimination are sufficiently "specific and related" where they consist of the same type of conduct or where the same individual targets a plaintiff with similar discriminatory acts over time. See Taylor, 207 F. Supp. 3d at 303 (applying continuing violation doctrine where the plaintiff applied for the same position fourteen times without success); Mohamed, 2015 WL 5307391, at *3-4 (applying continuing violation doctrine to "recurring failure to pay Plaintiff higher wages"); Sotomayor, 862 F. Supp. 2d at 251 (applying continuing violation doctrine to conduct of individual defendant who "subject[ed] [the plaintiff] to an inordinate number of formal and informal observations[ ] and [gave] her negative ratings" over a three-year period).

Repeated references to the plaintiff and other black women as "going to the fields" consist of the same type of conduct carried out over a long period of time by the same group of supervisors. There is no allegation that the defendant attempted to remedy this conduct, even though it persisted throughout the duration of the plaintiff's employment. Accordingly, these incidents are sufficiently specific and related to establish a discriminatory practice at ConEd under the NYCHRL's continuing violation doctrine. Use of that phrase to the plaintiff before June 2013 is actionable as part of her NYCHRL discrimination claim.

The plaintiff's remaining allegations prior to June 2013, on the other hand, concern a wide variety of discriminatory conduct carried out by a number of different individuals. Though some individuals involved in timely allegations are also involved in untimely allegations, the incidents are sporadic, and the plaintiff fails to connect the timely and untimely allegations in any meaningful way. Accordingly, the remainder of her untimely allegations are not actionable under the continuing violation doctrine, even under the NYCHRL's more lenient standard. See Mohamed, 2015 WL 5307391, at *3-4 (declining to apply continuing violation doctrine to failure-to-promote allegation where complaint did "not provide an adequate basis to determine whether the promotion decision [was] connected to Plaintiff's timely allegations"); Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) ("Later evaluations and letters to file by separate individuals are not part of the same continuing pattern of discriminatory conduct by a prior principal.").

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 189 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

Therefore, I recommend that dismissal be denied and leave to amend be granted with respect to the plaintiff's race and sex discrimination claims under the NYCHRL.[13] However, with the exception of references to the plaintiff as "going to the fields" by various supervisors, conduct that occurred before June 23, 2013, should be barred by the statute of limitations.

[13]    Though the plaintiff also asserts discrimination based on religion, national origin, and ethnicity, none of the plaintiff's timely allegations describes inferior treatment based on these characteristics. Therefore, dismissal should be granted and leave to amend should be denied with respect to discrimination claims based on these characteristics under Title VII, the NYSHRL, and the NYCHRL.

### 3. Disparate Impact and Facial Discrimination

All of the allegations discussed above consist of disparate treatment claims, that is, that the plaintiff was "treated [ ] less favorably than a similarly situated employee outside [her] protected group." Graham v. Long Island Railroad, 230 F.3d 34, 39 (2d Cir. 2000). However, the plaintiff also asserts that she suffered "disparate impact" and "facial discrimination." Both of these claims are without merit. To state a prima facie claim of disparate impact, a plaintiff must "(1) 'identify a specific employment practice' or policy; '(2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.' " Chin, 685 F.3d at 151 (first quoting Malave v. Potter, 320 F.3d 321, 326 (2d Cir. 2003); then quoting Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147, 160 (2d Cir. 2001)); see also Lewis v. City of Chicago, 560 U.S. 205, 212 (2010). Conversely, a "policy is discriminatory on its face if it expressly classifies persons on the basis of [a protected characteristic]." Correction Officers Benevolent Association of Rockland County v. Kralik, No. 04 Civ. 2199, 2011 WL 1236135, at *6 (S.D.N.Y. March 30, 2011) (quoting Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)). None of the plaintiff's timely allegations concerns a policy or practice implemented by ConEd that either explicitly discriminates on the basis of a protected characteristic or has a disparate impact on a protected group. Therefore, the plaintiff's pleadings do not state a claim based on either of these theories of discrimination.

### 4. ADA and GINA

**\*10** Even if the plaintiff had properly exhausted administrative remedies for her ADA and GINA claims, her pleadings fail to state a discrimination claim under either statute. To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013). To bring claims under the ADA, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory act. Harris, 186 F.3d at 247. Thus, like the plaintiff's Title VII claim, her ADA claims are barred to the extent that they are based on conduct that occurred prior to June 7, 2013. The plaintiff fails to allege that she had a disability or that an adverse employment action was taken against her because of a disability since that date.

GINA makes it unlawful for an employer "to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee ... because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1). The Act defines "genetic information" as (1) an employee's genetic tests; (2) the genetic tests of the employee's family members; or (3) the manifestation a disease or disorder in the employee's family members. 42 U.S.C. § 2000ff(4). The plaintiff does not allege that anyone at ConEd had such information or that she was discriminated against because of such information. Therefore, the plaintiff fails to state a colorable discrimination claim under GINA or the ADA

### C. Retaliation Claims

As discussed earlier, the defendant does not move to dismiss the retaliation claims under Title VII, the NYSHRL, and the NYCHRL to the extent that they are based on conduct that occurred within their respective statutes of limitations, with one exception. (Def. Memo. at 3 n.1).[14] The timely allegations of retaliation in the plaintiff's pleadings are (1) that she was denied a transfer to the Bronx in April 2015 as part of a systemic course of retaliation against her (Proposed SAC, ¶¶ 20-21); (2) that she was "put into isolation" for reporting acts of discrimination and harassment to ConEd management

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 190 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

and to the EEOC in 2013 and 2014 (Proposed SAC, ¶¶ 57, 59); and (3) that she was told she would be "written up by management" if she told coworkers about Mr. Gibbs' and Mr. Barnes' lewd conversation about her in 2013. (Proposed SAC, ¶ 57). Although the defendant does not move to dismiss the timely retaliation claims in their entirety, it does move to dismiss the claims based on the denial of the plaintiff's transfer request on the ground that that denial did not constitute an adverse employment action. (Def. Memo. at 15-16).

14    The defendant "incorporates all of the arguments contained in its Motion to Dismiss into [its opposition to the plaintiff's cross-motion for leave to amend]." (Def. Opp. Memo. at 7 n.5). Therefore, I assume that the defendant also does not oppose leave to amend for these claims on the ground of futility.

### 1. Denial of Transfer

Retaliation claims, like discrimination claims, are governed by a different standard under Title VII and the NYSHRL than they are under the NYCHRL. See Mihalik, 715 F.3d at 113.

### a. Title VII and NYSHRL

To survive a motion to dismiss a retaliation claim under Title VII or the NYSHRL, "the plaintiff must plausibly allege that: (1) [the] defendant[ ] discriminated—or took an adverse employment action—against [her], (2) 'because' [s]he has opposed any unlawful employment practice." Vega v. Hempstead Union Free School District, 801 F.3d 72, 90 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)); accord Taylor, 207 F. Supp. 3d at 307. The definition of "adverse employment action" sweeps more broadly in the context of retaliation claims than it does in the context of discrimination claims: "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " Vega, 801 F.3d at 90 (quoting Burlington North & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006)). In this analysis, "[c]ontext matters"; for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Burlington North & Santa Fe Railway, 548 U.S. at 69. Still, the standard is objective, examining the impact the action would have on a reasonable employee. Id. at 68-69.

*11 Here, the plaintiff describes the Bronx as her "home base" and explains that she made numerous requests to be transferred there. However, she fails to provide any information about how the denial of the transfer actually affected her, such that it might dissuade a reasonable employee in her shoes from reporting discrimination or harassment. This is insufficient to establish an adverse employment action in the context of a retaliation claim under Title VII or the NYSHRL. See Feliciano v. City of New York, No. 14 Civ. 6751, 2015 WL 4393163, at *7-8 (S.D.N.Y. July 15, 2015) (granting motion to dismiss Title VII and NYSHRL retaliation claims where the plaintiff "[did] not provide any information as to how the transfer impacted him").

Even if the plaintiff had sufficiently alleged an adverse employment action, her retaliation claim based on the denial of the transfer request would fail on the causation prong. "[F]or an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90. Here, however, the plaintiff does not tie the denial of the transfer request to the reporting of any act of discrimination or harassment. She makes only the conclusory allegation that she "has been systematically retaliated against by [the] [d]efendant and its employees" in that all of her requests to be transferred to the Bronx have been denied since the she was transferred out of the Bronx in 1993. (Proposed SAC, ¶ 21). This is insufficient to establish the but-for causation needed to state a retaliation claim. See Feliciano, 2015 WL 4393163, at *7-8 (granting motion to dismiss where the plaintiff alleged nothing "[b]eyond the conclusory allegation that in retaliation for his complaints and prior lawsuits, Plaintiff was transferred to the Bronx"). Therefore, the denial of the transfer request does not state a colorable retaliation claim under Title VII or the NYSHRL.

### b. NYCHRL

The claim based on the denial of the plaintiff's transfer request fails for similar reasons under the NYCHRL. To state a retaliation claim under the NYCHRL, a plaintiff must show that "(1) [she] participated in a protected activity known to defendants; (2) defendants took an action that disadvantaged [her]; and (3) a causal connection exists between the protected activity and the adverse action." Taylor, 207 F. Supp. 3d at 308 (alterations in original) (quoting Fletcher v. Dakota, Inc., 99 A.D.3d 43, 51-52, 948 N.Y.S.2d 263, 269 (1st Dep't

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 191 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

2012)). As discussed above, the plaintiff fails to make a causal connection between the reporting of any specific act of discrimination or harassment and the denial of the transfer request. Therefore, the denial of the transfer request also does not state a colorable retaliation claim under the NYCHRL.

## 2. Remaining Allegations

The defendant does not specify which of the remaining timely allegations it concedes is adequately pled. I therefore assume that the defendant does not move to dismiss any of the remaining timely allegations of retaliation. The plaintiff, meanwhile, argues that untimely allegations of retaliation should survive under the continuing violation doctrine. (Pl. Memo. at 10-13). This argument is without merit. The plaintiff's untimely allegations involve acts of retaliation carried out by different individuals in retaliation for the reporting of different acts of discrimination and harassment than those involved in her timely allegations.[15] (See, e.g., Proposed SAC, ¶¶ 27, 34). Thus, as alleged, the time-barred and non-time-barred acts of retaliation are discrete events that were not carried out pursuant to a specific policy or mechanism. I therefore recommend that dismissal be granted and leave to amend be denied with respect to the Title VII, NYSHRL, and NYCHRL retaliation claims based on all of the untimely allegations under those statutes and based on the denial of the plaintiff's transfer request in April 2015.[16] The remaining timely allegations of retaliation—which the defendant concedes are adequately pled—survive.

[15]    For example, Mr. Sheard, who was involved in the decision to put the plaintiff "into isolation" in 2013 and 2014 (Proposed SAC, ¶¶ 57, 59), is mentioned only once elsewhere in the plaintiff's pleadings—as one of the supervisors who referred to the plaintiff and other black female mechanics as "going to the fields." (Proposed SAC, ¶ 22). He is not mentioned in connection with any other acts of retaliation. The same goes for Mr. Barnes, who is otherwise mentioned in connection with pre-2013 conduct only once—for telling the plaintiff in 2012 that "no one wants you around here because you turn people in." (Proposed SAC, ¶ 56). The plaintiff also does not allege that she was "put into isolation" at any point before 2013, let alone explain what actually happened when she was "put into isolation," such that this act of retaliation might be connected to

pre-2013 conduct as part of a specific policy or mechanism instituted by ConEd.

[16]    Although the plaintiff also alleges retaliation under the ADA and GINA, she makes no timely allegations of retaliation for reporting discrimination or harassment based on a disability or her genetic information. I address her FMLA retaliation claim later in this Report.

## D. Harassment Claims

### 1. Hostile Work Environment

**\*12** As with the retaliation claims, the defendant does not move to dismiss the plaintiff's Title VII, NYSHRL, and NYCHRL hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred within the statutes of limitations. (Def. Memo. at 3 n.1). The timely allegations of harassment in the plaintiff's pleadings are: (1) Mr. Gibbs' and Mr. Barnes' lewd conversation about the plaintiff's body in 2013; (2) Mr. Galloza, Mr. Nolan, Mr. McEnery, and Mr. Jaworsky calling female mechanics "bottom of the barrel" in 2013; (3) Mr. Sheard telling other ConEd employees that the plaintiff "keeps getting pregnant so she can get time off the job"; (4) Mr. Sheard telling the plaintiff, "I do not trust your ass"; and (5) numerous supervisors referring to the plaintiff and other black female mechanics as "going to the fields" throughout the duration of her employment.

Unlike with the retaliation claims, the defendant does not argue that any of the timely allegations should be dismissed. I therefore assume that the defendant considers all of the above conduct to be part of the adequately pled hostile work environment claim. Accordingly, the only question to resolve is whether the untimely conduct is actionable as part of the same hostile work environment under the continuing violation doctrine.

The continuing violation doctrine applies differently to hostile work environment claims than it does to discrimination and retaliation claims, though the standard for applying the continuing violation doctrine to hostile work environment claims is the same under Title VII, the NYSHRL, and the NYCHRL.[17] Taylor, 207 F. Supp. 3d at 309 n.10. Because "the entire hostile work environment encompasses a single unlawful employment practice," all of the conduct that constitutes part of the hostile work environment,

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 192 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

including that which occurred before the limitations period, is actionable as long as "any act that is part of the hostile work environment" occurred within the limitations period. Morgan, 536 U.S. at 117-18; see also E.E.O.C. v. Bloomberg, L.P., 751 F. Supp. 2d 628, 647 (S.D.N.Y. 2010). Under this standard, an "offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 77 (2d Cir. 2010). This "requires courts to make an individualized assessment of whether incidents and episodes are related, " an inquiry in which courts have "flexibility [that] is useful in a context ... as amorphous as hostile work environment." Id.

17   Still, the standard to establish the existence of a hostile work environment is more lenient under the NYCHRL than it is under Title VII or the NYSHRL. Title VII and the NYSHRL require a plaintiff to establish "severe and pervasive" harassment in the workplace. Summa v. Hofstra University, 708 F.3d 115, 124 (2d Cir. 2013) (quoting Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009)). By contrast, the NYCHRL does not require a plaintiff to show severe and pervasive conduct, but only that the plaintiff was treated less well based on a protected characteristic. Mihalik, 715 F.3d at 110; see also Johnson, 990 F. Supp. 2d at 445.

The Supreme Court has held that untimely acts of harassment are sufficiently related to timely acts where there is "evidence from a number of ... employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." Morgan, 536 U.S. at 120; see also Rowe v. Hussmann Corp., 381 F.3d 775, 781 (8th Cir. 2004) (where "the same harasser ... commit[ed] the same harassing acts ..., the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment"). On the other hand, untimely acts and timely acts of harassment are not sufficiently related when they are committed by "different coworkers in a different section of the [workplace]." Dziedzic v. State University of New York at Oswego, 648 Fed.Appx. 125, 128 (2d Cir. 2016).

*13   The allegation that numerous supervisors referred to the plaintiff—along with other black female employees —as "going to the fields" throughout the duration of her employment consists of the same harassing conduct

committed by the same group of supervisors. Therefore, allegations that this occurred prior to June 2013 are part of the same actionable hostile work environment as allegations that it occurred after June 2013.

The remaining untimely allegations in the plaintiff's pleadings, on the other hand, date back as far as 1990 and involve distinct conduct by a number of different coworkers and supervisors. To be sure, some of the people involved in timely incidents of harassment are also involved in untimely allegations. For example, in 2004, Mr. Galloza called the plaintiff "unreliable" because of her pregnancy, and in 2000, he refused to give her to access shower facilities that were used by men (Proposed SAC, ¶¶ 32, 37); in 2004, Mr. McEnery refused to work with the plaintiff on a job and stated that she "should be in the kitchen bare foot and pregnant and have nothing to say on this job" (Proposed SAC, ¶ 38); in 2012, Mr. Barnes told the plaintiff that "no one wants you around here because you turn people in." (Proposed SAC, ¶ 56).

As the examples above demonstrate, however, the vast majority of the untimely allegations of harassment by the same people involved in timely allegations occurred nearly a decade, if not more, before the timely conduct. These acts are too sporadic to be considered actionable as part of the same hostile work environment. See, e.g., Benjamin, 387 F. Supp. 2d at 154 (six-year gap between alleged events precludes application of continuing violation doctrine on hostile work environment claim).

Moreover, the plaintiff does not allege any facts connecting Mr. Barnes' 2012 statement to the lewd conversation he had with Mr. Gibbs in 2013, as the former concerns the plaintiff turning people into the EEOC and the latter consists of sexual harassment. Nor does the plaintiff allege a plausible theory connecting the remaining untimely allegations of harassment committed by different individuals to the timely allegations in her pleadings. Therefore, with the exception of pre-2013 references to the plaintiff as "going to the fields," the continuing violation doctrine does not apply the plaintiff's hostile work environment claims. I recommend that the motion to dismiss be granted and leave to amend be denied with respect to the plaintiff's Title VII, NYSHRL, and NYCHRL hostile work environment claims to the extent that they are based on conduct before June 7, 2013 (Title VII), and June 23, 2013 (NYSHRL and NYCHRL), with the exception that claims based on supervisors referring to black female

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 193 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

employees as "going to the fields" before those dates should be permitted to proceed.[18]

[18] The plaintiff makes no timely allegations of harassment based on religion, national origin, or ethnicity. Dismissal should be granted and leave to amend should be denied with respect to the hostile work environment claims based on these characteristics.

### 2. Quid Pro Quo Harassment

"Quid pro quo harassment occurs when 'a tangible employment action result[s] from a refusal to submit to a supervisor's sexual demands.' " Brown v. City of New York, No. 10 Civ. 6491, 2011 WL 2693677, at *6 (S.D.N.Y. July 11, 2011) (alteration in original) (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753 (1998)). In the context of a quid pro quo harassment claim, a tangible employment action means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 604 (2d Cir. 2006) (quoting Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004)). Although the plaintiff alleges that Mr. Barnes and Mr. Gibbs made lewd remarks about her body in her presence in 2013, she does not allege that anyone at ConEd has made a sexual advance toward her since June 2013 or that she was retaliated against for refusing such an advance.[19] Accordingly, the plaintiff's pleadings fail to state a quid pro quo harassment claim.

[19] The plaintiff does allege that she refused "repeated sexual advances" by a supervisor named Dariene Wells from 2009 through 2011, which led to retaliation. (Proposed SAC, ¶ 47). However, this allegation is untimely.

### E. FMLA

**\*14** Courts in this Circuit recognize two types of claims under the FMLA: interference and retaliation. See Potenza v. City of New York, 365 F.3d 165, 167-68 (2d Cir. 2004); Drew v. Plaza Construction Corp., 688 F. Supp. 2d 270, 276 (S.D.N.Y. 2010). To state an FMLA interference claim, a plaintiff must allege:

[ (1) ] that she is an eligible employee under the FMLA; [ (2) ] that the defendant is an employer as defined by the FMLA; [ (3) ] that she was entitled to take leave under the FMLA; [ (4) ] that she gave notice to the defendant of her intention to take leave; and [ (5) ] that she was denied benefits to which she was entitled under the FMLA.

Graziadio v. Culinary Institute of America, 817 F.3d 415, 424 (2d Cir. 2016); accord Smith v. Westchester County, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011). The statute of limitations under the FMLA is two years unless the alleged violation is willful, in which case the statute of limitations is three years. 29 U.S.C. § 2617(c)(1)-(2); Smith, 769 F. Supp. 2d at 463. The plaintiff commenced this action on June 23, 2016. Thus, her FMLA claim is barred to the extent that it is based on conduct that occurred before June 23, 2014, or, if any alleged conduct is willful, June 23, 2013. None of the plaintiff's allegations since June 23, 2013, concern the denial of benefits to which she was entitled under the FMLA, willful or otherwise.

To establish a retaliation claim under the FMLA, a plaintiff must show that she was punished for exercising her rights under the FMLA. Hill v. New York City Housing Authority, ——— F. Supp. 3d ———, ———, 2016 WL 6820759, at *6 (S.D.N.Y. 2016). Though the plaintiff alleges that Mr. McEnery complained that the plaintiff "keeps getting pregnant so she can get time off the job" in 2014 (Proposed SAC, ¶ 60), she does not allege any instance within the statute of limitations in which an adverse action was taken against her for taking or attempting to take family or medical leave. Thus, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's FMLA claims.

### F. Intentional Infliction of Emotional Distress

To establish liability for intentional infliction of emotional distress ("IIED"), a plaintiff must prove that the defendant engaged in " '(1) extreme and outrageous conduct' with the '(2) intent to cause severe emotional distress,' that there was '(3) a causal connection between the conduct and the injury,' and that '(4) severe emotional distress' resulted." Rentas, 816 F.3d at 227 (quoting Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)). The statute of limitations

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 194 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

for IIED claims is one year. CPLR § 215(3); Rentas, 816 F.3d at 226. Thus, only conduct that occurred on or after June 23, 2015, may be considered part of the plaintiff's IIED claim. Not a single allegation in the plaintiff's pleadings, however, concerns conduct that occurred on or after that date. [20] Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's IIED claim.

[20]     Even assuming that at least one of the references to the plaintiff as "going to the fields" occurred within the statute of limitations, the plaintiff does not allege any emotional distress within the limitations period. The general allegation that such remarks were made throughout the duration of the plaintiff's employment is not enough to survive a motion to dismiss this "highly disfavored cause of action." De Sesto v. Slaine, 171 F. Supp. 3d 194, 201-02 (S.D.N.Y. 2016) (quoting Guan N. v. NYC Dep't of Education, No. 11 Civ. 4299, 2013 WL 67604, at *25 (S.D.N.Y. Jan. 7, 2013)).

### G. ERISA

***15** The plaintiff does not expressly state the section of ERISA under which she brings her claims. She alleges that ConEd "engaged in practices and acts and policies in which [the] [p]laintiff[ ] directly and indirectly suffered loss of benefits as to pensions and retirement plans." (Proposed SAC, ¶ 225). Thus, her claim is properly characterized as a claim "to recover benefits due to [her] under the terms of [her] plan[ ] [and] to enforce [her] rights under the terms of the plan" under 29 U.S.C. § 1132(a)(1)(B).

"ERISA does not expressly provide a statute of limitations for civil enforcement actions, so the most similar state statute of limitations applies to most ERISA claims...." Bilello v. JPMorgan Chase Retirement Plan, 607 F. Supp. 2d 586, 592 (S.D.N.Y. 2009). In New York, claims under Section 1132(a)(1)(B) are subject to a six-year statute of limitations, which is inferred from the statute of limitations for breach of contract claims under CPLR § 213. Burke v. PriceWaterhouseCoopers LLP Long Term Disability Plan, 572 F.3d 76, 78 (2d Cir. 2009); Bilello, 607 F. Supp. 2d at 592. Therefore, the plaintiff's ERISA claim is barred to the extent that it is based on conduct that occurred prior to June 23, 2010, six years before she commenced this action.

None of the plaintiff's allegations since June 23, 2010, concern the denial of benefits due to her under the terms of an employee benefit plan. Although the plaintiff attached a letter to her cross-motion for leave to amend that provides dates on which she took leave in connection with the calculation of her pension benefits (Letter of Rosann C. Milian dated Dec. 7, 2016, attached as Exh. C to Jasne Decl.), neither of her pleadings explains the significance of this letter. Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's ERISA claim.

### H. Undue Prejudice

As for the claims for which leave to amend is not futile, the defendant argues that permitting amendment would be unduly prejudicial because the "[d]efendant should not be forced to expend resources and bear the cost of filing a second motion to dismiss" so that the plaintiff may file "a slightly tidier complaint." (Def. Opp. Memo. at 9). However, the plaintiff's motion for leave to amend resolves the exact same issue that would be resolved by a motion to dismiss —whether the Proposed Second Amended Complaint states claims on which relief can be granted. The proposition that the defendant would need to expend additional resources to file a motion addressing the identical legal question addressed here is dubious. Moreover, this is not a situation where permitting amendment would require significant additional discovery or where the plaintiff is attempting to ambush the defendant with new claims on the eve of trial. Discovery has not yet started, and both parties acknowledge that the Proposed Second Amended Complaint raises the same claims as the Amended Complaint. This leaves the defendant with only bare "[a]llegations that an amendment will require the expenditure of additional time, effort, or money," which "do not [themselves] constitute undue prejudice." A.V.E.L.A. v. Estate of Monroe, 34 F. Supp. 3d 311, 318 (S.D.N.Y. 2014) (alterations in original) (quoting A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000)). Therefore, leave to amend should not be denied on the basis of undue prejudice.

### I. Attorneys' Fees

The plaintiff requests that she be awarded attorneys' fees in the event that she is ruled to be a prevailing party on any of her claims. (Pl. Memo. at 30-31). I have made no such recommendation here, nor is it possible for a plaintiff to be deemed a prevailing party on a motion to dismiss or motion for leave to amend. Therefore, the request for attorneys' fees should be denied.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 195 of 251

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

2017 WL 2258374

## J. Leave to Replead

**\*16** "[I]t is the usual practice ... to allow leave to replead" when a complaint is dismissed for failure to state a claim upon which relief can be granted. Cruz v. TD Bank, N.A., 742 F.3d 520, 523 (2d Cir. 2013) (per curiam); Woodward v. Morgenthau, 740 F. Supp. 2d 433, 441 (S.D.N.Y. 2010). Leave to replead may be denied, however, where a court has previously identified deficiencies in the pleadings and the deficiencies remain uncorrected in subsequent pleadings. Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 168 (2d Cir. 2003); see also Foman, 371 U.S. at 182. Although the plaintiff previously amended her complaint and conceded that some of the claims in her original complaint were deficiently pled (Stipulation), this is the first time that a court has identified the deficiencies in her pleadings. Therefore, I recommend giving the plaintiff leave to replead one more time to cure the deficiencies identified above. However, leave to replead should not be granted on the plaintiff's GINA, ADA, and Title VII claims based on race, religion, and ethnicity, as further amendment could not cure the plaintiff's failure to exhaust administrative remedies on these claims.

## Conclusion

For the reasons discussed above, I recommend that the defendant's motion to dismiss (Docket No. 21) and the plaintiff's cross-motion for leave to amend (Docket no. 33) each be granted in part and denied in part. Specifically, I recommend that dismissal be granted and leave to amend be denied with respect to all of the plaintiff's claims except:

1. Race and sex discrimination claims under the NYCHRL to the extent that they are based on conduct that occurred on or after June 23, 2013, except that references to the plaintiff as "going to the fields" before that date are actionable under the continuing violation doctrine.

2. Retaliation claims under Title VII based on conduct that occurred on or after June 7, 2013, and under the NYSHRL and NYCHRL based on conduct that occurred on or after June 23, 2013, except that the denial of the plaintiff's transfer request in April 2015 is not actionable under any statute.

3. Hostile work environment claims based on race and gender under Title VII based on conduct that occurred on or after June 7, 2013, and under the NYSHRL and NYCHRL based on conduct that occurred on or after June 23, 2013, except that references to the plaintiff's as "going to the fields" before that date are actionable under the continuing violation doctrine.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Analisa Torres, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections will preclude appellate review.

## All Citations

Not Reported in Fed. Supp., 2017 WL 2258374

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Munjal v. Emirates, S.D.N.Y., January 24, 2022

2017 WL 2709747
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry GRIMES-JENKINS, Plaintiff,
v.
CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Defendant.

16 Civ. 4897 (AT) (JCF)
|
Signed 06/22/2017

**Attorneys and Law Firms**

Hugh G. Jasne, Jasne & Florio, White Plains, NY, Victor Anthony Carr, Stock & Carr, Esqs, Mineola, NY, for Plaintiff.

Lorie Elizabeth Almon, Scott Roblan Rabe, Joanna Suzan Smith, Seyfarth Shaw LLP, New York, NY, for Defendant.

**ORDER ADOPTING REPORT
AND RECOMMENDATION**

ANALISA TORRES, United States District Judge

**\*1** Defendant, Consolidated Edison Company of New York, Inc., has moved to dismiss the Amended Complaint in part and Plaintiff Sherry Grimes-Jenkins has cross-moved for leave to file a second amended complaint. ECF Nos. 21 and 33. The Court referred the matter to the Honorable James C. Francis IV. After careful consideration, Judge Francis issued a Report and Recommendation (the "R&R") on May 22, 2017, proposing that dismissal and leave to amend be granted in part and denied in part. ECF No. 42. Objections to the R&R were due June 5, 2017. *See id.*

Despite notification of the right to object to the R&R, no objections were filed, and the time to do so has now passed. *See* Fed. R. Civ. P. 72(b)(2). When no objection is made, the Court reviews the R&R for clear error. *Dunham v. City of New York*, No. 11 Civ. 1223, 2013 WL 929029, at \*1 (S.D.N.Y. Mar. 11, 2013). The Court finds no clear error. Accordingly, the Court ADOPTS the R&R in its entirety. The motions to dismiss and amend are GRANTED in part and DENIED in part.

By **July 6, 2017**, Plaintiff shall file her amended complaint pursuant to the R&R.

The Clerk of Court is directed to terminate the motions at ECF Nos. 21 and 33.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2709747

2013 WL 2467923

2013 WL 2467923
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Queen M. ALLEN and Waltrina R. Whitman, Plaintiffs,

v.

VERIZON WIRELESS, et al., Defendants.

Civil Action No. 3:12–cv–482 (JCH).
|
June 6, 2013.

**Attorneys and Law Firms**

Queen M. Allen, Bloomfield, CT, pro se.

Waltrina Rene Whitman, Bloomfield, CT, pro se.

Peter C. Moskowitz, Jackson Lewis LLP, Matthew P. Mazzola, Michael H. Bernstein, Sedgwick LLP, New York, NY, Sarah R. Skubas, Jackson Lewis, Colleen M. O'Neill, Murtha Cullina, Hartford, CT, Catherine S. Nietzel, John Wade Cannavino, Jr., Nicole D. Wright, Ryan Ryan Deluca LLP, Stamford, CT, Barry J. Waters, Murtha Cullina LLP, New Haven, CT, Jude Francois, Montstream & May, Glastonbury, CT, for Defendants.

**RULING RE: MLS GROUP OF COMPANIES' MOTION TO DISMISS (Doc. No. 91), PROFESSIONAL DISABILITY ASSOCIATES' MOTION TO DISMISS (Doc. No. 92), VERIZON WIRELESS'S MOTION TO DISMISS (Doc. No. 93), METLIFE'S MOTION TO DISMISS (Doc. No. 98), METLIFE'S MOTIONS TO STRIKE (Doc. Nos.125, 129), and PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR–REPLY (Doc. No. 128).**

JANET C. HALL, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiffs Queen M. Allen ("Allen") and Waltrina R. Whitman ("Whitman") bring this suit against defendants Verizon Wireless ("Verizon"), Metropolitan Life Insurance Company s/h/a MetLife ("MetLife"), MLS Group of Companies ("MLS"), and Professional Disability Associates ("PDA"), alleging 27 state and federal claims related to Allen's requests for leave pursuant to the Family Medical Leave Act ("FMLA") and for short-term disability ("STD") as well as the release of Whitman's confidential medical

information in the process of administering those requests. Before the court are Verizons', Metlife's, MLS's, and PDA's Motions to Dismiss the plaintiffs' Fifth Amended Complaint.

**II. STANDARD OF REVIEW**

Upon a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether a plaintiff has stated a legally-cognizable claim by making allegations that, if true, would shows he is entitled to relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief' "). The court takes the factual allegations of the complaint to be true, *Hemi Group, LLC v. City of New* York, 559 U.S. 1, 130 S.Ct. 983, 986–87, 175 L.Ed.2d 943 (2010), and from those allegations, draws all reasonable inferences in the plaintiff's favor, *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (2009) (quoting *Twombly,* 550 U.S. at 556).

The plausibility standard does not impose an across-the-board, heightened fact pleading standard. *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008). The plausibility standard does not "require[ ] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8." *Arista Records, LLC v. Doe* 3, 604 F.3d 110, 119 (2d Cir.2010); *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (holding that dismissal was inconsistent with the "liberal pleading standards set forth by Rule 8(a)(2)"). However, the plausibility standard does impose some burden to make factual allegations supporting a claim for relief. As the *Iqbal* court explained, it "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 129 S.Ct. at 1949 (citations and internal quotations omitted). Under the Second Circuit's gloss, the plausibility standard is "flexible," obliging the plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin,* 521 F.3d at 213 (citation omitted); *accord Arista Records,* 604 F.3d at 120. Further, the court must construe *pro se* pleadings "broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000).

## III. FACTUAL BACKGROUND

**\*2** Allen was employed by Cellco Partnership d/b/a Verizon from November 8, 2004 to January 14, 2011, first as a customer service representative and later as a business support coordinator. Fifth Am. Compl. (Doc. No. 88) ¶ 7. From 2004 through 2007, Allen received a "performing" evaluation, which means she consistently attained and may have periodically exceeded job requirements. *Id.* In 2008, Allen received a "leading" evaluation, which means she consistently exceeded job requirements above and beyond expectations. *Id.* In July 2009, she received a "performing" evaluation. *Id.* at ¶ 11.

Metlife administers Verizon's claims for leave pursuant to the FMLA as well as for STD. *Id.* at ¶ 127. Verizon and Metlife have entered into a service agreement for this purpose. *Id.* at ¶ 334. Diane Anderson, a Verizon employee, coordinates requests for leave with Metlife. *Id.* at ¶ 186.

Allen requested leave for January 29, 2009, through February 13, 2009. *Id.* at ¶ 9. When Allen returned to work, she completed a "return to work" form, which represented that she suffered from a serious illness. *Id.* at ¶ 155. In August 2009, Allen was taken off a telephone call and brought into a meeting with Verizon's Management Team. *Id.* at ¶ 158. The Management Team discussed her net promoter score performance, which is a score rated by the consumer, and they discussed how Allen needed to improve her performance. *Id.* Allen was emotional after the meeting and felt undermined. *Id.*

Allen experienced high anxiety and depression in response to the meeting. *Id.* at ¶ 163. She sought psychiatric care and took time off from work, from September 2009 through November 2009. *Id* . at ¶ 163. She was originally denied FMLA and STD benefits for this period. *Id.* at. ¶ 222, Ex.

7. However, on appeal, Metlife reinstated her short-term benefits for that period. *Id.* at Ex. 8. In October 2009, Allen sought an accommodation for her anxiety and depression and requested a position that did not require her to be on the telephone. *Id.* at ¶ 165. Verizon informed Allen that there were no offline positions available and did not offer other options. *Id.*

Allen requested leave from February 6, 2010, through February 21, 2010, this time to care for her mother, Whitman. *Id.* at ¶ 23. As part of her request for leave—claim number ending in 5978—Allen provided Whitman's confidential medical information in the form of a certification ("FMLA certification"). *Id.* at ¶¶ 23, 41.

Allen submitted another claim—claim number ending in 8494—for FMLA leave and STD for March 8, 2010, through June 24, 2010. *Id.* at ¶ 24. Allen suffered from allergies and fatigue, she recently had her wisdom tooth pulled, and she was undergoing pulmonary and sleep testing. *Id.* at Ex. 15. Laura Cosme, an employee at Metlife, gained unauthorized access to Whitman's FMLA certification on March 26, 2010, while processing claim 8494. *Id.* at ¶ 41, Ex. 15. Shelly Bennett of Metlife denied Allen's 8494 claim for STD by letter on April 1, 2010. *Id.* at ¶ 43. In that letter, Bennett acknowledged that Metlife contacted Linda M. Spiegel, APRN ("Speigel"), who was Whitman's, not Allen's, health care provider. *Id.* at ¶¶ 3, 43. The information regarding Spiegel's care of Whitman was provided in the FMLA certification. *Id.* at ¶ 43.

**\*3** Allen's request under the FMLA was denied on April 5, 2010. *Id* . at Ex. 17. The denial of Allen's claim for STD was overturned months later. *Id.* at ¶ 92, Ex. 12. On July 14, 2010, Verizon sent Allen a memorandum on how to manage her time off as well as a "final written warning." *Id.* at ¶ 169. When an employee receives a "final written warning," she is unable to apply for jobs within Verizon. *Id.*

Allen later requested leave—unrelated to her request to care for her mother—from November 15, 2010, through January 14, 2011. *Id.* at ¶ 28. This claim ended in the number 8804. *Id.* at ¶ 44. Allen requested leave because she had a chronic serious health condition involving depression, anxiety, and severe pain in her mouth. *Id.* at ¶¶ 70, 82, 187. On November 23, 2010, Metlife emailed Allen to inform her that she needed to complete a medical authorization form so her physician could release medical information necessary for evaluating her claim. *Id.* at ¶ 178. Allen gave her physician the required forms. *Id.* at ¶ 188.

Metlife provided MLS and PDA's Independent Medical Peer Reviewer access to Allen and Whitman's private information. *Id.* at ¶¶ 141, 405. MLS used information from Whitman's FMLA certification in its peer review of Allen's STD claim. *Id.* at ¶ 378. PDA's Independent Medical Peer Reviewer created a report regarding the basis for Allen's claim. *Id.* at ¶ 149. In that report, PDA represented Whitman's medical history as though it were Allen's history. *Id.* at ¶ 185.

Metlife denied Allen's 8804 STD claim, stating that, "[t]he information available noted you received treatment, however, lacked the objective evidence sufficient to document a condition or symptoms that were of a level of severity that would be consistent with functional impairment and inability to perform your job." *Id.* at ¶ 81. Allen alleges that Metlife used Whitman's certification to deny her claim. *Id.* at ¶ 150. On January 4, 2011, Allen attempted to appeal her claim for STD and FMLA benefits. *Id.* at ¶ 181. Metlife acknowledged Allen's appeal request on January 14, 2011, and provided the administrative file to Allen in June 2011. *Id.* at ¶¶ 183–84.

While Allen was absent from work, Allen emailed her supervisor, Debra Bushman ("Bushman"), daily regarding her health. *Id.* at ¶¶ 189, 196. Bushman informed Allen that, as of January 1, 2011, she could no longer communicate her absences to Bushman via email. *Id.* at ¶ 189. She had to call the Call Center instead. *Id.* Due to her health condition, Allen had a difficult time calling Bushman. *Id.* Bushman was aware that Allen was ill and could not advocate for herself. *Id.* at ¶ 196. In addition, Anderson, as the coordinator for unplanned leaves, usually sent Allen emails regarding her absences. *Id.* at ¶¶ 179, 186, 247. However, Allen did not receive any emails from Anderson from November 15, 2010, through January 14, 2011. *Id.* at ¶ 179.

**\*4** On January 14, 2011, Verizon terminated Allen, alleging job abandonment. *Id.* Further, at some point during her employment with Verizon, Allen was informed that she would receive two "Recognizing You" certificates—awarded for stellar performance—valued at $75 in total. *Id.* at ¶ 230. Augeo Incent emailed Allen on September 16, 2011, promising her the certificates. *Id.* at ¶ 231. Allen never received the certificates. *Id.*

## IV. DISCUSSION

A. *Intentional infliction of emotional distress claims*

Allen and Whitman claim intentional infliction of emotional distress against Verizon and Metlife in Count Three, PDA in Counts 21 and 25, and MLS in Count 27. To raise a claim for intentional infliction of emotional distress, under Connecticut law, Allen and Whitman must allege: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Peytan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). Whether a defendant's conduct is extreme and outrageous is initially a question for the court to determine. *Perez–Dickson v. City of Bridgeport,* 304 Conn. 483, 527 (2012). Courts have found liability for IIED claims only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Conduct that is merely insulting, displays bad manners, or results in hurt feelings is insufficient to support a claim of IIED. *Id.*

Allen and Whitman allege that the defendants intentionally engaged in outrageous and extreme behavior when they used Whitman's confidential information, without Allen's or Whitman's consent, to tarnish Allen's reputation and deny her STD benefits. Fifth Am. Compl. ¶¶ 91, 392, 415. According to Allen and Whitman, the defendants' use of the confidential information was "intentional and malicious insofar that their actions were taken with knowledge that plaintiffs' emotional and physical distress would increase as a result of their conduct." Fifth Am. Compl. ¶¶ 96, 398, 421. Further, as to MLS and PDA, the use of the confidential information was "extreme and outrageous" because they each had an agreement with Metlife to provide an accurate peer review and were considered experts in the FMLA. Fifth Am. Compl. ¶¶ 396, 419.

### 1. Metlife and Verizon

Both Metlife and Verizon argue that Allen's claims for intentional infliction of emotional distress must fail because they are preempted by ERISA. "ERISA is an intricate, comprehensive statute. Its federal regulatory scheme governs employee benefit plans, which include both pension and welfare plans." *Boggs v. Boggs,* 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Thus, ERISA preempts state law

whenever state law comes into conflict with one of ERISA's provisions. *See Boggs,* 520 U.S. at 841 (holding that ERISA preempted a state law permitting the testamentary transfer of a nonparticipant spouse's community property interest in undistributed pension plan benefits).

**\*5** "The determination of whether a state law is preempted by ERISA requires two prongs of analysis." *Case v. Hospital of St. Raphael,* 38 F.Supp.2d 207, 208 (D.Conn.1999). First, a state law claim is preempted when it "refers to ERISA plans in the sense that it acts solely upon such plans or depends upon the existence of an ERISA plan as an essential part of its operation." *Id.* Second, even if the state law does not refer to ERISA, it is preempted if it "has a clear connection with a plan by mandating employee benefit structures and administration or by providing alternative enforcement mechanisms." *Id.* In *Case,* the court held that state contract, emotional distress, and CUTPA claims were preempted because the liability of the parties was dependent on the existence of the ERISA plan and the rights conferred by it. *Id.* at 209.

Allen's claims for intentional infliction of emotional distress are preempted because the actions taken by Verizon and Metlife that form the basis of her claims took place in the processing of her STD benefits request. *See Rovira v. AT & T,* 760 F.Supp. 376, 379 (S.D.N.Y.1991) (recognizing that when a beneficiary claims relief for injuries which arise out of the administration of an ERISA benefit plan, the state claims "relate to" the plans and are preempted). The case most on point is *Darcangelo v. Verizon Communic.,* 292 F.3d 181 (4th Cir.2002). In *Darcangelo,* the plaintiff alleged that Verizon's agent, CORE, solicited her private medical information. *Id.* at 188. The court stated that, "[i]f CORE obtained Darcalengelo's medical information in the course of processing a benefits claim or in the course of performing any of its administrative duties under the plan, these claims would be 'related to' the ERISA plan under [section] 514 and would therefore be preempted." *Id.* The court distinguished the allegations in Darcangelo's complaint because she alleged that CORE solicited her private medical information for the sole purpose of trying to terminate her. *Id.* Under that factual scenario, CORE did not obtain the information in the processing of a benefits claim, which is why the state law claim for intentional infliction of emotional distress was not preempted. *Id.* Because, here, Allen alleges that Metlife intentionally obtained her information—and Verizon intentionally used that information—in the processing of her request for STD benefits, her claims for intentional infliction of emotional distress are dismissed.

As for Whitman's claims, [1] her allegations of intentional conduct by Verizon are merely "threadbare recitals of elements of a cause of action." *Iqbal,* 556 U.S. at 678–79. She fails to plead any facts that allow the court to draw the reasonable inference that Verizon *intentionally used* (or intentionally allowed Metlife to use) Whitman's confidential information in Allen's FMLA and STD review. However, Whitman's allegations as to Metlife, while not a model of clarity, at this stage of litigation and as pled by a *pro se* plaintiff, are sufficient to withstand Metlife's Motion to Dismiss. Whitman alleges that "Cosme of Metlife gained unauthorized access" to her FMLA certification and contacted her physician on March 26, 2010, even though Allen spoke to Cosme on March 25, 2010, "and provided Cosme ... [with the] full details of her Health Care Provider information." Fifth Am. Compl. ¶¶ 12, 308. These allegations are enough to state a claim for relief. Therefore, Count Three is dismissed as to Verizon and as to Allen's claim against Metlife. Metlife's Motion to Dismiss Count Three as to Whitman is denied.

[1] Verizon and Metlife appear to argue that Whitman's claims are also preempted under ERISA. However, case law suggests that state laws are not preempted if they do not "implicate the relations along the ERISA plan entities, the principals, the employer, the plan, the plan fiduciaries and the plan beneficiaries." *Lyons v. Fairfax Properties, Inc.,* 2002 WL 31060373, at \* 4 (D.Conn. May 30, 2002). As Whitman's claims do not involve such relationships—she is a third party unrelated to the administration of STD benefits—her claims do not implicate such relationships and are not preempted.

2. MLS and PDA [2]

[2] Neither MLS or PDA argue that the claims alleged against them are preempted by ERISA. There is case-law that states claims against third parties who provide professional services to ERISA plans are not preempted. *See Lyons,* 2002 WL 31060373, at \*4 (collecting cases). Because MLS and PDA did not argue ERISA preemption, the court will not consider whether such case-law applies to peer reviewers.

**\*6** Allen and Whitman allege that MLS and PDA committed the tort of intentional infliction of emotional distress in conclusory terms. They claim that PDA and MLS "intended to inflict emotional distress and knew or should have known

that emotional distress was the likely result" when they (1) failed to acknowledge that there wasn't a consent form signed by Whitman or Allen to use Whitman's medical information and (2) used Whitman's confidential medical information to tarnish and deny Allen of short term disability. Fifth Am. Compl. ¶¶ 388, 390–92, 41, 413–15. They allege that using Whitman's confidential medical information in the processing of Allen's claim for STD benefits was extreme and outrageous because PDA and MLS each had an agreement with Metlife to perform an accurate peer review. Fifth Am. Compl. ¶¶ 396, 419.

These allegations do not include factual assertions sufficient 'to raise a right to relief above the speculative level.' " *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (quoting *Twombly,* 550 U.S. at 555). Therefore, Allen and Whitman's claims, set forth in Counts 21, 25, and 27, are dismissed without prejudice to replead.

### B. *Negligent misrepresentation*

Whitman alleges a claim of negligent misrepresentation against Metlife in Count Four. To state a claim for negligent misrepresentation under Connecticut law, Whitman must allege: "(1) a false representation was made to the party as a statement of fact, (2) it was made for the guidance of the party, (3) the party making the representation failed to exercise reasonable care in obtaining or communicating the information, and (4) the pleading party justifiably relied on the representation to its detriment." *MacNeal v. Alden Design, Inc.,* 2007 WL 3318259, at *2 (Conn.Super.Nov.1, 2007).

According to Whitman, Metlife made a misrepresentation of fact by suggesting in its April 1, 2010 letter that Allen provided Whitman's FMLA Certification rather than acknowledging that it obtained Whitman's FMLA certification without authorization. Fifth Am. Compl. ¶¶ 102–104. Metlife argues that Whitman fails to state a claim for negligent misrepresentation as a matter of law because the alleged statement by Metlife was made to *Allen* in its April 1, 2010, letter, not *Whitman* (who is the plaintiff bringing this claim). Metlife's Mem. in Supp. Mot. to Dismiss at 11 (Doc. No. 98). Metlife further argues that, "Whitman does not allege any specific fact that Metlife purportedly misrepresented," only that Metlife did not acknowledge how it obtained Whitman's FMLA certification. *Id.* at 12.

The court concludes that Whitman fails to state a claim for negligent misrepresentation. There are no allegations in the Fifth Amended Complaint to allow this court to make

the reasonable inference that Metlife made any statement to Whitman *for her* guidance or that Whitman justifiably relied on Metlife's statements to *her* detriment. *See Meade v. Yale University,* 2006 WL 2730320, at *5 (Conn.Super.Sept.7, 2009) (describing facts that sufficiently establish the reliance element of a cause of action for negligent misrepresentation). All Whitman alleges is that, "she relied on Metlife's misrepresentation until she reviewed" the FMLA, the Genetic Information Nondiscrimination Act (GINA), and Metlife's Customer Privacy Policy and Administrative Records. Fifth Am. Compl. ¶ 104. This is insufficient to state a claim and, therefore, Count Four is dismissed.

### C. *Invasion of privacy*

**\*7** Allen and Whitman allege invasion of privacy against all four defendants in Count Five. "[T]he law of privacy has not developed as a single tort, but as a complex of four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone." *Foncello v. Amorossi,* 284 Conn. 225, 234, 931 A.2d 924 (2007). The four categories are: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) publicity that unreasonably places the other in a false light before the public. *See id.* (citing *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 127–28, 448 A.2d 1317 (1982)).

Allen and Whitman do not specify in their Fifth Amended Complaint which category of invasion of privacy they are alleging. However, based on their allegations and their briefs in opposition to the defendants' Motions to Dismiss, it appears that they are alleging a claim for unreasonable intrusion upon the seclusion of another. *See* Pl. Mem. in Opp. Metlife's Mot. to Dismiss at 17. In their Fifth Amended Complaint, they claim that Cosme, a Metlife employee, "participated in theft or unauthorized access to Allen's employee record," and that MLS and PDA "gained unauthorized access to Allen's employee file when the party administrator [Metlife] provided ... [them] with medical and non-medical documentation" including Whitman's FMLA certification. Fifth Am. Compl. ¶¶ 110–11.

The claim of unreasonable intrusion upon the seclusion of another "consists solely of an intentional interference with [a person's] interest in solicitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that

2013 WL 2467923

would be highly offensive to a reasonable man." *Bremmer–McLain v. City of New London,* 2012 WL 2477921, at *14 (Conn.Super. June 1, 2012). The intrusion may be physical, but it does not have to be; it may be some other form of investigation or examination into the plaintiff's private concerns. *Id.*

### 1. MLS and PDA

MLS argues [3] that Allen and Whitman fail to raise a claim for unreasonable intrusion upon the seclusion of another, as a matter of law, because Allen and Whitman allege that Metlife gave MLS Whitman's FMLA certification. *See* MLS's Mem. in Supp. Mot. to Dismiss at 7; *see also* Fifth Am. Compl ¶ 111 (alleging that Metlife provided Whitman's FMLA certification to both MLS and PDA). The Fifth Amended Complaint is void of allegations that MLS and PDA intruded into Allen and Whitman's personal lives to obtain the FMLA certification. *See id.* at *15 (stating that the claim for unreasonable intrusion upon the seclusion of another failed because the complaint was void of allegations that the defendant obtained Bremmer–McLain's personal letter by opening his personal mail or intruding upon his personal life in some way). The allegations in the Fifth Amended Complaint cannot form the basis of an unreasonable intrusion upon the seclusion of another claim against MLS and PDA because, as alleged by Allen and Whitman, it was another party that committed the intrusion. Therefore, Count Five is dismissed as against MLS and PDA.

[3] PDA argues that Allen and Whitman fail to raise a claim against it for unreasonable intrusion into the seclusion of another because the plaintiffs have not alleged that the parties had a relationship. *See* PDA's Mem. in Supp. Mot. to Dismiss at 6. It is not an element of a claim for invasion of privacy that the plaintiff and defendant have a relationship. *See, e.g., Bremmer–McLain,* 2012 WL 2477921, at *14 (setting forth elements). Although PDA does not offer any other argument to rebut Allen and Whitman's claim for unreasonable intrusion into the seclusion of another, it does note —while discussing the possibility that Allen and Whitman brought a claim for invasion of privacy based on the category of unreasonable publicity given to the other's private life—that it cannot be liable for providing allegedly unauthorized information to Metlife when Metlife was the one who originally provided PDA with the information.

*Id.* The court will consider this argument generally in determining whether Allen and Whitman stated a claim under any of the categories of invasion of privacy.

### 2. Verizon

**\*8** Verizon argues that the claim for unreasonable intrusion into the seclusion of another must be dismissed as to it because Allen and Whitman "fail to allege that Verizon did anything that would constitute an invasion of privacy." Verizon's Mem. in Supp. Mot. to Dismiss (Doc. No. 95) at 16. Allen and Whitman merely allege in conclusory terms that Verizon committed an unauthorized intrusion. Fifth Am. Compl. ¶ 109. However, nowhere in the Fifth Amended Complaint do Allen and Whitman allege that Verizon took anything from Allen; rather they allege that Verizon should have protected Allen's employee file. Fifth Am. Compl. ¶ 113. Because the plaintiffs do not allege an intentional intrusion by Verizon, their claim against Verizon fails.

### 3. Metlife

Metlife argues that Allen and Whitman do not—and cannot —allege that Metlife intruded on their seclusion because, although Allen and Whitman allege that Metlife participated in theft or unauthorized access of Allen's employee record, this allegation is belied by their admission that Allen provided Metlife with Whitman's FMLA certification. *See* Metlife's Mem. in Supp. Mot. to Dismiss at 13; *see also* Fifth Am. Compl. ¶ 3. To the extent that Allen and Whitman claim that Metlife improperly accessed Whitman's FMLA certification after its authority to view the certification had expired, Metlife argues that Allen and Whitman fail to allege facts to raise the reasonable inference that Metlife intentionally accessed Whitman's FMLA certification. *See* Metlife's Mem. in Supp. Mot. to Dismiss at 13–14.

Regardless of the factual allegations set forth in the Fifth Amended Complaint, Allen's claim against Metlife fails because it is preempted by ERISA, *see supra,* p. 8–10. Any intrusion to obtain Whitman's FMLA certification occurred in the process of determining whether Allen should receive STD benefits. *See Darcangelo,* 292 F.3d at 188 (stating that, if the plan administrator obtained the plaintiff's medical information in the course of processing a benefits claim, the claims are preempted).

As for Whitman, just as with her claim for intentional infliction of emotional distress, she has alleged facts, at least

at this stage of litigation, to allow the court to draw the reasonable inference that Metlife intentionally interfered with her private affairs. Whitman alleges that, "Cosme of Metlife gained unauthorized access" to her FMLA certification and contacted her physician on March 26, 2010, even though Allen spoke to Cosme on March 25, 2010, "and provided Cosme ... [with the] full details of her Health Care Provider information." Fifth Am. Compl. ¶¶ 12, 308. Therefore, Metlife's Motion to Dismiss as to Count Five, as brought by Whitman, is denied.

### 4. Unreasonable publicity

Although Allen and Whitman appear to only raise a claim for unreasonable intrusion upon seclusion, in an abundance of caution, the defendants have also argued that the Fifth Amended Complaint fails to raise a claim for unreasonable publicity given to the other's private life. *See e.g.,* Metlife's Mem. in Supp. Mot. to Dismiss at 14. In an equal abundance of caution, the court will consider their arguments.

**\*9** To state a claim for unreasonable publicity given to the other's private life, the plaintiffs must allege that the defendants publicly disclosed a matter that (1) "would be highly offensive to a reasonable person, and (2) is not of a legitimate concern to the public." *Bremmer–McLain,* 2012 WL 2477921, at \*15. "Publicity ... means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.*

Allen and Whitman allege that Metlife disclosed Whitman's FMLA certification to MLS and PDA, *see* Fifth Am. Compl ¶ 111, and that MLS and PDA used that same information in their reports, which were sent to Metlife. *See* Fifth Am. Compl. ¶¶ 378, 391–92. These disclosures are simply too limited to constitute an invasion of privacy. *See e.g., Bremmer–McLain,* 2012 WL 2477921, at \*15 (stating that it is not an invasion of privacy to communicate a fact concerning the plaintiff's private life to a small group of persons); *Grigorenko v. Pauls,* 297 F.Supp.2d 446, 448–49 (D.Conn.2003) (analyzing the publication requirement for a claim of false light invasion of privacy and determining that communicating to nine people at Yale and three people outside of Yale does not constitute public disclosure). For this reason, if the plaintiffs attempted to allege a claim for unreasonable publicity given to the other's private life, it is dismissed.

### D. *False light*

Allen alleges a claim of false light against PDA in Count Eight. The definition of false light invasion of privacy is as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* at 448. Allen alleges that PDA created a false peer review report which suggested that Allen suffered from the medical inflictions that her mother, Whitman, suffered. Fifth Am. Compl. ¶ 149. This claims fails for the same reason a claim for unreasonable publicity given to the other's private life fails, *see supra,* pp. 16–17. Allen alleges that PDA sent this false report only to Metlife.[4] Fifth Am. Compl. ¶¶ 150, 367. Distribution to one other entity does not constitute "public" disclosure. *See Grigorenko,* 297 F.Supp.2d at 448–49.

4    Allen alleges that Verizon "used" PDA's report. Fifth Am. Compl. ¶ 150. However, there are no allegations that PDA sent the report to Verizon. Allen alleges only that PDA had an agreement with Metlife to prepare a peer review report. Fifth Am. Compl. ¶ 367.

### E. *Breach of contract claims*

Allen and Whitman allege claims of breach of contract against Verizon in Count One and Metlife in Count Two. Allen alleges breach of contractual duty against Metlife in Count 17, while Whitman alleges breach of contractual duty against Metlife in Count 18. Allen and Whitman together allege breach of contractual duty against PDA in Count 19, and against MLS in Count 20. Under Connecticut law, the elements of a breach of contract are "the formation of an agreement, performance by one party, breach of the agreement by

the other party and damages." *Rosato v. Mascardo,* 82 Conn.App. 396, 411, 844 A.2d 893(Conn.App.Ct.2004) (quoting *Bouchard v. Sundberg,* 80 Conn.App. 180, 189, 834 A.2d 744, (Conn.App.Ct.2003)).

    1. Breach of contract claim against Verizon

**\*10**  Allen and Whitman allege that Verizon breached two agreements: Verizon's Code of Conduct Policy and the Administrative Services Agreement entered into with Metlife for the administration of FMLA and STD claims. Fifth Am. Compl. ¶¶ 37, 39. Verizon argues that neither of these documents can form the basis of a breach of contract claim because they were not agreements entered into between Verizon and Allen or Whitman. Verizon's Reply at 5.

First, as to Verizon's Code of Conduct Policy, Verizon argues that there are no allegations to suggest that the Code of Conduct Policy constituted an agreement conferring rights of any kind on Allen and Whitman. *Id.* Verizon cites to an Exhibit 35, purportedly attached to the plaintiffs' Fifth Amended Complaint, which includes the Code of Conduct Policy. *Id.* According to Verizon, the Code of Conduct Policy explicitly disclaims giving employees rights of any kind and states that the policy can be changed by Verizon at any time. *Id.* Therefore, because under Connecticut law, personnel manuals are not considered contracts if they eschew "language that could reasonably be construed as a basis for a contractual promise ... [or include] appropriate disclaimers of the intention to contract," *Finley v. Aetna Life and Cas. Co.,* 202 Conn. 190, 199 n. 5, 520 A.2d 208 (1987) (overturned on other grounds), a breach of the Verizon Code of Conduct cannot form the basis of a breach of contract claim. *See* Verizon's Reply at 5.

The court cannot find an Exhibit 35 attached to the plaintiffs' Fifth Amended Complaint. However, the plaintiffs supplied the Code of Conduct as an attachment to its Motion for Leave to File a Fourth Amended Complaint (Doc. No. 64). The attached policy does, in fact, include appropriate disclaimers of the intention to contract. Therefore, it cannot form the basis of Allen and Whitman's breach of contract claim. [5] *See Gaudio v. Griffin Health Serv. Corp.,* 249 Conn. 523, 533, 733 A.2d 197 (1999) (allowing a claim for breach of contract to go forward because the personnel manual at issue did not include express language definitively stating that the employees were at-will).

[5]  Furthermore, as Verizon argues, even if the Code of Conduct were to constitute a contract between Verizon and Allen—an employee of Verizon—there are no allegations to support the claim that Whitman was a party to such a contract. There is no allegation that Whitman was an employee of Verizon or that the Code of Conduct applied to her in any way. *See* Verizon's Reply at 5.

Second, as to the Administrative Services Agreement entered into with Metlife for the administration of FMLA and STD claims, Verizon argues that Allen and Whitman have failed to allege any facts to support a conclusion that they are third-party beneficiaries to the Agreement. Verizon's Reply at 6. "In general, in order to claim breach of contract, the plaintiff must be a party to the contract." *Reyes v. Nautilus Ins. Co.,* 2012 WL 1004302, at \*4 (Conn.Sup.Ct. Mar. 6, 2012). However, Connecticut courts have recognized an exception when the party bringing suit is an intended third party beneficiary. *Id.* "A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract." *Id.* (quoting *Rapaport & Benedict, P.C. v. Stamford,* 39 Conn.App. 492, 497, 664 A.2d 1193 (1995)).

**\*11**  "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary]." *Id.* (quoting *Dow & Condon, Inc. v. Brookfield Development Corp.,* 266 Conn. 572, 580–81, 833 A.2d 908 (2003)). "[I]ntent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Id.*

Although Allen and Whitman state in conclusory terms that they are third-party beneficiaries, the court has the benefit of reviewing the Administrative Services Agreement. [6] While it is true that the Administrative Services Agreement explicitly states that "[n]othing in this [Indemnification] section is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, any right, claim or cause of action against the Indemnified Party or Supplier," Metlife's Mem. in Supp. Mot. to Dismiss, Ex. B., at 11, this third-party disclaimer is only listed in the "Indemnification" section and does not apply to the entire Agreement. In the Agreement, both Verizon and Metlife agree to keep health data—obtained during the performance of Metlife's duties and obligations under the Agreement

—private and confidential. *Id.* at 6, 833 A.2d 908 (listed under the heading "Privacy of Medical Records: Mutual Obligations of Supplier [Metlife] and Verizon Wireless"). Verizon further agrees to "undertake those efforts reasonably deemed necessary by Supplier to protect the information used in connection with the Supplier's administration, evaluation, analysis, or management of Verizon Wireless' disability plans, leave of absence programs or Family and Medical Leave Act compliance obligations subject to this Service Agreement." *Id.* at 7, 833 A.2d 908 (section 12.2). As the beneficiary of the programs subject to the Service Agreement and the individual whose medical information Verizon and Metlife promise to keep confidential, Allen and Whitman, respectively, are the intended beneficiaries of the contracting parties' promises. Therefore, at this stage of litigation, the court concludes that there are enough facts in the Fifth Amended Complaint to plausibly assert that the parties to the Administrative Services Agreement—Verizon and Metlife—intended to assume a direct obligation to Allen and Whitman. [7] *See Dow & Condon,* 266 Conn. at 580–81, 833 A.2d 908. Therefore, Verizon's Motion to Dismiss Count One is denied.

[6]     "Even where a document is not [attached to a complaint or] incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). As Allen and Whitman's breach of contract claims rest on the obligations set forth in the Administrative Services Agreement, the court will consider the Agreement in its Ruling.

[7]     Verizon attempts to argue that Allen and Whitman's claims for breach of contract are preempted by ERISA. However, to the extent that Allen and Whitman are alleging that Verizon breached its obligation to keep medical records submitted on behalf of an FMLA claim confidential, that obligation arises from, and relates to, Verizon's obligation under the FMLA and not under the STD policy (only the latter of which is an ERISA plan).

2. Breach of contract claims against Metlife

a. Claim for ERISA

In Count Two, Allen alleges that she entered into a contract with Metlife when she applied for STD benefits, and that Metlife breached that contract when it wrongfully denied her medical benefits. Fifth Am. Compl. ¶¶ 70–71. Although titled as a claim for breach of contract, this count appears to state a claim pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq. See* Fifth Am. Compl. ¶ 72 (stating that plaintiff can bring a lawsuit regarding wrongful denial of benefits according to ERISA section 502(a)(1)(B)). Metlife has not moved to dismiss this claim for denial of benefits under section 502(a)(1)(B) of ERISA; therefore, the court does not consider it. *See* Mem. in Supp. Mot. to Dismiss at 7, n. 7 (recognizing, without further discussion, that "Allen has improperly asserted her ERISA § 502(a)(1)(B) cause of action as part of her state law breach of contract cause of action, but does actually invoke her ERISA rights to pursue a claim for benefits in the second count.").

b. Common law breach of contract

**\*12** In Counts 17 and 18, Allen and Whitman, respectively, allege common law breach of contract claims against Metlife. They argue that they were third party beneficiaries to the Administrative Services Agreement between Verizon and Metlife and, in addition, that Metlife breached its Customer Privacy Policy. As to the Customer Privacy Policy, Metlife argues that it is not a contract because Allen and Whitman have failed to allege facts that they entered into an agreement with Metlife based on a mutual meeting of the minds. Metlife's Mem. in Supp. Mot. to Dismiss at 18. Allen and Whitman merely claim that Metlife *has* a Customer Privacy Policy. Fifth Am. Compl. ¶ 331.

However, for the reasons discussed above, *see supra,* pp. 20–21, the Administrative Services Agreement includes enough facts to plausibly suggest that Allen and Whitman are third-party beneficiaries to the Agreement and that Verizon and Metlife intended to create a direct obligation to Allen and Whitman to keep medical information provided pursuant to the FMLA confidential. Therefore, Metlife's Motion to Dismiss is denied as to Counts 17 and 18. [8]

[8]     Again, as with Allen's claim for breach of contract against Verizon, to the extent that Allen and Whitman are alleging that Verizon breached its obligation to keep medical records submitted on behalf of an FMLA claim confidential, that obligation arises from and relates to Metlife's

obligation under the FMLA and not under the STD policy (only the latter of which is an ERISA plan). Therefore, the claim is not preempted.

3. Breach of contract claims against MLS and PDA

The crux of Allen and Whitman's claims against both PDA and MLS is that they "owed Whitman and Allen as third-party beneficiaries to the contract[s] between Metlife and" PDA and MLS. Fifth Am. Compl. ¶¶ 357, 374. The contracts between Metlife and PDA and MLS were to provide an accurate peer review for claims relating to STD. *Id.* at ¶¶ 359, 382. Therefore, according to Allen and Whitman, PDA and MLS breached the contracts with Metlife by failing to provide an accurate peer review of Allen's medical information, as their reviews included information from Whitman's FMLA certification.

Both PDA and MLS argue that Allen and Whitman have failed to allege that they are third party beneficiaries to the Metlife contracts with PDA and MLS. *See* PDA's Mem. in Supp. Mot. to Dismiss at 8; MLS's Mem. in Supp. Mot. to Dismiss at 9. There are no allegations in the Fifth Amended Complaint to plausibly suggest that PDA and MLS intended to assume a direct obligation to Allen or Whitman. Allen and Whitman merely state, without more, that the two are third-party beneficiaries to the contracts. Furthermore, the fact that PDA and MLS were completing the peer review on Allen's claim does not offer any support to the plaintiffs' argument that they were third-party beneficiaries. "The fact that a person is a foreseeable beneficiary of a contract is not sufficient for him to claim rights as a third party beneficiary." *Grigerik v. Sharpe,* 247 Conn. 293, 318, 721 A.2d 526 (1998). Therefore, Allen and Whitman's claims for breach of contractual duty in Counts 19 and 20 are dismissed without prejudice to replead facts that plausibly allege that Allen and Whitman are third-party beneficiaries to the contracts between Metlife and MLS and PDA.

F. *Breach of fiduciary duty*

**\*13** In Counts 23 and 24, Allen and Whitman allege claims for breach of duty against PDA and MLS. In addition to alleging that PDA and MLS failed to exercise reasonable care, the plaintiffs claim that they "have material evidence that prove that the Defendants ... [PDA and MLS] breach fiduciary duties." Fifth Am. Compl. ¶¶ 419, 437. Because Allen and Whitman raise claims for general negligence against PDA and MLS in other counts, the court will construe these claims—as the defendants did—as ones for breach of fiduciary duty.

To state a claim for breach of fiduciary duty, the plaintiff must first allege that a fiduciary duty exists. *Biller Assoc. v. Peterken,* 269 Conn. 716, 721–22, 849 A.2d 847 (2004). "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise *and is under a duty* to represent the interests of the other." *Id.* at 723, 849 A.2d 847 (citing *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.,* 255 Conn. 20, 38, 761 A.2d 1268 (2000)). "In the seminal cases in which ... [the Supreme Court of Connecticut] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Hi–Ho Tower,* 255 Conn. at 38, 761 A.2d 1268. The Supreme Court has refused to recognize, as a matter of law, a fiduciary relationship when the parties were dealing at arm's length or when the parties were not engaged in a relationship of special trust and confidence. *Id.* at 39, 761 A.2d 1268.

Allen and Whitman have failed to allege facts to suggest that they had a fiduciary relationship with PDA and MLS. None of the allegations in the Fifth Amended Complaint suggest Allen or Whitman ever interacted with PDA or MLS, let alone had a relationship of special trust and confidence. As discussed earlier, *see supra,* p. 24, there are similarly no allegations to plausibly suggest that PDA or MLS were under a specific duty to act for the benefit of Allen or Whitman. Therefore, Allen and Whitman's claims for breach of fiduciary duty are dismissed as to PDA and MLS, with leave to replead facts that plausibly allege the existence of a fiduciary relationship.

G. *Breach of implied oral contract*

Allen alleges in Count 11 that Verizon breached an implied oral contract after it failed to provide Allen with two "Recognizing You" certificates valuing $75. Fifth Am. Compl. ¶¶ 230–231. "An implied contract is an agreement between the parties which is not expressed in words but which is inferred from the acts and the conduct of the parties.... The test is whether the conduct and acts of the parties show an agreement." *Brighenti v. New Britain Shirt Corp.,* 167 Conn. 403, 406, 356 A.2d 181 (1974) (internal citations omitted). "The elements of a breach of an implied contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Mahov v. Chicago Title Ins. Co.,* 2012 WL 3544883, at *2 (D.Conn. Aug.16, 2012) (citing *Pelletier v. Galske,* 105 Conn.App. 77, 81, 936 A.2d 689 (2007)).

**\*14** Verizon argues that Allen fails to allege that she and Verizon entered into a contract. Verizon's Mem. in Supp. Mot. to Dismiss at 13. All that Allen alleges is that Verizon offered her two certificates worth $75, and that Allen never received them. Fifth Am. Compl. ¶¶ 230–231. These allegations cannot form the basis of a breach of implied contract claim as Allen merely alleges an offer without any acceptance or performance.[9] Therefore, Allen's claim for breach of implied contract is dismissed.

9      Further, Allen attached emails to her opposition to Verizon's Motion to Dismiss—exhibits which were not included in her Fifth Amended Complaint—which show that Allen was communicating with a vendor, Augeo Incent, regarding these certificates, and not Verizon. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss, Ex. 40.

### H. *Negligence claims*

Allen and Whitman allege claims of negligence against Verizon and Metlife in Count Seven, PDA in Count 22, and MLS in Count 26. Allen and Whitman also bring a claim against Verizon in Count Six for "breach of duty" for failing to properly select and monitor service providers.

The court will consider the "failure to select" claim against Verizon first, as it can be summarily dismissed. Under Connecticut law, to prevail on a claim for negligence, a plaintiff must prove: (1) duty; (2) breach of that duty; (3) causation; and (4) actual injury or damages. *See Murdock v. Croughwell,* 268 Conn. 559, 848 A.2d 363, 367 (Conn.2004). "[A] duty of care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Gerber Trade Finance, Inc. v. Davis, Sita & Co., P.A.,* 128 F.Supp.2d 86, 95 (D.Conn.2001) (citing *Burns v. Board of Educ.,* 228 Conn. 640, 646, 638 A.2d 1 (1994)). The court is unaware of any basis for a duty Verizon owed Allen and Whitman to select and monitor a plan administrator. *See* Verizon's Mem. in Opp. Mot. to Dismiss at 18 (stating that the plaintiffs "merely assert that it [Verizon] had a duty, but fail to allege how this duty came about"). Therefore, Count Six is dismissed.

Moving to the claims for general negligence against the four defendants, as Verizon argues, Allen and Whitman cannot maintain a negligence claim against the defendants because they have only alleged emotional injury as a result of the alleged negligence. Verizon Mem. in Opp. Mot. to Dismiss at 19 (citing *Fischer v. Yale Univ.,* 2006 Conn.Super. LEXIS 386, at \*2 (Conn.Super.Ct. Feb. 8, 2006)). "Emotional injury can provide the basis of a claim for simple negligence only as a consequence of a physical injury." *Fischer,* 2006 Conn.Super. LEXIS 386, at \*2 (citing *Bushnell v. Bushnell,* 103 Conn. 583, 594, 131 A. 432 (1925)).

Allen and Whitman allege that, due to Verizon and Metlife's alleged negligence, they experienced "conscious pain and suffering and physical injuries, medical expenses, and other damages." Fifth Am. Compl. ¶ 145. As for MLS and PDA, Allen alleges that her "depression and anxiety worsened," she "began to vomit, cry and worry excessively about the future," and she suffered a "fear of loneliness and sleeplessness." Fifth Am. Compl. ¶¶ 408–09. These injuries are "purely emotional or are physical manifestations of emotional injuries, and therefore cannot provide the basis for [a] negligence cause[ ] of action." *Fischer,* 2006 Conn.Super. LEXIS 386, at \*2.

**\*15** However, rather than dismiss these claims, the court will, given plaintiffs' *pro se* status, construe them as claims for negligent infliction of emotional distress. Under Connecticut law, a cause of action for negligent infliction of emotional distress requires a showing "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Perodeau v. City of Hartford,* 259 Conn. 729, 748–49, 792 A.2d 752 (2002) (quoting *Montinieri v. S. New England Tel. Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978)); *see Miner v. Town of Chesire,* 126 F.Supp.2d 184, 197 (D.Conn.2000). Or, in other words, "[i]n order to prevail on a negligent infliction of emotional distress claim, the following elements must be proven: '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.' " *Vega v. Sacred Heart Univ., Inc.,* 871 F.Supp.2d 81, 85 (D.Conn.2012) (citing *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444, 815 A.2d 119 (2003)).

### 1. Verizon

The court will consider Allen and Whitman's claims separately. First, as to Allen, her claim against Verizon must fail because, "[i]n the employment context, liability for negligent infliction of emotional distress cannot arise

2013 WL 2467923

from behavior that is part of an ongoing relationship. It can arise only from conduct occurring in the termination process." *Mody v. Gen. Electric Co.,* 2006 WL 1168051 at *3 (D.Conn. Apr.26, 2006) (internal quotation marks and citations omitted); *Perodeau,* 259 Conn. at 762–63, 792 A.2d 752 (holding that municipal employer could not be liable for negligent infliction of emotional distress claim based on conduct occurring "within a continuing employment context" rather than "in the termination of employment"). Because Allen's claim for negligent infliction of emotional distress does not pertain to any actions taken by Verizon in the termination process, Allen's claim must fail.

As for Whitman, she claims that she was injured when Verizon negligently failed to protect her FMLA certification. [10] Fifth Am. Compl. ¶ 140. Although the claim is not particularly clear, when taking the Fifth Amended Complaint as a whole, there are facts plausibly alleged that Verizon should have known that, by failing to protect Whitman's private, confidential medical information, she could suffer emotional harm. Therefore, Verizon's Motion to Dismiss Count Seven, as to Whitman, is denied.

[10]    To the extent that Verizon argues that Whitman's claim is preempted by ERISA, the court disagrees. Any duty owed to Whitman to keep the medical certification confidential arises out of the FMLA and not the STD Plan.

### 2. Metlife

Because the court has construed Allen and Whitman's cause of action for negligent infliction of emotional distress, Allen and Whitman must allege facts to plausibly assert "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Perodeau,* 259 Conn. 729, 748–49, 792 A.2d 752 (2002) (quoting *Montinieri* 175 Conn. at 345, 398 A.2d 1180); *see also Vega v. Sacred Heart Univ., Inc.,* 871 F.Supp.2d 81, 85 (D.Conn.2012) ("In order to prevail on a negligent infliction of emotional distress claim, the following elements must be proven: '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.' ") (citing *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444, 815 A.2d 119 (2003)).

**\*16**  Taking Whitman's claim first, she has alleged that Metlife, by failing to keep her FMLA certification confidential, created an unreasonable risk of causing Whitman emotional pain. Fifth Am. Compl. ¶ 140 (stating that "Metlife has a duty to administer FMLA claims for Verizon ... [and] failed to protect Whitman['s] ... confidential ... medical records"). Such allegations, at this stage of litigation and by a *pro se* plaintiff, are enough to survive a Motion to Dismiss.

As for Allen's claim, the court has difficulty seeing how Allen has stated a claim that Metlife's conduct created an unreasonable risk of causing *her* emotional distress. To the extent that Allen's claim rests on Metlife's failure to protect the FMLA certification, it was only foreseeable that such a breach in confidentiality would harm Whitman, the person whose medical information was breached. To the extent that Allen's claim rests on Metlife's use of Whitman's confidential information against Allen in denying her STD benefit claim, such a claim is preempted by ERISA. Therefore, Allen's negligence claim against Metlife—construed as a claim for negligent infliction of emotional distress—is dismissed without prejudice to replead with facts that plausibly allege that Metlife's failure to protect Whitman's FMLA certification created an unreasonable and foreseeable risk of causing harm to Allen.

### 3. PDA and MLS

According to Allen and Whitman, both PDA and MLS had a legal duty to provide an accurate peer review of Allen's medical claim. Fifth Am. Compl. ¶¶ 407, 425. They also had a duty to "protect patients unlawful confidential protected employee records and to base Allen's review solely on Allen's medical documentation not Whitman's medical information." Fifth Am. Compl. ¶ 424; *see also* ¶ 406. Allen and Whitman allege that the two peer review companies "should have known that when Allen and Whitman reviewed the administrative file ending with 8804 that included ... Whitman's unauthorized medical documentation ... this would cause extreme emotional distress." Fifth Am. Compl. ¶ 408.

MLS argues that these allegations are insufficient to plausibly state a claim for negligent infliction of emotional distress. MLS Mem. in Opp. Mot. to Dismiss at 17. MLS claims that there are no facts to support a claim that Allen and Whitman's distress was foreseeable or that "emotional distress is a foreseeable result of reading a review of a short-term disability claim." *Id.* However, at this stage of litigation, construing claims by *pro se* plaintiffs, the court disagrees. Allen and Whitman allege that MLS and

PDA negligently used Whitman's FMLA certification in reviewing Allen's claim and that the use of Whitman's medical information caused emotional distress to Whitman—because her confidential information was used without her consent—and to Allen—because she believed MLS and PDA would provide an accurate review. See Fifth Am. Compl. ¶¶ 405–06, 418. Therefore, MLS and PDA's Motions to Dismiss Counts 22 and 26—construed as claims for negligent infliction of emotional distress—are denied.

### I. *Breach of ADA confidentiality*

**\*17**  Allen alleges in Count 16 that Verizon violated the ADA by breaching Allen's confidentiality. Section 12112(d) of the Americans with Disabilities Act requires employees to treat information obtained regarding the medical condition or history of any employee as a confidential medical record and to maintain such information on separate forms and in separate medical files. *See* 42 U.S.C. § 2112(d)(C). According to Allen, she only authorized Verizon to use Whitman's FMLA certification to determine whether she could obtain FMLA leave as part of her 5978 claim. Fifth Am. Compl. ¶ 292. Any further use of the FMLA certification, according to Allen, breached her confidentiality.

First, Verizon questions whether Allen may bring a claim for breach of ADA confidentiality without bringing a claim for discrimination under the ADA. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 30. In *Giaccio v. City of New York,* 308 Fed. Appx. 470, 471 (2d Cir.2009), the Second Circuit raised the possibility that a violation of the confidentiality provision of the ADA is not actionable without demonstrating discrimination. However, the Second Circuit ultimately did not decide whether discrimination is necessary to bring such a claim because it held that the plaintiff did not present evidence raising an inference that her drug test records were disclosed by the defendant. *See id.* Because any discussion of a discrimination requirement in *Giaccio* is *dicta,* the court will continue to consider whether Allen has alleged facts to plausibly suggest that Verizon violated her confidentiality.[11]

[11]  In *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 970 (8th Cir.1999), the court explained that the plaintiff needed to establish that the defendant's violation of the ADA under section 12112(d) —disclosing the plaintiff's back injury—caused some sort of tangible injury. However, the court did not decide whether that injury must be an "adverse employment action" as required to raise

a claim for disability discrimination pursuant to section 12112(a). *Id.* at 971. Allen merely alleges in a conclusory manner that Whitman's genetic information was used as a factor leading to her discharge. Fifth Am. Compl. ¶ 209.

Verizon next argues that Allen cannot state a claim for relief because the records at issue are Whitman's medical records, and not her own. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 30. Allen appears to argue in response that, because Whitman's medical information should be protected pursuant to the FMLA, it should also be protected under the ADA's confidentiality provision. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 45. The court has not found any case in which a plaintiff brought a claim for violation of the ADA's confidentiality provision based on disclosure of another person's medical records. The cases that address whether disclosure of an FMLA certification constitutes a violation of section 12112(d) all include medical information regarding the employee, and not a family member. *See e.g., Doe v. U.S. Postal Service,* 317 F.3d 339 (D.C.Cir.2003) (disclosure of employee's HIV status on FMLA form). Furthermore, in *Doe,* the court held that disclosure of an FMLA form is only a violation of the ADA's confidentiality requirement if the form was submitted in response to the employer's request (1) for information in connection with a voluntary medical examination which is part of an employee health program available to employees at the work site, or (2) for information regarding the ability of an employee to perform job-related functions. *Id.* at 345; *see also* 42 U.S.C. § 12112(d)(4)(B). Allen submitted Whitman's FMLA form so she could take leave to care for Whitman, not so she could take leave because of her own medical needs. *C.f. Doe,* 317 F.3d at 345 (stating that, when the plaintiff submitted his FMLA certification so he could take leave due to his own medical problems, the employer was seeking to determine whether the plaintiff was unable to perform the functions of his position). Because the FMLA certification includes Whitman's medical information —not Allen's—and was submitted to Verizon for a purpose other than the two categories set forth in section 12112(d) (4)(B), Allen's claim for breach of ADA confidentiality is dismissed.

### J. *Discrimination based on perceived disability, wrongful discharge*

**\*18**  Allen brings a claim for discrimination/wrongful discharge against Verizon in Count Nine. It appears that, within Count Nine, Allen is attempting to raise three claims: wrongful discharge; creating a hostile work environment, in

violation of the ADA; and discrimination based on perceived disability, in violation of the ADA. The court will consider each claim in turn.


1. Wrongful discharge

Allen claims that she was unlawfully terminated because of her perceived disability, actual disability, and Whitman's genetic information. Fifth Am. Compl. ¶¶ 209–10. As Verizon argues, a plaintiff is precluded from bringing a claim for wrongful discharge in violation of public policy when she has an adequate statutory remedy for the violation of public policy. *See Burnham v. Karl and Gelb, P.C.,* 252 Conn. 153, 164, 745 A.2d 178 (2000). This is because, "the rationale underlying the tort of termination in violation of public policy is that 'permitting the discharge to go unaddressed would leave a valuable social policy to go unvindicated.' " *Van Kruiningen v. Plan B, LLC,* 485 F.Supp.2d 92, 96 (D.Conn.2007) (quoting *Burnham,* 252 Conn. at 182, 745 A.2d 789).

All of the bases for which Allen alleges Verizon unlawfully terminated her may be remedied by seeking statutory recourse. Allen admits as much when she alleges that she was wrongfully terminated in violation of the public policies of the ADA, FMLA, GINA, and the Civil Rights Act of 1964. Fifth Am. Compl. ¶ 212; *see also* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 32. The public policies articulated in those statutes "are already safeguarded by the remedies enumerated in those statutes, and thus a claim for public policy wrongful discharge is not plaintiff's sole means for vindicating the anti-discrimination policy." *Storm v. ITW Insert Molded Prod.,* 400 F.Supp.2d 443 (D.Conn.2005). Therefore, Allen's claim for wrongful discharge is dismissed.


2. Hostile work environment

Allen alleges that she was subjected to a hostile work environment based on her perceived disability. Fifth Am. Compl. ¶ 164. "To establish a claim of hostile work environment, 'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ...'" [12] *Martin v. Town of Westport,* 558 F.Supp.2d at 242 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). " '[I]n order to be actionable ... a [n] ... objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that

the victim in fact did perceive to be so." *Id.* (quoting *Britell v. Dept. of Correction,* 247 Conn. 148, 167, 717 A.2d 1254 (1998)). Furthermore, "[a] plaintiff must ... demonstrate that she was subjected to the hostility because of her membership in a protected class." *Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 241 (2d Cir.2007).

[12]     It should be noted that, "[t]he Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments." *Bonura v. Sears Roebuck & Co.,* 62 F. App'x 399, 400 n. 3 (2d Cir .2004). However, certain district courts within the Second Circuit recognize such a cause of action, *Monterroso v. Sullivan & Cromwell, LLP,* 591 F.Supp.2d 567, 584 (S.D.N.Y.2008), and "the circuits that have reached this question have answered it in the affirmative." *Bonura,* 62 F.App'x at 400 n. 3.

**\*19** To support her hostile work environment claim, Allen alleges that, six months after learning of Allen's chronic health condition, her supervisors pulled her off of a telephone call and brought her to a meeting to discuss her performance. Fifth Am. Compl. ¶¶ 157–58, 160–61. The meeting ran long and forced her to work past the end of her shift. Fifth Am. Compl. ¶ 158. According to Allen, she perceived the meeting to be hostile, and she felt "undermined" because she took FMLA and STD leave. Fifth Am. Compl. ¶¶ 158, 161. Allen also alleges that she was "placed under greater scrutiny and treated differently," and that this led to a downward trend in her performance. [13] Fifth Am. Compl. ¶¶ 163–64. She further claims that Verizon's denial of her requests for FMLA leave and failure to protect her confidential medical records contributed to the hostile work environment. Fifth Am. Compl. ¶ 168; *see also* Pl. Mem. in Opp. Verizon's Motion to Dismiss at 31.

[13]     For the first time in her Opposition to Verizon's Motion to Dismiss, Allen alleges that she was subjected to 'staredowns' at work. Pl. Mem. in Opp. Verizon's Motion to Dismiss at 31. These allegations are not part of the Fifth Amended Complaint and will not be considered by the court. However, even if they were considered, it would not alter this analysis.

These allegations of being subjected to scrutiny and feeling undermined do not suggest "severe and pervasive" treatment that altered the conditions of Allen's employment nor do they in any way suggest that Allen was treated in a hostile

manner because of her disability. *See e.g., Balonze v. Town Fair Tire Centers, Inc.,* 2005 WL 752198, at * 4, 8–9(D.Conn. Mar.31, 2005) (finding that allegations that an employer called the plaintiff "gimpy" and "useless" and complained about the plaintiff attending therapy during work hours did not meet the standard for a hostile work environment claim under the ADA); *Murphy v. BeavEx, Inc.,* 544 F.Supp.2d 139, 151 (D.Conn.2008) (stating that alleged harsh criticism is insufficient to establish a hostile work environment claim); *LaBella v. New York City Admin. for Children's Servs.,* 2005 WL 2077192, at *20 (E.D.N.Y. Mar.28, 2005) ("[A]n employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult.") (internal quotation marks omitted). Allen's allegations are insufficient and, therefore, Allen's hostile work environment claim is dismissed.

3. Discrimination based on perceived or actual disability

Allen alleges that Verizon discriminated against her because of her disability, in violation of the ADA, by terminating her employment on January 14, 2011. Fifth Am. Compl. ¶ 197. The ADA provides, *inter alia,* that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112(a). To state a claim for disability discrimination under the ADA, a plaintiff must allege that: (1)[her] employer is subject to the ADA; (2)[she] was disabled within the meaning of the ADA; (3)[she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4)[she] suffered adverse employment action because of [her] disability." *Rieger v. Orlor, Inc.,* 427 F.Supp.2d 105, 115 (D.Conn.2006) (quoting *Giordano v. City of New York,* 274 F.3d 740, 748 (2d Cir.2001)).

**\*20** Verizon argues that "Allen's allegations that Verizon terminated her ... because she was disabled, or perceived as such, amount to nothing more than a legal conclusion that is 'not entitled to be assumed true.'" Verizon's Mem. in Supp. Mot. to Dismiss at 24. Verizon relies on *Fritz v. The Eye Center,* 2010 WL 3210863, 2010 U.S. Dist. LEXIS 81805 (D.Conn. Aug. 11, 2010), to support its argument. In *Fritz,* the court held that the plaintiff established that she suffered from a disabling disease, that the defendant knew about her condition, and that she had collected an unspecified number of sick absences over her eight year employment due to this condition. *Id.,* at *11. However, according to the court, such

allegations do not raise an inference that the plaintiff was terminated because of her condition.

Unlike *Fritz,* Allen alleges that she had attempted to contact her supervisor via email regarding her absences, but was told that she had to call her supervisor instead. Fifth Am. Compl. ¶ 189. According to Allen, she had a difficult time speaking on the telephone due to her serious health condition. Fifth Am. Compl. ¶ 189. In addition, her supervisor knew she was ill and could not advocate for herself. [14] Fifth Am. Compl. ¶ 180. Ultimately, Verizon terminated Allen for alleged job abandonment after restricting the best method for Allen to communicate her absences. Fifth Am. Compl. ¶¶ 196, 236.

[14]   Verizon argues that Allen does not allege that she informed Verizon of her inability to speak over the phone. Verizon's Mem. in Supp. Mot. to Dismiss at 27. Allen's allegation that her supervisor knew that she could not advocate for herself, Fifth Am. Compl. ¶ 180, when construed in Allen's favor, suggests that she informed her supervisor of her inability to speak over the telephone.

Although not a model of clarity or the most plausible claim for disability discrimination possible, the court cannot conclude at this stage of litigation that Allen has not stated a claim for relief. If Verizon interfered with Allen's ability to explain her absences to her supervisors—knowing that Allen could not comply with the change in protocol due to her disability—and terminated her for failing to report her absences to her supervisors, then Allen can make out a *prima facie* case for disability discrimination. [15] Therefore, Verizon's motion to dismiss Allen's claim for disability discrimination is denied. [16]

[15]   Verizon's citation to *Vandenbroek v. PSEG Power Conn., LLC,* 2009 WL 650392, 2009 U.S. Dist. LEXIS 18320, at *17 (D.Conn. Mar. 10, 2009), does not alter this conclusion. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 26. In *Vandebroek,* the plaintiff conceded that he was terminated for violating the company's no call/no show policy, and the court granted summary judgment to the defendant because the plaintiff did not produce any evidence to suggest that his disability was a factor in the termination decision. The plaintiff only argued that his disability—alcoholism—was the reason why he violated the no call/no show

policy. *Id.* The *Vandebroek* case is distinguishable for two reasons: (1) the court acted at the summary judgment stage rather than at the motion to dismiss stage; and (2) Allen, unlike Vandebroek, alleges that Verizon manipulated the no call/no show policy to prevent Allen from abiding by it. Fifth Am. Compl. ¶ 189.

16    For the first time, in her Sur-reply to Verizon's Reply at 6 (Doc. No. 120), Allen alleges that Verizon failed to offer her a reasonable accommodation—a leave of absence—under the ADA. Allen did not allege this claim in her Fifth Amended Complaint. Therefore, the court will not consider it. However, Allen did allege that she requested an accommodation after she took a leave of absence in 2009. She alleges that, after experiencing emotional distress, which caused her to be "confused, distraught and anxiety ridden," she requested a position that would not require her to speak on the telephone. Fifth Am. Compl. ¶ 165. According to Allen, Verizon "stated there were no offline position[s] and did not offer any options." *Id.* As Verizon did not move to dismiss a claim for failure to accommodate based on these allegations, the court will not consider it.

### K. *FMLA interference and retaliation*

Allen alleges FMLA interference and retaliation against Verizon in Counts 12 and 13. "The FMLA entitles eligible employees to 'twelve workweeks per year of unpaid leave, 'because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.' *Ridgeway v. Royal Bank of Scotland Group,* 2012 U.S. Dist. LEXIS 41995, at * 13, 2012 WL 1033532 (D.Conn.2012) (quoting *Sista v. CDC Ixis North America, Inc.,* 445 F.3d 161, 174 (2d Cir.2006)).

#### 1. FMLA interference

To state a claim for FMLA interference, Allen must allege: (1) she is an eligible employee under the FMLA; (2) Verizon is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to Verizon of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA. *Id.* (citing *Higgins v. NYP Holdings, Inc.,* 836 F.Supp.2d 182 (S.D.N.Y.2011)). Allen bases her FMLA interference claim on two instances in which Verizon denied her FMLA benefits: when she sought leave between September 2009 and November 2009, Fifth Am. Compl. ¶ 222, and when she sought leave between February 2010 and June 2010, Fifth Am. Compl. ¶ 225.

**\*21** Verizon argues that Allen cannot state a claim for FMLA interference because she has admitted in her Fifth Amended Complaint that she was not entitled to FMLA leave during those time periods because she failed to provide necessary medical information within the designated deadline. Verizon's Mem. in Supp. Mot. to Dismiss at 28; *see also* Fifth Am. Compl. ¶¶ 170, 217–18. An employer may require an employee seeking leave pursuant to the FMLA to provide, in a timely manner, a certification issued by the health care provider of the eligible employee describing the appropriate medical facts regarding the condition, when the serious health condition started, and how long it is expected to continue. 29 U.S.C. § 2613. "The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification." 29 C.F.R. 825.305(b).

Allen argues that she was exempt from the deadline because she had "extenuating circumstances." Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 39. "The FMLA contains a built-in equitable provision in its regulations, specifying that an employee must submit requested medical certification [within 15 calendar days] ... *unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.*" *Peter v. Lincoln Technical Institute,* 255 F.Supp.2d 417, 441 (E.D.Pa.2002) (internal citations omitted). "Good faith requires 'at least that the employee contact his employer by telephone and make it aware that he is unable to return his certification before the deadline.' *Id.* (quoting *Washington v. Fort James Operating Co.,* 2000 WL 1673134, at \*5, (D.Or.Nov.7, 2000).

Allen has alleged that her health care providers, Wendy Brus, MSW, and Susan Hope, APRN, contacted Metlife so as to complete the FMLA forms during the appropriate time period for her request for leave between February 2010 and June 2010. Fifth Am. Compl. ¶ 224. She also attached to her Fifth Amended Complaint a facsimile from Susan Hope requesting the necessary FMLA paperwork on April 22, 2010. Fifth Am. Compl., Ex. 18. Although not entirely clear, the Fifth Amended Complaint includes allegations that could state a plausible claim that Allen made a good faith effort to comply

with the requirement that she provide a certification, at least as to her request for leave between February 2010 and June 2010.[17] Furthermore, Allen alleges in her Fifth Amended Complaint that, as for her claim for leave between September 2009 and November 2009, Verizon set a deadline for her to provide a certification "which deviated from Family Medical Leave Act laws." Fifth Am. Compl. ¶ 219. If Verizon denied Allen benefits based on her failure to provide certification within a period of time less than the statutorily-required 15 days, such action would interfere with Allen's ability to exercise her statutory rights. *See Ridgeway,* 2012 U.S. Dist. LEXIS 41995, at * 18–19 (stating that an employer's failure to provide notice to an employee "which inhibits or restricts an employee from successfully obtaining leave can substantiate a cause of action for interference"). Therefore, Verizon's Motion to Dismiss as to Allen's claim for FMLA interference is denied.[18]

[17]    Verizon's citation to *Townsend–Taylor v. Ameritech Serv.,* 523 F.3d 815 (7th Cir.2008), is not on point, as the court considered on a motion for summary judgment whether the plaintiff introduced evidence to explain or justify his delay in providing a certification. Here, the court is only considering whether Allen has alleged facts to plausibly suggest she made a good faith effort to provide the certification within the required time frame.

[18]    In addition, although not alleged within the specific count claiming FMLA interference, Allen alleges elsewhere in the Fifth Amended Complaint that Verizon failed to keep Whitman's FMLA certification confidential, in violation of the FMLA. Fifth Am. Compl. ¶ 140. At least one court has interpreted such allegations to be a claim for FMLA interference. *See Mahran v. Benderson Development Co., LLC,* 2011 WL 1467368, at *4 (W.D.N.Y. Apr.18, 2011) (interpreting plaintiff's claim that defendant violated the privacy of the medical information he submitted to secure short-term disability leave as a claim for FMLA interference). In *Mahran,* the court recognized that the confidentiality of medical records submitted when one is applying for leave is one of the rights protected under the FMLA. *Id.* Because a claim for FMLA interference is based on an employer's interference, restraint, or denial of an FMLA right, Allen's claim that Verizon failed to protect the FMLA certification as required under the FMLA

may, at this stage, be considered a claim for FMLA interference. *Id.*

### 2. FMLA retaliation

**\*22**  Allen alleges that Verizon terminated her in retaliation for seeking and taking FMLA leave. Fifth Am. Compl. ¶ 243. FMLA retaliation claims are subject to the *McDonnell Douglas* burden shifting analysis. To state a prima facie case of retaliation, the plaintiff must allege that "(1) she exercised her rights under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Milne v. Navigant Consulting,* 2010 U.S. Dist. LEXIS 115650, at *34–35, 2010 WL 4456853 (S.D.N.Y. Oct. 27, 2010).

Verizon argues that Allen has failed to state a claim for FMLA retaliation because she has not alleged any facts to suggest Verizon terminated her *because* she took prior FMLA leave and that, instead, Allen admits that she was terminated for failing to return to work. Verizon's Mem. in Supp. Mot. to Dismiss at 26. However, as discussed above, *see supra,* pp. 38–39, Allen has alleged facts to plausibly suggest that Verizon made it difficult for Allen to comply with its policy for informing her supervisor of her absences. Further, "[t]he fourth element of plaintiff's prima facie case, an inference of discrimination, is established by proximity between plaintiff's exercise of his FMLA leave and the adverse employment action, which immediately followed." *Stevens v. Coach U.S.A.,* 386 F.Supp.2d 55, 62 (D.Conn.2005). Allen alleges that she requested and took FMLA leave on numerous occasions, including from November 15, 2010 through January 14, 2011, Fifth Am. Compl. ¶ 28, and that she was terminated on January 14, 2011, Fifth Am. Compl. ¶ 250. Therefore, Allen has stated a plausible claim for retaliation.

### L. ERISA interference and retaliation

Allen alleges two claims against Verizon of ERISA interference and retaliation in Counts 14 and 15.

### 1. ERISA interference

"Section 510 of ERISA prohibits terminations 'for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan].' " *Hayes v. Compass Group USA, Inc.,* 343 F.Supp.2d 112, 121 (D.Conn.2004) (citing 29

U.S.C.A. § 1140). "Stated differently, a § 510 claim involves three elements: (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled." *Id.* (citing *Romero v. SmithKline Beecham,* 309 F.3d 113, 119 (3rd Cir.2002)).

Verizon argues that Allen fails to state an ERISA interference claim because the Fifth Amended Complaint fails to include any allegations that Verizon terminated her to avoid paying her STD benefits, as Verizon denied her claim for STD benefits before she was terminated. Verizon's Mem. in Supp. Mot. to Dismiss at 23, n. 8. However, Allen alleges that she appealed the denials for her STD and FMLA benefits on January 4, 2011. Fifth Am. Compl. ¶ 181. Metlife acknowledged the appeal on January 14, 2011, the same day Allen was fired. Fifth Am. Compl. ¶ 183. Therefore, Verizon's Motion to Dismiss is denied as to Allen's claim for ERISA interference.

### 2. ERISA Retaliation

**\*23** "ERISA [section] 510 [also] provides that it is illegal to 'discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan.' " *Giordano v. Thompson,* 564 F.3d 163, 169 (2d Cir.2009) (citing 29 U.S.C. § 1140). To allege a prima facie case of ERISA retaliation, Allen must allege that: (1) she was engaged in protected activity; (2) Verizon was aware of that activity; (3) she suffered an adverse employment decision; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.*

Again, as with Allen's claims for disability discrimination and FMLA retaliation, Verizon relies on the fact that Allen admits she was terminated for job abandonment. Verizon's Mem. in Supp. Mot. to Dismiss at 24. However, as discussed when analyzing Allen's claims for disability discrimination and FMLA retaliation, Allen has alleged facts to suggest, at least at this stage of litigation, that Verizon interfered with her ability to report her absences, *see supra,* pp. 38–39. Further, she has alleged that she engaged in protected activity —filing and appealing her request for STD benefits—in close proximity to her termination. *Perry v. NYSARC, Inc.,* 424 Fed. Appx. 23, 25 (2d Cir.2011) (stating that temporal proximity can support an inference of causal connection if the retaliatory action and protected activity were "very close" in time). This is sufficient to state a claim for relief. Therefore, the Motion to Dismiss the claim for ERISA retaliation in Count 15 is denied.

### M. *Discrimination in violation of Title II of GINA*

Allen alleges in Count Ten that Verizon violated Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA) by denying her fringe benefits—namely STD— due to her family medical history. GINA makes it "an unlawful employment practice for an employer to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee." 42 U.S.C. § 2000ff–1(a)(1). Genetic information is defined as "information about—(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff. Therefore, to state a claim for genetic discrimination under GINA, Allen must allege "(1) that she was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from Plaintiff's genetic tests." *Leone v. North Jersey Orthopaedic Specialists, P.A.,* at * 5 (D.N.J. Apr. 27, 2012).

Allen clearly alleges that she was an employee of Verizon and that she was denied STD benefits.[19] The issue is whether Allen alleges that Verizon considered her genetic information in deciding to deny her request for STD. Verizon argues, first, that Allen "has not met her burden of establishing that the medical information at issue consists of 'genetic information.' " Verizon's Mem. in Supp. Mot. to Dismiss at 29. According to Allen, she has met her burden because "family history is included in the definition of genetic information because it is often used to determine whether someone has an increased risk of getting a disease, disorder, or condition in the future." Pl. Mem. in Opp. Verizon's Mot. to Dismiss (Doc. No. 106) at 35; *see also Poore v. Peterbilt of Bristol, LLC,* 852 F.Supp.2d 727, 730 (W.D.Va.2012). However, evidence of a family member's disease diagnosis is only considered "genetic information" if used to determine the likelihood of disease in another individual. It is not considered "genetic information" if it "is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual." *Poore,* 852 F.Supp.2d at 731.

19    In her Opposition to Verizon's Motion to Dismiss, Allen claims, for the first time, that Verizon discriminated against her because of her genetic

information when she was fired on January 14, 2011. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 35. Nowhere in the Fifth Amended Complaint does Allen allege that her GINA claim was based on her termination from Verizon. Rather, she explicitly states that Verizon discriminated against her by denying her fringe benefits. Fifth Am. Compl.¶ 223. Therefore, the court will not consider this termination claim.

**\*24** The court finds it hard to imagine how Allen has alleged that Whitman's medical history was used as genetic "family history" when she claims that PDA accidentally reported that Allen herself suffered from Whitman's afflictions. However, assuming *arguendo,* that Allen has alleged that Verizon possessed her genetic information, she has failed to allege facts to raise a reasonable inference that Verizon denied her STD benefits *because* of this genetic information. [20] Allen merely states in a conclusory manner that her STD claim "was denied due to Allen's family medical history." Fifth Am. Compl. ¶ 225. Such conclusory allegations do not meet the standard set forth in *Twombly* and *Iqbal.* Therefore, Allen's claim for discrimination pursuant to GINA is dismissed.

[20]   Verizon also argues that nowhere does Allen allege that Verizon even had access to this genetic information, as it was Metlife who viewed Whitman's FMLA certification, not Verizon. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 29.

## V. CONCLUSION

For the foregoing reasons:

MLS's Motion to Dismiss (Doc. No. 91) is **DENIED** as to Count 26. It is **GRANTED** as to Count Five, Count 20 (with leave to replead), Count 24, and Count 27 (with leave to replead).

PDA's Motion to Dismiss (Doc. No. 92) is **DENIED** as to Count 22. It is **GRANTED** as to Count Five, Count Eight, Count 19 (with leave to replead), Count 21 (with leave to replead), Count 23, and Count 25 (with leave to replead).

Metlife's Motion to Dismiss (Doc. No. 98) is **DENIED** as to Count Three (Whitman's claim only), Count Five (Whitman's claim only), Count Seven (Whitman's claim only), and Counts 17 and 18. It is **GRANTED** as to all other claims, with leave to replead as to Count Seven (Allen's claim). The Motion to Dismiss does not address, and this Ruling does not apply to, Count Two.

Verizon's Motion to Dismiss (Doc. No. 93) is **DENIED** as to Count One, Count Seven (Whitman's claim only), Count Nine (only as to claim for disability discrimination), Count 12, Count 13, Count 14, and Count 15. It is **GRANTED** as to all other claims, with leave to replead as to Count Three (Whitman's claim only).

Plaintiffs have until **July 7, 2013** to file an Amended Complaint as to only those claims dismissed with leave to replead, upon plausible allegations, supported by bases in fact and law. *See* Fed.R.Civ.P. 11. The court reminds the plaintiffs that, although they need to allege facts to support their claims for relief, they need not provide supporting documentation nor do they need to repeat the same factual allegations in different iterations for each claim.

Further, because the plaintiffs are proceeding *pro se* and unfamiliar with the rules governing motions practice, the court has given them some leeway to file additional papers related to the various Motions to Dismiss. Thus, the court **GRANTS** plaintiffs' Motion for Leave to File Sur-reply (Doc. No. 128) and **DENIES** Metlife's Motions to Strike (Doc. Nos.125, 129). However, to the extent that Allen and Whitman have included any additional claims in their Sur-replies, as noted throughout this Ruling, such claims are not considered.

**\*25  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2467923

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3199684

United States District Court,
W.D. New York.

Thomas J. WEGA, Plaintiff,

v.

CENTER FOR DISABILITY RIGHTS, Defendant.

No. 06–CV–6375.
|
Sept. 30, 2009.

West KeySummary

**1**     **Civil Rights** 🔑 Particular Conditions,
Limitations, and Impairments

**Civil Rights** 🔑 Employment Qualifications,
Requirements, or Tests

Former employee, who had suffered a stroke,
was not a qualified individual with a disability
under the ADA. Although former employee
asserted that he had trouble thinking of the right
word at the right time, he could not think of
an instance when that problem had kept him
from performing the essential functions of his
job. Neither former employee's left shoulder
weakness nor the problems with his left leg
affected his ability to carry out his work-related
duties. Americans with Disabilities Act of 1990,
§ 3(2)(A) (2004), 42 U.S.C.A. § 12102(2)(A)
(2004); 29 C.F.R. 1630.2(j)(1)(i, ii); 45 C.F.R. §
84.3(j)(2)(ii).

**Attorneys and Law Firms**

Thomas C. Hartzell, Sr., Finucane & Hartzell, Pittsford, NY,
for Plaintiff.

Erin M. Sobkowski, Matthew J. Fusco, Chamberlain,
D'Amanda, Oppenheimer & Greenfield, LLP, Rochester, NY,
for Defendant.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

### *INTRODUCTION*

**\*1**  Plaintiff Thomas J. Wega ("plaintiff" and/or "Wega"),
brings this action pursuant to the Americans With Disabilities
Act, 42 U.S.C. § 12100, *et seq.* ("ADA") claiming that
defendant Center for Disability Rights ("CDR") unlawfully
discriminated against him on the basis of a disability.
Specifically, plaintiff alleges that he is disabled under the
ADA as a result of residual effects of a cerebral vascular
accident sustained in 1994; that CDR failed to accommodate
his condition during the time of his employment; and that he
was unlawfully terminated from his employment because of
his condition.

Defendant denies plaintiff's claims, and alleges that plaintiff
failed to request any reasonable accommodation, and that
his termination of employment was not a result of any
discriminatory animus. In addition, defendant moves for
summary judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure on grounds that plaintiff has failed to state
a cause of action for discrimination. Specifically, defendant
contends that Wega has failed to establish that he is disabled
under the terms of the ADA; has failed to establish that
he requested and was denied a reasonable accommodation
for his condition; and that CDR had reasonable business
justification for terminating Wega's employment. Plaintiff
opposes defendant's motion and cross-moves for summary
judgment arguing that he is a qualified individual with a
disability within the meaning of the ADA and that defendant
failed to accommodate plaintiff during his employment.
Moreover, plaintiff asserts that there are questions of fact as to
the scope and range of discriminatory harassment and abuse
plaintiff suffered while employed with CDR.

For the reasons set forth below, I grant defendant's motion
for summary judgment, and deny plaintiff's cross-motion for
summary judgment.

### *BACKGROUND*

At the outset, this Court must review the requirements of
the Local Rules of Civil Procedure. Local Rule 56 provides:

2009 WL 3199684, 40 NDLR P 11

"In any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, there shall be annexed to the notice of motion "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." *See* W.D.N.Y. Loc. R. Civ. P. 56.1(a). "The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." *See id.* 56.1(b). In short, the moving party must set forth the material facts that it contends are not in dispute, whereas the non-moving party must then set forth the material facts that he contends are in dispute (i.e., material facts as to which she contends that there is a genuine issue). CDR has complied with both rules. *See* Def.'s Statement of Material Facts, Doc. # 58 ("SOMF") and Def.'s Response to Plaintiff's Statement of Material Facts Pursuant to Rule 56.1., Doc.# 78 ("Responding Statement").

**\*2** Plaintiff, however, appears to have only partially complied with the Local Rules by submitting a "Statement of Material Facts Raising Genuine Issues of Fact For Trial" ("Hybrid Statement"). [1] *See* Doc.# 74.3. Plaintiff's Hybrid Statement failed to specifically controvert the defendant's SOMF as required by Loc. R. Civ. P. 56.1(b) and (d). [2] Although plaintiff's Hybrid Statement sets forth some facts that appear to somewhat contradict defendant's SOMF and at the same time setting forth his own version of undisputed facts under 56.1(a), it nonetheless includes facts that are contained in defendant's SOMF i.e., facts about which there is no disagreement and that create no genuine issue of material fact. Consequently, plaintiff's Hybrid Statement has the effect of causing confusion and obscuring the record. Further, it fails to specifically set forth which facts create a genuine issue of material fact-as opposed to a recitation of all the alleged facts. Since plaintiff has only partially complied with Rule 56.1(b) and 56.1(d), the third paragraph of Rule 56.1 comes into play. It reads: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless* controverted by the statement required to be served by the opposing party." *See id.* R. 56.1(c) (emphasis added).

[1]    Such failure to abide by Loc. Rule 56 does not "streamline the consideration of summary judgment motions by freeing [this Court] from the need to hunt through voluminous records without guidance from the parties." *See Holtz v.*

*Rockefeller & Co., Inc.,* 258 F.3d 62, 74 (2d Cir.2001) (discussing Rule 56.1 of the Loc. Rules of Civ. Proc. for the Southern and Eastern Districts of New York which is essentially the same as Loc. Rule 56).

[2]    In this regard, Rule 56.1(d) provides that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)," with citations identifying "with specificity" the relevant page or paragraph of the cited authority. *See id.* R. 56.1(d).

As this Court held in *Kuchar v. Kenmore Mercy Hosp.,* 2000 WL 210199, at \*1 (W.D.N.Y.2000) "[w]hile the consequence of this miscue is minimal given the general consensus between the parties [as shown by defendant] as to the constituent facts of this case, where a discrepancy exists this Court is obligated to and will 'deem admitted' the [moving party's] version of the facts ... [although] the Court is [also] obligated to and will believe the [non-moving party's] evidence and all justifiable inferences will be drawn in his favor." [3] In view of Rule 56.1(c), the relevant facts that the court deems undisputed, based on the Amended Complaint, the parties' 56.1 Statements (as limited by invocation of the Local Rule), and other materials submitted in connection with defendant and plaintiff's motions for summary judgment, are as follows:

[3]    *See Holtz,* 258 F.3d at 73–74 ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules"); cf. *Covelli v. Nat'l Fuel Gas Distrib. Corp.,* 2001 WL 1823584, at \*1 (W.D.N.Y.2001) (holding that the district court "may, but is not required to, search the record for evidence which the party opposing summary judgment fails to point to in his Loc. Rule 56 statement. Inasmuch as the citations to the record in defendant's Statement support its factual assertions, this Court declines to search the record in an attempt to find evidence contradicting such when plaintiff has failed to do so ....") (citations omitted).

Plaintiff suffered a stroke in March 1994. *See* SOMF, ¶ 1. In October 1994, plaintiff underwent a comprehensive neuropsychological evaluation performed by Dr. Peter B. Sorman, Ph.D. ("Dr.Sorman"). *See id.,* ¶ 3. Dr. Sorman's report dated November 3, 1994 ("November 1994 Report")

found that plaintiff had "superior abilities" with respect to intellectual functioning. For instance, general intelligence and verbal intellectual capacities were in the high average range while the nonverbal intellectual capacities was in the average range. *See id.,* ¶ 4. [4] With regard to attention and coordination, plaintiff was within average range. *See id.,* ¶ 5. A sensory-perception examination revealed that all of plaintiff's sensory organs were within normal limits. *See id.* In terms of language and academic abilities the November 1994 Report showed that plaintiff had "no apparent word finding difficulties" and his academic capabilities are commensurate with his level of education. *See id.*

[4]     The November 1994 Report indicates that plaintiff had "[v]ery superior abilities ... for fund knowledge. Superior abilities ... for verbal abstract reasoning. High average functioning ... for vocabulary, mental arithmetic calculations requiring sustained mental control, knowledge of social convention, and visual sequencing of social information. Mr. Wega scored within the average range for visuospatial synthesis of complex design. Low average functioning ... for immediate auditory sequential memory digits, visual attention to relevant features in the environment[.]" *See* Affirmation of Matthew J. Fusco ("Fusco Aff."), ¶ 4, Ex. C.

**\*3** The report further found that plaintiff demonstrates "superior verbal abstraction capabilities" in terms of new learning ability. *See id.* In addition, the November 1994 Report summarized Dr. Sorman's examination of plaintiff by finding that he is "functioning in the high average range of general intelligence with a statistically significant difference noted between verbal and nonverbal intellectual capacities, the latter within average range.... Mr. Wega ... has retained very superior fund of general knowledge and high average vocabulary, mental arithmetic calculations and verbal abstraction capacities in the superior range.... Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." *See id.,* ¶ 6. Indeed, on many of the factors tested, plaintiff scored above average. *See* Fusco Aff., Ex. C.

At the time of his stroke, plaintiff was employed as the Director of Health and Safety Services for the American Red Cross ("Red Cross"). *See id.,* ¶ 7. Within months after the stroke, plaintiff returned to work but he continued to receive physical therapy for problems with his leg. *See id.,* ¶ 2. In 1998 plaintiff was terminated from his position at the Red Cross. *See id.,* ¶ 7. [5] In 1999, plaintiff was hired by the American Heart Association ("AHA") as Vice–President for Health Admissions. *See id.,* ¶ 8. However, in early 2002 plaintiff was placed on a performance improvement plan by the AHA. In seeking assistance from VESID, plaintiff received a job coach to assist him at work. Plaintiff's VESID counselor, Laura Mass referred him back to Dr. Sorman for a re-evaluation in February 2002. *See id.,* ¶ 11.

[5]     Prior to Wega's termination from the Red Cross, he sought assistance from the N.Y. State Vocational and Educational Services for Individuals with Disabilities ("VESID") concerning his problems at work.) *See id.,* ¶ 10.

Dr. Sorman's report dated February 11, 2002 ("February 2002 Report") revealed that plaintiff's vocabulary function were in the high average range in terms of his intellectual abilities. In addition, his "non-verbal reasoning was assessed at ... average capacity" and his "IQ composite ... is at the upper end of the average range." *See id.,* ¶ 12. Plaintiff also exhibits average "working memory" and he "still exhibits intellectual capacities in the average-to-above average range with well-developed verbally mediated skills." *See id.* Essentially, the February 2002 Report concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." *See id.* The report however indicated that "[m]ulti-tasking ... may present a challenge as will issues such as organization and time management of responsibilities." *See id.* [6] One of the recommendations in the February 2002 Report was that plaintiff receive the assistance of a job coach. *See id.,* ¶ 13. In this regard, plaintiff had at least ten job coaching sessions with Ray Connor, a coach provided through VESID from mid-April through mid-May 2002. *See id.* Despite the services of the job coach, plaintiff was terminated from his employment at the AHA in either May or June 2002. *See id.,* ¶ 14.

[6]     In a letter addressed to his primary care physician, Dr. Marc Berliant, dated August 12, 2002, plaintiff described that he has "time and organizational management deficiencies" and was first demoted and then later terminated from the AHA. *See id.,* ¶ 9.

**\*4** In the fall of 2002, plaintiff applied for the position of Director of Administration at the CDR. *See id.,* ¶ 15. Plaintiff's cover letter indicated that he suffered from a stroke but had made a "remarkable recovery." *See id.,* ¶ 15. In fact, plaintiff testified at his deposition that at no time during his employment with CDR did he ever request an accommodation regarding either his physical or mental limitations as a result of his 1994 stroke. *See id.,* ¶ 16. In December 2002, CDR hired plaintiff as the Director of Administration and he held that title until April 2004. *See id.,* ¶ 18. As Director of Administration plaintiff had two main areas of responsibility, namely the finances of the organization and overall human resource guidance. *See* Affidavit of Bruce Darling ("Darling Aff."), ¶ 23. However, throughout the fall of 2003 and well into 2004 plaintiff had performance problems handling the financial responsibilities of his job as seen by his lack of knowledge of CDR's funding streams, as exhibited by his inability to complete major tasks [7] and as shown by plaintiff's failure to file the organization's taxes in 2003. [8] *See* SOMF, ¶ 17. Plaintiff's title changed in April 2004 to Director of Human Resources ("HR Director") and his financial responsibilities with respect to CDR were taken away from him. *See id.,* ¶ 18. He received no reduction in pay and still participated in the management team. *See id.* [9] In August 2004, CDR terminated plaintiff from his employment for poor performance. [10] *See id.,* ¶ 19.

[7] One of the tasks that was not getting done was responding to Finger Lakes Developmental Disabilities Service Office, one of CDR's major funders with respect to specific concerns raised about services provided to an individual client named Joe McNulty. On August 22, 2003, Darling sent plaintiff an e-mail asking to see the McNulty letter. After numerous drafts and correspondence back and forth between plaintiff and Darling, the final version of the letter was not completed until May 2004. At this time, Darling had taken over the writing of the letter himself. *See* Darling Aff., ¶¶ 33–37.

[8] During plaintiff's fifteen months of being responsible for the finances of CDR, it was learned that he did not take steps to make sure that CDR filed its taxes in 2003. *See* Darling Aff., ¶ 53.

[9] As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility

to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. *See* Darling Aff., ¶ 55. According to Darling, at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. *See* Darling Aff., ¶ 58. It became apparent that plaintiff had simply thrown himself into the paperwork and was spending all his time filing and CDR did not need to pay someone a HR Director's salary to have them be a file clerk. *See id.,* ¶ 63.

[10] A month later, plaintiff informed his physician, Dr. Berliant by letter that this was the third job where he was unable "to do the job consistently well enough for my employer." *See id.,* ¶ 20.

Plaintiff's counsel asked Dr. Sorman to evaluate plaintiff in 2007 and to provide an independent medical evaluation relating to his condition. *See* Hybrid Statement, Third. Dr. Sorman's August 2007 Report ("August 2007 Report") indicates that his findings are consistent with data contained in his November 1994 Report. *See* Sorman's August 2007 Report, at 5. With respect to general intelligence, plaintiff was in the high average range and his IQ was in the average range. *See id.,* at 4. The report further found that plaintiff's strengths consisted of "knowledge of vocabulary definitions and verbal abstract reasoning." *See id.* "High average knowledge was noted for: mental arithmetic calculations, fund of knowledge, and ... nonverbal reasoning." *See id.* Dr. Sorman was asked by plaintiff's counsel to give an opinion as to whether "[f]rom the time period of 12/02/02 until 08/13/04 when plaintiff was employed at the [CDR] ... he [was] 'Successfully disabled within the meaning of the [ADA], and that he suffered from three or more functional disabilities affecting a major life activity.' " *See id.,* at 5. Dr. Sorman opined that "with a reasonable degree of neuropsychological certainty, [plaintiff] has been disabled (since the onset of his stroke in March 1994), [and] ... during the time frame as well from 12/02/02 through 08/13/04." *See id.*

### DISCUSSION

#### I. *Summary Judgment Standard*

**\*5** A motion for summary judgment shall be granted if the pleadings demonstrate that "there is no genuine issue as to any

2009 WL 3199684, 40 NDLR P 11

material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotation marks omitted), but must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See* Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Fed.R.Civ.P. 56(c)).

## II. *Timeliness of Plaintiff's Submissions*

Defendant filed its Motion for Summary Judgment on September 30, 2008 pursuant to Magistrate Judge Marion Payson's Amended scheduling Order dated March 20, 2008 ordering that all dispositive motions were to be filed no later than September 30, 2008. *See* Fusco Affidavit dated Feb. 12, 2009 ("Fusco Aff. II"), 14. Pursuant to the Local Rules, plaintiff had thirty days to respond to the summary judgment motion filed by CDR. *See* W.D.N.Y. Loc. R. Civ. P. 56.1(e). Plaintiff did not respond to CDR's motion within thirty days, nor did plaintiff file a formal motion before the Court seeking an extension of the date by which opposition papers were to be due. *See* Fusco Aff. II, ¶ 7–11. Instead, on November 5, 2008, five days after plaintiff's opposition papers were due, plaintiff filed an affidavit with the Court requesting new scheduling dates. *See id.,* ¶ 13, Ex.B. Plaintiff requested for an extension of fact discovery before Judge Payson and for an "extension of deadlines for answering Defendant's pending Motion for Summary Judgment and for submission of Plaintiff's own Motion for Summary Judgment to January 15, 2009." *See id.*

Defendant argues that to date, plaintiff's untimely request has not been granted and as such plaintiff's submissions are in violation of Local Rule 56.1 and must be denied. *See id.,* 122. Plaintiff contends that his summary judgment motion is timely under an extension application granted by this Court dated November 19, 2008. *See* Thomas Hartzell Affirmation dated January 14, 2009 ("Hartzell Aff."), Sixth and Doc.# 69. Courts in this district have stricken papers where parties have failed to follow Local Rules and recognized established deadlines. *See Lewis v. FMC Corp.,* 2008 WL 4500185, at \* 1 (W.D.N.Y.2008). Here, the Court's November 19, 2008 Order states that "plaintiff's motion for an extension of time to respond to defendant's motion for summary judgment is granted." *See* Doc. # 69. However, the Order further indicated that counsel would be notified of a revised briefing schedule for defendant's summary judgment motion following Judge Payson's issuance of a decision on the discovery motions pending before her. [11] Notwithstanding this Order, and before Judge Payson issued her decision on the discovery motions, [12] plaintiff filed his motion for summary judgment on January 15, 2009. The Court finds that plaintiff has ignored the Court's orders and the established deadlines. However, based on the undisputed evidence, as reflected in the papers submitted by the parties, the Court grants summary judgment in favor of CDR, thus rendering plaintiff's non-compliance as moot.

[11] Courts require that parties adhere to scheduling orders and Fed.R.Civ.P. 16(b) provides that when the court has filed a Rule 16 scheduling order, it may properly require that good cause be shown before it is modified. *See Covington v. Kid,* 1999 WL 9835, at \*3 (S.D.N.Y.1999). In this case, plaintiff has ignored Judge Payson's Amended Scheduling Order without either offering good cause or receiving consent from the Court. The Amended Scheduling Order in this case called for all factual discovery to be completed by August 11, 2008 and all dispositive motions to be filed by September 30, 2008. *See* Fusco Aff. II, ¶ 4. However, on September 11, 2008 plaintiff filed an affidavit seeking an order extending discovery and the date by which all dispositive motion were due. *See id.* Judge Payson denied the request to extend discovery on October 29, 2008, and informed plaintiff during oral argument that if he wished to extend the time to file dispositive motions, he should file a motion before this Court. *See id.,* ¶¶ 9–11.

[12]    Judge Payson denied plaintiff's motions for extension of time to complete discovery on August 31, 2009.

### III. *Retroactive Application of the ADA Amendments*

**\*6** Because plaintiff's cross-motion includes portions of the ADA Amendments Act of 2008, Pub.L. No. 110–325 ("ADA Amendments"), which implies that it is plaintiff's belief that the ADA Amendments should apply to his claims, the court first examines whether the ADA Amendments would apply retroactively. [13]

[13]    Among other changes, the ADA Amendments significantly expand the scope of the ADA's definition of disability. The bill's "Findings" and "Purposes" sections explain that the changes are intended to reject some of the limitations imposed by the Supreme Court's holdings in *Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which Congress felt had "narrowed the broad scope of protection intended to be afforded by the ADA." *See* ADA Amendments § 2.

When a case implicates a federal statute enacted after the events alleged in the action, the court will not apply the new statute where it would have retroactive effect (i.e., where it would increase a party's liability for past conduct or impose new duties with respect to transactions already completed) absent clear congressional intent favoring retroactivity. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 280 (1994) (case relating to the Civil Rights Act of 1991 where the Supreme Court discussed whether statutory amendments should be applied to cases arising from events predating enactment of the amendments). In *Landgraf,* the Court stated that where, as here, a statute is not explicit as to its retroactivity, a court "must determine whether the new statute would have retroactive effect" as to the case before it. *See* 511 U.S. at 280. In other words, it must ascertain whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *See id.* If so, the court must apply the "traditional presumption" that the statute "does not govern absent clear congressional intent favoring such a result." *see id.* [14]

[14]    In *Landgraf's* companion case, *Rivers v. Roadway Express,* the Court examined a situation directly analogous to that presented by the ADA Amendments-namely, whether to retroactively apply a part of the Civil Rights Act of 1991 which Congress had enacted in response to a Supreme Court decision that had narrowed the applicability of the preexisting civil rights statute. *See* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). The Court held that "[e]ven when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear" before the statute can be retroactively applied. *See id.* at 313.

Application of the ADA Amendments to this case would cause a retroactive effect by placing a new requirement upon defendant which could potentially increase defendant's liability for past conduct and impose new duties with respect to transactions already completed. [15] *See Landgraf,* 511 U.S. at 280. Additionally, the ADA Amendments lack clear congressional intent favoring retroactive application. To the contrary, the ADA Amendments indicate a preference for prospective application-"This Act and the amendments made by this Act shall become effective on January 1, 2009." *See* ADA Amendments, § 8; *see also E.E.O.C. v. Agro Distrib. LLC,* 555 F.3d 462, 2009 WL 95259, at *8 n. 8 (5th Cir.2009) ("Congress recently enacted the [ADA Amendments], but these changes do not apply retroactively." (citation and quotation signals omitted)). Because retroactive application of the ADA Amendments to this case would result in a retroactive effect and the ADA Amendments do not clearly favor retroactivity, the ADA Amendments shall not be applied retroactively to plaintiff's claim. [16]

[15]    As discussed below, there is a serious question as to whether plaintiff has shown that he is disabled within the meaning of the ADA as it stood prior to the ADA Amendments. To the extent the Court would reach a different conclusion under the amended statute, the amendments would clearly have the effect of "increas[ing] a party's liability for past conduct" by imposing on defendant the restrictions the ADA places on an employer as to its treatment of a disabled employee. Application of the ADA Amendments would therefore have a "retroactive effect," and the Court must give

2009 WL 3199684, 40 NDLR P 11

effect to the presumption against application of the statute, and apply the law as it existed before the amendments.

16   For similar reasons, other courts that have addressed the retroactivity of the ADA Amendments have concluded that they do not apply retroactively. *See, e.g., Geoghan v. LIRR,* 2009 WL 982451, at *8–9 (E.D.N.Y.2009); *Kravar v. Triangle Servs.,* 2009 WL 805807, at *4 n. 3 (S.D.N.Y.2009); *Moran v. Premier Educ. Group,* 2009 WL 507505, at *7 (D.Conn.2009); *Schmitz v. Louisiana,* 2009 WL 210497 (M.D.La.2009); *Rudolph v. U.S. Enrichment Corp.,* 2009 WL 111737, at *4–6 (W.D.Ky.2009) (ADA Amendments do not apply retroactively and thus court applied the statute as it existed before the amendments).

### IV. *ADA Discrimination*

#### A. Standards

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a); *see Sutton,* 527 U.S. at 476. In ADA discrimination cases, the plaintiff has an initial burden of alleging a prima facie case. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998). There are four elements that a plaintiff must show to make out a prima facie case of discrimination under the ADA: (1) the employer is subject to the ADA; (2) the plaintiff suffers from a disability as defined by the ADA; (3) the plaintiff is otherwise qualified to perform the tasks required of the job; and (4) the plaintiff suffered an adverse employment action as a result of his disability. *See id.* at 869–70; *see also Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001); *Cusack v. News America Marketing In–Store Servs., L.L.C.,* 2008 WL 2663001, at *4 (S.D.N.Y.2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination. *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program,* 198 F.3d 68, 72 (2d Cir.1999). If the defendant meets its burden, it then falls to the plaintiff once again to demonstrate that the defendant's proffered explanation is a pretext for termination based on disability. *See id.*

**\*7**  The ADA also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *See* 42 U.S.C. § 12112(b)(5)(A); *see also Lovejoy–Wilson v. NOCO Motor Fuel,* 263 F.3d 208, 216 (2d Cir.2001). Thus, a plaintiff can also make out a prima facie case of discrimination under the ADA by showing that (1) he is an individual with a disability as defined by the ADA; (2) an ADA-covered employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the job sought; and (4) the employer refused to make such reasonable accommodation. *See id.* Here, defendant claims that plaintiff cannot establish a prima facie case of discrimination. *See* Def. Br. at 4. Accordingly, the Court begins by examining whether plaintiff meets the four-part test set forth in *Ryan* and *Lovejoy–Wilson*. Since there is no dispute that the CDR is an entity covered by the ADA, the Court addresses the question of whether plaintiff suffers from a disability under the meaning of the ADA.

#### B. Plaintiff has Failed to Establish a Prima Facie Case of Disability Discrimination

It is noteworthy that plaintiff failed to respond to CDR's contention that he was not disabled within the meaning of the ADA, as interpreted prior to the January 1, 2009 ADA Amendments. Plaintiff has not rebutted defendant's arguments regarding the issue of disability as it relates to the pre-ADA Amendments. I find that the plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, and therefore, cannot state a prima facie case of discrimination. It is well settled under federal law that the mere presence of a medical condition or impairment suffered by a plaintiff does not establish that the plaintiff is disabled under the ADA. *See Toyota,* 534 U.S. at 195 ("[m]erely having an impairment does not make one disabled for purposes of the ADA"). Rather, to establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that "substantially limits one or more major life activities...." 42 U.S.C. § 12102(2)(A). "Major life activities" are defined in the regulations promulgated by the EEOC as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See* 45 C.F.R. § 84.3(j)(2) (ii).

To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities

that are of central importance to most people's daily lives." *See Toyota,* 534 U.S. at 185. Moreover, "[t]he impairment's impact must also be permanent or long term." *See id.; see also* 29 C.F.R. § 1630.2(j)(1)(i)-(ii) (A major life activity is substantially limited when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity.") Finally, the determination of whether or not a person suffers a disability under the ADA "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. *See Sutton,* 527 U.S. at 483. Instead, courts are to look to "the effect of [an] impairment on the life of the individual." *See* 29 CFR pt. 1630, App. § 1630.2(j); *see also Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 151 (2d Cir.1998) (disability determinations to be made on an individualized case-by-case basis).

 **\*8** In the instant case, plaintiff has failed to identify any major life activity that was substantially impaired by his stroke. Although plaintiff's amended complaint seems to allege that he suffers from impairments due to a stroke he suffered in 1994 that fall into three categories including physical limitations of the left side resulting in a limp, verbal communication abilities and cognitive limitations, these impairments do not in and of itself bring plaintiff within the definition of a qualified individual under the ADA. *See Mitchell v. Girl Scouts of the U.S.A.,* 2003 WL 22705121, at \*5 (S.D.N.Y.2003) (A showing of an impairment alone is insufficient to qualify as a disability) (citing to *Toyota,* 534 U.S. at 195). With respect to his left side restrictions, plaintiff testified that neither his left shoulder weakness nor the problems with his left leg affected his ability to carry out his duties at the CDR. *See* Fusco Aff., Ex. G., at 26–27. In fact, Wega testified that he never requested any accommodation from the CDR concerning either his left leg or shoulder. *See id.,* at 27. [17]

[17]    As it relates to Wega's limitations concerning walking and left side weakness, during his time working at CDR, plaintiff regularly walked at least a block, he never used a wheelchair, crutches or a walker, but did use a cane on occasion. *See* Fusco Aff., Ex. G., at 26. Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time-much less than the plaintiff can walk-do not constitute substantial limits on walking. *See, e.g.,*

*Mitchell,* 2003 WL 22705121, at \*6 (finding that inability to do a "substantial amount of walking ... while of course to an extent is limiting, does not rise to the level of a substantial limitation"); *Rosa v. Brink's, Inc.,* 103 F.Supp.2d 287, 290 (S.D.N.Y.2000) (finding inability to walk for long period of time does not amount to substantial limitation); *Butterfield v. New York State,* 1998 WL 401533, at \*9 (S.D.N.Y.1998) (finding plaintiff's trouble taking extended walks "simply does not, as a matter of law, constitute a sufficiently substantial limitation to allow his case to go to the jury on this point").

The amended complaint also states that plaintiff has "limitations of verbal communication ability." *See* Fusco Aff., Ex. A. When asked at his deposition what verbal communication problems he had, plaintiff's only response was "thinking of the right word at the right time sometimes is a difficulty for me." *See id.,* Ex. G., at 42. When asked if these limitations of verbal communications in any way kept plaintiff from performing the essential functions of his job at CDR, plaintiff responded with "I can't think of an instance at this time." *See id.* In addition, Dr. Sorman's November 1994 Report found that plaintiff had "superior abilities" with respect to intellectual functioning and that he retained very superior fund of general knowledge and high average vocabulary. *See* Fusco Aff., Ex. C. In terms of language and academic abilities the November 1994 Report also showed that plaintiff had "no apparent word finding difficulties." *See id.*

The February 2002 Report by Dr. Sorman concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." *See id.,* Ex. D. Moreover, Dr. Sorman's August 2007 Report indicates that his findings are consistent with data contained in his November 1994 Report. Accordingly, plaintiff's complaint that his verbal communication limitations due to his stroke, which compromised his ability to maintain employment, does not establish the substantial impairment of a major life activity. The undisputed evidence, including plaintiff's testimony and the objective neurological testing reveal that any limitations on verbal communications that plaintiff suffered as a result of his stroke did not substantially impair any major life activity.

Plaintiff also claims that he is impaired due to "cognitive limitations, including memorial powers[.]" *See* Fusco Aff., Ex. A. However, plaintiff has come forward with no evidence to show that his cognitive limitations substantially limited his

performance of any major life activity. *See Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir.2005) (Inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is "unable to perform the variety of tasks central to most people's daily lives") (quoting *Toyota,* 534 U.S. at 200). Here, the evidence shows that Dr. Sorman found plaintiff to be average or above average in most of the cognitive categories which could be tested. *See* Fusco Aff., Exs.C & D and Sorman's August 2007 Report. Dr. Sorman also concluded that plaintiff is "functioning in the high average range of general intelligence.... Mr. Wega ... has retained very superior fund of general knowledge ... mental arithmetic calculations and verbal abstraction capacities in the superior range.... Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." *See* Fusco Aff., Ex.C. While plaintiff may claim that his cognitive impairments made performing his job functions difficult, based on the testing by the physician, it was not impossible.

**\*9** In addition, the November 1994 Report and February 2002 Report never indicated that plaintiff could not return to work. Moreover, it was only when plaintiff's counsel requested that Dr. Sorman perform an independent medical examination did the doctor opine that plaintiff was "disabled (since the onset of his stroke in March 1994)[.]" *See Sutton,* 527 U.S. at 483 (determination of whether or not person suffers a disability under ADA "is an individualized inquiry" that does not rest on mere diagnosis of impairment). However, even the August 2007 Report did not indicate that plaintiff could not work. As a result, plaintiff has not shown how his condition substantially limits his major life activities. *See* 42 U.S.C. § 12101(2)(A). Because plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, I find that he has failed to state a prima facie case of discrimination under the ADA, and therefore grant defendant's motion for summary judgment dismissing his claim under the ADA.

**C. Reasonable Accommodation**
To establish a reasonable accommodation claim under the ADA, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *See Graves v. Finch*

*Pruyn & Co., Inc.,* 457 F.3d 181, 184 (2d Cir.2006) (citations omitted). Plaintiff contends that "CDR failed to recognize [his] 'subtle deficits' and offer a reasonable accommodation." *See* Pl. Br. at 9. However, "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *See id.* at 184 (citations and quotation marks omitted). "[A]n employer has a duty reasonably to accommodate an employee's disability [only] if ... the employer knew or reasonably should have known that the employee was disabled." *See Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir.2008).

Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires ... [and] does not include the 'marginal' functions of the position." *See Mitchell v. Washinetonville Cent. Sch. Dist.,* 190 F.3d 1, 8 (2d Cir.1999) (quoting 29 C.F.R. § 1630.2(n) (1)). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *See* 42 U.S.C. § 12111(8); *see also Shannon v. New York City Transit Auth.,* 332 F.3d 95, 100 (2d Cir.2003) ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position") (citation and quotation marks omitted). Other evidence of whether a particular function is essential includes, inter alia, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. *See* 29 C.F.R. 1630.2(n)(3); *Mitchell,* 190 F.3d at 8 n. 3.

**\*10** Even assuming, arguendo, that plaintiff is disabled within the meaning of the ADA, plaintiff's claim fails. There is no indication from the record that plaintiff requested an accommodation from CDR and that CDR denied plaintiff a reasonable accommodation. Plaintiff does not dispute that he did not request an accommodation. In fact, plaintiff's deposition testimony reveals that he never made any request for an accommodation concerning his walking or weakness on his shoulder. *See* Fusco Aff., Ex.G, at 27. In addition, plaintiff repeatedly testified that he did not ask for any accommodations from CDR relating to any residual symptoms of his stroke. *See id.,* at 56–57, 64, 93–94. Plaintiff further testified that he was not "aware of any kind of accommodation at the time [he] was hired that [he] might

Wega v. Center for Disability Rights, Not Reported in F.Supp.2d (2009)

2009 WL 3199684, 40 NDLR P 11

need." *See id.,* at 57. Moreover, plaintiff did not inform anyone at CDR of his alleged verbal communication and cognitive limitations. Nor does he allege that they were in any way obvious. Plaintiff also failed to seek the assistance of a job coach despite the fact that he knew one was available to him through VESID.

Moreover, even if the court were to conclude that plaintiff's alleged cognitive disability was obvious, it is inaccurate to state that defendant took no steps to accommodate him. *See Brady,* 531 F.3d at 134 (The Second Court took the opportunity to refine the general rule and "held that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious-which is to say, if the employer knew or reasonably should have known that the employee was disabled"); *Tully–Boone v. North Shore–Long Island Jewish Hosp. Sys.,* 588 F.Supp.2d 419, 425 (E.D.N.Y.2008) (subscribing to the legal position that it is unlawful for an employer to refuse to make reasonable accommodations to known physical and mental limitations) (citing *Brady,* 531 F.3d at 134)). Here, the affidavit of Darling demonstrates the he took a number of steps to train plaintiff by making task lists for him, by making out a spreadsheet for him so that he could understand how the CDR business works e.g. funding streams, and finally by reducing plaintiff's responsibilities while allowing him to still retain the title of director with a director's salary. *See* Darling Aff., ¶ 37, 39, 49–51.

In addition, plaintiff has not proffered any evidence to show that he could perform the essential functions of his job either as Director of Administration for CDR or as HR Director with or without a reasonable accommodation. Plaintiff was initially hired as Director of Administration for the CDR in December 2002. *See* SOMF, ¶ 18. The essential functions of this position include, inter alia, the oversight of both the finances of CDR and overall human resource guidance for approximately one hundred employees. *See* Darling Aff., ¶ 23. The evidence shows that throughout the fall of 2003 and well into 2004, during plaintiff's time as Director of Administration, plaintiff had performance problems handling the financial responsibilities of his job as seen by his ignorance of CDR's funding streams, as exhibited by his inability to complete major tasks such as providing reports to the Board of Directors and as shown by plaintiff's failure to file the organization's taxes in 2003. As a result of plaintiff's

inability to perform the financial aspects of his job, although it had no legal obligation to do so, defendant altered plaintiff's job functions and permitted him to focus solely on human resources responsibilities. *See Graves,* 457 F.3d at 187 (While "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, ... the ADA does not require creating a new position for a disabled employee") (citations omitted).

**\*11** Plaintiff's title changed in April 2004 to HR Director and his financial responsibilities with respect to CDR were taken away from him. *See* SOMF, ¶ 18. However, he received no reduction in pay and still participated in the management team. *See id.* As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. See Darling Aff., ¶ 55. Darling indicated that at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. *See* Darling Aff., ¶ 58. Plaintiff has not proffered any evidence showing that he could perform the essential functions of either a Director of Administration or HR Director with or without a reasonable accommodation, nor has plaintiff even suggested any accommodation that CDR could have provided to enable him to do so. Accordingly, defendant's motion for summary is granted, plaintiff's cross-motion is denied and plaintiff's failure to accommodate claim is dismissed.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied. Plaintiff's Amended Complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3199684, 40 NDLR P 11

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7742779
United States District Court, N.D. New York.

Curtis A. O'DONNELL, Plaintiff,

v.

KING B 100, LLC, Rensselaer Iron & Steel, Inc.,
Grimmel Industries, Inc., Georgia Recyclers,
LLC, Gary T. Grimmel, individually, and
Betty G. Grimmel, individually, Defendants.

1:14-cv-1345
|
Signed 05/03/2016

**Attorneys and Law Firms**

Sarah J. Burger, Cooper, Erving Law Firm—Saratoga Office, Saratoga Springs, NY, for Plaintiff.

Christopher E. Buckey, Erin M. Callahan, Vitaliy Volpov, Whiteman, Osterman Law Firm—Albany Office, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

*1 Plaintiff Curtis A. O'Donnell served as Defendants' corporate pilot from January 23, 2008 until April 20, 2013, when he was terminated. Plaintiff claims that his termination was the result of prohibited disability discrimination in violation of the Americans with Disability Act, 42 U.S.C. § 12101 ("ADA") and the New York State Human Rights Law, N.Y. Executive Law § 296 ("HRL"). See Second Amended Complaint ("Complaint"), dkt. # 32. Plaintiff further alleges that Defendants violated New York Labor Law ("NYLL") § 190, et seq., breached the parties' agreement by not paying him annual cost of living adjustments ("COLAs"), year-end bonuses ("YEBs"), and severance, and improperly retaliated against him under the NYLL by filing counterclaims in this action. Id. Defendants King B 100, LLC ("King B"), Rensselaer Iron & Steel, Inc. ("RI&S"), Grimmel Industries ("GI"), Georgia Recyclers, LLC ("GR"), Gary T. Grimmel, and Betty G. Grimmel (the "Grimmels") (collectively "Defendants") deny the allegations, and filed counterclaims for (1) breach of contract; (2) promissory estoppel; (3) unjust enrichment; and (4) intentional misrepresentation. Answer to Second Amended Complaint and Counterclaims ("Answer"), dkt. # 33.

Defendants move for summary judgment. Dkt. # 46. Plaintiff opposes the motion and cross-moves for partial summary judgment in his favor on his NYLL, breach of contract, promissory estoppel, and retaliation claims, and to dismiss Defendants' counterclaims. Dkt. # 49. Defendants filed a reply, dkt. # 50–# 52, and Plaintiff filed a sur-reply. # 56. The Court has considered all of these submissions, and decides the instant motions without the need for oral argument. For the reasons that follow, Defendants' motion and Plaintiff's cross-motion are each granted in part and denied in part.

**II. STANDARD OF REVIEW**

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). The nonmoving party cannot defeat summary judgment by " simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), or by a factual argument based on " conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

When considering cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002)(citation omitted). " [N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 227 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

## III. BACKGROUND [1]

[1] Unless indicated otherwise, the facts set forth above are taken from the parties' Local Rule 7.1(a)(3) Statements of Material Facts ("SOMF") that are admitted by the opposing party, properly supported by the record, or deemed admitted for failing to provide proper factual opposition. See Local Rule 7.1(a)(3). The Court will set forth only those facts that are relevant to deciding the instant motions.

### a. The Parties' Work Relationship [2]

[2] The facts in Section III(a) are taken primarily from Defendants' Statement of Material Facts ("Def. SOMF") ¶¶ 1-3, 13-57.

**\*2** Defendant King B 100, LLC ("King B") is a limited liability company incorporated in the State of New York. Defendant Gary T. Grimmel is co-owner of King B and primarily responsible for the management of King B's operations. Defendant Betty G. Grimmel is Gary Grimmel's wife and co-owner of King B.

Plaintiff Curtis O'Donnell ("Plaintiff") first became acquainted with the Grimmels in 2007 when they were looking to purchase an airplane for King B and were given Plaintiff's name as a reference. After initially contacting him regarding an airplane, the Grimmels inquired whether Plaintiff was available to work as King B's pilot. At that time, Plaintiff was employed as Shoe Show, Inc.' ("Shoe Show") corporate pilot.

In the fall of 2007, while still employed by Shoe Show, Plaintiff flew the Grimmels several times, being paid on a per-flight basis. On November 11, 2007, Plaintiff and the Grimmels met in New York to discuss the possibility of Plaintiff becoming their full-time pilot. On November 15, 2007, Plaintiff sent an e-mail to Betty Grimmel outlining his proposed employment terms, which included: (A) annual salary of $135,000.00; (B) annual cost of living adjustments; (c) one-time bonus of $25,000.00; (D) a severance package if terminated without cause; (E) year-end bonus in lieu of a 401K plan or other pension plan; (F) vacation time; (G) relief pilot; and (H) transportation to and from the airplane. At that time, Plaintiff's annual salary with Shoe Show was approximately $125,000.00. Additionally, Plaintiff was living in Charlotte, North Carolina and wanted to continue residing there and be allowed to travel to and from North Carolina to

where King B's airplane was located. Plaintiff was aware that he would be serving in an on-call capacity for the Grimmels.

Betty Grimmel responded to Plaintiff's November 15, 2007 e-mail that same day, confirming that she would talk to Gary Grimmel but that it may be a few days before she got back to him. On November 27, 2007, Plaintiff sent a reminder e-mail to Betty Grimmel about his potential employment. Betty Grimmel responded via e-mail stating that they would agree to: (A) $135,000.00 annual salary; (B) one-time sign up bonus of $25,000.00 if Plaintiff agreed to stay with them for 5 years; (c) "cash bonus end of year to replace 401k"; (D) two weeks paid vacation; (E) health insurance; and (F) six month severance pay if Plaintiff was terminated without cause.

Plaintiff confirmed in a subsequent e-mail to Betty Grimmel that he would continue to reside in Charlotte and be provided with transportation or reimbursement for transportation costs to and from where he was needed and, if idle time in between trips became excessive, that he would be able to return home. Upon sending this e-mail, Plaintiff believed the parties were close to, but had not yet reached, an agreement.

Betty Grimmel responded on November 27, 2007, agreeing that Plaintiff could reside in Charlotte, would be provided transportation to and from King B's airplane, and would have the option of going home at any time he was not needed.

The next day, November 28, 2007, Plaintiff contacted Betty Grimmel again via e-mail, noting that he would be turning in his notice to Shoe Show that day but wanted to confirm that the Grimmels agreed to an annual COLA to his base salary. Betty Grimmel sent an e-mail confirming that they agreed to an annual COLA to his base salary, and Plaintiff submitted his resignation to Shoe Show that afternoon or the next day (November 29, 2007) believing that the parties had an agreement " in principle."

**\*3** Plaintiff testified that he submitted his resignation in person to Robert Tucker, Shoe Show's Chief Executive Officer, and told him about the Grimmels' offer. According to Plaintiff, he indicated to Mr. Tucker that he would be willing to stay at Shoe Show but would need an increase in salary.

On November 29, 2007, Plaintiff reported to Betty Grimmel via e-mail that he had an upcoming meeting with Mr. Tucker and Shoe Show's Chief Financial Officer, Jack Vanderpole, and that they "will likely ask me to reconsider my resignation." Plaintiff also asserted that he was "dread[ing] it

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 228 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

and hop[ing] to move as quickly through this part as possible." Plaintiff said he felt "good with [his] decision to leave," but he would "just have to see what the day brings."

Plaintiff testified that, during this subsequent meeting, Mr. Tucker offered to match the Grimmels' $135,000.00 salary and agreed to relieve Plaintiff from having to be at Shoe Show's offices when he was not flying. Plaintiff testified that, at some point, Mr. Tucker also told Plaintiff that he would increase his salary to $250,000.00. Plaintiff contends that he did not accept this offer, and subsequently never revisited it, because he was concerned that the 250,000.00 salary would increase his alimony and/or child support payments, and because he otherwise considered the offer "unrealistic."

Plaintiff testified that he accepted Mr. Tucker's offer to match the Grimmel's proposed $135,000.00 annual salary (instead of the $250,000.00 annual salary), to relieve him from office duty, and to pay him a $25,000.00 bonus. Plaintiff thereafter communicated to the Grimmels that he was going to continue to work for Shoe Show, but offered to help them find a pilot. Plaintiff also continued to fly the Grimmels on a per-flight basis, and at some point indicated that if they wanted to make him another offer for employment he would consider it.

On January 3, 2008, Plaintiff e-mailed Betty Grimmel noting that he felt that he had made the wrong decision in accepting Mr. Tucker's offer, but stated that "his offer is impossible to ignore ... and if we were talking about only *minor* differences, [Plaintiff] would have no problem accepting less money." Plaintiff also told Betty Grimmel that Mr. Tucker's offer was "way over the top" but that "kind of opportunity does not come along very often." In the same e-mail, Plaintiff stated that he would prefer to work with the Grimmels but did not think it would be wise to consider much less than Mr. Tucker's offer, and that "it really comes down to what Mr. Tucker has offered as compared to what you might offer. But I will say that you wouldn't have to beat his offer and I'm tempted enough that you may not even have to match his offer."

The parties agree that, in the January 3, 2008 e-mail, Plaintiff was referring to Mr. Tucker's offer to increase his salary to $250,000.00, an offer which Plaintiff never accepted and never intended to accept. Plaintiff testified that he told Betty Grimmel about the $250,000.00 offer because he felt it was a standing offer, although not a formal one, but never told her that it was an offer he had already decided not to accept or that he accepted Mr. Tucker's offer to increase his salary only to $135,000.00. In his January 3, 2008 e-mail, Plaintiff also

relayed to Betty Grimmel that the Grimmels did not need to offer him $250,000.00 for an annual salary but that if they were willing to offer something near that number, he would be willing to consider working for them.

**\*4** On January 4, 2008, Betty Grimmel wrote to Plaintiff stating that they both knew that "Mr. Tucker's offer is crazy" and that Plaintiff "would be crazy to turn it down," and asked Plaintiff to help them advertise for a pilot. Plaintiff responded to Betty Grimmel stating, in part: "As for Mr. Tuckers [ *sic* ] offer, your [*sic*] right it is crazy, but based on my feelings about you and Gary, you don't have to match his offer ... just food for thought." That same day, Plaintiff also provided Betty Grimmel with a draft advertisement for a pilot, which provided, in part, that the "schedule will include mostly weekend flying" and "the [a]pplicant must anticipate being away from home on holidays, but may have long periods [of] duty free time."

On January 8, 2008, Betty Grimmel sent Plaintiff an e-mail offering him: (A) $150,000.00 salary for the first year, with a $25,000.00 sign-up bonus; and (B) $175,000.00 annual salary for the second year, "plus everything else we included ins. yr end bonus etc."

On January 11, 2008, Plaintiff rejected the offer and responded to Betty Grimmel with the following counter-proposal: (A) $150,000.00 salary for the first year, with a $25,000.00 sign-up bonus; (B) $175,000.00 for the second year; and (c) $25,000.00 annually in "Soft Money" which would be used towards Plaintiff's purchase of the Grimmels' boat and two jet skis.

Plaintiff's January 11, 2008 counter-proposal was rejected by the Grimmels on January 13, 2008 when Betty Grimmel e-mailed Plaintiff stating: "Gary will not go any higher. We are staying at our 175,000 offer. You were with Mr. Tucker for 5 yr and was getting 115 then went to 125. We are adding 50,000 to that price. Mr. Tucker only went to 250,000 because he was going to lose you. I will understand if you don't want to take our offer ..." The parties agree that Betty Grimmel did not state in the January 13, 2008 email that the Grimmels would agree to, among other things, pay cost of living adjustments or year-end bonuses. Def. SOMF ¶ 55; Pl. Resp. SOMF ¶ 55. Plaintiff contends, however, that he had subsequent conversations with the Grimmels regarding the costs of living adjustments and year-end bonuses which "the parties agreed to in or about March 2009, and January 2010." Pl. Resp. SOMF 56. While Betty Grimmel stated at

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

her deposition that she thought there was an agreement for year-end bonuses and annual cost-of-living adjustments, B. Grimmel Dep. pp. 69–70, Gary Grimmel stated in his affidavit that "[w]e never reached an agreement to pay Plaintiff any cost of living adjustments nor year-end bonuses, although we paid Plaintiff "Christmas" bonuses at the end of the year." G. Grimmel, ¶ 23.

There is no dispute that the parties agreed that Plaintiff would be paid the equivalent of six months' salary if he was terminated without cause, although Defendants contend this agreement was limited to the first five years of employment, *see* G. Grimmel Dep. pp 34-36; G. Grimmel Aff., ¶ 23, whereas Plaintiff contends there was no temporal limitation. *See* O'Donnell Aff., ¶ 11. There is also no dispute that the parties agreed that Plaintiff could continue to reside in North Carolina, and that the Defendants would pay Plaintiff's cost of traveling to and from the location of Defendants' airplane.

**b. Plaintiff's Employment and Motorcycle Accident**

Plaintiff started working as Defendants' pilot on January 23, 2008. In this position, Plaintiff was expected to be on call to pilot Gary and Betty Grimmel when needed. Def. SOMF ¶ 25. The amount of advance notice the Grimmels gave Plaintiff when they needed to fly varied, but Plaintiff knew that he was required to work around Gary Grimmel's schedule. *Id.* ¶ 70.

On March 27, 2013, a car pulled into Plaintiff's path causing him to " lay his motorcycle down," resulting in soreness and swelling in his knees and shoulders. Def. SOMF ¶¶ 81, 86. Plaintiff sent Betty Grimmel a text message telling her about the accident, stating that he was a little banged up, "but not bad" and only had a few scrapes. *Id.* ¶ 82. That same day, Plaintiff went to the emergency room at Carolinas Medical Center-Northeast in Concord, North Carolina, where x-rays were taken of his hand and knee. *Id.* ¶ 83. Plaintiff testified that, at that time, his pain was minimal, his x-rays came back negative, he was not given any prescriptions by his treating physician, and was otherwise released with no work-restrictions. *Id.* ¶ 84. Plaintiff did not tell the Grimmels that he went to the emergency room. *Id.* ¶ 85.

**\*5** On March 27, 2013, Plaintiff filled a prescription for 30 doses of hydrocodone/acetaminophen. *Id.* ¶ 91.[3] Plaintiff also filled a prescription for 50 doses of hydrocodone/acetaminophen on April 19, 2013. *Id.* ¶ 92. Hydrocodone/acetaminophen contains a narcotic and is prescribed to relieve moderate to severe pain. *Id.* ¶ 93.

The Federal Aviation Administration ("FAA") advises pilots not to fly while on narcotic pain relievers, including hydrocodone, as they may cause "sedation (drowsiness) or impair cognitive function, seriously degrading pilot performance." *Id.* ¶ 94. Plaintiff contends, however, that he never ingested this medication, and that he has never flown under the influence of any drug or substance prohibited by the FAA. O'Donnell Aff. ¶ 22.

3    It is unclear from the instant record where this prescription came from.

Following his accident, Plaintiff suffered soreness and swelling in his knees and soreness in his shoulders. On the April 1, 2013, Plaintiff went to Charlotte Medical Clinic Main in Charlotte, North Carolina to be examined by his flight surgeon to determine whether there was any reason that he would be ineligible to fly. *Id.* ¶¶ 86-87. Plaintiff's shoulder and cervical spine were examined by Michele L. Dyer, NP, and both were found to be unremarkable. *Id.* ¶ 88. Plaintiff testified that at this appointment it was recommended that he not fly for a day or so to allow the swelling to go down and for his condition to improve, but that he was still eligible to fly. *Id.* ¶ 89. The April 1, 2013 Medical Office Visit Notes indicate that Plaintiff was prescribed Medrol Dosepak to take 1-2 tablets up to 3 times a day, as needed, and hydrocodone. The Notes state that Plaintiff "is an airline pilot and recommended no flying [f]irst 2 days of dosepak. He will not use other NSAID on Dosepak verbalizes understanding. He may continue hydrocodone as needed." *Id.* ¶ 95.

Plaintiff filed his prescription for the Medrol Dosepak on Wednesday, April 3, 2013, but contends that he never took either of the medications prescribed by Dr. Dyer. *Id.* ¶ 96. There is no dispute that Plaintiff did not tell the Grimmels he was prescribed these medications, and he is " unsure" whether he told them that he was not supposed to fly for the first two days while on Medrol Dosepak—which he contends is irrelevant because he never took the medication. *Id.* ¶¶ 99-100. Plaintiff concedes, however, that he did not tell the Grimmels that his flight surgeon recommended that he not fly for a day of so after the April 1, 2013 medical examination. *Id.* ¶ 101.

Plaintiff flew the Grimmels on Thursday, April 4, 2013 from Tampa International Airport to Palm Beach International Airport, and again on Saturday, April 6, 2013 from Palm Beach to Tampa. *Id.* ¶ 97.

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 230 of 251

2016 WL 7742779, 2016 A.D. Cases 504,191

On Thursday, April 11, 2013, Plaintiff went to OrthoCarolina in Charlotte, North Carolina and saw Richard Mostak, M.D., due to continued discomfort in his right knee and shoulders. *Id.* ¶ 102. Plaintiff did not tell the Grimmels about this consultation. *Id.* ¶ 107. Plaintiff advised Dr. Mostak that he had some general pain and soreness and swelling in his knee and shoulders when pressure was applied to them. *Id.* ¶ 103. Plaintiff testified that the only impact that his injury had on him during this time was that he could not walk fast; other than that he was fine. *Id.* ¶ 104. Plaintiff testified that he was able to drive a car, he continued assisting his friend with excavating and grading property, and he did not otherwise alter his routine. *Id.* ¶ 105. The orthopedic physician did not give Plaintiff a diagnosis, but recommended a MRI on his right knee and shoulder. *Id.* ¶ 106. The Grimmels assert that Plaintiff did not tell them that it was recommended he have a MRI; Plaintiff contends that he does not recall whether he told them about having an MRI. *Id.* ¶ 108; Pl. Resp. SOMF ¶ 108.

### c. Plaintiff's Discharge

**\*6** On Monday, April 15, 2013, Betty Grimmel sent Plaintiff a text message notifying him that they might need to fly to Phoenix, Arizona that weekend. Def. SOMF ¶ 119. Also on April 15, 2013, Plaintiff began receiving treatment on his shoulder from a chiropractor, but Gary Grimmel was unaware of the treatment. *Id.* ¶¶ 115-16.

On Wednesday, April 17, 2013, Plaintiff had the MRIs completed and was scheduled to hear the results on Friday, April 19, 2013. *Id.* ¶ 109.

On April 18, 2013, at approximately 12:57 p.m., Betty Grimmel sent Plaintiff a text message confirming that they would need him to come to Tampa to meet them the next night, April 19, 2013, to pilot the plane. *Id.* ¶ 120. Plaintiff then spoke with Betty Grimmel on the phone about the trip. *Id.* ¶ 121. During this call, Betty Grimmel contends that Plaintiff did not tell her that he had an April 19th doctor's appointment or that he was receiving physical therapy for his shoulder; Plaintiff contends that he is " unsure" if he told her about the April 19, 2013 doctor's appointment. *Compare* Def. SOMF *with* Pl. Respon. SOMF ¶ 122 (and respective citations to the record).

At approximately 7:00 p.m. on April 18, 2013, Betty Grimmel advised Plaintiff that they needed him for a 6:00 p.m. or 7:00 p.m. flight departure on April 19, 2013. Def. SOMF ¶ 123. There is no dispute that, at this time, Plaintiff did not tell Betty Grimmel about his doctor's appointment the next day. *Id.* ¶

124. Between 7:57 p.m. and 8:18 p.m., Plaintiff sent Betty Grimmel a text message stating: "if we were to go to phx tomorrow, and I tell you this only for planning, don't have the winds for sat yet, but long range forecast show it to be about the same, the trip, if we could do it without a stop, would take 7:20 ... We will have to stop of course so plan on it being closer to 8 hours." *Id.* ¶ 125. Then, at some point between 8:21 p.m. and 8:42 p.m., Plaintiff advised Betty Grimmel that he would not be available for the trip because he had "a doctors [ *sic* ] apt in the morning related to [his] motorcycle accident at 10 [a.m.]." *Id.* ¶ 126. Betty Grimmel responded to Plaintiff asking, "can u do appointment when u get back." *Id.* ¶ 127. Plaintiff replied:

> To [*sic*] late to cancel it, and it's the followup to MRI I had done yesterday. I'll go to airport and stand by for all the flights, may just get on an earlier one but I can't book it its [ *sic* ] listed as sold out I can fly into Orlando, land at 2;40 rent a car and drive down, should be able to be there before 6 ...

*Id.* ¶ 128.

Betty Grimmel responded stating: "Hold off 1 min," and Plaintiff responded: "Ok." He then sent a text message to Betty Grimmel stating: "Early flight is now sold out on us air, only option now is that flight gets in at 6:02 pm or go to Orlando," and: "Sorry Betty, I can get there somehow if Gary wants to go in our plane." *Id.* ¶ 129. Betty Grimmel then told Plaintiff that they would fly by commercial airline to Phoenix, *id.* ¶ 130, something Gary Grimmel did not want to do. *Id.* ¶ 134.

As a manager of King B, and without any input or guidance from others, Gary Grimmel decided on April 19, 2013 [4] to terminate Plaintiff's employment. *Id.* ¶¶ 135-136; G. Grimmel Aff., ¶¶ 31-37. Gary Grimmel "viewed Plaintiff's asserted unavailability and his failure to even attempt to reschedule his personal appointment as him being uncooperative, unaccommodating, insubordinate and, ultimately, as failing to meet his job duties and responsibilities for which he was being well-compensated." G. Grimmel Aff., ¶ 36. He called Plaintiff on April 20, 2013, and the first words he said to Plaintiff were: "Curt, it's become obvious that you have had too much time off, you feel your needs are more important than mine,

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

therefore it's time we part ways." Def. SOMF ¶ 137-138. After Gary Grimmel notified Plaintiff that he was discharged, Plaintiff told Gary Grimmel that his doctor's appointment was important to him to find out what was going on with his knee, and that he had a torn meniscus. *Id.* ¶¶ 139-140. Plaintiff concedes, however, that this information was inconsequential because, as Plaintiff testified, "at that point [Gary Grimmel] had already fired me." *Id.* ¶ 141.

4    Defendants' SOMF indicates the decision was made on April 29, 2013 but, in the context of the other undisputed facts, this is clearly a typographical error.

 **\*7**  On April 20, 2013, after Plaintiff's employment was terminated, he sent a text message to Betty Grimmel asking if was possible to save his job, and indicting that he had no intention of making Gary Grimmel think he was "being uncooperative." *Id.* ¶ 142. Plaintiff sent another text message to Betty Grimmel on April 20, 2013 stating: "Gary was also mad at me about not telling him how injured I am from my accident. I didn't know the extent of those injuries until that follow-up visit yesterday, when they told me the results of the MRI ..." *Id.* ¶ 143; *see also Id.* ¶¶ 110-14. 5

5    At his April 19, 2013 appointment, Plaintiff advised Dr. Mostak that his knee was feeling better since the accident. The results of Plaintiff's shoulder MRI came back negative and the MRI for his right knee indicated Plaintiff had a torn meniscus. Plaintiff was not required to have, and has not undergone, surgery for his knee. For treatment, Dr. Mostak stated that they would just observe it "and see how it does." Plaintiff was not placed on any physical limitations by his physician.

When asked at his deposition why he fired Plaintiff, Gary Grimmel stated: " Because I couldn't trust him anymore as a pilot.... He didn't tell us the truth about his injuries." G. Grimmel Dep. p. 37. When question further, Gary Grimmel stated: "He said [he had] a couple of scratches and bruises and he had to lay his motorcycle down," but when question if he knew what Plaintiff's actual injuries were, he stated: " [T]hey were severe enough that he had to have an MRI," but also stated that he had "no clue" as to the extent of those injuries. *Id.* Gary Grimmel stated in an affidavit that the lack of trust he referred to at his deposition was based upon Plaintiff's concealment of his medical treatment, facts that Gary Grimmel learned of only after he discharged

Plaintiff. G. Grimmel Aff., ¶¶ 38-42. 6    At her deposition, Betty Grimmel stated that she believed that Gary Grimmel discharged Plaintiff "because he didn't trust Curt. Because Curt didn't tell us that he was having an MRI.... When you have a single pilot, you have to trust your pilot.... He didn't tell us that he went for an MRI, correct. And we were going on a long flight with one pilot and neither of us fly." Def. SOMF ¶¶ 187-88.

6    Gary Grimmel stated in his affidavit:

It was only after I told [Plaintiff] that I thought it was time for us to part ways that he told me that he did not cancel his April 19th appointment because it was important for him to find out what was going on with his MRI on his knee.

I had no idea that Plaintiff was having any type of knee problems. However, the way that he talked about his knee injury and doctor's appointment on April 20th—after I told him of my decision to terminate his employment—made it appear as though he had been injured since his motorcycle accident, he had concealed this fact from us, and he flew us several times when he likely should not have. By the time I found out about Plaintiffs knee pain and his blatant dishonesty, I had already made and informed him of my decision to terminate his employment. The trust that had been broken as a result of Plaintiff concealing his injuries and treatment, however, confirmed that Plaintiff could never work as our pilot.

Plaintiff's concealment of his knee injury was disturbing. I still do not know what the ultimate diagnoses of his alleged motorcycle accident injuries was or whether he should have flown following his accident. But I was troubled then, and continue to be troubled today, by the fact that Plaintiff concealed from us that: (A) he went to the emergency room after his accident; (B) he was suffering ongoing knee pain; and (C) he was examined by his flight doctor to see whether he was eligible to fly. I also was troubled to learn during the course of this lawsuit that Plaintiff, in fact, was told not to fly for a day or more and that he did not think he was required to or deemed it important enough to inform us of this information while he was still employed and flying us in the King B aircraft as a single pilot.

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 232 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

Since this litigation has started, it has also been brought to my attention that Plaintiff was having shoulder-related pain as a result of his accident and received occupational therapy treatment for his shoulder starting in April. Again, I had no idea that Plaintiff was experiencing any such pain to the extent that he was receiving treatment. Similarly, we have now learned that Plaintiff was taking a steroid and hydrocodone following his accident. Plaintiff never informed us of those facts.

As an employer, it is imperative for me to be able to trust my employees. There is, of course, a much deeper trust I must have for our single pilot given he is solely responsible for my safety and Mrs. Grimmel's safety. I learned after terminating Plaintiff's employment that Plaintiff was not open or honest with us about his accident, his alleged injuries or the prescriptions he was taking.... Simply stated, Plaintiff's breach of trust regarding his medical condition while flying us could not be remedied....

G. Grimmel Aff., ¶¶ 38-42.

**\*8** Prior to Plaintiff's termination on April 20, 2013, Defendants never cited him for being unaccommodating or insubordinate. Pl. Resp. SOMF ¶ 27.

### d. Plaintiff's Compensation

In 2008, Plaintiff made approximately $136,923.29 in reported gross wages; in 2009, Plaintiff made approximately $175,961.34 in reported gross wages; in 2010, Plaintiff made approximately $174,999.76 in reported gross wages; in 2011, Plaintiff made approximately $174,999.76 in reported gross wages; and in 2012, Plaintiff made approximately $174,999.76 in reported gross wages. Def. SOMF ¶¶ 60-64. Plaintiff was paid a $25,000.00 sign-up bonus, and received "Christmas bonuses" which were " at least $1,000.00, possibly $2,000.00." *Id.* ¶¶ 65-66. Plaintiff was not paid any severance following his discharge. Pl. SOMF ¶ 216.

### e. Facts Relating to Defendants' Counterclaims

Defendants contend that from approximately 2008 through April 20, 2013, King B either paid or reimbursed Plaintiff at least $53,076.29 for commercial flights for which Plaintiff alleged he incurred charges. Defendants further contend upon information and belief that, because Plaintiff's wife was employed by U.S. Airways, Plaintiff was able to fly

free of charge on all or a portion of the flights for which he sought and received reimbursement or payment from King B totaling $53,076.29. Thus, Defendants contend, that because " Plaintiff failed to disclose to Defendants the fact that he could fly free of charge and continued either to collect reimbursements from Defendants to cover the cost of his commercial flights or to induce Defendants to cover the cost of such flights by alleging that the flight expenses were reasonable and necessary within the meaning of the parties' agreement," Plaintiff breached his promise to seek reimbursement only for necessary charges; was unjustly enriched; and damaged King B because it detrimentally relied upon Plaintiff's representations.

Plaintiff counters that while he was previously married to Suzanne O'Donnell from approximately 1995 to 2009, a U.S. Airways flight attendant who received flight privileges for personal and family use, " [t]here was no agreement between O'Donnell and the Grimmels that O'Donnell would use his wife's employer's benefits." Pl. SOMF ¶ 233;[7] *see* Def. Respon. SOMF ¶ 233 (denying this allegation). Plaintiff further contends that he never received reimbursements for any travel expenses incurred while working for Defendants. Pl. SOMF ¶ 234. Defendants deny this allegation. Def. Respon. SOMF ¶ 234.

[7]    Plaintiff further contends that "[s]uch an agreement is impermissible because U.S. Airways forbids employee benefits to be used for business purposes.

Finally, Plaintiff asserts that "[a]t no time prior to the filing of the counterclaim was O'Donnell asked to pay any money back for travel expenses to the Grimmels. In fact, prior to the filing of the Counterclaims, no issue was ever raised to O'Donnell regarding his travel expense or the charging on the American Express card." Pl. Respon. SOMF ¶ 235. Defendants contend, however, that while Plaintiff was not asked to pay any money back for travel expenses charge on King B's American Express credit card, " [t]he record does not support the assertion that Plaintiff was not asked to pay back the money initially paid to Suzanne O'Donnell for Plaintiff's travel expenses." Def. Respon. SOMF ¶ 235.

## IV. DISCUSSION

### a. ADA and HRL Disability Claims [8]

[8]    Because the Court dismisses the ADA and HRL claims on the merits, it need not decide whether

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 233 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

the Defendants operated as a single integrated enterprise such to meet the minimum employee thresholds of the ADA and the HRL.

**\*9** To succeed on his ADA and HRL claims, Plaintiff must establish that he: (1) suffered from, had a record of, or was regarded as suffering from a disability within the meaning of the ADA and/or the HRL; (2) was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) suffered an adverse employment action. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005) (ADA claim); *Kaufman v. Columbia Memorial Hospital*, 2 F. Supp.3d 265, 277 (N.D.N.Y. 2014) (applying same standard to HRL claim). The ADA defines "disability" as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such impairment. *See* 42 U.S.C.§ 12102(1). Under the HRL, "disability" is defined as: (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function; (b) a record of such impairment; or ( c ) a condition regarded as such an impairment. *See* Executive Law § 292(21).

The mere presence of a medical condition does not establish that a plaintiff is disabled. *Shaughnessy v. Xerox Corp.*, 2015 WL 1431687,\*3 (W.D.N.Y. Mar. 27, 2015) (plaintiff's sprained ankle did not constitute a disability); *see also* 29 C.F.R. § 1630.2(G)(ii) ("not every impairment will constitute a disability within the meaning of this section"). In addition, it is well settled that temporary impairments with little or no long-term permanent impact are not disabilities under the ADA. *Shaughnessy*, 2015 WL 1431687, \*3 (citing *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998)) (superseded on other grounds). Similarly, temporary conditions with no long-lasting or permanent consequences are not protected under the HRL. *See Guary v. Upstate Nat'l Bank*, 618 F. Supp.2d 272, 275 (W.D.N.Y. 2009) (holding that plaintiff, who broke her ankle resulting in a single, twelve-week disability leave with no alleged physical limitations thereafter, was not disabled under ADA or "the parallel New York statute"); *Simmons v. Woodycrest Center Human Development, Inc., et al.*, 2011 WL 855942 (S.D.N.Y. Mar. 9, 2011) (holding that plaintiff, who suffered from high blood pressure but was otherwise not in an acute state of ill health, was not disabled under the HRL). As such, courts routinely dismiss disability discrimination claims by plaintiffs who allege only minor or transitory injuries. *See Dudley v. New York City Housing Authority*, 2014 WL 5003799, \*34

(S.D.N.Y. Sept. 30, 2014) (plaintiff's injury during recovery from surgery for torn meniscus did not qualify as an ADA disability); *Anderson v. National Grid, PLC*, 93 F. Supp.3d 120 (E.D.N.Y. 2015) (dismissing ADA claim based upon spondylolisthesis, a condition causing back pain); *see also* 42 U.S.C. § 12102(3)(B)(A transitory impairment is an impairment with an actual or expected duration of 6 months or less.).

Plaintiff has failed to establish facts from which a reasonable fact finder could conclude that he suffered from anything more than a minor or transitory injury. Indeed, viewing the facts in the light most favorable to Plaintiff, the injuries he sustained from his motorcycle accident required little or no treatment, and which, aside from limiting his ability to walk quickly following the accident, did not otherwise limit his physical abilities. Thus, Plaintiff has failed to present facts from which a reasonable fact finder could conclude that he suffered from a disability within the meaning of the ADA and/or the HRL. Plaintiff has also failed to establish that, at the time of discharge, he had a record of an ADA or HRL qualifying impairment.

Perhaps realizing these deficiencies, Plaintiff argues that there exists a question of fact as to whether Defendants regarded him as having injuries that were more than transitory and minor. *Id.* The Court disagrees.

**\*10** The injuries at issue arise from Plaintiff's March 27, 2013 motorcycle accident. Only Defendants' knowledge of, or belief about, the extent of these injuries at the time of discharge is relevant. *See Singleton v. United Parcel Service, Inc.*, 2014 WL 943129, at \*2 (D. Conn. 2014)("Being regarded as having such an impairment" means "that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.' ") (citing 29 C.F.R. § 1630.2(g)(iii)); *Nelson v. City of New York*, 2013 WL 4437224, at \*7 (S.D.N.Y. 2013)(When an individual suffers an adverse employment action based on the employer's good faith—but incorrect—belief that an impairment is disabling, the individual is regarded as disabled.). Viewing the evidence in the light most favorable to Plaintiff, no reasonable fact finder could conclude that on April 20, 2013 when Gary Grimmel told Plaintiff that he was discharged ("Curt, it's become obvious that you have had too much time off, you feel your needs are more important than mine, therefore it's time we part ways."),

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

Defendants regarded Plaintiff as suffering from an ADA or HRL qualifying disability.

The facts, viewed in the light most favorable to Plaintiff, indicate that following the motorcycle accident, he sent Betty Grimmel a text message telling her that he was a little banged up "but not bad" and only had a few scrapes. Plaintiff did not tell the Grimmels that he went to the emergency room following this accident. [9] While Plaintiff was examined by his flight surgeon on April 1, 2013, there is no indication that Plaintiff advised Defendants of this examination. Further, there is no dispute that Plaintiff did not tell the Grimmels that he was prescribed a steroid and a narcotic on April 1, 2013, that he filled the prescription for Medrol Dosepak on April 1, 2013, [10] or that his flight surgeon recommended that he not fly for a day of so after the April 1, 2013 medical examination. Moreover, Plaintiff flew the Grimmels on April 4, 2013 and again on April 6, 2013.

[9]   And even if he had, it would not have provided probative evidence that Defendants believed Plaintiff suffered from a serious condition because the results of the emergency room medical examination were unremarkable (x-rays were negative, Plaintiff was not given any prescriptions, and was released with no work-restrictions).

[10]   Plaintiff asserts that he is "unsure" whether he told the Grimmels that he was not supposed to fly for the first two days while on Medrol Dosepek, but contends that he never took the medication. The Court accepts the representation that he never took the medication as true for purposes of this motion.

In addition, while Plaintiff consulted with an orthopedic surgeon on April 11, 2013 due to discomfort in his right knee and shoulders, he did not tell the Grimmels about this consultation. Even though Plaintiff does not recall whether he told the Grimmels that the orthopedic surgeon recommended that he obtain a MRI of his right knee and shoulders, the Grimmels deny that he advised them of this recommendation. In the face of the Grimmel's assertion to the contrary, Plaintiff's uncertainty about whether he told the Grimmels about the MRI amounts to mere speculation that he did, which is insufficient to support Plaintiff's evidentiary burden on this motion. There is also no evidence supporting an inference that Defendants were aware that Plaintiff began receiving chiropractic treatment on his shoulders on April 15, 2013. Thus, when Betty Grimmel sent Plaintiff a text message on

April 15, 2013 notifying him that they might need him to fly to Phoenix, Arizona for the following weekend, the Grimmels knew only that Plaintiff had been in motorcycle accident that caused him a few scrapes and which did not prevent him from piloting the Grimmels' airplane. There is no evidence demonstrating that, at this point in time, Plaintiff provided Defendants any indication that he was receiving ongoing medical treatment, that he was scheduled to have an MRI on April 17, 2013, or that he exhibited any symptoms of a serious medical condition.

**11  Plaintiff had the MRIs completed on April 17, 2013, and was scheduled to hear the results on Friday, April 19, 2013. On April 18, 2013, Betty Grimmel notified Plaintiff by text message that he was needed to fly Defendants on April 19, 2013. Betty Grimmel and Plaintiff spoke by telephone the same day about the trip. Betty Grimmel contends that Plaintiff did not tell her that he had an April 19th doctor's appointment or that he was receiving physical therapy for his shoulder; Plaintiff contends that he is "unsure" if he told her about the doctor's appointment. Again, Plaintiff's uncertainty about what he told Betty Grimmel is insufficient to support his evidentiary burden on this motion. Further, even assuming that Plaintiff mentioned his MRI follow-up appointment during this telephone conversation, the record reflects that Plaintiff thereafter maintained his of ability to fly the airplane, and the Grimmels' persisted in their desire for him to do so.

On April 18, 2013, at approximately 7:00 p.m. (after the telephone conversation referenced above), Betty Grimmel advised Plaintiff that they did in fact need him to come to work on April 19, 2013 for a 6:00 p.m. or 7:00 p.m. flight departure. There is no dispute that, thereafter, Plaintiff sent Betty Grimmel a text message discussing the weather forecast for the April 19, 2013 trip thereby indicating his intention to perform his duties for the flight. It was not until some time later on April 18, 2013 that Plaintiff advised Betty Grimmel that he would not be available for the trip because he had "a doctors [ sic] apt in the morning related to [his] motorcycle accident at 10 [a.m.]." Betty Grimmel responded by asking Plaintiff if he could reschedule the appointment—thereby signifying her desire to have Plaintiff pilot the airplane the following day. Plaintiff replied that he thought it was too late to cancel the appointment and indicated that it was a follow-up " to [a] MRI [he] had done yesterday." However, even after mentioning the MRI, Plaintiff indicated (in the same correspondence and in a later correspondence that same evening) that he would be able to pilot the plane on April

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 235 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

19, 2013, although he might arrive later than requested. Thus, while Plaintiff had mentioned that he had received an MRI related to his motorcycle accident, he still indicated that he was physically capable of piloting the airplane.

Other than Plaintiff's April 18, 2013 statement that he had a MRI performed for injuries " related" to his motorcycle accident, there are no facts from which a reasonable fact finder could conclude that Defendants regarded Plaintiff as suffering from anything more than a transitory, minor condition. Indeed, the Grimmels were told by Plaintiff that the accident caused only scrapes, they observed Plaintiff flying their airplane after the accident, Plaintiff continued to maintain his ability to pilot the airplane after telling Betty Grimmel about the MRI, and the record lacks evidence indicating that Plaintiff exhibited signs of anything more than a minor physical impairment or that he told Defendants that he suffered from any condition that substantially limited his physical abilities.

When boiled to the core, Plaintiff's ADA and HRL claims are based wholly on the proposition that Defendants might have mistakenly regarded Plaintiff as suffering from a qualifying disability *because* he had an MRI performed. But even viewing the facts in the light most favorable to Plaintiff, no reasonable fact finder could conclude, in this situation, that merely having an MRI performed " related to" an accident causing only minor injuries raised the specter that Plaintiff *might be* suffering from an a serious disability within the meaning of the ADA or HRL. Indeed, there is no evidence in the record that Plaintiff exhibited any outward signs of a significant illness or disability; that his injuries had worsened or his condition had deteriorated since the accident; that he was unable to perform his job duties after the accident; or that Defendants expressed reservation in his ability to pilot the aircraft even after Plaintiff told Betty Grimmel about the MRI. Rather, the undisputed evidence indicates that after Plaintiff disclosed his doctor's appointment to review his MRI, Betty Grimmel asked him to re-schedule the appointment so he could pilot the airplane on April 19, 2013. And while Plaintiff declined to re-schedule the appointment, he continued to maintain that he could pilot the airplane on the 19th although at a later time than the Grimmels wanted.

**\*12** Plaintiff has failed to offer concrete examples of something from which a reasonable inference could be drawn that, at the time of discharge, Defendants might have perceived Plaintiff as disabled within the meaning of the ADA or HRL. *See Soules v. State*, 2015 WL 5797014, at \*8 (D. Conn. 2015), *appeal filed*, No. 15-3418 (2d Cir. Oct. 27, 2015)(granting a Fed. R. Civ. P. 12(b)(6) motion to dismiss because the plaintiff failed to allege specific facts from which the court could "infer that any Defendant regarded Plaintiff as disabled because of a knee injury."). Further, Plaintiff's speculation that Defendants *might* have suspected him of having a disabling condition is insufficient to withstand summary judgment. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 456 (2d Cir. 1999);[11] *id.* at 448;[12] *Richardson v. N.Y. Dep't. of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir. 1999).[13] Based on the evidence presented, no reasonable fact finder could conclude that between Plaintiff's last contact with Betty Grimmel on April 18, 2013 and Gary Grimmel's telephone call discharging Plaintiff on April 20, 2013, the Grimmels developed a mistaken belief that Plaintiff was suffering from a disability within the meaning of the ADA or the HRL.

[11]     (Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.")

[12]     As indicated in <u>Bickerstaff,</u> on a motion for summary judgment the Court:

      must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

      Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[13]     (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual).

Moreover, Plaintiff's post-discharge communications are insufficient to create a question of fact as to Defendants' mind-set at the time of discharge. The fact that the Grimmels testified at their depositions that Plaintiff was discharged because Gary Grimmel no longer trusted Plaintiff does not

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 236 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

create a genuine question of material fact as to whether the discharge was motivated by discriminatory animus. The evidence, viewed in the light most favorable to Plaintiff, indicates that at the time of discharge, the Grimmels knew only that: (1) Plaintiff had received scrapes and minor bruises from a motorcycle accident; (2) Plaintiff had flown the Grimmels after the motorcycle accident; (3) Plaintiff was expected to fly the Grimmels on April 19, 2013; and (4) despite that he represented that he was capable of doing so, Plaintiff declined to pilot Defendants' plane because he wanted to attend a doctor's appointment to learn the results of a previously undisclosed MRI. There existed no facts—other than Plaintiff's refusal to pilot Defendants' airplane because he wanted to learn the results of an MRI related to an ostensibly minor condition resulting from the motorcycle accident—from which a reasonable fact finder could conclude that the "lack of trust" arose from a belief *at the time of discharge* that Plaintiff had a more serious condition than he was letting on. Indeed, even Plaintiff has conceded that any information about his condition that he provided after being discharged was inconsequential because "at that point [Gary Grimmel] had already fired [him]." Def. SOMF ¶ 141.

Thus, Plaintiffs' ADA and HRL claims are dismissed for failing to establish a *prima facie* case of discrimination. *See Pierce v. Donahoe*, 963 F. Supp. 2d 366, 375-76 (D. Del. 2013)(granting summary judgment and dismissing plaintiffs ADA claim upon determining her employer was not "sufficiently aware of plaintiffs hearing loss such that it knew or regarded plaintiff as having a disability" when plaintiff did not inform her supervisors of her disability or make any statements suggesting more than a "hearing problem"); *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir. 1996) (affirming dismissal of plaintiff's "regarded as" ADA claim because plaintiff "produced no evidence that her supervisors or the management at [her employer] were aware of the [disability]"); *Tabatchnik v. Cont'l Airlines*, 262 Fed.Appx. 674, 676 (5th Cir. 2008) (affirming summary judgment and dismissal of employee's ADA claim because plaintiff failed to show that employer regarded him as having an impairment based solely upon plaintiff's request for extended lunch breaks to go to doctor's appointments).

**\*13** Further, and assuming *arguendo* that Plaintiff could establish a *prima facia* case of disability discrimination, Defendants have articulated a nondiscriminatory reason for his discharge. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)(If a plaintiff demonstrates a *prima facie* case, this gives rise to a presumption of unlawful

discrimination and the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)(Defendant's burden of production at this stage is not a demanding one, it need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."). Defendants contend that, as expressed by Gary Grimmel during the April 20, 2013 telephone call, Plaintiff was discharged for failing to perform his job function as required.

Plaintiff argues, however, that the Grimmels testified at their depositions (and asserted in the administrative agency) that Plaintiff was discharged because Gary Grimmel could no longer trust Plaintiff. Nonetheless, both of the asserted reasons constitute legitimate, nondiscriminatory bases for discharge, and thus shift the burden to Plaintiff to produce evidence "capable of carrying the burden of persuasion that employer's action was at least in part motivated by discrimination." *Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). Plaintiff has failed to meet this burden.

The evidence presented, even when viewed in the light most favorable to Plaintiff, does not demonstrate that either of the employer's stated reasons for discharge was false, or that discrimination was the real reason for the adverse action. The undisputed evidence indicates that Plaintiff was required to make himself available to fly in accordance with the Grimmel's needs, yet failed to do so on April 19, 2013. *See* Pl. Respon. SOMF ¶ 25 (O'Donnell understood that he would be working for Defendants in an on-call capacity); *id.* ¶ 70 (Admitting that "[t]he amount of advance notice the Grimmels gave Plaintiff when they needed to fly varied, but Plaintiff knew that he needed to work around Mr. Grimmel's schedule."); *id.* ¶ 134 (Admitting that as a result of his unavailability on April 19, 2013, "the Grimmels flew to Phoenix on a commercial airline, something Mr. Grimmel did not want to do."). Further, Plaintiff has failed to demonstrate that he kept the employer accurately apprized of his medical condition. *See* Pl. Respon. SOMF ¶ 85 (admitting that he did not tell the Grimmels that he went to the emergency room after his motorcycle accident); *id.* ¶ 99 (admitting that he did not tell the Grimmels that he was prescribed a steroid by his physician on April 1, 2013, which he had filled and picked-up from the pharmacy on April 3, 2013); *id.* ¶ 107 (admitting that he did not tell the Grimmels that he was going to see an orthopedic surgeon on April 11, 2013);

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

*Id.* ¶¶ 155-16 (admitting that on April 15, 2013, he began receiving treatment on his shoulder from a chiropractor but that Gary Grimmel was unaware of this treatment). Therefore, Plaintiff has failed to demonstrate that either of the employer's articulated reasons for discharge was false.

Moreover, for the reasons discussed above, Plaintiff has failed to produce evidence from which a reasonable fact finder could conclude that the discharge determination was motivated by a belief that Plaintiff suffered from an ADA or HRL qualifying disability. *See Sista v. CDC Ixis N. Am. Inc.,* 445 F.3d 161, 173 (2d Cir. 2006) ("Because [plaintiff] can point to no evidence from which a reasonable jury could conclude that he was terminated on account of his mental illness rather than his past behavior, we conclude that the District Court did not err in granting summary judgment and dismissing [plaintiff's] ADA claims"); *Fall v. New York State United Teachers,* 289 Fed.Appx. 419, 421-22 (2d Cir. 2008) (affirming grant of summary judgment to employer because employer showed "evidence supporting [a] legitimate basis for the termination" and plaintiff failed to meet her ensuing burden to "offer evidence that [the employer's] position was false or that discrimination was the real reason for the adverse action" other than her own conclusions). Accordingly, the ADA and HRL claims are dismissed.

### b. Breach of Contract Claims

**\*14** The parties cross-move for summary judgment on the breach of contract claims. For the reasons that follow, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

Under New York law, [14] to succeed on a breach of contract claim, the Plaintiff must show: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Grp., Inc. v. Staub,* 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012). While an exchange of emails may constitute a binding contract under New York law, *Rubinstein v. Clark & Green, Inc.,* 395 Fed. Appx. 786, 788 (2d. Cir. 2010)(citing *e.g., Stevens v. Publicis. S.A.,* 50 A.D.3d 253, 255-56, 854 N.Y.S.2d 690, 692 (1st Dep't 2008)), "[f]or a contract to be binding, the parties' agreement must be definite enough so that the parties' intent can be ascertained with some degree of certainty." *In re Cairns & Associates, Inc.,* 372 B.R. 637, 651 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). It is Plaintiff's burden to "establish[ ] all essential terms of the alleged contract, with sufficient

definiteness," and to demonstrate the existence of a meeting of the minds, including "the parties' mutual assent and mutual intent to be bound." *Id.* at 652; *May v. Wilcox,* 182 A.D.2d 939, 940 (3d Dep't 1992); *see also In re Cairns & Associates, Inc.,* 372 B.R. at 652.

14    All parties agree that New York law applies and, accordingly, the Court will apply this law to the state law claims.

### 1. Cost Of Living Adjustments and Year-End Bonuses

There is a factual dispute whether the parties came to a binding agreement to pay Plaintiff yearly Cost of Living Adjustments ("COLAs") and/or Year-End Bonuses ("YEBs"). Betty Grimmel and Plaintiff indicate that there was such an agreement, but Gary Grimmel contends there was not. Further, the record indicates that Plaintiff was not paid yearly COLAs, and, although paid Christmas bonuses, he contends these were not the year-end bonuses the parties agreed upon.

Given the factual dispute on whether an agreement was reached on the payment of COLA and YEBs, and whether the Christmas bonuses were YEBs, it will be for a jury to decide whether the parties reached a binding agreement on these issues, and, if they did, whether there was a reason the benefits were not paid in accordance with that agreement. *See Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1st Dep't 1999)("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."); *Restatement (Second) of Contracts § 202,* comment g (The conduct of the parties to agreement "is often the strongest evidence of their meaning."); *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104, 850 N.E.2d 653 (2006)(" Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned. Such abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage. However, waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection. Generally, the existence of an intent to forgo such a right is a question of fact.") (Internal quotation marks and citations omitted). Accordingly, the parties' motions on these issues are denied.

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 238 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

### 2. Severance Pay

**\*15** Assuming *arguendo* that the parties' severance agreement was in effect at the time of Plaintiff's discharge, the record is clear that Plaintiff was discharged for cause and, therefore, severance was not required.

In determining whether an employee was terminated for cause for purposes of entitlement to post-termination benefits, "an employer's decision ... may be set aside only where it is made in bad faith, was arbitrary or was the result of fraud." *Welland v. Citigroup Inc.*, 2003 WL 22973574, at \*11 (S.D.N.Y. Dec. 17, 2003) *aff'd*, 116 Fed.Appx. 321 (2d Cir. 2004) (dismissal of complaint in its entirety on summary judgement). As such, if a decision is reasonable, a court may not substitute its judgment for that of the employer on the disputed factual issues." *Id.; see William Stevens, Ltd. v. Kings Vill. Corp.*, 234 A.D.2d 287, 288 (2d Dep't 1996) (unless unreasonable, an agent is bound to act in accordance with the employer's direction and control.)

Plaintiff's primary duty was to be available to fly the Grimmels when required, Def. SOMF ¶ 25, yet he failed to make himself available on April 19, 2013 at the time instructed. Further, he failed to provide a compelling reason for his unavailability. Plaintiff only advised Betty Grimmel on April 18, 2013 that he had a follow-up appointment from a MRI related to his motorcycle accident which, as discussed *supra*, appeared to the Grimmels to have resulted in only minor injuries to Plaintiff. Because Betty Grimmel notified Plaintiff on April 15, 2013 that he would be probably be needed on April 19, 2013, and because Plaintiff concealed his doctors' appointments following the motorcycle accident, Defendants had no reason to believe Plaintiff's appointment could not have been rescheduled. Plaintiff's excuse—that it was too late to cancel the appointment despite that he had been given four days notice that he would probably be needed to fly the Grimmels for the upcoming weekend, and his failure to make an effort to reschedule his Friday doctor's appointment in light of the logistics of Plaintiff's travel time to the Grimmels' airplane, was reasonably interpreted as a dereliction of his duties.

Given Plaintiff's well-established duties, the decision to terminate his employment for failing to reschedule what appeared to be (and actually was) a non-emergency appointment was reasonable. *See Reilly v. Polychrome Corp.*, 872 F. Supp. 1265, 1268 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 405 (2d Cir. 1995) ("[b]ecause plaintiff was not excused from compliance with the order by reason of personal emergency, his failure to report to work constituted a legitimate basis for defendants' action"); *see also Matter of Cowan*, 23 A.D. 3d 815 (3d Dep't 2005) (on-call employee who failed to respond to employer's attempts to contact him was terminated for misconduct and ineligible for unemployment benefits).

Further, even assuming that the discharge determination was because Gary Grimmel no longer trusted Plaintiff, the determination was not in bad faith or arbitrary. There is no dispute that Plaintiff concealed his medical treatment following his motorcycle accident from Gary Grimmel, including the fact that he was prescribed narcotic and steroid medications (that he admitted to filling), and that he received advice from his physician that he should not fly for a period of time. No reasonable fact finder could conclude that the determination to discharge an airline pilot under these circumstances was made in bad faith or was arbitrary. Accordingly, Defendants' motion for summary judgment on that much of the breach of contract claims address to the payment of severance is granted, and the breach of contract claims on severance payments are dismissed.

### c. **Promissory Estoppel Claim**

**\*16** Plaintiff's promissory estoppel claim fails as a matter of law. "New York law, which governs here, does not recognize promissory estoppel in the employment context." *Rojo v. Deutsche Bank*, 2010 WL 2560077, at \*7 (S.D.N.Y. 2010) *aff'd*, 487 Fed.Appx. 586 (2d Cir. 2012); accord *Lai v. Deiorio Foods Inc.*, 2016 WL 814930, at \*7 (N.D.N.Y. 2016)(" '[I]t is well established that New York law does not recognize promissory estoppel in the employment context.' ")(*citing Kramsky v. Chetrit Group, LLC*, 2011 WL 2326920, at \*4 (S.D.N.Y. 2011)).

To the extent such a claim could be asserted, it fails on the merits. A plaintiff may not maintain a promissory estoppel claim that is duplicative of a breach of contract claim. *See Soldiers', Sailors', Marines' & Airmen's Club, Inc. v. Carlton Regency Corp.*, 30 Misc. 3d 352, 364 (New York Co. Sup. Ct. 2010) (plaintiffs could only set forth promissory estoppel allegations that are not subsumed in their counterclaim for breach of contract). Plaintiff's promissory estoppel claim (Count Six) is identical to his breach of contract claims (Counts Four and Five).

Further, to succeed on such a claim, "a plaintiff must show: (1) a clear and unambiguous promise; (2) reasonable and

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 239 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance." *Tri-Cty. Motors, Inc. v. American Suzuki Motor Corp.*, 494 F. Supp.2d 161, 173 (E.D.N.Y. 2007). Promissory estoppel is limited to that "class of cases in which the person to whom the promise is made, in reliance upon the promise, has suffered unconscionable injury." *Tutak v. Tutak*, 123 A.D.2d 758, 759 (2d Dep't 1986). Plaintiff's alleged injuries—failing to receive COLAs and YEBs [15]—are not unconscionable because they are expected damages of Plaintiff's contractual non-performance claim. *See Fishoff v. Coty Inc.*, 676 F. Supp.2d 209, 220 (S.D.N.Y. 2009) *aff'd*, 634 F.3d 647(2d Cir. 2011)(unconscionable injury requires more than the expected damages which naturally flow from nonperformance of alleged agreement). Moreover, Plaintiff's contention that Defendants' failure to provide him COLAs and YEBs caused him unconscionable injury because he suffered economic hardship or lost other employment opportunities fails as a matter of law. *See Banger v. Spanish Broadcasting System, Inc.*, 2007 WL 2780390, at *6 (S.D.N.Y. 2007)(dismissal of promissory estoppel claim based on economic hardship due to reliance on employer's alleged promises and employee's failure to leave to seek better employment terms). As such, Plaintiff cannot establish the unconscionable injury necessary to support his claim.

[15]    Because the Court has already determined that Plaintiff is not entitled to severance pay, the Court does not consider severance pay in the context of Plaintiff's promissory estoppel claim.

For these reasons, Plaintiff's motion for summary judgment on his promissory estoppel claim is denied, Defendants' motion is granted, and the claim is dismissed.

#### d. NYLL Claims

#### 1. Severance Pay

Because the Court has already determined that Plaintiff is not entitled to severance pay, Plaintiff has no NYLL claim arising from this benefit. *See Kannilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 Fed.Appx. 153, 158 (2d Cir. 2012)(Plaintiff cannot assert a claim for wages under the Labor Law if he does not have an enforceable contractual right to such wages.). Accordingly, Plaintiff's NYLL claim for severance pay is dismissed.

#### 2. YEBs

**\*17**  Plaintiff's claim that Defendants failed to pay him wages in the form of YEBs in violation of NYLL § 193(1) (Count Three) turns on the questions of whether there was an agreement to pay YEBs as part of compensation and, if there was, whether the YEBs were in fact paid. *See Ryan v. Kellogg Partners Inst. Servs.*, 19 N.Y.3d 1 (2012). Because these questions must be answered by a jury, the parties' motions relative to Count Three are denied.

#### 3. COLAs

Plaintiff also claims that Defendants failed to pay him wages in the form of COLAs in violation of the NYLL (Count Two). While Plaintiff initially pled this claim generally under "NYLL article 6 §§ 190 *et seq.*," he now asserts that this claim is viable under NYLL § 191(1)(d). Pl. MOL., at 20. As Plaintiff concedes, § 191(1)(d) provides that workers shall be paid "wages in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer." Plaintiffs claim fails because, as set forth in the Complaint, the alleged "terms of the agreement" were: "The parties also agreed that [Plaintiff's] base salary would be increased *annually* according to the cost of living index." Compl., ¶ 20 (emphasis added). Thus, even assuming the parties agreed that Plaintiff would be paid annual COLAs, the failure to pay them does not amount to a violation of NYLL § 191(1)(d). Accordingly, Count Two is dismissed.

#### 4. Labor Law § 215 Retaliation

Plaintiff claims that Defendants' counterclaims constitute unlawful retaliation in violation of NYLL § 215 (Count Seven). The claim is without merit.

To establish retaliation under NYLL § 215, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an adverse action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse action. *See Ozawa v. Orsini Design Associates, Inc.*, 2015 WL 1055902, n.10 (S.D.N.Y. Mar. 11, 2015). Plaintiff cannot establish a *prima facie* retaliation claim because he has not suffered any adverse action as a result of Defendants filing the counterclaims. For a counterclaim to be actionable

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 240 of 251

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

as retaliatory, it must have some impact on Plaintiff's employment or prospective employment. *See D' Amato v. Five Start Reporting, Inc.*, 80 F. Supp. 3d 395,420(E.D.N.Y. 2015)(citing *Fei v. WestLB AG*, 2008 WL 594768, at *3 (S.D.N.Y. Mar. 5, 2008)). Plaintiff's employment with Defendants was not impacted by Defendants' counterclaims, which were filed after his termination, and Plaintiff has failed to present sufficient facts from which a reasonable fact finder could conclude that Plaintiff's employment prospects have been negatively impacted by the counterclaims. Thus, Plaintiff's NYLL § 215 retaliation claim is dismissed.

### e. Cross-Motion for Summary Judgment on Defendants' Counterclaims

Plaintiff argues that he should be granted summary judgment dismissing Defendants' counterclaims. The Court disagrees on three of the four counterclaims, but finds that the promissory estoppel counterclaim should be dismissed.

Plaintiff argues that: (1) the parties agreed that Defendants would provide Plaintiff with the option of going home from a trip with Defendants when he was not needed; (2) Defendants would provide such transportation; (3) there was no agreement that Plaintiff would use his ex-wife Suzanne O'Donnell's U.S. Airways employee flight privileges (free or discounted flights); (4) it was "impossible" for Plaintiff to use his ex-wife's flight privileges with U.S. Airways because he was only married to her " a until sometime in 2009," and because such an agreement would be impermissible under U.S. Airways' regulations, and (5) Plaintiff never received any reimbursements for travel expenses. Pl. MOL, p. 4. Defendants contest these points, and Plaintiff has failed to present evidentiary proof establishing that no genuine question of material fact exists on the counterclaims.

**\*18** However, for the reasons discussed with regard to Plaintiff's promissory estoppel claim, Defendant's promissory estoppel counterclaim must also be dismissed. The

promissory estoppel counterclaim is duplicative of the breach of contract counterclaim, arises in the context of an employment dispute, and does not alleged facts reasonably supporting that Defendants incurred an unconscionable injury. Accordingly, Plaintiff's motion for summary judgment dismissing Defendants' counterclaims is granted in part, dismissing the promissory estoppel counterclaim, and denied as to the other counterclaims.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, Dkt. # 46, is GRANTED in part and DENIED in part. The motion is granted to the extent that Plaintiff's ADA, HRL, Breach of Contract for Severance Pay, Promissory Estoppel, NYLL severance pay, NYLL COLA pay, and NYLL Retaliation claims are DISMISSED. Plaintiff's claims for Breach of Contract for the payment of COLAs and YEBs, and his NYLL claims for unpaid YEBs, remain viable.

Plaintiff's cross-motion for partial summary judgment, Dkt. # 49, is GRANTED in part and DENIED in part. The motion is granted to the extent that the promissory estoppel counterclaim is DISMISSED, and denied in all other respects.

Defendants' letter motions to strike, Dkt. ## 57 and 59, are DENIED.

The parties are to file their pretrial papers for the May 10, 2016 trial no later than 11:59 PM on May 5, 2016.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 7742779, 2016 A.D. Cases 504,191

---

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 241 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Syeed v. Bloomberg L.P.,   S.D.N.Y.,   October 25, 2021

2019 WL 6916099
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry SCALERCIO-ISENBERG, Plaintiff,

v.

MORGAN STANLEY SERVICES
GROUP INC., et al., Defendants.

19-CV-6034 (JPO)
|
Signed 12/19/2019

**Attorneys and Law Firms**

Sherry Scalercio-Isenberg, Sparta, NJ, pro se.

Ryan Stephen Carlson, Nukk-Freeman and Cerra, PC, Chatham, NJ, Patricia M. Prezioso, Porzio, Bromberg & Newman, P.C., Morristown, NJ, for Defendants.

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

**\*1** Plaintiff Sherry Scalercio-Isenberg brings this action *pro se* against Defendants Morgan Stanley Services Group Inc., Matthew Dziedzic, James P. Gorman, Jeff Brodsky, and Kerrie R. Heslin (collectively, "Morgan Stanley"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (*See* Dkt. No. 5-2 ("Compl.").) Plaintiff alleges that Morgan Stanley discriminated against her on the basis of age, gender, and disability when it failed to hire her. (*Id.*) She further alleges that Defendants retaliated against her when she complained of the discrimination. (*Id.*) Defendants removed the case from New York Supreme Court, New York County, on June 27, 2019. (Dkt. No. 1.) Defendants now move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 8.) For the reasons that follow, the motion to dismiss is granted.

**I. Background**

Plaintiff Sherry Scalercio-Isenberg is a 53-year-old woman. (Compl. at 4.) She was previously Managing Director, Head of Americas at Lombard Risk Management. (Compl. at 4, 7.) In that role, she managed a team of fourteen, and reported directly to the London-based CEO. (Compl. at 4.) In 2012 or 2013, Scalercio-Isenberg resigned from Lombard Risk Management due to her need for an emergency surgery. (*Id.*) The surgery left her with a physical disability on her left side, which is visible when she walks. (*Id.*)

Scalercio-Isenberg asserts in her complaint that she applied to Defendant Morgan Stanley over 25 times in approximately six months. (Compl. at 5.) [1] Scalercio-Isenberg alleges that the online application portal "requires the [c]andidate to answer many [p]re-screening questions which directly relate to a [c]andidate['s] [g]ender, [d]isability and [a]ge." (Compl. at 5–6.) However, the online portal only collects data on a volunteer basis regarding a candidate's gender and ethnicity. (Dkt. No. 10-2 at 6.) [2] No data is collected via the online portal regarding a candidate's disability or age. (*See* Dkt. No. 10-2.) In any event, Scalercio-Isenberg never received an interview.

[1]   Morgan Stanley disputes this fact, asserting that she submitted 24 applications between September 2016 and May 2018. (Dkt. No. 9 at 2 n.3.)

[2]   The candidate portal was "incorporated by reference" in the complaint (*see* Compl. at 5–6), and thus can be properly considered when considering Morgan Stanley's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

Scalercio-Isenberg subsequently contacted Defendant Matthew Dziedzic, who she alleges "oversees and controls the [r]ecruiting and hiring process for [r]isk management positions" in the New York Office. (Compl. at 7.) In a phone conversation, Dziedzic raised concerns about Scalercio-Isenberg's resume format. (*Id.*) A contact of Scalercio-Isenberg whom she describes as "a highly regarded expert in the [r]ecruiting [s]ervices business," allegedly told her that Dziedzic was attempting to " 'weed' [her] out," and that it was "a common practice used by [r]ecruiters to hide Title VII

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 242 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

[d]iscrimination." (Compl. at 7–8.) In response, Scalercio-Isenberg decided to "find a way around the potential discrimination she suspected was occurring," and reached out to Victoria Heimann, a recruiter in Morgan Stanley's Philadelphia office. (Compl. at 8, 15.) Heimann provided her with guidance regarding how to improve her resume. (*Id.*)

**\*2** On May 3, 2018, Scalercio-Isenberg again applied to Morgan Stanley, this time for Executive Director, Liquidity Planning and Coverage Strategy. (Compl. 8–9.) On May 6, 2018, when she checked her application status, she was "shocked" to learn that she was no longer being considered for the position. (Compl. at 9.) The next day, she sent an email to Dziedzic, requesting feedback on her application. (*Id.*) In her email, she expressed her surprise and asserted that she was "highly qualified in every area of [l]iquidity risk [management,] i.e., [t]reasury, cash management, [c]ollateral [management] and all reg[ulatory] compliance." (Compl. at 10.) When he did not respond, she alleges that she sent Dziedzic five follow-up emails from May 8, 2018, to May 26, 2018. (Compl. 10–11.) In the interim, on May 17, 2018, Scalercio-Isenberg had a phone call with Alison Guerzon, who worked with Recruiting, to "review [Scalercio-Isenberg's] background and experience." (Compl. at 11.) As part of that conversation, Guerzon "inquired about a break in employment," and Scalercio-Isenberg "explained the break was due to [her] surgery and provided details." (*Id.*) Guerzon expressed "interest and empathy," and provided information about a helpful program for which Scalercio-Isenberg would qualify. (*Id.*)

In her May 22, 2018 email to Dziedzic, she asserted that "[t]his [wa]s clearly NOT a beneficial time to discriminate against a Female Wallstreet [sic] professional," and that she would not tolerate gender discrimination. (Dkt. No. 10-9 at 2.)[3] In her May 26, 2018 email to Dziedzic, she complained of his "unethical business practices," because he had remained "silent and unresponsive." (Dkt. No. 10-10 at 3.)[4] She further threatened to "move forward with next steps and, at a minimum, email the timeline of events and copies of the emails ... sent ... to [Defendant] James Gorman [President and CEO of Morgan Stanley]." (*Id.*) In further correspondence, she asked how it was "ethically possible" for her to be rejected only three days after applying and demanded a "logical response and explanation." (Compl. at 12.) She informed him that she had "worked in Wall Street a long time [sic]" and that she was "very business savvy and kn[e]w bullshit when [she saw] it." (Compl. at 12, 18.)

3   This email was "incorporated by reference" in the complaint (*see* Compl. at 11), and thus can be properly considered when considering Morgan Stanley's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Roth*, 489 F.3d at 509.

4   This email was also "incorporated by reference" in the complaint (*see* Compl. at 11), and thus can be properly considered when considering Morgan Stanley's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Roth*, 489 F.3d 499 at 509.

On June 3, 2018, Scalercio-Isenberg emailed Defendant James Gorman, President and CEO of Morgan Stanley. (Compl. at 12.) In the email, she expressed concern about Dziedzic and the "unethical business practice" in the New York office. (*Id.*) She stated that a friend of hers who "knows [and] worked with [Dziedzic] previously ... validated [her] concerns after [she] explained [her] interactions with [Dziedzic]." (*Id.*) She went on to describe herself as "a very smart, dynamic Wallstreet [sic] woman" who "keep[s] [her]self in good shape" and is "very presentable no matter what kind of meeting or board presentation." (Dkt. No. 10-12 at 3.)[5] She explained that she was the Managing Director, Head of Americas at Lombard Risk Management, and provided insight into her working experience in the 1990s:

> In the late 90's, as a Sr. Treasury-Finance Analyst, reporting into the Treasurer/CFO's office[, w]e were in a liquidity crisis! I worked through all the numbers late one night when PNW (Pinnacle West Capital corp./APS [sic] was contemplating Chapter11 [sic] bankruptcy. I was only 28 years old, I had no idea what was happening in the Board room [sic]. The CFO came down and told me what I needed to prepare, asap! I built spreadsheets for hours at late night [sic] figuring our Liquidity position out for 2 weeks! No software program to run the calcs! Our Holding Company managed Liquidity for 4 other entities. [Many Bank Accounts,

Case 5:22-cv-00762-BKS-TWD   Document 23   Filed 03/28/23   Page 243 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

several Broker Dealer relationships for Liquidity funding or Investment for excess Cash reserves.: [sic]

**\*3** (*Id.*) Scalercio-Isenberg also attached "a timeline of events and a screenshot [of the job position]." (Compl. at 12; *see* Dkt. No. 10-12 at 6.)

5    This email was also "incorporated by reference" in the complaint (*see* Compl. at 12), and thus the full text can be properly considered when considering Morgan Stanley's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Roth, 489 F.3d 499 at 509.*

On June 7, 2018, Morgan Stanley began what Scalercio-Isenberg refers to as "formal [r]etaliation efforts" against her by sending her a cease and desist letter. (Compl. at 13.) The letter from Defendant Kerrie Heslin, outside counsel for Morgan Stanley, asserts that Scalercio-Isenberg engaged in "repeated abusive, disparaging and disruptive behavior toward Morgan Stanley's employees, including ... unsolicited emails making false and disparaging remarks about Matthew Dziedzic." (Compl. at 14.) It affirms that all Morgan Stanley hiring decisions "are based on legitimate, business reasons," and that based on Scalercio-Isenberg's "abusive and unprofessional conduct, [she is] not eligible to be considered for any positions at Morgan Stanley. (Compl. at 13.) Heslin wrote that Scalercio-Isenberg "must <u>immediately</u> cease and desist from ... further abusive, disruptive and unwanted contact toward Morgan Stanley's employees, including but not limited to any unsolicited contact via email, telephone, text message or social media." (Compl. at 14.) Scalercio-Isenberg, for her part, asserts that her "communications were professional, pleasant and cordial." [6] (Compl. at 16.)

6    While Morgan Stanley details a number of "harassing email[ ]" communications sent to Defendants after Scalercio-Isenberg's receipt of the cease and desist letter (*see* Dkt. No. 9 at 8–10), the Court cannot consider them in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). None of these emails are "attached to the complaint or incorporated in it by reference," nor are they documents "upon which the complaint solely relies" and are "integral to the complaint." *Roth, 489 F.3d at 509* (alterations omitted). The emails do not qualify as documents

that Scalercio-Isenberg "had knowledge and relied on in bringing suit," *Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993),* because "[a] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).* Accordingly, these communications are "excluded" from consideration. Fed. R. Civ. P. 12(d).

## II. Legal Standard

A district court properly dismisses an action under Rule 12(b)(1) if the court "lacks the statutory or constitutional power to adjudicate it." *Garcia v. Lasalle Bank NA.,* No. 16 Civ. 3485, 2017 WL 253070, at \*3 (S.D.N.Y. Jan. 19, 2017) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L., 790 F.3d 411, 417 (2d Cir. 2015)).* "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).* In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court must accept as true all the material factual allegations contained in the complaint, but a court is "not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).* Additionally, a court "may refer to evidence outside the pleadings." *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).*

**\*4** Dismissal under Rule 12(b)(6) is proper when a complaint lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).* "A document filed *pro se,*" like the complaint here, "is to be liberally construed," and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp, 521 F.3d 202, 214 (2d Cir. 2008)* (Sotomayor, J.) (quoting *Erickson v. Pardus, 551 U.S. 89, 94 (2007)* (per curiam)). Nonetheless, even a *pro se* complaint must contain "factual allegations sufficient to raise a right to relief above the speculative level," including "an allegation regarding [each] element necessary to obtain relief." *Blanc v. Capital One Bank, 2015 WL 3919409, at \*2* (internal quotation marks omitted). When considering a motion to dismiss under Rule 12(b)(6), the Court may consider facts alleged in the

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 244 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

complaint as well as any documents attached to it as an exhibit or incorporated in it by reference. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam). Additionally, when a plaintiff fails to attach or incorporate by reference any document "upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss." (*Id.* (internal quotation marks and citation omitted))

## III. Discussion

Defendants move to dismiss Plaintiff's NYSHRL and NYCHRL claims pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants further move to dismiss Plaintiff's Title VII, ADEA, ADA, NSHRL, and NYCHRL claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Territorial Scope of NYSHRL and NYCHRL

Morgan Stanley argues that Scalercio-Isenberg's NYSHRL and NYCHRL claims must be dismissed pursuant to Rule 12(b)(1) because she cannot plead facts alleging any impact in New York State or New York City. (*See* Dkt. No. 9 at 12–15.)

Scalercio-Isenberg is a resident of New Jersey, not New York. (*See* Compl. at 27.) Under the NYSHRL and NYCHRL, "nonresidents of the city and state must plead and prove that the alleged discriminatory conduct had an impact within those respective boundaries." *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 289 (2010). Critically, "it is the site of impact, not the place of origination, that determines where discriminatory acts occur." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 362 (S.D.N.Y. 2007). Scalercio-Isenberg alleges, in sum and substance, that she was discriminated against when she was not hired by the New York office of Morgan Stanley, and that Morgan Stanley retaliated against her when she complained. (*See* Compl.)

However, even "[w]here the discriminatory conduct occurs outside the geographical bounds of New York City, courts have found that the impact requirement is satisfied if the plaintiff alleges that the conduct has affected the terms and conditions of plaintiff's employment within the city." *Anderson v. HotelsAB, LLC*, No. 15 Civ. 712, 2015 WL 5008771, at *2 (S.D.N.Y. Aug. 24, 2015). Courts in this district have accordingly found that when non-resident plaintiffs allege that that they were not hired for a job in New York City on a discriminatory basis, the impact requirement for both the NYSHRL and NYCHRL is met. *See*

*Chau v. Donovan*, 357 F. Supp. 3d 276, 283–84 (S.D.N.Y. 2019); *Anderson*, 2015 WL 5008771, at *3–4. Therefore, Scalercio-Isenberg's NYSHRL and NYCHRL claims cannot be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

### B. Age and Gender Discrimination Claims

Scalercio-Isenberg alleges that Morgan Stanley's decision not to hire her was impermissibly based, in part, on her age and gender. (*See* Compl. at 4.) Discrimination claims under Title VII, the ADEA, and the NYSHRL are evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Dimps v. Taconic Corr. Facility*, No. 17 Civ. 8806, 2019 WL 1299844, at *7 (S.D.N.Y. Mar. 20, 2019) ("The pleading standards for employment discrimination claims raised under NYSHRL mirror the pleading requirements under Title VII ... and ADEA.") First, the plaintiff must establish a *prima facie* case of discrimination based on the protected characteristic. The burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Finally, the burden shifts back to the plaintiff to demonstrate the employer's reason for the adverse employment action was merely a pretext for discrimination. *See Dimps*, 2019 WL 1299844, at *4 (citing *McDonnll Douglas*, 411 U.S. at 802, 804).

**\*5** Here, Scalercio-Isenberg has failed to make out a *prima facie* case that she suffered age or gender discrimination when Morgan Stanley declined to hire her. To establish a *prima facie* claim of gender or age discrimination for failure to hire, a plaintiff must demonstrate: (1) she is a member of a protected class, (2) she was qualified for the job for which she applied, (3) she was denied the job; and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). Further, to prevail on a claim of age discrimination, the plaintiff must demonstrate that her age was the "but for" cause of the adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

Here, Scalercio-Isenberg does not demonstrate that Morgan Stanley's failure to hire her occurred under circumstances that give rise to an inference of gender discrimination. Scalercio-Isenberg has alleged no facts that suggest that Morgan Stanley's decision not to hire her was based on her gender. The fact that she showed that she was "very interested" in employment with Morgan Stanley when she submitted approximately 25 job applications (*see* Compl. at 7), does not

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 245 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

entitle her to a job interview. Further, the speed with which her latest application was rejected (*see* Compl. at 8–9) does not suggest anything other than perhaps a familiarity with her application after a litany of job applications. Even the fact that she may have volunteered that she was a woman on her application (*see* Dkt. No. 10-2 at 6) does not move the needle in her favor. Scalercio-Isenberg is missing the connective tissue that links her protected status to the alleged failure to hire. She offers no allegations, save for her own speculation and that of other uninvolved persons, that Morgan Stanley used that information in its hiring decisions — much less that it was a *motivating factor* in their decision making. Accordingly, Scalercio-Isenberg fails to make out even a *prima facie* case for gender discrimination under Title VII or the NYSHRL.

Scalercio-Isenberg further cannot demonstrate that she was not hired on account of age discrimination. She does not allege any facts that suggest that Morgan Stanley even knew of her age when the decision not to hire her was made. Contrary to the allegations in her complaint, the online application portal does not collect information about a candidate's age. (*See* Dkt. No. 10-2.) Scalercio-Isenberg alleges that while assisting her with "streamlining" her resume, Heimann told her: "Sherry, at our [a]ge, we've done a lot, we have a lot of experience ... but you don't want to intimidate the [h]iring manager." (Compl. at 8.) Even if this statement were to be construed as Heimann expressing an opinion that the hiring manager was "intimidated" by Scalercio-Isenberg's age, this comment alone is insufficient to demonstrate that age discrimination was the "but for" cause of Morgan Stanley's failure to hire her. Accordingly, Scalercio-Isenberg also fails to make out a *prima facie* case for age discrimination under the ADEA or the NYSHRL.

### C. Disability Discrimination Claims

Scalercio-Isenberg also claims that she failed to be hired at Morgan Stanley, in part, on the impermissible basis of her disability. (*See* Compl. at 4.) Disability discrimination claims are similarly handled under the *McDonnell Douglas* framework. *See Dimps*, 2019 WL 1299844, at \*7. To establish a *prima facie* claim of disability discrimination under the ADA, a plaintiff must demonstrate that (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her

disability. *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam). The "same elements" must be proved to establish an NYSHRL disability claim. *Kinneary v. City of N.Y.*, 601 F.3d 151, 158 (2d Cir. 2010).

 \*6 Here, Scalercio-Isenberg has alleged no facts to suggest that Morgan Stanley knew of her disability when they made the decision not to hire her. Contrary to the allegations in her complaint, the online application portal does not collect information about a candidate's disability. (*See* Dkt. No. 10-2.) Additionally, while Scalercio-Isenberg alleges that she mentioned her disability to Guerzon in their May 17, 2018, conversation (*see* Compl. at 11), Morgan Stanley had made the decision not to hire her by May 6, 2018 (*see* Compl. at 9). Although Scalercio-Isenberg alleges that her disability is "visible when she walks" (Compl. at 4), she does not allege that any of the defendants ever saw her walk and was thus alerted to her disability. Accordingly, Scalercio-Isenberg fails to make a *prima facie* case of disability discrimination under the ADA or the NYSHRL.

### D. NYCHRL Discrimination Claims

The NYCHRL has a different pleading standard than pleading standards applied to claims under Title VII, ADEA, the ADA, and the NYSHRL. To prove a claim for discrimination under the NYCHRL, a plaintiff must demonstrate by a preponderance of the evidence that she was "treated less well at least in part *because of* a protected trait." *Bell v. McRoberts Protective Agency*, No. 15 Civ. 0963, 2016 WL 1688786, at \*4 (S.D.N.Y. Apr. 25, 2016) (internal quotation marks omitted) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)). As noted above, Scalercio-Isenberg has not pleaded any facts that permit an inference that she was treated less well than other applicants to Morgan Stanley, including other unsuccessful Morgan Stanley applicants. While Scalercio-Isenberg has asserted that the situation "has smelled bad from the beginning" (Compl. at 12), she must raise "factual allegations sufficient to raise a right to relief above the speculative level." *Blanc*, 2015 WL 3919409, at \*2 (citation omitted). Accordingly, her NYCHRL claims must fail.

### E. Retaliation Claims

"The standards for evaluating ... retaliation claims are identical under Title VII and the NYSHRL." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citation omitted). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 246 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; (4) there was a causal connection between the protected activity and that adverse action. *Id.*

It is not clear that Scalercio-Isenberg's allegations establish that she was engaged in protected activity. A plaintiff is "required to have had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII." *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Galderi-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "The objective reasonableness of a complaint is to be evaluated from the perspective of a reasonable similarly situated person." *Kelly*, 716 F.3d at 17. Here, Scalercio-Isenberg's alleged subjective belief that she was being discriminated against on the basis of her gender, age, or disability cannot plausibly be viewed as a reasonable belief under the circumstances alleged in the complaint. Scalercio-Isenberg never alleged that anyone commented negatively on any protected characteristic nor has she alleged a single fact that would suggest that Morgan Stanley's decision not to hire her was made on any discriminatory basis. Because she has not alleged enough facts to suggest that she was engaged in protected activity, her retaliation claims under both Title VII and the NYSHRL must fail.

**\*7** To prevail on a retaliation claim under the NYCHRL, a plaintiff must show (1) that she took an action opposing her employer's discrimination, and (2) that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action. *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 838 (S.D.N.Y. 2013) (quoting *Mihalik*, 715 F.3d at 112). "A defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik*, 715 F.3d at 113 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39–40 & n.27 (N.Y. App. Div. 1st Dep't 2009)). As discussed above, Scalercio-Isenberg has failed to allege facts suggesting that any discrimination took place. Further, under the circumstances, it cannot plausibly be inferred that Morgan Stanley's cease and desist letter was motivated even in part by "discriminatory or retaliatory motives." Defendant Heslin explicitly stated that the letter was intended to stop Scalercio-Isenberg's "repeated abusive, disparaging and disruptive behavior toward Morgan Stanley's employees, including ... unsolicited emails making false and disparaging remarks about Matthew Dziedzic." (Compl. at

14.) Indeed, Scalercio-Isenberg herself alleges that that she sent a litany of emails to various Morgan Stanley employees — including emails to Defendant Gorman, Morgan Stanley's CEO. (Compl. at 9–12.) The letter further affirms that all Morgan Stanley hiring decisions "are based on legitimate, business reasons," and that based on Scalercio-Isenberg's "abusive and unprofessional conduct, [she is] not eligible to be considered for any positions at Morgan Stanley." (Compl. at 13.) Given that Scalercio-Isenberg has not alleged any facts plausibly giving rise to an inference that discrimination took place, it follows that she has not alleged any facts that might demonstrate that Defendant Heslin's letter was based even in part by "discriminatory or retaliatory motives." Accordingly, Scalercio-Isenberg's NYCHRL retaliation claim must fail.

### F. Individual Liability

Scalercio-Isenberg also brings suit against several individual defendants: James Gorman, President and CEO; Jeff Brodsky, Chief Human Resources Officer; Matthew Dziedzic, Head of North America Experienced Recruiting; and Kerrie Heslin, outside legal counsel for Morgan Stanley. As a matter of law, none of the individual defendants can be held liable under Title VII, the ADA, or the ADEA. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (holding that there is no individual liability under Title VII); *Costabile v. N.Y. Dist. Council of Carpenters*, No. 17 Civ. 8488, 2018 WL 4300527, at \*4 (S.D.N.Y. Sept. 10, 2018) (citing *Spiegel v. Schulman*, 604 F.3d 72, 79 (2d Cir. 2010)) (finding that there is no individual liability under the ADA); *Wray v. Edward Blank Assocs., Inc.*, 924 F. Supp. 498, 503 (S.D.N.Y. 1996) (holding that there is no individual liability under ADEA). And Defendant Heslin cannot be held individually liable under the NYSHRL because such liability is "limited to individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365–66 (S.D.N.Y. 2012) (citation omitted). As outside counsel for Morgan Stanley, she does not meet this standard.

Under the NYSHRL and the NYCHRL, individual liability requires "[a]ctual participation in conduct giving rise to a discrimination claim." *Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 143 (S.D.N.Y. 2015). Here, as discussed in Sections III.B–III.E above, Scalercio-Isenberg has not alleged any facts that suggest that there *was* any conduct giving rise to a discrimination claim. Accordingly, it follows that there is no individual liability for any of the defendants under the state or city law.

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 247 of 251

Scalercio-Isenberg v. Morgan Stanley Services Group Inc., Not Reported in Fed. Supp....

2019 WL 6916099

### G. Leave to Amend

The Second Circuit has held that "[d]istrict courts should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend.... However, leave to amend is not necessary when it would be futile." *Ashmore v. Prus,* 510 F. App'x 47, 49 (2d Cir. 2013) (summary order) (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)). "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco,* 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir. 1999) (per curiam)). Accordingly, because of the "special solicitude" with which *pro se* complaints must be read, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted), this Court will afford Scalercio-Isenberg an opportunity to amend her complaint and cure the deficiencies noted above.

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiff is granted leave to file an amended complaint provided that she does so on or before January 21, 2020. If no amended complaint is filed on or before January 21, 2020, this action will be dismissed with prejudice.

**\*8** The Clerk of Court is directed to close the motion at Docket Number 8.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 6916099

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 248 of 251

2017 WL 4417751

2017 WL 4417751
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'Drea FOX, Plaintiff,

v.

ALBANY MEDICAL CENTER, et al., Defendants.

Civil Action No. 1:17-CV-0798 (TJM/DEP)

|

Signed 09/11/2017

**Attorneys and Law Firms**

K'DREA FOX, 37 Mohawk Avenue, Waterford, NY 12188,
Pro se.

REPORT, RECOMMENDATION, AND ORDER

David E. Peebles, U.S. Magistrate Judge

**\*1** This is an action brought by *pro se* plaintiff K'Drea
Fox against defendant Albany Medical Center ("AMC") and
five individuals pursuant to Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title
VII"), alleging employment discrimination and retaliation.
Plaintiff's complaint and accompanying application for leave
to proceed *in forma pauperis* ("IFP") have been forwarded to
me for review. For the reasons set forth below, plaintiff's IFP
application is granted, and I recommend that each of plaintiff's
claims be dismissed, with the exception of her Title VII
retaliation cause of action asserted against defendant AMC.

I. BACKGROUND

Plaintiff commenced this action on July 20, 2017. Dkt. No.
1. In her complaint, which is prepared on a pre-printed form
generated for use in Title VII actions, plaintiff alleges that she
was employed by defendant AMC initially in August 2014
as a sterile processing associate, and was later transferred
into the AMC Pharmacy Department in or about March 2016.
Dkt. No. 1 at 3. While in the Pharmacy Department, plaintiff
was harassed and retaliated against and, after requesting a
meeting with the company's new human resources director
to complain of the harassment, was demoted and subjected
to further harassment. *Id.* The complaint also alleges that
plaintiff was sent home in the middle of a shift for not
following department protocol, a disciplinary action to which

other employees had not been subjected for similar conduct,
and was suspended from her job on April 29, 2016. *Id.*
Plaintiff's employment was ultimately terminated on May 9,
2016. *Id.*

Plaintiff's complaint contains two causes of action. In the first,
she alleges discrimination on the basis of race and sex and
the existence of a hostile work environment based on her sex.
Dkt. No. 1 at 3. Plaintiff's second claim asserts a retaliation
claim for seeking to file a formal complaint regarding the
discrimination and harassment. *Id.* at 4. As relief, plaintiff
seeks compensatory and punitive damages. *Id.* at 5.

Plaintiff's complaint was accompanied by an application for
leave to proceed without prepayment of fees and costs. Dkt.
No. 2. The application reflects that plaintiff is not currently
receiving income from any source and is indebted to several
creditors. *Id.*

II. DISCUSSION

A. IFP Application

When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $400, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed IFP if it determines that she
is unable to pay the required filing fee. 28 U.S.C. § 1915(a)
(1). [1] In this instance, because I conclude that plaintiff meets
the requirements for IFP status, her application for leave to
proceed without prepayment of fees is granted. [2]

1      The language of that section is ambiguous, in that
       it suggests an intent to limit availability of IFP
       status to prison inmates. *See* 28 U.S.C. § 1915(a)
       (1) (authorizing the commencement of an action
       without prepayment of fees "by a person who
       submits an affidavit that includes a statement of
       all assets such prisoner possesses"). Courts have
       construed that section, however, as making IFP
       status available to any litigant who can meet the
       governing financial criteria. *Hayes v. United States*,
       71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *see also*
       *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536
       n.1 (S.D.N.Y. 2002).

2      Plaintiff is reminded that, although her IFP
       application has been granted, she will still be

2017 WL 4417751

required to pay fees incurred in this action, including copying and/or witness fees.

B. Sufficiency of Plaintiff's Complaint

1. Standard of Review

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in her complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by applicable requirements of the Federal Rules of Civil Procedure. Specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

2. Analysis

a. Title VII Claims Asserted
Against the Individual Defendants

**\*3** Plaintiff's claims are asserted pursuant to Title VII. Dkt. No. 1 at 2. As defendants, plaintiff not only names her former employer, the AMC, but also five individual defendants. *Id.* at 1. It is well established, however, that "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) (quotation marks omitted). Accordingly, I recommend that plaintiff's claims against the individual defendants in this action be dismissed.

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)
2017 WL 4417751

b. Discrimination Claims Asserted Against Defendant AMC

To state a *prima facie* case of discrimination under Title VII, a complaint must allege that (1) the plaintiff belongs to a protected class; (2) she is qualified for the position at issue; (3) her employment was terminated, or she suffered some other form of adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004). In this case, plaintiff's complaint is lacking in allegations plausibly linking the adverse actions complained of—including being sent home in the middle of a shift, being stripped of duties or demoted, and ultimately having her employment terminated—to either plaintiff's sex or race. Accordingly, I recommend that plaintiff's Title VII discrimination claim be dismissed.

To assert a cognizable Title VII hostile work environment claim, a complaint must allege facts plausibly suggesting that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [plaintiff]'s employment and create an abusive environment." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010). In addition, "it is axiomatic" that the defendants' conduct "occurred because of [plaintiff's protected status]." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Once again, in this case, while plaintiff alleges harassment, there is nothing in her complaint to link the harassment she experienced with any protected classification. Accordingly, I recommend that plaintiff's hostile work environment claim be dismissed as well.

c. Retaliation

Plaintiff's second cause of action alleges retaliation. Dkt. No. 1 at 4. In order to plead a cognizable claim of retaliation, plaintiff must advance non-conclusory allegations that (1) she engaged in protected activity; (2) the defendants were aware of the activity; (3) the defendants took adverse action against the plaintiff; and (4) there is a causal connection with the protected activity and the adverse action. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). In this case, in light of my obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint alleges sufficient facts to survive review under section 1915(e) concerning plaintiff's retaliation claim.[3]

Accordingly, I recommend that defendants be directed to answer plaintiff's complaint with respect to the retaliation claim only.

[3]  In rendering this finding, I express no opinion as to whether plaintiff's retaliation claim can withstand a properly filed motion to dismiss.

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

**\*4** In this case, I find that plaintiff's Title VII claims asserted against the individual defendants are not legally cognizable, and no better pleading can cure this defect. I therefore recommend that plaintiff not be permitted to amend her complaint to assert claims against individual defendants under Title VII. The defects discussed above with respect to plaintiff's discrimination and hostile work environment claims, however, could possibly be cured by better pleading. For that reason, I recommend that leave to amend be granted with regard to those claims.

If plaintiff chooses to file an amended complaint, she should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany

Case 5:22-cv-00762-BKS-TWD    Document 23    Filed 03/28/23    Page 251 of 251

Fox v. Albany Medical Center, Not Reported in Fed. Supp. (2017)
2017 WL 4417751

of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

III. SUMMARY, ORDER, AND RECOMMENDATION

Because plaintiff has demonstrated entitlement to IFP status, her application for leave to proceed without prepayment of fees is granted. Turning to the allegations in plaintiff's complaint, while I find that plaintiff's retaliation cause of action should survive review under section 1915(e), the complaint otherwise fails to support a cognizable discrimination or hostile work environment claim. Based upon the foregoing it is hereby

ORDERED that plaintiff's application for leave to proceed without prepayment of fees (Dkt. No. 2) is GRANTED; and it is further respectfully

RECOMMENDED as follows:

(1) All of plaintiff's Title VII claims asserted against the individual defendants in this action be DISMISSED without leave to replead;

(2) Plaintiff's Title VII discrimination and hostile work environment claims asserted against defendant Albany Medical Center be DISMISSED with leave to replead; and

(3) In the event plaintiff does not avail herself of the opportunity to file an amended complaint, the case proceed only with respect to plaintiff's Title VII retaliation claim asserted against defendant Albany Medical Center.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[4] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[4]      If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

*5  The clerk of the court shall serve a copy of this order on plaintiff in accordance with the court's local rules.

All Citations

Not Reported in Fed. Supp., 2017 WL 4417751

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.